ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel: (856) 795-2121
By:    John J. McDermott, Esq.
         (jmcdermott@archerlaw.com)
         William J. Stack, Esq.
         Charles J. Dennen, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Tel: (713) 650-8805
By:    Kathy D. Patrick, Esq.
         (kpatrick@gibbsbruns.com)
         Anthony N. Kaim, Esq.
         Jorge M. Gutierrez, Esq.

LANGSAM STEVENS SILVER & HOLLAENDER, LLP
1818 Market Street, Suite 2610
Philadelphia, PA 19103
Tel: (215) 732-3255
By:    Larry D. Silver, Esq.
         (lsilver@lssh-law.com)
         David E. Romine, Esq.
         Jennifer Graham Meyer, Esq.
         Erin M. Carter, Esq.

*Attorneys for Plaintiff*
*Occidental Chemical Corporation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

| | | |
|---|---|---|
| OCCIDENTAL CHEMICAL CORPORATION | ) | CIVIL ACTION NO. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Electronically Filed |
| | ) | |
| 21ST CENTURY FOX AMERICA, INC.; | ) | |
| 3M COMPANY; A.E. STALEY | ) | **COMPLAINT** |
| MANUFACTURING COMPANY; AKZO | ) | |
| NOBEL COATINGS, INC.; ALDEN LEEDS | ) | |

INC.; ALLIANCE CHEMICAL INC.;                    )
AMERICAN INKS & COATINGS                         )
CORPORATION; APOLAN                              )
INTERNATIONAL, INC.; ARKEMA INC.;                )
ASHLAND LLC; ATLANTIC RICHFIELD                  )
COMPANY; ATLAS REFINERY, INC.;                   )
AVENTISUB LLC; BASF CATALYSTS LLC;               )
BASF CORPORATION; BATH IRON                      )
WORKS CORPORATION; BENJAMIN                      )
MOORE & CO.; BEROL CORPORATION;                  )
BORDEN & REMINGTON CORP.;                        )
CAMPBELL FOUNDRY COMPANY;                        )
CANNING GUMM LLC; CBS                            )
CORPORATION; CHARGEURS WOOL                      )
(USA) INC.; CHARGEURS, INC.;                     )
CHEMTRADE CHEMICALS                              )
CORPORATION; CLEAN EARTH OF                      )
NORTH JERSEY, INC.; CNA HOLDINGS                 )
LLC; COATS & CLARK INC.; CONOPCO,                )
INC.; COOPER INDUSTRIES, LLC;                    )
COVANTA ESSEX CO.; CRODA INC.;                   )
CURTISS-WRIGHT CORPORATION;                      )
DARLING INGREDIENTS INC.; DII                    )
INDUSTRIES, LLC; E.I. DU PONT DE                 )
NEMOURS AND COMPANY; EDEN WOOD                   )
CORPORATION; ELAN CHEMICAL CO.,                  )
INC.; EMERALD KALAMA CHEMICAL,                   )
LLC; ENPRO INDUSTRIES, INC.; ESSEX               )
CHEMICAL CORPORATION; EVERETT                    )
SMITH GROUP LTD.; FLINT GROUP                    )
INCORPORATED; FORT JAMES LLC;                    )
FOUNDRY STREET CORPORATION;                      )
FOUNDRY STREET DEVELOPMENT, LLC;                 )
FRANKLIN-BURLINGTON PLASTICS, INC.;              )
GARFIELD MOLDING COMPANY, INC.;                  )
GENERAL ELECTRIC COMPANY;                        )
GIVAUDAN FRAGRANCES                              )
CORPORATION; GOODRICH                            )
CORPORATION; HARRIS CORPORATION;                 )
HEXCEL CORPORATION; HEXION INC.;                 )
HOFFMANN-LA ROCHE, INC.;                         )
HONEYWELL INTERNATIONAL, INC.;                   )
HOUGHTON INTERNATIONAL INC.;                     )
INGREDION INCORPORATED; INNOSPEC                 )
ACTIVE CHEMICALS LLC; INX                        )

INTERNATIONAL INK CO.; ISP )
CHEMICALS LLC; JOHNSON & JOHNSON; )
KALAMA SPECIALTY CHEMICALS, INC.; )
KEARNY SMELTING & REFINING CORP.; )
LEEMILT'S PETROLEUM, INC.; LEGACY )
VULCAN, LLC; MALLINCKRODT LLC; )
MARATHON OIL CORPORATION; )
MCKESSON CORPORATION; MELON )
LEASING CORPORATION, INC.; MELTSER- )
TONNELE AVENUE LLC; MI HOLDINGS, )
INC.; NAPPWOOD LAND CORPORATION; )
NATIONAL-STANDARD LLC; NEWELL )
BRANDS INC.; NOKIA OF AMERICA )
CORPORATION; NOVARTIS )
CORPORATION; NOVELIS )
CORPORATION; NOVEON HILTON DAVIS, )
INC.; OTIS ELEVATOR COMPANY; PABST )
BREWING COMPANY, LLC; PALIN )
ENTERPRISES L.L.C.; PFISTER URBAN )
RENEWAL CORPORATION; PHARMACIA )
LLC; PITT-CONSOL CHEMICAL )
COMPANY; PMC GLOBAL, INC.; PPG )
INDUSTRIES, INC.; PUBLIC SERVICE )
ELECTRIC AND GAS COMPANY; PURDUE )
PHARMA TECHNOLOGIES, INC.; QUALA )
SYSTEMS, INC.; QUALITY CARRIERS, )
INC.; R. T. VANDERBILT HOLDING )
COMPANY, INC.; RECKITT BENCKISER )
LLC; REVERE SMELTING & REFINING )
CORPORATION; REXAM BEVERAGE CAN )
COMPANY; ROSELLE MAUSOLEUM )
MAINTENANCE FUND, INC.; ROYCE )
ASSOCIATES, A LIMITED PARTNERSHIP; )
RTC PROPERTIES, INC.; SAFETY-KLEEN )
ENVIROSYSTEMS COMPANY; )
SCHIFFENHAUS PACKAGING )
CORPORATION; SEQUA CORPORATION; )
SETON COMPANY, INC.; SPECTRASERV, )
INC.; STALEY HOLDINGS LLC; STANLEY )
BLACK & DECKER INC.; STWB INC.; SUN )
CHEMICAL CORPORATION; SUNOCO )
(R&M), LLC; SUNOCO PARTNERS )
MARKETING & TERMINALS L.P.; TATE & )
LYLE INGREDIENTS AMERICAS LLC; )
TEVAL CORPORATION; TEXTRON, INC.; )

3

| | |
|---|---|
| THE HARTZ MOUNTAIN CORPORATION; | ) |
| THE NEWARK GROUP, INC.; THE | ) |
| OKONITE COMPANY, INC.; THE | ) |
| SHERWIN-WILLIAMS COMPANY; | ) |
| TIFFANY AND COMPANY; UNITED | ) |
| STATES STEEL CORPORATION; WIGGINS | ) |
| PLASTICS, INC.; AND ZENECA INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff Occidental Chemical Corporation ("OxyChem") files this action for cost recovery and contribution under Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9607 and 9613 (CERCLA) for contribution and the recovery from Defendants of response costs that OxyChem has expended to date and will expend in the future in response to releases and threatened releases of hazardous substances into the Lower Passaic River and elsewhere within the Diamond Alkali Superfund Site. The purpose of this action is to ensure that each and every party responsible for the contamination of the Lower 8.3 Miles pays its fair share of the costs of investigation, design, and anticipated implementation of the remedy for such contamination. This action is not intended to impact the pace or progress of the ongoing remediation efforts.[1]

## I.   **INTRODUCTION**

1.     For more than a century, New Jersey's Passaic River has been a heavily polluted industrial waterway. In the 1870s, the Passaic River already had "a shocking degree of contamination." In the next decade, major pollutants in the Passaic River included "sewage, oil,

---

[1] This CERCLA action relates to the Passaic River, which runs through Essex and Hudson counties in New Jersey. With respect to Local Rule 10.1, it was impracticable to note in the first paragraph of the complaint the addresses of each named party. This information is contained, *infra*, in paragraphs 51-172.

and industrial discharges such as dyes, acids and chemicals."  One study notes that, in 1894, "one-third of the Passaic River's total flow was untreated sewage."  By the turn of the century, the Passaic River was delisted as a commercial fish source; and by 1926, the U.S. government declared the river's "fish life destroyed."

2.      This history is tragic.  But no single hazardous substance, and no single source, is solely to blame.  Over the last century, hundreds of companies—among them, factories, refineries, and manufacturers of all types—polluted the Passaic River with countless hazardous substances. Indeed, the United States Environmental Protection Agency (EPA) sent letters to more than *one hundred* potentially responsible parties (PRPs) notifying them they may be liable for the costs of cleaning up releases of hazardous substances in the Passaic River.

3.      From the scores of hazardous substances in the Passaic River, EPA identified *eight* chemicals of concern (COCs).  EPA sought a remedy that would achieve its remediation goals for each of these eight COCs.  According to EPA, the eight COCs that drive the requirements for remediation are[2]:

- poly-chlorinated biphenyls (PCBs)
- mercury
- dioxins and furans
- poly-aromatic hydrocarbons (PAHs)
- DDT
- dieldrin
- lead
- copper

4.      In 2016, because of the threat to human health and the environment by each of the eight COCs, EPA issued a Record of Decision that calls for extensive dredging and capping in Operable Unit 2, the first 8.3 miles of the Passaic River (the "OU2 Remedy").  The OU2 Remedy will remove and cap sediment containing hazardous substances.  Removed sediment will be

---

[2] Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) ("OU2 ROD") § 5.2 (Contaminants of Concern), https://semspub.epa.gov/work/02/396055.pdf (last visited June 29, 2018).

treated, and hazardous substances will be neutralized and disposed of safely. In turn, the dredged riverbed will be capped, isolating the remaining hazardous substances left in the riverbed sediment.

5.       Despite the century of pollution by hundreds of parties, only *one* company has stepped forward to work with EPA to design the remedy. Under the Administrative Settlement Agreement and Order on Consent for Remedial Design for Operable Unit Two of the Diamond Alkali Superfund Site (Region 2, CERCLA Docket No. 02-2016-2021) ("2016 ASAOC"), OxyChem agreed to design the OU2 Remedy and foot the design's estimated $165-million bill. Meanwhile, no other company has accepted responsibility for any share of the design cost.

6.       Just as no single chemical or substance is solely responsible for the contamination in the Lower Passaic River, no single COC is solely responsible for the OU2 Remedy. Rather, EPA found that each of the eight COCs drives the OU2 Remedy. EPA determined that anything short of that remedy would leave unacceptable concentrations of each of the eight COCs in the Lower Passaic River. EPA's selected remedy was based on modeling that each COC—on its own—had sufficiently contaminated the Lower 8.3 Miles of the Passaic to require the OU2 Remedy.

7.       And just as *each* of the eight COCs drives the OU2 Remedy, *each* PRP liable for any one of them must pay its equitable share to clean up that COC. Each of more than one hundred PRPs disposed of, or is otherwise liable under CERCLA for, at least one of these eight COCs. In many cases, these parties are liable for several COCs, not to mention other hazardous substances. This map depicts the location of Defendants on the Passaic River.



      8.     The costs of the design of the OU2 Remedy, which OxyChem alone is financing are response costs that address the historic pollution of the Passaic River by scores of PRPs.  As a matter of federal law, those parties must pay their fair and equitable shares of those response costs. Law and equity demand that they do so for several reasons.

7

9.     First, OxyChem itself never polluted the Passaic River—as EPA acknowledges.[3] Rather, from the 1940s to 1969, the agricultural chemicals plant located at 80-120 Lister Avenue (the "Lister Avenue Plant") was owned and operated by Diamond Shamrock Chemicals Company (DSCC) or its predecessors in interest.  By no later than June 1983, the public was fully aware of contamination at the Lister Avenue Plant, when following an investigation by the New Jersey Department of Environmental Protection (NJDEP), Governor Thomas Kean held a press conference and declared a state of emergency for the Ironbound neighborhood adjacent to the Lister Avenue Plant.

10.     In 1986, more than three years after the Governor's press conference and almost sixteen years after DSCC sold the plant in 1971, an affiliate of OxyChem purchased the stock of DSCC, in a transaction in which DSCC's corporate parent, Maxus Energy Corporation ("Maxus") agreed to "indemnify, defend, and hold harmless" OxyChem against all environmental liabilities. Maxus did just this for the next thirty years:  OxyChem held Maxus to its contractual obligation to defend OxyChem for environmental liabilities related to the Lister Avenue Site.  But in 2016— through no fault of OxyChem—YPF S.A., Maxus's parent, plunged Maxus into bankruptcy, in an attempt to cleanse its balance sheet of environmental liabilities and escape its indemnity obligations to OxyChem.

---

[3] News Release from Region 02, *EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River* (Oct. 5, 2016), https://19january2017snapshot.epa.gov/newsreleases/epa-secures-165-million-agreement-occidental-chemical-conduct-work-needed-start-cleanup_.html (last visited June 29, 2018) ("*Although Occidental Chemical Corporation did not directly discharge pollution into the Passaic River*, the company is legally responsible for pollution discharged from the former Diamond Alkali pesticides manufacturing plant that operated in Newark from the 1940s to the 1960s." (emphasis added)).

11.    Second, the Lister Avenue Plant—the only source of OxyChem's alleged liability—allegedly disposed of only two of the eight COCs identified by EPA as driving the OU2 Remedy: dioxins and DDT.  Responsibility for the other six COCs does not lie with OxyChem, but with scores of other PRPs.  Further, even as to dioxins and DDT, the Lister Avenue Plant was one among many properties associated with these two COCs.  Thus, responsibility for these COCs rests only in part with OxyChem.

12.    CERCLA requires that *all* responsible parties pay their fair shares of response costs they caused or to which they contributed.  OxyChem is not responsible for cleaning up all eight of the COCs in the Lower Passaic River or for pollution caused by other parties.  Still, OxyChem stepped up to do its part on the OU2 Remedy, which was driven by and which addresses all eight COCs.  This action is to see to it that all other PRPs follow suit.

13.    Consistent with EPA's goal of requiring all parties to pay their fair shares of response costs, OxyChem brings this action for a money judgment for cost recovery and contribution under CERCLA and for a declaratory judgment as to liability for future response costs so that all responsible parties bear their fair and equitable shares of the costs OxyChem has already incurred and those costs OxyChem will incur in the future to design the OU2 Remedy.

## II.    HISTORY OF THE DISPUTE

### A.    EPA Establishes the Diamond Alkali Superfund Site

14.    The Diamond Alkali Superfund Site (the "Site") was listed on the Superfund National Priorities List in 1984.  As defined by EPA, the Site consists of "the former Diamond Alkali facility at 80-120 Lister Avenue in Newark, New Jersey, the Lower Passaic River Study

Area (LPRSA), the Newark Bay Study Area and the areal extent of contamination."[4]  The LPRSA is "the 17-mile, tidal portion of the Passaic River, from RM 0 to Dundee Dam (RM 17.4), and its watershed, including the Saddle River (RM 15.6), Third River (RM 11.3) and Second River (RM 8.1)."[5]  EPA has divided the Site into four "operable units" (OUs):

- OU1, the former site of the Lister Avenue Plant;

- OU2, the lower 8.3 miles of the Passaic River (the "Lower 8.3 Miles");

- OU3, the 17-mile LPRSA; and

- OU4, Newark Bay and portions of the Hackensack River, Arthur Kill, and Kill van Kull.[6]

---

[4] OU2 ROD § 1 (Site Name, Location and Brief Description).

[5] *Id.*

[6] *See id.* § 4.1 (Phased Approach and Early Actions).

15.    Below is a depiction of each of the OUs.[7]



16.     This CERCLA action primarily concerns OU2: the costs of designing and, eventually, implementing the remedy EPA selected for this portion of the Site.  Below is a summary of remedies that EPA has to date selected with respect to each OU.[8]

| OU ID | Name | Decision Document | Cleanup Technologies Selected in the Decision Document |
|---|---|---|---|
| 00 | SITEWIDE | No decision document | |
| 01 | 80 AND 120 LISTER AVENUE | Record of Decision September 30, 1987 | Cap (engineered cap) Containment (other, NOS, onsite) Decontamination Demolition Disposal (offsite) Monitoring Recycling (offsite) Residuals Treatment/Disposal (onsite) Solidification/Stabilization (exsitu, onsite) Treatment (other, NOS, exsitu, onsite) Vertical Engineered Barrier (slurry wall) |
| 02 | PASSAIC RIVER STUDY - LOWER | Record of Decision March 03, 2016 | Cap (insitu) Dewatering Disposal (offsite) Dredging Habitat Restoration Incineration (offsite) Institutional Controls Monitoring (fish tissue) Monitoring (sediment) Monitoring (surface water) Physical Separation (exsitu, onsite) Residuals Treatment/Disposal (onsite) |
| 03 | NEWARK BAY | No decision document | |
| 04 | EXTENDED PASSAIC RIVER STUDY | No decision document | |

17.     The Site, including the "aerial extent of contamination" as designated by EPA, and including the upland sources of that contamination, comprise a "facility" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9) (herein referred to as the "Facility").  There has been a "release" and/or "threatened release" of hazardous substances at the Facility within the meaning of Sections 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(22) and 9607(a).  Organic and inorganic compounds detected at the Facility at elevated levels are "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).  The release and/or threatened release of

---

[8] *See Superfund Site: Alkali Co., Newark, NJ, Operable Units,*
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.ous&id=0200613 (last visited June 29, 2018).

hazardous substances at the Facility has caused and will continue to cause OxyChem to incur response costs, including costs for removal and/or remedial actions as defined in Section 101(23)-(25) of CERCLA, 42 U.S.C. § 9601(23)-(25). Such costs are necessary and consistent with the National Contingency Plan.

### B. OxyChem Acquires Diamond Shamrock Chemicals Company

18.     As noted, OxyChem did not itself discharge any hazardous substances to the Lower Passaic River. Instead, OxyChem's liability for cleanup costs allegedly stems from its acquisition of the stock of DSCC in 1986. DSCC stopped operating the Lister Avenue Plant in 1969, and sold the plant to Chemicaland Corporation in 1971.[9] In 1977, the Lister Avenue Plant was closed.[10] When OxyChem acquired DSCC's stock in 1986, the Lister Avenue Plant had been closed for nine years, and DSCC had not operated it for seventeen years.

19.     When OxyChem acquired the stock of DSCC, Maxus agreed to indemnify, defend, and hold OxyChem harmless from, among other things, all environmental liabilities resulting from DSCC's closed chemical plant sites, including all liabilities allegedly arising from contamination by the Lister Avenue Plant.

20.     Relying on Maxus's retention of responsibility for the closed DSCC sites, as well as the comprehensive environmental indemnity Maxus provided under the stock purchase agreement, DSCC was merged into OxyChem in 1987. Maxus's affiliate Tierra Solutions, Inc. ("Tierra") also assumed liability to indemnify, defend, and hold OxyChem harmless against environmental liabilities arising from DSCC's former chemical plant sites and operations.

---

[9] *See* EPA Record of Decision, Phase I Removal 80-120 Lister Avenue Plant Site (Sept. 30, 1987) § I (Background Chronology Leading to this Record of Decision).

[10] *See id.*

### C. EPA Finds That Over One Hundred Parties Are Responsible for Pollution at the Site and Takes Remedial Action

21.  As part of its Superfund program, EPA has studied the Facility and has taken a series of response actions there.  As EPA recognizes, the Lower Passaic River has been "a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities" since the 1800s.[11]  Accordingly, "over 100 industrial facilities have been identified as potentially responsible for discharging contaminants into the river."[12]  Following extensive study, EPA concluded that these discharges had contaminated sediments in the Lower Passaic River with hazardous substances, including dioxins, furans, PCBs, PAHs, DDT, dieldrin, other pesticides, mercury, lead, copper, and other metals.[13]  According to EPA, "data shows elevated concentrations of COCs are ubiquitous in sediments of the lower 8.3 miles, bank to bank."[14]

22.  During EPA's decades of conducting investigative and other response actions on the Passaic River, OxyChem has cooperated with EPA and has shouldered more than its share of the burden to clean up the river.  Throughout this period, OxyChem's indemnitors, Maxus and Tierra, have performed work in OxyChem's name and on its behalf.  Together, OxyChem, Maxus, and Tierra have historically borne responsibility for the former operations at the Lister Avenue Plant.

---

[11]  Administrative Settlement Agreement and Order on Consent for Removal Action, in re: Lower Passaic River Study Area of the Diamond Alkali Superfund Site, Occidental Chemical Corporation and Tierra Solutions, Inc., Respondents (June 23, 2008) (Region 2, CERCLA Docket No. 02-2008-2020) § 10(a).

[12]  OU2 ROD § 2 (Site History and Enforcement Activities).

[13]  *See* Louis Berger Group, Inc., *Remedial Investigation Report for the Focused Feasibility Study of the Lower Eight Miles of the Lower Passaic River* (2014), http://ourpassaic.org/EarlyAction.aspx (last visited June 29, 2018) ("RI Report for the Lower Eight Miles") at ES-2-3.

[14]  OU2 ROD § 5.3 (Sediment Conceptual Site Model).

23.     In 1987, EPA issued a Record of Decision that selected as a remedy a cap of the Lister Avenue Plant and the construction of slurry walls to prevent contamination from the Lister Avenue Plant from migrating into the Lower Passaic River.  Construction of that remedy was completed in 2001 by OxyChem's indemnitor, Tierra, pursuant to a Consent Decree (Civil Action No. 89-5025 (AET)) entered by the U.S. District Court for the District of New Jersey in 1990 between the United States and OxyChem and Tierra.  On behalf of OxyChem, Tierra incurred more than $61 million in response costs in complying with the Consent Decree.

24.     After the Lister Avenue Plant was capped, OxyChem, Maxus, and Tierra continued to cooperate with EPA to address contamination at the Site.  In 1994, OxyChem entered into an Administrative Consent Order (Region II, Index No. II-CERCLA-0117) with EPA to perform the Remedial Investigation and Feasibility Study (RI/FS) of a six-mile stretch from RM 1 to RM 7 ("1994 RI/FS ACO for the Lower 6").  Tierra performed that work on OxyChem's behalf.  The RI found dioxins, along with many COCs not linked to the Lister Avenue Plant's operations.  It also demonstrated that Newark Bay's tidal influences caused contaminated sediments to move into and out of this six-mile stretch.  Reinforcing the concern about this tidal influence, the RI Report for the Lower Eight Miles concluded that "mass transport across the RM 0 boundary with Newark Bay is bi-directional" and that "the Upper Passaic River and Newark Bay are the major external sources to the contaminant burden in recently-deposited sediments."[15]

25.     Although COCs not linked to the Lister Avenue Plant's operations were discovered in the Lower Passaic River, no PRP besides OxyChem agreed to bear any of the costs associated

---

[15] RI Report for the Lower Eight Miles at 8-8, Data Evaluation Report No. 2 of App. A. at 4-1.

with the 1994 RI/FS ACO for the Lower 6.  Instead, those costs were paid entirely by OxyChem's indemnitors, Maxus and Tierra.

26.    In 2002, EPA again expanded the scope of the investigation, to include the full 17 miles of the Lower Passaic River below the Dundee Dam.[16]  As a result of these studies, EPA identified companies other than OxyChem that "owned or operated facilities from which hazardous substances were potentially discharged to the river."[17]

27.    A group of PRPs eventually organized into the Cooperating Parties Group (CPG). Initially, OxyChem, Maxus, and Tierra were members of the CPG.  In 2004, the CPG signed a settlement agreement with EPA in which CPG members agreed to pay for the RI/FS for the entire lower 17-miles of the Lower Passaic River ("2004 RI/FS ASAOC for the Lower 17"). That settlement was amended in 2005 and 2007 to add more parties, so that a total of more than 70 parties are now obligated to perform work under this settlement with EPA.  OxyChem, through its indemnitors Maxus and Tierra, paid significant costs associated with this 2004 RI/FS ASAOC for the Lower 17.

28.    On or about June 23, 2008, OxyChem, Tierra, and EPA entered into an Administrative Settlement Agreement and Order on Consent for Removal Action (Region 2, CERCLA Docket No. 02-2008-2020) ("Tierra Removal ASAOC") to excavate and dispose of sediments at RM 3.0 to RM 3.8.  The Tierra Removal ASAOC anticipated that the work would be performed in two phases.  In 2012, Tierra performed the Phase 1 removal and completed dredging, dewatering, and transport of 40,000 cubic yards of sediment, which removed significant volumes

---

[16] *See* OU2 ROD § 2.1.2 (The Six-Mile Study).

[17] *Id.* § 2.1.3 (The 17-Mile Study).

of dioxins and of all eight COCs from the Passaic River.  The Phase 1 removal cost over $83 million.  EPA described this removal action as "the most significant removal of contaminated material from the Passaic in history."[18]

29.     On or about October 4, 2011, OxyChem entered into an Administrative Settlement Agreement and Order on Consent for Combined Sewer Overflow/Storm Water Outfall Investigation (Region 2, CERCLA Docket No. 02-2011-2016) ("CSO ASAOC") to determine the nature and extent of contamination emanating from the combined sewer overflows and the storm water outfalls to the Passaic River.  Tierra performed work under the CSO ASAOC, incurring response costs more than $2.5 million.

30.     In June 2012, EPA and the CPG signed a consent order for a time-critical removal action to address the high concentrations of dioxins, PCBs, and other contaminants at a mudflat on the Passaic River's eastern bank at RM 10.9 in Lyndhurst, New Jersey.  This removal action is often referred to as the "RM 10.9 Removal."  This removal was more than seven miles upriver from the Lister Avenue Plant—but only slightly downriver from Defendant Givaudan Fragrances Corporation's property, whose chemical processes are known to generate dioxins.  Despite this distance from the Lister Avenue Plant, OxyChem voluntarily accepted a Unilateral Administrative Order for Removal Response Activities from EPA (Region 2, CERCLA Docket No. 02-2012-2020), directing it to perform certain activities with respect to the RM 10.9 Removal ("RM 10.9 Removal UAO").  OxyChem is in full compliance with the RM 10.9 UAO.  On OxyChem's behalf, Tierra incurred response costs of more than $1 million under the RM 10.9 Removal UAO.

---

[18] EPA Press Release, *EPA Signs Agreement with Companies to Remove Major Source of Dioxin from the Lower Passaic River* (June 23, 2008), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/ded62422a0eb385c85257471005eecb0.html (last visited June 29, 2018).

31.     During the course of these investigations and removal actions, EPA decided to address the Lower 8.3 Miles separately.  Rather than await the outcome of the RI/FS for the lower 17 miles to select a remedy for the entire LPRSA, EPA undertook a targeted Remedial Investigation and Focused Feasibility Study of the lower 8.3 miles of the Passaic River.  This study eventually led EPA to issue the OU2 ROD, which calls for the Lower 8.3 Miles to be dredged and for a protective cap to be installed over the riverbed, to permanently isolate the remaining contaminated sediments. The scientific findings and studies that underlie EPA's selected remedy are set out in two EPA documents: the RI for the Lower Eight Miles and the Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River ("FFS Report").  Both documents are available in the EPA Administrative Record.

32.     EPA sent notices to many of the Defendants in this action that they are potentially responsible for costs of designing and implementing EPA's selected remedy for OU2.[19]  EPA also encouraged the PRPs to meet and discuss a workable approach to sharing responsibility for OU2 response costs.  OxyChem reached out by letter in May 2016 to numerous Defendants and set up a meeting to discuss their participation in the design of the OU2 Remedy.[20]  Only a small number of Defendants attended the meeting, and none agreed to share responsibility for the remedial design.

---

[19] *See* List of Parties That Received the March 31, 2016 Notice of Potential Responsibility for the Lower 8.3 Miles of the Lower Passaic River, Operable Unit Two of the Diamond Alkali Site, https://semspub.epa.gov/work/02/457510.pdf (last visited June 29, 2018).

[20] Defendants or their affiliates that were sent an invitation for a meeting to discuss their participation in the design of the OU2 Remedy, include, but are not limited to, 21st Century Fox America, Inc.; Alliance Chemical Inc.; BASF Catalysts LLC; BASF Corporation; Conopco, Inc.; DII Industries, LLC; Franklin-Burlington Plastics, Inc.; Givaudan Fragrances Corporation; Nokia of America Corporation; Pitt-Consol Chemical Company; PPG Industries, Inc.; Public Service Electric and Gas Company; Quality Carriers, Inc.; Sequa Company; Sun Chemical Company; The Sherwin-Williams Company; Legacy Vulcan, LLC.

33.     On September 30, 2016, OxyChem entered into the 2016 ASAOC, under which OxyChem agreed to design (and fund the costs of designing) the remedy for OU2 of the Lower Passaic River.  Under the order, OxyChem is working with EPA on the design of the engineered cap.   This includes performing a predesign investigation; developing plans for project management, remedial design work, and sitewide monitoring; and executing three distinct remedial designs: preliminary, intermediate, and final.  In the 2016 ASAOC, EPA confirmed that the remedy was selected to address over a dozen hazardous substances, beyond the dioxins and DDT for which OxyChem is alleged to be liable.[21]  EPA also stated that "[d]ata show that, between RM 0 and RM 8.3, surface sediments in the navigation channel are as highly contaminated as those in the shoals, based on median concentrations . . . . In other words, data show that elevated concentrations of COCs are ubiquitous in surface sediments of the lower 8.3 miles[.]"[22]

34.     EPA originally estimated the design work under the 2016 ASAOC would cost $165 million.  Furthermore, EPA estimates that it will cost an additional $1.38 billion to implement the OU2 Remedy.   Additionally, OxyChem itself has incurred and will continue to incur response costs pursuant to the Tierra Removal Order, the CSO ASAOC, the RM 10.9 Removal UAO, and the 2016 ASAOC and for investigating and identifying other PRPs.  These costs have been and will continue to be incurred by OxyChem (i) for actions taken in response to the release or threatened release of hazardous substances at the Site, within the meaning of 42 U.S.C. §

---

[21] See 2016 ASAOC ¶ 11 (Findings of Fact) ("The sediments of the Lower Passaic River contain hazardous substances, including, but not limited to, cadmium, copper, lead, mercury, nickel, zinc, polyaromatic hydrocarbons ('PAHs'), dieldrin, bis (2-ethylhexyl) phthalate, polychlorinated biphenyls ('PCBs'), dichlorodiphenyl-trichloroethane ('DDT'), polychlorinated dibenzo-p-dioxins ('PCDDs') including 2,3,7,8-tetrachloro-dibenzo-p-dioxin ('2,3,7,8-TCDD'), polychlorinated dibenzofurans ('PCDFs'), 2,4-dichlorophenoxy acetic acid ('2,4-D'), 2,4,5-trichlorophenoxy acetic acid ('2,4,5-T'), and 2,4,5-trichlorophenol ('2,4,5-TCP').").

[22]  OU2 ROD § 5.3 (Sediment Conceptual Site Model).

9607(a)(4); (ii) for necessary costs of response consistent with the National Contingency Plan, within the meaning of 42 U.S.C. § 9607(a)(4)(B); and (iii) in excess of OxyChem's equitable shares, within the meaning of 42 U.S.C. § 9613(f).

**D.    Cooperating with EPA, OxyChem and Its Indemnitors Spend Hundreds of Millions of Dollars to Remedy Contamination at the Site**

35.    OxyChem and its indemnitors, Maxus and Tierra, have spent hundreds of millions of dollars in the effort to respond to and remedy contamination in the river, both with respect to the Lister Avenue Plant and for the Site as a whole.  The following costs were borne entirely by OxyChem and/or its indemnitors, on OxyChem's behalf, even though countless others are also responsible to clean up their own pollution of the river:

- OxyChem's indemnitors, Maxus and Tierra, spent over $83 million on a removal action adjacent to OU1, the Lister Avenue Plant, that was contaminated with all eight COCs.

- Tierra incurred over $2.5 million in response costs to investigate the extent of contamination from combined sewer overflows and storm water outfalls into the Passaic River.

- Maxus, Tierra, and certain of their affiliates entered into a $130-million settlement, and OxyChem entered into a $190-million settlement, with the NJDEP for natural resource damages, costs of the state of New Jersey, and economic damages that NJDEP alleged arose from contamination of the river.

- OxyChem agreed to design the OU2 Remedy at an estimated cost of over $165 million.

Once the design of the OU2 Remedy is complete, OxyChem stands ready to discuss with EPA the implementation of the remedy with an acceptable consent decree and with other parties participating—but cannot be expected to do it alone.  Defendants must pay their fair shares of the response costs.

**E.    OxyChem's Indemnitors Are Forced into Bankruptcy**

36.    In June 2016, YPF, S.A., the parent company of Maxus and Tierra, forced Maxus, Tierra, and certain affiliates into bankruptcy and caused Maxus and Tierra to default on their

obligations to indemnify, defend, and hold OxyChem harmless from all environmental liabilities arising from the Lister Avenue Plant, including alleged liabilities to remediate contamination in OU2 and the Site.[23]  As a result, OxyChem has been forced to incur millions of dollars of response costs to address DSCC's operations at the Site.  OxyChem also expects to incur significant response costs in the future.  OxyChem is prepared to bear its fair and equitable share of the responsibility to remedy contamination at the Facility.  OxyChem is not, however, responsible to identify and remediate Defendants' disposals of hazardous substances.  Instead, Defendants are liable under CERCLA to pay their own equitable shares of these costs.

### III.  EIGHT CONTAMINANTS OF CONCERN DRIVE EPA'S SELECTED REMEDY AT THE SITE, AND EVERY PARTY THAT RELEASED ANY COC MUST PAY ITS FAIR SHARE OF RESPONSE COSTS

37.     Countless hazardous substances have contaminated the Lower Passaic River.  All of them will be addressed by EPA's selected remedy for OU2.  EPA has, however, identified eight COCs that pose the greatest potential risk to human health and the environment in OU2: dioxins and furans, PCBs, mercury, DDT, copper, dieldrin, PAHs, and lead.[24]  EPA's Preliminary Remediation Goals (PRGs), which are based on both human-health and ecological effects, required a remedy that addresses all eight COCs.

---

[23] The bankruptcy court ruled that the Liquidating Trust owns OxyChem's claims for common law alter ego, fraudulent transfer, and asset-stripping against Maxus and Tierra's parent companies, YPF, S.A. and Repsol, S.A., which claims the Liquidating Trust is pursuing.  The Liquidating Trust takes the position that this ruling extends to include alter ego claims against YPF, S.A. and Repsol, S.A. under CERCLA to hold them responsible for the actions of their wholly owned subsidiary, Diamond Shamrock (now known as Maxus).  If such CERCLA claims are not pursued by the Liquidating Trust against YPF, S.A. and Repsol, S.A., then OxyChem reserves the right to amend this complaint to assert them itself.

[24] *See* OU2 ROD § 5.2 (Contaminants of Concern).

**A.    EPA Determined That the OU2 Remedy Was Necessary to Achieve the Remediation Goals with Respect to the Eight COCs**

38.    EPA determined the OU2 Remedy was necessary to meet the PRGs and that the alternatives to the remedy would not adequately reduce the concentrations of each COC.  For instance, according to EPA, under a "focused capping" option, PCB concentrations would exceed the goal by a factor of 8, mercury by a factor of 20, dioxins by a factor of 6, and total DDX by a factor of 150 (with these four COCs used as representatives of all eight COCs).[25]  Thus, according to EPA, the OU2 Remedy was necessary to reach the PRGs, and adequately reduce the concentrations of all eight COCs.  "EPA's modeling of each of the alternatives predicted that in order to achieve COC concentrations approaching as closely as possible to remediation goals, bank-to-bank remediation in the lower 8.3 miles is necessary."[26]

39.    EPA has stated that the cleanup plan for OU2 requires the permanent removal from the river of approximately 24,000 pounds of mercury; 6,600 pounds of PCBs; 1,300 pounds of DDT; and 13 pounds of dioxins.[27]  Notably, even before design or implementation of EPA's selected remedy under the 2016 ASAOC, OxyChem's indemnitors already paid to remove a significant volume of dioxins and other COCs in Phase 1 of the Tierra Removal Order.

**B.    Defendants Are Responsible for Their Equitable Shares of the Cost to Remediate All Eight COCs, Along with Other Hazardous Substances**

40.    DSCC's manufacturing process involved only two of the eight chemicals that led EPA to select the remedy: dioxins/furans and DDT.  The Lister Avenue Plant was not the only

---

[25] *See id.* at § 10.3 (Long-Term Effectiveness and Permanence).

[26] *Id.*

[27] *See* Elias Rodriguez, *EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River* (Oct. 5, 2016), https://19january2017snapshot.epa.gov/newsreleases/epa-secures-165-million-agreement-occidental-chemical-conduct-work-needed-start-cleanup_.html (last visited June 29, 2018).

plant responsible for releases of dioxins/furans or DDT into the Lower Passaic River.  The other PRPs responsible for releases or disposals of dioxins and DDT into the Lower Passaic River must bear their equitable shares of the response costs for those COCs.

41.     The Lister Avenue Plant did not engage in any industrial processes that generated or caused the disposal of the other six COCs that are also driving the cost of the EPA-mandated remedy: namely, PCBs, mercury, copper, dieldrin, PAHs, and lead.  Accordingly, on *any* theory of liability, OxyChem should not bear any share of the response costs associated with any of these other six COCs that drove EPA to select the OU2 Remedy.  The parties who disposed of the other six COCs should bear the full response costs for those COCs.

42.     Under CERCLA, the Court can and should assess allocable shares of the costs to design the remedy among the responsible parties.  EPA ordered the dredge-and-cap remedy because it found that this was the only remedy that would effectively clean up and isolate all *eight* of the key COCs cited in the OU2 ROD.  EPA indicated that alternatives short of its selected remedy would not achieve the remediation goal for any of the eight COCs.[28]  Accordingly, a fair allocation would first allocate the OU2 response costs in equal shares to each of the eight COCs, with each COC's share then allocated amongst the parties responsible for that COC.

43.     OxyChem has incurred and will incur costs in the performance of the work required by the 2016 ASAOC, including but not limited to, costs of investigation, testing, and design of the remedy mandated by the OU2 ROD.  By this action, OxyChem seeks recovery from Defendants of their respective fair and equitable shares of those costs.  OxyChem also seeks recovery of Defendants' respective fair and equitable shares of the costs OxyChem has incurred and/or will

---

[28] OU2 ROD § 10.3 (Long-Term Effectiveness and Permanence).

continue to incur pursuant to the Tierra Removal ASAOC, the CSO ASAOC, and the RM 10.9

Removal UAO and costs associated with investigating and identifying other PRPs responsible for

polluting the Lower Passaic River, whether as a result of direct discharge, downstream flows,

migration from upland sites, improper disposal, or tidal influences from Newark Bay.  In addition,

OxyChem seeks a declaratory judgment imposing an equitable allocation of all future costs of

designing the remedy against at least the parties responsible for the releases of the eight COCs that

are driving the remedy.

44.     In connection with the Maxus and Tierra bankruptcy, OxyChem granted a partial

release of its CERCLA contribution claim to 41 of the Defendants.[29]  That release is limited to the

"Itemized Amount" of $165 million associated with the costs to design the remedy for OU2 that

OxyChem was deemed to have incurred as of the date of the Debtors' Petition.  OxyChem did *not*

release its claim for contribution against these parties for costs to design the remedy that exceed

$165 million or for certain other costs related to the Tierra Removal ASAOC, the CSO ASAOC,

the RM 10.9 Removal UAO, and costs associated with investigating and identifying other PRPs

responsible for polluting the Lower Passaic River.  OxyChem also did not grant *any* release to 79

Defendants, each of whom is—as set out below—liable to pay its full allocable share of the costs

OxyChem has incurred and will incur in the future to design the remedy for OU2 of the Site.

## IV.    **JURSDICTION AND VENUE**

45.     OxyChem files this civil action pursuant to Sections 107(a)(1), (a)(2), (a)(3), (a)(4),

and (a)(4)(B) and 113(f)(1) and (f)(3)(B) of CERCLA, as amended, 42 U.S.C. §§ 9607(a)(1),

---

[29]  Attached hereto as Exhibit A is a list of the 41 Defendants that have received from OxyChem a partial release of
contribution liability for their shares of the Itemized Amount of $165 million, along with a list of the 79 Defendants
that have *not* received any release from OxyChem.

(a)(2), (a)(3), (a)(4), and (a)(4)(B) and 9613(f)(1) and (f)(3)(B) for the recovery and contribution from Defendants of response costs that OxyChem has expended to date and will expend in the future in response to releases and/or threatened releases of hazardous substances at the Diamond Alkali Superfund Site.

46.    This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 9607 and 9613(b), providing jurisdiction over controversies arising under CERCLA; 28 U.S.C. § 1331, providing jurisdiction over federal questions; and 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 9613(g)(2), providing jurisdiction over declaratory judgment actions.

47.     Upon information and belief, all parties and/or their predecessors are conducting business in the State of New Jersey and/or conducted business in the State of New Jersey during the relevant time period, and have or had sufficient contacts with the State of New Jersey to be subject to the jurisdiction of this Court.

48.    Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the property where the releases and threatened releases of hazardous substances have occurred is located within the territorial limits of this District, the damages giving rise to these claims occurred in this District, and multiple Defendants reside in this District.

49.    Pursuant to 42 U.S.C. § 9613(l), OxyChem will provide a copy of the complaint to the Attorney General of the United States and to the Administrator of the United States Environmental Protection Agency.

50.    Pursuant to paragraph 106 of the 2016 ASAOC, OxyChem notified EPA in writing 60 days prior to the initiation of this suit that it intended to file a suit in the United States District Court for the District of New Jersey against liable parties for matters related to the 2016 ASAOC.

V.    **PARTIES**

51.    Plaintiff OxyChem is a New York corporation with its principal place of business at 5005 LBJ Freeway, Dallas, Texas.

52.     Defendant 21st Century Fox America, Inc. (f/k/a News America, Inc./Montrose Chemical Company/Chris Craft Industries) ("Fox America") is a corporation organized under the laws of the State of Delaware with its principal place of business at 1211 Avenue of the Americas, New York, New York.

53.    Defendant 3M Company (f/k/a Minnesota Mining & Manufacturing Co.) is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota.

54.    Defendant A.E. Staley Manufacturing Company ("A.E. Staley") is a corporation organized under the laws of the State of Delaware with its principal place of business at 2200 E. Eldorado Street, Decatur, Illinois.

55.    Defendant Akzo Nobel Coatings, Inc. is a Delaware corporation with its principal place of business at 525 W. Van Buren St. Fl.16, Chicago, Illinois.

56.    Defendant Alden Leeds Inc. ("Alden Leeds") is a corporation organized under the laws of the State of New York with its principal place of business at 55 Jacobus Avenue, South Kearny, New Jersey.

57.    Defendant Alliance Chemical Inc. ("Alliance Chemical") is a corporation organized under the laws of the State of New Jersey with its principal place of business at P.O. Box 237, Ridgefield, New Jersey.

58.    Defendant American Inks & Coatings Corporation is a Pennsylvania corporation with its principal place of business at 3400 North Hutchinson Street, Pine Bluff, Arkansas.

26

59.     Defendant APOLAN International, Inc. (f/k/a Atlantic Polymers & Products, Inc.) is a New Jersey corporation with its principal place of business at 5036 Industrial Road, Wall Township, New Jersey.

60.     Defendant Arkema Inc. ("Arkema") is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 900 First Avenue, King of Prussia, Pennsylvania.

61.     Defendant Ashland LLC (f/k/a Ashland Chemical Company) ("Ashland"), is a limited liability company organized under the laws of the State of Kentucky with its principal place of business located at 50 East River Center Boulevard, Covington, Kentucky.

62.     Defendant Atlantic Richfield Company (ARCO) is a corporation organized under the laws of the State of Delaware with its principal place of business at 501 Westlake Park Boulevard, Houston, Texas.

63.     Defendant Atlas Refinery, Inc. (a/k/a Atlas Refining, Inc.) ("Atlas Refining") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 142 Lockwood Street, Newark, New Jersey.

64.     Defendant Aventisub LLC (f/k/a Roussel Uclaf) ("Aventisub") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 3711 Kennett Pike, Suite 200, Greenville, Delaware.

65.     Defendant BASF Catalysts LLC (f/k/a Engelhard Corporation) ("BASF Catalysts") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey.

66.     Defendant BASF Corporation (BASF) is a corporation organized under the laws of the State of Delaware with its principal place of business located at 100 Campus Drive, Florham Park, New Jersey.

67.     Defendant Bath Iron Works Corporation (BIW) is a corporation organized under the laws of the State of Maine with its principal place of business at 700 Washington Street, Bath, Maine.

68.     Defendant Benjamin Moore & Co. ("Benjamin Moore"), a subsidiary of Berkshire Hathaway, Inc., is a corporation organized under the laws of the State of New Jersey with its principal place of business is located at 101 Paragon Drive, Montvale, New Jersey.

69.     Defendant Berol Corporation ("Berol") (c/o Newell Rubbermaid Inc.) is a corporation organized under the laws of the State of Delaware with its principal place of business at 2711 Washington Boulevard, Bellwood, Illinois.

70.     Defendant Borden & Remington Corp. is a Massachusetts corporation with its principal place of business at 63 Water Street, Fall River, Massachusetts.

71.     Defendant Campbell Foundry Company (CFC) is a corporation organized under the laws of the State of New Jersey with its principal place of business at 800 Bergen Street, Harrison, New Jersey.

72.     Defendant Canning Gumm LLC ("Canning Gumm") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at c/o MacDermid Incorporated, 245 Freight Street, Waterbury, Connecticut.

73.     Defendant CBS Corporation (CBS), formerly known as Viacom Inc. and Westinghouse Electric Corporation ("Westinghouse"), is a corporation organized under the laws of the State of Delaware with its principal place of business at 51 W. 52nd Street, New York, New York.

74.      Defendant Chargeurs Wool (USA) Inc. (f/k/a United Piece Dye Works) ("Chargeurs") is a corporation organized under the laws of the State of Delaware with its principal place of business at 178 Wool Road, Jamestown, South Carolina.

75.      Defendant Chargeurs, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 251 Little Falls Drive, Wilmington, Delaware.

76.      Defendant Chemtrade Chemicals Corporation (as successor to Essex Industrial Chemicals Inc.) ("Chemtrade") is a corporation organized under the laws of the State of Delaware with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey.

77.      Defendant Clean Earth of North Jersey, Inc. ("Clean Earth") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 115 Jacobus Avenue, Kearny, New Jersey.

78.      Defendant CNA Holdings LLC ("Celanese") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 222 W. Las Colinas Boulevard, Suite 900, Irving, Texas.

79.      Defendant Coats & Clark, Inc. ("Coats") is a corporation organized under the laws of the State of Delaware with its principal place of business at 3430 Toringdon Way, Suite 301, Charlotte, North Carolina.

80.      Defendant Conopco, Inc. (f/k/a S. B. Penick Company), d/b/a Unilever Best Foods North America ("Unilever") is a corporation organized under the laws of the State of New York with its principal place of business at 700 Sylvan Avenue, Englewood Cliffs, New Jersey.

81.      Defendant Cooper Industries, LLC ("Cooper") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 600 Travis Street, Suite 5800, Houston, Texas.

82.     Defendant Covanta Essex Co. (f/k/a American Ref-Fuel Company) (ARC) is a company organized under the laws of the State of Delaware with its principal place of business at 445 South Street, Morristown, New Jersey.

83.     Defendant Croda, Inc. ("Croda") is a corporation organized under the laws of the State of Delaware with its principal place of business at 300A Columbus Circle, Edison, New Jersey.

84.     Defendant Curtiss-Wright Corporation ("Curtiss-Wright") is a corporation organized under the laws of the State of Delaware with its principal place of business at 13925 Ballantyne Corporate Place, Suite 400, Charlotte, North Carolina.

85.     Defendant Darling Ingredients Inc. (f/k/a Darling International, Inc.) ("Darling") is a corporation organized under the laws of the State of Delaware with its principal place of business at 251 O'Connor Ridge Boulevard, Suite 300, Irving, Texas.

86.     Defendant DII Industries, LLC (f/k/a Dresser Industries, Inc.) (DII), a subsidiary of Halliburton Company, is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 2001 Ross Avenue, Dallas, Texas.

87.     Defendant E.I. du Pont de Nemours & Company is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware.

88.     Defendant Eden Wood Corporation ("Eden Wood") is a corporation organized under the laws of the State of Delaware with its principal place of business at 47 Parsippany Road, Whippany, New Jersey.

89.     Defendant Elan Chemical Co., Inc. ("Elan") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 268 Doremus Avenue, Newark, New Jersey.

90.     Defendant Emerald Kalama Chemical LLC (f/k/a Kalama Chemicals) is a limited liability company organized under the laws of the State of Washington with its principal place of business at 2730 West Tyvola Road, Four Coliseum Centre, Charlotte, North Carolina.

91.     Defendant EnPro Industries, Inc. ("EnPro"), formerly Crucible Steel ("Crucible"), is a corporation organized under the laws of the State of North Carolina with its principal place of business at 5605 Carnegie Boulevard, Suite 500, Charlotte, North Carolina.

92.     Defendant Essex Chemical Corporation ("Essex") is a corporation organized under the laws of the State of New York with its principal place of business at 2030 Dow Center, Midland, Michigan.

93.     Defendant Everett Smith Group, Ltd. (f/k/a Blanchard Bro. & Lane, Eagle Ottawa Leather, Albert Trostel & Sons) ("Everett Smith") is a limited liability company organized under the laws of the State of Wisconsin with its principal place of business at 330 Kilbourn Avenue, Suite 1400, Milwaukee, Wisconsin.

94.     Defendant Flint Group Incorporated (f/k/a Flint Ink Corporation) is a Michigan corporation with its principal place of business at 601 Abbott Road, East Lansing, Michigan.

95.     Defendant Fort James LLC (f/k/a Fort James Corporation f/k/a Crown Zellerbach Corporation) is a Virginia limited liability company with its principal place of business at 133 Peachtree Street NE, Atlanta, Georgia.

96.     Defendant Foundry Street Corporation (FSC) is a corporation organized under the laws of the State of New Jersey with its principal place of business at 260 Knoll Drive, Park Ridge, New Jersey.

97.    Defendant Foundry Street Development, LLC ("Foundry") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 616 South 21st Street, Philadelphia, Pennsylvania.

98.    Defendant Franklin-Burlington Plastics, Inc. (f/k/a Franklin Plastics Corporation) ("Franklin-Burlington") is a corporation organized under the laws of the State of Delaware with its principal place of business at 33587 Walker Road, Avon Lake, Ohio.

99.    Defendant Garfield Molding Company, Inc./Garfield Manufacturing Company ("Garfield") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 10 Midland Avenue, Post Office Box 3236, Wallington, New Jersey.

100.    Defendant General Electric Company ("General Electric") is a corporation organized under the laws of the State of New York with its principal place of business at 33-41 Farnsworth Street, Boston, Massachusetts.

101.    Defendant Givaudan Fragrances Corporation ("Givaudan") (formerly known as Givaudan-Roure Corporation) is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1199 Edison Drive, Cincinnati, Ohio.

102.    Defendant Goodrich Corporation ("Goodrich") is a corporation organized under the laws of the State of New York with its principal place of business at 2730 W. Tyvola Road, Four Coliseum Centre, Charlotte, North Carolina.

103.    Defendant Harris Corporation (f/k/a ITT Corporation, f/k/a ITT Industries, Inc.) ("Harris") is a Delaware corporation with its principal place of business located at 1025 West NASA Boulevard, Melbourne, Florida.

104.     Defendant Hexcel Corporation (f/k/a Fine Organics, Inc.) ("Hexcel") is a corporation organized under the laws of the State of Delaware with its principal place of business at 281 Tresser Boulevard, Stamford, Connecticut.

105.     Defendant Hexion Inc. (f/k/a Borden Chemical, Inc.) is a New Jersey corporation with its principal place of business at 180 East Broad Street, Columbus, Ohio.

106.     Defendant Hoffmann-La Roche Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 150 Clove Road, Suite 8, Little Falls, New Jersey.

107.     Defendant Honeywell International Inc. ("Honeywell") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 115 Tabor Road, Morris Plains, New Jersey.

108.     Defendant Houghton International Inc. (f/k/a E.F. Houghton & Co., Inc.) is a Pennsylvania corporation with its principal place of business at Madison and Van Buren Avenues, Valley Forge, Pennsylvania.

109.     Defendant Ingredion Incorporated is a Delaware corporation with its principal place of business at 5 Westbrook Corporate Center, Westchester, Illinois.

110.     Defendant Innospec Active Chemicals LLC (f/k/a Finetex, Inc.) ("Innospec") is a limited liability company organized under the laws of the State of Georgia with its principal place of business at 510 West Grimes Avenue, High Point, North Carolina.

111.     Defendant INX International Ink Co. (f/k/a Midland Color Company and f/k/a Roberts & Carlson, Inc.) is a Delaware corporation with its principal place of business at 150 North Martingale Road, Suite 700, Schaumburg, Illinois.

112.    Defendant ISP Chemicals LLC (f/k/a International Specialty Products, Inc. and ISP Van Dyk, Inc.) (ISP) is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1361 Alps Road, Wayne, New Jersey.

113.    Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business at One Johnson and Johnson Plaza, New Brunswick, New Jersey.

114.    Defendant Kalama Specialty Chemicals, Inc. (f/k/a Kalama Chemical Inc.) is a corporation organized under the laws of the State of Washington with its principal place of business at 900 4th Avenue, Seattle, Washington.

115.    Defendant Kearny Smelting & Refining Corp. ("Kearny Smelting") is a corporation organized under the laws of the State of New York with its principal place of business at 936 Harrison Avenue, Kearny, New Jersey.

116.    Defendant LeeMilt's Petroleum, Inc. (f/k/a Power Test Corporation) ("LeeMilt") is a corporation organized under the laws of the State of New York with its principal place of business at 2 Jericho Plaza, Suite 110, Jericho, New York.

117.    Defendant Legacy Vulcan, LLC (f/k/a Vulcan Materials Company; f/k/a Kolker Chemical Corporation) ("Vulcan") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama.

118.    Defendant Mallinckrodt LLC ("Mallinckrodt") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 675 James S. McDonnell Boulevard, Hazelwood, Missouri.

119.    Defendant Marathon Oil Corporation (f/k/a USX Corp., f/k/a Federal Shipbuilding & Dry Dock Company) is a Delaware corporation with its principal place of business at 5555 San Felipe Street, Houston, Texas.

120.    Defendant McKesson Corporation ("McKesson") is a corporation organized under the laws of the State of Maryland with its principal place of business at One Post Street, San Francisco, California.

121.    Defendant Melon Leasing Corporation, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business located at 109-113 Jacobus Avenue, Kearny, New Jersey.

122.    Defendant Meltser-Tonnele Avenue LLC ("Meltser") is a limited liability company organized under the laws of the State of New Jersey with its principal place of business located at 187-189 Foundry Street, Newark, New Jersey.

123.    Defendant MI Holdings, Inc. ("MI Holdings") is a corporation organized under the laws of the State of Missouri with its principal place of business located at 601 Midland Avenue, Rye, New York.

124.    Defendant Nappwood Land Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut.

125.    Defendant National-Standard LLC ("National-Standard") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1618 Terminal Road, Niles, Michigan.

126.    Defendant Newell Brands Inc. (f/k/a Newell Rubbermaid, Inc.) (NBI) is a corporation organized under the laws of the State of Delaware with its principal place of business at 221 River Street, Hoboken, New Jersey.

127.     Defendant Nokia of America Corporation (f/k/a Alcatel-Lucent USA, Inc.) ("Lucent") is a corporation organized under the laws of the State of Delaware with its principal place of business at 600-700 Mountain Avenue, Suite 700, New Providence, New Jersey.

128.     Defendant Novartis Corporation (f/k/a Ciba Geigy Corporation) is a New York corporation with its principal place of business at One South Ridgedale Avenue, Building 122, East Hanover, New Jersey.

129.     Defendant Novelis Corporation (f/k/a Alcan Aluminum Corporation) ("Alcan") is a corporation organized under the laws of the State of Texas with its principal place of business at 3560 Lenox Road, Suite 2000, Atlanta, Georgia.

130.     Defendant Noveon Hilton Davis, Inc., a subsidiary of Dystar LP ("Noveon Hilton Davis"), is a corporation organized under the laws of the State of Delaware with its principal place of business at 2235 Langdon Farm Road, Cincinnati, Ohio.

131.     Defendant Otis Elevator Company ("Otis") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 1 Carrier Place, Farmington, Connecticut.

132.     Defendant Pabst Brewing Company, LLC ("Pabst") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 10635 Santa Monica Boulevard, Los Angeles, California.

133.     Defendant Palin Enterprises L.L.C. ("Palin") is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 235 Park Avenue, South, 8th Floor, New York, New York.

134.     Defendant Pfister Urban Renewal Corporation ("Pfister Urban") is a New Jersey corporation with its principal place of business at P.O. Box 237, Ridgefield, New Jersey.

36

135.    Defendant Pharmacia LLC (f/k/a Monsanto Company) ("Pharmacia") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 7000 Portage Road, Kalamazoo, Michigan.

136.    Defendant Pitt-Consol Chemical Company ("DuPont"), a subsidiary of Du Pont Chemical and Energy Operations, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at 1007 Market Street, Wilmington, Delaware.

137.    Defendant PMC Global, Inc. (a/k/a Kleer Kast, a Division of PMC Inc.) ("Kleer Kast") is a corporation organized under the laws of the State of Delaware with its principal place of business at PMC, Inc., 12243 Branford Street, Sun Valley, California.

138.    Defendant PPG Industries, Inc. (PPG) is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at One PPG Place, Pittsburgh, Pennsylvania.

139.    Defendant Public Service Electric & Gas Company (PSE&G) is a corporation organized under the laws of the State of New Jersey with its principal place of business at 80 Park Plaza, Newark, New Jersey.

140.    Defendant Purdue Pharma Technologies, Inc. ("Purdue") is a corporation organized under the laws of the State of Delaware with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut.

141.    Defendant Quala Systems, Inc. ("Quala") is a corporation organized under the laws of Delaware with a principal place of business at 500 N. Westshore Boulevard, Suite 435, Tampa, Florida.

142.    Defendant Quality Carriers, Inc. (a/k/a/ Quality Distribution, Inc., f/k/a Chemical Leaman Tank Lines, Inc.) ("Quality Distribution") is a corporation organized under the laws of the

State of Illinois with its principal place of business located at 4041 Park Oaks Boulevard, Suite 200, Tampa, Florida.

143.    Defendant R. T. Vanderbilt Holding Company, Inc. (f/k/a R. T. Vanderbilt Company, Inc., f/k/a Vanderbilt Chemical Corporation) is a Delaware corporation with its principal place of business at 30 Winfield Street, Norwalk, Connecticut.

144.    Defendant Reckitt Benckiser LLC ("Reckitt") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 399 Interpace Parkway, Parsippany, New Jersey.

145.    Defendant Revere Smelting & Refining Corporation ("Revere") is a corporation organized under the laws of the State of Delaware with its principal place of business at 2777 Stemmons Freeway, Suite 1800, Dallas, Texas.

146.    Defendant Rexam Beverage Can Company (f/k/a American National Can Company) is a Delaware corporation with its principal place of business at 10 Longs Peak Drive, Broomfield, Colorado.

147.    Defendant Roselle Mausoleum Maintenance Fund, Inc. (f/k/a Peter Roselle & Sons, Inc.) (the "Roselle Entities") is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 163 Tremont Avenue, East Orange, New Jersey.

148.    Defendant Royce Associates, a Limited Partnership (f/k/a Royce Chemical Company) ("Royce") is a limited partnership organized under the laws of the State of New Jersey with its principal place of business at 35 Carlton Avenue, East Rutherford, New Jersey.

149.    Defendant RTC Properties, Inc. (f/k/a Union Minerals and Alloys Corporation ("Union Minerals") is a New York corporation with its principal place of business at 100 Central Avenue, Building 30, Kearny, New Jersey.

150.    Defendant Safety-Kleen Envirosystems Company ("Safety-Kleen") is a corporation organized under the laws of the State of California with its principal place of business at 42 Longwater Drive, Norwell, Massachusetts.

151.    Defendant Schiffenhaus Packaging LLC ("Schiffenhaus") is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 2013 McCarter Highway, Newark, New Jersey.

152.    Defendant Sequa Corporation ("Sequa") is a corporation organized under the laws of the State of Delaware with its principal place of business at 3999 CA Boulevard, Palm Beach Gardens, Florida.

153.    Defendant Seton Company, Inc. ("Seton") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 849 Broadway, Newark, New Jersey.

154.    Defendant Spectraserv, Inc. ("Spectraserv"), a privately held corporation owned by members of the Joseph P. Miele family and a successor company to Modern Transportation Company, is a corporation organized under the laws of the State of New Jersey with its principal place of business at 75 Jacobus Avenue, Kearny, New Jersey.

155.    Defendant Staley Holdings LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 501 Silverside Road, Suite 55, Wilmington, Delaware.

156.    Defendant Stanley Black & Decker Inc. (f/k/a/ The Stanley Works) ("Stanley") is a corporation organized under the laws of the State of Connecticut with its principal place of business at 1000 Stanley Drive, New Britain, Connecticut.

157.    Defendant STWB Inc. (f/k/a Sterling Winthrop, Inc./Sterling Drug) (STWB) is a Delaware corporation with its principal place of business at 100 Bayer Road, Building 4, Pittsford, Pennsylvania.

158.    Defendant Sun Chemical Corporation ("Sun Chemical") is a corporation organized under the laws of the State of Delaware with its principal place of business at 35 Waterview Boulevard Parsippany, New Jersey.

159.    Defendant Sunoco (R&M), LLC (as a successor to Sun Oil Company) is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 1735 Market Street, Philadelphia, Pennsylvania.

160.    Defendant Sunoco Partners Marketing & Terminals L.P. is a limited partnership organized under the laws of the State of Texas with its principal place of business located at 1818 Market Street, Suite 1500, Philadelphia, Pennsylvania.

161.    Defendant Tate & Lyle Ingredients Americas LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 320 Schuyler Avenue and 100 Third Avenue, Kearny, New Jersey.

162.    Defendant Teval Corporation ("Teval"), formerly named Guyon General Piping, Inc. ("Guyon"), is a corporation organized under the laws of the State of New York with its principal place of business at 1 Portland Square, Portland, Maine.

163.    Defendant Textron, Inc. ("Textron") is a corporation organized under the laws of the State of Delaware with its principal place of business at 40 Westminster Street, Providence, Rhode Island.

164.    Defendant The Hartz Mountain Corporation (f/k/a Sternco Industries, Inc.) ("Hartz") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 400 Plaza Drive, Secaucus, New Jersey.

165.    Defendant The Newark Group, Inc. ("Newark Group") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 20 Jackson Drive, Cranford, New Jersey.

166.    Defendant The Okonite Company, Inc. ("Okonite") is a corporation organized under the laws of the State of Delaware with its principal place of business at 102 Hilltop Road, Ramsey, New Jersey.

167.    Defendant The Sherwin-Williams Company ("Sherwin Williams") is a corporation organized under the laws of the State of Ohio with its principal place of business located at 101 West Prospect Avenue, Cleveland, Ohio.

168.    Defendant Tiffany and Company ("Tiffany") is a corporation organized under the laws of the State of New York with its principal place of business at 727 Fifth Avenue, New York, New York.

169.    Defendant United States Steel Corporation (f/k/a USX Corp., f/k/a Federal Shipbuilding & Dry Dock Company) is a Delaware corporation with its principal place of business at 600 Grant Street, Pittsburgh, Pennsylvania.

170.    Defendant Wiggins Plastics, Inc. (WPI) is a corporation organized under the laws of the State of New Jersey with its principal place of business at 180 Kingsland Road, Clifton, New Jersey.

171.    Defendant Zeneca Inc. is a Delaware corporation with its principal place of business at 10 Finderne Avenue, Bridgewater, New Jersey.

41

172.    Defendants 'XYZ Corporations' 1-10, these names being fictitious, are entities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the named defendants.

173.    Many of the Defendants sued below were also defendants in earlier litigation filed in New Jersey under the Spill Act.[30]  Many of them sought and were denied motions to dismiss claims that they were liable for the discharges described below.  The allegations as to these parties include the allegations that were previously sustained as sufficient to state a claim for relief in the New Jersey Litigation.  OxyChem has organized its allegations specific to individual Defendants by the COCs identified in the OU2 ROD.

## VI.    ALLEGATIONS AGAINST INDIVIDUAL PARTIES BY PRIMARY COC

### A.    PCBs

174.    OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of PCBs (among other hazardous substances) that have contaminated and continue to contaminate the sediments of the Lower Passaic River.

175.    Defendant **Nokia of America Corporation (f/k/a Alcatel-Lucent USA, Inc.) ("Lucent")**, a successor to Western Electric Company, Inc. ("Western Electric"), owned and operated a 147-acre property located at 100 Central Avenue, Kearny, New Jersey, also designated

---

[30]  Many of the Defendants in this action were also third-party defendants in *NJDEP, et al. v. Occidental Chemical Corp., et al.*, Docket No. ESX-L9868-05 (PASR), in the Superior Court of New Jersey, Essex County (the "New Jersey Litigation").  In the New Jersey Litigation, the third-party defendants were sued under the New Jersey Spill Act regarding remediation costs incurred prior to the 2016 ASAOC and the dredge-and-cap remedy for the Lower 8.3 miles of the Passaic River at issue here.  "Nexus packages" for each third-party defendant containing evidence of the defendants' releases of hazardous substances into the Passaic River were filed in the New Jersey Litigation and are available at http://www.nj.gov/dep/passaicdocs/thirdparty-tierra.html (last visited June 29, 2018).  Many third-party defendants filed or joined motions to dismiss in the New Jersey Litigation; however, all motions to dismiss were denied.  Additionally, many third-party defendants entered into a "Track 7 Stipulation" in which those defendants stipulated to having discharged hazardous substances to the Passaic River.

as Block 288, Lot 10.01 on the tax maps of Kearny, Hudson County.  This property is part of the Facility.  Western Electric manufactured switchboards, wiring, and related telecommunications equipment, including mercury relays and transformers.  Lucent also operated a powerhouse on the property.  Western Electric had at least 13 active and inactive PCB transformers on the property, including two stored outdoors without adequate roof and walls or proper diking. Hazardous substances utilized at the property included, among others, PCBs, chromium, copper, lead, nickel, zinc, cyanide, beryllium, silver, PAHs, mercury, and asbestos. During Lucent's ownership and operation of the Lucent Property, hazardous substances such as PCBs were disposed of on the property.   There are instances of spills of PCBs on the property. The property's soil and groundwater tested positive for PCB and mercury contamination, among other hazardous substances. PCBs were also detected in Passaic River sediments adjacent to the property's discharge pathways.  The discharge pathways include (1) the discharge of untreated process wastewaters and stormwater to the storm sewers that discharged to the Passaic River through outfalls, including five New Jersey Pollutant Discharge Elimination System (NJPDES) outfalls to the Passaic River; (2) flooding of buildings via floor drains that would subsequently drain to outfalls to the Passaic River; (3) groundwater flows into the Passaic River; (4) a manual release valve in the drainage pit and drains from the outside drum storage area; and (5) an extensive network of storm sewers, catch basins, and outfalls that discharged directly to the Passaic River. The process wastewater included the wastewater from the screw machines, metal plating operations, and the manufacturing of transformers.  Lucent is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's

mandated remedy.  Under CERCLA §§ 107(a)(2) and/or (a)(3) and CERCLA § 113, Lucent is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and capping PCBs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, copper, and PAHs.

176.   United Cork Companies, as a predecessor to Defendant **BASF Corporation (BASF)**, operated the 27-acre chemical manufacturing facility at 50 Central Avenue, Kearny, New Jersey from 1935 to 1964.  This property is part of the Facility.  United Cork manufactured insulation and dyestuffs at the property from 1935 to 1964.  BASF is the successor in interest to United Cork Companies.  From 1964 until 1990, BASF operated the property.  BASF formulated and manufactured chemical products, chemical intermediaries, plasticizers, and dyes at the property.  The main material manufactured by BASF was phthalic anhydride, which is associated with the formation of dioxins.  BASF also used other dioxin-associated compounds on the property, including maleic anhydride, chloranil, and benzaldehyde.  Chemicals in the soil at the property include copper, lead, mercury, petroleum hydrocarbons, PCBs, PAHs, bis(2  ethylhexyl) phthalate, and other phthalates.  Chemicals in groundwater at the property include PCBs, lead, xylene, bis(2  ethylhexyl) phthalate, and other phthalates.  Numerous discharge routes to the Passaic River exist from the property, including direct stormwater and process water discharges and spills, leaks, and migration of waste formerly stored directly on the ground surface.  Further, a cross-connection existed between the process sewer and storm sewers onsite, which resulted in the release of hazardous substances into the Passaic River.  Indeed, an internal June 1978 BASF memorandum admits that the BASF property discharged surface water to the Passaic River, in violation of the Federal Clean Water Act of 1972.  After BASF acknowledged this issue, it took

eleven more years for BASF to cap the sewer line, only doing so in 1989.  Passaic River sediment samples adjacent to the property show the presence of bis(2 ethylhexyl) phthalate, other phthalates, phenanthrene, mercury, lead, copper, arsenic, PAHs, PCBs, dioxin-associated compounds, and other hazardous substances.  BASF is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, BASF is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river including but not limited to dioxin-associated compounds, PAHs, lead, mercury, and copper.

177.   From approximately 1954 until 1994, Defendant **Pharmacia LLC (f/k/a Monsanto Company) ("Pharmacia")** owned and operated a chemical manufacturing facility on the foot of Pennsylvania Avenue in Kearny, New Jersey abutting the Passaic River.  This property is part of the Facility.  Pharmacia used hazardous substances at its property including maleic anhydride, PCBs, toluene, benzene, phenol, ethylene oxide, and phosphoric acid.   During Pharmacia's ownership and operation of the property, it disposed of hazardous substances onto the property and directly into the Passaic River through the Kearny storm sewer and a discharge pipe that discharged to the Passaic River.  Pharmacia also had numerous settling pits and ponds on the property.   Specifically, Pharmacia disposed of highly concentrated PCB mixtures to a PCB Disposal Area Pond, which is within 500 feet of the Passaic River.  PCBs have moved through the

property's drainage system, groundwater, and soil towards the river.  The property is on the waterfront to the Passaic River.  Mercury, copper, lead, PAHs, PCBs, and dioxin-associated compounds have been detected in soils on the property.  Stormwater flowed through contaminated areas on the property and discharged to the Passaic River via runoff during wet weather.  Pharmacia is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Pharmacia is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, copper, and PAHs.

178.  Defendant **McKesson Corporation ("McKesson")** sold McKesson Envirosystems to Safety-Kleen Corp. in 1987, which became Defendant **Safety-Kleen Envirosystems Company ("Safety-Kleen")**, a subsidiary of Safety-Kleen Corp.  Before then, McKesson, through its predecessors, operated at 600 Doremus Avenue, Newark, New Jersey, near RM 0 to RM 0.5, beginning in 1974.  This property is part of the Facility.  The prior owner of the property, Vulcan, continued its chemical manufacturing operations, mainly methylene chloride, at the property after the 1974 sale to McKesson.  In 1975, Vulcan discontinued all chemical production operations on the property.  McKesson's predecessor, Inland Chemical Corporation ("Inland"), also operated at the property beginning in 1974.  Inland began to phase out chemical manufacturing over the first four years and initiated solvent recovery services at the property.  As

46

of 1979, Inland's operations at the property included the recovery of waste material from Bristol-Myers Squibb Corporation.  This arrangement ended in or about April 1981.  Chemicals reportedly handled during this 1979 to 1981 time period included acetone, dimethyl aniline, hydrochloric acid, toluene, and xylenes.  Methylene chloride was the highest volume waste material handled, with an estimated 21,732,000 pounds per year received.  As of October 1981, there were 94 storage tanks on the property, ranging from 800 to 230,000 gallons.  Inland reportedly processed 450,000 to 600,000 gallons of chemical and liquid waste per month.  As of the 1981 merger with Inland, McKesson and/or McKesson Envirosystems owned and continued to operate the property as a hazardous waste treatment facility.  As of 1982, McKesson was processing numerous chemicals at the property, including acetone, dimethyl aniline, methylene chloride, and mixed chlorinated hydrocarbons.   In October 1982, there was an explosion and fire on the property during the processing of waste dimethyl sulfoxide, and NJDEP ordered the plant closed immediately.  McKesson then posted a $250,000 performance bond to NJDEP to guarantee that remedial cleanup and facility upgrades work would be completed.  The property has reportedly remained inactive since 1982, except for the remediation activities.  Soil testing at the property, performed in 1982, 1994, 1999, and 2000/2001, detected a long list of hazardous substances, including PCBs, carbon tetrachloride, methylene chloride, trichloroethane, hexachlorobenzene, methyl aniline, arsenic, lead, and mercury.  Similarly, groundwater investigations performed in 1981/1982, 1988, 1994, and 1999 also detected a long list of hazardous substances, including acetone, carbon tetrachloride, methanol, toluene, iron, and lead.   These and many other hazardous substances related to McKesson's operations were identified in Passaic River sediments in the vicinity of the property.  Over the years, there were several spills and chemicals found leaching from the property.  Contaminated runoff from the property was flowing into a storm drain and discharging to the

47

Passaic River.  NJDEP documentation in 1979 reported that stormwater runoff discharged to Newark Bay and that, on repeated site visits, there were leaking, cracked, and open 55-gallon drums containing solvents that were not stored in contained areas.  Also in 1979, NJDEP documented "extensive spillage" at the property and a stream of runoff that discharged to Newark Bay.  The Newark Bay tidally influences the Passaic River.  On information and belief, onsite soil contaminants reached the Passaic River via runoff.  Safety-Kleen is liable as an owner and/or operator at the time of disposal of hazardous substances.  McKesson is liable as a current owner and/or operator of the property.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(1) and/or 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, McKesson and Safety-Kleen are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances they disposed of that have contaminated and continue to contaminate the Passaic River, including but not limited to mercury, lead, and copper.

179.    Defendant **Purdue Pharma Technologies, Inc. ("Purdue")** operated at 199 Main Street, Lodi, New Jersey from 1946 as B. L. Lemke & Co. ("Lemke"), which later changed its name to Napp Chemicals, Inc. ("Napp"), which then changed its name to Purdue Services, Inc., which finally changed its name to Purdue Pharma Technologies, Inc. on March 28, 2003. Defendant **Nappwood Land Corporation** is the current owner of the property at 199 Main Street. The property is part of the Facility.  Lemke operated at the property as a chemical manufacturer for the pharmaceutical industry from 1946 to 1970.   Lemke produced and stored dry

pharmaceutical, cosmetic, and food chemical products.  From 1970 to 1995, Napp manufactured bulk generic drugs and performance chemicals for the cosmetic and pharmaceutical industries. The manufacturing process included synthesis and drying of compounds mixed with water and/or solvent, blending and grinding of mixtures of dry powder, micronizing, and other particle size reduction processes.  Major products manufactured at the property at 199 Main Street during this time included para-hydroxybenzoic acid, trimethoprim, and methylparaben.  On April 21, 1995, Napp was manufacturing a gold precipitating agent—a dry mixture of aluminum powder, sodium hydrosulfite, and potassium carbonate being blended in a reactor and followed by a liquid spray of benzaldehyde.  This process was water reactive, and there was an explosion and fire resulting in the death of five employees and destruction of the facility.  Following emergency procedures, all operations ceased on the property.   While the plant was operating, raw materials in use included fumaric acid, phenol, and phthalic anhydride, which are dioxin-associated compounds.  Several other dioxin-associated compounds, including chlorobenzene and 1,2 dichlorobenzene, were identified in the groundwater and soil at the property, and 1,3 dichlorobenzene and 1,2,4 trichlorobenzene were also found in groundwater.  Soil sampling during the remedial investigation identified numerous contaminants in the soil, including 1,1,1-trichloroethane, 1,1,2-trichloroethane, toluene, PCBs, mercury, copper, lead, and PAHs, and groundwater testing revealed the same.  While the property was in operation by Purdue and its predecessors, there were numerous discharges of contaminants to the Saddle River, which is a tributary of the Passaic River. Moreover, there are two catch basins in the northwest corner of the property that flow through underground piping to an outfall and discharge to the Saddle River, and there were several instances of flooding during which runoff reached the Saddle River. By March 24, 2000, demolition of the plant at the property was completed.  Purdue is liable as an owner and/or operator

49

at the time of disposal of hazardous substances.  Nappwood Land Corporation is liable as the current owner and/or operator of the property.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Purdue and Nappwood Land Corporation are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances they disposed of that have contaminated and continue to contaminate the Passaic River, including but not limited to mercury, copper, lead, and PAHs.

180.    Defendant **Chargeurs Wool (USA) Inc. (f/k/a United Piece Dye Works)** **("Chargeurs")** operated at two locations: (1) 199 and 205 Main Street, Lodi, New Jersey ("Main Street Property") and (2) 42 Arnot Street, Lodi, New Jersey ("Arnot Property").  In the alternative, Defendant **Chargeurs, Inc.** operated the Main Street Property and the Arnot Property.  The Main Street Property and the Arnot Property are part of the Facility.  Chargeurs owned and operated the Main Street Property from the 1800s until 1957 and the Arnot Property from 1910 until 1959.  The Main Street Property was used to manufacture dyestuffs for the textile industry, pharmaceuticals, synthetic organic chemicals, inorganic chemicals, fine chemicals, industrial cleaning solutions, and resins.  Due to historical activities on the property, sampling of soils and groundwater indicate that the Main Street Property is significantly contaminated with metals and organic compounds, such as chlorinated and nonchlorinated aromatic compounds.  The Main Street Property soil sampling identified hazardous substances including 1,2-dichlorobenzene, toluene, arsenic, copper, lead, and mercury.   The Main Street Property groundwater sampling identified hazardous

substances including tetrachloroethene, antimony, PAHs, mercury, copper, and lead.  Chargeurs disposed of hazardous substances directly into the Saddle River, a tributary of the Passaic River and part of the Facility.  These disposals include but are not limited to (1) green dye waste being discharged in February 1947; (2) gray, turbid water from a pipe located at the property's ash dump discharged in September 1948, the deposits of which were observed downstream to the Passaic River; and (3) industrial waste discharged as a result of an overflow from the sump pit and screen room in December 1949.  Further, the Main Street Property industrial sanitary sewer was linked to a pump station that discharged to the Passaic Valley Sewerage Commission (PVSC) trunk line, which has a 15-inch overflow to the Saddle River.  There are documented bypasses around the pump station, which means the industrial sanitary sewer discharged directly to the Saddle River. Also, the Main Street Property, which had 1,2-dichlorobenzene, toluene, arsenic, copper, lead, and mercury soil contamination, was adjacent to the Saddle River and was subject to historical flooding with runoff into the Saddle River.  The Arnot Property is located directly across Saddle River from the Main Street Property.  The Arnot Property held "slime coal" waste piles, aboveground storage tanks (including two 250,000 gallon aboveground fuel tanks), coal ash waste piles, coal storage, and two large water reservoirs (located west of the Arnot Property).  The drainage swales at the Arnot Property were sampled in 1987, and chromium, lead, and PCBs were identified as contaminants.  Further, the Arnot Property, which had lead and PCB soil contamination, was adjacent to the Saddle River and was subject to historical flooding with runoff into the Saddle River.  Chargeurs is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including PCBs from the Main Street Property and the Arnot Property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's

51

mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Chargeurs is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, mercury, copper, lead, and PAHs.

181.     Defendant **Wiggins Plastics, Inc. (WPI)** has owned and operated at 180 Kingsland Road, Clifton, New Jersey from approximately 1955 to the present.  This property is part of the Facility.  WPI manufactures molded components for electronic, electrical, and mechanical use from thermoset and thermoplastic materials.  WPI uses numerous hazardous substances on the property, including benzene, total petroleum hydrocarbons (TPEHs), PAHs, toluene, xylene, PCBs, copper, and iron.  The property's soil is contaminated with hazardous substances, including arsenic, mercury, copper, lead, and toluene, and the property's groundwater is contaminated with hazardous substances including chlorobenzene, chloroform, and methylene chloride.  WPI disposed of and continues to dispose of hazardous substances on the property and into the Passaic River.  For example, an oil slick was observed in the Third River (which flows into the Lower Passaic River) and traced to a three-inch metal outlet from the property.  Cooling water from the property discharges through a metal outlet to the Passaic River via the Third River, and surface water runoff is discharged to the Passaic River via Weasel Brook (which flows into the Lower Passaic River).  WPI also stores empty drum containers outdoors on pavement, and these drums have the potential to leak residual chemicals onto the pavement and into the Third River via stormwater runoff.  WPI is liable as the current owner and/or operator of the property.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from

52

the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, WPI is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, dioxin-associated compounds, mercury, copper, lead, and PAHs.

182.   Defendant **The Hartz Mountain Corporation (f/k/a Sternco Industries, Inc.) ("Hartz")** and its predecessors owned and operated a 10.3-acre property on the 600 and 700 blocks of South 4th Street, Harrison, New Jersey from 1970 until at least 1993.  This property is part of the Facility.  Hartz manufactured and assembled aquariums, aquarium supplies, and pet foods and later added warehousing, distribution, and assembly of pet supply products.  As of 1991, several hazardous materials were located on the property including acetylene, battery acid, dimethyl ether, kerosene, pesticides, and fungicides.  During Hartz's ownership and operation of the property, Hartz disposed of hazardous substances on the property and into the Passaic River.  As of 1987, cooling water from the vapor degreaser, spot welders, and air conditioner equipment were discharged to the sewer system.  Millions of gallons of process wastewater containing oil, grease, chlorides, volatile solids, volatile solvents, lead, mercury, and pesticides were discharged to sanitary sewers.  Soil sampling between 1993 to 1996 at the property revealed PCB contaminants, and PCBs were also located in floor sumps. Catch basins at the property contained antimony, copper, lead, nickel, and PCBs.  On or about September 29, 1981, approximately 500 gallons of fuel were discharged directly to the Passaic River due to a leak in one of Hartz's fuel oil tanks.  The property was also serviced by a combined storm/sanitary sewer system that discharged to the municipal system, and on information and belief, contaminated wastewater and stormwater runoff

53

reached the Passaic River through the sewer systems.  Hartz is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Hartz is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to lead, mercury, copper, and PAHs.

183.    Defendant **Hexcel Corporation (f/k/a Fine Organics, Inc.) ("Hexcel")** and its predecessors have owned and operated 205 Main Street, Lodi, New Jersey since 1973.  This property is part of the Facility. During the period of 1973 to 1981, Hexcel operated both a fine chemical manufacturing operation and an industrial maintenance chemicals operation at the property.   After 1981, Hexcel manufactured industrial alkaline, water-based cleaners, paint strippers, deodorant/air freshener soap blocks, dibactol, and oxalic/phosphoric acid liquid cleaners. Hexcel also made resins until 1986, which consisted of polyurethane prepolymers and curatives. In 1985, Hexcel began to implement New Jersey's Environmental Cleanup Responsibility Act (ECRA) remediation activities on the property.  EPA and NJDEP have noticed Hexcel that it is a PRP for the Passaic River.  PCBs were identified in property soils, groundwater, and in the oil recovery well.  Soil sampling identified pages of hazardous substances on the property, including arsenic, lead, copper, mercury, PCB 1260, PCB 1254, PCB 1242, and PCB 1248.  Groundwater sampling also identified numerous hazardous substances on the property, including arsenic, lead,

copper, mercury, PCB 1242, and PCB 1248.  Hexcel disposed of hazardous substances on the property as well as into the Saddle River, both of which are part of the Facility.  Process wastewater discharged to the industrial sewer lines and sanitary lines from the property, which ultimately discharged to the Saddle River on at least 21 separate documented instances from 1947 to 1984. Moreover, there were several instances during which wastewater from the property bypassed PVSC's pump station and discharged directly to the Saddle River.  The property is adjacent to the Saddle River and was subject to historical flooding, with contaminated runoff reaching the river. Hexcel is liable as the current owner and/or operator of the property.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Hexcel is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to lead, mercury, and copper.

184.    Defendant **ISP Chemicals LLC (f/k/a International Specialty Products, Inc. and ISP Van Dyk, Inc.) (ISP)** and its predecessors have owned and operated 11 William Street, Belleville, New Jersey from 1943 until the present.  This property is part of the Facility.  The Passaic River is approximately 250 feet east-southeast of the property.  ISP manufactured a main component in sunscreens (ultraviolet absorbers), emulsifiers, and emollients.  ISP stored, used, or produced several hazardous substances on the property including formaldehyde, acetone, methanol, chloroform, fuel oil, propane, and tetrahydrofuran.  From 1965 to 1979, process oil

containing PCBs was used to heat reaction vessels and distillation columns.  Soil sampling showed mercury, PCBs, PHCs, and volatile organic compounds.  Likewise, groundwater sampling showed PCBs, chloroform, di-n-butyl phthalate, and benzene.  ISP disposed of hazardous substances on the property.  For example, contaminants were discharged onto the property and to the Passaic River during a 1948 pipe removal and a 1977 sewer line blockage.  Process waste and the majority of sanitary waste from the property was discharged to PVSC.  Multiple incidents with storm sewers, leaks, and overflows caused hazardous substances to enter the Passaic River.  ISP is liable as the current owner and/or operator of the property.  Releases of hazardous substances including PCBs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, ISP is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PCBs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, PAHs, and dioxins.

**B.    Mercury**

185.    OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of mercury (among other hazardous substances) that have contaminated and continue to contaminate the sediments of the Lower Passaic River.

186.    Defendant **Kalama Specialty Chemicals, Inc. (f/k/a Kalama Chemical Inc.)** owned and operated the property located at 290 River Drive, Garfield, New Jersey from 1982 to 1994.  Defendant **Goodrich Corporation ("Goodrich")** acquired Kalama Specialty Chemicals,

56

Inc. in 1998 and sold it to Defendant **Emerald Kalama Chemical LLC (f/k/a Kalama Chemicals)** in 2006.  Goodrich has owned the property since 2001 and continues to own the property today.  Chemical manufacturing of pharmaceuticals, cosmetics, food packaging and preservatives, synthetic flavorings, printing inks, and dyestuffs occurred on the property from 1891 until at least 1994.  Hazardous substances were used at the property, including formaldehyde, benzoic acid, toluene, benzene, and phenol.  PCBs have been identified in property media.  On information and belief, process waste sewer lines at the property, which were the source of high levels of soil contamination including biphenyl, discharged to the Passaic River.  Additionally, the outfall of the storm sewer network, with catch basins and yard drains existing throughout the property, is the Passaic River.  There were also significant contaminated groundwater releases into the Passaic River from unconsolidated deposits at the property.  Several floods in the basement of Building 33-B, where phenol was stored between 1984 and 1994, may have carried phenol to groundwater.  Kalama Specialty Chemicals, Inc. and Emerald Kalama Chemical LLC are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Kalama Specialty Chemicals, Inc. and Emerald Kalama Chemical LLC are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, lead, copper, and PAHs.  Further, Goodrich is liable as a current owner and/or operator of the property.  Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and

CERCLA § 113, Goodrich is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, lead, copper, and PAHs.

187.    RCA Corporation (RCA) was founded by Defendant **General Electric Company ("General Electric")** in 1919, became independent of General Electric in 1932, and was reacquired by General Electric in 1986.  General Electric is the successor to RCA.  RCA's property was located at 415 South 5th Street, Harrison, New Jersey, which is within the Facility.  RCA operated at the property from 1917 until 1976.  The 14-acre property was used to manufacture radio and vacuum tubes.   Raw materials used in the property's operations included trichloroethylene, methanol, barium carbonate, glass, nickel, copper, carbon, and mica.  Operations at the property released mercury into the groundwater, surface waters, building materials, and property soil.  Mercury has been detected in and under buildings on the property and in groundwater at the property.   Further, the property was in the Bergen Street CSO district—where, PVSC reports show, during wet weather, waste frequently bypassed from the PVSC interceptor to the Passaic River.  General Electric is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the General Electric property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, General Electric is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it

disposed of that have contaminated and continue to contaminate the river, including but not limited to PAHs, lead, and copper.

188.    From approximately 1902 through 1971, Defendant **PPG Industries, Inc. (PPG)** or its predecessor entities owned and operated a paint manufacturing facility at 29-75 Riverside Avenue in Newark, New Jersey.  This property is part of the Facility.  As discussed below, the EPA has identified the PPG property itself as a Superfund site, responsible for releasing and disposing of benzene, mercury, chromium, and arsenic into the Passaic River.  PPG manufactured paint, varnish, linseed oil, lacquer, and resin at the property.  Process wastes PPG generated at the property include PCBs, mercury, zinc, cadmium, copper, chromium, and lead.  On information and belief, a 4- to 6-inch sewer pipe discharged from the property directly to the Passaic River.  Onsite buildings had floor drains that discharged directly to the Passaic River via at least seven onsite outfalls.  Furthermore, on multiple occasions, former employees reported direct dumping of raw materials and finished products into the Passaic River.  In September 2012, EPA proposed adding the property to the National Priority List, noting that in 2009 it had identified a source of benzene, mercury, chromium, and arsenic onsite that was discharging to the Passaic River.  EPA's 2009 emergency removal action to stop the discharge to the Passaic River consisted of plugging discharge pipes from several buildings and two related storage tanks.  As part of EPA's 2009 emergency removal action, standing water in the basement of a building was pumped into two frac tanks.  Testing of the frac tank wastewater contained dioxins.  Testing of floor sweep composite samples collected from the first, third, and fifth floors of the building also contained dioxins.  Sediments on or adjacent to the property are polluted with numerous hazardous substances, including dioxins, dioxin-associated compounds, lead, barium, cadmium, chromium, copper, PAH, PCBs, and mercury.  PPG is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including

mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, PPG is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, PCBs, lead, copper, and PAHs.

189.    Defendant **Sequa Corporation ("Sequa")** owned and operated the property located at 185 Foundry Street, Newark, New Jersey from 1967 to 1987.  This property is part of the Facility.  Sequa manufactured organic pigments, including printing and news inks.  Sequa sold part of its business to Defendant **Sun Chemical Corporation ("Sun Chemical")** in 1986.  In turn, Sun Chemical operated the property from 1986 or 1987 to 2003 and owned the property from 1990 to 2004.  Sun Chemical manufactured organic pigments for automotive paints and plastics.  On information and belief, Sun Chemical and/or Sequa received, used, manufactured, discharged, released, stored, and/or disposed of the following hazardous substances at the property: ethyl benzene, toluene, xylene, PCBs, arsenic, cadmium, chromium, lead, acetic acid, bis (2-ethylhexyl) phthalate, sodium hydroxide, dianilinoterephthalic acid, ditoluidinoteriphthalic acid, methanol, and phosphoric acid.  The floor drains in the facility buildings and the facility trenches route from the property to the Roanoke Avenue Combined Sewer Overflow (CSO).  There is a history of flooding at the property, which flowed into the Passaic River through the Roanoke Avenue CSO. From the 1950s to the 1980s, the City of Newark documented that the Roanoke Avenue CSO malfunctioned and bypassed directly to the Passaic River, even in dry weather.  Sequa discharged hazardous substances to the sewer system from 1967 through the early 1980s; these discharges

bypassed to the Passaic River during both dry weather and wet weather.  Hazardous substances discharged to the combined sewer system by Sequa from the early 1980s through 1986 and by Sun Chemical from 1986 to 2004 have discharged to the Passaic River during wet weather bypassing events.  As a result of overflows from the sewer during rain, Sun Chemical continuously released dye of a reddish-purple color into the Passaic River.  High mercury concentrations have been identified in sewer sediment at the property.  Inspectors have noted that effluent from four filter presses drips directly onto concrete floors.  Soil sampling revealed soils contaminated with PCBs; petroleum hydrocarbons; base neutrals; volatile organic compounds; and priority pollutant metals, including copper, lead, and mercury.  Sequa and Sun Chemical are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Sequa and Sun Chemical are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, lead, copper, and PAHs.

190.    Defendant **Alliance Chemical Inc. ("Alliance Chemical")** or its predecessors owned or operated the property at 33 Avenue P, Newark, New Jersey from at least 1946 until 2001. This property is part of the Facility.  Defendant **Pfister Urban Renewal Corporation ("Pfister Urban")** also owned or operated on part of the property or area adjacent to the property concurrently with Alliance Chemical.  From at least 1946 until 2001, Alliance Chemical manufactured specialty organic chemicals including intermediates for the textile and photographic

industries, dye and pigment intermediaries, and diazo and zinc compounds.  Alliance Chemical's dye production is associated with dioxins, furans, dioxin-associated compounds, PCBs, copper, and mercury.  Alliance Chemical has been listed by EPA as a producer of Class II dioxin-associated organic chemicals.  Soil and groundwater sampling at the property indicates the presence of dozens of hazardous substances, including mercury, copper, lead, and other metals; PCBs; chlorobenzene; xylenes; DDx; and numerous dioxin-associated compounds.  During Alliance Chemical's ownership and operation of the property, Alliance Chemical disposed of hazardous substances on the property and into Plum Creek, a tributary of the Passaic River, all of which are part of the Facility.  Alliance Chemical disposed of process effluent into Plum Creek, stored open drums on the property, discharged PCBs into the PVSC system, and created air emissions and chemical runoff in Plum Creek after a 1980 building explosion.  In its January 24, 1991 Response to an EPA CERCLA 104(e) Request for Information Concerning the Passaic River Study Area, Alliance Chemical stated that it continued to discharge process effluent to Plum Creek until 1970.  Beginning in the early 1970s, the wastewater was discharged to the PVSC wastewater treatment plant, where hazardous substances still entered the Passaic River from the Avenue P sewer line, by way of overflow from the Roanoke Avenue CSO.  Alliance Chemical and Pfister Urban are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Alliance Chemical and Pfister Urban are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs

of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, dioxin-associated compounds, PCBs, DDx, lead, copper, and PAHs.

191.    Defendant **DII Industries, LLC (f/k/a Dresser Industries, Inc.) (DII**), a subsidiary of Halliburton Company, owned and operated 401 Worthington Avenue, Harrison, New Jersey from 1985 to 1993.  The property is part of the Facility.  DII manufactured and tested pumps using raw materials such as ferrous and nonferrous metals, cast iron, stainless steel, titanium, various bronzes, brass castings, lubrication oils, water soluble cutting oils, parts washer solution, coolant oil, and Citri-Kleen.  Catch basins on the property as well as soil sampling show dozens of contaminants, including mercury.  On information and belief, the catch basins collected surface water runoff, and the runoff flowed into the Passaic River during bypass events.  Further, process wastewaters were discharged to the Town of Harrison combined sewer system, which bypassed to the Passaic River at the Worthington Avenue CSO.  DII is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, DII is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, dioxin-associated compounds, PCBs, copper, lead, and PAHs.

192.    Defendant **Cooper Industries, LLC (f/k/a Mcgraw-Edison and their predecessors) ("Cooper")**, a subsidiary of Eaton Corporation, and its predecessors owned and operated 401 Worthington Avenue, Harrison, New Jersey from 1904 to 1985. The property is located 0.25 miles north of the Passaic River and is part of the Facility. The main operations on the property were pump manufacturing and testing, specifically machining, assembly, and testing of centrifugal and reciprocating pumps. Metal was melted down in a foundry and poured into molds to make castings. Raw materials used in property operations included ferrous and nonferrous metals, cast iron, stainless steel, titanium, the radioactive materials Cobalt-60 and iridium, and various bronzes and brass castings. Soil contamination includes PAHs, PCBs, mercury, copper, and lead. Groundwater contamination includes PAHs, copper, and lead. Cooper disposed of hazardous substances onto the property and into the Passaic River. Groundwater from the property flows southeast, toward the Passaic River, following the ground surface contours, and thus, based on the proximity of the property to the Passaic River, there is potential for contaminated groundwater from the property to reach the Passaic River. Catch basins located throughout the property—contaminated with PAHs, PCBs, mercury, copper, and lead—collect stormwater runoff and are connected to the Harrison combined sewer system. Wastewaters from the property—contaminated with mercury, iron, and lead—discharged into the Harrison combined sewer system, which bypassed to the Passaic River at the Worthington Avenue CSO. In 1983, approximately 100 gallons of No. 2 fuel oil was discharged to the soil due to a break in an underground line. Leaks from a PCB-containing transformer were noted during an August 1985 ECRA inspection, and during a 1985 ECRA inspection, an overturned 55-gallon drum of toluene and approximately 20 reused waste drums were noted on the north side of the foundry. Mercury and lead were contained in property discharges to the Harrison combined sewers that were subject to bypass to

the Passaic River during wet weather.  The property is located in the Worthington Avenue CSO district.  Historical PVSC reports indicate that wastes were routinely bypassed from the PVSC main interceptor to the Passaic River at the Worthington Avenue CSO overflow location during wet weather.  Cooper is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Cooper is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, PAHs, copper, and lead.

193.    Defendant **Essex Chemical Corporation ("Essex")** operated at 330 Doremus Avenue, Newark, New Jersey from 1953 to 1989.   Defendant **Chemtrade Chemicals Corporation (as successor to Essex Industrial Chemicals Inc.) ("Chemtrade")** or its predecessors operated at 332-352 Doremus Avenue, Newark New Jersey from 1989.  These properties are part of the Facility.  Essex manufactured and processed chemicals using magnesium oxide recovery, sulfuric acid production, oleum and chromium sulfate production, and aluminum sulfate production processes.  Chemical products were loaded into tank cars at the property, potentially leading to spills on the property.  Chromic acid, caustic soda, and waste oil were stored in aboveground storage tanks and underground storage tanks.  Essex also conducted vehicle washing and maintenance operations at the garage and truck washing area.  Essex stored, used, and/or produced sulfuric acid and caustic soda, both of which have been shown to generate

65

mercury throughout the production process.  Soil contamination includes PAHs, PCBs, lead, and mercury.  Groundwater contamination includes PAHs, PCBs, copper, lead, and mercury.  Essex disposed of hazardous substances on the property and into the Passaic River.  For example, Essex discharged noncontact cooling water used during magnesium oxide recovery operations as well as sulfuric acid and sulfur dioxide production to the Passaic River through the National Pollutant Discharge Elimination System (NPDES)-permitted outfall.  Further, on April 4, 1983, aluminum sulfate was directly discharged to the Passaic River via an outfall because of a leaking valve in the storage tank.  Contaminants also reached the Passaic River via the sanitary sewer, and there are documented occasions in which contaminants were discharged to the Passaic River by runoff, spills, and flooding.  In 1991, NJDEP reported that groundwater sampling at the former Essex Industrial Chemicals property identified arsenic, cadmium, chromium, lead, copper, 1,1,1-trichloroethane, nickel and zinc—all above NJDEP groundwater quality standards.  The groundwater contamination continued at least as of 2005.  Essex and Chemtrade are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Essex and Chemtrade are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, dioxin-associated compounds, PCBs, lead, and PAHs.

194.     Defendant **Seton Company, Inc. ("Seton")** has owned and operated 849 Broadway, Newark, New Jersey from 1906 to the present day.  This property is part of the Facility. Seton manufactures leather for shoes, handbags, and automobiles.  Seton discharged to the Verona Avenue combined sewer district until 1992, when a civil action brought by PVSC compelled Seton and the City of Newark to construct a separate sewer line from the Seton facility directly to the PVSC interceptor.  In addition to overflows during rain from the Verona Avenue CSO, Seton discharged hazardous substances to the Passaic River via other pathways.  For example, between September 1987 and December 1990, PVSC samples of Seton's waste effluent indicated "high" or "violation" levels of chromium on nine occasions and "high" or "violation" levels of sulfides on fifteen occasions.  In addition to chromium and sulfides, PCBs, 2-butanone, toluene, mercury, copper, lead, and PAHs were found on the property.  Seton is liable as the current owner and/or operator of the property.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, Seton is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, copper, lead, and PAHs.

195.     Defendant **Royce Associates, a Limited Partnership (f/k/a Royce Chemical Company) ("Royce")** owned and operated 17 Carlton Avenue, East Rutherford, New Jersey from 1929 to 1982.  This property is part of the Facility.  From 1931 to 1982, Royce manufactured sodium hydrosulfite, zinc oxide, sodium sulfoxalate formaldehyde, and zinc sulfoxalate

formaldehyde as ingredients for the textile and rubber manufacturing industries. Royce also manufactured sodium dithionite, sodium, zinc hydroxymethane sulfinite, and zinc oxide. The raw materials Royce used included sulfur dioxide, sodium chloride, methanol, formaldehyde, and caustic soda. From at least 1941 to 1982, Royce reportedly used a large lake/pond at the rear of the property to receive noncontact cooling water, the overflow of which was received by a drainage ditch along the southern border of the property and ultimately discharged to the Passaic River. Spills occurred on the property, including two spills of oily material and "white powder," 350 gallons of diesel fuel, and No. 6 heating oil. The property's soil is contaminated with chlorobenzene, ethylbenzene, trichlorofluoromethane, toluene, arsenic, lead, and mercury. Sediment from the property's pond is contaminated with benzene, methylene chloride, arsenic, lead, mercury, and barium. Royce disposed of hazardous substances onto the property and into the Passaic River. A drainage ditch along the southern edge of the property discharged to the Passaic River. Industrial process wastes from the property were discharged to the PVSC system. Royce is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Royce is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury, and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, copper, and lead.

196.     Defendant **BASF Corporation (BASF)** and its predecessors owned and operated 150 Wagaraw Road, Hawthorne, New Jersey from 1946 to 1986. This property is part of the

Facility.   Historically, textile pigment dispersions, dyestuffs, pigments, and dyes were manufactured at the property, and BASF continued the same operations and also manufactured special polymers and chemicals.  BASF utilized dioxin-associated compounds, and the filter tanks used to filter Passaic River water for cooling purposes contained various dioxins and furans.  Over the years of property development and operation, the property has been subject to several spills, releases, and disposals of process wastes on the property.  COCs stored, used, and/or produced at the property included mercury, dioxin-associated compounds, copper, lead, PCBs, and PAHs.  Soil contamination includes mercury, dioxin-associated compounds, dieldrin, PAHs, PCBs, copper, and lead.   The property's groundwater is contaminated with mercury, dioxin-associated compounds, PAHs, copper, and lead.  The property's stormwater contamination includes dioxin-associated compounds and PAHs. There are documented discharges of hazardous substances from the property to the Passaic River.  As examples: In 1977, fuel oil spilled to the ground and reached the drainage ditch, and in 1978, paint was discharged at the property, and the paint also appeared in the drainage ditch.  In 1986, sulfuric acid overfilled a tank and flowed to a nearby drain.  Floor and trench drains from the manufacturing facility connected to the process sewer and then discharged to the PVSC sewer system.  During the time there were operations on the property (1950 to 1986), wastewater generated at the property was discharged to the Yantacaw Street outfall, which was a "permitted" discharge point to the Passaic River, during various bypassing events.  As of late 1985, the property was reported to discharge 450,000 gallons a day of untreated process water to the PVSC system.  Since 1985, and likely before this time, the yard area contained drains for storm runoff.   These drains also discharged noncontact cooling water and boiler blowdown to the Passaic River.  Storm sewer catch basins were connected to an unlined ditch, which led to an outfall at the Passaic River.  In 1967, drums that stored sulfuric acid were found

69

to be leaking, and historically, stormwater runoff was discharged to the Passaic River. Additionally, nitrobenzene leaked from a tank farm, and nitrobenzene, aniline, and other base neutral compounds were then found in the groundwater below the property.  Groundwater flow at the property is in the direction of the Passaic River.  BASF is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, BASF is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to copper, lead, and chromium.

197.    Defendant **Mallinckrodt LLC ("Mallinckrodt")** and its predecessors operated at a property located at 223 West Side Avenue, Jersey City, New Jersey.[31]  From 1982 to 1993, Defendant **MI Holdings, Inc. ("MI Holdings")** and its predecessors owned and operated the property.  This property is part of the Facility.  Since 1887, Mallinckrodt and its predecessors have produced and packaged a host of chemicals at the property, including but not limited to iron oxides and salts (including ferrous sulfate and ferric chloride), mercury oxides and salts (including red mercuric oxide), bichloride for mercury processing, medicinal chemicals, photographic chemicals,

---

[31] Defendant Mallinckrodt is a cash-out party, having entered into an Administrative Settlement Agreement with EPA, with respect to the 165-167 Main Street, Lodi, New Jersey Property.  It is not a cash-out party with respect to the Jersey City Property operations, which are the subject of this complaint.

uranium trioxide, acetone, alcohols, benzene, ethers, inorganic chemicals, mineral acids, potassium chloride, potassium sulfate, sodium nitrate, toluene, xylenes, and zinc acetate.  In the 1940s, a Mallinckrodt predecessor under contract with the federal government conducted work related to the Manhattan Project, converting uranyl nitrate into uranium trioxide.  From 1982 to 1993, MI Holdings manufactured calcium stearate dispersions, diagnostic chemicals, food preservatives, surfactants, and zinc stearate dispersions.  The following COCs have been detected at the property: mercury, dioxin-associated compounds, PAHs, copper, and lead.  Through numerous pathways, Mallinckrodt, MI Holdings, and their predecessors released, among other hazardous substances, mercury, dioxin-associated compounds, copper, lead, and PAHs into the public waters at the confluence of the Passaic River, Hackensack River, and Newark Bay, which has a tidal influence on the Passaic River:

- 1887-1924:  through direct discharges of untreated wastewater from the property to Morris Canal.

- 1887-1957:  through direct discharges of untreated wastewaters.

- 1957-1993: (a) during dry weather and wet weather, through direct discharges of untreated wastewater through the Fisk Street CSO; and (b) during operational upsets and related bypassing events that occurred at the western portion of the property's publicly owned treatment works outfall, through direct discharges of untreated wastewater.

The following COCs were detected in sediments near the west side outfall and the Fisk Street CSO: dioxin-associated compounds (1,2- dichlorobenzene and gamma-BHC), LMW and HMW PAHs, copper, lead, and mercury.  Further, NJDEP listed the property on its Known Contaminated Sites List.  In October 1992, MI Holdings entered into a memorandum of agreement with NJDEP

to voluntarily clean up mercury contamination on the eastern portion of the property.  In 1993, the western portion of this property was remediated under NJDEP's Voluntary Site Cleanup Program. Mallinckrodt and MI Holdings are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Mallinckrodt and MI Holdings are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxin-associated compounds, copper, lead, and PAHs.

198.    Defendant **BASF Catalysts LLC (f/k/a Engelhard Corporation) ("BASF Catalysts" or "Engelhard")** began operations at 1 West Central Avenue, East Newark, New Jersey in 1953.  The property is part of the Facility.  Operations at this property included potassium gold cyanide manufacture, silver cyanide salt production, and the manufacture of ink paste and powder containing heavy metals (also described as precious metal coating products).  Raw materials used in operations include precious metals (gold, platinum, palladium, rhodium, iridium, and ruthenium); resin solutions; and organic solvents.  Various forms submitted to PVSC by Engelhard (BASF Catalysts predecessor) between 1972 and 2003 indicate multiple COCs were located on the property. Hazardous substances suspected to be present on the property include mercury, lead, 1,1,1-trichlorethane, and arsenic.  The property is located in the Central Avenue CSO district, which is one of the permitted discharge points to the Passaic River.  Historical PVSC reports indicate that wastes were routinely bypassed from this CSO district to the Passaic River

during wet weather.  PVSC documents also indicate that an 18-inch stormwater outfall existed from the property to the Passaic River.  On March 6, 1990, Engelhard received a notice of violation from PVSC for Lower Explosive Limit excursions.  On February 4, 1991, Engelhard submitted a notification of hazardous wastes discharge of sodium sulfate and excess sodium hydroxide to the sanitary sewer.  BASF Catalysts is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including mercury from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, BASF Catalysts is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping mercury and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to  copper, lead, and PAHs.

### C.    Dioxins

199.    OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of dioxins (among other hazardous substances) that have contaminated and continue to contaminate the sediments of the Lower Passaic River.

200.    From 1924 to 1998, Defendant **Givaudan Fragrances Corporation ("Givaudan") (formerly known as Givaudan-Roure Corporation)** manufactured aromatic chemicals, flavors, fragrances, pharmaceuticals, intermediates, and pesticides at 100 Delawanna Avenue and 125 Delawanna Avenue in Clifton, New Jersey, slightly upstream from mile 10.9 of the Passaic River.  This property is part of the Facility.  From 1947 to 1984, Givaudan

manufactured hexachlorophene (HCP) on the property and, at times, was the largest HCP maker in the world.  From 1947 to 1949, Givaudan manufactured 2,4,5-TCP feedstock at the property. Givaudan's processes, including the manufacture of HCP, generated dioxins and furans, including 2,3,7,8-TCDD, as a manufacturing byproduct.  Batches of HCP produced at Givaudan contained up to 893 ppb of 2,3,7,8-TCDD, confirming that dioxins were generated in its HCP production process.  In addition to generating dioxins, Givaudan maintained a chemical effluent pit near its process buildings containing mercury, lead, and copper, among other hazardous chemicals.  Soil in the eastern portion of the property, including in the area of the former chemical effluent pit and adjacent stormwater retention pond, was contaminated with 2,3,7,8-TCDD, 2,4,5-TCP, mercury, lead, copper, PAHs, DDx, and dieldrin, among other hazardous substances.  Stormwater runoff, including overflow from the stormwater retention pond, flowed through these contaminated areas and discharged via a series of swales and pipes along the eastern portion of the property to a storm drain that discharged through a storm sewer in River Road to the Passaic River.  Upon information and belief, until the 1950s, Givaudan directly discharged untreated process waste to the chemical sewer, which drained into the Third River and the Passaic River.  After the 1950s, Givaudan discharged to the PVSC hazardous substances where numerous documented storm events and line breaks resulted in discharges to the Third River and the Passaic River.  A July 13, 2017 memorandum addressed to EPA personnel found that the dioxins from the property are prevalent in the Passaic River sediments adjacent to the property and in sediments downriver.  Givaudan is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including dioxins and furans from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA

§§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Givaudan is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, mercury, DDT, dieldrin, copper, lead, and PAHs.

201. **The CSD Property**. The Central Steel Drum property, a former drum processing plant, is located at 704 Doremus Avenue, Newark, New Jersey, approximately 0.9 miles south of the Passaic River and approximately 0.5 miles west of the confluence of the Passaic River and Newark Bay, which is within the Facility (the "CSD Property"). In 1951, the Central Steel Drum Company (CSD) bought the CSD Property. CSD stored, incinerated, painted, and reconditioned steel drums that contained residues of foods, paints, and organic and inorganic chemicals, including hazardous substances. Every day, CSD received and processed approximately 3,000 30- and 55-gallon drums—many still containing waste—from the food, paint, adhesives, and ink industries. Specifically, the following Defendants contracted for the disposal or treatment of hazardous substances at the CSD Property:

- Defendant **3M Company (f/k/a Minnesota Mining & Manufacturing Co.)**

- Defendant **BASF Corporation (f/k/a Inmont Corporation f/k/a to InterChemical Corporation)**

- Defendant **Akzo Nobel Coatings, Inc. (f/k/a Reliance Universal, Inc.)**

- Defendant **American Inks & Coatings Corporation**

- Defendant **Rexam Beverage Can Company (f/k/a American National Can Company)**

- Defendant **APOLAN International, Inc. (f/k/a Atlantic Polymers & Products, Inc.)**

- Defendant **Borden & Remington Corp.**

- Defendant **Hexion Inc. (f/k/a Borden Chemical, Inc.)**

- Defendant **Novartis Corporation (f/k/a Ciba Geigy Corporation)**

- Defendant **Houghton International Inc. (f/k/a E.F. Houghton & Co., Inc.)**

- Defendant **Flint Group Incorporated (f/k/a Flint Ink Corporation)**

- Defendant **Fort James LLC (f/k/a Fort James Corporation f/k/a Crown Zellerbach Corporation)**

- Defendant **INX International Ink Co. (f/k/a Midland Color Company and f/k/a Roberts & Carlson, Inc.)**

- Defendant **R. T. Vanderbilt Holding Company, Inc. (f/k/a R. T. Vanderbilt Company, Inc., f/k/a Vanderbilt Chemical Corporation)**

- Defendant **The Sherwin-Williams Company (as successor to The Valspar Corporation, as successor to Lilly Industries Inc., as successor to Guardsman Products, Inc.)**[32]

These Defendants arranged for CSD to dispose of their spent and unusable waste.  CSD removed hazardous substances from the drums by incinerating them, creating ash piles five feet high and fifteen feet in diameter, unprotected from wind and rain.  Most ash was spread throughout the CSD Property to fill in potholes and wetland areas.  On the CSD Property, drainage ditches collected runoff from the entire CSD Property and discharged this runoff to the Newark Bay at the confluence of the Passaic River, approximately 2,600 feet east of the CSD Property, and near RM 0 to RM 0.5.  Newark Bay tidally influences the Passaic River.  Soil samples showed dioxins, PCBs, and pesticides, LMW/HMW PAHs, DDT, dieldrin, copper, lead, mercury, and PAHs. Disposals of dioxins and other hazardous substances from the CSD Property have contaminated and continue to contaminate the sediments of the Passaic River.  Under CERCLA § 107(a)(3) and

---

[32] Together, the following entities are referred to as the "CSD Defendants":  3M Company; BASF Corporation; Akzo Nobel Coatings, Inc.; American Inks & Coatings Corporation; Rexam Beverage Can Company; APOLAN International, Inc.; Borden & Remington Corp.; Hexion Inc.; Novartis Corporation; Houghton International Inc.; Flint Group Incorporated; Fort James; INX International Ink Co.; The Sherwin Williams Company; and R. T. Vanderbilt Holding Company, Inc.

CERCLA § 113, the CSD Defendants are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and capping dioxins and other hazardous substances that have contaminated and continue to contaminate the river, including but not limited to DDT, dieldrin, copper, lead, mercury and PAHs.[33]

202.     Defendant **Roselle Mausoleum Maintenance Fund, Inc. (f/k/a Peter Roselle & Sons, Inc.) (the "Roselle Entities")** operated two landfills in Kearny, New Jersey.  The Kearny Landfill (later known as the MSLA 1D Landfill) operated at 1500 Harrison Avenue, and the Keegan Landfill (later known as MSLA 1B Landfill) operated at the foot of Bergen Avenue.  The Kearny and Keegan Landfills are part of the Facility.  Starting in the late 1940s until the early 1980s, the Roselle Entities leased property from the Town of Kearny as individual entities and as a joint venture named the Municipal Sanitary Landfill Authority (MSLA) to operate the Kearny and Keegan Landfills, where they accepted both municipal and industrial waste.  During the Roselle Entities' operation of the landfills, hazardous substances were disposed of or otherwise came to be located on the Kearny and Keegan Landfills and in the Passaic River.  During the Roselle Entities' participation in the hauling business, they arranged for the disposal of hazardous substances at Kearny and Keegan Landfills, during which hazardous substances were disposed of or otherwise came to be located at Kearny and Keegan Landfills and in the Passaic River.

- **The Kearny Landfill**. Upon information and belief, during the Roselle Entities' operation of the Kearny Landfill, the Roselle Entities disposed of or arranged for the disposal of industrial waste including sludges, pharmaceuticals, activated charcoal and scrubber sludge, filter cake, asphaltic bottoms, insecticides, and pesticides containing

---

[33] BASF Corporation's liability is subject to the contribution release described in paragraph 44 above.

hazardous substances into the Passaic River.  Leachate, surface runoff, and drainage discharge from the ditches at the landfill flow into Cedar Creek and Frank's Creek, which are tributaries to the Passaic River.  As of 1995, an estimated 250,000 gallons per day of leachate from the Kearny Landfill, including dioxin-associated compounds (chlorobenzene, 1,4-dichlorobenzene), DDT, PAHs, copper, lead, and mercury, discharged to the Passaic River.  The Roselle Entities are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including dioxins from the Kearny Landfill have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, the Roselle Entities are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, DDT, PAHs, copper, lead, mercury, and dieldrin.

- **The Keegan Landfill.** Upon information and belief, during the Roselle Entities' operation of the Keegan Landfill, the Roselle Entities disposed of or arranged for the disposal of industrial waste including drummed industrial waste containing hazardous substances into the Passaic River.  Leachate, surface runoff, and drainage discharge from the ditches at the landfill flow into Frank's Creek and an unnamed creek, both tributaries to the Passaic River.  DDT, dieldrin, 2,3,7,8-TCDD, PAHs, PCBs, copper, lead, and mercury have been detected in soils on the Keegan Landfill.  Stormwater

flowed through contaminated areas on the Keegan Landfill and discharged to tributaries of the Passaic River via runoff during wet weather, including approximately 65 million gallons of contaminated leachate annually.  The Roselle Entities are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including dioxins from the Keegan Landfill have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, the Roselle Entities are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to DDT, dieldrin, PCBs, PAHs, copper, lead, and mercury.

203.    From 1902 until manufacturing operations ceased in 1999, Defendant **The Sherwin-Williams Company ("Sherwin Williams")** conducted multiple manufacturing processes at its facilities, including the manufacturing of paints and related products and DDT and storage of insecticides at its property located at 40, 60, and 62-70 Lister Avenue in Newark, New Jersey.  This property is part of the Facility.  Pentachlorophenol (a Class I Pesticide Chemical associated with dioxin formation), copper, lead, and mercury were identified by Sherwin Williams as potentially present in products made at the property prior to 1984.  Sherwin Williams used carbazole violet pigment in its paint, which contains chloranil, a Class I Pesticide Chemical associated with the formation of dioxins.  Soil sampling at the property identified hazardous substances, including dioxins; several dioxin-associated substances; DDx; PAHs; PCBs; and

metals, including arsenic, copper, lead, mercury, thallium, and zinc.  Former employees observed dumping of process waste, drums filled with waste from prior spills, damaged products, paint, and other products directly into the Passaic River.  Additionally, more than seven outfall pipes discharged to the Passaic River.  The Brown Street CSO, located in the bulkhead of the property, discharged combined process waste and stormwater from the property prior to 1970 and continued to discharge stormwater after 1970.  Sherwin Williams is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including dioxins from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Sherwin Williams is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, mercury, DDT, dieldrin, lead, copper, and PAHs.

204.    Defendant **Ashland LLC (f/k/a Ashland Chemical Company) ("Ashland")** operated the property located at 1106 Harrison Avenue in Kearny, New Jersey (the "Drew Chemical Corporation Property") from approximately 1970 to at least 2010.  This property is part of the Facility.  Ashland is the successor in interest to Drew Chemical Corporation.  Drew Chemical Corporation purchased the Drew Chemical Corporation Property in 1970 and began its operations.  Drew Chemical Corporation operated a production and warehouse facility involved in the manufacture of industrial water treatment chemicals, boiler compounds, paint defoamers, and other specialty chemicals.  Additional industrial processes included reactor work used for esterification and saponification.  In 1975, the company reportedly produced approximately 33-

million pounds of products per year, with that number increasing to as high as 50-million pounds in 1989.  Raw materials were shipped to the Drew Chemical Corporation Property by truck and stored in aboveground storage tanks.  When needed, the chemicals were pumped from the tanks to the production areas, where vessels and reactors were used.  The drum storage area had a capacity of 60 to 70 drums.   Drums stored in the area contained hazardous waste, including "floor sweepings, laboratory waste reagents, filter waste, and off-specification chemicals which were no longer reclaimable."  While it was reported that the company produced more than 500 products, the principal products produced at the Drew Chemical Corporation Property were water treatment chemicals (e.g., boil water compounds, cooling water treatment systems); wastewater flocculants; process aids (e.g., latex paint defoamers); and maintenance chemicals (e.g., degreasers, antiscalants, general purpose cleaners).  Drew Chemical Corporation's 1992 Community Right to Know survey lists 314 pages of hazardous substances and chemicals as being used or produced onsite.  In particular, COCs stored, used, and/or produced at the Drew Chemical Corporation Property included dioxins and dioxin-associated compounds, PAHs, PCBs, copper, lead, and mercury.  Site soil contamination includes PAHs, PCBs, copper, lead, mercury, volatile organic compounds, and semi-volatile organic compounds, mercury, dioxin-associated compounds, and dieldrin.  Based on information compiled to date, dioxins associated with the Site have been identified in local area soil and sediments.  Site effluent contamination includes copper, lead, and volatile organic compounds.  There are documented discharges of hazardous substances from the Drew Chemical Corporation Property to the Passaic River.  As examples: Drew Chemical Company discharged waste material to the Kearny municipal sewer system without a permit for approximately five years.  In 1977, the company's wastewater flow into the municipal sewer system was reported as 87,500 gallons per day.  The 1975 NPDES permit for PVSC included the

81

combined sewer outfall at Worthington Avenue in Harrison as one of the permitted discharge points to the Passaic River. Historical PVSC reports indicate that wastes were routinely bypassed from the PVSC main interceptor to the Passaic River at the Worthington Avenue CSO location during wet weather. Therefore, a pathway existed for contaminated wastewaters from the property to enter the Passaic River during periods of heavy precipitation. Drew Chemical Corporation also reported that industrial waste generated at the Drew Chemical Corporation Property was discharged to the Kearny sanitary sewer located on the south side of Harrison Avenue. PVSC cited the company for various violations, many involving pH noncompliance for wastewaters entering into the municipal sewer system. An article dated March 18, 1989 reported Drew Chemical Corporation as one of the many industrial facilities releasing toxins into the sewer systems of Hudson County. The toxins reportedly released from the Drew Chemical Corporation Property in 1988 from May 1 to October 31 were 11 pounds of ethylene glycol, 22 pounds of zinc compounds, 6 pounds of acrylamide, and 8 pounds of chromium compounds. During waste effluent surveys conducted between 1972 and 1991, hazardous substances such as copper and lead were detected in wastewater. On November 19, 1985, the company reported that approximately 400 gallons of reacted and unreacted polyacrylamide polymer were spilled onsite, with approximately 70% of that contaminant entering a catch basin in the parking lot before it entered the sewage system. Additionally, COCs detected in site soil and used in industrial operations at the Drew Chemical Corporation Property were likely transported into site storm drains and into the Lower Passaic River via the Frank's Creek tributary. Groundwater flows towards the Passaic River. Ashland is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including dioxins from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be

removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Ashland is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances they disposed of that have contaminated and continue to contaminate the Passaic River, including but not limited to PAHs, copper, lead and mercury.

205.    Defendant **Melon Leasing Corporation, Inc.** currently owns 109-113 Jacobus Avenue, a portion of property once owned by Defendant **Clean Earth of North Jersey, Inc.** (**"Clean Earth"**).  Clean Earth and its predecessors operated on a property located at 101-115 Jacobus Avenue, Kearny, New Jersey.  Clean Earth is the current partial owner of the 101-115 Jacobus Avenue property and has operated it since 1984.   Specifically, the area located at 101-105 Jacobus Avenue is owned by Clean Earth; Clean Earth leases the property at 109-113 Jacobus Avenue from Melon Leasing Corporation, Inc.; and the property at 115 Jacobus Avenue serves as Clean Earth's offices and onsite laboratory.  This property is part of the Facility.  Clean Earth is the ultimate successor via mergers and name changes involving S&W Waste, Inc.  From 1984 to the present, Clean Earth and its predecessors provided hazardous and nonhazardous waste treatment and disposal for third parties at the property.  Specifically, on October 3, 1984, Clean Earth began its operation of a hazardous waste treatment, storage, and disposal (TSD) facility at the property, processing solid and liquid wastes for resale or disposal.  Clean Earth continues to operate a hazardous and nonhazardous waste TSD facility at the property.  Clean Earth ships and receives waste by both highway and rail in both bulk and nonbulk containers.  The primary waste treatment operations at the property include the following: solidification/stabilization of solids, slurries, and sludges in concrete cells, containers, and the property's containment building;

repackaging of waste containers and laboratory packs; repackaging and consolidation of PCB wastes; storage of wastes; blending/bulking of wastes in tanks and tankers; and collection and transfer of batteries, pesticides, mercury-containing devices, consumer electronics, lamps, and oil-based finishes.  Permitted hazardous waste storage at the property (as of 1992) was 60,000 gallons of liquid waste in five tanks and up to an additional 187,000 gallons of waste in drums, rolloffs, and tankers.  Clean Earth previously has indicated the acceptance of an extensive list of over 540 waste products, including dioxins, dioxin-associated compounds, DDx, PCBs, copper, mercury, lead, dieldrin, and PAHs.  Numerous spills have been documented at the property, including paints and resins, dry-form acid, hydraulic oil, liquid containing lead, solvents, oil sludge, liquid acid, and solidified hazardous waste.  These spills were each reported as remediated at the time they were observed.  In addition, potentially contaminated stormwater has been observed overflowing containment berms at the property more than once.  The property itself has been documented to be contaminated with various hazardous substances in soil and groundwater and has been undergoing remediation since 1997 under an AOC executed between NJDEP and Clean Earth in 1991.  Site soil contamination includes various dioxins or dioxin-associated compounds; it also includes PCBs, copper, lead, and mercury.  Site groundwater contamination includes dioxin-associated compounds, PAHs, PCBs, copper, lead, and mercury.   A chronology of onsite remedial investigation and remediation includes the following: From 1986 to 1987, Clean Earth sampled groundwater from monitoring wells at the property, and dioxin-associated compounds were found. Other substances such as benzenes, lead, arsenic, and PAHs were also found in groundwater. According to a 1988 Resource Conservation and Recovery Act (RCRA) facility investigation report, which was necessitated by documented discharges to soil, Clean Earth was required to prepare an assessment plan proposal report that would include a groundwater monitoring and soil

sampling program.  In 1990, NJDEP confirmed the presence of dioxins in soil samples.  Two 2,000-gallon underground storage tanks were removed from the property in 1990.  Also in 1990, Clean Earth was required by NJDEP to perform a remedial investigation.  In 1992, Clean Earth prepared a modified remedial investigation work plan.  Twenty-eight soil samples were taken, and eleven areas of concern were identified.  The NJDEP approved Clean Earth's remedial investigation report in 1996, leading to the development of a remedial alternative analysis and remedial action workplan, which was submitted by Clean Earth to NJDEP in 1997.  In 1998, Clean Earth submitted a remedial action report to NJDEP, and a two-year groundwater monitoring plan was also proposed to address metal-contaminated soils.   Around 2006 to 2007, Clean Earth introduced a remedial action report that related to portions of the property, but in April 2008, NJDEP advised that the 2007 remedial action report had deficiencies.  There are documented discharges of hazardous substances from the property to the Passaic River.  As examples: The property is connected to the Kearny Municipal Utilities Authority sewer system via Jacobus Avenue.  In 1955, the Town of Kearny constructed the Kearny Sewage Treatment Plant, to which the property wastewater discharged.  Incoming wastewater to the Kearny Sewage Treatment Plant underwent primary treatment and chlorination before discharge via the plant's outfall.  During periods when incoming wastewater surpassed the treatment plant's capacity, the wastewater first entered a regulated chamber where it was then bypassed, untreated, via the plant's outfall, which then discharged to the Hackensack River directly at the confluence of the Passaic River, Hackensack River, and Newark Bay, which tidally influences the Passaic River.  Indeed, the Kearny Sewage Treatment Plant had a well-documented history of noncompliance related to spills, leaks, and discharges.  Groundwater generally flows west toward the Passaic River.  Upon information and belief, a nexus exists between the property and the Passaic River via groundwater

85

flow.  Regarding runoff, the property is bordered to the west by the Lower Passaic River, and potentially contaminated stormwater had been observed overflowing containment berms at the property on more than one occasion.  Clean Earth and Melon Leasing Corporation, Inc. are liable as current owners and/or operators of the property.  Releases of dioxins from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, Clean Earth and Melon Leasing Corporation, Inc. are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dioxins and other hazardous substances they disposed of that have contaminated and continue to contaminate the Passaic River, including but not limited to PAHs, mercury, lead and copper.

206.  **Bayonne Barrel & Drum Property.** The Bayonne Barrel & Drum property, a former drum processing plant, is located at 150-154 Raymond Boulevard, Newark, New Jersey, approximately 1,800 feet west of the Passaic River within the Facility (the "Bayonne Barrel Property").  From 1940 until 1983, Bayonne Barrel & Drum operations on the Bayonne Barrel Property consisted of cleaning and reconditioning steel drums sent to its site by its customers.  The drums sent to the Bayonne Barrel Property contained waste, including hazardous substances. Customers of Bayonne Barrel & Drum arranged for and intended Bayonne Barrel & Drum to dispose of their spent and unusable waste present in the drums.  Removal of hazardous substances and other wastes from the drums was accomplished using chains and caustic solution or through incineration.  Wastewater from removing waste from the drums using solution flowed into a settling sluice and holding tanks and then was discharged to a drainage ditch that flowed into the sanitary sewer or on numerous occasions flowed into Harrison Creek, a tributary of the Passaic

River.  Wastewater at the site has been tested to contain, among other hazardous substances, copper, lead, mercury, PAHs, and PCBs.  Waste ash (containing hazardous substances) from removing waste through incineration was stored in numerous disposal piles on the property. Sampling of eight ash piles showed the presence of dioxins, PCBs, and metals.  Surface runoff from the property, including from the ash piles, flowed through a series of storm drains and into Harrison Creek and the Passaic River.  An accidental spill of red dye on the Bayonne Barrel Property in 1984 immediately ran into Harrison Creek, demonstrating the runoff pathway to the Passaic River.  Moreover, a study by the New York Academy of Sciences found that, as of 2006, the site runoff was still contributing between 1 and 9 grams of toxic equivalency values of dioxins to the Passaic River each year.  Pursuant to an Administrative Order on Consent for Removal Action, numerous parties that had arranged for disposal of hazardous substances at the Bayonne Barrel Property agreed to perform removal activities there.  These parties include the following Defendants:

- Defendant **3M Company**

- Defendant **BASF Corporation**

- Defendant **Zeneca Inc.**

- Defendant **E.I. du Pont de Nemours & Company**

- Defendant **Hoffmann-La Roche Inc.**

- Defendant **Johnson & Johnson**

- Defendant **Pharmacia LLC (f/k/a Monsanto Company)**

- Defendant **Ingredion Incorporated**

- Defendant **Akzo Nobel Coatings, Inc.**[34]

---

[34] Together, the following entities are referred to as the "BBD Defendants": 3M Company; BASF Corporation; Zeneca

Disposals of dioxins from the Bayonne Barrel & Drum Property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  The BBD Defendants arranged for the disposal or treatment of hazardous substances at the Facility.  Under CERCLA § 107(a)(3) and CERCLA § 113, the BBD Defendants are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and capping dioxins and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, mercury, DDT, copper, lead, and PAHs.[35]

**D.    DDT**

207.    OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of DDT or its breakdown products (among other hazardous substances) that have contaminated and continue to contaminate the sediments of the Lower Passaic River.

208.    Defendant **21st Century Fox America, Inc. (f/k/a News America, Inc./Montrose Chemical Company/Chris Craft Industries) ("Fox America")** operated a manufacturing plant at 100/120 Lister Avenue in Newark from 1939 to 1972 at which it manufactured many organic chemicals; herbicides; and pesticides, including up to 3-million pounds of DDT per year.  This property is part of the Facility.  Fox America manufactured 2,4-D and 2,4,5-T at the property and likely generated dioxins and furans as a manufacturing byproduct of these processes.  It also

---

Inc.; E.I. du Pont de Nemours & Company; Hoffman-La Roche Inc.; Johnson & Johnson; Pharmacia Corporation, now known as Pharmacia LLC; Ingredion Incorporated; and Akzo Nobel Coatings, Inc.

[35] Pharmacia's liability and BASF Corporation's liability are subject to the contribution release described in paragraph 44 above.

manufactured several dioxin-associated chemicals including, among other chemicals, the gamma isomer of benzene hexachloride (lindane), hexachlorobenzene, trichlorobenzene, propanil, and likely tetrachlorobenzene.   Dioxin-associated compounds, including dichlorobenzenes, dichlorophenol, phthalic anhydride, and pentachlorophenol, were used in and/or produced by processes at the property.   Fox America's predecessor, Montrose Chemical Company, also produced several types of phthalate compounds including bis(2-ethylhexyl) phthalate, butyl phthalate, dimethyl phthalate, and dioctyl phthalate. Metals like lead and copper were likely discharged with property wastewater as a result of corrosion of site process equipment.   The operations of a related company, Montrose Refining Company, occurred at the 100/120 Lister Avenue property from approximately 1939 to 1944 and involved the refining of waste crankcase oil.  Waste oils have historically been identified as containing PCBs and PAHs.  Soil contamination at the property reflects the property's operations, with elevated concentrations of DDx, dichlorophenol, trichlorophenol, lindane, and chlorinated benzenes, as well as COCs dieldrin and mercury.  In addition to its operations at the property, Montrose Chemical Company operated on a portion of the adjacent Sherwin-Williams Site at 70 Lister Avenue from 1935 to 1943, at which soil contamination is similar in nature and concentration to the soil contamination at the 100/120 Lister Avenue property and was found to contain dioxins and furans, chlorobenzene, dichlorobenzenes, and trichlorobenzene.  Two sewer connections were historically present at the property that lead directly to the Passaic River as of 1914, which Montrose Chemical Company may have continued to use.  Additionally, process wastes from the property that were ultimately discharged to the city sewer system may have discharged through a regulator located at Brown Street, which subsequently discharged to the Passaic River at Sherwin Williams's property.  Storm drains on the property flowed to the Brown Street outfall to the Passaic River prior to 1970 and

the Lockwood Street outfall to the Passaic River after 1970.  Further, pipes in line with the facility driveway discharged process wastes directly to the Passaic River through the adjacent Hilton Davis property.  Fox America is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of DDT from Fox America have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Fox America is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping DDT and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, PCBs, mercury, dieldrin, lead, copper, and PAHs.

209.    Defendant **Conopco, Inc. (f/k/a S. B. Penick Company), d/b/a Unilever Best Foods North America ("Unilever")**, as the successor to the S. B. Penick Company, and its predecessors, owned and operated a 17-acre property located at 540 New York Avenue in Lyndhurst, New Jersey from 1938 to 1986.  This property is part of the Facility.  Defendant **Aventisub LLC (f/k/a Roussel Uclaf) ("Aventisub")** or its predecessors operated the property from 1985 to 1987 as part of their pesticide and agrichemical business.  The plant at the property manufactured pharmaceuticals and pesticides, including DDT.  Sampling performed in July 1984 indicated that the property's soil was contaminated with lindane, DDT, DDE, DDD, chlordane, α-BHC, b-BHC, aldrin, heptachlor, and dieldrin.  Buildings 6 and 7 of the plant were contaminated with DDT, as well as other pesticide substances and byproducts, including compounds associated with the formation of dioxins.  Maleic acid (a dioxin-associated chemical) was identified at the property.  In April 1995, a predecessor to Unilever submitted proposed language for a Declaration of Environmental Restriction for the property under the Industrial Site Recovery Act.  The draft

declaration listed pesticides and herbicides, PAHs, dioxin-associated compounds, metals, and other hazardous substances.   These hazardous substances included 4'4' DDT, chlordane, heptachlor, and other substances in site soils.  The property has a clear pathway to the Passaic River.  The storm sewer adjacent to this heavily contaminated property leads to the Passaic River. During the plant's operating period, PVSC cited Unilever for polluting wastewater discharges from the property to the Passaic River.   Additionally, runoff from the property entered the South Drainage Ditch, which discharged to a storm drain that leads to the Passaic River.  On information and belief, Unilever left unsealed drums containing contaminated dirt at the property and had underground chemical storage tanks that lacked safety devices and leaked frequently.   Unilever and Aventisub are liable as owners and/or operators at the time of disposal of hazardous substances. Releases of DDT by Unilever and Aventisub have contaminated and continue to contaminate the sediments in the Lower Passaic River and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.   Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Unilever and Aventisub are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping DDT and other hazardous substances they disposed of that have contaminated and continue to contaminate the Passaic River, including but not limited to PAHs.

### E.      Copper

210.    OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of copper (among other hazardous substances) that have contaminated and continue to contaminate the sediments of the Lower Passaic River.

211.    The Thomasset/Hilton Davis business owned by Defendant **Noveon Hilton Davis, Inc., a subsidiary of Dystar LP ("Noveon Hilton Davis")** operated at the property located at 104-112 Lister Avenue (also referenced as 120 Lister Avenue) in Newark, New Jersey (which is also designated as Block 2438, Lot 56 on the tax map of the City of Newark) from 1955 until it sold some of these operations in 1986.  This property is part of the Facility.  Noveon Hilton Davis, or its predecessors, continued to own the property from 1986 to 1993.  Defendant **STWB Inc. (f/k/a Sterling Winthrop, Inc./Sterling Drug) (STWB)**, or its predecessors, acquired the operations at the property in 1986.   Operations at the property included production of phthalocyanine colors (phthalocyanine blue and phthalocyanine green) for the automotive industry, transoxides for the textile industry, and D&C colors for the drug and cosmetic industry. Property operations also included production of 2,4,2-Schaeffer salt (2-naphthol-6-sulfonic acid) and fluorescein dyes.  The phthalocyanine blue process utilized copper and phthalic anhydride (a Class III Organic Chemical associated with the formation of dioxins) in the manufacturing process and trichlorobenzene (1,2,4-trichlorobenzene is an EPA Class III Organic Chemical associated with the formation of dioxins) in the finishing process.  PCB formation was associated with phthalocyanine blue production, depending on the raw materials and process used.  Phthalocyanine blue purchased from other sources and used at the property may have contained PCBs.  The phthalocyanine green process involved the addition of chlorine (in various forms) to phthalocyanine blue, which may have contributed to the formation of PCBs and dioxins/furans. D&C color products were identified containing lead on at least one occasion, and process wastes contained chlorinated benzenes in filtrates.  2,4,2-Schaeffer salt production may have generated dioxin-like compounds including chlorinated naphthalenes.  Mercury was used in laboratories on the property.  Soil sampling at the property identifies copper at up to 1,950,000 ppb, and it also

indicates high levels of hexachlorobenzene, dichlorobenzene, trichlorobenzene, PAHs, PCBs, lead, mercury, and dozens of other hazardous chemicals.  The Noveon Hilton Davis business discharged waste directly to the Passaic River.  Decant water from the phthalocyanine blue manufacturing process was directly discharged to the Passaic River in 1956 and then from 1963 through 1971 through a sewer line that discharged to the Passaic River through the property bulkhead.  In 1964, the Noveon Hilton Davis business likely began collection of acid effluent from phthalocyanine green production for discharge to the Passaic River to resolve problems with acid corrosion of the combined sewer line, which may have occurred periodically until 1971.  Process wastes from all over the plant were discharged to the River through diversion of flow through a false sewer system.  High levels of dioxins/furans, PCBs, copper, lead, mercury, and PAHs have been detected in Passaic River sediments near the property.  Noveon Hilton Davis and STWB are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of copper by STWB and Noveon Hilton Davis, or their predecessors, have contaminated and continue to contaminate the sediments in the Lower Passaic River and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Noveon Hilton Davis and STWB are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to PAHs, PCBs, lead, and mercury.

212.    Defendant **Alden Leeds Inc. ("Alden Leeds")** has operated at 55 Jacobus Ave., South Kearny, New Jersey since before 1972 until it ended production in June 1999.  This property is part of the Facility.  Alden Leeds's operations included the manufacture of plastic bottles, which

were then filled with household-strength bleach and ammonia, with principal raw materials including sodium hypochlorite and ammonium hydroxide.  The bleach and ammonia were stored onsite in aboveground storage tanks.  The property was also known to have had cadmium, a CERCLA-listed hazardous substance, in its wastewater.  Alden Leeds's discharge was bypassed to the Passaic River from the beginning of its operations at the property until February 28, 1975 with no federal permit.  On information and belief, the property's discharge during this period contained hazardous substances, including cadmium, again with no permit.  Also, on information and belief, beginning on February 28, 1975, the discharge was bypassed to the Passaic River, during which time Alden Leeds received numerous notices of violation from the PVSC based upon historical noncompliant exceedances of certain hazardous substances, or pH excursions, in the plant's wastewater discharge to the PVSC system.  Furthermore, during periods of rainfall, overflow was discharged through the outfall line to the Passaic River.  Alden Leeds is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of copper by Alden Leeds have contaminated and continue to contaminate the sediments in the Lower Passaic River and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Alden Leeds is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to sodium hypochlorite, ammonium hydroxide, and cadmium.

213.    Defendant **Franklin-Burlington Plastics, Inc. (f/k/a Franklin Plastics Corporation) ("Franklin-Burlington")** is the current owner of the property located at 113 Passaic Avenue, Kearny, New Jersey.  This property is part of the Facility.  The property is bounded by

the Passaic River to the west.  Since 1976, Franklin-Burlington operated a plastics manufacturing plant at the property.  Hazardous substances used or present at the property include PCBs, antimony, arsenic, beryllium, cadmium, chromium, copper, lead, mercury, zinc, pyrene, flouranthene, chrysene, xylenes, chloroform, ethylbenzene, bromodichloromethane, and phthalates.  From 1976, there have been periodic direct discharges from a sump pit located on the property to the Passaic River via an 8-inch pipe.  Periodic overflows from the property into the Marshall Street CSO also discharged to the Passaic River.  Additionally, groundwater and surface water from the property flow westerly to the Passaic River.  Franklin-Burlington is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of copper by Franklin-Burlington have contaminated and continue to contaminate the sediments in the Lower Passaic River and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Franklin-Burlington is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, and PCBs.

214.    Defendant **Spectraserv, Inc. ("Spectraserv")**, then operating as Modern Transportation, began operating at 75 Jacobus Avenue, Kearny, New Jersey in 1962.  This property is part of the Facility.  The property was bounded to the west by the Passaic River, with a portion of the property extending into the river to the pierhead and bulkhead line.  From 1962 to the present, Spectraserv and its predecessors have accepted and disposed of municipal sludge from numerous federal, state, county, and local treatment works, as well as clean-out materials from

anaerobic digesters from many publicly owned treatment works.  In addition to domestic sludges and digester clean-out materials, Spectrserv also accepted industrial wastes.  Once at the property, the wastes were unloaded via flexible unloading lines into one of eight aboveground steel tanks.  A second transfer of the wastes occurred when the stored wastes were drained from the tanks into the underground piping system, which led to a transfer pump.  A common discharge line of 12-inch steel pipe with a flexible end carried the wastes from the transfer pump to ocean-going barges for disposal at designated EPA disposal sites off the New York/New Jersey coast.  With the enactment of the Marine Protection Research and Sanctuary Act of 1972, the volumes of waste permissible for ocean dumping were significantly reduced.  As a result, Spectraserv constructed an onsite sludge treatment and dewatering facility that includes unloading, storage, chemical conditioning, dewatering, stabilization, and transportation.  The influent sludge is dewatered by a filtration process, creating two byproducts: solids (dewatered sludge) and a liquid material (filtrate).  The solids are transported to permitted or approved offsite sludge management facilities.  The filtrate is further treated in two clarifiers that act as settling tanks.  The clarifiers are designed so that the liquids rise to the top of the tanks, where they can be drained off in one direction and any remaining solids can be drained from the bottom in a different direction.  The supernatant off the top, after passing through the second clarifier, is discharged to the PVSC treatment plant in Newark.  In 1970, a chemical reaction in one of the receiving tanks caused hydrogen sulfide to be emitted at the property.  Water was sprayed to dilute the effects of the gas, but despite efforts, the gas emissions resulted in critical injury to three people, killed three people, and injured an additional five people.  From 1976 to 1988, Spectraserv operated an acid-caustic neutralization facility at the property.  From 1978 to 1981, Spectraserv operated a waste oil reprocessing facility with 16 aboveground storage tanks and processing tanks.  Treatment of the waste oil consisted of

filtration, decanting, heating, and sedimentation.  A 6,000- to 7,000-gallon underground skimmer tank was used to contain spills and runoff in the waste oil reprocessing area.  1990 site figures indicated that stormwater in the waste oil reprocessing area passed through an existing grease/oil separator on the south side of the property before discharging to the Passaic River.  In December 1990, Spectraserv submitted remediation plan revisions to NJDEP, which included site figures depicting an existing 6-foot steel pipe leading from the property to the Passaic River for discharging untreated stormwater.  The waste oil facility processing areas consisting of the boiler, filtration units, and sedimentation units were decontaminated, decommissioned, and removed from the property between 1989 and 1991.  A 1993 AOC, in which NJDEP determined that the facility could not be delisted from TSD status because of soil contamination and potential groundwater contamination, required Spectraserv to further investigate and clean up (1) all remaining contaminants at the property and (2) all contaminants emanating from or that had emanated from the property.  A subsequent remedial investigation conducted at the property during 1994-1995 identified several areas of concern, including the oil/water separator area, the Passaic River filling area, the former waste oil reprocessing/tank farm area, the former acid/caustic neutralization area, and the site groundwater quality area.  A revised remedial action workplan submitted to NJDEP in November 2001 indicated that three out of the nine areas of concern required additional remedial action.  In accordance with an April 2002 NJDEP-approved remedial action workplan, Spectraserv conducted additional remedial actions during 2002 to 2003, including in the oil/water separator area, the Passaic River filling area, and the former waste oil reprocessing/tank farm area.  Additional remediation took place.  Over the years, Spectraserv has expanded its business services to include digester and tank clean-out work, lagoon cleaning, and mechanical repairs at sewage treatment plants, in addition to dewatering and disposal services for municipal and industrial

sludge.  Hazardous substances stored, used, and/or produced at the property include copper, cupric sulfate, lead, mercury, and PCBs.  Wastewater effluent samples collected in 2000 contained several hazardous substances, including copper and mercury.  Site soil contamination includes copper, lead, mercury, dioxin-associated compounds, and PAHs.  Site groundwater contamination includes lead, among several other metals.  There are numerous documented discharges of hazardous substances from the property via direct pathways, the sanitary sewer, the storm sewer, groundwater, and runoff.  As examples: During a December 12, 2000 site inspection, NJDEP observed a barge docked at the Spectraserv bulkhead on the Passaic River.  "A large, flexible hose was observed lying overtop the barge, with one end connected to a pipehead on the riverbank and the other end unconnected and open on the river side of the barge."  This flexible hose was used as the connection between Spectraserv's land-based operations and its sludge transportation barges.  During a September 2005 NJDEP compliance evaluation investigation, Spectraserv was issued a notice of violation for an unauthorized discharge.  The inspector described the noncompliance as "discharge of pollutants (sludge) to the Passaic River via storm drain."  The investigation revealed a discharge from the dry sludge storage area to the Passaic River via an onsite storm drain.  According to a Spectraserv representative, the dry sludge storage area had been "washed down" earlier that morning.  The inspector directed Spectraserv to cease discharging immediately and clean up the remaining water, as this was a violation of Spectraserv's NJPDES permit.  Moreover, the property is permitted to discharge sanitary and industrial wastewater effluent to the PVSC treatment plant in Newark.  Spectraserv has been issued numerous notices of violation from PVSC for improper discharges, among other issues.  A 6,000- to 7,000-gallon underground skimmer tank was used to contain spills and runoff in the waste oil reprocessing area.  Site figures indicate that stormwater in the waste oil reprocessing area passed through an existing

grease/oil separator on the south side of the property prior to discharging to the Passaic River. Finally, groundwater flow follows the topography, moving west toward the Passaic River, and as noted, the groundwater was contaminated with hazardous substances.  Spectraserv is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Spectraserv is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, PCBs, lead, mercury, and PAHs.

215.    Defendant **Arkema Inc. ("Arkema")** is the successor in interest to Wallace & Tiernan, Inc. (WTI), which operated at a property located at 25 Main Street, Belleville, New Jersey from 1913 to 1997.  This property is part of the Facility.  At the property, WTI manufactured measurement and control equipment, including chlorinators, pressure instruments, flow meters, dry chemical feed systems, and cathodic protection systems.  The manufacturing of these products involved a variety of industrial operations including milling and lathing, plastic molding, plating, heat treating, and painting.  Reports over the years of operation state that wastes and waste streams from the property included copper plating solution, flammable solvents, lead waste, and waste paint materials.  As noted, WTI engaged in plating operations, which include the use of cadmium, chrome, copper, and nickel.  The property was served by City of Belleville storm sewers that discharged to the Passaic River.  Tested sediments revealed that hazardous substances, such as cadmium, copper, and mercury, were discharged to the Passaic River via the catch basins located

less than one block from the Passaic River and storm sewer network.  Sediments found in another catch basin on the property, also less than one city block from the Passaic River, included copper, mercury, and nickel.  Arkema is liable as owner and/or operator at the time of disposal of hazardous substances.   Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Arkema is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to cadmium and mercury.

216.   Defendant **Elan Chemical Co., Inc. ("Elan")** has operated at 268 Doremus Avenue, Newark, New Jersey from 1977 to the present, manufacturing chemicals for the food flavor and fragrance industries.  This property is part of the Facility.  The process to create these materials consists of three steps—reaction, washing, and purification.  All residual solvents and unreacted raw materials are removed and reused until degraded.  When the solvent or material is no longer viable, it is disposed of as hazardous waste, combined with the waste stream from the entire production facility.  Hazardous substances stored, used, and/or produced on the property include copper chromite, copper powder, maleic anhydride, maleic acid, phthalic anhydride, and sulfuric acid.  Site soil at the property contains chlorobenzene, PAHs, PCBs, copper, lead, and mercury.  Site groundwater is contaminated with hazardous substances such as acenaphthene, chrysene, naphthalene, phenanthrene, and pyrene.  In 1990, a 6-inch discharge pipe was found

exiting the southeast portion of the property to the Passaic River.  Since 1977, the process waste stream from the property has been connected to a sanitary sewer system.  Floor drains at the property have been connected to the sanitary sewer system since at least 1977.  The floor drains direct wash and rain waters to a sump, which pumps the waters to a pretreatment system, which ultimately discharges to the sanitary sewer.  On August 23, 1985, an acid discharge of 3,000 gallons to the PVSC sewer system was reported.  And on January 5, 1994, PVSC sued Elan alleging it discharged pollutants including toluene, zinc, 1,2-dichloroethane, and methylene chloride in excess of its permitted discharge limitations.  The property is subject to flooding from the adjacent Passaic River.  Site soils and media are contaminated with various COCs, creating the potential for discharge of COCs in contaminated soil during site flooding events.  For example, in January 1988, the property flooded with overflow from the Passaic River for approximately six hours.  On December 11, 1992, the property flooded because of a sanitary sewer overflow and overflow from the Passaic River; the property remained flooded for three days.  In December 1988, RCRA inspectors noted a drum storage area sloped toward a drainage depression that flowed to the Passaic River.  Approximately 1,000 drums of waste oils, unused materials, and unsold product were in those drums, and oil was leaking from some of the drums.  Finally, groundwater flow from the property is expected to be toward the Passaic River and subject to tidal fluctuations.  Offsite sediment samples have been taken from multiple locations around the property to the Passaic River.  Those samples contained dioxin-associated compounds, PAHs, PCBs, mercury, copper, and lead.   Elan is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA

§§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Elan is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, PCBs, and PAHs.

217.    Defendant **Kearny Smelting & Refining Corp. ("Kearny Smelting")** operated at 936 Harrison Avenue, Kearny, New Jersey from 1946 to 2009. This property is part of the Facility. Kearny Smelting's operations at the property included scrap metal smelting and scrapping of brass and bronze. The process of scrap metal smelting involved the melting of scrap metal containing copper alloys as well as other metal alloys in a rotary smelting furnace to produce bronze and brass ingots. COCs stored, used, and/or produced at the property included copper, lead, and fuel oil (which can be a source of PAHs). Site soil contamination includes dioxin-associated compounds, PAHs, PCBs, copper, lead, and mercury. Site groundwater contamination at the property includes PAHs, lead, copper, and mercury, and property surface water is contaminated with copper, lead, and mercury. Moreover, copper, lead, and mercury were detected in sediment on the property. Between at least 1956 and 2009, process wastewater and noncontact cooling water were discharged to an onsite, unlined lagoon. The lagoon discharged to Frank's Creek, which is a tributary to the Passaic River. In 1984, it was reported that process wastewater discharge included overflow from a cooling tower and settlement tanks, a leaking valve at the electrostatic precipitator, and an air pollution scrubber device. Over the years, many contaminants were discharged to the lagoon, including laboratory wash water and discharge from a pipe that originated in a conveyor pit and ran through a drainage ditch that entered the lagoon. Stormwater discharges from the property, if they were discharged to the combined storm and sanitary sewer system, were diverted

to the Passaic River via the Worthington Avenue CSO during wet weather.  Runoff from the property discharged directly to the lagoon referenced above.  Over the years, NJDEP discovered raw material, scrap, slag, and waste exposed to stormwater; observed a spill of approximately 125 gallons of fuel oil along the property's eastern fence line; observed a spill of 100 to 150 gallons of No. 4 fuel oil to site soil; and reported mismanagement of hazardous waste and solid waste, observing mounds of incinerator ash and hundreds of drums and transformers on the property.  Kearny Smelting is liable as a current owner and/or operator of the property.  Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, Kearny Smelting is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, PCBs, and PAHs.

218.   Defendant **Newell Brands Inc.'s (f/k/a Newell Rubbermaid, Inc.) (NBI)** predecessor, Goody Products, Inc., operated on a property at 969 Newark Turnpike, Kearny, New Jersey from 1969 to 1994.  This property is part of the Facility.  Goody Products' operations involved the production of metal hair accessories such as barrettes and pins.  Specific processes performed at the property included stamping, casting, heat treating, annealing, burnishing, polishing, and coating of medical components.  COCs stored, used, and/or produced at the property included copper, lead, kerosene, and sulfuric acid.  Property soil contamination includes dioxin-associated compounds, PAHs, PCBs, copper, lead, and mercury.  Site groundwater contamination

at the property includes dioxin-associated compounds, PAHs, copper, lead, and mercury. Dioxin-associated compounds, PAHs, and PCBs were also detected in site sediment. From 1969 to 1984, industrial wastewater generated at the property, which included, on information and belief, dioxin-associated compounds, PAHs, copper, lead, and mercury, was discharged to Dead Horse Creek (a secondary tributary to the Passaic River) via a cast iron pipe. From 1984 to 1994, treated wastewater was discharged to Dead Horse Creek. From 1972 to 1984, sanitary wastewater was treated in an onsite treatment plant and discharged to Dead Horse Creek. And in the mid-1980s, a lined collection pit was built onsite to hold treated process wastewater to discharge to Dead Horse Creek. On information and belief, hazardous substances may have reached Dead Horse Creek via runoff. Specifically, waste materials generated at the property, including solid waste and hazardous waste, were collected in various containers on an outdoor asphalt waste collection pad located near Dead Horse Creek. NBI is liable as an owner and/or operator at the time of disposal of hazardous substances. On information and belief, releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, NBI is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of, on information and belief, that have contaminated and continue to contaminate the river, including but not limited to, on information and belief, mercury, lead, and PAHs.

219.    The predecessor of Defendant **CBS Corporation (CBS)**, **formerly known as Viacom Inc. and Westinghouse Electric Corporation ("Westinghouse")**, operated on a

property at 95 Orange Street, Newark, New Jersey from at least 1893 to 1983. This property is part of the Facility. Westinghouse owned and operated a relay instrument and electrical equipment manufacturing facility at the property. Westinghouse fabricated parts and assembled relays and instruments. Operations at the property also included degreasing, alkaline cleaning, deoxidizing, alodining, electroplating, chromating, phosphating, spray and dip painting, spray and dip coating, machining of parts, and coil winding. COCs stored, used, and/or produced at the property included copper, lead, cutting-oil waste, and Pyranol A. Site soil contamination includes dioxin-associated compounds, dieldrin compounds, PAHs, PCBs, and copper, lead, and mercury. Site groundwater contamination at the property includes dioxin-associated compounds, PAHs, copper, lead, and mercury, and site wastewater contains copper, lead, and mercury. On information and belief, from 1893 to 1922, prior to PVSC's sewer system completion, wastewater discharges from the property directly discharged to the Passaic River. According to wastewater analytical data, copper, lead, mercury, oil and grease, and caustic soda were detected in effluent from six sewer discharge points at the property. During wet weather, wastewater from the property bypassed to the Passaic River via the PVSC Clay Street CSO. With respect to groundwater contamination, on information and belief, transformers containing PCB oil were stored in vaults in the basement of the facility. A 30,000-gallon tank and a 550-gallon fuel oil underground storage tank were also present on the property. On information and belief, PCBs and fuel oil likely migrated from soil into shallow groundwater at the property and to the Passaic River. Because of the proximity of the property to the Passaic River, cooling water likely discharged to the ground surface, and contaminated groundwater likely reached the Passaic River. CBS is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River,

including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, CBS is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury and lead.

220.    Defendant **A.E. Staley Manufacturing Company ("A.E. Staley")** is a division of Tate & Lyle North America.  A.E. Staley operated at 320 Schuyler Avenue in Kearny, New Jersey from approximately 1966 until at least 1975.  A.E. Staley also performed manufacturing operations at 100 Third Avenue, Kearny, New Jersey until approximately 1978.  In the alternative, Defendant **Staley Holdings LLC**, Defendant **Tate & Lyle Ingredients Americas LLC**, or their predecessors owned and operated these properties during this time.  These properties are part of the Facility.  At its Kearny properties, A.E. Staley manufactured organic polymers, rubber-based adhesives, and leather finishes and created polymers whose emulsions were used as ingredients of other products such as waxes, polishes, paints, and coatings.  The company used ethyl acrylate in its chemical reactors in 1970, and in 1971, the company used methyl methacrelate and methyl acrelate (described as being monomers) in its polymerization process at its Schuyler Kearny property. Hazardous substances utilized at the Kearny properties include, among others, chromium, copper, lead, nickel, mercury, and silver.  While at the Kearny properties, A.E. Staley washed out its monomer storage tanks and discharged the wash water to the sewer system, which entered Frank's Creek—a tributary of the Passaic River. Moreover, due to capacity limitations, overflow occurred at the Ivy Street interceptor during heavy rainstorms.  A.E. Staley, Staley Holdings LLC, and Tate

106

& Lyle Ingredients Americas LLC are liable as owners and/or operators at the time of disposal of hazardous substances.  Disposals of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, A.E. Staley, Staley Holdings LLC, and Tate & Lyle Ingredients Americas LLC are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, and nickel.

221.    Defendant **Foundry Street Corporation (FSC)** is the owner, landlord, and real estate management company for industrial property located in the Foundry Street Complex, a multi-tenant industrial park, at 185 Foundry Street, Newark, New Jersey.  This property is within the Facility.  The Foundry Street Complex consists of approximately six different City of Newark tax parcels, including Block 50, Lots 4, 5, 6, 10, 21, and 22.  The property, while owned by FSC, has been operated by Automatic Electro Plating Corp. (AEPC) from approximately 1970 until as late as 2014.  As of 1991, FSC also leased a portion of the property in the Foundry Street Complex to Sun Chemical Corporation ("Sun") and Fleet Auto Electric Corporation ("Fleet").  The Pigment Division of Sun has been located on Block 5005, Lot 22 from 1967 to the present.   Sun manufactures quinacridone pigments, which are primarily used in the automotive industry; in printing inks; and in plastics.  Fleet has been located on Block 5005, Lot 22 from 1968 to the present.  AEPC's operations involved the electroplating of steel components with zinc or nickel finishes, with processes including electroplating, plating, polishing, anodizing, and coloring.

Information developed to date indicates that AEPC used, stored, generated, and/or discharged at least 24 raw, process, and waste materials, including arsenic, caustic soda, cyanide, lead, mercury, nickel, sulfuric acid, and zinc.  For years, contaminants have been discharged from AEPC's Foundry Street Complex to the Roanoke Avenue combined sewer system, as well as dry and wet weather bypassing of wastewater from the Roanoke Avenue sewer system, with the ultimate discharge of the contaminants to the Passaic River.  AEPC also had extensive heavy metals discharged to the PVSC collection system, such as zinc, copper, lead, mercury, and arsenic. In January 1986, AEPC was found to be in violation of § 307 and § 308, subsections 1317 and 1318 of the federal Clean Water Act.  The violations centered on AEPC's failure to submit categorical pretreatment baseline monitoring reports and other compliance monitoring reports to PVSC. Reportedly, as of April 1987, AEPC signed a consent decree and paid an assessed penalty of $100,000 to settle the action.  FSC is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of copper by FSC have contaminated and continue to contaminate the sediments in the Lower Passaic River and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, FSC is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to lead and mercury.

222. **Harris Corporation (f/k/a ITT Corporation, f/k/a ITT Industries, Inc.)** (**"Harris"**) and its predecessors have operated as ITT Avionics Division at 100 Kingsland Road in Clifton, New Jersey from 1946 to the present day.  This property is part of the Facility.  The property is 50 acres and is bordered to the west by the Third River, a tributary to the Passaic River.

The Third River discharges to the Passaic River approximately one quarter mile east of the property. Harris assembles electronic equipment used in the defense industry. Historically, Harris manufactured televisions and radio tubes, telephones, washing machines, and printed circuit boards. Harris's current operations include welding, soldering, painting, printing, degreasing, drilling, machining, grinding, assembly, and product testing. Methylene chloride, trichloroethene (TCE), and 1,1,1-trichloroethane were stored in 55-gallon drums on the property. Harris operated an industrial wastewater pretreatment facility from 1982 to 1990. Process operations feeding the facility used plating baths of cadmium, chromium, copper, lead, molybdenum, nickel, silver, tin, and zinc, in addition to degreasing operations that used TCE and 1,1,1-trichloroethane. Fifty-four substances were identified on the property, including nitrogen, dichlorodifluoromethane, sulfuric acid, hydrogen chloride, potassium hydroxide, acetone, and nitric acid. On August 14, 1986, 1,1,1-trichloroethane was released on the property, necessitating a groundwater pump and treatment system that has been in operation since 1992. Property soil contamination includes arsenic, benzene, toluene, 1,2-dichloroethane, and 1,1-dichloroethene. Property groundwater contamination includes the above-listed contaminants and many others, including 1,1,1-TCA, ethylbenzene, chloroform, and volatile organic compounds. As noted, there was a wastewater pretreatment facility in use from 1982 until 1990, but it is unknown if any pretreatment apparatus was used prior to that time. The sewer line on the property joins one of the PVSC main interceptors, and historical PVSC records indicate that wastes were routinely bypassed from the local intercepting sewer and PVSC main interceptor to the Passaic River. Catch basins on the property discharge to the stormwater collection system, which then discharges to the Third River, a tributary of the Passaic River. Waste generated at the property was discharged to the Yantacaw Street outfall, which was a permitted discharge point to the Passaic River, during various bypassing

events.   Boiler blowdown, which is known to be wastewater that includes heavy metals and corrosion inhibitors, was historically piped to the stormwater collection system from 1946 until at least 1975.   On March 31, 2001, approximately 50 gallons of ethylene glycol were spilled, and approximately 20 gallons of the substance reached the storm sewer to the Third River.   On August 14, 1986, approximately 300 gallons of 1,1,1-trichloroethane was released to the property's subsurface.   Finally, on information and belief, runoff of contaminated soil reached the Third River, and direct runoff contamination of the Passaic River also occurred as the property slopes towards the Third River, which then discharges to the Passaic River.   Harris is liable as the current owner and/or operator of the property.   Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.   Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, Harris is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river.

223.   Defendant **Pabst Brewing Company, LLC ("Pabst")** operated a brewery at 400 Grove Street in Newark, New Jersey from 1946 to 1985.   This property is part of the Facility. Pabst brewed and packaged approximately 206,000 barrels of beer monthly at the brewery.   The principal raw materials used in the operations included barley malt, corn grits, hops, yeast, and water. Caustic soda was used onsite to clean recycled beer bottles, and spent caustic soda discharged to the sanitary sewer "without treatment or dilution."   Pabst was identified as a "Major Contributing Industry" by PVSC in 1977 and a "Significant Industrial User" of the PVSC system in 1982, discharging 1.44 million gallons of wastewater per day without pretreatment.   During the

closing of the plant in June 1985, 1.3-million gallons of beer and 8,000 gallons of anhydrous ammonia were dumped into the sanitary sewer.  Heavy metals are known to be present in the brewing process and brewery wastewater in general.  A 2006 study of brewery waste sludge identified manganese, magnesium, zinc, copper, lead, and nickel in sludge created by brewery effluent.  COCs stored, used, and/or produced at the plant included copper, lead, mercury, and PAHs.  In 1991, a closure plan for nine underground storage tanks at the plant was submitted by the subsequent property owner and approved by NJDEP.  Site soil, groundwater, and wastewater contamination includes copper, PCBs, mercury, lead, and PAHs.   There are documented discharges of hazardous substances from the property to the Passaic River.  As examples: Pabst was discharging upwards of one-million gallons of brewery waste per day without pretreatment, meaning that all heavy metals usually found in wastewater treatment sludge were discharged to the sanitary sewer during Pabst's four decades of operation.  Pabst's sanitary flow in 1985 was made up of water from the washdown of vessels, piping, equipment, sinks, and cooling water from the air conditioners.  Historical PVSC reports indicate that wastes were routinely bypassed from the PVSC main interceptor to the Passaic River at the Clay Street CSO during wet weather.  In addition to pre-permit discharges to the PVSC system, Pabst had numerous documented violations or exceedances of its permit.  Pabst is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Pabst is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed

of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, and PAHs.

224.    Defendant **Palin Enterprises L.L.C. ("Palin")** and/or its predecessors leased the entire property located at 25 Belgrove Drive (also known as 44 Passaic Avenue) in Kearny, New Jersey and subleased portions to multiple tenants.  This property is part of the Facility.  The property has operated since the early 1900s.  Until the late 1950s, the property was used to manufacture linen thread, material, and yarns from raw flax and twine.  Later, the property was converted into an industrial park and was leased to various tenants.  Palin's tenants manufactured various aluminum products, including baseball bats and hockey sticks.  In the initial step of the process, aluminum billets were melted and introduced into molds to create "blanks."  These blanks were then transported from the property east of Passaic Avenue to Marshall Clark Manufacturing (also located on the property), where various finishing operations were conducted.  Site soil and groundwater contamination includes copper, dioxin-associated compounds, PCBs, lead, and PAHs.  On information and belief, contaminated groundwater was released into the Passaic River. Inspectors during a 1988 RCRA generator inspection noted that there was oil spilled in a work area located on the property.  Inspectors were told that lubricating oils were used on the aluminum parts and then the parts were dipped into a solvent bath.  The solvent/oil mixture was continuously fed to a distillation unit to recover the oil and solvents.   No manifests were filed for the removal/disposal of hazardous wastes.  A 2003 NJDEP inspection report identified many problems at the property, including monitoring wells that were open, unlocked, and in disrepair; silvery aluminum files and shavings were located throughout the property; Building 24 was being used to store machinery, transformers, fuse boxes, multiple open and unlabeled drums, and office equipment; by the entrance to Building 22, a petroleum odor was observed, and the soil and gravel

in the area were stained; employees were dumping waste wash water from Building 22 into the loading dock area (American was previously required to cease this practice in September 1989); and in Building 22, there was a trench gorged in the concrete floor that was visibly stained, and workers were dripping oil/metal mixtures over the floor surfaces. Palin is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Palin is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxin-associated compounds, PCBs, lead, and PAHs.

225.     Defendant **PMC Global, Inc. (a/k/a Kleer Kast, a Division of PMC Inc.) ("Kleer Kast")** has operated on a property located at 450 Schuyler Avenue, Kearny, New Jersey from 1971 to the present. This property is part of the Facility. From the late 1970s through at least 1999, operations at the property produced plastic products for the graphic arts, stationary, and packaging industries; cellulose acetate sheeting; acetate pellets; compounded and extruded cellulose; butyrate; propitionate; acetate tool handles; and plasticized compounds. The property operated 24 hours per day, 7 days per week, all year. In 1994 and 1995, raw, process, and hazardous materials found onsite included copper, mercury, lead, and PAHs. There are documented releases of hazardous substances from the property to the Passaic River. Prior to July 1986, the property disposed of all wastewater to Frank's Creek, a tributary of the Passaic River. This disposal included stormwater and runoff as well as cooling water, containing copper, mercury, lead, and

PAHs.  On March 21, 1985, dye testing conducted at the property documented that process overflows discharged to the drains ultimately flowed to Frank's Creek.  These hazardous substances were present in the disposals to Frank's Creek for the fourteen years it disposed wastewater to surface water without a permit and during several documented permit violations. On August 1, 1989, NJDEP conducted an inspection and issued a notice of violation on October 6, 1989 for an unpermitted discharge of noncontact cooling water from injection molding machines and floatables, including plastic pellets, found in the effluent.  By 1987, all process wastewater, contact cooling waters, and sanitary wastewater generated at the property were being directed to the PVSC treatment plant.  From 1988 to 1995, a sampling identified hazardous substances in its wastewater, including copper, mercury, lead, and PAHs.  Kleer Kast is liable as the current owner and/or operator of the property.  Disposals of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113, Kleer Kast is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, lead, and PAHs.

226.    Defendant **Schiffenhaus Packaging LLC ("Schiffenhaus")** has operated at 2013 McCarter Highway, Newark, New Jersey from 1895 to present.  This property is part of the Facility.  Schiffenhaus manufactures linerboard and fiber, specializing in corrugated boxes and display items, packaging paper, plastic film, shelving, and lockers.  Schiffenhaus reported in December 1994 that its production of corrugated products, displays, and preprinted liner averaged

114

42-million square feet per month.  COCs stored, used, and/or produced at the property included copper, lead, mercury, and PAHs.  Hazardous substances known to be present in the property's wastewater also included copper, lead, mercury, and PAHs.  Prior to the operation of the PVSC system in 1924, all of Schiffenhaus's wastewater was, on information and belief, discharged directly to the Passaic River.  As operations have been consistent since they began in 1895, the property's wastewater during the period 1895 to 1924 would have contained hazardous substances. Furthermore, the property is located in the Delavan Avenue CSO district.  During the period from 1895 to 1924, wastes were discharged from the property directly to the Passaic River via the Delavan Avenue CSO until the municipal sewers were tied to the PVSC system as of 1924.  The wastewater discharge from the Schiffenhaus property to the PVSC system and its Delavan Avenue CSO location was likely bypassed to the Passaic River from the municipal tie-in in 1924 through February 28, 1975 (the effective date of PVSC's NJDPES permit).  Discharge from this property was released to the Passaic River over an approximately 51-year period without a federal permit. From February 28, 1975, historical analysis centering on the property's wastewater discharge to PVSC indicates certain hazardous substances, such as copper, lead, and mercury, were present. Schiffenhaus did not employ a batch wastewater pretreatment process until 1998.  Finally, numerous notices of violation and/or reports of noncompliance with wastewater discharge permits were issued to Schiffenhaus based upon historical exceedances of hazardous substances detected in the property's wastewater discharge to the PVSC system.  Shiffenhaus is liable as the current owner and/or operator of the property.  Releases of hazardous substances including copper from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.      Under CERCLA §§ 107(a)(1) and/or 107(a)(3) and CERCLA § 113,

Schiffenhaus is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping copper and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, PAHs, and lead.

**F.      Dieldrin**

227.      OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of dieldrin (among other hazardous substances) that have contaminated and continue to contaminate the sediments of the Lower Passaic River, including Defendants **Givaudan**, **Sherwin Williams**, **Fox America**, and the **CSD Defendants.**

228.      The allegations contained in paragraphs 200, 201, 203, and 208 are incorporated as if set forth fully herein.   Under CERCLA §§ 107(a)(1) and/or 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Defendants **Givaudan**, **Sherwin Williams**, **Fox America**, and the **CSD Defendants** are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping dieldrins and other hazardous substances they disposed of that have contaminated and continue to contaminate the Passaic River.

**G.      PAHs**

229.      OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of polychlorinated aromatic hydrocarbons (among other hazardous substances) that have contaminated and continue to contaminate the sediments of the Lower Passaic River.

230.   From 1968 until 1990, Defendant **Ashland LLC (f/k/a Ashland Chemical Company) ("Ashland")** or its predecessors operated the property located at 221 Foundry Street, Newark, New Jersey (the "Foundry Property").   The Foundry Property is part of the Facility. Defendant **Foundry Street Development, LLC ("Foundry")** is the former owner of the property from 2003 until Defendant **Meltser-Tonnele Avenue LLC ("Meltser")** purchased the property. Meltser is the current owner of the property.  Here, Ashland or its predecessors received, stored, and repackaged aliphatic and aromatic hydrocarbons, acids, alcohols, alkines, amines, esters, ethers, glycols, halogenated solvents, ketones, and nitroparaffins.  As of August 1, 1979, the Foundry Property had a storage and transfer capacity of 737,000 gallons of hazardous materials; a chemical storage capacity of 1,712,300 gallons; and a maximum transfer capacity of 50,000 gallons per day.  Ashland received bulk shipments, stored the materials in aboveground tank farms, and repackaged the materials into bags and drums for distribution to customers.  Ashland also prepared solvent blends from raw materials.  And Ashland recovered mixed solvents and stored them in 55-gallon drums.  With these operations, Ashland generated waste oils, spill cleanup material, and "hose residue."  Waste acids and bases from drumming operations and accidental spillage from the acid truck were collected in a neutralization pit, which was routinely pumped into the sanitary sewer after pH adjustment.  Remedial investigations of the Foundry Property identified areas of concern, including rail car transfer areas, storage tank farms, truck loading racks, collection sump pumps, storage buildings and drum rooms, and the neutralization pit.  COCs stored, used, and/or produced at the Foundry Property included dioxin-associated compounds, caustic soda, fuel oil, kerosene, and sulfuric acid.  Site soil contamination includes dioxin-associated compounds, dieldrin, DDx, and PAHs.  Over 65 compounds have been identified in soils as exceeding NJDEP's most stringent soil cleanup criteria.  Site groundwater contamination

includes dioxin-associated compounds, dieldrin, DDx, PAHs, copper, lead, and mercury.  There are documented discharges of hazardous substances from the Foundry Property.  For example, in 1976, polluting and explosive industrial waste entered the Passaic River because Ashland's line broke during tank cleaning.  From 1967 to 1979, discharges of hazardous substances into the sewer system at the Foundry Property discharged directly to the Passaic River via the Roanoke Avenue CSO—which was known to chronically malfunction.  Indeed, PVSC documented that the Roanoke Avenue CSO and outfall to the Passaic River were inoperative from 1967 to late 1979, resulting in continuous direct discharges.  Runoff from the Foundry Property likely entered PVSC catch basins along Foundry Street.  Finally, groundwater from underdrain systems was pumped to an oil/water separator and then to the sewer.  A 1988 sampling plan states that "groundwater collection and/or sump systems . . . tend to function as contaminant accumulation and migration pathways."  Ashland and Foundry are liable as owners and/or operators at the time of disposal of hazardous substances.  Meltser currently owns the property and is liable as the current owner and/or operator of the property.  Releases of PAHs from the Foundry Property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Ashland, Foundry, and Meltser are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances they disposed of that have contaminated and continue to contaminate the Passaic River, including but not limited to mercury, dioxin-associated compounds, copper, and lead.

231.     Defendant **Innospec Active Chemicals LLC (f/k/a Finetex, Inc.) ("Innospec")** and its predecessors operated at 418 Falmouth Avenue, Elmwood Park, New Jersey from 1956 to 2005.  This property is part of the Facility.  Innospec manufactured and supplied ingredients and chemical aids to other manufacturers of textile and personal care products.  Innospec utilized or discharged several hazardous substances including maleic anhydride, dichlorobenzene, and trichlorobenzene, which are Class III organic compounds that EPA has associated with the formation of dioxins, along with xylene, acetylene, methanol, and sulfuric acid.  Groundwater sampling revealed exceedances for vinyl chloride, benzene, chlorobenzene, and 1,4 dichlorobenzene, among others.  In 2002, soils contained exceedances for several contaminants, including chlorobenzene, vinyl chloride, and benzene.  In 1972, PVSC noted that synthetic oil was flowing into Fleischer's Brook—a tributary to the Passaic River—via a floor drain located on the property.  Innospec has stored raw materials and empty drums outside on a concrete slab that is sloped to sanitary drains.  Noncontact cooling water and stormwater are discharged to an unnamed tributary to the Passaic River, and upon information and belief, the property's floor drains have been connected to the stormwater system.  Waste generated at the property was discharged to the Yantacaw Street outfall, which was a "permitted" discharge point to the Passaic River, during various bypassing events.  Innospec is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Innospec is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility,

including the costs of removing and/or capping PAHs and other hazardous substances including lead and mercury it disposed of that have contaminated and continue to contaminate the river.

232.   **Sunoco (R&M), LLC** (as a successor to Sun Oil Company) owned and operated the property described below from 1916 to 2002.   Defendant **Sunoco Partners Marketing & Terminals L.P.** has owned and operated the property from 2002 to the present.   Sunoco Partners Marketing & Terminals L.P. and Sunoco (R&M), LLC and their predecessors (together, "Sunoco") operated on a property located at 436 Doremus Avenue, Newark, New Jersey, near RM 0 to RM 0.5.   This property is part of the Facility.   The property consists of 23.2 acres, and the Lower Passaic River borders the property to the east.   Sunoco began operations at the property related to shipping and storing of petroleum products in the 1920s.   The 1926 and 1932 U.S. Army Corps of Engineers (USACE) surveys state Sunoco stored oil in barrels and used a dock to ship the oil products.   A 1931 Sanborn map labels the Sunoco-operated facility as an oil- and gasoline-distributing station with an overwater warehouse connected to a dock, ten aboveground storage tanks for petroleum products, and eight tanks with pumps underneath.   On January 12, 1935, an oil fire originating from a barge at the adjoining facility partially destroyed the Sunoco facility, spreading across Sunoco's oil-saturated pier and causing an oil explosion at the Sunoco property consuming several thousand gallons of oil stored in the overwater warehouse.   A 1942 USACE survey indicated the Sunoco property was used for receiving and shipping petroleum products by harbor carrier and coastwide carrier.   The Sunoco property included 27 petroleum product storage tanks with a total capacity of approximately 8-million gallons and a pipeline connecting the property to a refinery in Marcus Hook, Pennsylvania.   On December 31, 1945, Sunoco purchased the northern portion of the property, and on information and belief, after that date, Sunoco was the sole petroleum terminal operator at the property.   A 1950 Sanborn map depicts the property as

containing as many as 32 oil and gasoline storage tanks, a tank-filling building, a drum-filling building, and an oil warehouse.  A 1953 USACE survey of the property indicates the entire property was occupied by Sunoco for use as an oil distribution terminal for receiving and shipping petroleum products.  The property had total storage capacity of approximately 17-million gallons in 80 steel storage tanks, which increased by 1965 to 26-million gallons in only 76 storage tanks. In 1969, the property reportedly operated 24 hours a day, 7 days a week and contained storage tanks with capacities between 11,500 and 2,270,000 gallons.  Since 1980, the facility has engaged solely in redistributing petroleum products.  The property receives finished petroleum products from the company's Pennsylvania refinery via a pipeline and barges.  The products are stored in aboveground tanks and then repackaged before being distributed via barges and tanker trucks. Products stored and distributed at the property include fuel oils, gasoline, kerosene, and jet turbine fuel.  Since 1994, the total storage volume at the property has been approximately 25-million gallons.  In 1993, Sunoco signed a memorandum of agreement with NJDEP agreeing to conduct a remedial investigation (RI) and feasibility study (FS) to address contamination at the property. The RI and remedial action plan (RAP) identified known sources of site contamination, site hydrodynamics, and known releases of contaminants, and they included an investigation of subsurface petroleum hydrocarbon soil and groundwater contamination related to releases due to operations on the property.  Remediation and monitoring are ongoing at the property.  COCs stored, used, and/or produced on the property include oil products, fuels, petroleum sludge, tank bottom solids, waste crank oil, oil/water-separator wastes, and PAHs.  Site soil contamination includes PAHs, PCBs, and lead.  Site groundwater contamination includes PAHs, iron, and volatile organic compounds.  There are numerous documented discharges of hazardous substances from the property to the Passaic River via direct pathways, the sanitary sewer, the storm sewer,

121

groundwater, and runoff.  As examples: There were large oil fires in 1924 and 1935 at the property.

On April 26, 1961, oil from an oil/water-separator owned and operated by Sunoco was observed

discharging to the Lower Passaic River.  On October 5, 1976, an oil spill of approximately 20,000

gallons discharged to the Lower Passaic River.  On May 5, 1978, approximately 10,000 gallons of

oil were spilled onto an embankment and into the Lower Passaic River when a delivery barge hose

snapped.  On January 20, 1984 and again on March 7, 1984, the Coast Guard observed that seepage

of oil into Newark Bay from the property was ongoing.  The Newark Bay tidally influences the

Passaic River.  On March 8, 1985, EPA indicated that "several spills of gas[oline] and oil" were

reported at the property, with some reaching the Lower Passaic River and impacting water quality.

On November 21, 1991, a bleeder valve at the property was left open, resulting in an oil sheen in

the Lower Passaic River.  Further, Sunoco maintains one stormwater discharge point to the Lower

Passaic River that does not flow to the municipal wastewater collection and treatment system.  This

discharge is from the oil/water separator in the eastern portion of the property.  PAHs, PCBs, and

lead, have been detected in soil on the property.  Further, PAHs, PCBs, copper, and lead have been

detected in offsite sediments near the property.  Sunoco Partners Marketing & Terminals L.P. is

liable as the current owner/operator of the property.  Sunoco (R&M), LLC is liable as an owner

and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances

including PAHs from the property have contaminated and continue to contaminate the sediments

in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped

as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(2) and/or

107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44

above, Sunoco Partners Marketing & Terminals L.P. and Sunoco (R&M), LLC are therefore liable

for the costs of response resulting from the release of hazardous substances from the Facility,

122

including the costs of removing and/or capping PAHs and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, copper, and lead.

233.  Defendant **Novelis Corporation (f/k/a Alcan Aluminum Corporation) ("Alcan")** and its predecessors, Brixite Manufacturing Co., Inc. and Wallmaster Aluminum Company, operated at 1 Jacobus Avenue, Kearny, New Jersey in the Tomkins Tidewater Terminal from approximately 1953 through 1975.   This property is part of the Facility.  Alcan used the property for manufacturing aluminum siding, roofing, and accessories.  Alcan also manufactured building products using asphalt as a raw material.  In 1974, Alcan reported manufacturing 52,000,000 pounds of materials at the property using 35,600 gallons of solvents/thinners.  Alcan used coating materials consisting of ketones, aromatics, alcohol, aliphatic hydrocarbons, cellosolve acetate, and butyl alcohol.  In the 1990s, thirteen underground storage tanks containing fuel oil, gasoline, diesel, and waste oil—most of which were pitted and corroded—were removed from the property.   Materials detected in site soils include PAH compounds chrysene and benzo(a)anthracene, PCBs, copper, lead, and mercury, among other hazardous substances. Sediment samples collected along the center of the Passaic River approximately 225 feet west of the waterfront of the property were contaminated with metals, volatile organic chemicals, and other substances consistent with the substances present in the samples of media from the Alcan site, including cadmium, chromium, copper, lead, mercury, nickel, zinc, benzene, toluene, benzo(a)anthracene, and chrysene.  Process wastes from the property discharged directly to the Passaic River through approximately five pipes.  Until 1969, plating waste from onsite operations was discharged to a sump well, which has failed and caused plating wastes to drain into the Passaic River via an overflow drain pipe.  The New Jersey Department of Health (NJDOH) issued Alcan

123

a cease-and-desist order in October 1969 because of this discharge.  Additionally, surface water from the property flowed into storm sewers that discharged directly to the Passaic River immediately west of the property, and because much of the property is below grade, groundwater on the site is tidally influenced and is connected hydraulically to the river, with a net flow toward the river.  Alcan is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Alcan is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, copper, lead, and mercury.

234.    Defendant **Public Service Electric & Gas Company (PSE&G)** operated on several properties within the Facility that disposed of and released PAHs and other hazardous substances that have contaminated and continue to contaminate the sediments in the Lower Passaic River.  PSE&G is liable as an owner and/or operator at the time of disposal of hazardous substances. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, PSE&G is therefore liable for the costs of response resulting from the release of hazardous substances from the properties below that are part of the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river.

- **The Harrison Property:** PSE&G and its predecessor entities operated for nearly 100 years on a 30-acre parcel located at 2000 Frank E. Rodgers Boulevard (the "Harrison

124

Property"). The Harrison Property is part of the Facility. The Harrison Property includes approximately 1,600 feet of Passaic River shoreline. From 1902 until 1926, PSE&G utilized the Harrison Property to store oil and manufactured gas. A gas plant began commercial operation in 1926. The gas plant originally used coal and coke as feedstock. In the 1950s, the plant used natural gas and kerosene. From 1973 to 1980, the plant used naphtha as a feedstock. Process wastewater from the plant was discharged directly to the Passaic River until January 1979, at which point the effluent was diverted to the PVSC sewer system. On information and belief, treatment techniques that were utilized onsite were ineffective, resulting in the discharge of dozens of hazardous substances to the Passaic River, including dioxins, PAHs, aromatics, inorganics, and metals. Excess water in the ash pit on the Harrison Property was discharged to the Passaic River. In the late 1960s, reports indicate that tar and oil were being discharged to the Passaic River from the Harrison Property, resulting in an oil slick on the Passaic River. In 1993 and 1994, PSE&G confirmed numerous oily discharges to the Passaic River emanating from the river bank adjacent to the plant. Soil sampling at the Harrison Property indicates elevated concentrations of numerous hazardous substances, leading to a Remedial Action Work Plan with the NJDEP in 2001 to excavate tar masses and residuals throughout the Harrison Property. The Harrison Property has historically allowed for runoff into the Passaic River via stormwater, flooding, and surface runoff. Sheet pile walls were not installed along the waterfront area until 2003.

- **Market Street Property:** PSE&G operated at the property located at Market Street and Raymond Boulevard, Newark, New Jersey (the "Market Street Property"). The

Market Street Property is part of the Facility. From 1847 to 1954, PSE&G manufactured gas on the Market Street Property. In approximately 1900, it had six naphtha tanks. PSE&G expanded the operations there to include an ammonia plant, an oil storage tank, an underground tar tank, tar storage and ammonia liquor storage tanks, a relief holder, a water gas generating house, a filtration house, and a machine shop. Coal gas, water gas, and carbureted water processes were used at the Market Street Property. COCs stored, used, and/or produced by PSE&G at the Market Street Property included PAHs, lead, and mercury. Site soil contamination includes PAHs, lead, and mercury. Site groundwater contamination includes PAHs and lead. There are documented releases of hazardous substances from the Market Street Property to the Passaic River. As examples: Before PVSC was created in 1924 (from 1847 to 1924), sanitary/industrial waste from the Market Street Property entered the City of Newark sewer system and discharged directly to the Passaic River. From the creation of PVSC in 1924 to 1954, sanitary sewer discharges from the Market Street Property were bypassed to the Passaic River via the City Dock CSO during wet weather. Additional likely releases of hazardous substances from the Market Street Property to the Passaic River include from open pipe discharges; floor drains, trenches, piping, and sumps; surface water bodies, and groundwater flow.

- **Paterson Gas Plant Property:** PSE&G operated at the property located at Wait Street in Paterson, New Jersey (the "Paterson Property"). The Paterson Property is part of the Facility. From the mid-1860s to 1978, PSE&G produced manufactured gas at the Paterson Property. From approximately 1985 to at least 1992, PSE&G and Transcontinental Gas Pipeline Corporation operated there as a natural gas metering and

regulating station.   PSE&G used several gas production methods.   PSE&G manufactured coal gas by distilling volatile matter from coal, with some steaming of coke to produce water gas; carbureted water gas by enriching water gas with a thermally cracked hydrocarbon, such as oil; reformed natural gas by using the same carbureted water gas process, except natural gas was used in place of oil; modified air-jet gas by using natural gas pressure to aspirate air into the natural gas stream; cold enrichment gas by adding natural gas to the various manufactured gas streams to increase the level of heat; cyclic catalytic reformed gas by passing a hydrocarbon and steam over a nickel catalyst; oil gas by thermal cracking and reforming light oil; and liquified petroleum air gas by vaporizing propane or butane and mixing it with air.   COCs stored, used, and/or produced at the Paterson Property included oil, coal, tar/tar pitch, and carbon. Site soil contamination includes PAHs, dioxin-associated compounds, copper, lead, and mercury.   Site groundwater contamination includes PAHs, dioxin-associated compounds, copper, and lead.  There are documented releases of hazardous substances from the Paterson Property to the Passaic River.  As examples: From the 1860s to 1989, the Paterson Property discharged sanitary and industrial wastewater directly to the Passaic River.  In 1971, PVSC informed PSE&G that PVSC was not permitted to accept waste from gas work properties and, therefore, directed PSE&G to treat the waste so it was nonpolluting and discharge it to the Passaic River.  PVSC's 1971 Annual Report states that polluting material (odor, chemical oxygen demand, and biological oxygen demand) was discovered to have been discharged from the Paterson Property to the Passaic River.  From October to December 1988, PSE&G reported to NJDEP discharges of "an oily substance" from the Paterson Property to the Passaic

127

River.  In February 1989, PSE&G reported to NJDEP a sheen of oil in the Passaic River.  Additionally, groundwater from the Paterson Property flows towards the Passaic River, and contaminants (PAHs, copper, and lead) from its overburdened aquifer discharged to the Passaic River.

- **Front Street Property:** PSE&G operated at the property located at Front Street (now McCarter Highway), between Lombardy Place and Fulton Street in Newark, New Jersey (the "Front Street Property").  The Front Street Property is part of the Facility. From 1869 to 1937, PSE&G and its predecessors operated a manufactured gas plant at the Front Street Property.  The plant used coal gas, water gas, and carbureted water gas processes.  PSE&G's operations at the Front Street Property included coal gasification and coal burning.  In 1937, the manufactured gas plant was withdrawn from service there.  The Front Street Property continued to serve as a gas holding station until the 1950s.  Throughout the operation of the Front Street Property, it held five tar tanks ranging from 4,000 gallons to 115,000 gallons in capacity; a 9,750-gallon tar well and a 6,400-gallon tar well (one of which was just 40 feet from the Passaic River); a tar separator vault; a 4,000-gallon liquor well; gas holders; three oil tanks ranging from 50,000 to 80,000 gallons in capacity; and eight smaller underground storage tanks that contained gasoline, diesel, and waste oil.  COCs stored, used, and/or produced at the Front Street Property included coal tar, PAHs, heavy metals, gasoline, and diesel fuel. Site soil contamination includes PAHs, lead, copper, and mercury.  Groundwater contamination includes PAHs, copper, lead, and mercury.  By the end of 2003, PSE&G had excavated more than 250,000 tons of contaminated soil at the property to address soil and groundwater contamination related to manufactured gas plant operations.

There are documented releases of hazardous substances from the Front Street Property to the Passaic River.  As examples: From 1869 to 1924, sanitary and industrial waste from the Front Street Property entered the City of Newark sewer system and discharged directly to the Passaic River.  From the creation of the PVSC in 1924 to 1995, sanitary sewer discharges from the Front Street Property were bypassed to the Passaic River via the Rector Street CSO during wet weather.  Until 1950, ammonia liquor mixed with cooling water effluent was discharged directly to surface water.  It is likely that groundwater from the Front Street Property containing hazardous substances released into the Passaic River.  In March 2002, "oily product" was released into the Passaic River as a result of the vibration of sheet piles being driven along the waterfront site. Additionally, "oil-like material" has been noted in various monitoring wells installed at the Front Street Property.

- **East Newark Gas Property:** PSE&G operated at the property that was comprised of two parcels located at 419 Passaic Avenue ("Parcel 1") and 400-404 Passaic Avenue ("Parcel 2") in Newark, New Jersey ("East Newark Property").  The East Newark Property is part of the Facility.  From 1872 to 1890, coal gas was manufactured on the East Newark Property.  It was used as a gas holder facility until approximately 1906. It used, at a minimum, the coal gas manufacturing process, which involved the thermal reduction of coal in retorts.  COCs stored, used, and/or produced by PSE&G at the East Newark Property included PAHs, mercury, copper, and lead.  There are documented discharges of hazardous substances from the East Newark Property to the Passaic River.  As an example: From 1872 to 1890, sanitary and industrial waste from the East

Newark Property entered the City of Newark sewer system and discharged directly to the Passaic River.

- **Former City Dock Substation Property:** PSE&G operated at the property located at River Street and City Dock Street in Newark, New Jersey (the "Substation Property"). The Substation Property is part of the Facility.  In 1891, PSE&G began generating electricity for electric light and power.   In 1905, the Substation Property began receiving energy from the 3,000-kilowatt turbine generator located on the adjacent Coal Street Generating Station (see below).  In 1908, a steam pipeline was installed so the Substation Property and the adjacent PSE&G Coal Street Generating Station could exchange steam.  From 1909 to 1912, frequency exchangers were installed on the Substation Property.  With the installation of the steam pipeline and the frequency exchangers, the electric light and power capabilities at the Substation Property were combined with the railway generating facilities of the adjacent PSE&G Coal Street Generating Station.  While the facility at the Substation Property was dismantled in 1922, a September 2002 Preliminary Assessment Report concluded that, given the time period during which electricity was generated at the Substation Property, dielectric fluids containing PCBs were likely used and/or stored on the Substation Property.  As of the Report, a battery room existed onsite.  The Report shows that the battery room contained "banks of lead-acid batteries."  COCs stored, used, and/or produced at the Substation Property included mercury, dielectric fluids containing PCBs, and lead-acid batteries.  Site soil contamination includes several types of PAHs, PCBs, lead, copper, and mercury.  Site groundwater contamination includes dioxin-associated compounds and PAHs.   There are documented discharges of hazardous substances from the

130

Substation Property to the Passaic River.  As examples: Prior to 1892 through 1924, the Substation Property discharged wastewater and stormwater directly to the Passaic River via the City of Newark combined sanitary and storm sewer.  Beginning in 1924 until at least 2002, wastewater and stormwater discharges from the Substation Property were bypassed to the Passaic River via the City Dock CSO during wet weather. Furthermore, because the Substation Property is riverfront to the Passaic River, there is a potential for both runoff and groundwater discharge to the Passaic River.

- **Coal Street Generating Station Property:** PSE&G operated at the property located at McCarter Highway and Center Street in Newark, New Jersey (the "Coal Street Property").  The Coal Street Property is part of the Facility.  From 1894 to 1928, PSE&G conducted power generating operations and street railway services at the Coal Street Property.  From 1928 to the 1980s, vehicle maintenance operations were performed there.  In 1905, a 3,000-kilowatt turbine generator was installed on the Coal Street Property.  The entire output of the turbine generator was reportedly used at the adjacent PSE&G Former City Dock Station.  In 1908, a pipeline was installed that was used to exchange steam between this Coal Street Property and the Former City Dock Station.  COCs stored, used, and/or produced at the Coal Street Property included copper, lead, PCBs, and PAHs.  Site soil contamination includes PAHs, PCBs, lead, and copper.  Site groundwater contamination includes lead and mercury.  There are documented discharges of hazardous substances from the Coal Street Property to the Passaic River.  As examples: From 1894 to 1924, sanitary and industrial wastewater discharged from the Coal Street Property to the Passaic River via a City of Newark CSO.  From 1924 to 1980, sanitary and industrial wastewater was discharged to the

131

PVSC system.  During wet weather, sanitary and industrial wastewater would bypass to the Passaic River via the Rector Street CSO and a bypass at the PVSC sewage treatment plant.  Because the Coal Street Property is located along the Passaic River, stormwater runoff generated at the property would discharge to the Passaic River.

- **Essex Property:** From 1915 to the present, PSE&G and its subsidiaries have owned and operated an electricity-generating station located at 155 Raymond Boulevard, Newark, New Jersey (the "Essex Property").  The Essex Property is part of the Facility. The Essex Property has generated combustion gases, coal bottom ash, fly ash, coal storage runoff, waste oil, filter press waste, natural gas scrubber waste, transil oil, noncontact cooling water, boiler blowdown, LP boiler cleaning residuals, HP boiler cleaning residuals, soot, carbon black, condenser cleanings, feedwater heater cleanings, and air heater/fireside wash water.  The Essex Property is contaminated with mercury, PCBs, dioxin-associated compounds, copper, lead, and PAHs.  Prior to 1947, noncontact cooling water and wastewater containing hazardous substances was directly discharged to the Passaic River.  From 1948 to 1970, the Essex Property had at least five outfalls to the Passaic River, including a site discharge canal; a former ash pit outfall; groundwater and surface runoff from an electrical cable vault; an outfall from the ash lakes; and an outfall to Lawyer's Ditch, which discharged to the Passaic River.  From 1970 to at least 1996, many of the outfalls on the property were assigned discharge numbers, including DSN 341 (the discharge canal) and DSN 342 (chemical waste basin discharge).  Additionally, there have been numerous instances of spills of hazardous substances at the Essex Property to either the discharge canal or the Passaic River itself,

including spills of fire suppression runoff from the electrical switching facility, fuel oil, asphalt/gasoline/naptha, mineral oil, and kerosene.

235.   On information and belief, Defendant **Reckitt Benckiser LLC ("Reckitt")** acquired certain assets and liabilities of Lehn & Fink (L&F), the former owner and operator of the property described below at the time of disposal.  On information and belief, Defendant **STWB Inc. (STWB)** is the successor to L&F.  L&F operated on a property located at 192-194 Bloomfield Avenue, Bloomfield, New Jersey from approximately 1925 to 1965.  This property is part of the Facility.   L&F manufactured chemicals and pharmaceuticals, including cleaning products, disinfectants, and personal toiletry items, several of which contained phenols and cresols.  During that time, industrial waste from the property was discharged through the Meadow Brook sewer directly to the Second River, a tributary of the Passaic River.  L&F was reported by PVSC in 1927 for polluting Meadow Brook, also a tributary of the Passaic River, with industrial waste containing hazardous substances.  After 1931, L&F's wastewater, contaminated with phenol, cresols, and other industrial chemicals, discharged through the Union Outlet Sewer to the PVSC system and was subject to bypassing into the Passaic River during overflow events or to the Meadowbrook storm sewer, which continued to discharge to Second River.  In May 1928, L&F was named as a contributor of chemical waste to the Meadow Brook culvert, and in June 1928, a letter on the same topic indicates that an extensive investigation established that pollution entering the Meadow Brook storm culvert did not originate from any location above L&F.  In 1930, the same storm sewer was described as discharging sanitary sewage and industrial waste to the Second River, again a tributary of the Passaic River.  In September 1947, for an "extended period" during that month, PVSC diverted all sewerage to the Passaic River while screen guides at Newark Bay were installed.  At other times, PVSC also diverted all sewage to the Passaic River while repairs were

undertaken at the Newark Bay treatment plant.  Reckitt and STWB are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Reckitt and STWB are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river.

236.    Defendant **Pitt-Consol Chemical Company ("DuPont")**, a subsidiary of Du Pont Chemical and Energy Operations, Inc., is the corporate successor of Pitt-Consol Chemical Company, which owned and operated at 191 Doremus Avenue from 1955 until 1983.  This property is part of the Facility.  From 1955 until 1983, Pitt-Consol Chemical Company, as predecessor to DuPont, continued operations at the property distilling and extracting products from coal tar, creosote oil, and their derivatives.  Several unlined lagoons were located on the property, which were used to dispose of liquid byproducts.  During DuPont's operation of the property, process wastes were directed to a 54-inch storm sewer that ran from the property to the Roanoke Avenue combined sewer and discharged from a 60-inch outfall to the Passaic River.  Wastewater flow from the Roanoke Avenue combined sewer was deliberately bypassed to the Passaic River in 1948.  Since the 1950s, the Avenue P regulator, which controlled sanitary flow to the Roanoke Avenue combined sewer, would be jammed and left in an open position and therefore allow untreated wastewater to be discharged to the Passaic River from the Roanoke Avenue combined sewer.  PVSC reported in 1972 that process waste was being discharged in the 54-inch sewer.  The Roanoke Avenue combined

134

sewer system and outfall to the Passaic River was documented by PVSC to have been inoperative from 1971 through late 1979, which allowed untreated wastes to enter the Passaic River.  During the period when the plant was operated by DuPont, it also produced phenols, xylenols, and cresol. Process wastes were discharged to the sanitary sewer system which was routinely bypassed to the Passaic River.  A drainage ditch also existed on the north end of the property.  Since the late 1940s, through the 1950s and again during the 1970s, hazardous wastes released into the Passaic River through the Roanoke Avenue CSO due to inoperative regulator equipment and through routine bypassing.  Hazardous substances used at the property were found in river sediments adjacent to the property.  Tar-like materials used by DuPont were also found in the Roanoke Avenue outfall in the 1970s.  DuPont is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, DuPont is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including mercury, PCBs, and lead.

237.   Defendant **Garfield Molding Company, Inc./Garfield Manufacturing Company ("Garfield")** has operated at 10 Midland Avenue, Post Office Box 3236, Wallington, New Jersey from as early as 1917 to the present day.  This property is part of the Facility.  The operations performed at Garfield's property in Wallington, New Jersey principally have involved the molding of plastics, cement, and other materials for use in the electric industry.  Types of

molding conducted at the property have included compression molding, injection molding, thermoset molding, and transfer molding.  Currently or in the past, operations at the property included asbestos storage, coal storage, a laboratory, mixing and blending, mold storage, sand blasting, sewer pump house, and a tool and dye shop.  Over 40 waste materials were used in or generated at the property, including acetylene, ammonia, asbestos, formaldehyde, lead, and toluene.  In 1988, an investigation of the property identified underground storage tanks (holding fuel oil, gasoline, and waste oil); five drum storage areas located throughout the property; groundwater contamination; asbestos; and two former groundwater production wells.  Historical soil sampling identified several hazardous substances, such as antimony, cadmium, copper, lead, mercury, PCBs, and total petroleum hydrocarbons.  Sampling of the groundwater at the property revealed acenaphthene, benzene, dibenzofuran, and xylene.  During the time that the property was operational, hazardous substances were discharged directly to the Passaic River through various means, including humidity room condensate wastewater directly to the Saddle River (a tributary of the Passaic River), "polluting" boiler blowdown wastewater directly to the Saddle River, noncontact cooling wastewater directly to the Saddle River, and several unpermitted discharges and other violations of its permits.   Hazardous substances were also discharged through stormwater, storm drains, and concrete trenches.  Runoff from the property was also a source of hazardous substances in the Passaic River from, among other ways, spills, discharges, and property groundwater that flows toward the Passaic River.  Garfield is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113,

and subject to the contribution release described in paragraph 44 above, Garfield is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury and copper.

238.    Defendant **Hoffmann-La Roche, Inc. ("Hoffmann")** purchased property located at 340 Kingsland Road, Nutley, New Jersey and began its operations in 1928.  This property is part of the Facility.  Historic operations and facilities on the property in the 1930s included a strychnine building, a sodium building, a barbituric building, and raw product storage.  From 1940 to 1946, Hoffmann manufactured "ethical prescription medicines."  In 1960 to 1961, Hoffmann manufactured bulk "ethical pharmaceuticals," vitamins, and aromatic chemicals.  Currently, Hoffmann's operations on the property include the manufacturing of pharmaceutical preparations. Drum storage of virgin materials and hazardous waste occurred in Building 106, and the warehousing of virgin materials, products, intermediates, and equipment occurred in Buildings 103 and 104.  Numerous storage tanks were scattered about the property.  Those storage tanks contained many chemicals, including hexane, toluene, kerosene, solvents, acids, and sulfuric acid. Prior to 1982, when the property's site pretreatment facility became functional, wastewater was conveyed to Building 47 (the lime house) where lime was added and then discharged to the city sanitary sewer system.  Effluent, as tested in August 1978, contained hazardous substances, including copper, lead, nickel, arsenic, and mercury.  Accidental releases of chloroform and toluene have occurred, and there are several areas of concern on the property, including area 109 involving mercury contamination within a utility tunnel adjacent to Buildings 44 and 56, area 67 for the process sewer system, area 106 for the chemical transfer network, and area 128 for the

former railroad spur, in addition to numerous other areas of concern.  Site soil contains acetonitrile, hexane, xylene, lead, and polynuclear aromatic hydrocarbons.  Groundwater monitoring also identified acetone, methylene chloride, aluminum, arsenic, lead, and iron.  Surface waters from the drainage basin in which the property resides are routed ultimately to the Passaic River, located slightly greater than one mile east of the property, and there are numerous documented releases including fuel oil, hydraulic fluid, kerosene, acetone/heptane/water, and IPA/THF/toluene mixture.  Until 1994, stormwater was discharged without a permit.  In the 1960s, site stormwater catch basins may have been connected to the Valley Drain, and the Valley Drain discharged ultimately to the Passaic River.  Property groundwater and runoff would overflow St. Paul's Brook, which discharges to the Passaic River.  Hoffman is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Hoffmann is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, copper, lead, PCBs, and dioxin-associated compounds.

239.    Beginning in approximately 1917, Federal Shipbuilding & Dry Dock Company, a subsidiary and/or trade name of Defendant **United States Steel Corporation (f/k/a USX Corp., f/k/a Federal Shipbuilding & Dry Dock Company)** and Defendant **Marathon Oil Corporation (f/k/a USX Corp., f/k/a Federal Shipbuilding & Dry Dock Company)**, operated at a property

located at 100 Central Avenue, Kearny, New Jersey, approximately 0.4 miles east of the Passaic River ("Federal Shipbuilding property").  This property is part of the Facility.  United States Steel Corporation and Marathon Oil Corporation built and repaired merchant and war ships and other vessels at the Federal Shipbuilding property.  These operations involved heavy machine work and steel fabrication.  The property was used for building warships during the World Wars and included 108 buildings on 160 acres.  The property had an 8,000-ton floating dry dock, which housed a floating welding barge, machine shop, and power plant.  From 1921 to 1948, the dry dock was used for repairs—during which, the entire dock was submerged, so that sandblasting grit, paint, oil and grease, and other waste would enter the water.  The property also had a settling tank, plumbed to the paint shop, with a discharge line to the South Wet Basin, which leads to the mouth of the Hackensack River at Newark Bay.  Facilities also included three 1,000-gallon fuel oil tanks; one 60-gallon lubricating oil tank; two 60-gallon engine lubricating oil tanks; one 60-gallon machine lubricating oil tank; and one 60-gallon cutting oil tank.  In the 1920s, the property included a large boiler shop and a paint shop.  During WWII, production capabilities significantly expanded.   Between 1918 and 1947, Federal Shipbuilding delivered 322 vessels that had been constructed at the property.   United States Steel Corporation sold the Federal Shipbuilding property to the United States Navy in 1948.  From the 1950s to the 1960s, on three occasions, the entire yard was flooded with half a foot to 11 feet of water—causing rapid run off.  Union Minerals acquired the Federal Shipbuilding property in 1964.   Union Minerals used the property to dismantle ships for scrap metal.  On information and belief, during Union Minerals' tenure at the property, paint chips, overspray, and other wastes generated during ship repair and dismantling discharged into the Hackensack River.  Union Minerals stopped dismantling ships on the property in March 1983.  In 1988, Union Minerals changed its name to Defendant **RTC Properties, Inc.**

**(f/k/a Union Minerals and Alloys Corporation) ("Union Minerals")**.  PAHs (specifically, chrysene and naphthalene), copper, lead, and mercury are known to be present on Federal Shipbuilding property.  PAHs, copper, lead, and mercury are associated with the types of operations performed by Federal Shipbuilding.  Other chemicals present in site soils and known to be associated with operations performed at the Federal Shipbuilding property include zinc, chromium, and trichloroethene.  Further, copper, lead, and mercury have been found in the groundwater at the property.  PAHs, PCBs, copper, lead, and mercury were found in offsite sediments adjacent to the property.  United States Steel Corporation and Marathon Oil Corporation are liable as owners and/or operators at the time of the disposal of hazardous substances.  RTC Properties, Inc. is liable as the current owner and/or operator of the property.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(1) and/or 107(a)(2) and/or 107(a)(3) and CERCLA § 113, United States Steel Corporation, Marathon Oil Corporation, and RTC Properties, Inc. are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and capping PAHs (specifically, chrysene and naphthalene) and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to copper, lead, and mercury.

240.    Defendant **Textron, Inc. ("Textron")** acquired the Federal Leather Company, Inc. in 1956 and, on information and belief, has succeeded to its liabilities.  The Federal Leather property is located at 681 Main Street, Belleville, New Jersey adjacent to the Passaic River.  This property is part of the Facility.  The property was developed in 1916 by Federal Leather and was

operated by Federal Leather through 1968. Federal Leather manufactured leather, artificial leather, and vinyl plastics. In 1924, Federal Leather exclusively produced artificial leather. In and around 1938, Federal Leather covered all of Block 56, Lots 5, 6, 7, 9, and 31. At that time, the property contained a foundry, a wire rope factory, numerous solvent/fuel/naphtha tanks, a dye grinding shop, a lacquer storage facility, a varnishing and drying shop, a dope mixing shop, a chemical storage area, a dye house, and a solvent recovery shop. In 1950, Federal Leather expanded into Block 108, Lots 10, 12, 20, 50, 60, and 62, where it continued to operate the prior types of facilities. In 1977, portions of the property were the subject of a PVSC investigation regarding the discharge of process waste stream to the Passaic River. Federal Leather's specific operations at the property included producing vinyl coated fabrics, dyeing finishing textiles, and producing automobile seat covers and injection molded vinyl parts. Hazardous substances used at the property included antimony trifluoride, dyes, fuel oils, naphtha, solvents, and varnishes. Multiple reports and assessments demonstrate that Federal Leather released hazardous substances directly to the Passaic River until at least 1926. After 1926, sanitary sewers were installed to route wastewater to the PVSC. Furthermore, on information and belief, hazardous substances from the property reached the Passaic River via storm sewers and groundwater contaminant migration. Textron is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Textron is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other

hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury and copper.

241.    Defendant **Berol Corporation ("Berol")** is the successor by merger to Faber-Castell Corporation.  Faber-Castell operated the property at 41 Dickerson Street, Newark, New Jersey.  This property is part of the Facility.  Sometime prior to 1934, Faber-Castell purchased the property for the manufacture of pencil erasers from natural rubber.  As of 1975, operations on the property produced rubber and ink.  The property produced 140,000 pounds per month of rubber and 3,650 gallons per month of ink and paint.  The process included handling raw materials (rubber, abrasives, carbon black, dyes, rubber substitute, and plastisols).  Rubber or plastisols were mixed/milled, rolled into sheets/extruded, cut, and packed.  Dyes were dissolved in water. Pigments were dispersed into water-based inks or paints.  COCs stored, used, and/or produced at the property included PAHs, copper, PCBs, and lead.  In 1985, the Faber-Castell operation at the property purchased 30 pounds of phenol per month.  Site soil contamination includes numerous types of PAHs.  In 1975, and the property discharged 10,347,160 gallons to the sanitary sewer.  In 1979, the property discharged 14,036,168 gallons to the sanitary sewer, through three approximately 6-inch outlets, two of which discharged industrial waste, with a total daily flow of approximately 65,200 gallons.  The industrial process wastewater was not pretreated prior to discharge to the sanitary sewer.  The outlets discharging industrial process wastewater were associated with the rubber manufacturing process and the ink manufacturing process.  There are documented discharges of hazardous substances from the property to the Passaic River.  As examples: As of 1979, at least three outfalls from the property to the combined sewer system existed.  On information and belief, these outfalls were used for process wastewater discharge dating to the beginning of facility operations prior to 1934.  The combined sewer system in this

area discharged via the Clay Street CSO to the Passaic River during wet weather.  Both the rubber manufacturing process and the ink manufacturing process may have been associated with PAHs. As of 1993, industrial wastewater discharge to the combined sewer was permitted by PVSC.  At this time, the two industrial discharge outlets on the property were from the rubber manufacturing area and the packaging area.   As of 1994, floor drains and trenches were present in the manufacturing areas of the buildings and discharged to the combined sanitary sewer system.  These floor drains and trenches were likely present during operations prior to 1994.  Berol is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Berol is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to copper.

242.   Defendant **CNA Holdings LLC ("Celanese")** operated the property at 354 and 375 Doremus Avenue in Newark, New Jersey from 1954 until 1996.  This property is part of the Facility.  There, Celanese operated a chemical bulk storage and distribution business.  Hazardous substances were shipped to the Celanese property via ship, railroad car, and tanker truck for redistribution to customers.   Upon receipt, the hazardous substances were offloaded to aboveground storage tanks by aboveground pipes and a pipe tunnel and bridge spanning Doremus Avenue.  From 1954 to 1974, Celanese operated an onsite, unlined landfill used to dispose of

paraformaldehyde sludge and diatomaceous filter materials.  From 1954 to 1987, Celanese filled drums at the property, filling 10,000 to 12,000 drums annually.  Chemicals including acrylates, acetates, and glycols were fed into 55-gallon drums.  Once filled, the drums were stored in a warehouse prior to shipment to customers via truck.  From 1966 to 1993, Celanese operated a formaldehyde manufacturing facility at the property.  The formaldehyde production process included two steps, catalytic oxidation of methanol and purification.  From 1980 to 1988, under RCRA, the property was awarded interim status as a hazardous waste storage unit.  In 1988, that status was changed to hazardous waste generator.  COCs stored, used, and/or produced at the property included caustic soda, sulfuric acid, and dioxin-associated compounds.  Site soil contamination includes PAHs, dioxin-associated compounds, dieldrin, DDx, PCBs, copper, lead, and mercury.  Site groundwater contamination at the property includes PAHs and dioxin-associated compounds.  The property borders Plum Creek (a tributary of the Passaic River), and there is a nexus from the property to Plum Creek.  COCs detected in Plum Creek's sediment include dieldrin, DDx, PAHs, PCBs, copper, lead, and mercury.  There are documented discharges of hazardous substances from the property to the Passaic River.  As examples: In 1976, approximately 50,000 gallons of methanol were discharged to the ground at the property. Up to 30,000 gallons of that methanol flowed into a ditch and discharged to the Passaic River via Plum Creek.  In 1980, Celanese reported that 500 to 900 gallons of methyl alcohol were discharged to the Passaic River from the property.  In 1981, Celanese reported that approximately 14,000 gallons of cooling water containing 20 to 30 ppm of chromate were spilled, and approximately 2,000 gallons entered Plum Creek.  On July 19, 1984, a broken sewer line on the property caused a discharge of approximately 5 to 10 pounds of formaldehyde.  In 1992, a pipe leak caused a release of butyl acrylate into the Passaic River from the property.  In addition to wastewater from its

144

manufacturing operations, Celanese discharged sanitary wastewater, noncontact cooling water, wastewaters from the stripping of exhaust gas from scrubbers, and stormwater collected in diked and paved areas.  None of the property's wastewater was treated prior to the discharge to the PVSC sanitary sewer.  In August 1975, Celanese reported trace metals including copper, lead, and mercury in effluent from the property.  There are three distinct areas of groundwater flow at the property, one of which flows towards Plum Creek and another that flows towards the Passaic River.  The property is subject to regular flooding caused by overflow of the Passaic River, and stormwater runoff from the property flows to the Passaic River and Plum Creek.  Instances of runoff contamination are numerous.  As just a few examples: Around 1970 to 1971, approximately 10,000 gallons of ethylene glycol discharged to the ground from pipes between two pipes.  On February 17, 1982, 300 gallons of acetic acid discharged to the ground through a leaking heat exchange valve in the diked tank farm located north of the warehouse.  On March 29, 1984, 300 gallons of No. 6 fuel oil spilled on the property when a tank was overfilled in the diked tank area of the east farm.  On October 19, 1984, a tank overflowed and discharged 7,600 gallons of formaldehyde solution to the ground at the property.  In 1994, a leaking flange on a pier line valve resulted in approximately 187 gallons of acetic acid and water spilling to the ground.  Celanese is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Celanese is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs

145

and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins and dioxin-associated compounds.

243.     Defendant **Eden Wood Corporation ("Eden Wood")** and its predecessors owned and operated a property located at 1 Ackerman Avenue in Clifton, New Jersey from 1930 to late 1986.  The property is bordered on the east by the Passaic River.  This property is part of the Facility.  Eden Wood and its predecessors began operations at the property as a one-truck scrap paper business.  Eden Wood and its predecessors manufactured container board, box board, and roofing felt and shingles.  By 1978, operations had an estimated annual capacity of approximately 82,500 tons of product.  COCs stored, used, and/or produced at the property included PAHs and PCBs.  NJDEP reports that the soil in the drum storage area on the property is contaminated with lead, copper, and mercury; that the soil in the transformer area on the property is contaminated with PCBs; and that soil at other areas of the property is contaminated with fuel oil and petroleum hydrocarbons.  There are documented releases of hazardous substances from the property to the Passaic River.  As examples: According to an NJDOH Field Information Report from 1971, a 12-inch pipe of unknown origin was discharging from the property to the Passaic River.  According to a similar report in 1972, a 10-inch pipe was discharging from the property via the bulkhead to the Passaic River.  Historical PVSC documents reveal that oily industrial wastes and paper pulp wastes discharged from the property to the Passaic River on numerous occasions via the storm and sanitary sewers, including the following: In 1926, the property was polluting the Passaic River by bypassing the Ackerman Avenue sewer and discharging directly to the river; in 1937, it was reported that an Eden Wood predecessor was dumping paper pulp rags on the Passaic River bank for years; in 1947, PVSC reported that an Eden Wood predecessor was discharging industrial waste to the river through a partially opened valve; in 1956, an oil slick flowed to the Passaic River via

146

a 14-inch pipe from the property because a wooden wedge was placed in the flap valve to keep it open; and in 1969, a 20-inch steel pipeline at the property allowed industrial waste to reach a nearby catch basin prior to releasing into the Passaic River.  Finally, the property is elevated on the Dundee Canal side, and thus, stormwater runoff is known to release into the Passaic River and the Dundee Canal.  Eden Wood is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Eden Wood is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, mercury, copper, and lead.

244.    Defendant **The Okonite Company, Inc. ("Okonite")** operated a property located at Block 1076, Canal and Jefferson Streets in Passaic City, New Jersey.  This property is part of the Facility.  At the property, Okonite manufactured insulated electrical wires and cables, as well as electrical and splicing tape for at least 14 years.  Prior to 1983, the property utilized two tanks (1,500 gallons and 2,500 gallons) to store waste degreasing solvents and waste drawing oils.  As of 1985, the facility was conducting a distillation operation for trichloroethylene recovery purposes after the two tanks were decommissioned in 1983.  NJDEP documents from 1999 note that soils located on the property were visibly contaminated with petroleum hydrocarbon and required excavation.  In 1992, sediment samples detected the soil was contaminated with copper, lead, zinc, and mercury.  In 2001 and 2004, Okonite reported that site soil samples were contaminated with

dioxin-associated compounds.   Groundwater contamination at the property includes dioxin-associated compounds. There are documented releases of hazardous substances from the property to the Passaic River.  As one example, in 1973 to 1974, the PVSC reported on the discharge of "polluting" boiler blowdown from the property.  The company was directed to halt the pollution and discharge the boiler blowdown to the sanitary sewer.  Okonite is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including PAHs from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Okonite is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping PAHs and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxin-associated compounds, PCBs, mercury, copper, and lead.

**H.     Lead**

245.    OxyChem seeks to recover costs, contribution, and a declaratory judgment against the following covered parties that are responsible for the releases of lead (among other hazardous substances) that have contaminated and continue to contaminate the sediments of the Lower Passaic River.

246.    Defendant **Legacy Vulcan, LLC (f/k/a Vulcan Materials Company; f/k/a Kolker Chemical Corporation) ("Vulcan")** operated at a property of approximately 9.5 acres of waterfront land located at 600 Doremus Avenue in Newark, New Jersey.  This property is part of the Facility.  From 1952 until 1975, Vulcan used the property for chemical manufacturing operations.   On information and belief, the following hazardous substances were used or

148

manufactured at the property by Vulcan: anhydrous flake caustic soda and solid caustic soda, benzyl benzoate, butyl benzoate, carbon tetrachloride, chlorine, chloroform, cresyl diphenyl phosphate, DDT, dibutyl phthalate, dimethyl phthalate, hexachlorocyclohexane, hydrogen, hydrogen chloride, hydrochloric acid, iron, isophthalic acid, lead, methyl bromide, methyl chloride, methylene chloride, organic chemicals, organochlorine, organophosphorus, pentachlorophenol (a compound associated with dioxins), phthalic anhydride, plasticizers, sodium hypochlorite, tetraphthalic acid, tin, tricresyl phosphate, and zinc chloride.  Testing of site media indicates the property was heavily contaminated with numerous hazardous substances including PCBs, mercury, lead, copper, and PAHs.  Site soil is also contaminated with pentachlorophenol and other hazardous substances associated with the formation of dioxins.  On information and belief, in 1972, Vulcan discharged to the Passaic River 700 to 800 pounds per day of chlorinated hydrocarbons, 10 pounds per day of lead, 250 pounds per day of zinc, and 5,800 to 66,000 pounds per day of total suspended solids. During September and October 1973, Vulcan discharged to the Passaic River up to 1,090 pounds per day of chlorinated hydrocarbons, 6.9 pounds per day of lead, and 48 pounds per day of zinc.  Process wastes generated at the property were discharged directly to the Passaic River at a reported rate of approximately 14.4 million gallons per day through a single discharge pipe in 1971. September and October 1973 sampling reports of plant effluent to the Passaic River indicate the wastewater contained up to 1,090 pounds per day of chlorinated organics, up to 48 pounds per day of zinc, and up to 7 pounds per day of lead.  In 1969, Vulcan discharged process waters, noncontact cooling water, and condensate from property operations to the Lower Passaic River through a 36-inch outfall pipe at the property.  Prior to 1970, chlorine streams that could not be sold were absorbed in water, neutralized with caustic, and discharged to the property's sewer.  In addition, weak caustic streams were washed to the private sewer, which

149

ultimately discharged to the Lower Passaic River.  Additionally, stormwater runoff from the property discharged to the Passaic River, including via a storm drain on the southern portion of the property, and poor housekeeping practices have been documented at the property related to stormwater discharge, including flooding at the property creating small ponds, drums from the property floating on Doremus Avenue, and drum storage adjacent to the property's creek.  A groundwater discharge route to the Passaic River was also reported in 1981 and was likely historically present at the property.  Vulcan is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.   Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Vulcan is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, PCBs, DDT, mercury, PAHs, and copper.

247.    From approximately 1970 until 1992, Defendant **Quality Carriers, Inc. (a/k/a/ Quality Distribution, Inc., f/k/a Chemical Leaman Tank Lines, Inc.) ("Quality Distribution")** owned and operated a truck washing facility located at 80 Doremus Avenue, Newark, New Jersey. This property is part of the Facility.  From approximately 1993 to at least 1999, Defendant **Quala Systems, Inc. ("Quala")** operated the truck washing facility at that property.   Both Quality Distribution's and Quala's truck washing operations involved detergent, caustic wash, steam, and water flush.  Wastewater from the truck washing operations flowed into area floor drains, which prior to 1993, were discharged directly to the municipal sewer system and, after 1993, were discharged to

150

a wastewater treatment system.  Soil samples from the property indicate the presence of hazardous substances including benzene, phenol, copper, zinc, PCBs, and lead.  Lead has been identified in the site soil at up to 2,060 ppm.  The property has numerous discharge pathways to the Passaic River, including storm drains, process sewer lines, and surface runoff.  Sediment core samples from a site slightly downriver from the stormwater outfall of the property show the presence of, among other hazardous substances, PCBs, copper, zinc, and lead.  Between 1986 and 1997, several violations of hazardous waste management regulations at the property were documented.  Quality Distribution and Quala are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Quality Distribution and Quala are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to DDT, PCBs, copper, mercury, and PAHs.

248.    Defendant **Stanley Black & Decker Inc. (f/k/a/ The Stanley Works) ("Stanley")** operated at a property located at 140 Chapel Street, Newark, New Jersey from 1875 to 1985, where it manufactured hand tools.  This property is part of the Facility.  Its operations included forging, machining, grounding, heat treating, painting, polishing, assembling, and shipping of hand-striking tools, such as hammers and bars.  COCs stored, used, and/or produced at the property included quench oil (which is a source of PAHs), transformer oil, and No. 2 fuel oil (which is also a source

of PAHs).  Site soil contamination includes 4,4-DDT, 4,4-DDE, PAHs, PCBs, copper, lead, and mercury.  Site groundwater contamination at the property includes dioxin-associated compounds, DDT, PAHs, PCBs, copper, lead, and mercury.  From 1875 to 1924, the combined sanitary and storm sewers in the area discharged directly to the Passaic River.  From 1924 through the 1970s, stormwater, industrial wastewater, and sanitary wastewater generated at the property were discharged to the PVSC sanitary sewer.  During wet weather, those waters were discharged directly to the Passaic River.  Stanley's PVSC sewer connection application indicates that the property discharged 23,103,888 gallons of industrial and domestic wastewater to the PVSC sanitary sewer in just 1980 alone.  Furthermore, the property is within a flood hazard area, and floodwaters likely transported hazardous substances such as No. 2 fuel oil, quench oil, and transformer oil that were used or stored at the property to the Passaic River.  Stanley is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Stanley is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, copper, and PAHs.

249.    Defendant **Revere Smelting & Refining Corporation ("Revere")** operated at a property located at 387 Avenue P, Newark, New Jersey from 1957 to 1972.  This property is part of the Facility.  At the property, Revere operated a lead and antimony recovery and smelting plant.

Lead and antimony were reclaimed from various types of batteries. Lead scraps were melted in a furnace with acid waste solids and air scrubber overflow. The battery dismantling process is associated with mercury and included neutralizing battery acid with sodium hydroxide in tanks. COCs stored, used, and/or produced at the property included lead and copper. A 1971 NJDOH wastewater report indicated lead in the effluent from furnace cooling water. Site soil contamination includes lead, and site wastewater contamination also includes lead. Industrial acid waste from lead battery dismantling operations was directly discharged through a 10-inch concrete outfall to Plum Creek. Multiple 1970 stream pollution report violations indicate "dark gray" industrial acid waste discharged to Plum Creek (a tributary of the Passaic River). Process wastewater from the battery dismantling operations was either directly discharged to Plum Creek or was discharged with waste from air scrubbers to an outside holding lagoon. The property is near a flood-prone area, and documents indicate that flood waters would have discharged to Plum Creek. The process wastewater that was discharged in waste lagoons or on the ground surface would have discharged to Plum Creek during flooding events. And on information and belief, due to the proximity of the property to Plum Creek, groundwater likely migrated to the creek, which ultimately discharged to the Passaic River. Revere is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Revere is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility,

including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to copper.

250.    Defendant **Otis Elevator Company ("Otis")** operated at a property located at 1000 First Street, Harrison, New Jersey from 1910 to 1980.  This property is part of the Facility.  Otis manufactured various metal products including elevator cabs, doors, airplane engine crankcases, and platforms.  The manufacturing process generally involved bending, cutting, and stamping sheet metal and steel beams. Transformers containing PCB oils and at least one gasoline underground storage tank for vehicle fueling were on the property.  COCs stored, used, and/or produced at the property included copper, lead, mercury, and PCB-containing transformers.  Site soil contamination includes lead, and site effluent contains copper, lead, and mercury.  From 1910 to 1980, all sanitary and stormwater discharges were released directly to the Passaic River though at least 12 outfalls, but potentially as many as 21 outfalls.  Floor drains, including those in the paint spray booth and at the loading dock, drained through the outfalls.  In 1969, the NJDOH sent a cease-and-desist letter to Otis, ordering it to stop "discharging industrial waste and other polluting matter into the Passaic River." In January 1970, NJDOH field inspectors reported discharges to the Passaic River from a scrap metal storage area on the property.  In 1972, Otis was issued a notice of violation for discharging boiler blowdown to the Passaic River through five outfalls.  And in 1978, PVSC reported that lead, copper, and mercury were present in discharges from the property.  Moreover, upon information and belief, groundwater at the property was hydraulically connected and flows towards the Passaic River.  Otis is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's

154

mandated remedy.   Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Otis is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury and copper.

251.    Defendant **Bath Iron Works Corporation (BIW)** is the result of three mergers, beginning with Congoleum Corp.  BWI, through its predecessor Congoleum Corp., operated at a property located at 195 Belgrove Drive, Kearny, New Jersey.  This property is part of the Facility. From the late-1880s to the early- to mid-1970s, Congoleum owned and operated a flooring manufacturing facility at the property and manufactured all types of linoleum and/or vinyl floorings, wall coverings, and desk tops.  The linoleum manufacturing process included mixing a cement or binder, filler material, oil, and pigments.  The linoleum was "seasoned" in ovens at a specific temperature and for a specific duration.  From the late 1880s to mid-1980s, Congoleum operated a laboratory at the Property. During the early- to mid-1940s (during World War II), Congoleum manufactured various products for military use, including tent cloth, aerial torpedo parts, grenades, and synthetic leathers.  Also during the time Congoleum operated at the property, it manufactured adhesives used for flooring, which included lignin and mercury; manufactured vinyl asbestos tile; and operated a power plant, which included a steam generator, oil-fueled boilers, and a backup electric generator.  COCs stored, used, and/or produced at the property included lead, mercury, PAHs, and PCBs.  Site soil contamination includes hazardous substances, such as dioxin-associated compounds, DDT, PAHs, PCBs, copper, lead, and mercury.  Site groundwater contamination at the Property also includes dioxin-associated compounds, PAHs,

PCBs, copper, lead, and mercury.  Over the years, there were several documented and potential direct discharges from the property to the Passaic River.  For example, noncontact cooling water discharged via an outfall to the Passaic River, and floor drains in one of the buildings on the Property discharged to a sump in the building, which then discharged via a pipe to the river.  The discharge to the drains included runoff from the machines.  In the 1940s through the early 1970s, during times of wet weather/sewer system overflow, untreated contact cooling water was discharged to the Passaic River.  As of 1971, 30-million gallons of wastewater per year were discharged to the storm sewer/Passaic River.  In 1943, runoff of water used to fight a building fire discharged to the Passaic River.  The building contained flammable dyes and solvents used to produce camouflage mesh cloth.   BIW is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, BIW is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, mercury, copper, and PAHs.

252.    Defendant **National-Standard LLC ("National-Standard")** operated as Athenia Steel Company ("Athenia Steel") at 714-716 Clifton Avenue, Clifton, New Jersey, which is within the Facility.  Athenia Steel began operations at the property in 1907 and was acquired by National-Standard in 1938.  Operations on the property continued until National-Standard stopped operating in mid-April 1988, which triggered environmental investigations under the New Jersey ECRA.

Athenia Steel manufactured high carbon steel wire and strips from hot-rolled steel.  Acid baths cleaned the steel stock, and the finished product was coated with petroleum oil.  Molten lead was used to heat and soften steel stock.  Site studies commissioned by National-Standard reported that drawing, cutting, heat treating, cleaning, and other operations required or generated a litany of contaminants, including 1,1,1-Trichloroethane, hydrochloric acid, lead, liquid nitrogen, sodium hydroxide, and sulfuric acid.  There are documented discharges of hazardous substances from the property to the Passaic River.  In the mid-1970s, Athenia Steel built a facility to treat process water before it was discharged into the PVSC system; before this, Athenia Steel likely did not treat process water before discharging it.  Also, from the early 1900s to approximately 1973, the property used three onsite cesspools, which received rinse waters from manufacturing lines.  The property also had a dry well that received surface runoff.  Soil contamination included lead, copper, cyanide, acetone, and PCBs.  Soil located in the cesspools and dry well includes petroleum hydrocarbons, copper, and lead.  Other soil contamination includes lead, copper, PCBs, volatile organic compounds, petroleum hydrocarbons, and pesticides.  Groundwater sampling revealed numerous contaminants, including di-methyl phthalate, benzene, chloroform, trichloroethene, arsenic, copper, lead, and mercury.  Historically, spills of hazardous materials were discharged to Weasel Brook, a tributary to the Passaic River.  Moreover, contaminated groundwater and surface runoff flowed into Weasel Brook.  National-Standard is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the National-Standard property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, National-Standard is therefore liable for the costs of response resulting from the release of

hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, mercury, and PAHs.

253.    Defendant **Covanta Essex Co. (f/k/a American Ref-Fuel Company) (ARC)** operated at its property located at 66 Blanchard Street, at the bank of the Passaic River, which is within the Facility, beginning in October 1990.   ARC operated the Essex County Resource Recovery Facility (ECRRF), a waste-to-energy plant for refuse collection and incineration.   The ECRRF recovered ferrous materials from incinerated ash and burned waste to generate energy. ARC would service municipalities, transfer stations, haulers, and other companies.   Hazardous substances stored, used, or produced at the property include acetylene, caustic soda, cobalt, copper, diesel fuel, nitric oxide, lime, and sulfuric acid.   In 1988, during construction activities, a large dewatering pond containing contaminated groundwater was routed via the Central Ditch to discharge to the Passaic River.   ARC exceeded discharge limits between 1990 and 1993 for benzene, lead, methylene chloride, petroleum hydrocarbons, toluene, 1,1,1-trichloroethane, and zinc.   The property's groundwater is contaminated with arsenic, lead, benzene, cyanide, and iron. There are documented discharges of hazardous substances from the property to the Passaic River. Between 1990 and 1994, stormwater and site runoff were routed to three onsite oil/water separators before discharging to the property's Central Ditch and West Ditch, both of which discharge to the Passaic River.   ARC is liable as an owner and/or operator at the time of disposal of hazardous substances.   Releases of hazardous substances including lead from the ARC property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release

described in paragraph 44 above, ARC is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxin-associated compounds, copper, and PAHs.

254.    Defendant **Atlas Refinery, Inc. (a/k/a Atlas Refining, Inc.) ("Atlas Refining")** has operated at 142 Lockwood Street, Newark, New Jersey, which is within the Facility, from 1887 to the present.  Atlas Refining's operations ranged from rendering animal oils in 1887 to developing and marketing chemicals, paint oils, and synthetic linseed oils.  In the 1920s through the 1930s, Atlas Refining increased refinery production.  During the 1940s and 1950s, Atlas Refining supplied "aircraft carbon removing compound."  Throughout the 1980s and 1990s, Atlas Refining generated phenol, formaldehyde, mercury, selenium, and sulfuric acid.  In the 1990s, Atlas Refining had at least 30 chemicals in its inventory, including acetylene, ammonia, diethyl sulfate, ethyl alcohol, fuel oil #6, propane sodium bisulfite, and sulfuric acid.  Onsite hazardous-material storage tanks held acrylic acid, anhydrous ammonia, sodium bisulfate, sulfuric acid, and fuel oil.  Many of these hazardous chemicals reached the Passaic River through storm sewers.  For instance, on June 6, 1972, oil and other industrial material traveled from the Atlas Refining yard towards Blanchard Street, entering the storm catch basin and then discharging to the Passaic River.  Inspectors noted that the "polluting discharge" was due to poor housekeeping.   Numerous contaminants, including phenol and formaldehyde, were found in sanitary sewer discharge from Atlas Refining.  The toxic sewer system discharge continued through the 1970s.  "[O]bjectionable material" flowed to the Lockwood Street storm sewer (which discharges to the Passaic River via the Lockwood Street outfall) "in violation of municipal ordinances."  Further, Atlas Refining had

159

illegal connections to the Lockwood Street storm sewer.  City of Newark inspectors identified "major spills," with rain washing the spillage through the Blanchard Street storm sewer, which discharges to the Passaic River.  The inspectors also identified Atlas Refining's discharge as a "major source of pollutants" that ultimately discharged to the Passaic River.  During 1971 and 1974, Atlas Refining discharged to the sanitary sewer approximately 1.7-million to 2-million gallons, with post-treatment effluents including copper; lead; and iron and metal contaminants, including arsenic, cyanide, and mercury.  In the early 1980s, the City of Newark identified Atlas Refining as a "known source of pollutants entering the Lockwood Street storm sewer" with an illegal storm sewer connection.  Following investigations in 1981, Atlas Refining rerouted the discharge.  It was only in 1986 that Atlas Refining was granted a discharge permit.  From 1986 through 1990, Atlas Refining continuously discharged excessive petroleum hydrocarbons to the sewer system and was issued numerous violations.  Atlas Refining is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the Atlas Refining property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Atlas Refining is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, PAHs, and copper.

255.   From at least 1872 until 1939, Defendant **Everett Smith Group, Ltd. (f/k/a Blanchard Bro. & Lane, Eagle Ottawa Leather, Albert Trostel & Sons) ("Everett Smith")** operated a leather tanning and finishing facility a quarter-mile from the Passaic River, at 20 Bruen

Street, Newark, New Jersey, which is within the Facility.  Blanchard Bro. & Lane was acquired by Eagle Ottawa Leather, then by Albert Trostel & Sons, and ultimately by Everett Smith in May 2007.  The property was used for storing, boiling, splitting, swelling, drying, pebbling, graining, tacking, scouring/mixing/leaching, shaving, buffing, and currying hides.  The property had two underground naphtha tanks and coal storage houses.  In the early 1900s, the leather tanning and dyeing industry involved clearing hides with sulfuric acid and bleaching with lead acetate, as well as tanning with chromium.  Hides also contained arsenic from preservatives.  Lead-containing dye and aniline dyes were used.  Tannery wastewater from Blanchard's operations contained hazardous substances, including chromium, lead, aniline, arsenic, copper, and zinc, which were present in the direct and overflow discharges from the property to the Passaic River.  For 52 years before PVSC was established, the property discharged wastewater directly to the Passaic River.  In 1924, after this 52-year period, Blanchard discharged wastewater to the Passaic River via combined sewer overflows during wet weather until 1939.  Everett Smith is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the Everett Smith property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Everett Smith is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to copper.

256.    Since 1930, Defendant **Campbell Foundry Company (CFC)** has operated three properties.  First, CFC has operated since 1930 and continues to operate at 800 Bergen Street,

Harrison, New Jersey (the "Bergen Street Property").   Second, in 1975, CFC purchased 2 Worthington Avenue, Harrison, New Jersey (the "Worthington Avenue Property") and continued to operate it until 1992.  Third, on information and belief, CFC operated at 1235 Harrison Avenue, Kearny, New Jersey ("Shipping Yard Property") from at least 1981 until 1991.  The Bergen Street Property, Worthington Avenue Property, and Shipping Yard Property are all within the Facility.

- The Bergen Street Property is located approximately 2,000 feet northwest of the Passaic River.  There, CFC manufactures manhole covers, storm drain and sewer gratings, and other cast-iron products.  Metallic cupola dust, generated at the Bergen Street Property, contains toxic lead, cadmium, and chrome.  In 1982, NJDEP cited CFC for (1) illegally operating an offsite waste disposal facility for foundry generated waste, (2) transporting hazardous waste without a waste manifest, and (3) failing to submit the required permit application for the operation of an offsite disposal area.  In 1986, NJDEP cited CFC for improper labeling of hazardous waste containers and spilling hazardous waste on the ground.   A 1986 NJDEP report noted that hazardous waste generated onsite— amounting to 821,680 pounds for that calendar year alone—contained lead, cadmium, and chromium.  Occupational Health and Safety Administration (OSHA) cited CFC for 28 violations of workplace safety standards, 22 of which were classified as "serious." Between 1987 and 1995, at least 48 substances were being used at the Bergen Street Property, including acetylene, antifreeze, cerium, methylene chloride, phosphoric acid, and titanium dioxide.

- The Worthington Avenue Property occupied approximately two acres and was connected to the PVSC system before 1942.  Since CFC purchased it in 1975, it has not operated there.  Throughout the 1990s, samples were taken from the Worthington

Avenue Property to determine the impact of past manufacturing operations. The samples detected arsenic, mercury, lead, benzo(a) anthracene, benzo(b) fluoranthene, and copper.

- CFC's Shipping Yard Property is an illegal landfill. CFC admits that it is being operated illegally. It was used for the disposal of waste sand and clay, slag, and cupola dust (which contains cadmium and lead). Ten tons of waste per week were disposed of at this property. In 1981, NJDEP cited CFC for operating a hazardous waste landfill without a permit.

CFC is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including lead from the CFC properties have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under §§ 107(a)(1) and/or 107(a)(2) and/or 107(a)(3) and CERCLA § 113, CFC is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PAHs, PCBs, and mercury.

257.   In December 1976, a predecessor to Defendant **Cooper Industries, LLC ("Cooper")** acquired J. Wiss & Sons Co. (JWS). On information and belief, Cooper is the successor to JWS. In 1848, JWS started manufacturing cutlery; these operations continued at successive locations in Newark, New Jersey until 1985. The property addresses are 7 Bank Street (1848-1854); 13 Bank Street (beginning in 1854); 26 Bank Street (until 1887); and 33 Littleton Avenue (1887-1985), all located in Newark, New Jersey and all of which are within the Facility.

JWS forged, fabricated, and finished steel, which involved pickling and plating. This generated wastewater containing heavy metals (e.g., cadmium, chromium, copper, lead, and arsenic), which was discharged either directly to the Passaic River or via overflows within the PVSC's CSO system. These discharges occurred for the entire 136 years of operations on the properties and, for all but 10 years, were not covered by a federal discharge permit. Additionally, documents from 1978 indicate that there was no pretreatment of wastewater prior to discharge. Cooper is liable as an owner or operator at the time of disposal of hazardous substances. Releases of hazardous substances including lead from the Cooper property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy. Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Cooper is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, copper, and mercury.

258. Defendant **Honeywell International Inc. ("Honeywell")**, or its predecessors, operated at 65 Lodi Street, Passaic, New Jersey, which is within the Facility, from 1899 until 1987. Honeywell predecessor General Chemical Company operated at the property and was acquired by Honeywell predecessor Allied Chemical in 1920. Allied Chemical used this property as a nitrating plant, as a bulk acid distribution facility, and as storage for engineered plastics and pellets. An incinerator was also located at the rear of the property, approximately 30 feet from the Passaic River. An onsite disposal pit, located approximately 60 feet from the Passaic River, was used to wash drums. Soil samples taken from around underground fuel storage tanks revealed elevated levels of TPH, benzene, toluene, and xylene. Soil sampling in areas near the tank wash area

164

revealed TPH, zinc, and lead that exceeded ECRA guidelines.  Soil from other areas of the property included contaminants such as TPH, lead, cadmium, arsenic, selenium, zinc, copper, and mercury. In 1991, groundwater sampling indicated that volatile organic compounds (trans1,2dichloroethene and trichloroethene), chromium, and lead were present that exceeded ECRA standards.   Around 1994, the property was capped utilizing asphalt and stone layers, with certain areas capped with permeable membranes.   The property was issued a Declaration of Environmental Restriction, which stated that soil on the property still contained contaminants.   Hazardous substances found in onsite soils and groundwater include benzene, toluene, zinc, lead, and arsenic.  These hazardous substances were released into the Passaic River.  Floor drains located throughout the property discharged directly to the Passaic River.  Further, there was a release from the subsurface storage tanks located at the waterfront of the Passaic River.  Therefore, hazardous substances were also found in Passaic River sediment adjacent to the property.  Honeywell is liable as an owner and/or operator at the time of disposal of hazardous substances.   Releases of hazardous substances including lead from the Honeywell property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Honeywell is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, copper, and arsenic.

259.    Defendant **Atlantic Richfield Company (ARCO)** owned and operated a bulk petroleum storage facility at the 86 Doremus Avenue in Newark (the "Getty Newark Terminal

Site"), located at River Mile 1.5 on the waterfront to the Passaic River, which is within the Facility, from 1930 to 1950.  From 1985 until at least 2014, Defendant **LeeMilt's Petroleum, Inc. (f/k/a Power Test Corporation) ("LeeMilt")** owned and operated a bulk petroleum storage facility at the Getty Newark Terminal Site.  From 1930 to 2014, hazardous substances emanating from the Getty Newark Terminal Site were disposed of or otherwise came to be located in the Passaic River.  Upon information and belief, during ARCO's ownership and operation of the Getty Newark Terminal Site, ARCO disposed of untreated wastewater to the PVSC, where numerous documented storm events and line breaks resulted in discharges to the Passaic River.  Upon information and belief, during LeeMilt's ownership and operation of the Getty Newark Terminal Site, LeeMilt disposed of effluent from an onsite oil-water separator into the Passaic River.  Until at least 1993, LeeMilt disposed of untreated wastewater into the PVSC, where numerous documented storm events and line breaks resulted in discharges to the Passaic River.  Stormwater flowed through contaminated areas on the Getty Newark Terminal Site and discharged to the Passaic River via runoff during wet weather.  ARCO and LeeMilt are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the Getty Newark Terminal Site have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113 , and subject to the contribution release described in paragraph 44 above, ARCO and LeeMilt are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, copper, and PAHs.

260.   **D & J Trucking Property.**  For several years in the 1970s, Defendant **Benjamin Moore & Co. ("Benjamin Moore")** and Defendant **The Sherwin-Williams Company ("Sherwin Williams")** arranged for the disposal of hazardous substances at 310-336 Avenue P, Newark, New Jersey by D & J Trucking, which resulted in contamination of the Lower Passaic River.  This property is part of the Facility.  Starting in 1974, D & J Trucking purchased the property and began using it to dump hazardous substances and other compounds illegally, including but not limited to, liquid waste (such as paint waste, tank washings, and still bottoms) from the Benjamin Moore and Sherwin Williams operations at 134 Lister Avenue, Newark, New Jersey and 60 Lister Avenue, Newark, New Jersey, respectively.  During D & J Trucking's operation of the property, it dumped liquid waste (including paint pigments) from vacuum trucks and drums directly onto the property and into unlined pits on the property.  In 1978, NJDEP revoked D & J Trucking's Solid Waste Administration registration because of the "willful, negligent, and illegal discharges" on the property.  Liquid waste from the property discharged to Plum Creek, a tributary to the Passaic River, which is part of the Facility, and eventually came to be located in the Passaic River.  Copper, mercury, lead, PAHs, PCBs, dieldrin, DDx, and dioxin-associated compounds have been detected in soils on the property.  Stormwater flowed through contaminated areas on the property and discharged to Plum Creek via runoff during wet weather. Benjamin Moore and Sherwin Williams are liable as transporters and/or arrangers of hazardous substances at this property.  Disposals of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA § 107(a)(3) and CERCLA § 113, Benjamin Moore and Sherwin Williams are therefore liable for the costs of response resulting from the release of

hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to copper, mercury, PAHs, PCBs, and DDx.

261.     Defendant **Canning Gumm LLC ("Canning Gumm")** or its predecessors operated at a property located at 538 Forest Street, Kearny, New Jersey, which is within the Facility, beginning in 1938 or 1939 and continuing through 2000.  In 1952, a Canning Gumm predecessor manufactured "Clepo" compounds at the property.  In correspondence from 1962, the property was used for compounding commercial detergents.   By 1972, Canning Gumm manufactured cleaners, acid salts, abrasive tumbling compounds, and paint strippers at the property.  At that time, the property produced "blended specialty products for metal finishing processes" and operated a small laboratory for metal finishing procedures.  In 1981, Canning Gumm manufactured soap compounds and other chemicals for metal plating, painting, or other finishing.  In 1982, operations at the property included the blending of powdered and liquid raw materials that were purchased from outside vendors.  In 1987, the company manufactured alkaline cleaners for the metal finishing industry.  In 1991, Canning Gumm focused on manufacturing products for the metal finishing industry, including alkaline cleaners, powder and liquid acids, mass finishing compounds, and phosphating compounds.  The company manufactured a sulfuric acid-based brass brightener that was used in the electroplating and metal finishing industry.  The property stored, utilized, and generated lead, copper, mercury, and PAHs.  Analysis of the wastewater discharge from the property found the following compounds over allowable limits: lead, copper, nickel, and total cyanide.  Soil at the property is contaminated with chloride, toluene, volatile organic compounds, and xylenes.   Groundwater contamination include 1,1,1-trichloroethane, 1,1-dichloroethane, benzene, methylene chloride, and xylenes.  Canning Gumm's

discharge to the CSO system was bypassed to the Passaic River from the beginning of property operations until February 28, 1975 (the effective date of PVSC's NJDPES permit), and such releases were not covered by a federal permit.  The property's discharge during this time contained lead, cyanide, copper, and nickel.  Discharges from this property was released to the Passaic River over a 39-year period without a federal permit.  Following the issuance of PVSC's NJDPES permit in 1975, Canning Gumm's discharges to the CSO system was bypassed to the Passaic River, repeatedly violating its discharge permit.  Canning Gumm is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the Canning Gumm property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Canning Gumm is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, copper, and PAHs.

262.    During the 1800s through 1949, the predecessor to Defendant **Coats & Clark, Inc. ("Coats")**, The Clark Thread Co., operated several thread mills at three properties, all of which are within the Facility: (1) 260 Ogden Street, Newark, New Jersey (the "Newark Property"); (2) 900 Passaic Avenue, East Newark, New Jersey (the "East Newark Property"); and (3) 735 Broad Street, Bloomfield, New Jersey (the "Bloomfield Property").  There are documented discharges of hazardous substances from each of these properties to the Passaic River.

- Clark Thread's operations at the Bloomfield Property began in 1922 and ended in 1949.  Clark Thread produced cotton thread.  The Bloomfield Property was used to bleach and

169

mercerize thread.  Raw materials used in Clark Thread's Bloomfield operations include sodium hydroxide, sulfuric acid, sodium hypochlorite (which produces toxic chlorinated organic byproducts), and dyes.  At the Bloomfield Property, sulfuric acid and sodium hypochlorite were stored in aboveground storage tanks.  Clark Thread's operations, which involved chlorinated organic byproducts, including sodium hypochlorite, likely were a source of dioxins in the Passaic River.  Clark Thread's Bloomfield Property has been the subject of two Memoranda of Agreement (MOA) between NJDEP and the property owners/operators, with the most recent executed on July 17, 2001 with SGA and Clark Thread.  The property has been under investigation by various consultants since the 1980s with 41 areas of concern identified.  Groundwater at the Bloomfield Property is contaminated with lead, PCE, and chloroform. The Bloomfield Property discharged cooling water and/or boiler blowdown water to the banks of the Third River via a pipe.    Copper, lead, and chlordane were detected in sediment samples taken at (1) the spillway, (2) just below the former discharge pipe outfall, and (3) 10 feet below the downgradient edge of the property.

- Clark Thread began operating at the Newark Property before 1872 and stopped operations there in 1947.  Clark Thread also operated at the East Newark Property starting in 1875 until 1931.  The Newark and East Newark Properties' operations included bleaching, dyeing, milling, and finishing.  Dye baths contain toxic materials and heavy metals and are often responsible for a high percentage of total contaminants in a property's effluent.  Further, the higher the textile production, the greater the resulting waste.   Clark Thread has been the largest and most important thread

manufacturer in the United States.  Hazardous substances were used at the Newark and East Newark Properties and discharged directly to the Passaic River prior to 1926 and subsequently via overflows within the PVSC's CSO system.  Both the Newark and East Newark Properties are adjacent to the Passaic River, and both have documented direct releases of dye known to be contaminated and are being investigated and remediated by the two property operators.  For at least 54 years between starting operations in 1872 and the connection of the Newark Property to the PVSC system in or around 1926, Clark Thread's Newark Property discharged industrial process, sanitary, and storm water directly to the Passaic River.  In February 1926, a PVSC inspection identified Clark Thread's Newark and East Newark Properties as polluting facilities to the Passaic River even after 1926.

Coats is liable as an owner and/or operator at the time of disposal of hazardous substances. Releases of hazardous substances including lead from the Coats property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.   Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Coats is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxins, dioxin-associated compounds, mercury, and copper.

263.   Defendant **Benjamin Moore & Co. ("Benjamin Moore")** has owned and operated a paint and resin manufacturing facility at 134 Lister Avenue, located at River Mile 3.4 on the

waterfront of the Passaic, which is within the Facility, since 1925.  During Benjamin Moore's ownership of the property, hazardous substances were disposed of or otherwise came to be located in the Passaic River.  Upon information and belief, during Benjamin Moore's ownership and operation of the property, Benjamin Moore disposed of process wastewater, tank cleaning sludge, and other materials containing hazardous substances into the Passaic River.  As of 1967, the sanitary sewer near the property had corroded and was affecting the adjacent storm sewer, which discharged directly to the Passaic River through the Lockwood storm sewer outfall, located on the Benjamin Moore property.  As of 1971, Benjamin Moore's onsite storm sewer system disposed of tank cleaning sludge, wash water, and caustic solutions—all directly into the Passaic River.  As of 1973, Benjamin Moore disposed of process waste materials via two outfalls that discharged directly to the Passaic River.  As of 1987, Benjamin Moore disposed of collected contaminated stormwater, boiler blowdown, and compressor blowdown into the Passaic River.  Mercury, copper, lead, PAHs, PCBs, and dioxin-associated compounds have been detected in soils on the property. Stormwater flowed through contaminated areas on the property and discharged to the Passaic River via runoff during wet weather.  EPA issued Benjamin Moore a General Notice Letter in 2003 and a Notice of Potential Responsibility under CERCLA for the property in 2016.  Benjamin Moore is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Benjamin Moore is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have

contaminated and continue to contaminate the river, including but not limited to mercury, copper, PAHs, and PCBs.

264.   Defendant **EnPro Industries, Inc. ("EnPro")**, through its predecessor Crucible Steel ("Crucible"), operated at a property, abutting the Passaic, located at 1000 South Fourth Street, Harrison, New Jersey, which is within the Facility.   From 1900 to 1947, Crucible was involved in steel manufacturing operations, including the operation of a steel rolling mill on the property.   As part of the steel manufacturing process, molten lead was used in quenching baths. In 1947, Crucible began subdividing the Property and selling and leasing portions to other entities. Defendant **Teval Corporation ("Teval")**, formerly named Guyon General Piping, Inc. ("Guyon"), purchased part of Crucible's property in 1947 and operated as a lessee and/or owner/operator at 900-1000 South Fourth Street, Harrison, New Jersey, which is also within the Facility.   Guyon operated a pipe fabrication facility on parts of the original Crucible property.   In 1988, the property became vacant.   COCs stored, used, and/or produced that the property included mercury, copper, lead, and sulfuric acid.   Site soil contamination includes PAHs, dioxin-associated compounds, dieldrin, PCBs, copper, lead, and mercury.   Site groundwater contamination includes PAHs, dioxin-associated compounds, dieldrin, PCBs, copper, lead, and mercury.   There are documented discharges of hazardous substances from the property to the Passaic River.   Before 1969, Crucible regularly spread solutions containing hazardous substances onto its grounds to guard against dust.   Because the property is close to the Passaic River, runoff from flooding and storm events allowed for hazardous substances to be discharged to the Passaic River.   Before 1970, Crucible discharged wastewater and acidic effluent to the Passaic River without treatment through the sanitary sewer.   After 1970, Crucible installed a rudimentary wastewater treatment plant, which did not fully treat wastewater prior to its discharge to the Passaic River.   In 1970, PVSC filed a

173

complaint against Crucible alleging that "for some time past," Crucible discharged polluting material to the Passaic River through a culvert that it owned, violating New Jersey law.  During this 1970 lawsuit, the court signed an order naming Guyon as an additional party.  The property also had a central sewer network, which discharged directly to the Passaic River.  In 1990, consultants for Guyon reported that sanitary waste generated at the property discharged to the PVSC wastewater treatment plant.  Testing conducted by an environmental health consultant indicated that Guyon was discharging oil to the Passaic River.  Groundwater at the property was hydraulically connected to the Passaic River, so that PAHs, mercury, PCBs, dieldrin, copper, and lead contained in the property's soil would discharge to the Passaic River.   Enpro and Teval are liable as owners and/or operators at the time of disposal of hazardous substances.  Releases of hazardous substances including lead (as to Enpro) and PAHs (as to Teval) from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Enpro and Teval are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead, PAHs, and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, PCBs, and copper (as to EnPro) and PCBs, mercury, copper, and lead (as to Teval).

265.    In 1957, Defendant **Croda, Inc. ("Croda")** purchased the "lanolin business" of Hummel Chemical Company and renamed that business Hummel Lanolin Corporation. Croda/Hummel Lanolin began operating as a tenant at 185 Foundry Street (Block 5005 – Lot 21), Newark, New Jersey in the late-1950s and ceased operations at that property as of 1987.  This

property is a part of the Facility.   The property contained Building #39, which was the main Hummel Lanolin facility, and the facility was expanded in 1964 with the addition of a warehouse building.   At the property, Hummel Lanolin produced lanolin and lanolin derivatives.   Its operations utilized several raw materials to produce its finished products, including alcohols, hydrogen peroxide, lanolin, and soda ash.   Facility operations also included the use of "drying" and "bleaching" tanks.   The soap stock and wash waters generated at the property were neutralized with either sulfuric acid or hydrochloric acid to free water insoluble fatty acids.   The recovered fatty acids would surface to the top of the mixture, and the remaining acid solution would be pumped to a tank for neutralization with either caustic soda or soda ash before discharge to the PVSC system.   The property was reported to generate hazardous waste that included, but is not limited to, chemical process liquids, chemical process solids, waste materials classified as "characteristic of ignitability," and toluene.   In 1979 and 1980, PVSC investigations identified Hummel Lanolin as having the following metal contaminants in its process waste and noncontact cooling water: arsenic, cadmium, chromium, copper, lead, mercury, nickel, and zinc.   In September 1986, the property became subject to ECRA regulation (now an Industrial Site Recovery Act regulation), due to a pending sale of the property.   Samplings of property soils and sewer system sediments were conducted in the course of the ECRA remediation between 1986 and 1988.   Many contaminants were found and believed to be associated with Hummel Lanolin's operations, including copper, lead, total cyanide, cadmium, and DDT.   Site soil contamination includes benzene, copper, lead, toluene, zinc, and 2-Butanone.   There are numerous documented and potential discharges from the Property to the Passaic River.   As examples: Wastewater discharged from the property was carried via combined sewers, which ultimately discharged to the Passaic River.   In the 1979 and 1980 PVSC investigations, Hummel Lanolin was identified as having

175

copper, lead, and mercury (among other contaminants) in its process waste and noncontact cooling water.  Moreover, a system of strip drains within the property are tied to the Roanoke Avenue CSO, allowing stormwater and/or surface runoff to serve to transport contaminants to the drains and ultimately to the Passaic River.  Historical core samples taken of sediments in the Passaic River in the vicinity of the Roanoke Avenue CSO have served to identify contaminants in those sediments that match raw, process, and waste materials known to be associated with Hummel Lanolin's operations.  Croda is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of lead by Croda/Hummel Lanolin have contaminated and continue to contaminate the sediments in the Lower Passaic River and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Croda is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, copper, and PAHs.

266.    Defendant **Curtiss-Wright Corporation ("Curtiss-Wright")** owned and operated a 160-acre property located at 1 Passaic Street in Wood Ridge, New Jersey, which is within the Facility.  During World War II, Curtiss-Wright manufactured cyclone engines, and Curtiss-Wright continued to do defense-related work until the 1960s.  Gas turbine generators were produced during the 1970s.  COCs stored, used, and/or produced at the property included lead, dioxin-associated compounds, PCBs, mercury, copper, and PAHs.  Site soil contamination includes lead, dioxin-associated compounds, PCBs, mercury, copper, and PAHs.  High mercury concentrations were found in groundwater wells.  Groundwater contamination also includes lead, dioxin-

associated compounds, PCBs, mercury, copper, and PAHs. There are documented discharges of hazardous substances from the property to the Passaic River.  For example, process wastewater from the plant discharged directly to a storm sewer to the Feld's Brook, a tributary to the Saddle River, which in turn is also a tributary to the Passaic River.  Mixtures of jet fuel also entered the storm sewer and discharged to Feld's Brook.  Between 1945 and 1985, both PVSC and NJDEP documented discharges of process-related oils, oil-water mixtures, cutting fluids, pickling liquids, sewage, and "colored wastes" from the property to Feld's Brook and the Saddle River. Accidental spills of oil and other substances emanated to a ditch that fed into Feld's Brook.  At the property, an underground storage facility housed rusty and deteriorated barrels of toxic waste.  On January 10, 1992, a PCB inspection identified improper storage and documentation.   Curtiss-Wright is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the Curtiss-Wright property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.   Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, Curtiss-Wright is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances they disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxin-associated compounds, PCBs, mercury, copper, and PAHs.

267.    In May 1996, Defendant **Darling Ingredients Inc. (f/k/a Darling International, Inc.) ("Darling")** acquired Standard Tallow Corp., which from at least 1926, operated on a property located at 61 Blanchard Street in Newark, New Jersey, which is within the Facility.  On information and belief, Darling is the successor to Standard Tallow.  At the property, Standard

177

Tallow produced tallow and meat meal by processing fat and bones.  COCs stored, used, and/or produced at the Property included lead, copper, and PAHs.  Wastewater generated at the property included lead, copper, and PAHs.  There are documented discharges of hazardous substances from the property to the Passaic River.  For instance, a February 1926 PVSC report documented that the property was discharging sanitary wastes and wastes from its rendering kettles—all directly to the Passaic River.  On September 15, 1969, PVSC notified Standard Tallow that it was violating New Jersey and local law: PVSC had traced from the property a "highly polluting" and "turbid, amber-brownish liquid" entering the Blanchard Street storm sewer and discharging to the Passaic River.  The PVSC stated that, "[b]ecause of 'sloppy housekeeping' with polluting materials all along your yards, it appears that every time a rainfall occurs, this material reaches the ditches, and thence the Passaic River[.]"  In March 1970, PVSC advised Standard Tallow that it had traced a source of "heavy pollution" in the Passaic River to the property, caused by personnel washing down the facility yard and processing equipment.  In reports from 1971 and 1972, PVSC observed that the facility yard was covered with decaying tallow waste products.  Leaky condensate steam pipes discharged hot water, causing waste materials to flow to the railroad track.  Rain washed this waste into a storm catch basin on Blanchard Street and to the Passaic River.  Darling is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the Darling property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Darling is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances

they disposed of that have contaminated and continue to contaminate the river, including but not limited to copper and PAHs.

268.     Starting on December 11, 1978, Defendant **Textron, Inc. ("Textron")** operated at a property located at 400 Doremus Avenue, Newark, New Jersey, which is within the Facility. Resins were manufactured at the property since the 1930s.  In 1980, Textron reported to PVSC that it manufactured and processed alkyd and polyester resins.  COCs stored, used, and/or produced at the property included dioxin-associated compounds and PAHs.  Process wastes, consisting of filter cake and press paper, as well as strainer bags, were drummed, held onsite, and shipped to another facility on a monthly basis.  Bag drainings were recycled or disposed of as bulk liquid hazardous waste.  A March 1987 ECRA report documents soil and groundwater sampling in 27 areas of concern, chosen because of visible evidence of spills or discharges of raw materials, fuel oil, or finished product.   Copper, PCBs, mercury, lead, and PAHs were found in soil and groundwater.  There are documented discharges of hazardous substances from the property to the Passaic River.  For example, on September 10, 1979, a tank in the yard overflowed, causing resin to spill into a drain and enter the underground flume in the shallow aquifer, ultimately reaching the Newark Bay (within the Passaic River study area).  The Newark Bay tidally influences the Passaic River.  A 1987 report showed that there was evidence of surface spills of resin, waste material, phthalic anhydride, and fuel oil.  Stormwater from storm sewers and catch basins was discharged directly to the Passaic River.  Before 1982, the property's storm drains, located where hazardous materials were handled, were uncovered.  Textron is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the Textron property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a

result of EPA's mandated remedy. Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Textron is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to PCBs, mercury, copper, and PAHs.

269.    Starting in the late 1890s, Defendant **The Newark Group, Inc. ("Newark Group")** operated on a property located at 17 Blanchard Street, Newark, New Jersey, which is within the Facility. Newark Group reports that it manufactures recycled paperboard into various grades, including plain, laminating, partition, and lined chip—finished products with trace amounts of hazardous substances. COCs stored, used, and/or produced at the property included lead, copper, mercury, and PCBs. From 1997 to 2002, Newark Group produced between 73,426,000 and 79,788,000 pounds of paperboard annually. During this time, metals discharged to the PVSC by the property included lead, copper, and mercury. There are documented discharges of hazardous substances from the property to the Passaic River. For instance, reports from 1925 through 1927 indicated that Newark Group's "wash water" discharged via the storm sewer to the Passaic River. From 1968 to 1980, the Newark Group discharged to the Morris Canal storm sewer—and through the Lockwood Street outfall ultimately to the Passaic River—1,000 gallons per day of noncontact cooling water, boiler blowdown wastewater, and process washdown water. In 1980, Newark Group identified hazardous substances, including lead, copper, mercury, and arsenic, in the industrial waste to be discharged to the sanitary sewer. In a City of Newark study in 1978 or 1979, Newark Group discharged 160,000 gallons of industrial waste to the easterly line of the Morris Canal storm sewer. The study also indicated that pollutants in the groundwater near

the property may have been leaching directly into the Passaic River.  Newark Group is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the Newark Group property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Newark Group is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to dioxin-associated compounds, PCBs, mercury, and copper.

270.    From 1897 to 1985, Defendant **Tiffany and Company ("Tiffany")** operated on a property located at 820 Highland Avenue in Newark, New Jersey, which is within the Facility.  Tiffany alloyed fine silver to make sterling silver—which it then made into flatware, hollow ware, and fancy goods.  Hazardous substances stored, used, and/or produced at the property included sulfuric acid, hydrofluoric acid, and nitric acid.  Site soil and groundwater contamination at the property included lead, copper, mercury, and PAHs.  There are documented discharges of hazardous substances from the property to the Passaic River.  The Tiffany property was in the Verona Avenue CSO District, which discharged to the Passaic River.  Moreover, floor drains throughout the property drained to a tank that had an overflow pipe discharging to the PVSC system.  On September 25, 1984, a Star Ledger reporter contacted NJDEP and indicated that Tiffany dumped cyanide and other hazardous chemicals near sludge pits behind the plant, which was approximately 250 feet east of the Second River, a tributary to the Passaic River.  Finally, the

property's groundwater flows towards the Second River.  Tiffany is liable as an owner and/or operator at the time of disposal of hazardous substances.  Releases of hazardous substances including lead from the property have contaminated and continue to contaminate the sediments in the Lower Passaic River, including OU2, and must be removed from the riverbed and/or capped as a result of EPA's mandated remedy.  Under CERCLA §§ 107(a)(2) and/or 107(a)(3) and CERCLA § 113, and subject to the contribution release described in paragraph 44 above, Tiffany is therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and/or capping lead and other hazardous substances it disposed of that have contaminated and continue to contaminate the river, including but not limited to mercury, copper, and PAHs.

## VII.   CAUSES OF ACTION

### COUNT I: CERCLA COST RECOVERY UNDER SECTION 107(a)

271.   Plaintiff realleges and incorporates by reference paragraphs 1 through 270 as if fully set forth herein.

272.   Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River; (2) owned or operated a portion of the Facility at the time hazardous substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; and/or (4) transported hazardous substances to the  Facility, having selected it for treatment or disposal of such hazardous substance,

resulting in a release or threatened release of hazardous substances into the Lower Passaic River, as described in greater detail above.

273.    Each release or threatened release of hazardous substances at the Facility as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the National Oil and Hazardous Substances Contingency Plan, 40 C.F.R. Part 300 et seq. (the "NCP").

274.    Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), Plaintiff is entitled to cost recovery from each Defendant for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the 2016 ASAOC, the Tierra Removal ASAOC, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against each Defendant as follows:

(a)    declaring that each Defendant is jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred or to be incurred by Plaintiff as a result of releases or threatened releases of hazardous substances at the Facility;

(b)    awarding Plaintiff an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be incurred by Plaintiff, including costs incurred in connection with the 2016 ASAOC, the Tierra Removal ASAOC, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs;

(c)    awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law and such other and further relief as the Court determines is just, equitable, and

appropriate.

## COUNT II: CERCLA CONTRIBUTION UNDER SECTION 113(f)(1) and 113(f)(3)(B)

275.    Plaintiff realleges and reincorporates by reference paragraphs 1 through 270 as if fully set forth herein.

276.    Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River; (2) owned or operated a portion of the Facility at the time hazardous substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substance, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, as described in greater detail above.

277.    Each release or threatened release of hazardous substances at the Facility, as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the NCP.

278.    Pursuant to each of the 2016 ASAOC, the Tierra Removal ASAOC, and the CSO ASAOC, Plaintiff has resolved its liability to the United States for some or all of a response action or for some or all of the costs of such action in an administrative settlement and has incurred and will incur necessary response costs consistent with the NCP.

184

279.    Plaintiff has incurred and will incur necessary response costs consistent with the NCP in compliance with the RM 10.9 Removal UAO, and is entitled to contribution from defendants pursuant to CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1).

280.    Pursuant to the 2016 ASAOC, the Tierra Removal Order, the CSO ASAOC, and the RM 10.9 Removal UAO, Plaintiff has incurred and will incur in the future more than its fair, equitable share of response costs and damages.

281.    Under CERCLA Sections 113(f)(1) and 113(f)(3)(B), 42 U.S.C. §§ 9613(f)(1) and 9613(f)(3)(B), Plaintiff is entitled to contribution from each Defendant for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the 2016 ASAOC, the Tierra Removal ASAOC, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs.  Plaintiff is also entitled to an allocation by the Court of the response costs, future response costs, and damages as between Plaintiff and the Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against each Defendant as follows:

(a)    declaring that the Defendants are liable under 42 U.S.C. §§ 9613(f)(1) and 9613(f)(3)(B) for Defendants' shares, determined by the Court using such equitable factors as it determines are appropriate, of response costs incurred and to be incurred by Plaintiff as a result of releases or threatened releases of hazardous substances at the Facility;

(b)    awarding Plaintiff an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be incurred by Plaintiff, including costs incurred in connection with the 2016 ASAOC, the Tierra Removal Order, the CSO

ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs; and

(c)      awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law and such other and further relief as the Court determines is just, equitable, and appropriate.

## COUNT III: CERCLA DECLARATORY JUDGMENT

282.    Plaintiff realleges and incorporates by reference paragraphs 1 through 270 as if fully set forth herein.

283.    Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River; (2) owned or operated a portion of the Facility at the time hazardous substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substance, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, as described in greater detail above.

284.    Each release or threatened release of hazardous substances at the Facility, as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the NCP.

285.    An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between Plaintiff and Defendants regarding their respective rights and responsibilities for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the 2016 ASAOC, the Tierra Removal Order, the CSO ASAOC, the RM 10.9 Removal UAO, for work performed in identifying other PRPs for such response costs, and for future necessary response costs to be incurred by Plaintiff in connection with the contamination at the Facility.

286.    Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201-2202, Plaintiff is entitled to a declaratory judgment on liability for response costs and damages under CERCLA Section 107(a), 42 U.S.C. § 9607(a) and/or CERCLA Section 113(f)(1) and (f)(3)(B), 42 U.S.C. § 9613(f)(1) and (f)(3)(B) that will be binding in any subsequent action or actions to recover further response costs under the 2016 ASAOC, Tierra Removal Order, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for response costs.

287.    If and when EPA selects a remedy or interim remedy for any other portion of the Facility, or assesses damages for injury to, destruction of, or loss of natural resources for any other portion of the Facility, Plaintiff reserves the right to amend to seek additional declaratory or damages relief as to other Operable Units.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against each Defendant as follows:

(a)    declaring that the Defendants are liable for all or their proper shares, determined by the Court using such equitable factors as the Court determines are appropriate, of the

response costs incurred and to be incurred by Plaintiff resulting from releases or threatened releases of hazardous substances at the Facility;

(b)     declaring that the Court's judgment on each Defendant's liability for response costs and/or damages is binding on any subsequent action or actions to recover further response costs or damages;

(c)     awarding Plaintiff an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be incurred by Plaintiff, including in connection with the 2016 ASAOC, the Tierra Removal Order, the CSO ASAOC, the RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs; and

(d)     awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law and such other and further relief as the Court determines is just, equitable, and appropriate.

Respectfully submitted,

ARCHER & GREINER, P.C.

Dated: June 30, 2018

By:     _s/ John J. McDermott_
John J. McDermott, Esq.
(jmcdermott@archerlaw.com)
William J. Stack, Esq.
Charles J. Dennen, Esq.
One Centennial Square
Haddonfield, NJ 08033
Tel: (856) 795-2121
Fax: (856) 795-0574

GIBBS & BRUNS, LLP
Kathy D. Patrick, Esq.*
(kpatrick@gibbsbruns.com)
Anthony N. Kaim, Esq.*
Jorge M. Gutierrez, Esq.*
1100 Louisiana, Suite 5300
Houston, TX 77002
Tel: (713) 650-8805
Fax: (713) 750-0903

LANGSAM STEVENS SILVER &
HOLLAENDER, LLP
Larry D. Silver, Esq.*
(lsilver@lssh-law.com)
David E. Romine, Esq.*
Jennifer Graham Meyer, Esq.
Erin M. Carter, Esq.*
1818 Market Street, Suite 2610
Philadelphia, PA 19103
Tel: (215) 732-3255
Fax: (215) 732-3260

*Attorneys for Plaintiff*
*Occidental Chemical Corporation*

* *Proc hac vice* application to be filed

<u>**LOCAL RULE 11.2 CERTIFICATION**</u>

The undersigned hereby certifies that:

1.      The matter in controversy is related to the subject of actions pending in the Superior Court of New Jersey, Appellate Division, Docket Nos. A-2036-17 and A-2038-17, both captioned *N.J. Dept. of Envtl. Prot. v. Occidental Chem. Corp., et al.*, and both arising out of an action in the Superior Court of New Jersey, Civil Division, Docket No. ESX-L-9868-05, captioned *N.J. Dept. of Envtl. Prot. v. Occidental Chem. Corp., et al.* (the "NJDEP Litigation"). While many Defendants in the instant action were third-party defendants in the NJDEP Litigation, the claims against each of those third-party defendants were resolved.  The actions currently pending in the Appellate Division involve the appeals of final orders related to cross-claims among Occidental Chemical Corporation, Repsol, S.A., and Joseph J. Farnan, Jr., as Liquidating Trustee for the Maxus Liquidating Trust, none of whom are Defendants in the instant action.

2.      The matter in controversy is related to the subject of an action pending in the United States Bankruptcy Court for the District of Delaware, Case No. 16-11501, captioned *In re Maxus Energy Corp.*, including related adversarial proceedings against Repsol, S.A., YPF, S.A., YPF Holdings, Inc., YPF International S.A., and CLH Holdings, Inc.


   */s/ John J. McDermott*
   John J. McDermott, Esquire