# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### NEWARK VICINAGE

| | | |
|---|---|---|
| OCCIDENTAL CHEMICAL CORPORATION | ) | Hon. Madeline Cox Arleo |
| | ) | Hon. Joseph A. Dickson |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:18-cv-11273-MCA-JAD |
| | ) | |
| v. | ) | **PLAINTIFF OCCIDENTAL** |
| | ) | **CHEMICAL CORPORATION'S** |
| 21ST CENTURY FOX AMERICA, INC., *et al.* | ) | **ANSWER, ADDITIONAL DEFENSES,** |
| | ) | **COUNTERCLAIM AND** |
| Defendants. | ) | **CROSSCLAIM AGAINST ALL** |
| | ) | **DEFENDANTS** |

---

ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel.    (856) 795-2121
By:    John J. McDermott, Esq.
       (jmcdermott@archerlaw.com)
       William J. Stack, Esq.
       Charles J. Dennen, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.    (713) 650-8805
By:    Kathy D. Patrick, Esq.
       (kpatrick@gibbsbruns.com)
       Anthony N. Kaim, Esq.
       Katherine H. Kunz, Esq.
       Jorge M. Gutierrez, Esq.
       Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2610
Philadelphia, PA 19103
Tel.    (215) 732-3255
By:    Larry D. Silver, Esq.
       (lsilver@lssh-law.com)
       David E. Romine, Esq.
       Jennifer Graham Meyer, Esq.
       Erin M. Carter, Esq.

GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067
Tel.    (310) 553-3610
By:    Peter A. Nyquist, Esq.
       (pnyquist@ggfirm.com)
       Noah Perch-Ahern, Esq.
       Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

Plaintiff, Occidental Chemical Corporation ("OxyChem"), hereby files the following Answer, Additional Defenses, Counterclaim and Crossclaim to Defendant Pabst Brewing Company, LLC ("Defendant") Counterclaim.

As a preliminary matter, OxyChem states that Defendant's Counterclaim includes a significant definitional error.  It alleges repeatedly that "OxyChem is Diamond Alkali Company" or that it is the successor-in-interest to "all the liabilities of" the Diamond Alkali Company or various other companies enumerated by Defendant throughout its counterclaim. This is not accurate.  Accordingly, Plaintiff OxyChem denies this allegation wherever it is made, including where it is embodied (erroneously) in the purported definitional term "OxyChem."

For the avoidance of doubt, as used in this Answer, Additional Defenses, and Counterclaims, Plaintiff uses the term "OxyChem" to refer solely to Occidental Chemical Corporation.

## NATURE OF ACTION[1]

1.      OxyChem denies that OxyChem has not paid its alleged share of response costs.  In fact, as alleged in OxyChem's own Complaint, OxyChem has paid more than its alleged share of response costs at the Diamond Alkali Superfund Site.  OxyChem admits that the Diamond Alkali Superfund Site (the "Site") is defined by the United States Environmental Protection Agency ("EPA") as the former Diamond Alkali facility at 80-120 Lister Avenue in Newark, New Jersey, the Lower Passaic River Study Area ("LPRSA"), the Newark Bay Study Area and the areal extent of contamination.  OxyChem admits that EPA's definition of the Site is described at pp. 1-2 Record

---

[1] For ease of reference, OxyChem's Answer replicates the headings contained in the Counterclaim. Although OxyChem believes no response is required to such headings, to the extent a response is deemed required and to the extent those headings and titles could be construed to contain factual allegations, those allegations are denied.

of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) ("OU2 ROD"). OxyChem otherwise denies the allegations in Paragraph 1.

2.      OxyChem admits Defendant has alleged its entitlement to recover response costs under CERCLA in its Counterclaim, but OxyChem denies Defendant is entitled to any such recovery. To the extent Paragraph 2 alleges that Defendant has incurred or will incur response costs at the Site, OxyChem lacks knowledge of or information sufficient to form a belief about the truth of these allegations, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). To the extent any additional response is required, OxyChem denies the allegations in Paragraph 2.

## JURISDICTION AND VENUE

3.      OxyChem admits the allegations in Paragraph 3.

4.      OxyChem admits the allegations in Paragraph 4.

5.      OxyChem admits the allegations in Paragraph 5.

## PARTIES

6.      OxyChem lacks knowledge of or information sufficient to form a belief about the truth of the allegations in Paragraph 6, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). To the extent any additional response is required, OxyChem denies the allegations in Paragraph 6.

7.      OxyChem denies the allegations set forth in Paragraph 7.

8.      OxyChem denies it is the Diamond Alkali Company or that it is the corporate successor to "all the liabilities of Diamond Alkali Company" as alleged in this paragraph. OxyChem admits that the Diamond Shamrock Chemicals Company[2] ("DSCC") owned and/or operated the Lister Plant at the time 2,3,7,8-tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD") and

---

[2] Throughout this Answer, OxyChem will use "DSCC" to refer to Diamond Shamrock Chemicals Company and its corporate predecessors, including Diamond Shamrock Corporation and Diamond Alkali Company.

the other "contaminants of concern" ("COCs"), as defined in OU2 ROD § 5.2, were allegedly disposed and released into the Passaic River and other parts of the Diamond Alkali Superfund Site. OxyChem further denies it is the Successor-in-interest to Kolker Realty Company, Kolker Chemical Works, Inc., Diamond Alkali Organic Chemical Division, Diamond Alkali Company, Diamond Chemicals Company, Diamond Shamrock Chemicals Company, Occidental Diamond Alkali Corporation, and Occidental Agricultural Products, Inc. OxyChem admits it is a successor by merger, but denies it is the Successor-in-interest to all the liabilities of, Occidental Electrochemicals Corporation, Oxy-Diamond Alkali Corporation, and Occidental Chemical Agricultural Products, Inc. OxyChem acknowledges that Defendant asserts that when it uses the term "OxyChem," it is purporting to include within that term other entities that Defendant alleges are OxyChem's predecessors-in-interest, but OxyChem denies it is the Successor-in-interest to those entities and otherwise denies the allegations set forth in Paragraph 8.

## GENERAL ALLEGATIONS

9.     OxyChem denies the allegations set forth in Paragraph 9.

10.     Paragraph 10 sets forth conclusions of law and therefore no answer is required. To the extent any additional response is required, OxyChem denies the allegations in Paragraph 10.

11.     To the extent Paragraph 11 alleges that Defendant has incurred or will incur response costs at the Site and/or other damages, OxyChem lacks knowledge of or information sufficient to form a belief about the truth of these allegations, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). OxyChem otherwise denies the allegations in Paragraph 11.

### Ownership and Operational History of the Lister Plant

12.     OxyChem admits that from the mid-1940s through 1951, Kolker Chemical Works, Inc. owned and operated the plant located at 80 Lister Avenue (the "Lister Plant"), on the south

bank of the Passaic River at approximately River Mile 3.2; and from 1951 through approximately 1969, DSCC owned and operated the Lister Plant.  OxyChem further admits that at certain times DSCC manufactured DDT and phenoxy herbicides, including Agent Orange, at the Lister Plant. OxyChem otherwise denies the allegations in Paragraph 12.

13.     OxyChem admits that two of the chemicals DSCC manufactured at the Lister Plant were 2,4-dichlorophenoxyacetic acid ("2-4D") and 2,4,5-trichlorophenoxyacetic acid ("2,4,5-T"). OxyChem otherwise denies the allegations in Paragraph 13.

14.     OxyChem admits that DDT, 2,4D, 2,4,5-T, and 2,3,7,8 TCDD are Hazardous Substances[3] under 42 U.S.C. §9601(14).  OxyChem further admits that DDT, 2,4D, and 2,4,5-T were used and/or produced at the Lister Plant.  Defendant has not specified what other Hazardous Substances are at issue in Defendant's allegation that "many other constituents were used, produced, disposed, and released at and from the Lister Plant and adjacent disposal areas" that are also "Hazardous Substances under 42. U.S.C. §9601(14)," so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  Paragraph 14 also sets forth conclusions of law, to which no response is required.  OxyChem otherwise denies the allegations in Paragraph 14.

15.     OxyChem admits that DSCC stopped operating the Lister Plant in 1969 and sold the plant to Chemicaland Corporation in 1971.  OxyChem otherwise denies the allegations in Paragraph 15.

16.     OxyChem admits that from late 1976 through early 1977, the Lister Plant manufactured the herbicide 2,4-D.  OxyChem otherwise denies the allegations in Paragraph 16.

17.     OxyChem denies the allegations in Paragraph 17.

---

[3] Defendant does not define "Hazardous Substances" in its Counterclaim.  When referencing "Hazardous Chemicals" in this Answer, OxyChem is referring to the definition found at CERCLA Section 101(14), 42 U.S.C.A. § 9601(14).

### The *Aetna* Litigation and the Court's Findings of Intentional
### <u>and Continuous Releases from the Lister Plant</u>

18.     OxyChem admits that in September 1984, DSCC filed suit against Aetna Casualty & Surety Company and 125 other insurers in New Jersey Superior Court.   OxyChem otherwise denies the allegations in Paragraph 18.

19.     Paragraph 19 references pleadings in the *Aetna* litigation, documents that speak for themselves.   OxyChem otherwise denies the allegations in Paragraph 19.

20.     Paragraph 20 references pleadings in the *Aetna* litigation, documents that speak for themselves.   OxyChem otherwise denies the allegations in Paragraph 20.

21.     OxyChem admits Paragraph 21.

22.     OxyChem admits that the bench trial in the *Aetna* litigation lasted twenty days, after which Judge Stanton issued findings of fact and conclusions of law.   OxyChem otherwise denies the allegations in Paragraph 22.

23.     Paragraph 23 references Judge Stanton's findings of fact and conclusions of law in the *Aetna* litigation, a document that speaks for itself.   OxyChem otherwise denies the allegations in Paragraph 23.

24.     Paragraph 24 references Judge Stanton's findings of fact and conclusions of law in the *Aetna* litigation, a document that speaks for itself.   OxyChem admits the quoted language about DSCC appears in the trial court's opinion but denies that it is a summary of the trial court's conclusions.   OxyChem otherwise denies the allegations in Paragraph 24.

25.     Paragraph 25 references Judge Stanton's findings of fact and conclusions of law in the *Aetna* litigation, a document that speaks for itself.   OxyChem admits the quoted language appears in the trial court's opinion, albeit without surrounding context from the opinion. OxyChem otherwise denies the allegations in Paragraph 25.

26.     Paragraph 26 references Judge Stanton's findings of fact and conclusions of law in the *Aetna* litigation, a document that speaks for itself.  OxyChem otherwise denies the allegations in Paragraph 26.

27.     Paragraph 27 references Judge Stanton's findings of fact and conclusions of law in the *Aetna* litigation, a document that speaks for itself.  OxyChem admits that the language quoted appears in the trial court's opinion, albeit without surrounding context from the opinion. OxyChem otherwise denies the allegations in Paragraph 27.

28.     Paragraph 28 references Judge Stanton's findings of fact and conclusions of law in the *Aetna* litigation, a document that speaks for itself.  OxyChem otherwise denies the allegations in Paragraph 28.

29.     Paragraph 29 references the hearsay testimony of Walter Blair in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 29.

30.     Paragraph 30 references the hearsay testimony of Nicholas Centanni in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth

7

of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 30.

31.     Paragraph 31 references the hearsay testimony of Aldo Andreini in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 31.

32.     Paragraph 32 references the hearsay testimony of Arthur Scureman in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 32.

33.     Paragraph 33 again references the hearsay testimony of Arthur Scureman in the *Aetna* litigation, the record of which speaks for itself.  As stated previously, OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such

allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 33.

34.     Paragraph 34 also references the hearsay testimony of Arthur Scureman in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 34.

35.     Paragraph 35 references the hearsay testimony of John Burton in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial. Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 35.

36.     Paragraph 36 also references the hearsay testimony of John Burton in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 36.

37.     Paragraph 37 references the hearsay testimony of Dr. L. Anthony Wolfskill in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 37.

38.     Paragraph 38 references the hearsay testimony of Michael Catania in the *Aetna* litigation, the record of which speaks for itself.  OxyChem was not a party to the trial of DSCC's insurance claims against its insurers and did not participate in the trial or discovery leading up to the trial.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of this purported testimony and, as a result, the truth of Defendant's allegations about this testimony, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 38.

39.     Paragraph 39 references DSCC's briefing in the *Aetna* litigation appeal, a document which speaks for itself.  OxyChem admits that DSCC appealed the *Aetna* trial court's decision.  OxyChem also admits the quoted language appears in DSCC's appellate brief. OxyChem, however, was not a party to the appeal and did not participate in the briefing of the appeal.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of the statement contained in DSCC's appellate brief, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 39.

40.     Paragraph 40 references DSCC's briefing in the *Aetna* litigation appeal, a document which speaks for itself.  OxyChem, as noted, was not a party to the appeal did not participate in the briefing of the appeal.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of the statements about DSCC's positions in its appeal, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 40.

41.     Paragraph 41 references the New Jersey Appellate Division's decision in the *Aetna* litigation appeal, a document which speaks for itself.  OxyChem admits the quoted language appears in the Appellate Division's decision, albeit without relevant surrounding context.  OxyChem otherwise denies the allegations in Paragraph 41.

42.     Paragraph 42 references the New Jersey Appellate Division's decision in the *Aetna* litigation appeal, a document which speaks for itself.  OxyChem was not a party to the trial or appeal of DSCC's insurance claims against its insurers and did not participate in the trial, the discovery leading up to the trial, or the appeal.  Accordingly, OxyChem lacks knowledge or information sufficient to form a conclusion about the veracity, completeness, or reliability of Defendant's purported summary of "additional facts" it contends the Appellate Division included in its opinion and, as a result, the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).   OxyChem otherwise denies the allegations in Paragraph 42.

### Additional Evidence of Releases from Lister Plant

43.     Paragraph 43 references a 1955 memorandum sent from DSCC management to John Burton, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced memorandum, albeit without relevant surrounding context.  John Burton was

never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged interaction between Mr. Burton and Mr. Taylor. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). OxyChem otherwise denies the allegations in Paragraph 43.

44. Paragraph 44 references a July 3, 1956 Passaic Valley Sewerage Commission memorandum, and a July 6, 1956 letter from John Burton, documents which speak for themselves. OxyChem admits the quoted language appears in the referenced July 6, 1956 letter from Mr. Burton, albeit without relevant surrounding context. OxyChem did not own the stock of DSCC at the time of this alleged interaction between Mr. Burton and the PVSC. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). OxyChem otherwise denies the allegations in Paragraph 44.

45. Paragraph 45 references a memorandum dated on or around July 10, 1956 from John Burton to DSCC corporate representatives, a document which speaks for itself. OxyChem admits the quoted language appears in the referenced memorandum, albeit without relevant surrounding context. John Burton was never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged interaction between Mr. Burton and unnamed corporate representatives of DSCC. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). OxyChem otherwise denies the allegations in Paragraph 45.

46.    Paragraph 46 references a memorandum dated on or around July 10, 1956 from John Burton to DSCC corporate representatives, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced memorandum, albeit without relevant surrounding context.  John Burton was never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged interaction between Mr. Burton and unnamed corporate representatives of DSCC. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 46.

47.    Paragraph 47 references a letter dated on or around July 22, 1956 from John Burton to plant inspectors, and a July 26, 1956 letter from Mr. Burton to Dr. Bruce Gleissner, documents which speak for themselves.  OxyChem admits the quoted language appears in the referenced documents, albeit without relevant surrounding context.  John Burton was never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged interaction between Mr. Burton and unnamed plant inspectors.  OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 47.

48.    Paragraph 48 references a memorandum dated July 31, 1956 from Bill Taylor to John Burton, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced memorandum, albeit without relevant surrounding context.   Neither Bill Taylor nor John Burton were ever employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged communication between Mr. Taylor and Mr. Burton.  OxyChem is

without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). OxyChem otherwise denies the allegations in Paragraph 48.

49.     Paragraph 49 references an April 4, 1960 memorandum from John Burton to DSCC representatives, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced memorandum, albeit without relevant surrounding context.  Mr. Burton was never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged memoranda from Mr. Burton to unnamed DSCC representatives. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). OxyChem otherwise denies the allegations in Paragraph 49.

50.     Paragraph 50 references a survey dated March 24, 1967, signed by F. Gordon Steward, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced survey, albeit without relevant surrounding context.  F. Gordon Steward was never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged survey by Mr. Steward. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 50.

51.     Paragraph 51 references a notice of violation dated August 3, 1956 to DSCC for illegal discharges to the Passaic River from the Lister Plant, and DSCC's response to that notice, documents which speak for themselves.  OxyChem did not own the stock of DSCC at the time of this alleged notice of violation nor DSCC's alleged response. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this

14

paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 51.

52.     Paragraph 52 references a communication dated October 13, 1964 from the U.S. Army Corps of Engineers to DSCC, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced communication, albeit without relevant surrounding context.  OxyChem did not own the stock of DSCC at the time of this alleged communication between the U.S. Army Corps of Engineers and DSCC. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 52.

53.     Paragraph 53 references a communication dated September 18, 1968 from the U.S. Army Corps of Engineers to DSCC, a document which speaks for itself.  OxyChem did not own the stock of DSCC at the time of this alleged communication between the U.S. Army Corps of Engineers and DSCC. OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 53.

54.     Paragraph 54 references a report dated October 18, 1969 from a Mr. Gregoric to Bill Taylor, a document which speaks for itself.  Neither Mr. Gregoric nor Bill Taylor were ever employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged communication between Mr. Gregoric and Mr. Taylor.  OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 54.

55.     Paragraph 55 references a memorandum dated November 12, 1968 from Bill Taylor, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced memorandum, albeit without relevant surrounding context.  Bill Taylor was never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged memorandum from Mr. Taylor.  OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 55.

56.     Paragraph 56 references a memorandum dated September 1968 from Bill Taylor, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced memorandum, albeit without relevant surrounding context.  Bill Taylor was never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged memorandum from Mr. Taylor.  OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 56.

57.     Paragraph 57 references a 1968 communication from Bill Taylor, a document which speaks for itself.  OxyChem admits the quoted language appears in the referenced memorandum, albeit without relevant surrounding context.  Bill Taylor was never employed by OxyChem and OxyChem did not own the stock of DSCC at the time of this alleged communication from Mr. Taylor.  OxyChem is without knowledge or information sufficient to form a conclusion about the truth of Defendant's allegations in this paragraph, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem admits that DSCC closed the Lister Plant in 1969. OxyChem otherwise denies the allegations in Paragraph 57.

**Response Activities Resulting from Disposal and Releases of 2,3,7,8 – TCDD and Other Hazardous Substances at the Lister Plant and Adjacent Disposal Areas**

58.     OxyChem denies the allegations in Paragraph 58.

59.     OxyChem denies the allegations in Paragraph 59.

60.     Paragraph 60 references New Jersey Governor Thomas H. Kean's Executive Order No. 40, a document which speaks for itself.   OxyChem otherwise denies the allegations in Paragraph 60.

61.     Paragraph 61 references an administrative order dated June 13, 1983 from NJDEP, a document which speaks for itself.  OxyChem admits that NJDEP's administrative order imposed certain stabilization measures on DSCC, but OxyChem denies Defendant has summarized them accurately in this paragraph.  OxyChem otherwise denies the allegations in Paragraph 61.

62.     Paragraph 62 references an Administrative Consent Order executed by DSCC and NJDEP in March 1984, a document which speaks for itself.  OxyChem admits that NJDEP's Administrative Consent Order imposed certain remediation obligations on DSCC, but OxyChem denies Defendant has summarized them accurately in this paragraph.  OxyChem otherwise denies the allegations in Paragraph 62.

63.     OxyChem admits that the EPA listed the Diamond Alkali Superfund Site on the National Priorities List ("NPL") in 1984.  OxyChem denies Defendant has summarized that NPL listing accurately in this paragraph.  OxyChem otherwise denies the allegations in Paragraph 63.

64.     OxyChem denies the allegations in Paragraph 64.

65.     OxyChem admits that the LPRSA, as defined by the EPA, covers the 17-mile stretch of the Lower Passaic River and its tributaries from the Dundee Dam to Newark Bay.

66.     OxyChem admits the allegations in Paragraph 66.

67.     OxyChem admits that during EPA's decades of conducting investigative and other response actions on the Passaic River, OxyChem has cooperated with NJDEP and EPA and that

OxyChem has (along with its indemnitors Maxus and Tierra) shouldered more than its share of the burden to clean up the river.  OxyChem otherwise denies the allegations in Paragraph 67.

### The 80 and 120 Lister Avenue Area

68.     Paragraph 68 references an Administrative Consent Order executed by DSCC and NJDEP in March 1984, and an Administrative Consent Order executed by DSCC and NJDEP in December 1984, documents which speak for themselves.  OxyChem, however, was not a party to these Orders and otherwise denies the allegations in Paragraph 68.

69.     Paragraph 69 references a 1987 EPA Record of Decision concerning 80 and 120 Lister Avenue, a document which speaks for itself.  OxyChem otherwise denies the allegations in Paragraph 69.

70.     Paragraph 70 references a 1990 Consent Decree entered by the Federal District Court for the District of New Jersey relating to the 1987 EPA Record of Decision concerning 80 and 120 Lister Avenue, a document that speaks for itself.  OxyChem admits it was one of the parties to the Consent Decree.  OxyChem further admits that Tierra's (as OxyChem's indemnitor and as the then-owner of the Lister Avenue Plant Site) construction of the interim remedy began in April 2000 and was completed in December 2001.  OxyChem otherwise denies the allegations in Paragraph 70.

71.     Paragraph 71 references a 2008 EPA Administrative Settlement Agreement and Order on Consent, a document which speaks for itself.  OxyChem admits it was a party to the 2008 Administrative Settlement Agreement and Order on Consent and further admits that in 2012, Tierra (as OxyChem's indemnitor and as the then-owner of the Lister Avenue Plant Site) performed the Phase 1 removal and completed the dredging, dewatering, and transport of 40,000 cubic yards of contaminated sediment.  OxyChem further admits that it has not implemented Phase

II of the removal action, for which conditions precedent have not yet occurred, and which EPA is considering including in the OU2 remedial action in accordance with the Record of Decision. OxyChem otherwise denies the allegations in Paragraph 71.

**The Lower Passaic River Study Area**

72.     Paragraph 72 references a 1994 Administrative Order on Consent and a Remedial Investigation and Feasibility Study regarding a six-mile stretch of the Lower Passaic River (RM 1 to RM 7), documents that speak for themselves.  OxyChem admits it was a party to the 1994 Administrative Order on Consent and that the Remedial Investigation and Feasibility Study was performed by Tierra (as OxyChem's indemnitor). OxyChem further admits that in 2002, EPA expanded the scope of the investigation to include the entire 17-mile Lower Passaic River. OxyChem otherwise denies the allegations in Paragraph 72.

73.     Paragraph 73 references a 1994 Administrative Order on Consent and a Remedial Investigation and Feasibility Study regarding a six-mile stretch of the Lower Passaic River (RM 1 to RM 7), documents that speak for themselves.  OxyChem admits it, not DSCC, was a party to the 1994 Administrative Order on Consent and that the Remedial Investigation and Feasibility Study was performed by Tierra (as OxyChem's indemnitor). OxyChem further admits that in 2002, EPA expanded the scope of the investigation to include the entire 17-mile Lower Passaic River. OxyChem otherwise denies the allegations in Paragraph 73.  The last sentence of Paragraph 73 references a 2004 settlement agreement with EPA ("2004 RI/FS Agreement"), a document which speaks for itself.  OxyChem admits it was a party to the 2004 RI/FS Agreement, but OxyChem otherwise denies the allegations in Paragraph 73.

74.     Paragraph 74 references a May 2007 Administrative Settlement Agreement and Order on Consent ("2007 RI/FS ASAOC"), a document which speaks for itself.  OxyChem admits

it was a party, together with many other parties, to the 2007 RI/FS ASAOC. OxyChem otherwise denies the allegations in Paragraph 75.

75.     Paragraph 75 references a September 2016 Administrative Settlement Agreement and Order on Consent for Remedial Design for Operable Unit Two of the Diamond Alkali Superfund Site (CERCLA Docket No. 02-2016-2021) ("2016 ASAOC"), a document which speaks for itself. OxyChem admits it is a party to the 2016 ASAOC but denies the allegation that it has not yet incurred any costs pursuant to the 2016 ASAOC. OxyChem otherwise denies the allegations in Paragraph 75.

## The Newark Bay Study Area

76.     OxyChem admits that in addition to the 80 and 120 Lister Avenue area and the LPRSA, EPA has found dioxin, and other Hazardous Substances—including what EPA has identified as Eight Chemicals of Concern ("COCs") for the Diamond Alkali Superfund Site—in the Newark Bay Study Area. OxyChem denies those Hazardous Substances and Chemicals of Concern were released from the Lister Plant or any adjacent disposal areas associated with that plant into Newark Bay, including portions of the Hackensack River, the Arthur Kill and Kill Van Kull. OxyChem further admits that EPA has designated the Newark Bay Study Area as part of the Diamond Alkali Superfund Site. OxyChem otherwise denies the allegations in Paragraph 76.

77.     Paragraph 77 references a February 2004 Administrative Order on Consent to perform the RI/FS for the Newark Bay Study Area, a document which speaks for itself. OxyChem admits it is a party to the 2004 Administrative Order on Consent, but otherwise denies the allegations in Paragraph 77.

## The RM 10.9 Removal Action

78.     Paragraph 78 references the River Mile 10.9 Removal Area.  OxyChem admits that EPA found that an area in the Passaic River at and near to river mile 10.9 contained elevated concentrations of Hazardous Substances, including "dioxins, PCBs and other contaminants found at the surface of a mudflat on at the east bank of the river," but OxyChem otherwise denies the allegations in Paragraph 78.

79.     OxyChem denies the allegations in Paragraph 79.

80.     Paragraph 80 alleges, but does not cite the source of, what Defendant contends "EPA determined" regarding concentrations of 2,3,7,8-TCDD and other Hazardous Substances at River Mile 10.9. OxyChem admits, however, that EPA did—as stated in its March 3, 2016 Record of Decision—order in 2012 a "time critical removal action to address the risks posed by high concentrations of dioxins, PCBs and other contaminants found at the surface of a mudflat on the east bank of the river at RM 10.9."  If Defendant is referring to statements made in a June 2012 ASAOC between EPA and the CPG for a removal action to address high concentrations of dioxins, PCBs, and other contaminants at a mudflat on the Passaic River's eastern bank at RM 10.9, that document also speaks for itself.  OxyChem, however, was not a party to the 2012 ASAOC and therefore is without knowledge or information sufficient to permit it to form a conclusion as to the accuracy of Defendant's statements about what EPA "determined," so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 80.

81.     Paragraph 81 references a June 25, 2012 Unilateral Administrative Order for Removal Response Activities from EPA, a document that speaks for itself.  OxyChem admits it was a voluntary respondent to the June 25, 2012 UAO, and that the UAO contained the quoted language, but OxyChem otherwise denies the allegations in Paragraph 81.

82.     OxyChem denies the allegations in Paragraph 82.

## COUNT I
### (Contribution Under CERCLA Section 113)

83.    OxyChem re-alleges and incorporates by reference its responses to Paragraphs 1 through 82 of the Counterclaim as if fully set forth herein.

84.    OxyChem admits that, as alleged in Paragraph 84, Defendant is a "person" as defined in CERCLA Section 101(21).

85.    OxyChem admits that OxyChem is also a "person" as defined in CERCLA Section 101(21).

86.    OxyChem admits the allegations in Paragraph 86.

87.    OxyChem admits 2,3,7,8-TCDD, 2,4-D, 2,4,5-T, and DDT are Hazardous Substances under 42 U.S.C. §9601(14), but it denies that each of these—or any other--hazardous substances were released from the Lister Plant into the LPRSA.

88.    OxyChem admits there have been multiple releases and disposals of Hazardous Substances into the LPRSA by multiple parties, including all of the Defendants, but OxyChem denies that any Hazardous Substances from the Lister Plant or adjacent disposal areas migrated into the RM 10.9 Removal Area.  To the extent any additional response is required, OxyChem denies the allegations in Paragraph 88.

89.    OxyChem denies it was the "owner or operator" of the Lister Plant, as that term is used in 42 U.S.C. § 9601(20), at or during the time of the acts or omissions which Defendant alleges resulted in the release of Hazardous Substances on, at, under or from the Lister Plant and adjacent disposal areas.  To the extent any additional response is required, OxyChem denies the allegations in Paragraph 89.

90.    OxyChem denies the allegations in Paragraph 90.

91.    OxyChem denies the allegations in Paragraph 91.

92.     To the extent Paragraph 92 alleges that Defendant has incurred or will incur costs under the listed orders, OxyChem lacks knowledge of or information sufficient to form a belief about the truth of these allegations, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). OxyChem otherwise denies the allegations in Paragraph 92.

93.     OxyChem denies the allegations in Paragraph 93.

94.     To the extent Paragraph 94 alleges that Defendant has incurred or will incur response costs, or that it will pay more than its fair share of response costs for contamination Defendant itself caused, OxyChem lacks knowledge of or information sufficient to form a belief about the truth of these allegations, so such allegations are denied under Fed. R. Civ. P. 8(b)(5). Paragraph 94 also sets forth Defendant's demand for contribution, but OxyChem denies Defendant is entitled to recover contribution from OxyChem.

To the extent any further response is required to Count I, OxyChem submits that Defendant's Prayer for Relief in Count I of its Counterclaim should be denied and OxyChem demands strict proof of Defendant's allegations.

## COUNT II
### (Cost Recovery Under CERCLA Section 107)

95.     OxyChem re-alleges and incorporates by reference its responses to Paragraphs 1 through 94 of the Counterclaim as if fully set forth herein.

96.     OxyChem admits that it is a person who has incurred response costs at a Facility as defined in CERCLA Section 107.  Paragraph 96 also sets forth conclusions of law to which no answer is required.  To the extent any additional response is required, OxyChem denies the allegations in Paragraph 96.

97.     To the extent Paragraph 97 alleges that Defendants have incurred or will incur response costs, OxyChem lacks knowledge of or information sufficient to form a belief about the

truth of these allegations, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem

otherwise denies the allegations in Paragraph 97.

98.     Defendant previously sought and obtained dismissal of certain of OxyChem's

claims under Section 107, arguing that CERCLA Section 107 does not permit parties who incur

response costs voluntarily under administrative consent orders to sue other parties to recover

response costs.  In this paragraph of its Counterclaim, filed after the Court's dismissal, Defendant

now contends it can sue OxyChem under Section 107 to recover costs Defendant alleged it incurred

under administrative consent orders.   Accordingly, OxyChem counterclaims below against

Defendant for the same relief, on the same theory, and seeks a similar declaratory judgment

regarding Defendant's joint and several liability for response costs for the entire 17 miles of the

LPRSA.  To the extent Paragraph 98 alleges that Defendant has incurred or will incur response

costs, OxyChem lacks knowledge of or information sufficient to form a belief about the truth of

these allegations, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise

denies the allegations in Paragraph 98.

99.     OxyChem incorporates in its response to this paragraph its response to paragraph

98, above.  As Defendant in this paragraph now alleges that parties who incur response costs

voluntarily under administrative consent orders with EPA may sue other responsible parties under

CERCLA Section 107 to recover response costs from them, OxyChem therefore counterclaims

below against Defendant for the same relief, on the same theory, and seeks a similar declaratory

judgment regarding Defendant's joint and several liability for response costs for the entire 17 miles

of the LPRSA.  To the extent Paragraph 99 alleges that Defendant has incurred or will incur

response costs, OxyChem lacks knowledge of or information sufficient to form a belief about the

truth of these allegations, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  Paragraph

99 also sets forth conclusions of law to which no answer is required.  OxyChem otherwise denies the allegations in Paragraph 99.

To the extent any further response is necessary to Defendant's prayer for relief under CERCLA Section 107, OxyChem:

- Denies that any alleged response costs incurred by Defendant were caused by or attributable to releases or threatened releases from the Lister Plant or adjacent disposal areas;

- Denies that Defendant is entitled to any recovery of response costs under CERCLA Section 107;

- Denies that Defendant is entitled to an award of prejudgment interest, costs, attorneys' or expert fees, or to any other relief; and

- Demands strict proof of Defendant's alleged responses costs and/or damages.

## COUNT III
### (Declaratory Judgment – CERCLA)

100.    OxyChem re-alleges and incorporates by reference its responses to Paragraphs 1 through 99 of the Counterclaim as if fully set forth herein.

101.    OxyChem admits the allegations in Paragraph 101.

102.    OxyChem admits the allegations in Paragraph 102.

103.    OxyChem admits 2,3,7,8-TCDD, 2,4-D, 2,4,5-T, and DDT are Hazardous Substances under 42 U.S.C. §9601(14), but it denies that each of these—or any other—Hazardous Substances were released from the Lister Plant and adjacent disposal areas into the LPRSA.  To the extent any additional response is required, OxyChem denies the allegations in Paragraph 103.

104.    OxyChem admits 2,3,7,8-TCDD, 2,4-D, 2,4,5-T, and DDT are Hazardous Substances under 42 U.S.C. §9601(14), but it denies that each of these—or any other—Hazardous

Substances were released from the Lister Plant and adjacent disposal areas into the LPRSA. OxyChem otherwise denies the allegations in Paragraph 104.

105.   OxyChem denies the allegations in Paragraph 105.

106.   OxyChem denies it was the owner or operator of the Lister Plant, as that term is used in 42 U.S.C. §9601(20), at or during the time of the acts or omissions which Defendant alleges resulted in the release of Hazardous Substances on, at, under or from the Lister Plant and adjacent disposal areas.  To the extent any additional response is required, OxyChem denies the allegations in Paragraph 106.

107.   OxyChem denies the allegations in Paragraph 107.

108.   OxyChem admits it is a "person" within the meaning of CERCLA, but it denies it is in any way a "person liable" to Defendant under CERCLA Section 107.  To the extent any additional response is required, OxyChem denies the allegations in Paragraph 108.

109.   To the extent Paragraph 109 alleges that Defendant has incurred or will incur response costs, OxyChem lacks knowledge of or information sufficient to form a belief about the truth of these allegations, so such allegations are denied under Fed. R. Civ. P. 8(b)(5).  OxyChem otherwise denies the allegations in Paragraph 109.

110.   OxyChem denies the allegations in Paragraph 110.

To the extent any further response is necessary to Defendant's prayer for relief for Declaratory Judgment, OxyChem agrees that the Court may and should enter a declaratory judgment allocating joint and several liability among all responsible parties for response costs incurred for the entire 17 mile stretch of the Lower Passaic River Study Area, but OxyChem:

- Denies that Defendant is entitled to a declaratory judgment that OxyChem is liable for 100% of all response costs incurred within the LPRSA (including the RM 10.9 Removal Area) or in the Diamond Alkali Superfund Site;

- Denies that there are any equitable factors warranting a judgment allocating 100% of the liability under CERCLA Section 113 for all response costs within the LPRSA (including the RM 10.9 Removal Area) or in the Diamond Alkali Superfund Site against OxyChem;

- Denies that any judgment should issue holding OxyChem jointly and severally liable under Section 107 for all response costs that have been or may be incurred within the LPRSA (including the RM 10.9 Removal Area) or in the Diamond Alkali Superfund Site;

- Denies that there are any equitable factors warranting entry of a judgment allocating 100% of the liability under Section 107 for all response costs within the LPRSA (including the RM 10.9 Removal Area) or in the Diamond Alkali Superfund Site against OxyChem;

- Denies that any declaratory judgment should issue assessing OxyChem 100% liability for any response costs that may be incurred in the future within the LPRSA (including RM 10.9), the Diamond Alkali Superfund Site, or for implementation of the RM 109 Removal Action.

- Denies that any declaratory judgment should issue assessing OxyChem liability for additional current and future work obligations, prejudgment interest, reasonable costs, attorneys' fees, or any other relief.

<u>COUNT IV</u>
**(Declaratory Judgment – Corporate Successor)**

111.    OxyChem re-alleges and incorporates by reference its responses to Paragraphs 1 through 110 of the Counterclaim as if fully set forth herein.

112.    OxyChem admits the allegations in Paragraph 112.

113.    OxyChem admits that at times from the mid-1940s to March 1951, Kolker Chemical Works, Inc. produced DDT and phenoxy herbicides at the Lister Plant. OxyChem otherwise denies the allegations in Paragraph 113.

114.    OxyChem admits the allegations in Paragraph 114.

115.    OxyChem admits the allegations in Paragraph 115.

116.    OxyChem admits that in 1951 Diamond Alkali Company acquired the stock of Kolker Chemical Works, Inc., and that Kolker Chemical Works was renamed following the 1951 acquisition. The allegation "Diamond Alkali Company dissolved Kolker Chemical Works, Inc. (which had been renamed following the 1951 acquisition) and assumed all its assets and liabilities" appears to refer to the 1954 Plan of Liquidation of Diamond Alkali Organic Chemicals Division, a document which speaks for itself. OxyChem denies Defendant's allegation is an accurate or complete summary of this document and OxyChem otherwise denies the allegations in Paragraph 116.

117.    OxyChem admits the allegations in Paragraph 117.

118.    OxyChem admits that in July 1983 DSCC (then known as Diamond Shamrock Corporation) formed a wholly owned subsidiary named New Diamond Corporation.

119.    OxyChem admits that DSCC (then known as Diamond Shamrock Corporation) then executed a reverse merger whereby New Diamond Corporation became the parent of DSCC.

28

120.    OxyChem admits that after the reverse merger, DSCC (then known as Diamond Shamrock Corporation) changed its name to Diamond Chemicals Company, and in October 1983 changed its name to Diamond Shamrock Chemicals Company.

121.    OxyChem admits the allegations in Paragraph 121.

122.    OxyChem admits that in 1986 the new Diamond Shamrock Corporation sold the stock of Diamond Shamrock Chemicals Company to Oxy-Diamond Alkali Corporation, an indirect wholly owned subsidiary of Occidental Petroleum Corporation, but this allegation in Paragraph 122 is a materially incomplete statement of the transaction.  Two years before this stock purchase, DSCC's parent company, Diamond Shamrock Corporation, transferred to itself and assumed all liabilities for DSCC's "Discontinued Operations," including the discontinued operations at the closed Lister Avenue Plant.  Accordingly, when Plaintiff OxyChem purchased the stock of DSCC, the liabilities associated with Discontinued Operations and the Lister Avenue Plant were no longer held by DSCC, but rather had been transferred to and assumed by Diamond Shamrock Corporation, which retained those liabilities after the stock purchase, leaving OxyChem holding only the active chemicals business of DSCC.

123.    OxyChem admits the allegations in Paragraph 123.

124.    OxyChem admits the allegations in Paragraph 124.

125.    OxyChem denies the allegations in Paragraph 125.

126.    Paragraph 126 references the New Jersey Superior Court's 2011 summary judgment opinion in the matter of *New Jersey Dep't Envtl. Prot. v. Occidental Chem. Corp.*, Civil Action No. L-9868-05, a document which speaks for itself.  OxyChem denies this allegation summarizes accurately the Court's summary judgment and otherwise denies the allegations in Paragraph 126.

127.    OxyChem denies the allegations in Paragraph 127.

128.    OxyChem denies the allegations in Paragraph 128.

To the extent any further response is necessary to Defendant's prayer for relief for Declaratory Judgment, OxyChem denies that Defendant is entitled to any declaratory judgment that OxyChem is the corporate successor to the entities that owned and operated the Lister Plant from the mid-1940s through 1969 and is responsible for those entities' conduct and liabilities. OxyChem further denies that Defendant is entitled to any award of prejudgment interest, reasonable costs, attorneys fees or other relief on account of this claim.  OxyChem demands strict proof of Defendant's claim

## AFFIRMATIVE DEFENSES

The following are defenses OxyChem may assert based on the facts alleged in the Counterclaim or based on facts adduced in discovery.  In disclosing these defenses, OxyChem does not assume any burden of proof not otherwise required by law.  Moreover, OxyChem undertakes the burden of proof only as to those defenses deemed "affirmative" defenses by law, regardless of how defenses are denominated herein.  OxyChem reserves the right to assert further defenses that may become apparent during the course of discovery.

## FIRST SEPARATE DEFENSE

The Counterclaim fails, in whole or in part, to state a claim upon which relief can be granted.

## SECOND SEPARATE DEFENSE

The Counterclaim is barred, in whole or in part, by the applicable statutes of limitations and/or repose.

## THIRD SEPARATE DEFENSE

Defendant lacks standing to assert some or all the claims and the demands for relief in the Counterclaim.

## FOURTH SEPARATE DEFENSE

Defendant's claims are barred, in whole or in part, by the doctrine of estoppel, quasi-estoppel, and judicial estoppel.

## FIFTH SEPARATE DEFENSE

Defendant's claims are barred, in whole or in part, because none of the alleged acts or omissions of OxyChem proximately caused Defendant's alleged damages.

## SIXTH SEPARATE DEFENSE

The claims and/or damages alleged in the Counterclaim are barred, in whole or in part, by Defendant's failure to mitigate Defendant's "necessary response costs," if any.

## SEVENTH SEPARATE DEFENSE

Defendant cannot recover costs under CERCLA Section 107, 42 U.S.C. § 9607, because Defendant has not incurred any necessary response costs.

## EIGHTH SEPARATE DEFENSE

Defendant has failed to join parties in whose absence complete relief cannot be accorded among existing parties as required by Fed. R. Civ. P. 19(a)(1).

## NINTH SEPARATE DEFENSE

Defendant's claims are barred, in whole or in part, by the doctrines of waiver and/or ratification.

## TENTH SEPARATE DEFENSE

Any recoverable necessary response costs must be allocated among all parties in accordance with those factors recognized under Section 113(f) of CERCLA, 42 U.S.C. §9613(f),

and other equitable considerations, including without limitation, Defendant's recalcitrance and intentional conduct.

## ELEVENTH SEPARATE DEFENSE

Some or all costs alleged in the Counterclaim were or are unnecessary and/or inconsistent with the National Contingency Plan as set forth at 40 CFR § 300, *et seq.,* and are not "necessary costs of response" as required by CERCLA, and therefore cannot be reimbursed in whole or in part.

## TWELFTH SEPARATE DEFENSE

CERCLA does not permit an award of attorney's fees, experts' fees, consulting fees, costs of litigation, oversight or other costs, or interest, as sought by Defendant.

## THIRTEENTH SEPARATE DEFENSE

Defendant's claims are barred, in whole or in part, by the doctrine of release.

## FOURTEENTH SEPARATE DEFENSE

Defendant's recovery is barred by the doctrine of unclean hands.

## FIFTEENTH SEPARATE DEFENSE

Defendant's claims are barred, in whole or in part, and costs claimed, if any, should be limited, to the extent any fault, negligence, assumption of risk, or other culpable conduct by Defendant caused, proximately caused, and/or contributed to the alleged injuries and damages, or to the extent that the doctrines of contributory negligence, comparative fault, avoidable consequences, and/or other applicable common-law or statutory doctrines apply.

## SIXTEENTH SEPARATE DEFENSE

Defendant's claims are barred by Defendant's own, prior material breach of the contracts at issue in its claims.

**SEVENTEENTH SEPARATE DEFENSE**

Defendant's claims are barred, in whole or in part, by the doctrine of laches.

**EIGHTEENTH SEPARATE DEFENSE**

OxyChem adopts by reference all affirmative defenses heretofore and hereafter pleaded by the other parties as may be applicable to the facts alleged against OxyChem.

**NINETEENTH SEPARATE DEFENSE**

Defendant's claims are barred, in whole or in part, to the extent that the alleged damages in the Counterclaim were proximately caused by persons or entities other than OxyChem, including intervening and/or superseding acts or omissions.

**TWENTIETH SEPARATE DEFENSE**

Defendant's causes of action are barred, in whole or in part, because Defendant would be unjustly enriched if it were to prevail on any of the causes of action.

**TWENTY-FIRST SEPARATE DEFENSE**

Defendant is not entitled to recover from OxyChem because Defendant has not incurred costs in excess of its fair, equitable and proportionate share of necessary response costs.

**TWENTY-SECOND SEPARATE DEFENSE**

OxyChem is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

**TWENTY-THIRD SEPARATE DEFENSE**

In the event OxyChem is found to be liable for response costs or response activity costs alleged by Defendant, OxyChem cannot be liable for any costs beyond its proportionate share because the harms alleged by Defendant are distinct and reasonably capable of division, and

because there is a reasonable basis for determining the contribution of each party to the alleged harm or harms.

## TWENTY-FOURTH SEPARATE DEFENSE

Defendant is not entitled to recover from OxyChem more than its respective fair, equitable, and proportionate share, if any, of the necessary response costs allegedly expended by Defendant or to otherwise recover from OxyChem more than the amount of such relief, if any, for which OxyChem is liable.

## TWENTY-FIFTH SEPARATE DEFENSE

To the extent some or all of Defendant's claims relate to COCs that are present in historic fill, such claims are barred in whole or in part under CERCLA.

## TWENTY-SIXTH SEPARATE DEFENSE

OxyChem is entitled to a setoff against Defendant's claims.

## TWENTY-SEVENTH SEPARATE DEFENSE

To the extent Defendant seeks relief regarding alleged future costs, Defendant may only recover, if at all, for future response costs incurred in connection with an existing legal obligation.

## <u>PLAINTIFF OXYCHEM'S COUNTERCLAIMS AND CROSS-CLAIMS</u>

For its Counterclaims and Cross-Claims against Defendant Pabst Brewing Company, LLC ("Defendant"), Occidental Chemical Corporation ("OxyChem") specifically refers to and incorporates by reference OxyChem's Consolidated Counterclaims and Crossclaims Against All Defendants, Docket no. 763.  For the avoidance of doubt, OxyChem reiterates its enumerated counter- and crossclaims in this pleading, as follows:

1.      In its Complaint (Doc. 1), OxyChem principally limited its claims to those related to the Lower 8.3 miles of the Lower Passaic River, based on the EPA's 2016 Record of Decision

proposing a remedy for this portion of the river (see, *e.g.*, Doc. 1 ¶ 16 ("This CERCLA action primarily concerns OU2 [Operable Unit 2, the lower 8.3 miles of the Passaic River]")).  OxyChem realleges and incorporates the allegations and claims in its Complaint as if fully set forth herein.

2.     In its Counterclaim, however, Defendant has not limited its claims to OU2, but instead has alleged claims relating to the entire 17-mile Lower Passaic River Study Area ("LPRSA"), identified by the EPA as Operable Unit 3 ("OU3").  *See, e.g.*, Doc. 735, Counts I (CERCLA Section 113 claim for response costs incurred in the LPRSA); II (CERCLA Section 107 claim for joint and several liability for response costs "incurred and to be incurred by Defendant in connection with the LPRSA"), Count III  (Declaratory Judgment under CERCLA Sections 113 and 107 for alleged releases of Hazardous Substances "to the LPRSA (including the RM 10.9 Removal Area), and the Diamond Alkali Superfund Site.").

3.     OxyChem reserved "the right to amend to seek additional declaratory or damages relief as to other Operable Units" in its Complaint.  Doc. 1 ¶ 287.  In light of Defendant's broadening of the scope of this litigation to include the entire 17 miles of the LPRSA, OxyChem now asserts its counter- and cross-claims under Sections 107, 113, and for declaratory judgment relating to liability for response costs for the entire 17 miles of the LPRSA against Defendant and all other Defendants whom OxyChem originally sued in this matter.[4]

---

[4] OxyChem anticipates asserting additional claims against Defendant regarding Newark Bay, but OxyChem is barred by the 2007 Standstill Agreement from bringing them until such time as the EPA has decided the Newark Bay remedy.  Accordingly, under this pleading, OxyChem is limited to giving Defendants' notice that such claims exist, and OxyChem reserves the right to amend its pleading when permitted to do so under the Standstill Agreement.

## <u>HISTORY OF THE DISPUTE</u>

4.       OxyChem refers to and specifically incorporates by reference Paragraphs 1-44 of its original Complaint with regard to the Introduction, History of the Dispute, and Contaminants of Concern.

5.       In particular, in 2002, EPA expanded the initial six-mile scope of its investigation (RM 1 to RM 7, as part of the 1994 RI/FS ACO for the Lower 6) to include the full 17 miles of the Lower Passaic River.[5]

6.       A group of PRPs eventually organized into the Cooperating Parties Group (CPG). Initially, OxyChem, Maxus, and Tierra were members of the CPG. In 2004, the CPG signed a settlement agreement with EPA in which CPG members agreed to pay for the RI/FS for the entire lower 17-miles of the Lower Passaic River ("2004 RI/FS AOC for the Lower 17"). That settlement was amended in 2005 and 2007 to add more parties, so that a total of more than 70 parties were obligated to make payments to EPA under this settlement with EPA. OxyChem, through its indemnitors Maxus and Tierra, paid significant costs associated with this 2004 RI/FS AOC for the Lower 17.  The CPG , including OxyChem, Maxus and Tierra, entered into another agreement ("2007 RI/FS ASAOC") with EPA in 2007 regarding the RI/FS for the lower 17 miles of the Lower Passaic River, in which these parties agreed to perform the RI/FS work.  OxyChem, through its indemnitors Maxus and Tierra, paid significant costs associated with the 2007 RI/FS ASAOC until the Maxus bankruptcy filing in June 2016.  Since that bankruptcy filing, OxyChem has *itself* incurred response costs related to the 2007 RI/FS ASAOC by paying to EPA its oversight costs in excess of $1.8 million to date, and OxyChem will continue to incur such costs.  OxyChem seeks

---

[5] Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) ("OU2 ROD") § 2.1.2.

cost recovery and contribution for its payments to EPA pursuant to the 2007 RI/FS ASAOC from

Defendants in these Counterclaims and Crossclaims.

## JURISDICTION AND VENUE

7.     OxyChem refers to and specifically incorporates by reference Paragraphs 45-50 of

its original Complaint with regard to this Court's jurisdiction and the propriety of venue in this

District.

## PARTIES

8.     OxyChem refers to and specifically incorporates by reference Paragraphs 51-173

of its original Complaint with regard to the Parties to this dispute.  For the sake of clarity, in the

claims below, Defendant is referred to in this Counterclaim as Counter-Defendant and all other

Defendants originally named in OxyChem's Original Complaint are referred to as Cross-

Defendants.

## ALLEGATIONS AGAINST INDIVIDUAL PARTIES BY PRIMARY COC

9.     OxyChem refers to and specifically incorporates by reference Paragraphs 174-270

of its original Complaint with regard to the allegations against individual Parties by primary COC

and other responsibility for Hazardous Substances.

## COUNT IV
**(Counterclaim and Cross-claim against all Defendants for
CERCLA Cost Recovery Under Section 107(a))**

10.     OxyChem re-alleges and incorporates by reference its responses to Paragraphs 1

through 9 of the Counterclaim as if fully set forth herein.

11.     Counter-Defendant and all Cross-Defendants are liable for response costs incurred

in the entire 17 miles of the LPRSA under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because

Counter-Defendant and all Cross-Defendants are persons as defined by CERCLA § 601(21), 42

U.S.C. § 9601(21), who (1) own and operate a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA; (2) owned or operated a portion of the Facility at the time hazardous substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA; and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substance, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA, as described in greater detail above.

12.    Each release or threatened release of hazardous substances at the Facility as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the National Oil and Hazardous Substances Contingency Plan, 40 C.F.R. Part 300 et seq. (the "NCP"), through the entire reach of the 17-mile LPRSA.

13.    Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), Plaintiff is entitled to cost recovery from Defendant for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the LPRSA and for work performed in identifying other PRPs for such response costs, whether such costs are incurred directly or as a result of any counterclaim or crossclaim filed by any other party in this action.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against Counter-Defendant and all Cross-Defendants as follows:

(a) declaring that Counter-Defendant and all Cross-Defendants are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred or to be incurred by Plaintiff throughout the entire reach of the 17-mile LPRSA as a result of releases or threatened releases of hazardous substances at the Facility, whether such costs are incurred directly or on account of any counterclaim or cross-claim by Defendant or Cross-Defendant;

(b) awarding Plaintiff an amount determined by the Court to satisfy the obligation of Counter-Defendant and all Cross-Defendants for all necessary response costs incurred and to be incurred by Plaintiff in connection with the LPRSA, including response costs within and outside the scope of the 2004 RI/FS AOC for the Lower 17 and the 2007 RI/FS ASAOC, and work performed in identifying other PRPs for such response costs;

(c) awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law against Counter-Defendant and all Cross-Defendants and such other and further relief as the Court determines is just, equitable, and appropriate.

### COUNT V
### (Counterclaim and Cross-claim against all Defendants for CERCLA Cost Recovery Under Section 113(f))

14.     OxyChem re-alleges and incorporates by reference its responses to Paragraphs 1 through 13 of the Counterclaim as if fully set forth herein.

15.     Counter-Defendant and all Cross-Defendants are liable for response costs incurred in the entire 17 miles of the LPRSA under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because Counter-Defendant and all Cross-Defendants are persons as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) own and operate a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA; (2) owned or operated a portion of the Facility at the time hazardous

substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA; and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substance, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA, as described in greater detail above.

16.     Each release or threatened release of hazardous substances at the Facility as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the NCP, through the entire reach of the 17-mile LPRSA.

17.     Under CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1), Plaintiff is entitled to cost recovery from Defendant for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the LPRSA and for work performed in identifying other PRPs for such response costs, whether such costs are incurred directly or as a result of any counterclaim or crossclaim filed by any other party in this action.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against Counter-Defendant and all Cross-Defendants as follows:

(a) declaring that Counter-Defendant and all Cross-Defendants are liable under 42 U.S.C. § 9613(f)(1) for Defendants' shares, determined by the Court using such equitable factors as it determines are appropriate, of response costs incurred or to be incurred by Plaintiff throughout the entire reach of the 17-mile LPRSA as a result of releases or threatened releases of hazardous

substances at the Facility, whether such costs are incurred directly or on account of any counterclaim or cross-claim by Defendant or Cross-Defendant;

(b) awarding Plaintiff an amount determined by the Court to satisfy the obligation of Counter-Defendant and all Cross-Defendants for all necessary response costs incurred and to be incurred by Plaintiff in connection with the LPRSA, including response costs within and outside the scope of the 2004 RI/FS AOC for the Lower 17, the 2007 RI/FS ASAOC, and the 2012 RM 10.9 Removal UAO, and work performed in identifying other PRPs for such response costs;

(c) awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law against Counter-Defendant and all Cross-Defendants and such other and further relief as the Court determines is just, equitable, and appropriate.

## COUNT VI
### (Counterclaim and Crossclaim against all Defendants for
### Declaratory Judgment – CERCLA)

18.     OxyChem re-alleges and incorporates by reference its responses to Paragraphs 1 through 17 of the Counterclaim as if fully set forth herein.

19.     Counter-Defendant and all Cross-Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because Defendant, and each Cross-Defendant, is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA; (2) owned or operated a portion of the Facility at the time hazardous substances were disposed of, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA; (3) arranged for disposal, treatment, or transport for disposal or treatment of hazardous substances, resulting in a release or threatened release of hazardous substances into the Lower Passaic River,

including the entire 17-mile LPRSA, and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substance, resulting in a release or threatened release of hazardous substances into the Lower Passaic River, including the entire 17-mile LPRSA, as described in greater detail above.

20.     Each release or threatened release of hazardous substances at the Facility, as described above, has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the NCP throughout the entire 17-mile reach of the LPRSA.

21.     An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), among Plaintiff, Counter-Defendant, and all Cross-Defendants regarding their respective rights and responsibilities for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the entire 17-mile reach of the LPRSA, and work performed in identifying other PRPs for such response costs, and for future necessary response costs to be incurred by Plaintiff in connection with the contamination at the Facility, whether such costs are incurred directly or as a result of a counterclaim or crossclaim by any other party to this litigation.

22.     Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201-2202, Plaintiff is entitled to a declaratory judgment against Counter-Defendant and all Cross-Defendants assessing them liable for response costs and damages under CERCLA Section 107(a), 42 U.S.C. § 9607(a) and/or CERCLA Section 113(f)(1) and (f)(3)(B), 42 U.S.C. § 9613(f)(1) and (f)(3)(B) in a judgment that will be binding in any subsequent action or actions to recover further response costs in connection with the entire 17 miles of the LPRSA, and work performed in identifying other PRPs for such response costs.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against Counter-Defendant and all Cross-Defendants as follows:

(a) declaring that the Counter-Defendant and all Cross-Defendants are liable for all or their proper shares, determined by the Court using such equitable factors as the Court determines are appropriate, of the response costs incurred and to be incurred by Plaintiff resulting from releases or threatened releases of hazardous substances at the Facility throughout the entire 17 mile reach of the LPRSA;

(b) declaring that the Court's judgment on Counter-Defendant and Cross-Defendants' liability for response costs and/or damages is binding on any subsequent action or actions to recover further response costs or damages in the entire 17-mile reach of the LPRSA;

(c) awarding Plaintiff an amount determined by the Court to satisfy the obligation of Counter-Defendant and all Cross-Defendants for all necessary response costs incurred and to be incurred by Plaintiff in connection with the LPRSA, and work performed in identifying other PRPs for such response costs, whether such costs are incurred directly or as a result of counterclaims or cross-claims by other parties to this litigation; and

(d) awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees against Counter-Defendant and all Cross-Defendants as allowed by law, and such other and further relief as the Court determines is just, equitable, and appropriate.

Dated:  September 13, 2019

Respectfully submitted,

  /s/ *John J. McDermott*           
John J. McDermott, Esq.
(jmcdermott@archerlaw.com)
William J. Stack, Esq.
Charles J. Dennen, Esq.
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel. (856) 795-2121

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel. (713) 650-8805
By:     Kathy D. Patrick, Esq.
         (kpatrick@gibbsbruns.com)
         Anthony N. Kaim, Esq.
         Katherine H. Kunz, Esq.
         Jorge M. Gutierrez, Esq.
         Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER & HOLLAENDER
LLP
1818 Market Street, Suite 2610
Philadelphia, PA 19103
Tel. (215) 732-3255
By:     Larry D. Silver, Esq.
         (lsilver@lssh-law.com)
         David E. Romine, Esq.
         Jennifer Graham Meyer, Esq.
         Erin M. Carter, Esq.

GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067
Tel. (310)553-3610
By:     Peter A. Nyquist, Esq.
         (pnyquist@ggfirm.com)
         Noah Perch-Ahern, Esq.
         Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical*
*Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 13, 2019, a copy of Occidental Chemical Corporation's Answer, Additional Defenses, and Consolidated Counterclaims and Crossclaims Against All Defendants was served on counsel via electronic filing.


Dated:  September 13, 2019                    By: ___/s/ *John J. McDermott*_____
                                                          John M. McDermott, Esq.

45