**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE**

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION, | ) Hon. Madeline Cox Arleo |
| | ) Hon. Joseph A. Dickson |
| Plaintiff, | ) |
| | ) Civil Action No. 2:18-cv-11273 |
| | ) Electronically Filed |
| v. | ) |
| | ) **PLAINTIFF OCCIDENTAL** |
| | ) **CHEMICAL CORPORATION'S** |
| | ) **OPPOSITION TO CHARGEURS,** |
| 21ST CENTURY FOX AMERICA, INC., *et al.*, | ) **INC.'S MOTIONS TO DISMISS** |
| | ) **AND FOR SUMMARY** |
| Defendants. | ) **JUDGMENT AND BRIEF IN** |
| | ) **SUPPORT OF PLAINTIFF'S** |
| | ) **CROSS-MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| | ) |

ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel.    (856) 795-2121
By:    John J. McDermott, Esq.
        (jmcdermott@archerlaw.com)
        Charles J. Dennen, Esq.
        Lauren E. Krohn, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.    (713) 650-8805
By:    Kathy D. Patrick, Esq.
        (kpatrick@gibbsbruns.com)
        Anthony N. Kaim, Esq.
        Katherine H. Kunz, Esq.
        Jorge M. Gutierrez, Esq.
        Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel.    (215) 732-3255
By:    Larry D. Silver, Esq.
        (lsilver@lssh-law.com)
        David E. Romine, Esq.

GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067
Tel.    (310) 553-3610
By:    Peter A. Nyquist, Esq.
        (pnyquist@ggfirm.com)
        Noah Perch-Ahern, Esq.
        Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

## <u>TABLE OF CONTENTS</u>

**Page**

**TABLE OF AUTHORITIES** ................................................................. iv

**INTRODUCTION** ................................................................. 1

**STATEMENT OF FACTS** ................................................................. 5

I.     For Decades, Chargeurs' Predecessors Manufactured Dyes at Multiple Locations in New Jersey, and Released Hazardous Substances into the Passaic. ........................... 5

II.    Chargeurs Acquired United, Which Became Its Wholly Owned Subsidiary. ................. 6

III.   Chargeurs Acquired All Assets and Assumed All Liabilities of Its Subsidiaries Before Dissolving Them. ........................................................... 7

IV.   After Being Considered a PRP for Years, Chargeurs Submitted Erroneous and Misleading Information to EPA, Prompting EPA to Respond that It No Longer Considered Chargeurs a PRP. .................................................... 9

V.    Chargeurs Demands Expedited Discovery and Summary Judgment Before Electronic Discovery Begins for Any Other Party. ..................................... 12

**ARGUMENT** ................................................................. 12

I.     The Court Should Deny Chargeurs' Motion for Summary Judgment and Grant OxyChem's Because Chargeurs is the Corporate Successor to UPDW and United's CERCLA Liabilities as a Matter of Law. ....................................... 13

     A.     Legal Standard ................................................................. 13

     B.     Courts Uniformly Hold that an Express, General Assumption of a Predecessor's Liabilities Transfers CERCLA liability to the Successor. .......... 14

     C.     Chargeurs Expressly Assumed All UPDW's and United-PA's Liabilities. ...... 15

     D.     Chargeurs' Responses Are Meritless. ...................................... 19

         1.     Chargeurs' Misrepresents to the Court That No Plan of Liquidation Exists. Even If This Were True, It Would Be Irrelevant. ................. 19

         2.     The Statute of Frauds Does Not Apply Because OxyChem Is Not Enforcing a Contract. ................................................... 21

     E.     Separate from Chargeurs' Express Assumption of Liability, Genuine Issues of Material Fact as to Chargeurs' Successor Liability Prevent This Court from Granting Summary Judgment in Favor of Chargeurs. ................. 23

II.     This Court Has Personal Jurisdiction Because Chargeurs Is the Successor to Its
        Former Subsidiaries, Which Polluted the Passaic for Decades. ................................... 24

        A.      Legal Standard ................................................................................................. 24

        B.      Chargeurs' Predecessors' Contacts to New Jersey Are Imputed to
                Chargeurs. ........................................................................................................ 25

        C.      Chargeurs' Predecessors Had More Than Sufficient Contacts with New
                Jersey to Support Jurisdiction over Chargeurs.................................................. 26

        **CONCLUSION** ......................................................................................................... **29**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*A.V. Imports, Inc. v. Col De Fratta, S.p.A.*,
  171 F. Supp. 369 (D.N.J. 2001) ......................................................................................27

*Alcoa v. Beazer E.*,
  124 F.3d 551 (3d Cir. 1997)........................................................................................14, 18

*Am. Estates Wines, Inc. v. Kreglinger Wine Estates Pty, LTD*,
  2008 U.S. Dist. LEXIS 23494 (D.N.J. March 25, 2008) (Greenaway, J.).............25, 26, 27, 28

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................................................13, 28

*Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*,
  480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987).........................................26

*Association of Irritated Residents et al. v. EPA et al*,
  494 F.3d 1027 (D.C. Cir. 2007) ..................................................................................11

*Beazer E., Inc. v. Mead Corp.*,
  34 F.3d 206 (3d Cir. 1994).............................................................................................18

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)......................................................................................................25, 27

*Carteret Sav. Bank, FA v. Shushan*,
  954 F.2d 141 (3d Cir. 1992).........................................................................................24, 25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................................13

*City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*,
  918 F.2d 438 (4th Cir. 1990) .......................................................................................26

*Curley v. Klem*,
  298 F.3d 271 (3d Cir. 2002)..........................................................................................13

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014).......................................................................................................25

*Duris v. Erato Shipping, Inc.*,
  684 F.2d 352 (6th Cir. 1982) .......................................................................................26

*Flagship Interval Owner's Ass'n v. Phila. Furniture Mfg. Co.*,
    No. 09-1173, 2010 U.S. Dist. LEXIS 26472 (D.N.J. Mar. 22, 2010)....................................25

*Hackler v. Chaney*,
    470 U.S. 821 (1985)...................................................................................................11

*HRW Systems, Inc. v. Wash. Gas Light Co.*,
    823 F. Supp. 318 (D. Md. 1993) ...........................................................................15, 17

*Idaho v. M.A. Hanna Co.*,
    819 F. Supp. 1464 (D. Idaho 1993) .............................................................................29

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945).....................................................................................................25

*Kaucher v. County of Bucks*,
    455 F.3d 418 (3d Cir. 2006)........................................................................................13

*Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*,
    725 F.3d 369 (3d Cir. 2013).........................................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).....................................................................................................13

*Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*,
    960 F.2d 1217 (3d Cir. 1992).......................................................................................24

*Metcalfe v. Renaissance Marine, Inc.*,
    566 F.3d 324 (3d Cir. 2009).........................................................................................25

*Miller Yacht Sales, Inc. v. Smith*,
    384 F.3d 93 (3d Cir. 2004)...........................................................................................25

*Mylan Inc. v. SmithKline Beecham Corp.*,
    723 F.3d 413 (3d Cir. 2013).........................................................................................15

*O'Connor v. Sandy Lane Hotel, Co., Ltd.*,
    496 F.3d 312 (3d Cir. 2007).........................................................................................26

*Olin Corp. v. Consolidated Aluminum Corp.*,
    5 F.3d 10 (2d Cir. 1993).........................................................................................15, 17

*Patin v. Thoroughbred Power Boats Inc.*,
    294 F.3d 640 (5th Cir. 2002) .......................................................................................26

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001).........................................................................................13

*Philadelphia Elec. Co. v. Hercules, Inc.*,
  762 F.2d 303 (3d. Cir. 1985)............................................................................14, 15, 17, 19

*Purolator Prods. Corp. v. Allied–Signal, Inc.*,
  772 F. Supp. 124 (W.D.N.Y. 1991) .............................................................................15, 17

*Rhodia Inc. v. Bayer Cropscience Inc.*,
  No. CIV.04-6424 GEB MF, 2007 WL 3349453 (D.N.J. Nov. 7, 2007)..................................14

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
  903 F.3d 333 (3d Cir. 2018)..............................................................................................19

*United States v. Chrysler Corp.*,
  No. CIV. A. 88-341-CMW, 1990 WL 127160 (D. Del. Aug. 28, 1990)..................................14

*United States v. Gen'l. Battery Corp.*,
  423 F.3d 294 (3d Cir. 2005)...............................................................................14, 17, 23

*United States v. Iron Mountain Mines, Inc.*,
  987 F. Supp. 1233 (E.D. Cal. 1997).............................................................................15, 17

*United States v. Mexico Feed & Seed Co.*,
  980 F.2d 478 (8th Cir. 1992) ..........................................................................................1, 2

*United States v. Sterling Centrecorp Inc.*,
  960 F. Supp. 2d 1025 (E.D. Cal. 2013)......................................................................... *passim*

*Williams v. Bowman Livestock Equip. Co.*,
  927 F.2d 1128 (10th Cir. 1991) .........................................................................................26

*Worthem v. KartadtQuelle*,
  153 F. App'x 819 (3d Cir. 2005) .......................................................................................29

*Zavala v. Wal-Mart Stores Inc.*,
  691 F.3d 527 (3d Cir. 2012)..............................................................................................13

**State Cases**

*Dharia v. Om Riddhi Siddhi, LLC*,
  2017 WL 3442820 (N.J. Super. Ct. App. Div. Aug. 11, 2017) .............................................22

*In re Genelux Corp.*,
  126 A.3d 644 (Del. Ch. 2015), *vacated in part on other grounds sub nom.*
  *Genelux Corp. v. Roeder*, 143 A.3d 20 (Del. 2016) ..........................................................22

*In the Matter of United Piece Dye Works v. Joseph et. al.*,
  282 A.D. 60 (N.Y. App. Div. 1953), *affd.* 307 N.Y. 780 (1954).............................................27

**Federal Statutes**

CERCLA Section 107 ............................................................................................4

**State Statutes**

DEL. CODE ANN. TITLE 6 § 2714 ........................................................................21

N.J. STAT. ANN. § 25:1-15 ..................................................................................21

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................13

FED. R. CIV. P. 56(c) ...........................................................................................13

Local Rule 7.1(h) ..................................................................................................1

N.J. Court Rule 4:4-4(c).......................................................................................25

**Other Authorities**

49 N.J. PRAC., BUSINESS LAW DESKBOOK § 7:12 (2019-2020 ed.) ...............21

28 WILLISTON ON CONTRACTS § 70:143 (4th ed.) ........................................21

Plaintiff Occidental Chemical Corporation ("OxyChem") opposes Defendant Chargeurs, Inc.'s ("Chargeurs") motions to dismiss and for summary judgment, and cross-moves for a summary judgment ruling under Local Rule 7.1(h) that Chargeurs expressly assumed its former subsidiaries' liabilities, including its CERCLA liability to OxyChem.

## INTRODUCTION

These cross motions for summary judgment[1] are before the Court because Chargeurs asserts it is completely off the hook for a half century of pollution of the Passaic River by its former subsidiaries, despite having acquired all their assets and expressly assumed their liabilities. Chargeurs does not dispute that its former subsidiaries polluted the Passaic. Nor does Chargeurs argue that some entity other than Chargeurs is the true successor to these subsidiaries. Chargeurs is the *only* entity that could possibly be liable for its subsidiaries' pollution of the Passaic. Chargeurs does not dispute these facts. Rather, it now argues that when it liquidated its subsidiaries, acquired all of their assets, and expressly *assumed* their liabilities, those assumed CERCLA liabilities somehow vanished into thin air, leaving OxyChem and the other Defendants to shoulder the burden of its predecessors' pollution.

This is not how CERCLA works. Courts across the country have recognized that, "corporate successors are within CERCLA's ambit of liability," and courts thus apply "the traditional doctrines developed to prevent corporate successors from adroitly slipping off the hook." *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478, 487 (8th Cir. 1992) (collecting

---

[1] As discussed below, Chargeurs both moves to dismiss for lack of personal jurisdiction and moves for summary judgment on the grounds that it does not have successor liability for its predecessors' pollution of the Passaic. Both of Chargeurs' motions turn on the successor-liability analysis, because a predecessor's contacts with a forum are imputed to the successor for purposes of the personal-jurisdiction analysis.

1

authority).  "Any other result would thwart CERCLA's essential purpose of holding responsible parties liable for cleanup costs." *Id.*

OxyChem's motion is also ripe for summary judgment.  Before any other party even started electronic discovery in this case, Chargeurs insisted on expedited jurisdictional discovery and summary judgment, asserting that it is not liable for the pollution caused by the subsidiaries it liquidated and dissolved in 1982.  But during discovery, Chargeurs produced the smoking gun: its own contemporaneous board meeting minutes showing that it expressly assumed these subsidiaries' liabilities before dissolving them.  To decide these motions, and grant summary judgment in OxyChem's favor, the Court need review only one, undisputed paragraph of that one, undisputed and key document.  The minutes provide that Chargeurs:

> shall assume the liabilities of UPDW [United Piece Dye Works] and United not paid or otherwise provided for by UPDW and United, whether or not related to specific assets.

Chargeurs has stipulated that these minutes are authentic and has relied on them time and again facing EPA and OxyChem.  And those minutes are dispositive of these motions:  having expressly assumed the liabilities of United Piece Dye Works and United, Chargeurs remains liable for their pollution notwithstanding that those subsidiaries were later dissolved.  Why?  Because the entity that assumed the liabilities was *not* dissolved: it is Chargeurs, which still exists and which—by its own admission in its own minutes—remains responsible for the liabilities it expressly assumed.

Further, expedited discovery established the following undisputed facts:

- From the early- to mid-1900s, Chargeurs' former subsidiaries conducted dying operations on the Passaic River watershed, which EPA alleged released hazardous substances into the Passaic.

- In 1982, Chargeurs expressly "**assume[d] the liabilities**" of those subsidiaries.

- The subsidiaries had not settled their environmental liability with any party.

- The subsidiaries did not transfer their liabilities to any entity other than Chargeurs.

2

- In 1983, after expressly assuming their liabilities, Chargeurs liquidated and dissolved the subsidiaries.

This is air-tight proof that Chargeurs is the proper defendant in this case. It also establishes, as a matter of law, that there are no genuine issues of material fact that prevent the Court from entering summary judgment that Chargeurs is liable as a successor for its subsidiaries' liabilities because Chargeurs expressly assumed its subsidiaries' liabilities arising from their operations on the Passaic River watershed. This express assumption makes Chargeurs liable under CERCLA and subjects it to this Court's jurisdiction.

Chargeurs does not address its broad assumption of liabilities until the tail end of its lengthy brief (page 37 of 39)—because Chargeurs has no good answer for it. Chargeurs' express assumption is so clear cut that Chargeurs is left to plead that the Court should *ignore* the best and only evidence of what happened to its subsidiaries' liabilities before they were liquidated. But Chargeurs' statute-of-frauds arguments are non-sequiturs. This is not a breach-of-contract case. OxyChem is not holding Chargeurs to a contract. It is suing Chargeurs under CERCLA, a statute that imposes direct liability on Chargeurs because of Chargeurs' legally operative act: its express assumption of its subsidiaries' liabilities.

Chargeurs' contemporaneous board meeting minutes, signed by Chargeurs' own secretary, memorialize its broad assumption of its subsidiary's liabilities. Those minutes show exactly what happened, in real time. Chargeurs took the assets and liabilities of its former subsidiaries away from the subsidiaries, assumed those subsidiaries' liabilities, and then dissolved them. Chargeurs cannot dispute these facts. It has no evidence to the contrary. And it has stipulated to the authenticity and confirmed the validity of its own minutes in certified correspondence to EPA.

Rather than acknowledge the clear consequences of its own assumption of its subsidiaries' liabilities, Chargeurs' motion is the first time it argued that it did not assume *any* of its subsidiaries'

liabilities—a last-ditch effort to disavow its own corporate records, despite the fact that Chargeurs has relied on them time and again.  Before this suit was filed, Chargeurs told EPA that it *did, in fact,* assume its subsidiaries' liabilities—arguing only that this express assumption did not cover CERCLA liability.  Here, Chargeurs is left to try, feebly, to poke holes in its own corporate documents.  At the cost of its credibility, Chargeurs even misrepresents to the Court that its subsidiaries' plans of dissolution (referenced in Chargeurs' minutes) do not exist.  Chargeurs then asserts that its assumption of liabilities did not happen because these plans cannot be found.  The problem for Chargeurs is that it produced those plans to both OxyChem and to EPA and pasted these plans into its certified responses to EPA, along with detailed descriptions thereof.  These plans, along with Chargeurs' other corporate records, which are in evidence on OxyChem's motion, not only negate Chargeurs' summary judgment motion, they establish OxyChem's right to summary judgment against Chargeurs on the issue of its liability for its subsidiaries' pollution.

For the purpose of this motion, Chargeurs does not dispute that its former subsidiary, The United Piece Dye Works ("United"), released hazardous substances into the Passaic River. And by this cross-motion, OxyChem does not seek summary judgment on the amount of the CERCLA Section 107 or 113 response costs Chargeurs must pay for its assumed liability for its subsidiaries' pollution. Rather, OxyChem's motion is limited to a request for a summary judgment that Chargeurs *is* liable as a successor for any amount determined to be attributable to the former Chargeurs subsidiaries' pollution. And, as demonstrated below, based on its own evidence, Chargeurs cannot dump its responsibilities for its former subsidiaries' operations onto OxyChem or the other Defendants—because that liability belongs to Chargeurs and to no one else.

The Court should therefore deny Chargeurs' motion for summary judgment and grant OxyChem's cross-motion, finding that Chargeurs expressly assumed its subsidiaries' liabilities and that this express assumption of liability supports jurisdiction over Chargeurs.

## STATEMENT OF FACTS

I.     **For Decades, Chargeurs' Predecessors Manufactured Dyes at Multiple Locations in New Jersey, and Released Hazardous Substances into the Passaic.**

United, a New Jersey Corporation incorporated on June 10, 1912, operated at two locations in New Jersey: (1) 199 and 205 Main Street, Lodi, New Jersey ("Main Street Property"), and (2) 42 Arnot Street, Lodi, New Jersey ("Arnot Street Property").   Ex. 10, Chargeurs' Answers to Standard Interrogatories ("Std. ROGs") Nos. 1 and 2.   From at least 1912 to 1944, United operated on the Passaic River watershed, near the Saddle River, a tributary to the Passaic, on the Main Street Property, and from 1912 to 1959 on the Arnot Street Property.   *See* Ex. 1 (Doldan Depo Tr.) at 46:5-15.   United manufactured textile dyes at the Main Street Property from the early 1900s to at least 1957 and perhaps as late as 1968.   *See* Ex. 2 (2-6-18 Ltr. from Brendel to Fajardo) at 3.

The Main Street Property has been contaminated with metal and organic contamination and aromatic compounds.   *See* Ex. 3 (sampling map); Ex. 4 (Contamination Sources and Impacts to NAPP's Remedial Actions); Ex. 5 (Overview of Site History).   There is a long history of discharges of dye waste from the Main Street Property to the Saddle River.[2]   *See, e.g.*, Ex. 6 (3-24-47 Ltr. from Smith to PVSC); Ex. 7 (Stream Contaminations, 1948); Ex. 8 (Stream Contaminations, 1957).   The Arnot Property generated steam to heat buildings at the Main Street Property.   Ex. 10 (Std. ROGs) No. 2.   Facilities on the Arnot Property used slime coal to produce

---

[2] OxyChem has not had an opportunity to conduct substantive discovery into these operations, and Chargeurs does not dispute that United discharged hazardous substances into the Passaic. OxyChem provides these examples of evidence of United's discharges.

steam, and the location had underground piping into and across the Saddle River.  *See, e.g.*, Ex. 9 (Environmental Assessment Report of United Piece Dye Works) at GBV001572-73.  EPA has alleged that hazardous substances were released from the United facilities at the Main Street Property and the Arnot Street Property.  *See* Ex. 1 (Doldan Depo. Tr.) at 28:13-29:2.

## II.     Chargeurs Acquired United, Which Became Its Wholly Owned Subsidiary.

Chargeurs acquired United by merging it into its subsidiary UPDW.  Chargeurs does not dispute that UPDW is the successor to United.  *See, e.g.*, Ex. 2 (2-6-18 Ltr. from Brendel to Fajardo) at 5 ("United was merged with and into UPDW, with UPDW being the surviving corporation of that merger").  Although Chargeurs' acquisition of United involved a series of transactions, the details of which are not essential to deciding this dispute, we set them out below for completeness.

- In 1972 and 1977, three foreign companies acquired approximately 94% of the common stock of United.  Ex. 10 (Std. ROGs) at Nos. 1 and 4.

- On December 28, 1978, Chargeurs was incorporated under Delaware law, with the name "Pricel, Inc."  *Id.*

- On January 18, 1979, UPDW, Inc. ("UPDW") was incorporated under Delaware law.  On the same day, the three foreign companies transferred their shares (approximately 94%) of United in exchange for 100% of the shares of common stock of UPDW.  *Id.*[3]

- On January 26, 1979, United was merged into UPDW, which survived the merger.  *Id.* UPDW acquired all of the assets and assumed all of the liabilities and obligations of United. Ex. 1 (Doldan Depo. Tr.) at 54:3-54:9.

- The three foreign companies that owned stock in UPDW contributed it to Pricel, so that UPDW became a wholly owned subsidiary of Pricel.  Ex. 10 (Std. ROGs) at Nos. 1 & 4.

- On December 21, 1982, Pricel's name was changed to "Chargeurs, Inc."  *See* Ex. 1 (Doldan Depo. Tr.) at 48:10-12; Ex. 11 (12-22-82 Chargeurs Meeting Minutes).

---

[3] The approximately 6% of common stock of United not owned by UPDW was cancelled; the holders of those shares were entitled to receive $8.00 per share.  Ex. 10 (Std. ROGs) Nos. 1 & 4.

Thus Chargeurs was the corporate parent and sole shareholder of UPDW from 1978 or 1979 until its dissolution (discussed below) in 1983.  *See* Ex. 10 (Std. ROGs) at Nos. 1 & 4; Ex. 11 (12-22-82 Chargeurs Meeting Minutes); Ex. 1 (Doldan Depo. Tr.) at 49:7-9, 56:11-13.

### III.   Chargeurs Acquired All Assets and Assumed All Liabilities of Its Subsidiaries Before Dissolving Them.

In late 1982 and early 1983, Chargeurs assumed its subsidiaries' liabilities, acquired their assets, and dissolved them.  *See, e.g.*, Ex. 12 (6-18-18 Ltr. from Brendel to Fajardo) at 4-5.[4]  As Chargeurs admitted to EPA, "the only parties involved with the dissolution of UPDW were Chargeurs, Inc. (UPDW's sole shareholder), UPDW and United-PA (UPDW's wholly owned subsidiary, which also was liquidated and dissolved)."  *Id.* at 6.

Before the subsidiaries were dissolved, on December 22, 1982, Chargeurs' board unanimously voted to assume its subsidiaries' liabilities:

> FURTHER RESOLVED, that, in connection with the plans of liquidation referred to in the foregoing resolutions, **the Corporation shall assume the liabilities of UPDW and United [The United Piece Dye Works, a Pennsylvania corporation and wholly owned subsidiary of UPDW] not paid or otherwise provided for by UPDW and United, whether or not related to specific assets,** and that the President and Secretary of the Corporation be, and each of them hereby is, authorized to execute such mortgages, indentures, guarantees or other documents as may be required in connection with such assumption of liabilities . . . .

Ex. 11 (12-22-82 Chargeurs Meeting Minutes) at CH_000308.

Chargeurs' subsidiaries effectuated Chargeurs' assumption of their liabilities.   On December 22, 1982, UPDW's board voted to liquidate and dissolve UPDW, as well as UPDW's wholly owned subsidiary, The United Piece Dye Works, Inc., a Pennsylvania corporation ("United

---

[4] Chargeurs submitted to EPA:  "As the sole shareholder of UPDW, Chargeurs, Inc. authorized the liquidation and dissolution of UPDW and United-PA as documented in the 'Minutes of Special Meeting of the Board of Directors of Chargeurs Inc.'"  Ex. 12 (6-18-18 Ltr. from Brendel to Fajardo) at 4.

PA"). Ex. 13 (12-22-82 UPDW Meeting Minutes) at CHGR_000196-97.  Before that dissolution,

UPDW's board authorized its officers to effectuate Chargeurs' assumption of liabilities:

> [Resolved] that where any liability will be assumed by Chargeurs, the President and
> Secretary of the Corporation be, and each of them hereby is, authorized to execute
> and deliver such documents and take such other action as they may deem necessary
> or proper in order to effectuate the assumption by Chargeurs of such liability;

*Id.* at CHGR_000197.

UPDW also transferred to Chargeurs all of its assets, including shares in its subsidiaries

and a $4.2 million promissory note.  *Id.*; *see also* Ex. 12 (6-18-18 Ltr. from Brendel to Fajardo) at

6.  UPDW's minutes set out and adopted a Plan of Liquidation and Dissolution.  *See* Ex. 13 (12-

22-82 UPDW Meeting Minutes) at CHGR_000197.  Chargeurs confirmed that these minutes and

corporate records are the only documentation showing what assets and liabilities were transferred

from UPDW to Chargeurs.  *See* Ex. 12 (6-18-18 Ltr. from Brendel to Fajardo) at 7.[5]

Also on December 22, 1982, United PA, an indirect subsidiary of Chargeurs, approved its

liquidation and transferred all assets to Chargeurs.  Like UPDW, United PA authorized its officers

to effectuate UPDW's assumption of its liabilities, which would be assumed by Chargeurs.  *See*

Ex. 14 (12-22-82 United PA Meeting Minutes) at CHGR_000369-70.  United PA's minutes set

out and adopted a Plan of Liquidation and Dissolution.  *See id.*

Apart from these corporate records, there were no other documents relating to the liabilities

assumed by Chargeurs from UPDW.  *See* Ex. 1 (Doldan Depo. Tr.) at 69-70, 72, 123:9-13, 127:15-

---

[5] EPA asked Chargeurs for "all documents relating to any liability transferred from UPDW to
Chargeurs, Inc. or assumed by Chargeurs, Inc.," to which Chargeurs responded: "As noted above,
the Chargeurs Board Minutes reflect the assumption by Chargeurs, Inc. of 'liabilities of UPDW
and United[-PA] not paid or otherwise provided for by UPDW and United[-PA], whether or not
related to specific assets. . . .'" *Id.* at 7.  Similarly, when EPA requested all agreements regarding
the assumption of UPDW's liabilities, Chargeurs confirmed that the only relevant document was
Chargeurs' board minutes.  *Id.* at 8.

8

128:19; Ex. 15 (summary of Chargeurs' production).  Further, UPDW did not separately settle or

transfer their environmental liabilities to any entity other than Chargeurs.

- There was no schedule of liabilities that were paid or provided for by UPDW.  *See* Ex. 1 (Doldan Depo. Tr.) at 81:20-82:10, 99:18-21; Ex. 15 (summary of Chargeurs' production).

- There were no documents showing that any liabilities of UPDW were paid or otherwise provided for by UPDW.  *See* Ex. 1 (Doldan Depo Tr.) at 135:7-11; Ex. 15 (summary of Chargeurs' production).

- There were no documents showing that any other entity assumed UPDW's liabilities; that UPDW transferred its liabilities to any other entity; or that UPDW settled such liabilities. *See* Ex. 1 (Doldan Depo Tr.) at 123:14-25, 135:7-11, 136:7-19.

In January 1983, after these transactions were concluded, and after Chargeurs assumed its

subsidiaries' liabilities, Chargeurs dissolved UPDW.  *See* Ex. 10 (Std. ROGs) No. 4; Ex. 11

(Consent of the Sole Stockholder of UPDW, Inc.) at CH_000310-11; Ex. 11 (Certificate of

Dissolution) at CH_000312-14.

**IV.    After Being Considered a PRP for Years, Chargeurs Submitted Erroneous and Misleading Information to EPA, Prompting EPA to Respond that It No Longer Considered Chargeurs a PRP.**

Over a decade ago, the Environmental Protection Agency identified Chargeurs as a

potentially responsible party ("PRP") for the Diamond Alkali Superfund Site.  In 2006, EPA sent

Chargeurs a General Notice Letter, alleging that United released hazardous substances into

Diamond Alkali Superfund Site, for which Chargeurs was potentially responsible:

> EPA believes that hazardous substances were released from the United Piece Dye Works facilities located at 199 and 205 Main Street, and 42 Arnot Street, in Lodi, New Jersey, into the Lower Passaic River Study Area. . . . Chargeurs, Inc. as successor to United Piece Dye Works may be potentially liable for response costs which the government may incur relating to the study of the Lower Passaic River.

*See* Ex. 16 (EPA General Notice Letter) at CHGR_000033 (emphasis added).

On March 31, 2016, EPA notified Chargeurs that it had started negotiations for the design

of a remedy for the lower 8.3 miles of the Passaic River, referred to as Operable Unit 2 or OU2.

*See* Ex. 17 (EPA General Notice Letter) at CHGR_000131.  EPA corresponded with Chargeurs so that it could be involved in implementing the remedy.  *See, e.g.*, Ex. 18 (EPA Notice re: Cash-Out Settlement at CHGR_000104; Ex. 19 (EPA Notice re: Passaic Conference Call) at CHGR_00058; Ex. 20 (EPA Notice re: Passaic Allocation) at CHGR_000036.

In 2017, Chargeurs began to urge EPA to drop its claim that Chargeurs was a PRP, arguing—despite its corporate actions—that it was not a successor to UPDW.  *See* Ex. 21 (1-10-18 email from Brendel to Fajardo) at CHGR_000018.  Around April 2018, EPA requested information from Chargeurs regarding the corporate succession of its former subsidiaries.  *See* Ex. 22 (EPA Request for Information to Chargeurs) at CHGR_000174.  On June 18, 2018, Chargeurs responded to the request.  *See* Ex. 23 (6-18-18 Ltr. from Brendel to Yeh).

Chargeurs admitted to EPA that it ***had*** assumed its subsidiaries' liabilities, but it argued this assumption was not broad enough to include CERCLA liability.  *See id.* at 5-6. Chargeurs' motion is the *first time* that Chargeurs has claimed that it did not actually assume *any* liabilities of its former subsidiaries.  Before, Chargeurs admitted to EPA: "the liabilities ***being assumed by Chargeurs, Inc. pursuant to this language*** were limited to liabilities that were known by UPDW and/or Chargeurs, Inc. to exist at that time . . ."  *Id.* at 6 (emphasis added).  Chargeurs cited the board minutes seven times, conceding that "Chargeurs Board Minutes ***reflect the assumption by Chargeurs, Inc. of 'liabilities of UPDW and United[-PA]*** not paid or otherwise provided for by UPDW and United[-PA], whether or not related to specific assets.'"  *See id.* at 4, 7-8 (emphasis added).  Likewise, Chargeurs told OxyChem that "***the liabilities being assumed by Chargeurs, Inc. pursuant to this language*** were limited to liabilities that were known . . . to exist at that time." *See* Ex. 26 (8-3-19 Ltr. from Chargeurs to OxyChem) at 4-5 (emphasis added).

10

Mr. Doldan, secretary of Chargeurs, certified the submission to EPA, stating under penalty of law that he personally examined and was familiar with the information and all documents submitted to EPA.  *See* Ex. 1 (Doldan Depo Tr.) at 104:9-17; Ex. 23 (6-18-18 Ltr. from Brendel to Yeh).  Doldan certified to EPA as "true, accurate, and complete" the statements that "Chargeurs, Inc. **did not assume** any unknown and future alleged liability of UPDW with respect to the Diamond Alkali Site," and that the assumption was "neither specific enough to include CERCLA liability nor general enough to include any and all environmental liability."  *Id.* at 5, 6, 10 (emphasis added).

But at his deposition, Doldan testified he did not know one way or the other whether this statement to EPA was true, just as he did not know one way or the other whether Chargeurs actually assumed any liabilities of its former subsidiary UPDW.  *See* Ex. 1 (Doldan Depo. Tr.) at 57:19-22, 67:12-68:16, 76:7-21, 78:8-17, 118:19-22, 122:16-19.  Doldan had no personal knowledge of the relevant transactions and had no involvement in the operations of United. Doldan was born in 1973 in Argentina and was a child when the transactions occurred.  *See id.* at 8:24-9:7, 17:22-18:2, 18:17-24, 26:9-13. *See id.*  Doldan did not review the submission to EPA for accuracy and made no corrections or adjustments to them before they were sent; his review of the submission took approximately one hour.  *Id.* at 20:23-21:6, 107:5-19.

In response to Chargeurs' certified submission that it did not assume the CERCLA liability of UPDW, EPA advised Chargeurs by email that EPA no longer considered Chargeurs to be a PRP at the site.  *See* Ex. 24 (7-24-18 email from Flanagan to Brendel) at CHGR_000030.[6]

---

[6] EPA's decision not to pursue Chargeurs is within its discretion.  *See Hackler v. Chaney*, 470 U.S. 821, 831 (1985); *Association of Irritated Residents et al. v. EPA et al*, 494 F.3d 1027, 1031 (D.C. Cir. 2007).  But this decision is not dispositive of Chargeurs' liability to *OxyChem*.  And although unavailable to EPA at the time, Mr. Doldan's deposition raises serious questions about the veracity

**V.      Chargeurs Demands Expedited Discovery and Summary Judgment Before Electronic Discovery Begins for Any Other Party.**

After OxyChem filed this suit, Chargeurs demanded expedited jurisdictional discovery and the right to seek summary judgment before any electronic discovery was conducted by the other parties in this case.  *See* Ex. 25 (5-22-19 email thread between counsel).  OxyChem agreed to an expedited discovery and summary-judgment schedule.  *See id.*  During expedited discovery, Chargeurs produced 126 documents.  *See* Ex. 15 (summary of Chargeurs' production).  OxyChem then deposed Chargeurs' corporate representative, Mr. Doldan, on August 28, 2019.  With limited discovery complete, Chargeurs moved for summary judgment on December 16, 2019.

## ARGUMENT

Chargeurs moves to dismiss for lack of personal jurisdiction, or alternatively moves for summary judgment.  Whatever the posture, Chargeurs' arguments are meritless.  All of Chargeurs' theories are dispelled by one fact:  Chargeurs expressly "**assume[d] the liabilities** of UPDW and United [PA]."  This assumption rendered Chargeurs liable under CERCLA for the pollution caused by these entities.  And by virtue of this express assumption of liability, Chargeurs' predecessors' contacts with New Jersey (including five decades of pollution of the Passaic River) are imputed to Chargeurs, conclusively establishing personal jurisdiction over Chargeurs in this case.  Extensive case law confirms both points.  Because establishing Chargeurs' successor liability defeats both its motion for summary judgment and establishes its contacts with the forum, OxyChem first addresses successor liability, and then turns to personal jurisdiction.

---

of his certification to EPA—which EPA received and reviewed before it informed Chargeurs it would no longer be considered a PRP for the site.  In any event, EPA's decision does not prevent this Court from entering summary judgment for OxyChem, based on discovery in this case.

I.     **The Court Should Deny Chargeurs' Motion for Summary Judgment and Grant OxyChem's Because Chargeurs is the Corporate Successor to UPDW and United's CERCLA Liabilities as a Matter of Law.**

Chargeurs does not dispute that UPDW and United polluted the Passaic River or that this pollution gave rise to CERCLA liability.  Instead, Chargeurs argues that—after it expressly assumed the liabilities of its subsidiaries and dissolved them—the CERCLA liability for their bad acts somehow vanished.  This is not how CERCLA works.  Chargeurs succeeded to these entities' liabilities under blackletter corporate and CERCLA law.

A.     **Legal Standard**

Summary judgment is "proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 545 (3d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); *accord* Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." *Kaucher*, 455 F.3d at 423.  In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

Under this standard, for the reasons set out below, the Court should deny Chargeurs' Motion for

Summary Judgment and grant OxyChem's.

> **B.**     **Courts Uniformly Hold that an Express, General Assumption of a Predecessor's Liabilities Transfers CERCLA liability to the Successor.**

It is blackletter law that a party may be liable under CERCLA when it assumes another

entity's liability.  An acquiror is liable for its target's actions where "it assumes [its] liability."

*United States v. Gen'l. Battery Corp.*, 423 F.3d 294, 305 (3d Cir. 2005); *see also, e.g.*, *Litgo New*

*Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 389–90 (3d Cir. 2013)

(upholding district court allocation, including as to acquiror who expressly assumed environmental

liability in acquisition); *Rhodia Inc. v. Bayer Cropscience Inc.*, No. CIV.04-6424 GEB MF, 2007

WL 3349453, at *7 (D.N.J. Nov. 7, 2007) (finding that plaintiff had expressly assumed liabilities

of defendant, and therefore could not bring CERCLA action against defendant); *United States v.*

*Chrysler Corp.*, No. CIV. A. 88-341-CMW, 1990 WL 127160, at *7 (D. Del. Aug. 28, 1990)

("Knotts, Inc. expressly agreed to assume the liabilities . . . for any cause of action based upon

conduct occurring before the date of the Agreement.  Consequently, Knotts, Inc. expressly

assumed liability for the present action that the United States has brought under CERCLA.").  An

entity that expressly assumes liability remains liable even after the separate entity is dissolved.

*Alcoa v. Beazer E.*, 124 F.3d 551, 567 (3d Cir. 1997).

The Third Circuit has held that a general assumption of liabilities includes environmental

liabilities, unless the parties expressly agree otherwise.  In *Philadelphia Electric Co. v. Hercules,*

*Inc.*, 762 F.2d 303, 309 (3d. Cir. 1985), the court found Hercules assumed the liabilities of plaintiff

PECO, including environmental liabilities not yet known, since the assumption of those liabilities

was not excluded by one of the express exceptions in the relevant documents:  "Hercules broadly

assumed **all** liabilities incurred by Picco as of the closing date, subject to a few limited exceptions.

14

In such cases, it is of no consequence that the specific liability at issue is not enumerated." *Id.* at 309  (emphasis added).[7]  The same is true here.

### C.    Chargeurs Expressly Assumed All UPDW's and United-PA's Liabilities.

Chargeurs broadly "**assume[d] the liabilities**" of UPDW and United PA, rendering it liable under CERCLA for these entities' historical operations.  *See Phila. Elec.*, 762 F.3d at 309. Chargeurs contemporaneously recorded this broad assumption of all liabilities in board minutes signed by its own secretary.  *See* Ex. 11 (12-22-82 Chargeurs Meeting Minutes) at CH_000307-08.  A court can grant summary judgment on the basis of this legally operative act.  *Cf. Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418–19 (3d Cir. 2013) (court may grant summary judgment interpreting unambiguous instrument).   Summary judgment is straightforward here because Chargeurs has stipulated that, apart from the legal actions in its corporate records, there are no relevant facts or documents that could change the Court's analysis.  *See supra* at Statement of Facts, IV.  Nor does Chargeurs dispute the authenticity of its own minutes.  *See* OxyChem's and Chargeurs' Stipulation of Authenticity of Documents ("Stipulation of Authenticity").

The Court need interpret only one provision to grant summary judgment against Chargeurs:

> FURTHER RESOLVED, that, in connection with the plans of liquidation referred to in the foregoing resolutions, **the Corporation shall assume the liabilities of UPDW and United [The United Piece Dye Works, a Pennsylvania corporation and wholly owned subsidiary of UPDW] not paid or otherwise provided for by UPDW and United, whether or not related to specific assets**, and that the

---

[7] Courts across the country hold that general assumptions of liability transfer environmental liabilities.  *See Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 15-16 (2d Cir. 1993) ("all liabilities (absolute or contingent)"); *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1233, 1241–42 (E.D. Cal. 1997) ("Courts have universally held that language transferring 'all liabilities' is sufficiently broad to include environmental liability."); *HRW Systems, Inc. v. Wash. Gas Light Co.*, 823 F. Supp. 318, 332-33 (D. Md. 1993) ("all liabilities and obligations, liquidated or unliquidated"); *Purolator Prods. Corp. v. Allied–Signal, Inc.*, 772 F. Supp. 124, 131-32 (W.D.N.Y. 1991) (parties intended transfer where agreement referred to "all liabilities").  "Broad and unfettered" assumptions transfer CERCLA liability.  *See United States v. Sterling Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1035 (E.D. Cal. 2013).

> President and Secretary of the Corporation be, and each of them hereby is, authorized to execute such mortgages, indentures, guarantees or other documents as may be required in connection with such assumption of liabilities . . . .

Ex. 11 (12-22-82 Chargeurs Meeting Minutes) at CH_000307-08 (emphasis added). As Chargeurs certified to EPA, this document governs Chargeurs' assumption of liability. *See, e.g.*, Ex. 12 (6-18-18 Ltr. to EPA) at 7-8. Apart from the board minutes of Chargeurs and its subsidiaries, Chargeurs has no documents showing what happened to UPDW's liabilities. *See* Ex. 1 (Doldan Depo. Tr.) at 69-70, 72, 123:9-13, 127:15-128:19; Ex. 15 (summary of Chargeurs' production).

Rather than specifying types of liabilities it would assume or excluding specific liabilities from the assumption, Chargeurs ***broadly assumed*** all of UPDW's and United PA's liabilities. Chargeurs' own board minutes state plainly that Chargeurs "shall assume **the** liabilities" of its subsidiaries. Ex. 11 (12-22-82 Chargeurs Meeting Minutes) at CH_000308. Further broadening that assumption, Chargeurs assumed liabilities "whether or not related to specific assets." *Id.*; Ex. 1 (Doldan Dep. Tr.) at 82:20-84:10.

Chargeurs could have narrowed or limited its assumed liabilities—but chose not to do so. Chargeurs ***did not*** expressly state it was *not* assuming any unknown or future liabilities. Chargeurs ***did not*** enumerate particular types of liability (*e.g.*, contract, tort, environmental) it was assuming. Chargeurs ***did not*** state that it was assuming only liabilities existing as of a *particular time* (*e.g.*, before or after the assumption). Chargeurs ***did not*** draft a schedule of assumed liabilities. *See* Ex. 1 (Doldan Depo. Tr.) at 81:20-82:10, 99:18-21; Ex. 15 (summary of Chargeurs' production). Chargeurs ***did not*** draft a schedule of excluded liabilities. *See generally* Ex. 11 (12-22-82 Chargeurs Meeting Minutes). Under *Philadelphia Electric*, this ends the inquiry.

The only carveout in Chargeurs' blanket assumption is for liabilities "paid or otherwise provided for" by the former subsidiaries. *See* Ex. 11 (12-22-82 Chargeurs Meeting Minutes) at

CH_000308.  Chargeurs' corporate representative confirmed, however, that this carveout does not apply.  *See* Ex. 1 (Doldan Dep. Tr.) at 80:19-22, 81:6-15.   There is no schedule of liabilities that were paid or provided for by UPDW.  *See id.* at 81:20-82:10, 99:18-21; Ex. 15 (summary of Chargeurs' production).  Nor are there any documents showing that any liabilities of UPDW were paid or otherwise provided for by UPDW before they were assumed by Chargeurs.  *See* Ex. 1 (Doldan Depo Tr.) at 135:7-11; Ex. 15 (summary of Chargeurs' production).  Also, UPDW did not transfer its liabilities to any entity other than Chargeurs, and no other entity assumed any liabilities of UPDW.  *See* Ex. 1  (Doldan Depo Tr.) at 123:14-25, 135:7-11, 136:7-19.   Thus, Chargeurs is the only entity that could possibly have liability for UPDW's historical releases.

Chargeurs' undisputed assumption of "the liabilities" of UPDW was sufficient, as a matter of blackletter corporate-successorship law, to render Chargeurs liable under CERCLA for UPDW's historical operations.  As the Third Circuit recognized in *General Battery*, an acquiror is liable for its target's actions where "it assumes [its] liability." *Gen. Battery*, 423 F.3d at 305. Where there is a general assumption of liability, as Chargeurs did here, "it is of no consequence that the specific liability at issue is not enumerated." *Phila. Elec. Co.*, 762 F.2d at 310.  Just as in numerous prior CERCLA cases, Chargeurs' "broad and unfettered" assumption rendered Chargeurs liable for UPDW's operations. *See, e.g.*, *Olin Corp.*, 5 F.3d at 15-16; *Iron Mountain Mines*, 987 F. Supp. at 1241–42; *HRW Sys.*, 823 F. Supp. at 332-33; *Purolator Prods. Corp.*, 772 F. Supp. at 131-32.  These authorities prove the inescapable conclusion that Chargeurs' assumption of "the liabilities" of UPDW rendered Chargeurs liable for UPDW's pollution of the Passaic River.

Chargeurs points to exactly zero cases to the contrary.  Chargeurs simply asserts that its assumption of "the liabilities" of UPDW should not be read to include "all the liabilities" of UPDW.  Here the article— "the" versus "all"—makes no difference.  In *United States v. Sterling*

*Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1035 (E.D. Cal. 2013), like Chargeurs, the defendant acquired all assets of its predecessor "subject to its [the predecessor's] liabilities." *Id.* at 1036. The court rejected the argument, like Chargeurs' here, that the express assumption was not broad enough to include environmental liabilities because the word "all" did not precede "liabilities" in the agreement: "**these cases do not stand for the proposition that the word 'all' is a prerequisite for the broad assumption of liabilities**." *Id.* (emphasis added).  Rather, "use of the word 'all' to describe the liabilities assumed is one indicator of the parties' mutual intention to transfer broad liabilities. It is not the only indicator." *Id.*  The court then held that the "broad and unfettered" assumption, like Chargeurs' here, included CERCLA liability.  *See id.*

The plain language of Chargeurs' assumption of liabilities cannot be squared with Chargeurs' assertion that the assumption of "the liabilities" is simultaneously not specific enough to cover CERCLA liability or not general enough to include all environmental liability.  *See* Chargeurs MSJ at 38.  Chargeurs does not cite a case for this argument, but its phrasing suggests it intends to mirror cases analyzing agreements that *pre-dated* CERCLA.  Those cases do not apply because Chargeurs' assumption *post-dates* CERCLA and must be evaluated against the plain language of the statute.[8]

Under CERCLA, it does not matter whether Chargeurs specifically considered CERCLA or environmental liabilities when it assumed UPDW's liabilities.  The Third Circuit held that even "[a]n agreement entered into prior to the passage of CERCLA can allocate CERCLA liabilities." *Beazer E.*, 124 F.3d at 565.  Chargeurs' assumption is an easier case still.  CERCLA was passed two years *before* Chargeurs assumed its subsidiaries' liabilities.  Chargeurs could have excluded

---

[8] *See Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3d Cir. 1994) (pre-CERCLA agreement).

CERCLA liability from the liabilities it assumed, but chose not to.  *Compare Trinity Greenlease*, 903 F.3d at 350 ("the express language of the contract" dictated that company did not assume CERCLA liability); *see also Phila. Elec. Co.*, 762 F.2d at 310 ("clear and specific language" must be used "to effect the exclusion of unknown or contingent liabilities").  Chargeurs' broad and unfettered assumption of liabilities includes all environmental liability.

       **D.**    **Chargeurs' Responses Are Meritless.**

       In response to this straightforward logic, Chargeurs offers two perplexing responses. Chargeurs first argues its express assumption of "the liabilities of UPDW and United [PA]" was not effective because there was no "Plan of Liquidation" for UPDW and United PA.  This is a flat misrepresentation to the Court:  the plans exist.  But Chargeurs tanked its credibility on a non-sequitur, because the board minutes are crystal clear that the transfer of UPDW's liabilities is not contingent on the existence of a Plan of Liquidation.  Next, Chargeurs argues that the minutes are not "enforceable" because the statute of frauds is not satisfied.  This is another non-sequitur.  This is a CERCLA case, not a breach-of-contract case.  The statute of frauds does not apply to determination of CERCLA successor liability.  Even if it did, the board minutes would satisfy it because they are a writing signed by Chargeurs clearly assuming UPDW's liabilities.

             1.     *Chargeurs' Misrepresents to the Court That No Plan of Liquidation Exists. Even If This Were True, It Would Be Irrelevant.*

       Chargeurs argues that its express assumption of UPDW and United PA's liabilities was ineffective because the "predicate and conditional portion of the resolution" notes that the assumption of liabilities would take place "in connection with the plans of liquidation," and—according to Chargeurs—the plans of liquidation do not exist.  *See* Chargeurs MSJ at 24. Chargeurs then tells the Court that "no such plans [of liquidation] are contained in any document,"

"even though a separate plan of liquidation was anticipated, it does not exist," and claims "[t]here is no liquidation plan."  Chargeurs MSJ at 23-24.

Every one of these statements is false.  The Plan of Liquidation and Dissolution of UPDW is in the Minutes of Special Meeting of the Board of Directors of UPDW, Inc. dated December 22, 1982.  *See* Ex. 13 (12-22-82 UPDW Minutes) at CHGR_000196-97.  The Plan of Liquidation and Dissolution of United is also in the Minutes of Special Meeting of the Board of Directors of United Piece Dye Works, Inc. dated December 24, 1982.  *See* Ex. 14 (12-22-82 United Minutes) at CHGR_000369-70.  In each case, the Plan is preceded by an all-caps heading: "**PLAN OF LIQUIDATION AND DISSOLUTION**."  The Plans specify how the President and Secretary of UPDW and United PA shall wind up, liquidate, and dissolve the corporations.  These Plans describe how the subsidiaries facilitated Chargeurs' assumption of liabilities, a fact confirmed by Chargeurs' own board minutes which, standing alone, show that Chargeurs intended to and did in fact assume those liabilities.  *See supra* at Argument, I.C.  While the plans are further evidence of Chargeurs' assumption of its subsidiaries' liabilities, they are not necessary to establish that fact.

But Chargeurs' argument is more than merely wrong: it is a flat misrepresentation to the Court—not a mere oversight.  In 2018, Chargeurs submitted certified information to EPA describing these plans.  Chargeurs wrote to EPA that: "The Plan of Liquidation and Dissolution of UPDW (the 'Plan') is contained in the 'Minutes of Special Meeting of the Board of Directors of UPDW, Inc. dated December 22, 1982," and quoted from the Plan of Liquidation.  Ex. 12 (06-08-18 Ltr. from Brendel to Yeh) at 3-4.  Chargeurs also wrote: "[the] UPDW Board Minutes contain the Plan of Liquidation and Dissolution pursuant to which UPDW transferred to Chargeurs, Inc. all of its assets including its rights under the Notes."  *Id.* at 6.  Further, counsel for OxyChem questioned Chargeurs' representative about these provisions at his deposition.  *See* Ex. 1 (Doldan

20

Dep. Tr.) at 54:25-55:12.  Put bluntly, Chargeurs knew that the Plans of Liquidation existed, yet it still argued to the Court they did not—in a misguided effort to sow confusion when there is none.

> 2.    *The Statute of Frauds Does Not Apply Because OxyChem Is Not Enforcing a Contract.*

"As adopted by many states, the statute of frauds means that a contract may not be enforced, unless in writing."  28 WILLISTON ON CONTRACTS § 70:143 (4th ed.).  "[T]he statute of frauds aims to defend against fraud and perjury by denying force to certain types of oral contracts that are peculiarly susceptible."  49 N.J. PRAC., BUSINESS LAW DESKBOOK § 7:12 (2019-2020 ed.). In Delaware, the statute of frauds requires a "writing" that is "signed by the party to be charged." DEL. CODE ANN. TIT. 6 § 2714.  In New Jersey, it requires a "writing signed by the person assuming the liability."  N.J. STAT. ANN. § 25:1-15.

Chargeurs argues in circles to show the statute of frauds applies, but never explains why the board minutes would not meet it.  This is because, even if the statute applied, the board minutes clearly satisfy it.  Chargeurs stipulates they are authentic, the minutes are a "writing" signed by Chargeurs' own secretary, and they state plainly and unambiguously that Chargeurs has assumed all liabilities of UPDW.  *See* Ex. 11 (12-22-82 Chargeurs Meeting Minutes).

But the statute of frauds does not apply.  "Successor liability exists when the parties have, through ***agreements, words, or conduct,*** indicated their intent to shift liability from one party to another."  *Sterling Centrecorp*, 960 F. Supp. 2d at 1035 (emphasis added).  Here, the issue is not liability in contract, it is liability under CERCLA.  OxyChem has established successor liability based on Chargeurs' "words" and "conduct" assuming "the liabilities" of its subsidiaries.

A board of directors binds the corporation by voting.  Here, on December 22, 1982, Chargeurs' board voted unanimously to assume the subsidiaries' liabilities before it liquidated and dissolved them.  *See* Ex. 11 (12-22-82 Chargeurs Meeting Minutes). Chargeurs also caused its

21

subsidiaries to effectuate its assumption of their liability, its acquisition of their assets, and the dissolution of the subsidiaries—legal actions that were taken by the boards of directors of UPDW and United PA. *See* Ex. 14 (12-22-82 United Meeting Minutes); Ex. 13 (12-22-82 UPDW Meeting Minutes). All three entities were represented by the same people: Eugene Delutio, Douglas McPheters, and Richard Kart, who served as directors and officers of the affiliates. Those board votes by Chargeurs, UPDW, and United PA are legally binding. And those legal actions are memorialized in contemporaneous board minutes of each of the three affiliates, all signed by Richard Kart, who served as secretary for each affiliate. *See* Ex. 11 (12-22-82 Chargeurs Meeting Minutes); Ex. 13 (12-22-82 UPDW Meeting Minutes); Ex. 14 (12-22-82 United Meeting Minutes). Chargeurs then dissolved UPDW, filing the certificate of dissolution with Delaware. *See* Ex. 11 (12-22-82 Chargeurs Meeting Minutes) at CH_000313.

Chargeurs cannot dispute any of this. Rather, as Chargeurs itself has confirmed, Chargeurs' contemporaneous board minutes are the best and only evidence of what happened to its subsidiaries' liabilities. Chargeurs' corporate representative confirmed repeatedly that these minutes were the only evidence of what happened to UPDW's liabilities after it was dissolved. *See supra* at Statement of Facts, IV. Chargeurs has also stipulated to the authenticity of the meeting minutes. *See* Stipulation of Authenticity.

Given that Chargeurs has stipulated these minutes are authentic, there is no evidence— none—that they are inaccurate when they describe the liabilities Chargeurs assumed.[9] Here,

---

[9] In fact, under both Delaware and New Jersey law, board meeting minutes are presumed to be accurate and may be admitted as evidence of what was approved at a board meeting. *See In re Genelux Corp.*, 126 A.3d 644, 673-74 (Del. Ch. 2015), *vacated in part on other grounds sub nom. Genelux Corp. v. Roeder*, 143 A.3d 20 (Del. 2016); *Dharia v. Om Riddhi Siddhi, LLC*, 2017 WL 3442820, at *4 (N.J. Super. Ct. App. Div. Aug. 11, 2017).

Chargeurs, UPDW, and United minutes are the best evidence of what happened in 1982—based on formal corporate records drafted and signed in the real time and stipulated by Chargeurs to be authentic. As explained at length above, the plain text of these documents establishes Chargeurs' "intent to shift liability from one party to another," *Sterling Centrecorp*, 960 F. Supp. 2d at 1035, which is all that is required to shift liability under CERCLA. Accordingly, the statute of frauds does not apply.  But even if it did, the undisputed evidence Chargeurs stipulates is authentic contains a writing by Chargeurs assuming these liabilities.  On both the facts and the law, Chargeurs' statute-of-frauds argument fails.

> **E.     Separate from Chargeurs' Express Assumption of Liability, Genuine Issues of Material Fact as to Chargeurs' Successor Liability Prevent This Court from Granting Summary Judgment in Favor of Chargeurs.**

As established above, the Court should grant summary judgment that Chargeurs expressly assumed its subsidiaries' liabilities.  The only evidence in this case makes that conclusion inevitable; there is zero evidence to the contrary.  But even if the Court were for some reason disinclined to grant summary judgment in OxyChem's favor, the same facts require that Chargeurs' summary judgment motion be denied.

If the board minutes are somehow not dispositive in OxyChem's favor (and they are), then there necessarily remain fact questions whether Chargeurs is a successor to UPDW under prongs two through four of *General Battery's* four-part test; namely, whether Chargeurs' acquisition amounted to a consolidation or merger; whether it was fraudulent and intended to escape liability; or whether Chargeurs was a mere continuation of UPDW.  *See Gen. Battery Corp.*, 423 F. 3d at 305.  Here, Chargeurs' corporate representative:

- ***Did not know*** why Chargeurs dissolved UPDW—and could therefore not rule out that Chargeurs was attempting to escape its liability.

- ***Did not know*** whether Chargeurs retained any of UPDW's management personnel after dissolution—a factor relevant to whether Chargeurs was a mere continuation of UPDW;

- ***Did not know*** whether Chargeurs retained any of UPDW's physical locations after its dissolution—a factor relevant to the mere continuation analysis;

- ***Did not know*** whether Chargeurs retained or continued any of the operations of UPDW after its dissolution—another factor relevant to the mere continuation analysis.

*See* Ex. 1 (Doldan Depo Tr.) at 165:8-14, 169:16-19, 170:10-17, 171:5-17, 127:9-12.

Accordingly, if the Court is not inclined to grant summary judgment in favor of OxyChem, based on the broad, express assumption of liabilities in Chargeurs' board minutes, then these fact questions prevent it from granting summary judgment in favor of Chargeurs.

## II.   This Court Has Personal Jurisdiction Because Chargeurs Is the Successor to Its Former Subsidiaries, Which Polluted the Passaic for Decades.

Chargeurs also argues, unconvincingly, that it is not subject to personal jurisdiction in New Jersey for the pollution caused by its predecessors' discharges of toxic chemicals into the Saddle River and ultimately the Passaic River.  This is incorrect.  It is blackletter law that a corporate predecessor's contacts with a forum are imputed to its successor in analyzing personal jurisdiction. Accordingly, this Court has personal jurisdiction over Chargeurs in this CERCLA action.

### A.   Legal Standard

When a court reviews of motion to dismiss a case for lack of personal jurisdiction, like Chargeurs' motion here, it "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).  The plaintiff meets its burden and presents a prima facie case for the exercise of personal jurisdiction by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). Once the plaintiff does so, the burden shifts to the Defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 1226.

**B.      Chargeurs' Predecessors' Contacts to New Jersey Are Imputed to Chargeurs.**

"New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 95 (3d Cir. 2004) (citing N.J. Court Rule 4:4-4(c)); *see also Carteret Sav. Bank*, 954 F.2d at 145. "Thus, parties who have constitutionally sufficient 'minimum contacts' with New Jersey are subject to suit there." *Miller Yacht Sales, Inc.*, 384 F.3d at 96.  A court may exercise specific or general jurisdiction.  *See Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). "Specific jurisdiction exists if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 334 (3d Cir. 2009) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotations omitted)).

The acts of Chargeurs' predecessors are imputed to Chargeurs for personal-jurisdiction purposes.  The "Third Circuit has recognized that the jurisdictional contacts of a predecessor corporation may be imputed to its successor corporation without offending due process." *Flagship Interval Owner's Ass'n v. Phila. Furniture Mfg. Co.,* No. 09-1173, 2010 U.S. Dist. LEXIS 26472 at *17, *19 (D.N.J. Mar. 22, 2010) (internal citations and quotations omitted); *see also Am. Estates Wines, Inc. v. Kreglinger Wine Estates Pty, LTD*, 2008 U.S. Dist. LEXIS 23494, at *13-*24 (D.N.J. March 25, 2008) (Greenaway, J.) (applying personal jurisdiction through successor liability).  "[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an

alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (collecting cases).[10]

Chargeurs is subject to personal jurisdiction by virtue of its broad assumption of all of its former subsidiaries' liabilities, including those arising from its subsidiaries' decades-long operations in the Passaic River watershed.  Because of that express assumption, Chargeurs should have anticipated that it might be hauled into court in New Jersey.

### C.     Chargeurs' Predecessors Had More Than Sufficient Contacts with New Jersey to Support Jurisdiction over Chargeurs.

The Third Circuit uses this test for specific jurisdiction: (1) "the defendant must have purposefully directed [its] activities at the forum"; (2) "the litigation must arise out of or relate to at least one of those activities"; and (3) "the exercise of jurisdiction otherwise [must] comport with fair play and substantial justice." *O'Connor v. Sandy Lane Hotel, Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007) (citations and quotations omitted).  Once minimum contacts have been established, "courts rarely decline to find personal jurisdiction under the "fair play and substantial justice" prong.  *See Am. Estates Wines*, 2008 U.S. Dist. LEXIS 23494 at *23 (citing *Asahi*, 480 U.S. at 116 (Brennan, J., concurring)).  Under that prong, a court considers these factors:  "(1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering

---

[10] *See, e.g.*, *City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454 (4th Cir. 1990) ("The great weight of persuasive authority permits imputation of a predecessor's actions upon its successor whenever forum law would hold the successor liable for its predecessor's actions."); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) ("A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor."); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982) ("Any other ruling would allow corporations to immunize themselves by formalistically changing their titles.").

substantive social policies." *Kreglinger Wine Estates Pty, Ltd.*, No. 07-2474, 2008 U.S. Dist. LEXIS 23494 at *8.  The defendant bears the burden of establishing unreasonableness and must show "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *A.V. Imports*, 171 F. Supp. at 375 (quoting *Burger King*, 471 U.S. at 477).

Crucially, Chargeurs does not dispute that its predecessors' contacts were sufficient to establish personal jurisdiction by this Court—because it cannot do so.  *See* Chargeurs MSJ, VI.A (arguing only that Chargeurs itself is not subject to personal jurisdiction).  The evidence establishes that Chargeurs' subsidiaries meet the three-part test for specific jurisdiction: (1) the subsidiaries purposely directed their activities to New Jersey; (3) this case arises from those activities; and (3) exercising personal jurisdiction here comports with fairness and justice.

*First*, Chargeurs' predecessors UPDW and United purposefully directed their activities to New Jersey.  United was incorporated in New Jersey and operated textile factories in Lodi, New Jersey.  *See* Ex. 12 (6-18-2018 Chargeurs' Responses to EPA) at 2.  The factories operated from the early 1900s until the 1950s or 1960s.  *See* Ex. 1 (Doldan Depo Tr.) at 46:5-47:9.  The Lodi factory employed approximately "1,100 persons, occupy[ed] 507,000 square feet of floor space, [did] the processing [of dyes]."  *In the Matter of United Piece Dye Works v. Joseph et. al.*, 282 A.D. 60, 62 (N.Y. App. Div. 1953), *affd*. 307 N.Y. 780 (1954).  Additionally, "[o]rders for processing are received only in New Jersey and California."  *Id*. at 61.

*Second*, this litigation arose out of the activities of Chargeurs' predecessors—a fact that Chargeurs does not dispute.  OxyChem seeks contribution for costs to clean up hazardous substances it alleges were released by United into the Passaic River.  OxyChem has not had an opportunity to conduct substantive discovery on those releases into the Passaic River, but Chargeurs has not moved for summary judgment on the grounds that United did not pollute the

Passaic.  In fact, it does not dispute that pollution for purposes of this motion.[11]  Still, OxyChem has provided examples of evidence of such pollution above.  *See supra* at Statement of Facts, I.

*Third*, exercising jurisdiction here is reasonable. Chargeurs acquired entities that operated in New Jersey for a half century; stripped the assets of those entities and took them for itself; expressly assumed all liabilities of those entities; and then dissolved them.  *See supra* at Statement of Facts, III.  Chargeurs should not be surprised that it is now sued in a New Jersey court for the liabilities it assumed in New Jersey.  Exercising jurisdiction is reasonable here:

- Unlike Chargeurs, neither OxyChem nor any other party assumed liability for the pollution caused by Chargeurs' subsidiaries. It would be unfair to shift those liabilities to other parties based on Chargeurs asset-stripping transactions, but there is nothing unfair about holding Chargeurs responsible *for* liabilities it *chose* to assume in its own interest;

- Chargeurs' burden in defending this case is manageable, particularly because Chargeurs can share certain costs with more than 100 co-defendants;

- New Jersey has a strong interest in adjudicating a dispute over serious pollution at a major Superfund site, which is costing hundreds of millions of dollars to remedy; and

- OxyChem has a strong interest in holding other PRPs responsible for their pollution because it alone is shouldering the burden of paying for the design of the remedy—indeed, this case would be intractable if all successor corporations who moved their headquarters or operations from New Jersey over the years were able to evade this Court's jurisdiction.

*See Kreglinger*, 2008 U.S. Dist. LEXIS 23494, at *8.

For all these reasons, this Court's exercise of personal jurisdiction is consistent with fair play and substantial justice.  Chargeurs relies on *Worthem*, in which the Third Circuit held that a German company that sought adjudication of real property interest in Germany was not subject to

---

[11] Had Chargeurs disputed this fact, or sought summary judgment on that ground, OxyChem would have been entitled to additional discovery, including electronically stored information and depositions concerning historical operations of United and its releases of hazardous substances. Under the Federal Rules and the Supreme Court's decision in *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986), no summary judgment motion on the existence of discharges of hazardous substances or Chargeurs' equitable share of liability could be filed, much less granted.

personal jurisdiction in New York. *See Worthem v. KartadtQuelle*, 153 F. App'x 819, 825-26 (3d Cir. 2005). Chargeurs ignores that the company apparently had no operations in the United Sates, and only acted through an agent with a power of attorney. *See id.* at 825. Here, in contrast, Chargeurs is a Delaware corporation with its principal place of business in North Carolina, and it assumed liabilities related to its predecessor's New Jersey operations. It is fair to require Chargeurs to appear in this Court.

Finally, Chargeurs hangs its hat on a 1993 District of Idaho case that is neither binding here nor persuasive. In *Hanna*, the court found that the successor did not purchase "assets that are so connected with the forum as to put the successor on notice of its predecessor's presence in the forum." *Idaho v. M.A. Hanna Co.*, 819 F. Supp. 1464, 1482 (D. Idaho 1993). Chargeurs acquired an entity with decades of New Jersey operations, acquired its assets, assumed all its liabilities— whether related to particular assets or not—and dissolved that entity. Chargeurs was on notice of its predecessors' presence in New Jersey and should have anticipated defending suit there.

Chargeurs' predecessors' contacts with New Jersey easily support this Court's exercise of jurisdiction over Chargeurs. There is no question that UPDW and United had sufficient contacts with New Jersey to support personal jurisdiction, and those contacts are imputed to Chargeurs, as legal successor to UPDW and United. Chargeurs cannot evade this Court's jurisdiction.

## CONCLUSION

The Court should deny Chargeurs' motions to dismiss and for summary judgment, and grant summary judgment to OxyChem holding that Chargeurs is responsible as a successor to pay any environmental liabilities of its former subsidiaries. The evidence conclusively establishes, as a matter of law, that Chargeurs assumed these subsidiaries' environmental liabilities. But if the Court is not inclined to grant summary judgment on OxyChem's motion, it should still deny Chargeurs' motion, because OxyChem has not been afforded adequate time for discovery on the

merits of whether Chargeurs is the successor to its former subsidiary under CERCLA.

Dated:  January 22, 2020 By: /s/ *John J. McDermott*

John J. McDermott, Esq.
(jmcdermott@archerlaw.com)
Charles J. Dennen, Esq.
Lauren E. Krohn, Esq.
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel. (856) 795-2121

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel. (713) 650-8805
Kathy D. Patrick, Esq.
(kpatrick@gibbsbruns.com)
Anthony N. Kaim, Esq.
 Katherine H. Kunz, Esq.
Jorge M. Gutierrez, Esq.
Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel. (215) 732-3255
Larry D. Silver, Esq.
(lsilver@lssh-law.com)
David E. Romine, Esq.

GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067
Tel. (310) 553-3610
Peter A. Nyquist, Esq.
(pnyquist@ggfirm.com)
Noah Perch-Ahern, Esq.
Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical*
*Corporation*

30217896812v1