**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE**

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION ) | Hon. Madeline Cox Arleo |
| ) | Hon. Joseph A. Dickson |
| ) | |
| Plaintiff, ) | Civil Action No. 2:18-cv-11273-MCA-JAD |
| ) | |
| v. ) | |
| ) | **MOTION TO CLARIFY THE** |
| 21ST CENTURY FOX AMERICA, INC., *et al.* ) | **SCOPE OF DISCOVERY** |
| ) | |
| Defendants. ) | |
| ) | |

ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel.    (856) 795-2121
By:    John J. McDermott, Esq.
            (jmcdermott@archerlaw.com)
         Charles J. Dennen, Esq.
         Lauren E. Krohn, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.    (713) 650-8805
By:    Kathy D. Patrick, Esq.
            (kpatrick@gibbsbruns.com)
         Anthony N. Kaim, Esq.
         Katherine H. Kunz, Esq.
         Jorge M. Gutierrez, Esq.
         Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel.    (215) 732-3255
By:    Larry D. Silver, Esq.
            (lsilver@lssh-law.com)
         David E. Romine, Esq.

GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067
Tel.    (310) 553-3610
By:    Peter A. Nyquist, Esq.
            (pnyquist@ggfirm.com)
         Noah Perch-Ahern, Esq.
         Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

**I.     INTRODUCTION**

Nearly two years after this lawsuit was filed, Defendants claim to be unable to produce *any* ESI discovery without endless negotiations over the restrictions they seek to unilaterally impose on their discovery obligations.  One of the most damaging of these restrictions is Defendants' proposal to limit the scope of discovery to include *only* information *they consider* to be related to one of the eight chemicals identified by EPA as driving its selected remedy for the Lower 8.3 miles of the Passaic River (the "ROD COCs").

Information regarding chemicals besides the eight ROD COCs is critical to numerous elements of proof in the equitable allocation of response costs for both OxyChem's claims in Operable Unit 2 and its defense against Defendants' counterclaims in Operable Unit 4.  First, precursors (that can form ROD COCs) and degradation chemicals (formed from the breakdown of ROD COCs) are plainly relevant to a dispute over whether a Defendant released COCs into the river.  Second, non-ROD COC hazardous substances are also relevant to remediation costs, albeit at lower impacts: EPA recently settled the very liability at issue in this case with numerous *de minimis* parties in exchange for payments to compensate for harm from their releases of "non-ROD COC hazardous substances."  Moreover, EPA's remedy for OU2 will require the dredged sediment dewatering process include monitoring and treatment for hazardous substances—a response cost directly associated with non-ROD COCs.  Third, discovery relating to the chemicals that *EPA* required to be sampled for in the Lower Passaic River will supply important lines of evidence to prove each Defendant had a nexus to the river, that is, that a discharge pathway existed from each Defendant's site to the river.  Finally, Defendants' have brought $100 million counterclaims against OxyChem that are not limited to the 8 ROD COCs.  The counterclaims largely involve OU4—which includes the Upper 9 miles of the Passaic River—for which EPA has not yet issued a Record of Decision, but for which EPA required sampling and analysis of a broad

chemical list.  OxyChem is entitled to discovery for its defense.

As discovery to date has demonstrated, leaving to Defendants the question of what chemicals are relevant to this CERCLA action is an invitation for Defendants to hide the ball.  To resolve this issue, OxyChem has compiled a list of chemicals relevant to its claims and defenses, which is comprised of four categories:

1. The 8 ROD COCs, including congeners and related chemicals/analytes;

2. Precursors and degradation products of the 8 ROD COCs;

3. Chemicals required to be monitored for in the dredged sediment dewatering component of the remedy; and

4. Other chemicals EPA required to be sampled for in Lower Passaic River sediments.

Each of the chemicals in these categories is relevant as either a chemical that drives response costs or as a chemical that can prove Defendants released hazardous substances into the river.  Defendants cannot be allowed to hide information about their operations that involved these chemicals or information about the presence of these chemicals on their sites.

## II.   BACKGROUND

### A.   OxyChem's Claims

OxyChem brought this action to ensure that the parties responsible for the contamination of the Lower 8.3 Miles of the Passaic River pay their fair shares of the costs of investigation, design, and anticipated implementation of the remedy for such contamination.  *See* Complaint at 4 (Dkt. No. 1).  OxyChem's complaint includes detailed allegations about each Defendant's use and/or formation of, and associated discharge of, the eight chemicals identified by EPA as driving its selected remedy for the Lower 8.3 miles (the "8 ROD COCs"), as well as other hazardous substances that contributed to the need for and will be cleaned up by the remedy.

Specifically, OxyChem seeks to recover from Defendants response costs it has incurred

(and continues to incur) related to its design of the remedy selected by EPA, pursuant to the Administrative Settlement Agreement and Order on Consent for Remedial Design for Operable Unit Two of the Diamond Alkali Superfund Site ("2016 ASAOC").[1] One component of designing the remedy is the "predesign investigation" which involves "sediment core collection and analysis for chemical, waste, geological and geotechnical characterization, for the purposes of designing the dredging plan and the engineered cap, and developing a plan for dredged material disposal." *See* Ex. 1, 2016 ASAOC Scope of Work, at ¶ 3.2(a)(1).[2] For the predesign investigation, EPA determined the list of chemicals to be analyzed for in Passaic River sediments. *See id.* at ¶ 5.7(d) (setting forth requirements of Quality Assurance Project Plan governing analyses of chemical constituents to meet the objectives of EPA's ROD). In EPA's judgment, the list of chemicals that are relevant to the point of needing to be sampled for during the ongoing design of the remedy are far more extensive than just the 8 ROD COCs. *See id.*

### B. Defendants' Defenses and Counterclaims

On August 14, 2019, Defendants expanded the scope of this lawsuit by filing counterclaims against OxyChem seeking response costs allegedly incurred by the Cooperating Parties Group associated primarily with a 2007 Administrative Settlement Agreement and Order on Consent to complete a remedial investigation and feasibility study for the Lower Passaic River Study Area

---

[1] OxyChem also seeks to recover costs it has incurred under three other orders: (a) the 2008 Administrative Settlement Agreement and Order on Consent for Removal Action (the "Tierra Removal ASAOC"); the 2011 Administrative Settlement Agreement and Order on Consent for Combined Sewer Overflow/Storm Water Outfall Investigation (the "CSO ASAOC") and the 2012 Unilateral Administrative Order for Removal Response Activities (the "RM 10.9 Removal UAO"). *See* Complaint at ¶ 28-30.

[2] All exhibits referenced herein are appended to the Certification of John J. McDermott, Esq. in Support of Plaintiff Occidental Chemical Corporation's Motion to Clarify the Scope of Discovery, file simultaneously herewith.

("LPRSA" or "OU4") (the "2007 RI/FS").[3] Collectively, those counterclaims purport to seek recovery of over $100 million.[4]

A major objective of the 2007 RI/FS ASAOC was "to determine the nature and extent of contamination within the Lower Passaic River Study Area of the Diamond Alkali Superfund Site."[5] Like it did for OU2, for the 2007 RI/FS ASAOC EPA determined the list of chemicals to be analyzed for during sampling. *See*, *e.g.*, Ex. 3, 2007 RI/FS Statement of Work, at p. 3 (requiring work under 2007 RI/FS to be performed in accordance with EPA-approved project plans). Just as for OU2, the list of chemicals that EPA determined are relevant in OU4 is extensive.[6] Unlike for OU2, however, EPA has not yet selected a remedy for OU4 or issued a Record of Decision. Thus, what COCs will drive the OU4 remedy remain to be seen. Also unknown is Defendants' allocation theory for their alleged $100 million of counterclaims.

### C. Discovery of Defendants' Operations, Remediation, and Sampling

Both OxyChem and Defendants have served Requests for Production under Rule 34, seeking information relevant to the claims and defenses described above. OxyChem's Requests sought, among other things, information regarding the operations conducted at the properties at issue in the Complaint, releases of hazardous substances from Defendants' properties,

---

[3] The counterclaiming Defendants also seek to recover response costs allegedly incurred under a 2004 RI/FS for OU4 and a consent order for a time-critical removal action to address the high concentrations of dioxins, PCBs, and other contaminants at a mudflat on the Passaic River's eastern bank at RM 10.9 in Lyndhurst, New Jersey (the "10.9 Removal").

[4] *See* Ex. 2, November 22, 2019 Objections and Amended Answers of Defendant Givaudan Fragrances Corporation to Standard Interrogatory No. 22.

[5] *See* Ex. 3, Statement of Work for Remedial Investigation and Feasibility Study Portion of Lower Passaic River Restoration Project, at p. 1.

[6] *See, e.g.*, Ex. 4, Safety-Kleen Envirosystems Company's July 10, 2019 Responses and Objections to the Standard Interrogatories, at Attachment B (listing the categories of ROD COC and non-ROD COC analyses performed during sediment sampling in Lower Passaic River).

environmental remediation efforts undertaken at the properties, and sampling conducted to analyze the presence of chemicals in site media.[7]

Because this is a CERCLA case, OxyChem's RFPs defined "Hazardous substance(s)" as that term is defined by Section 101(14) of CERCLA. *See* Ex. 5 at 6. Defendants, in an "omnibus" set of objections, asserted that CERCLA's list of hazardous substances was "overly broad."[8] But Defendants did not identify what documents would be withheld or on what basis. *See* Ex. 6.[9] To date, for many Defendants, it is difficult to ascertain whether individual Defendants withheld documents from their hardcopy productions related to certain operations or events based on the Defendant's unilateral determination that, although CERCLA hazardous substances were involved, ROD COCs were not.[10]

In the year since RFPs were served, OxyChem has produced 1,935,000 documents and Defendants *collectively* have produced approximately 200,000 documents.

### D. The Parties' Positions and OxyChem's "Discoverable Chemicals List"

Defendants are seeking to limit ESI discovery to information regarding historical

---

[7] *See* Ex. 5, OxyChem's January 23, 2019 Requests for Production to Defendant Givaudan Fragrances Corporation at Nos. 2, 4, 5, 11, and 12.

[8] *See* Ex. 6, Defendants' March 8, 2019 Omnibus Objections to OxyChem's RFPs.

[9] "Defendants will not know whether any documents are being withheld pursuant to their objections until they complete their record review and make document productions beginning on April 19, 2019. To the extent any documents are withheld from production subject to a particular objection, Defendants will supplement their responses accordingly." *See id.* at 2.

[10] In their Requests for Production to OxyChem, all Defendants sought information regarding the 8 ROD COCs, "in addition to tracers, congeners, isomers, or analytes of those COCs, as well as raw materials, intermediary materials, products, or by-products containing any of these eight substances." *See* Ex. 7, Defendants' March 5, 2019 First Joint Request for Production of Documents to Occidental Chemical Corporation, at p. 5-6. Defendants also reserved their right to expand that list to include all CERCLA hazardous substances. *See id.* at n.4. Defendants also exceeded their own proposed limitation on discovery when they pursued OxyChem's sampling data by seeking an Order for *all* sampling data (not just sampling for the 8 ROD COCs). *See* Dkt. No. 622, 624.

operations and remedial investigation or sampling at their properties that, *in the Defendants' view,* "used or generated any of the eight COCs identified in the ROD." In other words, according to Defendants, operations are only relevant and chemicals on their sites are only discoverable if they directly involved one of the 8 ROD COCs.

Defendants' proposed limitations on ESI discovery would exclude evidence that is critical to this case.[11] OxyChem has prepared and proposes a workable Discoverable Chemicals List comprised of the following categories:

- Category 1: the 8 ROD COCs (*i.e.*, copper, Dieldrin, dioxins/furans, DDT, lead, mercury, PAH, and PCB), including congeners and related chemicals/analytes.

- Category 2: precursor chemicals or degradation products of the 8 ROD COCs (*i.e.*, chemicals that can form ROD COCs, or can be formed from the breakdown of ROD COCs).

- Category 3: chemicals that may require treatment of waste water to comply with NJDEP effluent limits during the upland sediment dewatering/cleanup component of EPA's selected remedy.

- Category 4: chemicals EPA required to be sampled for in Lower Passaic River sediments.

*See* Ex. 9 ("List of Hazardous Substances Relevant to Claims or Defenses").[12] As discussed below, each of these chemicals is relevant to this dispute.

---

[11] *See* Ex. 8, January 9, 2020 letter from OxyChem to SPG, at 6 ("Limiting ESI only to the eight COCs identified in the ROD, or only to manufacturing operations that used or generated any of the eight COCs identified in the ROD, is unduly restrictive. In assessing cleanup responsibility and liability, EPA itself has recognized (for example, in the earlier *de minimis* settlements) that those eight chemicals alone are not the only causes contributing to the cleanup. And, even as to those eight chemicals, we have discussed repeatedly the fact that Defendants' proposed limitation would exclude from their production evidence concerning precursor materials that yield one or more COCs as a result of a manufacturing process or waste, and would likely exclude evidence of chemical degradation products and markers that point to the presence of COCs.").

[12] Note that each list is inclusive, such that chemicals appearing in Category 1 may also appear in Categories 3 and/or 4.

### III.    LEGAL STANDARD

Under Rule 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant *to any party's claim or defense* and proportional to the needs of the case." The purpose of discovery is to "uncover facts about the claims and defenses set forth in the pleadings." *In re Gerber Probiotic Sales Practices Legit.*, 306 F.R.D. 527, 528 (D.N.J. 2015). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Accordingly, courts construe Rule 26 "broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

The danger of restricting access to relevant facts in a CERCLA allocation is illustrated in *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014). There, EPA selected a dredging and capping remedy to address PCB contamination of the Lower Fox River in Wisconsin. *Id.* at 689. In the ensuing CERCLA contribution lawsuit, the District Court adopted the defendants' proposal to limit "initial discovery" to the extent of each party's knowledge regarding the risk of environmental damage from discharges of PCBs. *Id.* at 696. The District Court then entered an equitable allocation based on the information gathered in discovery, which was limited per the court's adoption of the defendants' proposal. *Id.* at 696.

On appeal, the 7th Circuit vacated the District Court's allocation, explaining that "[w]ithout a more complete record, we are unable to endorse the court's decision to resolve the case on the basis it chose." *Id.* at 703. The "cases demonstrate that the district court must decide what is relevant based on the record as a whole; an allocation based on otherwise permissible factors will not be rescued if it does not explain why the court has chosen to disregard other apparently relevant information." *Id.* at 702. The court acknowledged that thorough discovery was "complex and time-consuming," but concluded that "in the equitable realm where CERCLA contribution actions

8

exist, we must remain vigilant to ensure that the financial responsibility for this huge project is properly allocated." *Id.* at 703.

In short, given that the Court will have broad discretion in crafting the equitable allocation in this case, that the Court is required to consider all relevant information in deciding on that allocation, and the significant dollars at stake in very large and complex remedial projects, it invites error to prematurely restrict the case at the discovery phase. Defendants are all here because they are PRPs with operations on or near the Passaic River that involved hazardous substances. Defendants must produce information regarding their operations and the remediation, investigations, and sampling on their sites without being handed an unfair opportunity to self-determine whether the hazardous substances involved or located on their sites impacted the remedy or should impact the allocation of response costs. That determination is in dispute.

## IV. ARGUMENT

### A. Precursors and Degradation Chemicals Are Directly Relevant to the 8 ROD COCs

It should go without saying—and Defendants have at least admitted as much—that discovery relating to the 8 ROD COCs must be produced. Indeed, when examining the "8 ROD COCs" on a per chemical basis, it is not simply a matter of operations and investigations that involve those eight chemical names, per se (that is, poly-chlorinated biphenyls (PCBs), mercury, dioxins and furans, poly-aromatic hydrocarbons (PAHs), DDT, dieldrin, lead, and copper). Rather, the 8 ROD COCs are in fact made up of hundreds of individual chemicals/analytes.[13] In other words, by agreeing to produce discovery related to the 8 ROD COCs, Defendants have already

---

[13] In the ROD, EPA uses "dioxins/furans" to describe 75 different dioxins and 135 different furans that are related compounds, or "congeners." Similarly, "PCBs" refers to a group of 209 congeners, and there are more than 100 different PAHs. *See* Ex. 10, Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) § 5.2 (Contaminants of Concern).

9

said they will be—or should be—producing information about the ROD COCs, *and* their individual congeners and analytes.

However, Defendants' myopic focus on *only* discovery relating to the 8 ROD COCs excludes directly relevant chemicals such as precursor and degradation chemicals, and chemicals that are commonly associated with the ROD COCs. Precursor chemicals are chemicals that can form ROD COCs; degradation products are chemicals that can be formed from the breakdown of ROD COCs. Both sets of chemicals are logically linked to OxyChem's claims regarding the ROD COCs: the existence of precursor chemicals make it more likely that ROD COCs were formed, and the existence of degradation chemicals make it more likely that ROD COCs were present. A list of precursor and degradation chemicals is attached as Exhibit 9.[14] Any contention on Defendants' part that these chemicals are not relevant to the dispute defies logic, as in many cases they are part of the ROD COCs' "life cycles."

To not allow discovery of chemicals that are precursors and degradation products of ROD COCs would offer an unfair escape route through which Defendants could unilaterally determine a key fact question that is, in many cases, in dispute: whether ROD COCs were present or formed on a Defendant's site or in their operations. OxyChem is in the process of identifying Defendants that have simply omitted from discovery entire operations because the Defendant judged the merits on its own to determine a precursor or degradation chemical did not result in release of a ROD COC into the Passaic River. And, to be clear, in many cases the self-omitted operation indisputably *did* involve a CERCLA hazardous substance. Accordingly, OxyChem requests an order that information regarding any ROD COC, *as well as any precursor and degradation*

---

[14] *See also* Ex. 11, Polyhalogenated Dibenzo-p-Dioxins/Dibenzofurans, 52 Fed. Reg. 108, 21415 (June 5, 1987); Ex. 12, M.P. Esposito, T.O. Tiernan, & Forrest E. Dryden, Dioxins, U.S. Environmental Protection Agency, EPA-600 /2-80-197 (Nov. 1980), at pp. 38, 55.

*chemicals*, is relevant.

### B. Certain Response Costs Are Directly Associated with Non-ROD COCs.

Defendants' limiting discovery only to the ROD COCs ignores that non-ROD COC hazardous substances nonetheless can act as "cost drivers" for the OU2 remediation. *See Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 358 (3d Cir. 2018) (noting that where an environmental cleanup "involves many impact areas and remediation activities with varying costs," an approach that "fails to account for cost differences will very likely lead to an allocation that is inequitable"). In EPA's Response to Comments as part of its cash-out settlement approach (August 7, 2018), EPA unequivocally stated that even parties who are not associated with ROD COCs are "exposed to liability for OU2 of the Site *due to the release of non-[ROD] COC hazardous substances*." *See* Ex. 13 at 13 (emphasis added). In other words, to settle the very liability at issue in this case, parties have had to pay EPA money to compensate for their release of non-ROD COC chemicals into the Passaic River and the resulting harm.

The fact that these parties were not responsible for ROD COCs was not a bar to liability; on the contrary, EPA's "substantive fairness" analysis concluded that "the[se] parties should pay an amount equal to the harm [they have] caused." *See id.* at 10. While the parties' contribution was "minimal" (around $280,600 each), the fact that it was based entirely on non-ROD COC-driven liability refutes any argument that only ROD COCs are relevant to a determination of each Defendant's liability.

There are other examples of specific response costs that are driven by non-ROD COC hazardous substances. For instance, one component of EPA's remedy for OU2 will involve "dewatering" dredged river sediments at an on-shore processing facility. *See* Ex. 1, 2016 Statement of Work, at ¶ 1.3(d). The water removed from those sediments will need to be monitored and treated to comply with NJDEP effluent discharge limits for certain non-ROD COC chemicals.

11

*See* Ex. 14, Effluent Limitations and Monitoring Requirements for the Lower Passaic River, at 6. OxyChem has incurred and continued to incur costs designing this component of EPA's remedy. A list of certain non-ROD COC chemicals subject to this requirement is included as Category 3 of Exhibit 9. These chemicals—that Defendants put into the river—are directly associated with specific costs in the remediation process, even if those costs are not the principal "drivers" of the remediation, and notwithstanding that they are not ROD COCs.

Similarly, in the Pre-Design Investigation component of the 2016 ASAOC, EPA determined the list of chemicals for which the river samples had to be analyzed—thus resulting in the incurrence of response costs associated with each of those chemicals (Category 4). OxyChem is entitled to discovery into these chemicals in order to understand Defendants' involvement with the chemicals and the allocation of liability for their release.

### C. Non-ROD COC Chemicals Can Prove a Defendant's Nexus to the Passaic River.

Non-ROD COC chemicals are relevant to determining if a defendant in fact has a "nexus" to the Passaic River such that on-site chemical discharges have made their way into the river, either through runoff, sewer outfall, or other discharge point. Numerous defendants have contended as part of their defenses that they do not have a nexus to the Passaic River. Showing that non-ROD COC chemicals have made their way into the Passaic River from a Defendant site where ROD COCs are found logically supports OxyChem's contention that those ROD COCs *also* found their way into the river.

A good example is the site in Kearny where Monsanto Company (now known as defendant Pharmacia LLC) operated a chemical manufacturing plant. The Monsanto site is situated on the eastern bank of the Passaic River at River Mile 2.5:



OxyChem alleges that PCBs (a ROD COC) and other hazardous substances were discharged into the river from the Monsanto site, and has evidence of extremely elevated concentrations of PCBs found in the site soil and groundwater. In response, Pharmacia argues that PCBs from the site did not reach the Passaic River.

Available information to support OxyChem's claim includes not only evidence of ROD COCs at the site (high concentrations of PCBs were detected in site soil and groundwater) but also includes evidence of *non*-ROD COCs: elevated levels of chlorobenzene were detected both on the Monsanto site and in Passaic River sediments *immediately adjacent to* the Monsanto site. *See* Ex. 15, 1991 Preliminary Remedial Investigation Report for Monsanto Kearny Plant. Those detections of chlorobenzene can serve as a marker linking PCB contamination from the Monsanto site to PCB contamination in nearby river sediments. That is, where high levels of chlorobenzene are found near the Monsanto site, one would also expect to find elevated levels of PCBs—and this hypothesis is borne out in the sampling data, where PCB hotspots are correlated to the chlorobenzene hotspot at the Monsanto site's discharge point:





Thus, even though it is not a ROD COC, chlorobenzene data provides a line of evidence linking upland site operations to pollution in the Passaic River sediment. Limiting discovery to the 8 ROD COCs only would inhibit this analysis.[15] Each of the chemicals for which EPA required analysis in OU2 and OU4 sediment samples stands to serve in this or a similar capacity. Accordingly, OxyChem requests an order that information regarding any chemical that EPA required to be analyzed for in river samples from OU2 and OU4 is relevant in discovery.

---

[15] OxyChem notes that Pharmacia is among the few Defendants that have *not* insisted on a scope of discovery limited to only the ROD COCs. The Monsanto site is included here not to show any deficiency in Pharmacia's discovery responses, but as an example of one way that information about non-ROD COCs can be relevant to OxyChem's claims against each Defendant.

14

### D. Defendants' Counterclaims Are Also at Issue and Not Limited to Any Subset of Hazardous Substances.

Defendants' insistence on limiting discovery to the eight ROD COCs ignores that the claims at issue in this dispute extend to Defendants' *counterclaims* against OxyChem, which brought the entire 17-mile Lower Passaic River Study Area into this case. The scope of the dispute therefore stretches beyond the eight ROD COCs for OU2, the first 8.3 miles of the Passaic River; indeed, the "COCs" for the upper 9 miles of the river have not yet been identified. Nor have Defendants even hinted at their allocation theory[ies] for their counterclaims on OU4. OxyChem's chemical list accordingly includes the hazardous substances or chemicals that EPA has called for to be analyzed in the river samples taken from OU4.

OxyChem must be able to discover Defendants' releases of these hazardous substances into OU4 in order to defend against Defendants' counterclaims. The chemicals that EPA has determined are relevant for sampling in the river have countless potential for relevance in OxyChem's defense: to prove a Defendant's nexus to the river; as a cost driver of the future OU4 remedy depending on the future OU4 ROD and the various aspects of the selected remedy; the harm of the hazardous substances themselves; insight into a Defendant's operational history, etc. The court should not prematurely restrict discovery. Defendants must produce information about their operations, releases, remediation and investigation efforts, and sampling that involves any chemical that EPA required to be sampled for in OU4.

## V. CONCLUSION

Like the defendants in *NCR Corp.*, for more than a year the Defendants here have proposed one restriction after another on the scope of their discovery obligations. While Defendants may believe such restrictions will benefit them in the short term by continuing to deprive OxyChem of the information needed to present its case, *everyone* loses if the Defendants prevent the Court from

gaining the information necessary to render an equitable allocation.  Defendants have not shown themselves to be fair stewards of the information that they alone control with respect to non-ROD COC chemicals that are nonetheless relevant and discoverable in this dispute.  Defendants will only produce what is expressly ordered.

For the foregoing reasons, OxyChem respectfully requests an Order requiring Defendants to produce responsive documents that involve or relate to the following discoverable chemicals (see Exhibit 9):

- Category 1: the 8 ROD COCs (*i.e.*, copper, Dieldrin, dioxins/furans, DDT, lead, mercury, PAH, and PCB), including congeners and related chemicals/analytes.

- Category 2: precursor chemicals or degradation products of the 8 ROD COCs (*i.e.*, chemicals that can form ROD COCs, or can be formed from the breakdown of ROD COCs).

- Category 3: chemicals that may require treatment of waste water to comply with NJDEP effluent limits during the upland sediment dewatering/cleanup component of EPA's selected remedy.

- Category 4: chemicals EPA required to be sampled for in Lower Passaic River sediments.

Dated:  February 21, 2020

Respectfully submitted,

  /s/ *John J. McDermott*
John J. McDermott, Esq.
(jmcdermott@archerlaw.com)
Charles J. Dennen, Esq.
Lauren E. Krohn, Esq.
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel. (856) 795-2121

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel. (713) 650-8805
By:    Kathy D. Patrick, Esq.
         (kpatrick@gibbsbruns.com)

        Anthony N. Kaim, Esq.
        Katherine H. Kunz, Esq.
        Jorge M. Gutierrez, Esq.
        Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER & HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel. (215) 732-3255
By:    Larry D. Silver, Esq.
        (lsilver@lssh-law.com)
        David E. Romine, Esq.

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067
Tel. (310) 553-3610
By:    Peter A. Nyquist, Esq.
        (pnyquist@ggfirm.com)
        Noah Perch-Ahern, Esq.
        Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 21, 2020, a copy of Plaintiff Occidental Chemical Corporation's Motion to Clarify the Scope of Discovery was served on counsel via CM/ECF.

Dated:  February 21, 2020                           By:    /s/ *John J. McDermott*
                                                                                                            John M. McDermott, Esq.