**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| OCCIDENTAL CHEMICAL CORPORATION, | ) | Hon. Madeline Cox Arleo |
| | ) | Hon. Magistrate Joseph A. Dickson |
| | ) | |
| | ) | Civil Action No. 2:18-CV-11273 |
| Plaintiff, | ) | (MCA-JAD) |
| | ) | |
| | ) | **RESPONSE IN OPPOSITION TO** |
| v. | ) | **PLAINTIFF'S MOTION TO** |
| | ) | **CLARIFY THE SCOPE OF** |
| | ) | **DISCOVERY** |
| 21ST CENTURY FOX AMERICA, INC., | ) | |
| *et al.*, | ) | |
| | ) | Oral Argument Requested |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

15272698.5

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ..................................................................................................1

BACKGROUND ....................................................................................................2

LEGAL STANDARD..............................................................................................5

ARGUMENT .......................................................................................................7

A.      OxyChem Has Failed To Do As Directed
        And Instead Provides Only Theoretical And
        Vague Rationales To Support Its Untimely Effort
        To Broaden Discovery To Chemicals Not Included In Its Complaint................7

        1.      OxyChem's Motion Does Not Comply With The Special Master's Order ............7

        2.      OxyChem's Complaint Relates Only To The Eight ROD COCs ...........................8

        3.      OxyChem Raised This List Of Chemicals For
                The First Time In the Context Of ESI Discovery And
                After The Parties Have Largely Completed Paper Discovery ...............................11

B.      OxyChem Has Not Met Its Burden To
        Demonstrate Relevance And Proportionality ...................................................11

        1.      OxyChem Has Not Identified Specific Congeners And
                Related Chemicals (Category 1) Or Established Their Relevancy ......................11

        2.      OxyChem Has Not Shown That All Precursor
                Chemicals And Degradation Products (Category 2) Are
                Relevant And That Discovery Of Them Would Be Proportional.........................13

        3.      OxyChem Has Not Shown That Non-ROD COC
                Chemicals Associated With Dewatering (Category 3) Are Relevant ...................15

        4.      OxyChem Has Not Shown That All Chemicals
                EPA Required To Be Sampled For (Category 4) Are
                Relevant And That Discovery Of Them Would Be Proportional.........................15

CONCLUSION....................................................................................................19

i

# TABLE OF AUTHORITIES

CASES

*ADA-ES, Inc. v. Big Rivers Elec. Corp.*, Civil Action No. 4:18-CV-00047-HBB, 2019 WL 1988661 (W.D. Ky. May 6, 2019)..................................................................... 6

*Claude B. Bamberger Int'l, Inc. v. Rohm and Haas Co.*, Civil Action No. 96–1041 (WGB), 1998 WL 684263 (D.N.J. Apr. 1, 1998) ................................................... 18

*Dix v. Total Petrochemicals USA, Inc.*, No. CIV. 10-3196 JBS/JS, 2011 WL 5513185 (D.N.J. Nov. 10, 2011)......................................................................................... 6, 8

*Emp'rs Ins. Co. of Wausau v. Daybreak Express, Inc.*, Civil Action No. 2:16-CV-4269-JLL-SCM, 2017 WL 2443064 (D.N.J. June 5, 2017)........................................... 6, 7

*NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014) ............................ 6, 7

*New Castle Cty. v. Halliburton NUS Corp.*, 111 F.3d 1116 (3d Cir. 1997) ............................... 17

*Tuno v. NWC Warranty Corp.*, 552 F. App'x 140 (3d Cir. 2014) ................................................. 6

RULES

Fed. R. Civ. P. 26................................................................................................................. 5, 14

15272698.5

## INTRODUCTION

Occidental Chemical Corporation's ("OxyChem") Motion to Clarify the Scope of Discovery (ECF No. 937-1) ("Mot.") seeks to significantly broaden the scope of discovery now—after paper discovery is mostly complete—to include a list of hundreds (or more) of additional chemicals, which is divorced from its Complaint (ECF No. 1), different than any prior lists shared with Defendants, and comprised of categories that leave ambiguity as to which chemicals are meant to be included.

This case is primarily about one company—OxyChem—and its substantial and intentional discharges of one of the most toxic chemicals ever created, 2,3,7,8-TCDD ("TCDD"), and other contaminants of concern ("COCs") directly to the Lower Passaic River (the "River") for over twenty years. OxyChem's Motion is the latest example of its ongoing efforts to try to shift the blame for the contamination of the River away from TCDD and itself and onto other chemicals and companies.

OxyChem's Motion seeks a one-size-fits-all approach to ESI that shifts OxyChem's discovery obligations onto the Defendants. OxyChem chose to sue 114 parties. Rather than tailor its requests to individual Defendants or subsets of Defendants, OxyChem seeks to obtain from *all* Defendants that discovery which might be relevant to *any* Defendant. In the process, OxyChem disregards whether the discovery will actually be important in resolving the issues in the case and the burden it places on the Defendants.

The Special Master should reject OxyChem's Motion for the following reasons: (1) OxyChem does not provide clear concrete reasons to support broadening discovery now, after paper discovery is mostly complete, to a list of hundreds (or more) of chemicals not mentioned in its Complaint; and (2) OxyChem has failed to meet its burden to show that the chemicals on its list

1

are all relevant for all Defendants and that the burden of having all parties review documents for these chemicals is proportional to the needs of the case.

Parties should commence ESI discovery and if OxyChem objects to a particular Defendant's ESI search and related production, it should raise those objections with a proffer that includes the requisite level of specific chemical and facility information to allow an evaluation of relevance and proportionality that is not currently before the Court.

## BACKGROUND

On January 23, 2019, OxyChem served requests for the production of documents individually on all Defendants.   Defendants objected to the scope of the requests, which sought, among other things, documents related to all CERCLA-defined "hazardous substances."  Although OxyChem argued information relating to all CERCLA-defined "hazardous substances" could lead to the discovery of admissible evidence, after Defendants maintained their objection, OxyChem did not pursue its position.[1]  Instead, the parties commenced paper discovery.  OxyChem did not serve any deficiency letters based on its position that discovery should be broader than the eight ROD COCs,[2] nor did it request a meet and confer with any Defendant on that basis.  Now, with paper discovery nearly complete, OxyChem is asking the Special Master to broaden the scope of discovery in this case.

---

[1] See Ex. A, Defendants' Omnibus Preliminary Objections to Plaintiff's First Request for Production of Documents ¶ 9 (Feb. 15, 2019) (objecting to OxyChem's proposed definition of "hazardous substances" as overbroad and inconsistent with the ROD and the Joint Sampling Protocol); Ex. B, Letter from OxyChem to SPG re Defendants' Omnibus Preliminary Objections to OxyChem's First Request for Production of Documents (Feb. 27, 2019) (arguing that discovery on all CERCLA-defined "hazardous substances" could lead to the discovery of admissible evidence related to the eight ROD COCs [as that term is defined in footnote 2], such as information that could be used to support a co-location theory); Ex. C, Letter from SPG to OxyChem re Preliminary Objections to OxyChem's First Requests for Production of Documents (Mar. 8, 2019) (summarizing February 28, 2019 meet and confer discussions and raising similar objections to those raised in Defendants' Omnibus Preliminary Objections).  Individual Defendants incorporated these omnibus objections in their individual responses and many separately raised such objections as well.
[2] This brief uses "ROD COCs" as that term is defined at page two of OxyChem's Motion (i.e., the eight chemicals identified by EPA as driving the OU2 remedy).

15272698.5

For months, Defendants have tried to negotiate with OxyChem to establish reasonable limits on the scope of ESI discovery to focus on issues actually in dispute and reduce the burden of collecting, reviewing, and producing irrelevant materials.  OxyChem has rejected Defendants' efforts and failed to offer any reasonable and workable compromise.  In December 2019, the Small Parties Group ("SPG") sent OxyChem a letter with a proposed ESI methodology and search terms as a starting point for individual Defendants' ESI.  Among other things, this letter proposed that ESI discovery be limited to information relevant to the eight ROD COCs—as had been done with paper discovery—and explained why a one-size-fits-all approach to ESI discovery is inappropriate in light of the unique circumstances of each facility and company.[3]

During a meet and confer on December 20, OxyChem acknowledged that extending ESI searches to all CERCLA-defined "hazardous substances" would be overly broad and could yield numerous irrelevant documents.  OxyChem therefore agreed to propose, and Defendants agreed in good faith to consider, an alternative list of chemicals broader than the eight ROD COCs but narrower than all CERCLA-defined "hazardous substances."  OxyChem, however, never provided Defendants with the promised alternative list of chemicals.

Instead, OxyChem broke off efforts to compromise.  On January 9, OxyChem sent Defendants a letter rejecting out of hand the SPG's proposal to limit ESI discovery to information relevant to the eight ROD COCs and offering no alternative list of chemicals for consideration.[4] At the January 15 status conference the following week, Defendants noted that they were expecting OxyChem to respond with a proposed "middle ground" and that without further explanation from OxyChem regarding the chemicals it considers relevant, "it's not clear what the bounds [of

---

[3] *See* Ex. D, Letter from SPG to OxyChem re ESI (Dec. 19, 2019).
[4] *See* Ex. E, Letter from OxyChem to SPG re ESI (Jan. 9, 2020).

discovery] . . . would be."[5]   The Special Master accordingly directed OxyChem to provide Defendants within ten days with an alternative list of chemicals beyond the eight ROD COCs for Defendants' consideration.[6]

The ten-day deadline came and went without any word from OxyChem.[7]   On February 5, nine days after the deadline set by the Special Master, OxyChem sent Defendants a list that included 1,214 chemicals (the "First Chemical List").[8]   At the February 12 status conference, Defendants pointed out the extreme overbreadth of the First Chemical List and the lack of explanation from OxyChem about why it considered all the chemicals on the list to be relevant.[9] SPG's counsel proposed that the parties meet and confer to discuss OxyChem's list in an effort to "better understand the list and whittle down" those chemicals actually in dispute.[10]   In response, OxyChem's counsel provided a summary explanation of how OxyChem had *prepared* the First Chemical List but failed to explain why each of the chemicals listed was relevant.[11]   OxyChem's counsel explained that its First Chemical List was not meant to be a proposed supplemental list of ESI search terms but instead a reference for Defendants to use when reviewing documents to determine their relevance.[12]

---

[5] *See* Ex. F, Jan. 15, 2020 Conf. Tr. at 94:15–95:21.
[6] *See id.* at 120:24–121:6 ("A good use of ten days would be to provide a list of the substances, reserving all your rights . . . . So I think that would be a good use of the next ten days.").
[7] *See* Ex. G, Letter from SPG to OxyChem re List of Chemicals Beyond the 8 COCs (Jan. 30, 2020).
[8] *See* Ex. H, Letter from OxyChem to Defendants re ESI (Feb. 5, 2020), with attached First Chemical List.
[9] *See* Ex. I, Feb. 12, 2020 Conf. Tr. at 37:6–13, 49:5–20.
[10] *Id.* at 37:23–38:4; *see also id.* at 39:4–17 (proposing that OxyChem present Defendants with the rationale for why it believes the chemicals are relevant and then Defendants could review and respond).
[11] *Id.* at 52–56.
[12] *Id.* at 42:23–25, 50–51.

4

After hearing from counsel, the Special Master ordered OxyChem to file a motion with a "proffer" as to the chemicals' relevance and OxyChem's "reasoning behind its request that the [D]efendants not disallow from the production of documents hits on those 1200 chemicals."[13]

On February 21, OxyChem filed its Motion, this time attaching a different list of chemicals ("Second Chemical List") that it now contends are relevant.[14]   Although OxyChem's Second Chemical List appears at first blush to contain fewer chemicals than its First Chemical List, it contains vague and open-ended descriptions that leave uncertain the number of chemicals OxyChem contends are relevant.  As a result, not only does OxyChem's Motion fail to adequately explain why these chemicals are relevant and proportional to the claims and defenses in this litigation, it fails to enumerate and specifically define which chemicals OxyChem contends should be subject to ESI discovery.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b) limits the scope of discovery to matter that is both relevant to a claim or defense and proportional to the needs of the case:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).  The rule of proportionality is intended to "discourag[e] discovery overuse" and address "the potential for discovery to be used as an instrument for delay or oppression."  Fed. R. Civ. P. 26(b), Advisory Committee Notes to 2015 Amendment.  The factors

---

[13] *Id.* at 65:7–14; *see also* Order of the Special Master Regarding Electronically Store Information (ECF No. 932) (ordering OxyChem to file a motion "regarding the relevancy of the chemicals listed on the [First] Chemical List").
[14] *See* Ex. 9 to Mot.

to be considered in evaluating whether discovery sought is proportional should be weighed on a "case-by-case basis." *Emp'rs Ins. Co. of Wausau v. Daybreak Express, Inc.*, Civil Action No. 2:16-CV-4269-JLL-SCM, 2017 WL 2443064, at *2 (D.N.J. June 5, 2017). And "[n]o single factor is designed to outweigh the other factors in determining whether the discovery sought is proportional." *Id.* (quotation omitted).

The proponent of discovery bears the burden of justifying the discovery it seeks. *See Tuno v. NWC Warranty Corp.*, 552 F. App'x 140, 148 (3d Cir. 2014) (Plaintiff has the "burden to explain why his request was not 'speculative,' lest he be allowed to engage in a 'fishing expedition' to find some evidence to support his claim"). The inquiry as to what discovery is justified must be grounded in the claims and defenses alleged in the parties' pleadings. *Dix v. Total Petrochemicals USA, Inc.*, No. CIV. 10-3196 JBS/JS, 2011 WL 5513185, at *3 (D.N.J. Nov. 10, 2011) ("Fishing expeditions during which a party searches for evidence to support claims or defenses not yet pleaded are not permitted."); *ADA-ES, Inc. v. Big Rivers Elec. Corp.*, Civil Action No. 4:18-CV-00047-HBB, 2019 WL 1988661, at *4 (W.D. Ky. May 6, 2019) ("The Court determines if discovery is relevant to a party's claim or defense by reference to the complaint or counterclaim and the answer.").

Ignoring these principles, OxyChem's Motion places considerable reliance on *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014), to support OxyChem's position that its facially burdensome list of chemicals is somehow appropriate in the context of this case. (Mot. at 8–9.) *NCR*, however, is inapposite. There, the Seventh Circuit vacated the trial court's judgment based on the trial court's failure to justify its decision to consider only one allocation factor. 768 F.3d at 701–03. The Seventh Circuit did not take issue with the number of chemicals for which discovery was allowed, and it certainly did not suggest that discovery should include

6

every chemical EPA sampled for at that site.  Indeed, the Seventh Circuit acknowledged the prudence of guarding against excessive discovery in CERCLA cases, stating, "[q]uestions of cause and culpability surrounding an environmental cleanup can be tremendously complex, and discovery into every matter that anyone deems relevant—no matter how unlikely it is to sway a court's equitable allocation of costs—could be prohibitively expensive and wasteful of the time of the court and parties alike."  *Id.* at 701.  The Special Master should heed this guidance in considering OxyChem's belated effort to massively expand the scope of discovery in this matter.

## ARGUMENT

**A.     OxyChem Has Failed To Do As Directed
        And Instead Provides Only Theoretical And
        Vague Rationales To Support Its Untimely Effort
        To Broaden Discovery To Chemicals Not Included In Its Complaint**

1.     OxyChem's Motion Does Not Comply With The Special Master's Order

Disregarding the Special Master's instructions, OxyChem's Motion fails to make a proffer justifying discovery on the chemicals in the First Chemical List.  Instead it presents a new list of chemicals that purportedly fit into four broad categories OxyChem contends are relevant.  The categorical descriptions in the Second Chemical List are vague and open-ended, leaving uncertainty as to exactly which chemicals OxyChem asserts are relevant.  *See, e.g.*, Section IV.B.1, *infra*.  Further, OxyChem's Motion states that the list should be used to search for responsive ESI, thus contradicting counsel's statements during the February meeting with the Special Master that OxyChem was proposing use of a list of chemicals for purposes of review and not for conducting ESI searches for responsive documents.[15]

---

[15] *Compare* Proposed Order of the Special Master Granting Plaintiff Occidental Chemical Corporation's Motion to Clarify the Scope of Discovery (ECF No. 937-7) at 1 (ordering Defendants to "produce . . . all responsive, non-privileged documents that involve or relate to the following discoverable chemicals") *with* Ex. I, Feb. 12, 2020 Conf. Tr. 42:23–25, 50–51 (stating First Chemical List was not meant to be a proposed

Despite the obvious need for technical or scientific support to aid the Special Master in assessing the relevance of hundreds (or more) of chemicals to the case, OxyChem has provided none.  For example, OxyChem does not even provide the most rudimentary explanation of what Aroclors, congeners, and homologs are or how they might be relevant.  It does not explain how specific chemicals are likely to serve as precursors or degradation products for the eight ROD COCs under conditions germane to the River or industrial operations on the River.  Instead, its Motion is replete with conclusory and speculative attorney argument that the categories *could* be relevant but largely fails to tie those categories to specific claims or defenses in the case.[16]  The four categories of chemicals in OxyChem's Proposed Order and Second Chemical List have introduced confusion and will delay the completion of document production and fact discovery.

### 2.    OxyChem's Complaint Relates Only To The Eight ROD COCs

The starting point for determining the appropriate scope of discovery is OxyChem's Complaint.  *See* Section III, *supra* (citing *Dix*, 2011 WL 5513185, at *3; *Big Rivers Elec. Corp*., 2019 WL 1988661, at *4).  In its Complaint, OxyChem tied its claims for relief exclusively to the eight ROD COCs.  In 287 paragraphs of allegations, the Complaint makes no mention of "congeners," "related chemicals," "analytes," "precursor chemicals," or "degradation products"; nor does it otherwise suggest that chemicals beyond the eight ROD COCs are at issue in this case. The reliance of OxyChem's claims on the eight ROD COCs is explicitly and repeatedly made clear.  By way of illustration, the Complaint alleges as follows:

- "From the scores of hazardous substances in the Passaic River, EPA identified *eight* chemicals of concern (COCs).  EPA sought a remedy that would achieve its remediation

---

supplemental list of ESI search terms but instead a reference for Defendants to use when reviewing documents to determine their relevance).

[16] OxyChem offers but one example, chlorobenzene, which it contends is a relevant non-ROD COC based upon an unsubstantiated co-location theory.  But as explained below, *see* Section IV.B.4. *infra*, even its discussion of chlorobenzene does not support the appropriateness of ESI discovery on that chemical.

goals for each of these eight COCs.  According to EPA, the eight COCs that drive the requirements for remediation are:

| | |
|---|---|
| • poly-chlorinated biphenyls (PCBs) | • DDT |
| • mercury | • dieldrin |
| • dioxins and furans | • lead |
| • poly-aromatic hydrocarbons (PAHs) | • copper |

(Compl. ¶ 3 (emphasis in original).)

- "EPA found that each of the eight COCs drives the OU2 Remedy." (*Id.* ¶ 6.)  "And just as *each* of the eight COCs drives the OU2 Remedy, *each* PRP liable for any one of them must pay its equitable share to clean up that COC." (*Id.* ¶ 7 (emphasis in original).)

- "Eight contaminants of concern drive EPA's selected remedy at the Site, and every party that released any COC must pay its fair share of response costs." (*Id.* at 21.)

- EPA has identified "eight COCs that pose the greatest potential risk to human health and the environment in OU2: dioxins and furans, PCBs, mercury, DDT, copper, dieldrin, PAHs, and lead.  EPA's Preliminary Remediation Goals (PRGs), which are based on both human-health and ecological effects, required a remedy that addresses all eight COCs." (*Id.* ¶ 37.)

- "EPA ordered the dredge-and-cap remedy because it found that this was the only remedy that would effectively clean up and isolate all *eight* of the key COCs cited in the OU2 ROD. . . . [A] fair allocation would first allocate the OU2 response costs in equal shares to each of the eight COCs, with each COC's share then allocated among the parties responsible for that COC." (*Id.* ¶ 42 (emphasis in original).)

- *See also id.* ¶¶ 174–270 (organizing allegations against individual Defendants by COC).

OxyChem's request for discovery on hundreds (or more) of additional chemicals is not based in its Complaint and OxyChem has not provided any justification for expanding discovery to include those chemicals.[17]  OxyChem's Motion, therefore, looks beyond the pleadings in an effort to justify the discovery it now seeks.

---

[17] OxyChem's reliance on EPA's Response to Comments for the 2018 de minimis settlement, *see* Mot. at 11, is misplaced.  In the Response to Comments (an incomplete copy of which was included as OxyChem's Exhibit 13) EPA stated that "[w]hile all OU2 PRPs received notice letters as PRPs for a release of a hazardous substances [sic] to the Lower Passaic River, *the hazardous substances attributable to the Settling Parties are not the COCs that are driving the remedy nor have they increased the anticipated costs of the OU2 clean-up*." (Ex. 13 to Mot. (emphasis added).)

OxyChem attempts to introduce new theories of liability in its Motion, stating for the first time, for example, that certain response costs are directly associated with non-ROD COC chemicals.  (Mot. at 11.)  But OxyChem merely asserts that such hazardous substances "*can* act as 'cost drivers' for the OU2 remediation."  (*Id.* (emphasis added).)  It does not proffer which hazardous substance would drive which costs under which circumstances.  And this new theory of liability is directly at odds with its Complaint, which specifically states that the eight ROD COCs are driving the OU2 Remedy and specifically requests an allocation of response costs in equal shares to each of the eight ROD COCs.[18]  (Compl. at 21 and ¶¶ 3, 7, 42.)

Another theory of liability OxyChem now presents is that the allocation should involve non-ROD COC chemicals to the extent they might require monitoring and treatment during the dewatering process.  (Mot. at 11–12.)  If OxyChem wants discovery in support of this new argument, it needs to demonstrate some connection between specific chemicals and the monitoring and treatment costs.  In addition to being speculative, this is at odds with the allegations in OxyChem's Complaint that the eight ROD COCs drive the remediation.

OxyChem also claims that non-ROD COC chemicals are relevant because of Defendants' OU4 counterclaims.  (*Id.* at 15.)  But the fact that Defendants were required to bring these compulsory counterclaims (which deal with costs related to settlements and orders involving the same portions of the Lower Passaic River Study Area ("LPRSA") that are the focus of the Complaint—the Lower 8.3 Miles and River Mile 10.9) before the COCs for OU4 have been identified only underscores that OxyChem brought this action prematurely.  Uncertainty as to the COCs for future remedies that may be adopted for OU4 is no reason to commence discovery now on every chemical for which EPA required sampling.

---

[18] The SPG does not take a position in this brief as to which factors or issues should be considered in the allocation.

3.      OxyChem Raised This List Of Chemicals For
The First Time In the Context of ESI Discovery And
<u>After The Parties Have Largely Completed Paper Discovery</u>

OxyChem proposes that the scope of ESI discovery be much broader than the scope of paper discovery.  Discovery of paper documents focused on the ROD COCs put at issue in the Complaint.  It was only when the parties commenced ESI that OxyChem asked the Special Master to adopt a broader view of the contaminants at issue.  The appropriate time for OxyChem to have raised the chemicals for which it now seeks discovery would have been more than a year ago when the parties were commencing paper discovery.  Alternatively, if OxyChem thought the parties' focus on the ROD COCs during paper discovery was too narrow, it could have timely sought assistance from the Court or Special Master.  OxyChem did not do so.  It should not be permitted through its Motion to retroactively broaden the scope of paper discovery, especially given the lack of any compelling explanation as to why discovery is needed on the hundreds of chemicals OxyChem proposes.

**B.     OxyChem Has Not Met Its Burden To**
**<u>Demonstrate Relevance And Proportionality</u>**

OxyChem has created four overlapping categories of an indeterminable number of chemicals that it claims are relevant to this case and should be used when Defendants search and review ESI.  As discussed below, the usefulness of discovery on these chemicals is speculative while the burden is significant.  OxyChem fails to establish that these chemicals should be included in the scope of discovery for each Defendant.

1.      OxyChem Has Not Identified Specific Congeners And
<u>Related Chemicals (Category 1) Or Established Their Relevancy</u>

Category 1 on OxyChem's Second Chemical List includes congeners, homologs, and related chemicals/analytes of the eight ROD COCs.  OxyChem makes no effort to explain which of these chemicals it considers relevant or why.  OxyChem does not even provide a list of Category

15272698.5

1 chemicals, let alone a proffer that would help the Special Master or Defendants understand what chemicals are included in Category 1. Category 1 is vague, overbroad, ambiguous, and fails to show a likely benefit that would justify the extensive burden and expense such discovery would place on Defendants.

OxyChem's descriptions of Category 1 chemicals are open-ended—they include "all available congeners and homologs" of polychlorinated dioxins and furans; PCBs "including all Aroclors, congeners, and/or homologs;" all PAHs "including but not limited to" 16 listed chemicals; and "DDT and degradation products – including" six listed chemicals. OxyChem makes no attempt to define congeners,[19] homologs, or "related chemicals/analytes" for each of the eight ROD COCs. OxyChem only notes that "there are more than 100 different PAHs," that the ROD defines dioxins/furans as a group of 210 congeners, and that the ROD defines PCBs as a group of 209 congeners. (Mot. at 9 n.13.) Notably, this description differs from OxyChem's First Chemical List, which had only 70 entries for PAHs and 48 entries for polychlorinated and polybrominated dioxins/furans, while it had 478 entries for PCBs and congeners.[20] OxyChem asserts that all parties have a common understanding of how to search and review ESI for the eight ROD COCs and their congeners and homologs, but even OxyChem lacks a consistent position on this issue.

Category 1 also includes "related chemicals/analytes" of the eight ROD COCs. OxyChem does not provide any definition or description of what chemicals are "related" or "analytes" of the eight ROD COCs. If the Special Master were to order, as OxyChem has requested, that Defendants

---

[19] The ROD notes that "congeners" simply means "related compounds." Ex. J, U.S. EPA, *Record of Decision Lower 8.3 Miles of the Lower Passaic River* 14 n.7 (2016).
[20] *See* Ex. H, Letter from OxyChem to Defendants re ESI (Feb. 5, 2020), with attached First Chemical List.

15272698.5

produce "all responsive non-privileged documents that involve or relate to" the Category 1 chemicals, it is unclear how Defendants could identify the "related chemicals" and "analytes."

OxyChem has provided no rationale for its significant broadening of Category 1 in the Second Chemical List and has made no proffer on relevance of individual chemicals implicated by its open-ended phrasing of Category 1 terms.  OxyChem's Motion merely asserts that "by agreeing to produce discovery related to the 8 ROD COCs, Defendants have already said they will be—or should be—producing information about the ROD COCs, ***and*** their individual congeners and analytes."  (Mot. at 9–10 (emphasis in original).)  This statement is OxyChem's entire discussion on the relevance of Category 1 chemicals and, as a proffer, it fails to establish the relevance of the entire universe of congeners, homologs, related chemicals, and analytes of the eight ROD COCs.

      2.      OxyChem Has Not Shown That All Precursor
                    Chemicals And Degradation Products (Category 2) Are
                    <u>Relevant And That Discovery Of Them Would Be Proportional</u>

OxyChem argues that because the eight ROD COCs are relevant, 139 chemicals that either "can form" or "can be formed from" one of those COCs (polychlorinated dioxins and furans) are also relevant to claims or defenses in the case.  (Mot. at 10–11.)  Without offering any scientific basis for its position, OxyChem simply asserts that "the existence of precursor chemicals make[s] it more likely that ROD COCs were formed, and the existence of degradation chemicals make[s] it more likely that ROD COCs were present." (*Id.* at 10.)  These statements, divorced as they are from any case-specific context, are unsupported speculation when applied to the chemicals OxyChem has put forth and add nothing to the arguments of OxyChem's counsel at the last status conference.

15272698.5

OxyChem relies on a 1980 EPA publication entitled "Dioxins" to create its list of purported precursor chemicals.[21] (*Id.* at 10 & Exs. 9, 12.)  According to the methodology of this report, however, the precursor chemicals list was created based upon a review of "current theories on mechanisms of the formation of dioxins" and "postulated conditions under which dioxins *might* be formed other than in commercial chemical production."[22]  OxyChem has not demonstrated that these theories or postulated conditions, whatever they may be, are relevant to the River for any of the chemicals in its Category 2 list.  Further, OxyChem has not established—or indeed, even asserted—that any of the listed precursor chemicals have been tested for or found in the River sediments.  Lacking any scientific support or case-specific context, the Special Master is left only with OxyChem's conclusory assertion that the chemicals listed in Category 2 are relevant.  OxyChem fails, therefore, "to explain the ways in which the underlying information bears on the issues" in this case.  Fed. R. Civ. P. 26, Advisory Committee Note to 2015 Amendment.

Even if OxyChem were able to demonstrate something more than a theoretical nexus between any Category 2 chemical and this case, OxyChem has made no showing that such a chemical would be relevant to all 114 Defendants.  Category 2 appears to be related entirely to dioxin-associated compounds.  OxyChem should not be permitted to require a Defendant to search for purported precursors and degradation products of a COC where OxyChem (a) has not alleged that the COC is associated with that Defendant; and (b) has no factual basis for asserting that processes or conditions are present to convert the precursor into the COC or break down the COC

---

[21] OxyChem also cites a 1987 Federal Register notice.  (Mot. at 10 n.14, Ex. 11.)  This document is simply a 1987 notice of promulgation of regulations that created testing and reporting requirements relating to certain dioxins and furans.  OxyChem provides no explanation as to how this document supports its argument that any chemical that "can form" or "can be formed from" polychlorinated dioxins and furans is relevant to this case.

[22] Ex. K, U.S. EPA, *Assessment of Dioxin-Forming Chemical Processes* at 1; EPA-600-2-80-158 (June 1980) (emphasis added).

into a degradation product.  Requiring each Defendant to search for all or even a subset of Category 2 chemicals would impose a burden disproportionate to the needs of the case.

       3.      OxyChem Has Not Shown That Non-ROD COC
              Chemicals Associated With Dewatering (Category 3) Are Relevant

As discussed above, OxyChem's Motion offers a new theory of liability premised on unspecified chemicals that might need to be monitored and treated during the dewatering process. (Mot. at 11–12.)  It is self-evident that OxyChem has not incurred any response costs associated with this theory, as it has only agreed to *design* the OU2 remedy.  Further, OxyChem makes no effort to demonstrate how non-ROD COC chemicals could have any impact on the costs of *designing* the dewatering system, nor has it established that this is a likely source of response costs.

Even if the presence of such chemicals were likely to meaningfully affect the cost, OxyChem takes the position in its Complaint that the eight ROD COCS are driving the remediation and that the response costs should be allocated by each ROD COC.  *See* Section IVA.A.2, *supra*. OxyChem does not explain why such costs should not be borne by the party or parties necessitating the remediation, which the Complaint alleges are the dischargers of ROD COCs.  Furthermore, OxyChem's Complaint does not allege that any Defendants discharged the Category 3 chemicals. Although OxyChem baldly asserts in its Motion that "Defendants put [these] chemicals into the [R]iver" (Mot. at 12), it does not explain which Defendants are allegedly responsible for which chemicals.  Therefore, forcing all Defendants to review their files for information related to these additional chemicals is unsupported and would be overly burdensome.

       4.      OxyChem Has Not Shown That All Chemicals
              EPA Required To Be Sampled For (Category 4) Are
              Relevant And That Discovery Of Them Would Be Proportional

OxyChem asserts that all Defendants should be required to produce documents that involve or relate to all "chemicals EPA required to be sampled for in Lower Passaic River sediments,"

specifically those chemicals EPA required to be analyzed for in River samples as part of the pre-design investigation for OU2 ("OU2 Pre-Design Investigation") and the 2007 remedial investigation and feasibility study ("RI/FS") for the 17-mile LPRSA.   (Mot. at 7, 14, 16.) OxyChem fails to demonstrate that each Category 4 chemical is relevant and that discovery regarding each chemical would be proportional to the needs of this case.

OxyChem conflates the sampling protocols included in EPA's investigations with the discovery necessary to support and defend the CERCLA claims at issue in this case.   In doing so, OxyChem fails to explain how information related to these chemicals is relevant to allocating liability for the costs associated with addressing the contamination in OU2—costs that are being driven by the eight ROD COCs (as alleged in OxyChem's Complaint) and, in particular, TCDD.

The purpose of an RI/FS or a pre-design investigation is broad.   An RI/FS is "the methodology for characterizing the nature and extent of risks posed by uncontrolled hazardous waste sites and for evaluating potential remedial options."[23]   The purpose of the RI/FS process is "to gather information sufficient to support an informed risk management decision regarding which remedy appears to be most appropriate for a given site."[24]   Similarly, the purpose of the OU2 Pre-Design Investigation was to "gather sufficient information to fully develop the Remedial Design [for OU2]."[25]

Accordingly, EPA remedial investigations begin with studies EPA can use to evaluate the total ecosystem surrounding a site and then evaluate the actual contaminant levels in each of these areas.[26]   When determining the nature and extent of contamination, EPA initially casts a wide net

---

[23] Ex. L, U.S. EPA, *Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA*, OSWER Directive 9355.3-01, at 1-3 (Oct. 1988) (hereinafter "Guidance").

[24] *Id.*

[25] Ex. 1 to Mot., U.S. EPA Region 2, *Statement of Work Pre-Remedial Design and Remedial Design Lower 8.3 Miles of Lower Passaic River Part of the Diamond Alkali Superfund Site* ¶ 3.2 (Sept. 26, 2016).

[26] *See* Ex. L, Guidance at 3-6–3-18.

16

and samples for many chemicals in many locations, and then later becomes more specific and targeted.[27]   In the LPRSA, this approach eventually led to the development of the ROD and the conclusion that the eight ROD COCs are the chemicals that should be remediated and removed from the River.

In contrast, to prevail in a private party contribution action, a party must prove that it paid more than its "fair share" of response costs.  *New Castle Cty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1122 (3d Cir. 1997).  Discovery into every chemical that EPA has included in its broad investigations in the River to obtain sufficient information to identify COCs and eventually develop defensible remedies for OU2 and OU4 will not aid the parties or the Court in determining the ultimate issue in this case: whether OxyChem has paid more than its fair share cleaning up the River.

In an attempt to link the chemicals included in these investigations to issues actually in dispute, OxyChem posits its theory that EPA-sampled chemicals could be used as markers providing a nexus between Defendants and the River.  (Mot. at 12–14.)  This theory is not supported by a reliable proffer that these chemicals are relevant and proportional to the needs of the case.  OxyChem asserts that "[s]howing that non-ROD COC chemicals have made their way into the Passaic River from a Defendant site where ROD COCs are found logically supports OxyChem's contention that those ROD COCs *also* found their way into the river."  (*Id.* at 12 (emphasis in original).)  But OxyChem offers no competent support for this highly technical theory.  It offers no literature or expert averments, instead asking the Special Master to take the scientific assertions of counsel at face value.

---

[27] *See id.* at 3-13 (describing a multi-layered sampling process and analysis approach that begins extremely broadly and grows increasingly targeted and rigorous).

While OxyChem's theory should be disregarded on that basis alone, OxyChem goes even further, extrapolating from a single, unsupported example to assert that *every* Defendant should search for and review ESI for *every* chemical for which EPA required sampling in OU2 and OU4 to determine whether such chemicals could serve as a marker linking ROD COCs to the Defendants' sites.  (*Id.* at 14.)  OxyChem offers only the example of chlorobenzene at the Monsanto site, stating in an unsubstantiated and conclusory manner that "detections of chlorobenzene can serve as a marker linking PCB contamination from the Monsanto site to PCB contamination in nearby river sediments."  (*Id.* at 13.)  And with respect to this one example, OxyChem has provided virtually no support for its assertion that "this hypothesis is borne out in the sampling data."  (*Id.*)  Because it relies on unfounded theories and extrapolation, the Special Master should reject OxyChem's invitation to broaden the scope of discovery based on its conjectural "marker" theory.

OxyChem's presentation of just a single example to support its theory further illustrates its attempt to foist the burden of discovery on Defendants by failing to tailor its requests to individual Defendants.  OxyChem does not explain the extent to which chemical markers might be useful— either by identification of particular sites or particular chemicals—or even an approximate number of Defendants who contest having a nexus to the River.  OxyChem's unsupported assertion that a single chemical might imply a single Defendant's nexus to the River does not justify requiring every Defendant to review ESI for every chemical for which EPA required sampling.  The discovery rules are not designed to assist a party "to find out if it has any basis for a claim." *Claude B. Bamberger Int'l, Inc. v. Rohm & Haas Co.*, Civil Action No. 96–1041 (WGB), 1998 WL 684263, at *2 (D.N.J. Apr. 1, 1998) (quotation omitted).

18

15272698.5

OxyChem's effort to expand the scope of discovery is merely an attempt to do what it has attempted to do for decades—obscure its role in the discharge of ROD COCs to the River.

## <u>CONCLUSION</u>

As is clear from OxyChem's Complaint, discovery in this case should focus on the eight COCs—and one in particular, TCDD—that the ROD identifies as driving the risks and the remedy. OxyChem's Motion fails to establish the relevance of the chemicals in its Second Chemical List and does not even attempt to tailor its request to chemicals that may be relevant to individual Defendants and facilities. As such, the discovery OxyChem seeks would distract from the real issues in this case while delaying the proceedings and imposing undue burden and expense on the Defendants. Even if OxyChem could establish some marginal potential relevance of these additional chemicals applicable to all 114 Defendants, the burden and expense of 114 parties conducting ESI discovery on an indeterminate number—though numbering at least 375—of chemicals would be staggering. The likely benefit would be marginal, if not non-existent, because it is the eight ROD COCs that are driving the risk and remedy. If OxyChem believes that certain parties should search for chemicals beyond the eight ROD COCs it should address such a request with specific parties so that the potential relevance can be evaluated and addressed with particularity.

Dated: March 2, 2020                     Respectfully submitted,

                                        */s/ Jeffrey D. Talbert*
                                        **PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
                                        One City Center, PO Box 9546
                                        Portland, ME 04112
                                        Telephone: 207.791.3239
                                        Jeffrey D. Talbert, Esq. (admitted *pro hac vice*)
                                        Benjamin S. Piper, Esq. (admitted *pro hac vice*)

19

**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: 816.474.6550
David R. Erickson, Esq. (admitted *pro hac vice*)
Joseph H. Blum, Esq. (NJ Bar No. 010211984)

*Common Counsel for the Small Parties Group*

20

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph H. Blum, hereby certify that on March 2, 2020 I caused a copy of the foregoing

**Response in Opposition to Plaintiff's Motion to Clarify the Scope of Discovery** to be served

via electronic filing on all counsel of record.


Dated: March 2, 2020                    */s/ Joseph H. Blum*
                                        **SHOOK, HARDY & BACON L.L.P.**
                                        2555 Grand Blvd.
                                        Kansas City, MO 64108
                                        Telephone: 816.474.6550
                                        David R. Erickson, Esq. (admitted *pro hac vice*)
                                        Joseph H. Blum, Esq. (NJ Bar No. 010211984)

15272698.5