# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### NEWARK VICINAGE

| | | |
|---|---|---|
| OCCIDENTAL CHEMICAL CORPORATION | ) | Hon. Madeline Cox Arleo |
| | ) | Hon. Joseph A. Dickson |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:18-cv-11273-MCA-JAD |
| | ) | |
| v. | ) | **OXYCHEM'S RESPONSE TO THE** |
| | ) | **SMALL PARTIES GROUP'S** |
| 21ST CENTURY FOX AMERICA, INC., *et al.* | ) | **MOTION FOR PARTIAL** |
| | ) | **SUMMARY JUDGMENT ON** |
| | ) | **OCCIDENTAL CHEMICAL** |
| Defendants. | ) | **CORPORATION'S SUCCESSOR** |
| | ) | **LIABILITY** |
| | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| | ) | |

ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel.   (856) 795-2121
By:   John J. McDermott, Esq.
          (jmcdermott@archerlaw.com)
       Charles J. Dennen, Esq.
       Lauren E. Krohn, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.   (713) 650-8805
By:   Kathy D. Patrick, Esq.
          (kpatrick@gibbsbruns.com)
       Anthony N. Kaim, Esq.
       Katherine H. Kunz, Esq.
       Jorge M. Gutierrez, Esq.
       Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel.   (215) 732-3255
By:   Larry D. Silver, Esq.
          (lsilver@lssh-law.com)
       David E. Romine, Esq.

GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
Tel.   (310) 553-3610
By:   Peter A. Nyquist, Esq.
          (pnyquist@ggfirm.com)
       Noah Perch-Ahern, Esq.
       Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

LEGAL STANDARD ........................................................................................ 5

ARGUMENT .................................................................................................... 6

    I.   MAXUS IS LIABLE FOR THE ACTIONS OF DSCC BECAUSE IT IS THE
       TRUE SUCCESSOR TO OLD DIAMOND AND EXPRESSLY ASSUMED
       THE LIABILITIES ASSOCIATED WITH THE LISTER PLANT BEFORE
       OXYCHEM'S ACQUISITION OF DSCC ...................................................... 6

       A.  Maxus De Facto Merged with Old Diamond and Expressly Assumed the
           Liabilities of the Ag Chem Business that Owned and Operated the Lister Plant .......... 7

           1.  Through a 1983 Stock Swap Transaction, Maxus Became Old Diamond—
               the Corporation that Owned and Operated the Lister Plant ..................................... 7

           2.  After Old Diamond Transposed Into Maxus, Maxus Completely
               Reorganized DSCC, Severing Any Relationship Between DSCC and the
               Ag Chem Business and Liabilities, and Expressly Assumed Those
               Liabilities Itself ................................................................................................... 7

           3.  Maxus's Representations to OxyChem in the Stock Purchase Agreement
               Confirm Maxus Had Assumed and Was the Successor to Old Diamond ............. 10

           4.  The EPA and Members of the SPG have admitted that Maxus is a liable
               party based on its ownership and operation of the Lister Plant ........................... 11

       B.  Under *General Battery*, Maxus Succeeded Old Diamond Because (1) It De
           Facto Merged with Old Diamond; (2) It Merely Continued Old Diamond; and
           (3) It Expressly Assumed the Lister Plant Liabilities .................................................. 12

           1.  Maxus de facto merged with DSCC. ................................................................... 14

           2.  Maxus is a Mere Continuation of Old Diamond .................................................. 15

           3.  Maxus Succeeded Old Diamond Because It Expressly Assumed the Ag
               Chem Liabilities .................................................................................................. 16

    II.  THIS SECTION 113 CONTRIBUTION ACTION REQUIRES A FACT-
       INTENSIVE EQUITABLE ALLOCATION AMONG LIABLE PARTIES—
       INCLUDING MAXUS .............................................................................................. 17

A. Ignoring Maxus, the SPG's Motion Seeks a Premature Equitable Allocation that OxyChem is "Fully Liable" for All of Old Diamond's Conduct, Acts, and Omissions..........................................................................................................18

1. Section 107(e)(1) Does Not Foreclose the Existence of Multiple Successors or Pretermit an Equitable Allocation....................................................20

2. Maxus's De Facto Merger With Old Diamond Was Not an Indemnification; Successorship Through Merger Benefits All Creditors and Third-Parties.......................................................................................................21

3. The Treatment of Maxus's Orphan Share of the Lister Plant Liability Is Itself an Equitable and Fact Intensive Inquiry.......................................................22

B. Even Without Maxus as a Liable Party, Defendants' Requested Relief Impermissibly Invades the Equitable Allocation..........................................................24

III. ISSUE PRECLUSION DOES NOT APPLY ...............................................................25

A. The Consent Judgments Expressly Prohibit the SPG From Seeking to Apply Issue Preclusion Here........................................................................................................26

B. The July 17, 2011 Legal Successorship Ruling Was Far Narrower Than the Order Now Sought By the SPG........................................................................................29

CONCLUSION............................................................................................................................30

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Adhesives Research Inc. v. Am. Inks & Coatings Corp.*,
    931 F. Supp. 1231 (M.D. Pa. 1996) ........................................................................23

*Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*,
    602 F.3d 204 (3d Cir. 2010) ................................................................................18

*Ali v. Univ. Corr. Health Care*,
    2018 WL 3158811 (D.N.J. 2018) ........................................................................30

*AlliedSignal, Inc. v. Amcast Int'l Corp.*,
    177 F. Supp. 2d 713 (S.D. Ohio 2001) ...............................................................18

*Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*,
    12 F. Supp. 2d 391 (M.D. Pa. 1998) ...................................................................23

*Anspec v. Johnson Controls, Inc.*,
    922 F.2d 1240 (6th Cir. 1991) ............................................................................20

*Arizona v. California*,
    530 U.S. 392 (2000) .............................................................................................26

*ASARCO LLC v. Atl. Richfield Co.*,
    353 F. Supp. 3d 916 (D. Mont. 2018) ...........................................................19, 24

*Ashland, Inc. v. GAR Electroforming*,
    729 F. Supp. 2d 526 (D.R.I. 2010) .....................................................................30

*Beazer E., Inc. v. Mead Corp.*,
    412 F.3d 429 (3d Cir. 2005) ..........................................................3, 6, 18, 24

*Berg Chilling Sys., Inc. v. Hull Corp.*,
    435 F.3d 455 (3d Cir. 2006) ...........................................................................13, 15

*Bobby v. Bies*,
    556 U.S. 825 (2009) .............................................................................................28

*Bowen Eng'g v. Estate of Reeve*,
    799 F. Supp. 467 (D.N.J. 1992), *aff'd*, 19 F.3d 642 (3d Cir. 1994) ..........................5

*Caldwell Trucking PRP v. Rexon Tech. Corp.*,
    421 F.3d 234 (3rd Cir. 2005) ..............................................................................16

*Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*,
   513 F. Supp. 2d 304 (E.D. Pa. 2007) ................................................................5

*Clean Harbors, Inc. v. Arkema, Inc.* (*In re Safety-Kleen Corp.*),
   380 B.R. 716 (Bankr. D. Del. 2008) .............................................................16

*Dici v. Com. of Pa.*,
   91 F.3d 542 (3d Cir. 1996).............................................................................30

*In re Emoral, Inc.*,
   740 F.3d 875 (3d Cir. 2014).............................................................6, 13, 22

*Exxon Mobil Corp. v. United States*,
   335 F. Supp. 3d 889 (S.D. Tex. 2018) .......................................................19, 24

*Farmland Indus., Inc. v. Colorado & E. R. Co.*,
   922 F. Supp. 437 (D. Colo. 1996).............................................................20, 25

*Fiber-Lite Corp. v. Molded Acoustical Prods. of Easton, Inc.*,
   186 B.R. 603 (E.D. Pa. 1994), *aff'd*, 66 F.3d 310 (3d Cir. 1995)..............................5

*Gould, Inc. v. A & M Battery & Tire Service*,
   987 F. Supp. 353 (M.D. Pa. 1997) ................................................................19

*Halliburton Energy Srvs., Inc. v. NL Indus.*,
   648 F. Supp. 2d 840 (S.D. Tex. 2009) .........................................................2, 21

*Harley-Davidson, Inc. v. Minstar, Inc.*,
   41 F.3d 341 (7th Cir. 1994) ........................................................................22

*Hobart Corp. v. Dayton Power & Light Co.*,
   407 F. Supp. 3d 732 (S.D. Ohio 2019) .......................................................21, 22

*Hwang Law Firm v. United States*,
   2008 WL 2704316 (E.D. Pa. July 9, 2008).............................................................5

*Knapp v. N. Am. Rockwell Corp.*,
   506 F.2d 361 (3d Cir. 1974).............................................................................5, 15

*Koch Materials Co. v. Shore Slurry Seal, Inc.*,
   205 F. Supp. 2d 324 (D.N.J. 2002) ........................................................5, 14, 15

*Kremer v. Chemical Constru. Corp.*,
   456 U.S. at 481-82 (1982)................................................................................28

*Lehman Bros. v. Gateway Funding Diversified Mortg. Servs.*,
   989 F. Supp. 2d 411 (E.D. Pa. 2013), *aff'd* 785 F.3d 96 (3d Cir. 2015).............................5, 6

*Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*,
    725 F.3d 369 (3d Cir. 2013) .................................................................................. *passim*

*Main, Inc. v. Blatstein*,
    1999 WL 424296 (E.D. Pa. June 23, 1999) .......................................................... 5, 15

*Marrese v. Am. Academy of Orthopaedic Surgeons*,
    470 U.S. 373 (1985) ................................................................................................... 28

*Marshak v. Treadwell*,
    595 F.3d 478 (3d Cir. 2009) .......................................................................... 5, 6, 13, 16

*New Jersey Tpk. Auth. v. PPG Indus., Inc.*,
    197 F.3d 96 (3d Cir. 1999) ........................................................................................ 21

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979) ................................................................................................... 28

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001) ......................................................................................... 5

*Prospect Funding Holdings, LLC v. Breen*,
    2018 WL 734665 (D.N.J. Feb. 5, 2018) ................................................................... 28

*Responsible Envtl. Sols. v. Waste Mgmt., Inc.*,
    2011 WL 382617 (S.D. Ohio 2011) ......................................................................... 19

*Rhodia Inc. v. Bayer Cropscience Inc.*,
    No. CIV.04-6424 GEB MF, 2007 WL 3349453 (D.N.J. Nov. 7, 2007) .................... 16

*Seneca Meadows, Inc. v. ECI Liquidating, Inc.*,
    121 F. Supp. 2d 248 (W.D.N.Y. 2000) .................................................................... 19

*Smith Land & Improvement Corp. v. Celotex Corp.*,
    851 F.2d 86 (3d Cir. 1988) ................................................................................. 13, 21

*Syenergy Methods, Inc. v. Kelly Energy Sys., Inc.*,
    695 F. Supp. 1362 (D.R.I. 1988) .............................................................................. 15

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
    903 F.3d 333 (3d Cir. 2019) ...................................................................................... 23

*United States v. Consolidation Coal Co.*,
    184 F. Supp. 2d 723 (S.D. Ohio 2002) .................................................................... 19

*United States v. Chrysler Corp.*,
    No. 88-341, 1990 WL 127160 (D. Del. Aug. 28, 1990) ........................................... 17

*United States v. Gen. Battery Corp.*,
    423 F.3d 294 (3d Cir. 2005)...................................................................... *passim*

*United States v. Monsanto Co.*,
    858 F.2d 160 (4th Cir. 1988) ................................................................................18

*United States v. R.W. Meyer, Inc.*,
    932 F.2d 568 (6th Cir. 1991) ...........................................................................6, 18

**State Cases**

*Matter of Estate of Dawson*,
    641 A.2d 1026 (N.J. 1994)....................................................................................30

*First Union Nat'l Bank v. Penn Salem Marina, Inc.*,
    190 N.J. 342 (2007) .............................................................................................28

**Federal Statutes**

42 U.S.C. § 9613(f)(1) ...................................................................................................6

CERCLA § 107.................................................................................11, 12, 20, 21, 31

CERCLA § 107(a) .......................................................................................................12

CERCLA § 107(e)(1)..............................................................................................20, 21

CERCLA § 113.................................................................................12, 18, 30, 31

CERCLA § 113(f)(1) ...................................................................................................12

CERCLA § 113(f)(3)(B)...............................................................................................12

**State Statutes**

N.J.S.A. 58:10-23.11f(a)(2)(a).....................................................................................29

N.J.S.A. 58:10-23.11g(c)(1) .........................................................................................29

New Jersey Spill Act........................................................................................ *passim*

Spill Act § 7 .................................................................................................................29

Spill Act § 8 .................................................................................................................30

**Rules**

Fed. R. Civ. P. 56(c) .....................................................................................................5

**Other Authorities**

Restatement (Second) of Judgments § 27 cmt. .................................................................28

## INTRODUCTION AND SUMMARY OF ARGUMENT

Nine years ago, based on a shared certificate of incorporation, a New Jersey court ruled OxyChem was strictly liable to the State as a bare legal successor to Diamond Shamrock Chemical Company ("DSCC"). OxyChem does not contest this. Where OxyChem concedes an inch, however, the Small Parties Group ("SPG") attempts to take a mile. The SPG's motion for summary judgment asks the Court to stretch that narrow finding on *liability* into an *equitable allocation of responsibility* in which OxyChem is held "***fully liable***"[1] and "***equitably responsible*** for *all* of the acts and omissions of the owners and operators of the Lister Plant from the mid-1940s through 1971."[2] As a matter of law and because there are genuine issues of material fact, the SPG's motion must be denied. OxyChem's liability as bare legal successor is not dispositive of the equitable allocation of responsibility between itself and Maxus Energy Corporation ("Maxus"), the true and substantive successor to the plant's owner and operator.

The SPG's motion rests on several legal errors. First, it urges the Court preemptively, and regardless of disputed issues of fact, to determine the *equitable allocation* of responsibility between OxyChem, a mere technical successor to DSCC, and Maxus, the true substantive successor to Old Diamond and the Lister Plant liabilities. OxyChem cannot be "fully liable" for the Lister Plant liabilities because the evidence raises genuine issues of material fact that Maxus (1) succeeded to this liability when it absorbed Old Diamond, (2) expressly assumed the liability in its reorganization of DSCC, and (3) *retained* the liability when, years later, OxyChem purchased the stock of DSCC.

The SPG's motion also misreads both CERCLA and the New Jersey ruling. The SPG conflates CERCLA's (and the Spill Act's) distinct phases for (1) liability and (2) equitable

---

[1]  SPG Proposed Order ⸿ 3.
[2]  SPG Brief at 24; *see also* SPG Proposed Order ⸿ 2.

1

allocation, arguing that once liability is established, equitable allocation is established *ipso facto* and without further proof. CERCLA, however, requires a plaintiff in a contribution action to first "prove that a defendant is liable under CERCLA"; only then is a "defendant's share of liability" equitably allocated.  **"[A] *determination of liability under CERCLA does not resolve equitable allocation.*"**[3]

The SPG again errs when it argues that the New Jersey court's judgments have preclusive effect on this Court's equitable allocation. None of the successorship orders from the New Jersey Spill Act litigation can carry preclusive effect because none were final judgments on the merits. Many of the SPG's members recognized and expressly agreed in Consent Judgments in that case that issue preclusion would not apply, so they are estopped now from claiming these interlocutory determinations are preclusive here.

To defeat the SPG's motion, OxyChem need only raise a fact issue that Maxus is *a* successor to the Lister liabilities—showing that OxyChem is not the *only* successor and thus not *100% "fully liable*" for the Lister operations. OxyChem easily surpasses this low bar. Three years *before* OxyChem acquired DSCC in 1986, Maxus succeeded Old Diamond and severed every connection between DSCC and the Lister liabilities. The SPG's brief and statement of material facts fast-forwards over 1983-1986, the years in which Maxus succeeded Old Diamond and its Lister liabilities, but this evidence raises a genuine issue of fact that Maxus is not only *a* liable party, it is the true, substantive successor to Old Diamond. First, in 1983, Maxus absorbed Old Diamond's businesses, assets, and liabilities—a de facto merger with, and mere continuation of, Old Diamond. Next, Maxus reconstituted the DSCC shell as a much smaller entity with no connection to the Lister Plant and expressly assumed the Old Diamond Ag Chem business and

---

[3]  *Halliburton Energy Srvs., Inc. v. NL Indus.*, 648 F. Supp. 2d 840, 861 n.14 (S.D. Tex. 2009).

2

liabilities of the entities that had owned and operated the Lister Plant. Three years after these transactions, in 1986, OxyChem acquired the active Chemicals Businesses owned by DSCC buying only active businesses from a DSCC entity that by then had no connection to the Lister Plant operations. This is confirmed by the Stock Purchase Agreement which, in itself, raises genuine issues about Maxus's successorship to and assumption of DSCC's liabilities. All of this precludes entry of any summary judgment that OxyChem alone is the *only* party responsible for DSCC's liabilities.

These facts are important because successorship is not the bright-line, hard-and-fast rule that the SPG asserts. Successorship is an equitable doctrine looking to substance over form: it recognizes there can be *multiple* successors to the same underlying liability—a substantive successor (Maxus), and a bare technical successor (OxyChem). Nor are equitable successorship questions relevant only to disputes between OxyChem and Maxus, as the SPG suggests. Equitable successorship doctrines benefit and protect all parties and creditors. Tellingly, EPA and the Cooperating Parties Group (which substantially overlaps with the SPG) filed proofs of claim in Maxus's bankruptcy, asserting under oath that Maxus was liable as an owner and operator under CERCLA. These facts, too, preclude entry of any summary judgment that OxyChem is fully liable for actions of Old Diamond and DSCC.

Finally, the SPG is not entitled to summary judgment of a 100% *allocation* of Old Diamond's and DSCC's share to OxyChem because *equitable allocation* is an inherently fact-bound determination. A CERCLA contribution action requires the Court to equitably allocate response costs amongst liable parties, including Maxus. This fact-intensive inquiry will "requir[e] the decisionmaker to resolve *factual disputes* going to the ultimate issues in the case."[4] Here, the

---

[4] *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 439-40 (3d Cir. 2005).

facts at trial will show it is Maxus—not OxyChem—that should bear the lion's share of equitable responsibility for Old Diamond's acts and omissions. Maxus, as Old Diamond, *was* the owner and operator of the plant; it *expressly assumed* the Agricultural Chemicals business that operated the Lister Plant; and it *agreed* it would bear the full responsibility for those actions by virtue of an absolute agreement to hold OxyChem harmless from them. Any fair reading of these disputed facts confirms summary judgment *cannot* be granted because OxyChem is neither the *only* successor to DSCC, nor the only party that should be "fully liable" for the Lister Plant operations. As a matter of equity and law, that party is who it has always been: Maxus.

In raising factual issues that controvert the SPG's overreaching request for a summary judgment that OxyChem is the *only* party liable for DSCC's actions, OxyChem is not attempting to "evade responsibility." SPG Brief at 1. OxyChem is the plaintiff here for a reason: as a technical successor to DSCC, OxyChem has done the *right* thing by stepping up to cooperate with EPA and design the remedy for the Lower 8.3 miles of the Passaic River. OxyChem is the only party to have done so, even though it never itself polluted the Passaic River. CERCLA permits OxyChem to recoup in contribution every dollar it has paid *over* its own fair share. OxyChem's fair share does not include Maxus's responsibility, which is independent, pre-existing, and remained with Maxus after OxyChem's acquisition of a completely reconstituted DSCC.

The SPG's summary judgment motion that OxyChem is "fully liable" for "conducts, acts, and omissions" that it did not commit and that relate to a business it never acquired must be denied. It is legally wrong, premature, and there are genuine issues of material fact showing:

(1) Maxus is the true and substantive successor to Old Diamond and the Lister Plant operations, *see* Part I, below;

(2) The equitable allocation in this contribution case demands a fact-intensive analysis that must consider each liable party's share of responsibility so that

no party is liable beyond its own equitable share, and each party (*including Maxus*) is allocated responsibility for its share, *see* Part II, below; and

(3) The technical finding in the Spill Act litigation that OxyChem is a liable party to the State cannot preclude any aspect of the equitable allocation amongst PRPs in this contribution action, *see* Part III, below.

## LEGAL STANDARD

Summary judgment is proper only if, after adequate time for discovery, there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001); Fed. R. Civ. P. 56(c).

The Third Circuit recognizes four circumstances in which an acquirer should be held responsible for the CERCLA liabilities of a business it acquires: "(1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company." *United States v. Gen. Battery Corp.*, 423 F.3d 294, 305 (3d Cir. 2005).[5] Third Circuit courts routinely enforce both de facto merger[6] and mere continuation[7] theories of successorship to prevent parties from stranding environmental liabilities.

---

[5] "CERCLA successor liability is a matter of uniform federal law, as derived from 'the general doctrine of successor liability in operation in most states. . . . '[G]iven the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs' matters of indirect CERCLA liability." *Id.* at 298.

[6] *See Gen. Battery*, 423 F.3d at 308-09 (acquisition constituted de facto merger); *Knapp v. N. Am. Rockwell Corp.,* 506 F.2d 361, 368–69 (3d Cir. 1974); *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp. 2d 324, 337 (D.N.J. 2002); *Lehman Bros. v. Gateway Funding Diversified Mortg. Servs.*, 989 F. Supp. 2d 411, 436-37 (E.D. Pa. 2013), *aff'd* 785 F.3d 96 (3d Cir. 2015); *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC,* 513 F. Supp. 2d 304, 315 (E.D. Pa. 2007).

[7] *See Marshak v. Treadwell*, 595 F.3d 478, 490-91 (3d Cir. 2009); *Bowen Eng'g v. Estate of Reeve*, 799 F. Supp. 467, 488 (D.N.J. 1992), *aff'd*, 19 F.3d 642 (3d Cir. 1994); *Hwang Law Firm v. United States*, 2008 WL 2704316, at *9 (E.D. Pa. July 9, 2008); *Main, Inc. v. Blatstein*, 1999 WL 424296, at *11 (E.D. Pa. June 23, 1999); *Fiber-Lite Corp. v. Molded Acoustical Prods. of Easton, Inc.*, 186 B.R. 603, 610 (E.D. Pa. 1994), *aff'd*, 66 F.3d 310 (3d Cir. 1995).

Successorship doctrines are equitable and evaluated in light of the entire factual record. The doctrine ensures that, when necessary to promote fairness, liabilities stay with their assets: this "prevent[s] the externalization of the seller's costs of doing business" by a transaction that leaves liabilities with less capitalized entities. *Gen. Battery*, 423 F.3d at 307. "[T]he purpose of successor liability is to promote equity and avoid unfairness." *In re Emoral, Inc.*, 740 F.3d 875, 881 (3d Cir. 2014). Courts properly consider equitable factors in determining successor liability. *See, e.g.*, *Lehman Bros.*, 989 F. Supp. 2d at 436-37. "In determining whether or not successor liability should be imposed, '[i]t is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent.'" *Marshak v. Treadwell*, 595 F.3d 478, 490 (3d Cir. 2009).

Finally, "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."[8] The "equitable allocation proceeding … require[s] the decisionmaker to resolve *factual disputes* going to the ultimate issues in the case."[9] *Each liable party* must be allocated its share because "[n]o tortfeasor can be required to make contribution beyond his own equitable share of the liability."[10]

## ARGUMENT

I.   **MAXUS IS LIABLE FOR THE ACTIONS OF DSCC BECAUSE IT IS THE TRUE SUCCESSOR TO OLD DIAMOND AND EXPRESSLY ASSUMED THE LIABILITIES ASSOCIATED WITH THE LISTER PLANT BEFORE OXYCHEM'S ACQUISITION OF DSCC**

From 1951 to 1969, through various predecessor entities, Old Diamond owned and operated the Lister Plant through its "Ag Chem" business division. Maxus is the substantive, equitable successor to Old Diamond. Maxus is liable for the actions of the former DSCC, because it de facto merged with Old Diamond, was a mere continuation of Old Diamond and, in any event,

---

[8] 42 U.S.C. § 9613(f)(1); *Beazer E.,* 412 F.3d at 438.
[9] *Id.* at 439-40.
[10] *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 577 (6th Cir. 1991).

expressly assumed the business and liabilities of the Ag Chem division that owned and operated the Lister Plant. As a result, the SPG's Motion for summary judgment that OxyChem is the sole successor to and the only party "fully liable" for the actions of Old Diamond must be denied.

A. **Maxus De Facto Merged with Old Diamond and Expressly Assumed the Liabilities of the Ag Chem Business that Owned and Operated the Lister Plant**

The evidence below raises genuine issues of fact that Maxus is also liable for DSCC's liabilities and so precludes any finding by the Court that OxyChem, alone, is either the sole successor to DSCC or is the only party that is "fully liable" for DSCC's actions.

1. **Through a 1983 Stock Swap Transaction, Maxus Became Old Diamond—the Corporation that Owned and Operated the Lister Plant**

In September 1983, Maxus de facto merged with Old Diamond. In a one for one stock swap, Old Diamond's shareholders became Maxus shareholders.[11] Its directors and officers likewise became Maxus directors and officers.[12] Maxus took over the corporate headquarters of Old Diamond[13] and it took the "Diamond Shamrock" name for itself,[14] until years later when it renamed itself Maxus.[15] In this stock swap transaction, there was complete continuity between Old Diamond and Maxus. Maxus moved paper but virtually nothing else—not people, money, office equipment, or headquarters. The de facto merger and mere continuation between Old Diamond and Maxus was complete in 1983, making Maxus Old Diamond's successor. In its 1983 Annual Report, Maxus described the transaction as "***the merger***."[16] This, alone, precludes summary judgment.

---

[11]  *See* OxyChem CSMF ¶5.
[12] *See id.* ¶¶6-7.
[13] *See id.* ¶8.
[14]  *See id.* ¶9.
[15]  *See id.* ¶10.
[16] *See id.* ¶ 5.

> ## 2. After Old Diamond Transposed Into Maxus, Maxus Completely Reorganized DSCC, Severing Any Relationship Between DSCC and the Ag Chem Business and Liabilities, and Expressly Assumed Those Liabilities Itself

After renaming the corporate entity that was Old Diamond as DSCC, Maxus next dismembered DSCC and reconstituted it as an entirely new entity.

First, Maxus created four new subsidiaries, all of which Maxus would ultimately own and control. Maxus assigned to each new subsidiary a former Old Diamond business line:

- **DS E&P**. DSCC transferred to DS E&P its exploration and production business assets and liabilities. Those assets had a net book value of over ***$1 billion***.[17]

- **DS R&M**. DSCC transferred to DS R&M its refining and marketing business assets and liabilities.  Those assets had a net book value of over ***$482 million***.[18]

- **DS Coal**.  DSCC assigned to DS Coal the coal business assets and liabilities.[19]

- **DS Corporate**.  DSCC assigned to DS Corporate all remaining businesses (*except* the active Chemicals Business), but *including* the former Ag Chem business assets and liabilities.[20]

Maxus directed DSCC to enter into an Assignment and Assumption Agreement with each subsidiary, under which DSCC assigned to, and the subsidiary assumed, all assets and liabilities associated with the business transferred.[21]   In all, Maxus would receive approximately ***$1.643 billion*** (1983 net book value) and 70% of DSCC's assets, accounting for ***80% of DSCC's former net income***.[22]   In exchange, Maxus also "assumed liability for substantially all of the [DSCC's] then-outstanding domestic long-term debt."[23]

---

[17] *See id.* ¶ 14-15.
[18] *See id.*
[19] *See id.*
[20] *See id.*
[21] *See id.*
[22] *See id.* ¶ 31.
[23] *See id.* ¶ 29.

DS Corporate received the Ag Chem business, which owned and operated the Lister Plant.[24] DS Corporate played a particularly important role, because it was formed specifically to *ensure* that Maxus was the successor to *all* of Old Diamond, with DSCC retaining *only* the active Chemicals Business. This is demonstrated by, among other things, a January 1984 Assignment and Assumption Agreement, in which DSCC transferred to DS Corporate *all* of its remaining assets and liabilities other than those comprising a single division: DSCC's active "industrial and process chemicals business."[25] The transferred assets included the "former agricultural chemicals [Ag Chem] and animal health businesses" of Old Diamond—the business that had owned and operated the Lister Plant.[26] DS Corporate also expressly assumed "any and all liabilities" related to "any of the assets and businesses so assigned"—including the Lister Plant environmental liabilities.[27]

Maxus then completed its self-described "transaction of *succession*."[28]  In January 1984, Maxus directed DSCC to transfer each of the four new subsidiaries to Maxus itself, so that they became wholly owned subsidiaries of Maxus.[29] As a result, Maxus now owned nearly all of the assets and had assumed nearly all of the liabilities of Old Diamond. To leave no doubt about who was now responsible for Old Diamond's Ag Chem liabilities, which had been expressly assumed

---

[24] *See id.* ¶¶ 2, 20.
[25] *See id.* ¶¶ 16-26.
[26] *See id.* ¶¶ 2, 20.
[27] *See id.* ¶¶ 18, 24, 26 (Assuming "All current liabilities relating to or based upon any of the assets or business activities assigned and transferred"); *see also id.* at MAXUS022695 (Assuming "Any and all liabilities for all claims and causes of action which any third party has asserted or may assert against the Company [DSCC], as well as the liability for such claims and causes of action and judgments' [sic] entered against the Company [DSCC], based upon an obligation or duty that the Company [DSCC] allegedly owed or owes to such third party in the Company's [DSCC's] capacity as the owner of any of the assets and business so assigned and transferred and which would not have arisen but for such ownership.").
[28] *See id.* ¶ 13.
[29] *See id.* ¶ 28.

by DS Corporate, Maxus merged DS Corporate *into itself*, completing the "transaction of succession" and making Maxus the successor by express assumption to the liabilities associated with the Diamond Alkali Superfund Site.[30]

DSCC received no real consideration for its transfer of any of these businesses, including the Ag Chem business, to Maxus.  In exchange for DSCC's assignment of assets to DS Corporate with a net book value of over $108 million, DSCC temporarily received a promissory note from DS Corporate in the principal amount of $81,636,750.[31] But less than a month later, as part of the transfer of the new subsidiaries to Maxus, Maxus directed DSCC to hand over the promissory notes DSCC had received from each of those subsidiaries when it lost its former business lines.[32] Thus, DSCC no longer held any of the assets, profits, benefits, or liabilities of the Old Diamond Ag Chem business: all of them had been fully merged into *and* expressly transferred to Maxus.[33]

After these transactions, the only link between DSCC and Old Diamond was a piece of paper: DSCC's certificate of incorporation. This evidence precludes any summary judgment that OxyChem is the *sole* successor to DSCC and Old Diamond or the only party "fully liable" for their actions.[34]

### 3.    Maxus's Representations to OxyChem in the Stock Purchase Agreement Confirm Maxus Had Assumed and Was the Successor to Old Diamond

The transactions described above predated by years OxyChem's acquisition of the active Chemicals Business. In them, Maxus had: (i) de facto merged with Old Diamond,

---

[30] *See id.* ¶ 17.
[31] *See id.* ¶ 22.
[32] *See id.* ¶ 28-30.
[33] Tellingly, when the Ag Chem business was ultimately sold to a third-party, it was Maxus—not DSCC—that kept the proceeds. *See id.* ¶ 23.
[34] The SPG's Statement of Material Facts skips over the three years between 1983, when Maxus took ownership and control of Old Diamond and completely reconstituted DSCC, and 1986, when OxyChem purchased the stock of DSCC.  *See* Dkt. No. 951 ¶¶ 13-14.

(ii) deconstructed and reconstituted it as DSCC, (iii) transferred the Ag Chem business and the Lister Plant out of DSCC and into DS Corporate and merged it into Maxus, and, (iv) created a new company (using DSCC's certificate of incorporation) that held only the active chemicals business OxyChem eventually purchased. Maxus had therefore succeeded to and fully assumed the Lister Plant assets and liabilities twice—first, by operation of law, through the 1983 de facto merger and, second, by express assumption in the reorganization, which culminated with Maxus merging DS Corporate into itself.

In 1986, years *after* Maxus concluded the de facto merger with Old Diamond and the reorganization, OxyChem purchased the stock of the newly reconstituted DSCC, a company that had no relation, save its certificate of incorporation, to the former Ag Chem business that operated the Lister Plant. The Stock Purchase Agreement recites that OxyChem acquired *only* the active "Chemicals Business," defined as the Chlor-Alkali, Soda Products, Process Chemicals, Chrome, and Cogeneration businesses; OxyChem did not acquire the discontinued Ag Chem business.[35] In addition, should any residual environmental liability remain with DSCC by virtue of its certificate of incorporation or corporate existence, Maxus promised to "defend, indemnify, and hold harmless" OxyChem for all such liabilities.[36]

### 4. The EPA and Members of the SPG have admitted that Maxus is a liable party based on its ownership and operation of the Lister Plant

Both EPA and the Cooperating Parties Group, whose members substantially overlap with the SPG, have sworn under oath in Maxus's bankruptcy that Maxus *is* liable under CERCLA Sections 107 and 113 "as owner and operator" of the Lister Site. EPA's sworn Proof of Claim attests that Maxus was directly liable to the United States under CERCLA "as owner and operator

---

[35] *See* OxyChem CSMF ⁋ 32-33.  (Section 2.02 and Schedule 2.02 and Exhibit 2.02 (listing businesses acquired by Oxy but *excluding* Agricultural Chemicals).
[36] *See id.* ⁋ 34.

of the Lister Plant" under CERCLA Section 107(a)(1) and (2), and asserted a general unsecured claim against the debtors for Operable Unit 2 for $1.38 billion.[37] The CPG likewise asserted sworn, unliquidated claims against Maxus for "cost recovery claims and/or contribution claims pursuant to Sections 107(a), 113(f)(1), and/or 113(f)(3)(B) of CERCLA for any costs related to" the EPA's Record of Decision for the Lower 8.3 Miles of the Lower Passaic River.[38] In return, the CPG received a $14 million Allowed Claim in the bankruptcy.[39] These sworn statements, in themselves, raise genuine issues of fact that Maxus is a successor to DSCC, and so preclude any summary judgment that OxyChem is the "fully liable" as the sole successor to DSCC.

### B. Under *General Battery*, Maxus Succeeded Old Diamond Because (1) It De Facto Merged with Old Diamond; (2) It Merely Continued Old Diamond; and (3) It Expressly Assumed the Lister Plant Liabilities

Under equitable successorship doctrines, Maxus could not take Old Diamond's ownership, management, assets, and cashflow, while leaving Old Diamond's Ag Chem liabilities in a diminished DSCC that was a shadow of Old Diamond. And, in fact, Maxus did *not* do that. It transferred the Ag Chem business to DS Corporate and merged it *into* itself—actions demonstrating that Maxus's own, express intent was to become the successor to those liabilities. It called the transaction a "transaction of succession" for a reason: consistent with successorship doctrines, Maxus recognized its merger with and assumption of Old Diamond's liabilities would make Maxus liable for them.

The Third Circuit recognizes the legal effect of a transfer and merger like this. "CERCLA persuades us that Congress intended to impose successor liability on corporations which either have merged with or have consolidated with a corporation that is a responsible party as defined in

---

[37] *See id.* ⁋ 37.
[38] *See id.* ⁋ 38.
[39] *See id.* ⁋ 39.

the Act." *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 92 (3d Cir. 1988). Maxus intended to be, and it was, the successor to Old Diamond and then to DS Corporate and the Ag Chem business. On these facts, the Court cannot grant a summary judgment that OxyChem is the *sole*, 100% liable successor to DSCC.

"*[D]e facto* merger and mere continuation[] are generally treated identically," requiring the satisfaction of the same factors with similar evidence. *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464-65 (3d Cir. 2006). The mere-continuation doctrine is a better fit for corporate restructurings, the de facto-merger doctrine for asset sales. *Id.* at 465. Courts find a de facto merger where these four elements are satisfied:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.
>
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
>
> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Gen. Battery*, 423 F.3d at 305.

An entity is a "mere continuation," when there is "'continuity in management, shareholders, personnel, physical location, assets and general business operation between selling and purchasing corporations following the asset acquisition.'" *In re Emoral,* 740 F.3d at 880. "[T]he proponent of successor liability need not necessarily establish all of these factors." *Marshak,* 595 F.3d at 490–91.  Here, there are genuine issues of material fact as to both doctrines.

1.      **Maxus de facto merged with DSCC.**

Maxus's 1983 corporate restructuring of Old Diamond Shamrock easily meets the de facto

merger test, and was complete three years before OxyChem's acquisition of DSCC.

Continuity of ownership is the single most important factor in the analysis—and it supports

a finding of de facto merger between Maxus and Old Diamond. *See Gen. Battery*, 423 F.3d at 305.

Maxus and Old Diamond swapped stock, one-for-one. This exceeds the level required to prove

continuity: that the predecessor's shareholders merely "retain[] some ongoing interest in their

assets." *See id.* at 307.

Continuity of management, personnel, location, assets, and operations also raise a genuine

issue of material fact about de facto merger. *See id.* at 305.  Maxus reconstituted Old Diamond's

board with the same directors and reinstated Old Diamond's officers as Maxus's officers.  Maxus

moved into Old Diamond's headquarters and operated under the Diamond Shamrock name.

Maxus's assumption of DSCC's historical obligations supports a de facto merger finding

and raises genuine issues of material fact that require SPG's summary judgment to be denied. *See

id.* at 305. Shortly after the stock swap, Maxus's newly created, wholly-owned subsidiaries

expressly assumed the liabilities of Old Diamond's business lines through assignment and

assumption agreements—a necessary step to continue the over $1.6 billion in former Old Diamond

operations that Maxus now owned and controlled. It also merged those liabilities into itself when

it merged with DS Corporate.

Under Maxus's control and plan, the DSCC entity that survived the transaction was not

the same corporation in any way. Although DSCC did not liquidate, it bore virtually no

resemblance to Old Diamond by the time Maxus had finished dismembering it. Courts in the Third

Circuit take a flexible approach to whether the seller corporation completely liquidates. In *Koch*

*Materials*, this Court ruled a de facto merger can occur even if the seller continues some operations,

reasoning that an acquiror of a business line, like Maxus, could be the successor to a seller that, like DSCC, continued other businesses. *See Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp. 2d 324, 337 (D.N.J. 2002). "The reasonable business expectations of those who relied upon the spun-off division are no less worthy of continued protection, nor is the risk of intentional evasion of pre-existing contractual and tort obligations lower, simply because the original stockholders were wise enough to have diverse interests." *Id.*[40] Other Third Circuit courts have likewise taken a flexible approach.[41] Here, where the purpose of the transaction was to transfer to Maxus all of Old Diamond except for a single business line it is perfectly equitable to find a de facto merger occurred.[42]

### 2.   Maxus is a Mere Continuation of Old Diamond.

The factors supporting that Maxus was the mere continuation of Old Diamond likewise raise genuine issues of material fact that preclude summary judgment that OxyChem is the only successor to DSCC and Old Diamond.  We list them, briefly, below:

- "continuity of ownership": Maxus swapped its stock for Old Diamond's.

- "continuity of management": Maxus adopted Old Diamond's directors as its own.

---

[40] *See also Syenergy Methods, Inc. v. Kelly Energy Sys., Inc.,* 695 F. Supp. 1362, 1365 (D.R.I. 1988) ("The contemporary corporation may have many different divisions, each one participating in a wholly separate and distinct market or industry from all of the others. Accordingly, … the policies and purposes of the de facto merger doctrine require that [it] be applied not only to the sale of assets constituting an entire corporation with its subsequent dissolution, but to the sale of assets constituting a corporate division as well.").

[41] In *Knapp*, the Third Circuit found successor liability although the predecessor continued to exist for 18 months as a shell after the transaction.  *See* 506 F.2d at 368-69; *accord Main, Inc. v. Blatstein*, 1999 WL 424296, at *11 (E.D. Pa. June 23, 1999) (finding mere continuation even though the predecessor entity continued to exist).

[42] To defeat a de facto merger, the undisputed evidence must demonstrate that the predecessor continued a large share of the business. In *Berg Chilling*, the Court denied a finding of de facto merger where the seller had spun off only one division while continuing numerous other operations under other divisions. *See* 435 F.3d at 470. This case is the inverse: Maxus absorbed three out of four of Old Diamond's historical divisions—comprising 80% of its historical revenue—leaving DSCC with only one division.

- "continuity of personnel":  Maxus took Old Diamond's executive officers as its own.

- "continuity of physical location": Maxus took Old Diamond's headquarters.

- "[continuity of] assets":  Maxus put Old Diamond's assets into new wholly-owned subsidiaries of Maxus, or directly acquired them.

- "[continuity of] business operations": Maxus's subsidiaries continued Old Diamond's former operations.

- "cessation of the prior business":  DSCC ceased operating three of four businesses, comprising 80% of its historical revenue.

- "whether 'the purchaser holds itself out to the world as the effective continuation of the seller'": For years, Maxus publicly used the Diamond Shamrock name.

*See Marshak*, 595 F.3d at 490–91.

### 3. Maxus Succeeded Old Diamond Because It Expressly Assumed the Ag Chem Liabilities

A party may also become a liable party under CERCLA by assuming liability. *Gen. Battery*, 423 F.3d at 305.  Courts in the Third Circuit recognize that parties who expressly assume CERCLA liability are directly liable as PRPs and have upheld equitable allocations of fault as to those parties.[43] In *Caldwell Trucking*, for example, the Third Circuit held that a former corporate parent was a PRP by contract, because it had assumed its former subsidiary's liabilities making the parent "directly liable" to the CERCLA plaintiff, not just indirectly liable to the former subsidiary under the agreement. *See Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234 (3rd Cir. 2005).

---

[43] *See Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 389-90 (3d Cir. 2013) (upholding allocation as to acquiror who expressly assumed environmental liability in acquisition); *Rhodia Inc. v. Bayer Cropscience Inc.*, No. CIV.04-6424 GEB MF, 2007 WL 3349453, at *7 (D.N.J. Nov. 7, 2007); *United States v. Chrysler Corp.*, No. 88-341, 1990 WL 127160, at *7 (D. Del. Aug. 28, 1990); *Clean Harbors, Inc. v. Arkema, Inc.* (*In re Safety-Kleen Corp.*), 380 B.R. 716, 40 (Bankr. D. Del. 2008) (buyer that expressly assumes liabilities can be held liable for CERCLA claims of third parties).

16

Here, Maxus *is* a PRP with direct CERCLA liability because its former affiliate, DS Corporate, expressly assumed the Lister Plant liabilities and then merged into Maxus. When OxyChem bought DSCC, Maxus went further and agreed to "hold [OxyChem] harmless" from any residual liability remaining in the DSCC corporate form.[44] The evidence demonstrates that Maxus did everything it could do to assume, acquire, and *keep* the liabilities associated with Old Diamond. And OxyChem did everything it could do to ensure it was not acquiring those liabilities, so that they remained with Maxus and were further ring-fenced by Maxus's promises in the Stock Purchase Agreement. Because Maxus expressly assumed the Lister Plant liabilities, it is a liable PRP, and the Court must consider Maxus's share of responsibility in the equitable allocation. These facts raise genuine issues that preclude any summary judgment that OxyChem is solely or 100% liable for the actions of DSCC.

## II.   THIS SECTION 113 CONTRIBUTION ACTION REQUIRES A FACT-INTENSIVE EQUITABLE ALLOCATION AMONG LIABLE PARTIES— INCLUDING MAXUS

The SPG presents its motion as if successor liability were a bright-line mandate that imposes liability fully and uniformly on every entity in its path without regard to justification, equity, or fairness.  But however much the SPG wants to wave them away, the genuine issues of material fact raised by Maxus's merger and succession transactions are issues the Court must consider. Both the application of successor liability and the allocation of responsibility among liable parties in a CERCLA contribution action are *equitable* analyses driven by the facts and fairness. Under these equitable standards, Maxus is the *substantive* successor to Old Diamond, so it must be allocated a share of equitable responsibility for the Lister Plant liabilities. This, in itself, requires the SPG's motion be denied.

---

[44] *See* OxyChem CSMF ⁋ 34.

A. **Ignoring Maxus, the SPG's Motion Seeks a Premature Equitable Allocation that OxyChem is "Fully Liable" for All of Old Diamond's Conduct, Acts, and Omissions**

A mid-discovery ruling that OxyChem is "fully liable" and "equitably responsible" for DSCC's and Old Diamond's liabilities would impermissibly encroach on the fact-intensive equitable allocation amongst all PRPs that CERCLA mandates. Significant liable parties must be considered in the equitable allocation. "A CERCLA contribution action consists of determining which parties are liable under CERCLA and [then] apportioning *the liable parties'* shares in an equitable manner." *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 438 (3d Cir. 2005). *A liable party* must be allocated its share because "[n]o tortfeasor can be required to make contribution beyond his own equitable share of the liability." *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 577 (6th Cir. 1991). The "*relative* culpability of *each* responsible party [must] be considered in determining the proportionate share of costs each must bear." *United States v. Monsanto Co.*, 858 F.2d 160, 173 n.29 (4th Cir. 1988).[45]

Against this fundamental rule of contribution, the SPG asks for a summary judgment that OxyChem alone is "fully liable" and "equitably responsible" for "all acts and omissions of the owners and operators of the Lister Plant from the mid-1940s through 1971," as if Maxus had zero responsibility for those acts. SPG Brief at 24. But the record is filled with evidence that Maxus is a liable party through de facto merger, mere continuation, and express assumption of Old Diamond's liabilities. And it is undisputed that OxyChem, itself, *never* polluted the Passaic River.

---

[45] *See also Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 229 (3d Cir. 2010) (courts must "set forth the equitable share of the total obligation to the claimant *for each party*, … so that *each party* should eventually be responsible for that amount"); *AlliedSignal, Inc. v. Amcast Int'l Corp.*, 177 F. Supp. 2d 713, 746 (S.D. Ohio 2001) ("[A] District Court may not require any party to contribute more than its equitable share of the entire cleanup costs.").

When Maxus is properly factored into the allocation, as it must be, the equitable allocation of liability between OxyChem, Maxus, and Defendants, cannot be resolved on summary judgment.[46] Equitable allocation "require[s] the decisionmaker to resolve *factual disputes* going to the ultimate issues in the case."[47] The court will be called on to decide deep fact questions when allocating *each* liable party *its own*, and only its own, equitable share of responsibility for cleaning up the Passaic River. For instance, as to just one equitable factor, the Third Circuit holds that "[a]n operator who has participated in remediation without slowing or interfering with that process likely *will not be assessed a large share of the remediation costs, if it is assessed any at all.*"[48] OxyChem is the only party cooperating with EPA to perform the design of the remedy under the 2016 ASAOC and Maxus performed remediation, as a liable party and on OxyChem's behalf, before it went bankrupt. This evidence must be considered before judging OxyChem "fully" or solely "equitably responsible" for the acts and omissions of an Ag Chem business it never owned or operated. Genuine issues of material fact preclude any resolution of these complex equitable-allocation issues on summary judgment.[49]

---

[46] The cases the SPG cites for its bright-line "only one successor" argument are irrelevant: they involved only *one* successor and raised no issues of de facto merger or multiple successors amongst whom the court was required to equitably allocate responsibility. *See Gould, Inc. v. A & M Battery & Tire Service*, 987 F. Supp. 353 (M.D. Pa. 1997) (defendant Gould acquired and continued to own polluter Marijol); *Responsible Envtl. Sols. v. Waste Mgmt., Inc.*, 2011 WL 382617 (S.D. Ohio 2011) (defendant CWM was the sole corporate successor to the polluting entity).

[47] *Id.* at 439-40.

[48] *Litgo*, 725 F.3d at 383; *see also ASARCO LLC v. Atl. Richfield Co*., 353 F. Supp. 3d 916, 954 (D. Mont. 2018) (quoting *United States v. Consolidation Coal Co.*, 184 F. Supp. 2d 723, 751 (S.D. Ohio 2002) ("More than any other factor, cooperation touches directly upon CERCLA's objective of prompt cleanup at the expense of responsible parties. With cooperation that goal is realized, but without cooperation that goal of CERCLA is thwarted.").

[49] *See, e.g.*, *Exxon Mobil Corp. v. United States*, 335 F. Supp. 3d 889, 948 (S.D. Tex. 2018) (denying summary judgment on equitable allocation where parties "propose[d] conflicting inferences about relative culpability" as a result of waste-reduction efforts); *Seneca Meadows, Inc. v. ECI Liquidating, Inc*., 121 F. Supp. 2d 248, 257 (W.D.N.Y. 2000) (rejecting summary judgment on allocation before discovery was completed because "[q]uestions of causation and appropriate

### 1.    Section 107(e)(1) Does Not Foreclose the Existence of Multiple Successors or Pretermit an Equitable Allocation

The SPG argues OxyChem is "fully liable" for Old Diamond's liabilities because Section 107(e)(1) "bars parties from divesting CERCLA liability by purporting to transfer it to a third party." SPG Brief at 11. The technical fact that OxyChem holds the same certificate of incorporation as DSCC makes it impossible for OxyChem to ever "*completely* divest itself of liability."[50] But Section 107(e)(1) does not foreclose the possibility of *multiple* successors to the same underlying liability—each with very different equitable shares of responsibility—and here, the evidence precludes the *sole* successorship summary judgment the SPG seeks.

In *Litgo*, the Third Circuit upheld an equitable allocation assigning *different* shares of liability to two successors to the *same* underlying CERCLA liability. Sanzari was liable as an owner at the time of disposal; Goldstein was liable as the current owner and because it expressly assumed Sanzari's environmental liabilities. *See Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 389-90 (3d Cir. 2013). Although Sanzari and Goldstein shared the same underlying CERCLA liability, the Third Circuit upheld the allocation of 27% of the costs to Sanzari and 70% to Goldstein, an allocation that expressly considered Goldstein's contractual assumption of Sanzari's environmental liabilities. *See id.* at 389-90.

Defendants' own cases recognize this well-established principle. In *Anspec v. Johnson Controls, Inc*., the Sixth Circuit reversed the district court's dismissal as to multiple potential successors to the same liability, including a successor by merger and the predecessor corporation.

---

equitable allocation of response costs involve quintessential issues of fact"); *Farmland Indus., Inc. v. Colorado & E. R. Co*., 922 F. Supp. 437, 442 (D. Colo. 1996) ("numerous factors create material issues of fact which bear on the proper allocation of response costs").

[50] *See Hobart Corp. v. Dayton Power & Light Co.*, 407 F. Supp. 3d 732, 742 (S.D. Ohio 2019).

See 922 F.2d 1240, 1247 (6th Cir. 1991).[51] In *Hobart Corp. v. Dayton Power & Light Co.*, the issue was whether WMO, as the successor to the polluter, SCA, was a liable party, or whether SCA had extinguished its CERCLA liability when another entity contractually assumed it. *See* 407 F. Supp. 3d at 739. Applying Section 107(e)(1), the court held that SCA could not "*extinguish*" or "*completely* divest itself of CERCLA liability." *Id.* at 742. As a result, there were at least three parties that "share[d] in the liability"—the two contractual assignees and the successor to the assignor. *Id.* at 739. This summary judgment determination on *liability* did not and could not address the equitable allocation of liability amongst them. "[A] determination of liability under CERCLA does not resolve equitable allocation."[52]

In sum, under Section 107(e)(1), once a liable party, always a liable party. Maxus, on the evidence, *is* a liable party. Each liable party is responsible for its own equitable share, and that requires a flexible fact-driven determination based on the "totality of the circumstances."[53]

### 2. Maxus's De Facto Merger With Old Diamond Was Not an Indemnification; Successorship Through Merger Benefits All Creditors and Third-Parties

The SPG also argues that an indemnification or assignment is only "enforceable as between contracting parties" but as to third parties merely "makes the assignee another obligor; it does not let the assignor off the hook." SPG Brief at 12-13. This misunderstands the law. Bilateral indemnities are fundamentally different than the equitable, common law doctrine of successorship, which benefits *all* parties and creditors, not just contractual counterparties. Maxus's de facto merger, completed years before OxyChem purchased the stock of DSCC, "accords a legal remedy to injured third parties." *Gen. Battery*, 423 F.3d at 307. The de facto merger equitable

---

[51] *See also Smith Land & Imp.,* 851 F.2d at 92 (vacating district court as to multiple potential successors to PRP under CERCLA).
[52] *Halliburton*, 648 F. Supp. 2d at 861 n.14.
[53] *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 104 (3d Cir. 1999).

successorship doctrine is available to OxyChem *and* to all PRPs, any of whom could bring a successor liability claim against Maxus.  Under this common law doctrine, Maxus is the true continuation of Old Diamond, the substantive successor to the Lister Plant liabilities.[54] The broad indemnity and hold harmless agreement in OxyChem's 1986 Stock Purchase Agreement exists in *addition* to the transactions—and is for the benefit of OxyChem—but it in no way displaces the binding legal effect of the "transaction of successorship" undertaken years earlier by which Maxus had become the substantive successor to Old Diamond.

The Third Circuit in *Emoral* rejected the thesis advocated here by the SPG that successor liability is relevant only between the predecessor and the successor, holding that a successor liability claim against a debtor is "general" and can be used by any and "all creditors." *Emoral*, 740 F.3d at 880-81. In the bankruptcy context, that means the successor-liability claims are property of the estate, to be pursued by the bankruptcy trustee for the benefit of all creditors alike. *See id.* Here, it means that Maxus's equitable successorship to Old Diamond and the Ag Chem liabilities is a remedy available to all PRPs; it is not a mere indemnity to be hashed out only between OxyChem and Maxus. And, as demonstrated below, EPA and SPG recognized this in their Proofs of Claim in Maxus's bankruptcy.

### 3.   The Treatment of Maxus's Orphan Share of the Lister Plant Liability Is Itself an Equitable and Fact Intensive Inquiry

In 1984, Maxus was a well-capitalized entity that absorbed billions of dollars of businesses, assets, and liabilities of Old Diamond, including the Ag Chem business that operated the Lister Plant. Having taken those assets and businesses for itself, the law required Maxus to succeed to

---

[54]  The SPG's citation to *Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341 (7th Cir. 1994) does not address or resolve successorship. *See* SPG Brief at 13. *Harley Davidson* states the basic proposition that "[i]ndemnification does not [transfer liability]," an observation *irrelevant* to whether liability is transferred by successorship. 41 F.3d at 343.  Here, Maxus is liable not merely an indemnitor as to OxyChem; it is Old Diamond's successor as to all PRPs.

Old Diamond's liabilities for the benefit of all third parties and creditors. Maxus's bankruptcy decades later did not operate, *ipso facto*, to make OxyChem solely liable for Maxus's equitable share of responsibility as a matter of law. *See Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 12 F. Supp. 2d 391, 404 (M.D. Pa. 1998) (denying on summary judgment that a successor should be fully liable for an insolvent corporate predecessor's orphan share).[55] Allocation of the share of a liable party that is bankrupt—an orphan share—is a discretionary, fact-based determination. "A court may *equitably allocate* among the parties before it the share of hazardous waste contamination belonging to responsible third-party entities not before it (such allocated amounts being known as 'orphan shares'),"[56] and "[a] court may equitably allocate orphan shares among liable parties *at its discretion*."[57]

Whether it is equitable here to saddle OxyChem with Maxus's share of responsibility for the Lister Plant rests on disputed issues of fact that preclude entry of summary judgment. The court cannot hold OxyChem "fully liable" and "equitably responsible for all of the acts and omissions of the owners and operations of the Lister Plant from the mid-1940s through 1970," acts OxyChem itself *did not* commit, without considering the evidence that Maxus is the true, substantive successor to Old Diamond, considering Maxus's equitable share of responsibility for the acts and omissions of Old Diamond, and then considering how to allocate Maxus's orphan share of

---

[55] The *Andritz* court reasoned: "In deciding which of two corporations should be made to shoulder the burden of answering for an unavailable corporate polluter, there is no compelling reason to shift that burden from Andritz to Bridon as a matter of course…. J & L's unavailability is not, in and of itself, grounds for shifting liability for its entire 'orphan share' to Bridon." *Id.*

[56] *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 347 n.6 (3d Cir. 2019).

[57] *Litgo*, 725 F.3d at 380 n.4. Allocating orphan shares equitably among all responsible PRPs is consistent with CERCLA. *See Adhesives Research Inc. v. Am. Inks & Coatings Corp.*, 931 F. Supp. 1231, 1244 (M.D. Pa. 1996) (without the ability to seek allocation of orphan shares to all parties, "the plaintiff would risk being unable to recover cleanup costs expended beyond its equitable share and attributable to absent or insolvent PRPs," and that "[w]ith 'incentives' like these, no prudent party would leap into a voluntary cleanup effort").

responsibility among all the parties, including the SPG—whose members have refused, steadfastly, to bear their fair share of the liabilities in Operable Unit 2.

**B.      Even Without Maxus as a Liable Party, Defendants' Requested Relief Impermissibly Invades the Equitable Allocation**

Equitable allocation "requir[es] the decisionmaker to resolve factual issues going to the ultimate issues in the case," *Beazer E.*, 412 F.3d at 439-40, and is inappropriate for summary judgment where the parties "propose conflicting inferences about relative culpability," *Exxon Mobil Corp. v. United States*, 335 F. Supp. 3d 889, 948 (S.D. Tex. 2018). The Court may consider a host of equitable factors relevant to culpability, including cooperation with the government. *See, e.g.*, *Litgo*, 725 F.3d at 383. Courts also have discretion to allocate orphan shares amongst parties to the case, or adjust equitable shares if culpable parties are unavailable. *See id.* at 380-83, 389.

SPG's motion here must be denied for this reason, too. No party can be subject to a ruling on its *equitable responsibility* based solely on a finding of its bare *liability*. The SPG is thus wrong not only in claiming that OxyChem is "fully liable" for all DSCC's operations, because it ignores Maxus's liability. The SPG is also wrong that OxyChem is fully liable for those operations for *all equitable purposes*. There are disputed and genuine issues of fact at the heart of the future equitable allocation—including OxyChem's "relative culpability" after considering all the surrounding equitable factors. *See Beazer E.*, 412 F.3d at 439-40. Only during the allocation phase will OxyChem and all parties to this case have the opportunity to propose their "conflicting inferences" about their "relative culpability." *Exxon*, 335 F. Supp. 3d at 948. There are genuine issues of material fact that will show that OxyChem's equitable share should be reduced based on the circumstances of its acquisition of DSCC[58]; its unmatched cooperation with the government[59];

---

[58] *See, e.g.*, *Beazer E.,* 412 F.3d at 446.
[59] *See, e.g.*, *ASARCO*, 353 F. Supp. 3d at 954 ("More than any other factor, cooperation touches directly upon CERCLA's objective of prompt cleanup at the expense of responsible parties …");

prior voluntary cleanups on its behalf by Maxus as indemnitor; EPA's recognition that OxyChem itself did not pollute the river; and a host of other factors that weigh in OxyChem's favor. Genuine issues of fact also demonstrate that OxyChem's share should be adjusted in light of responsible parties who are unavailable, that any orphan shares should be distributed equitably amongst all the parties to the case, and that parties who have refused to accept any responsibility in OU2 and have never cooperated with EPA to remedy it, like the SPG members, should bear a disproportionate share. *See, e.g.*, *Litgo*, 725 F.3d at 380, 389. All of these fact issues are genuine and germane; all of them preclude summary judgment on the final equitable allocation.

## III.   ISSUE PRECLUSION DOES NOT APPLY

The Court should deny outright the SPG's argument that issue preclusion applies to the Spill Act Court's July 19, 2011 order because it contravenes the Consent Judgment executed by the State and OxyChem.  The terms of that consent judgment specifically provide that interlocutory orders—including the July 19, 2011 order invoked by the SPG—did *not* become final.  And the SPG's own Third-Party Consent Judgment likewise prohibits it from asserting issue preclusion based on *any claims raised in the Spill Act proceeding* in future proceedings.

The Consent Judgments' prohibition on asserting issue preclusion ensured that the Spill Act Court's interlocutory consideration of issues in a specific context could not be used unfairly to preclude issues that the Spill Act Court did not—and did not intend to—finally resolve. The Spill Act Court's interlocutory rulings on successorship occurred early in a nine-track case management sequence. Many claims and issues—including the equitable allocation among the

---

*Farmland Indus.*, 944 F.Supp. at 1498-1500 (allocating 90% of response costs to parties who had refused to cooperate with government in cleanup, noting "a court should use its moral, as well as its legal sense, in framing an equitable decree").

parties—were never litigated, because resolution of those issues was reserved for the final track (which never occurred as a result of the settlements).

This procedural history, conspicuously absent from the SPG's motion papers, highlights their overreach. Having stipulated there would be *no* preclusive effect attached to the Spill Act Court's interlocutory rulings, the SPG is estopped from asserting any the preclusive effect attaches to them. Even the most generous application of issue preclusion would not permit the SPG to convert the Spill Act Court's limited, nonfinal ruling on OxyChem's legal successorship into an order predetermining an issue the Spill Act Court never considered; namely, this Court's equitable allocation of liability for all "acts and omissions" at the Lister Site.

### A. The Consent Judgments Expressly Prohibit the SPG From Seeking to Apply Issue Preclusion Here

The Consent Judgments entered by the Spill Act Court unequivocally bar the SPG's claim of issue preclusion against OxyChem. The December 16, 2014 Consent Judgment, entered as a final judgment on the State's claims against OxyChem, states:

> No other order of the Court against OCC, including the Court's Order of July 19, 2011, shall become final and non-appealable as a result of the entry of this Consent Judgment. But, as to Plaintiffs' only, the effect of the July 19, 2011 Order is intended to be embodied into this Consent Judgment.[60]

"[S]ettlement agreements ordinarily occasion no issue preclusion … unless it is clear … that the parties intend their agreement to have such an effect." *Arizona v. California*, 530 U.S. 392, 414 (2000). Here, the intention of all parties—including the SPG—was that the Spill Act Court's interlocutory orders on successorship to DSCC would have *no* preclusive effect. The SPG's Third-Party Consent Judgment provides:

---

[60] SPG Ex. 30, at ¶ 51; OxyChem CSMF at ¶ 57.

> In any subsequent … judicial proceeding for … recovery of costs and/or damages, or other appropriate relief concerning the Newark Bay Complex,[61] **no Party shall assert or maintain any defense or claim based upon the principles of** waiver, res judicata, **collateral estoppel, [or] issue preclusion**, … based upon any contention that the claims raised in the subsequent proceeding were or should have been brought in this case.[62]

Having stipulated it would neither "assert nor maintain" any defense based on issue preclusion, and having received in exchange a release of claims against them in the Spill Act case and contribution protection, the members of the SPG are absolutely barred from arguing issue preclusion here in this "subsequent…judicial proceeding." The SPG cannot use the Spill Act Court's interlocutory orders to argue that those judgments preclude litigation of *any* issue in this case, so its issue preclusion summary judgment motion must be denied.

And even if this did not end the issue (and it does) the fact that the State's claims were resolved by Consent Judgment and settlement belies the SPG's claim that any successorship issue was fully resolved, let alone that it dictates equitable allocation here.[63] To foreclose litigation of an issue, the party asserting the bar must show that the court in the prior proceeding issued a *final judgment on the merits*, and the determination of the issue was *essential* to that judgment. *First*

---

[61] As defined in the Third-Party Consent Judgment, "Newark Bay Complex" includes all areas at issue in this CERCLA lawsuit. *Id.* at ¶ 48.

[62] *Id.* at ¶ 47. This provision mirrors the language of EPA's frequently enforced Model Consent Decree by which settling parties waive issue preclusion against the government based on the proceeding that led to a consent decree. (CSMF, ¶ 51). The SPG modified that model language to apply the issue preclusion bar to *any* party in subsequent litigation relating to the Newark Bay Complex. (CSMF, ¶ 49-52).

[63] While not before the Court on the SPG's motion, on May 21, 2012 the Spill Act Court issued several other orders on the State's cost recovery claim, including a ruling that Maxus is not the legal or equitable successor of DSCC. The SPG, with good reason, did not even attempt to argue this ruling has preclusive effect here because it does not. In addition to the reasons discussed above, these other rulings have no preclusive effect because they applied different successorship law that is not applicable in this CERCLA action, involved different theories of recovery, and—while clearly erroneous on the facts—could not be appealed both because of the Consent Judgments and the subsequent bankruptcy of Maxus.

27

*Union Nat'l Bank v. Penn Salem Marina, Inc.,* 190 N.J. 342, 352 (2007).[64] The Consent Judgments entered on the State's claims were *not* on the merits and did not hinge on any essential ruling. Consent judgments are, by definition, not on the merits for purposes of issue preclusion. *See* Restatement (Second) of Judgments § 27 cmt. e (1982) ("In the case of a judgment entered by . . . consent . . ., none of the issues is actually litigated."). Nor was any prior ruling on successorship "essential" to those Consent Judgments. A "determination ranks as necessary or essential [to a judgment] only when the final outcome hinges on it." *Bobby v. Bies*, 556 U.S. 825, 835 (2009). None of the Spill Act court's prior orders were necessary or even relevant for the Spill Act court to enter the Consent Judgments, which were entered on a finding that the NJDEP's agreement to the settlement was not arbitrary, capricious or unreasonable.[65]

Nor should the Court use its discretion to treat any interlocutory ruling in the state court as "final" for purposes of issue preclusion against OxyChem, as doing so would be unfair. "The application of issue preclusion is a discretionary matter for the court and, as a rule of efficiency, should not be applied unless the court is fully satisfied with its fairness." *Prospect Funding Holdings, LLC v. Breen*, 2018 WL 734665, at *8 (D.N.J. Feb. 5, 2018) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)). While certain aspects of successorship were considered by the Spill Act Court, those considerations occurred in the early stages of a *nine-track* case management structure, long before equitable allocation was to be decided. Equitable allocation among parties was reserved for Track IX—the final stage that never occurred because the State's claims were resolved by settlement. Settlement of those claims was complex, because it occurred

---

[64] In federal court, the preclusive effect of a state court's decision is governed by the preclusion rules of the state court. *Marrese v. Am. Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985) (citing *Kremer,* 456 U.S. at 481-82).

[65] OxyChem CSMF ¶¶ 54, 64.

*before* that allocation, so all parties to the settlement dealt with that complexity by ensuring that no issue preclusion would apply to the Court's interlocutory orders on successorship. After all interested parties were provided notice and an opportunity to be heard, and after the SPG members themselves *consented* to the provision that issue preclusion could not later be asserted, the Spill Act Court entered the Consent Judgments. The SPG has not met its burden to show issue preclusion can or should apply to these interlocutory determinations, nor can it conclusively negate that applying issue preclusion would not be *unfair* to OxyChem, given the SPG's stipulation that it would not seek or be entitled to obtain issue preclusion *at all*.

> **B.   The July 17, 2011 Legal Successorship Ruling Was Far Narrower Than the Order Now Sought By the SPG**

The SPG is also barred from seeking issue preclusion because the State Court's order did not reach OxyChem's equitable share of liability *amongst all private PRPs* in contribution. The order addressed only OxyChem's liability *to the State*:

> Occidental Chemical Corporation is **strictly, jointly and severally liable** under the [Spill Act] for all past cleanup and removal **costs incurred by Plaintiffs [NJDEP]** associated with the discharges of hazardous substances at and from the Lister Plant property.[66]

It did not address (or even consider) an equitable allocation of responsibility among PRPs in contribution under Spill Act Section 7.[67] *Compare* N.J.S.A. 58:10-23.11g(c)(1); N.J.S.A. 58:10-23.11f(a)(2)(a). That issue, as explained above, was reserved for a later trial track (Track IX) that never occurred.[68] Because the Spill Act Court was not asked to and did not consider the *effect* of

---

[66]  OxyChem CSMF ¶¶ 65.
[67] *Id.* ¶¶ 64-67.
[68] *Id.* ¶¶ 67.

OxyChem's technical, legal successorship on a future equitable allocation, its judgment was not "on the merits" or "final" as to that issue, so it cannot be preclusive here.[69]

The threshold issue of liability under Spill Act Section 8 also involves a different factual analysis and legal standard than an equitable allocation of contribution liability under Spill Act Section 7 or CERCLA Section 113. In *Ashland, Inc. v. GAR Electroforming*, for example, the court rejected issue preclusion of a CERCLA §107 claim in a §113 contribution case because there was no identity of issues between a ruling on Section 107 cost-recovery and Section 113 contribution. *See* 729 F. Supp. 2d 526, 545 (D.R.I. 2010). The court rejected issue preclusion because the liability determinations for each case, though based on the same facts, were "conceptually different and require a separate analysis." *Id*. The same is true here: a ruling on OxyChem's liability does not preclude litigation on OxyChem's allocable share.

For all these reasons, the SPG's motion on "issue preclusion" must be denied. The SPG is not entitled to a summary judgment holding OxyChem ***"fully liable"*** for Old Diamond's liabilities based on an interlocutory order in the Spill Act litigation, that addressed a different legal issue and was not a final judgment on equitable allocation. Summary judgment must also be denied because the SPG *agreed* that judgment would have no preclusive effect in this proceeding *at all*.

## CONCLUSION

For the reasons set forth herein, OxyChem respectfully requests that the Court deny the relief requested by the SPG's motion.

---

[69] *See Matter of Estate of Dawson*, 641 A.2d 1026, 1034–35 (N.J. 1994) (collateral estoppel does not apply when the issues are different). *Ali v. Univ. Corr. Health Care*, 2018 WL 3158811, at *3 (D.N.J. 2018) (issue preclusion did not apply because claim of deliberate indifference was a distinct question from whether prisoner's medical need was serious); *Dici v. Com. of Pa.*, 91 F.3d 542, 549–50 (3d Cir. 1996) (workman's compensation ruling did not result in issue preclusion on Title VII claim).

Dated:  May 21, 2020                    Respectfully submitted,

   /s/ *John J. McDermott*
John J. McDermott, Esq.
(jmcdermott@archerlaw.com)
Charles J. Dennen, Esq.
Lauren E. Krohn, Esq.
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel. (856) 795-2121

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel. (713) 650-8805
By:   Kathy D. Patrick, Esq.
      (kpatrick@gibbsbruns.com)
      Anthony N. Kaim, Esq.
      Katherine H. Kunz, Esq.
      Jorge M. Gutierrez, Esq.
      Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel. (215) 732-3255
By:   Larry D. Silver, Esq.
      (lsilver@lssh-law.com)
      David E. Romine, Esq.

GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
Tel. (310) 553-3610
By:   Peter A. Nyquist, Esq.
      (pnyquist@ggfirm.com)
      Noah Perch-Ahern, Esq.
      Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical*
*Corporation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 21, 2020, a copy of Plaintiff OxyChem's Response to The Small Parties Group's Motion For Partial Summary Judgment on Occidental Chemical Corporation's Successor Liability was served on counsel via CM/ECF.


Dated:  May 21, 2020                         By:  ___/s/ *John J. McDermott*_____
                                                   John M. McDermott, Esq.