# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION | ) Hon. Madeline Cox Arleo |
| | ) Hon. Joseph A. Dickson |
| | ) |
| Plaintiff, | ) Civil Action No. 2:18-cv-11273-MCA-JAD |
| | ) |
| v. | ) |
| | ) **PLAINTIFF OCCIDENTAL** |
| 21ST CENTURY FOX AMERICA, INC., *et al.* | ) **CHEMICAL CORPORATION'S** |
| | ) **RESPONSE IN OPPOSITION TO** |
| Defendants. | ) **HOUGHTON'S MOTION FOR** |
| | ) **RULE 11 SANCTIONS** |

ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel.    (856) 795-2121
By:     John J. McDermott, Esq.
        (jmcdermott@archerlaw.com)
        Charles J. Dennen, Esq.
        Lauren E. Krohn, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.    (713) 650-8805
By:     Kathy D. Patrick, Esq.
        (kpatrick@gibbsbruns.com)
        Anthony N. Kaim, Esq.
        Katherine H. Kunz, Esq.
        Jorge M. Gutierrez, Esq.
        Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel.    (215) 732-3255
By:     Larry D. Silver, Esq.
        (lsilver@lssh-law.com)
        David E. Romine, Esq.

GREENBERG   GLUSKER   FIELDS
CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
Tel.    (310) 553-3610
By:     Peter A. Nyquist, Esq.
        (pnyquist@ggfirm.com)
        Noah Perch-Ahern, Esq.
        Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

    I.    The Central Steel Drum Site ................................................................................. 2

    II.   Houghton's Submission to EPA ........................................................................... 3

    III.   Maxus Allegations Against Houghton .................................................................. 4

    IV.   OxyChem's CERCLA Complaint ......................................................................... 5

    V.   Houghton's Contention Interrogatories to OxyChem and OxyChem's Responses .............................................................................................................. 7

    VI.   Houghton's Motion for Sanctions ........................................................................ 8

ARGUMENT ..................................................................................................................... 10

    I.    OxyChem complied with Rule 11 ....................................................................... 10

        A.   Houghton's 1997 submission to EPA provides evidentiary support for the allegation that Houghton shipped drums containing hazardous substances to Central Steel Drum. ............................................ 10

        B.   Evidentiary support abounds that hazardous substances were discharged from the CSD Site and that OxyChem has incurred response costs resulting from discharges of hazardous substances at the Diamond Alkali Superfund Site. ....................................................... 14

    II.   Houghton's Motion is Improper and Itself Violates Rule 11 ............................... 15

        A.   Courts in this District have admonished litigants *not* to file motions like the one presently before the Court. ..................................................... 15

        B.   Houghton's motion is not well grounded in fact or law, and was brought for an improper purpose. .......................................................... 17

CONCLUSION .................................................................................................................. 20

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*,
    618 F.3d 277 (3d Cir. 2010)............................................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................16

*Catellus Dev. Corp. v. U.S.*,
    34 F.3d 748 (9th Cir. 1994) ............................................................................13

*In re Cendant Corp.*,
    96 F. Supp. 2d 403 (D.N.J. 2000) ...................................................................18

*Champion Labs., Inc. v. Metex Corp.*,
    No. 02-5284, 2009 WL 2496888 (D.N.J. Aug.13, 2009) ................................11

*Conopco, Inc. v. Warner-Lambert Co.*,
    No. 99-101, 2000 WL 342872 (D.N.J. Jan 26, 2000)......................................17

*Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*,
    973 F.2d 688 (9th Cir. 1992) ..........................................................................13

*Moeck v. Pleasant Valley Sch. Dist.*,
    96 F.3d 387 (3d Cir. 2016)........................................................................19, 20

*N.J. Tpk. Auth. v. PPG Industries, Inc.*,
    197 F.3d 96 (3d Cir. 1999)..............................................................................11

*Nestle Foods Corp. v. Aetna Cas. and Sur. Co.*,
    135 F.R.D. 101 (D.N.J. 1990) .........................................................................17

*Oswell v. Morgan Stanley Dean Witter & Co., Inc.*,
    507 F. Supp. 2d 484 (D.N.J. 2007) .................................................................15

*In re Riddell Concussion Reduction Litig.*,
    No. 13-7585, 2016 WL 7365508 (D.N.J. Jan 6, 2016).....................................17

*Sea Lion, Inc. v. Wall Chem. Corp.*,
    974 F.Supp. 589 (S.D. Tex. 1996) ..................................................................13

*Sloatman v. Triad Media Solutions, Inc.*,
    No. 17-11383, 2018 WL 4204444 (D.N.J. Sept. 4, 2018) ...............................16

*Smith v. Psychiatric Solutions, Inc.*,
    750 F.3d 1253 (11th Cir. 2014) ...................................................................18

*Teamsters Local Union No. 430 Cement Exp., Inc.*,
    841 F.2d 66 (3d Cir. 1988)............................................................................10

*Transtech Indus., Inc. v. A&Z Septic Clean*,
    798 F.Supp. 1079 (D.N.J. 1992) ..................................................................13

*U.S. v. Alcan Aluminum Corp.*,
    964 F.2d 252 (3d Cir. 1992)..........................................................................14

*U.S. v. Rohm & Haas Co.*,
    939 F.Supp. 1142 (D.N.J. 1996) ..................................................................14

**Federal Statutes**

Comprehensive Environmental Response, Compensation, and Liability Act,
    42 U.S.C. §§ 9601, et seq.................................................................... *passim*

42 U.S.C. § 9604(e) .................................................................................2, 3, 4

42 U.S.C. § 9607 .............................................................................................10

42 U.S.C. § 9607(a) .......................................................................................11

42 U.S.C. § 9607(a)(3).................................................................................6, 11

42 U.S.C. § 9613 .........................................................................................6, 10

**State Statutes**

New Jersey Spill Compensation and Control Act,
    N.J.S.A. 58:10-23.11, et seq. ...............................................................4, 5, 12, 13

**Rules**

Fed. R. Civ. P. 1 .............................................................................................19

Fed. R. Civ. P. 11 ................................................................................... *passim*

Fed. R. Civ. P. 11(b) ......................................................................................14

Fed. R. Civ. P. 11(b)(3)..................................................................................10

Fed. R. Civ. P. 11(c)(2)..................................................................................17

Fed. R. Civ. P. 11(c)(6)..................................................................................20

Fed. R. Civ. P. 11(d) ................................................................................................16

Fed. R. Civ. P. 33(a)(2) ...........................................................................................17

Fed. R. Civ. P. 33(d) .................................................................................................7

L. Civ. R. 37.1 .........................................................................................................17

**Regulations**

D.N.J. Standing Order No. 2020-06 ........................................................................19

**Other Authorities**

5A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE
§ 1336 (2d ed. Supp. 2003) ................................................................................16

Georgene M. Vairo, RULE 11 SANCTIONS: CASE LAW PERSPECTIVES AND
PREVENTIVE MEASURES, § 4.01[c][3][F] (2d ed. Supp. 1994) ................................18

## **INTRODUCTION**

At a moment when litigants must redouble their efforts to promote judicial economy, Houghton International Inc. and its counsel instead make a cynical bid for leverage: seeking dismissal and fees as a Rule 11 sanction.

The lack of merit in Houghton's motion is clear from even a cursory review of the record. OxyChem alleges Houghton sent drums containing hazardous substances to Central Steel Drum, a notorious drum reconditioning operation near the Lower Passaic River.  Houghton contends this allegation is wholly without an evidentiary basis.  It makes this claim in the face of a 1997 document obtained from EPA's files in which Houghton admits to sending used drums to Central Steel Drum; that those drums had been used to contain raw materials or product at Houghton's chemical blending facility; and that those drums *could have been used to contain hazardous substances*.  While Houghton now insists those drums were "empty" when sent to Central Steel Drum, the 1997 submission to EPA expressly disclaims knowing whether and what substances were in the drums.

Houghton knows this is not the exceptional case warranting Rule 11 sanctions—in 2013, it paid $145,000 to the State of New Jersey to settle claims based on these same allegations.  But sanctions were never the goal.  By filing this motion in the middle of fact discovery, before producing a shred of information or seeking relief under any other rule, and bypassing the Special Master appointed by the Court to conserve judicial resources, Houghton has wasted this Court's and OxyChem's time in an attempt to gain a litigation advantage.  This stunt warrants an award of fees *to OxyChem*, but further distraction from the merits would be counterproductive. Instead, OxyChem respectfully submits that the Court should summarily deny Houghton's motion, and admonish Houghton (and other defendants) not to engage in frivolous motion practice.

## STATEMENT OF FACTS

I.    **The Central Steel Drum Site**

In 1991 and 1992, Houghton International Inc. was a customer of the Central Steel Drum

Company's ("CSD") drum reconditioning facility in Newark, New Jersey, adjacent to the Lower

Passaic River (the "CSD Site").  Dumville Aff. Ex. E at TIERRA-B-003025.  CSD's drum

reconditioning business serviced the chemical and other industries by receiving from its

customers used steel drums, incinerating those drums to remove any chemicals left remaining in

the drums when the customers shipped them to CSD, and reconditioning those drums to be used

again.  *See* Ex. 1 at 4 (Jan. 7, 1993 Judicial Consent Order Regarding CSD); Ex. 2 (Mar. 13,

1990 CSD Site Inspection Memorandum).[1]

CSD provided its drum reconditioning service to companies like Houghton from 1952

until it filed for bankruptcy and closed in 1994.  Ex. 3 at 12 (Nov. 26, 1997 Letter from EPA

pursuant to Section 104(e) of CERCLA).  During that period of operation, regulators

documented decades of environmental violations at the CSD Site, culminating in a 1993 Judicial

Consent Order with the New Jersey Department of Environmental Protection ("1993 NJDEP

Consent Order").  *See* Ex. 1 at 2.  The 1993 NJDEP Consent Order documented the sloppy

disposal practices, spills of hazardous waste, and permit violations at the CSD Site in a 19-page

list.  *Id*. at 4-23.  Notably, the drums sent to CSD were not empty.  Customers were permitted to

send "empty" drums containing up to an inch of chemical residue.  Ex. 2 at 1.  And there is

evidence that compliance with that requirement varied—NJDEP inspectors also found partially

and completely full drums on-site.  *Id.* at 1, 3; Ex. 1 at ¶ 34.

After CSD filed for bankruptcy and ceased operations, the site remained largely

---

[1] Except where specified, all references to exhibits ("Ex.") are to the exhibits described in the
Certification of John J. McDermott, Esq. submitted in support of this response.

untouched until the US Environmental Protection Agency designated it a Superfund site in 1997. *See* Ex. 3 at 12.  EPA found that, in addition to the large piles of ash and hazardous waste scattered throughout the property, "approximately 750 drums of flammable, corrosive, water reactive materials are abandoned on the Site.  Some of these drums are leaking, and will continue to deteriorate."  *Id.*

## II.   Houghton's Submission to EPA

During its investigation of the CSD Site, EPA used the sales records from CSD to identify customers that had shipped drums to the CSD Site.  *Id.* at 1.  One of the customers EPA identified was Houghton.  *Id.* at 19.  Pursuant to its authority under Section 104(e) of CERCLA, EPA sent to Houghton a request for information regarding Houghton's shipment of drums to CSD in 1991 and 1992 and Houghton's operations at the plant from which those drums were shipped.  *Id.*

On December 23, 1997, Houghton submitted its response to EPA signed by a Vice President of the company, stating:

- "Houghton's business was essentially the same during the period 1980-1994. Houghton blends hydrotreated naphthenic and paraffinic based mineral oils with other substances for use as lubricants, hydraulic and metalworking fluids. Houghton's product lines and ingredients have changed over time."  Houghton Ex. E at TIERRA-B-003027.

- Houghton "purchases raw materials and blends them into the products which it sells and distributes.  The Company uses a variety of cleaning agents.  To obtain names of substances would require an extensive and unreasonable amount of record searching.  EPA may arrange to review and copy the plant MSDS sheets upon reasonable notice."  *Id.*[2]

- "Reconditioned drums were purchased from CSD and used, empty drums were sent to CSD for reconditioning."  *Id.*

- In response to the question "whether each Container that was the subject of the

[2] In discovery in this case, Houghton has not produced or made available these MSDS sheets or any other documents.

transaction [with CSD] contained any substance at the time of the transaction," Houghton was "unable to provide a verifiable answer. The Chemicals which would have been in each drum are not identified in the paperwork. *They could have contained raw materials used at the plant or products received or shipped in drums*." *Id.* at TIERRA-B-03029 (emphasis added).

- "Houghton does not have information indicating whether there were or were not substances in any particular drum. EPA has not [sic] legal authority to require Houghton, or any person, to make a contention and provide proof. Houghton's failure to make a contention does not establish whether or not there were any substance [sic] in the drums." *Id.* at TIERRA-B-003030.

- "Houghton would expect drums of raw material to be emptied by pouring or shaking. Houghton would expect product drums to be similarly emptied. Any hazardous wastes present as residues would have been emptied in accordance with hazardous waste rules applicable to empty containers during that time period." *Id.*

- "Information about products and raw materials is widely available through MSDS records. These records are voluminous and are available for inspection at the plant." *Id.* at TIERRA-B-003031.

## III.    Maxus Allegations Against Houghton

In 2009, Houghton was sued under the New Jersey Spill Act by Maxus Energy Corporation and Tierra Solutions, Inc., who sought to recover in contribution Houghton's share of response costs NJDEP allegedly incurred in the Lower Passaic River and surrounding waterways. *See* Ex. 4 (Feb. 4, 2009 Third-Party Complaint B). Maxus and Tierra alleged that:

- Houghton operated a chemical blending facility at 6681 Snowdrift Road in Fogelsville, Pennsylvania (the "Allentown Plant");

- Houghton generated Hazardous Substances and/or hazardous wastes at the Allentown Plant;

- In a letter to the EPA dated December 23, 1997, Houghton admitted that it delivered containers to the Central Steel Drum Site for reconditioning from the Allentown Plant;

- The containers sent by Houghton to the Central Steel Drum Site contained Hazardous Substances and other compounds;

- Houghton is a "discharger" under the New Jersey Spill Act for the Hazardous Substances that were discharged at the Central Steel Drum Site.

*Id.* at ¶¶ 3373-3375.  In its Answer, Houghton admitted that it owned and operated the Allentown

Plant from 1979 to 2009, and that the operations involved the generation of hazardous substances

and hazardous wastes.  Ex. 5 at ¶ 3373 (Houghton's Nov. 9, 2009 Answer to Third-Party

Complaint B).  Houghton neither admitted nor denied the allegation that the drums sent by

Houghton to the Central Steel Drum Site contained hazardous substances and other compounds.

*Id.* at ¶ 3374.

Houghton settled the claims against it in the Spill Act Case by agreeing to pay $145,000

to the State of New Jersey.  *See* Ex. 6 (Houghton's Signature Page to Third-Party Consent

Judgment executed Mar. 19, 2013).

## IV.   OxyChem's CERCLA Complaint

After OxyChem's indemnitors Maxus and Tierra filed for bankruptcy in 2016, OxyChem

began directly incurring its own costs to design the EPA's selected remedy in the Lower 8 miles

of the Passaic River, among other response costs.  OxyChem initiated this lawsuit on June 30,

2018, asserting claims for cost recovery and contribution under CERCLA against Houghton and

more than 100 other defendants.  Dkt. 1 (Complaint).

OxyChem alleged that Houghton and fifteen other defendants (the "CSD Defendants")

"contracted for the disposal or treatment of hazardous substances at the CSD Property" and

"arranged for CSD to dispose of their spent and unusable waste."  *Id.* at ¶ 201.  OxyChem's

Complaint also included allegations regarding CSD's incineration of drums it received from its

customers, and how CSD's operations resulted in contamination of the Passaic River:

> CSD removed hazardous substances from the drums by incinerating them, creating
> ash piles five feet high and fifteen feet in diameter, unprotected from wind and rain.
> Most ash was spread throughout the CSD Property to fill in potholes and wetland
> areas.  On the CSD Property, drainage ditches collected runoff from the entire CSD
> Property and discharged this runoff to the Newark Bay at the confluence of the
> Passaic River, approximately 2,600 feet east of the CSD Property, and near RM 0
> to RM 0.5.  Newark Bay tidally influences the Passaic River.  Soil samples showed

dioxins, PCBs, and pesticides, LMW/HMW PAHs, DDT, dieldrin, copper, lead, mercury, and PAHs.

*Id.* Finally, OxyChem's Complaint alleged that the disposal of hazardous substances caused OxyChem to incur response costs, resulting in Houghton and the other CSD Defendants being liable to OxyChem under CERCLA:

> Disposals of dioxins and other hazardous substances from the CSD Property have contaminated and continue to contaminate the sediments of the Passaic River. Under CERCLA § 107(a)(3) and CERCLA § 113, the CSD Defendants are therefore liable for the costs of response resulting from the release of hazardous substances from the Facility, including the costs of removing and capping dioxins and other hazardous substances that have contaminated and continue to contaminate the river, including but not limited to DDT, dieldrin, copper, lead, mercury and PAHs.

*Id.* The files of OxyChem's consultant The Intelligence Group contain evidentiary support for these allegations, and those files have been produced to the Defendants. *See* Ex. 7 (Sept. 26, 2019 email making PRP search files available to Houghton via liaison counsel).[3]

When the Defendants filed motions to dismiss, Houghton joined. *See* Dkt. 440 (Houghton's Nov. 9, 2018 letter to Court joining motions to dismiss). The Court denied those motions as to OxyChem's contribution claims and one of its cost recovery claims against Houghton and the other Defendants. *See* Dkt. 647 (Jul. 31, 2019 Order).

Accompanying its Complaint, OxyChem filed a pretrial schedule it intended to propose to the Court after discussion with the Defendants. Dkt. 3 (OxyChem's Proposed Pretrial Order). Under that proposed schedule, fact discovery would have been completed by April 11, 2019. *Id.* at ¶ 1. OxyChem then sought Defendants' agreement to a Joint Discovery Plan on several occasions that would have completed fact discovery long before Houghton filed its motion for

---

[3] A 257-page collection of documents supporting OxyChem's allegations regarding the CSD Site are also maintained on the NJDEP's website: https://www.nj.gov/dep/passaicdocs/docs/3rd-PartyComplaintNexusPackages/3rd-PartyComplaintBNexus/CentralSteelDrumSite.pdf

sanctions, but each time OxyChem's proposal was rejected by Houghton and the other

Defendants. *See* Dkt. 531 (OxyChem letter to Court reciting Joint Discovery Plan proposals).

In its Rule 26 Initial Disclosures, Houghton identified Kipriam Timoseev as a person

likely to have discoverable information: "Mr. Timoseev is familiar with Houghton's Allentown

facility operations, which is the location from which empty drums were sent to the Central Steel

Drum operation." Ex. 8 at 2 (Houghton's Initial Disclosures). As the deposition phase of

discovery has not started, OxyChem has not yet deposed Mr. Timoseev.

## V.     **Houghton's Contention Interrogatories to OxyChem and OxyChem's Responses**

On August 5, 2019, Houghton served OxyChem with contention interrogatories.

Dumville Aff. Ex. A. Those contention interrogatories requested that OxyChem identify:

- "Each and every Hazardous Substance" OxyChem alleges were contained in the drums sent by Houghton to the CSD Site. *Id.* at Interrogatory 2;

- The "means and manner" by which OxyChem alleges Houghton's specific hazardous substances were released, and how OxyChem determined those releases of Houghton's specific hazardous substances occurred. *Id.* at Interrogatories 3, 4;

- All response costs OxyChem incurred that resulted from releases at the CSD Site of Houghton's specific hazardous substances. *Id.* at Interrogatory 5.

*Id.* In OxyChem's response, it reserved the right to supplement or revise those interrogatories, as

discovery was ongoing. Dumville Aff. Ex. B at 1, "Reservation of Rights" (OxyChem's

September 4, 2019 Answers to Contention Interrogatories). OxyChem also objected to the

contention interrogatories because, among other reasons, OxyChem had not obtained complete

discovery from Houghton and the interrogatories may require expert opinions. *See*, *e.g.*, *id.* at

Answer to Interrogatory 2. Notwithstanding those objections, OxyChem responded to

Houghton's interrogatories as provided in Fed. R. Civ. P. 33(d) and referred to letters to the

Defendants making available the files of its consultant The Intelligence Group, which contain

factual documents supporting OxyChem's allegations regarding the CSD Site and the CSD

Defendants.  *Id.* at Answer to Interrogatory 3.  OxyChem also described the costs it had incurred

at the Diamond Alkali Superfund Site that it was seeking to recover from the Defendants.  *Id.* at

Answer to Interrogatory 5.

On October 16, 2019, OxyChem supplemented its responses to Houghton's

interrogatories, attaching a copy of Houghton's own December 23, 1997 submission to EPA.

Houghton Ex. D (OxyChem's Supplemental Responses to Contention Interrogatories).

OxyChem also incorporated by reference its Amended Responses to Standard Interrogatory 22,

which was served on all parties on September 18, 2019.  *Id.* at Supplemental Response to

Interrogatory 5.  That Amended Response included a list of over $34 million in response costs

that OxyChem had incurred responding to releases of hazardous substances at the Diamond

Alkali Superfund Site.  Ex. 9 at 39-42, Exhibits A-D (OxyChem's Sept. 18, 2019 Supplemental

Responses to Standard Interrogatories).

**VI.**     **Houghton's Motion for Sanctions**

Two weeks later, counsel for Houghton wrote to OxyChem, insisting that OxyChem's

responses to Houghton's contention interrogatories were deficient.  Dumville Aff. Ex. F.

(Houghton's Nov. 7, 2019 Letter Threatening Rule 11 Sanctions).  However, rather than

pursuing relief under the rules governing discovery, Houghton instead demanded immediate

dismissal on threat of Rule 11 sanctions.  *Id.* at 3.

In response, counsel for OxyChem explained that "OxyChem's allegations practically

recite Houghton's own admissions to EPA and are—at a *minimum*—based on a reasonable

interpretation of those admissions."  Dumville Aff. Ex. G at 1 (OxyChem's Dec. 11, 2019

Response Letter, incorrectly described in the Dumville Affidavit as "follow[ing] Houghton's

Notice of Motion").  OxyChem's counsel further explained that "Houghton's prior admissions

and OxyChem's allegations based on those admissions make clear that this is not a situation where Rule 11 should even be discussed," that Houghton's threat of Rule 11 sanctions was improper, and if Houghton proceeded with its motion an award of costs and fees *to OxyChem* would be warranted. *Id.* at 2-3.

On April 10, 2020, counsel for Houghton sent a copy of its motion for Rule 11 sanctions to OxyChem, again threatening to seek Rule 11 sanctions if Houghton was not immediately dismissed. *See* Ex. 10 (Houghton's Apr. 10, 2020 Letter Enclosing Motion for Sanctions). OxyChem's counsel again responded to explain why filing its motion would be improper, and further suggested that good faith settlement discussions would be a more productive alternative. *See* Ex. 11 (OxyChem's May 4, 2020 Response Letter). Two days later, Houghton filed its motion for Rule 11 sanctions. Dkt. 963. The following day, an article was published in the online publication Law360 with the headline "OxyChem Faces Sanctions Bid Over NJ Cleanup Suit," which recited the claims in Houghton's motion for Rule 11 sanctions. *See* Ex. 12 (May 8, 2020 Law 360 article).

## ARGUMENT

### I.     OxyChem complied with Rule 11

Houghton's motion does not show that OxyChem's factual allegations are untrue, let alone that OxyChem and its counsel lacked a reasonable belief that those factual allegations were supported by evidence.  As a result, Houghton does not establish a violation of Rule 11.

By filing a complaint on behalf of its client, an attorney "is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3).  Sanctions for failing to comply with Rule 11 can be imposed "only in the 'exceptional circumstance' where a claim or motion is patently unmeritorious or frivolous." *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 297 (3d Cir. 2010) (internal citations omitted).  In the context of initiating a lawsuit, that "exceptional circumstance" is present where a plaintiff brings abusive litigation or misuses the court's process. *Teamsters Local Union No. 430 Cement Exp., Inc.*, 841 F.2d 66, 68 (3d Cir. 1988).  Rule 11 sanctions cannot be awarded—and should not even be sought—where, as here, each allegation has evidentiary support.

### A.     Houghton's 1997 submission to EPA provides evidentiary support for the allegation that Houghton shipped drums containing hazardous substances to Central Steel Drum.

OxyChem has sued Houghton under CERCLA's Section 107 cost recovery and Section 113 contribution provisions.  To establish Houghton's liability, OxyChem must prove at trial that: (a) that Houghton is one of CERCLA's four categories of potentially responsible parties; (b) that there was a release or a threatened release of hazardous substances from the facility into the environment; (c) that the release or threatened release caused OxyChem to incur response costs; and (d) that OxyChem's costs were necessary costs of response consistent with the National

Contingency Plan. *Champion Labs., Inc. v. Metex Corp.*, No. 02-5284, 2009 WL 2496888, at *23 (D.N.J. Aug.13, 2009) (citing *N.J. Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 104 (3d Cir. 1999)). "[T]he elements of the prima facie case for contribution are the same as those for a cost recovery action under Section 107(a)." *Id.*

      CERCLA's categories of potentially responsible parties include entities that "arranged for the disposal or treatment" of hazardous substances. 42 U.S.C. § 9607(a)(3). In its Complaint, OxyChem alleged that Houghton (and other defendants) are liable as arrangers because they "contracted for the disposal or treatment of hazardous substances at the [CSD Site]" and "arranged for CSD to dispose of their spent and unusable waste." Dkt. 1 at ¶ 201.

      Before filing its Complaint, OxyChem possessed evidence that:

(1) Houghton admitted the operations at its Allentown facility "involved the generation of hazardous substances and solid and hazardous wastes." Ex. 5 at ¶ 3373 (Houghton's Nov. 9, 2009 Answer to Third-Party Complaint B).

(2) Houghton sent drums from its Allentown facility to CSD for reconditioning in 1991 and 1992. Dumville Aff. Ex. E at TIERRA-B-003025, Attachment A (Houghton's Dec. 23, 1997 Response to EPA).

(3) The drums Houghton sent to CSD "could have contained raw materials used at the plant or products received or shipped in drums," and Houghton possessed hard-copy Material Safety Data Sheets regarding those materials and products. *Id.* at TIERRA-B-003029, 003031.

(4) At the Allentown facility, drums could have been used for storage of hazardous substances: "Any hazardous wastes present as residues would have been emptied in accordance with hazardous waste rules applicable to empty containers during that time period." *Id.* at TIERRA-B-003030.

Most of these admissions are contained in a 1997 submission from Houghton to EPA. That submission was carefully worded. It stated that "Houghton *would expect* drums of raw material to be emptied by pouring or shaking" and "Houghton *would expect* product drums to be similarly emptied." *Id.* at TIERRA-B-003030 (emphasis added). Importantly, Houghton never denied the drums could have contained hazardous substances: "Houghton does not have information

indicating *whether there were or were not* substances in any particular drum.  EPA has not [sic] legal authority to require Houghton, or any person, to make a contention and provide proof."  *Id.* (emphasis added).

Despite Houghton's own submission to EPA admitting that the drums it sent to CSD for reconditioning could have contained CERCLA hazardous substances, and its conspicuous inability to represent to EPA that the drums were free of such substances, Houghton now insists that "the only competent evidence on which OxyChem has relied indicates those drums contained air *and nothing else*."  Houghton's Br. at 11 (emphasis in original).  But "air and nothing else" is not what Houghton's 104(e) Response says.  To the contrary, Houghton specifically disclaimed knowing whether the drums contained substances in both its 104(e) Response and its pleading in the Spill Act case.  *See* Dumville Aff. Ex. E at TIERRA-B-003030 ("Houghton's failure to make a contention does not establish whether or not there were any substance in the drums."); Ex. 5 at ¶ 3374 ("Houghton is without knowledge or information sufficient to form a belief as to the allegations [that the containers sent by Houghton to the Central Steel Drum Site contained Hazardous Substances and other compounds]").

Houghton's representation that the drums were "empty" is based only on Houghton's unsubstantiated assumption that it would have been complying with environmental regulations at the time.  Even if this were true, a drum that was "empty" for regulatory purposes was still permitted to contain some amount of a hazardous substance.  *See* Ex. 2 at 1.  But not only has Houghton failed to provide evidence that it complied with applicable environmental regulations, Houghton has provided no discovery or information about its operations at the Allentown facility or drum emptying practices during the relevant time period.  Houghton did not even produce from its own files its 1997 104(e) Response or the MSDS documents it promised to make available to

EPA.  Houghton appears to rest on an affidavit of counsel in support of this motion for Rule 11 sanctions that certifying that "Houghton conducted a diligent investigation in connection with its dealings with the Central Steel Drum site in responding to discovery in the NJDEP Litigation and that Houghton found no information in its possession, custody, or control other than the same information reported to EPA in the EPA 104(e) response."  McAleese Aff. at ¶ 3; Ex. 8 (Initial Disclosures of Houghton).   But Houghton settled the NJDEP litigation before producing any information or a witness for deposition and brings this motion as a tactic to again avoid discovery here.

Even without this information from Houghton, several courts have relied on the existence of a process which "inherently involves" the generation and disposal of hazardous substances, in combination with a showing of a defendant's ownership of the hazardous substances, as a basis for alleging arranger liability.  *See, e.g., Sea Lion, Inc. v. Wall Chem. Corp.*, 974 F.Supp. 589, 599 (S.D. Tex. 1996); *Catellus Dev. Corp. v. U.S.*, 34 F.3d 748, 752 (9th Cir. 1994) (defendants who arranged for battery recycling, which inherently involved disposal of batter casings, cannot escape having battery casings defined as a discarded material simply by selling the battery to another party who then disposed of the casings); *Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 695 (9th Cir. 1992) (inherent generation of hazardous waste, in combination with ownership of the hazardous substances, sufficient to impose arranger liability).

Further, in 2009, Houghton was sued under the New Jersey Spill Act based on these same factual allegations.  Houghton paid $145,000 to the State of New Jersey to settle that claim.  *See Transtech Indus., Inc. v. A&Z Septic Clean*, 798 F.Supp. 1079, 1092 (D.N.J. 1992) (denying motion for Rule 11 sanctions based in part on defendant's prior settlement of claim for cleanup costs at site, despite defendant's characterization of prior settlement as "nuisance money.").

**B.      Evidentiary support abounds that hazardous substances were discharged from the CSD Site and that OxyChem has incurred response costs resulting from discharges of hazardous substances at the Diamond Alkali Superfund Site.**

Among the misrepresentations in Houghton's submission to the Court, two in particular stand out: the first is Houghton's recitation of the proof is required to establish a defendant's liability under CERCLA, and the second is a mischaracterization of OxyChem's disclosures in this case.  Houghton contends that:

> in order for OxyChem to comply with Rule 11(b), it must, *at a minimum*, be able to identify the "Hazardous Substance" that Houghton supposedly sent to the Central Steel Drum site, have some factual basis that the "Hazardous Substance" from Houghton was "Released" to the Lower Passaic River *and* have a factual basis for its allegation that it has incurred costs responding to the "Release" of [Houghton's] "Hazardous Substances" in the Lower Passaic River.

Houghton's Br. at 8.  This characterization of what CERCLA requires lacks any citation, and misleads the Court because it is completely wrong.  To establish a defendant's liability under CERCLA, finding a causal connection between defendant's wastes and a plaintiff's costs is not required.  *U.S. v. Rohm & Haas Co.*, 939 F.Supp. 1142, 1150 (D.N.J. 1996).  A CERCLA plaintiff "must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs."  *U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 264 (3d Cir. 1992).  "[I]t is the *release alone* that must justify the response costs, not the particular waste generated by one given defendant."  *Id.*

Ample evidence supports OxyChem's allegations that hazardous substances were released from Central Steel Drum.  The 1993 NJDEP Consent Order contained nineteen pages of environmental violations at the CSD Site, including dioxin-laden ash piles, open sludge pits, unmonitored storage tanks, and towers of drums containing hazardous substances.  *See* Ex. 1 at 4-23.  EPA designated it a Superfund site in 1997, noting "approximately 750 drums of flammable,

corrosive, water reactive materials are abandoned on the Site.  Some of these drums are leaking, and will continue to deteriorate."  *See* Ex. 3 at 1, 12.

Similarly, there can be no dispute that OxyChem has incurred response costs as a result. Contrary to Houghton's representation to the Court that OxyChem "has failed to provide *any* such information" regarding its response costs, Houghton's Br. at 10, OxyChem identified in its interrogatory responses more than $34 million in response costs to address discharges of hazardous substances in the Lower Passaic River by Central Steel Drum and other operations along the river. *See* Ex. 9 at 39-42, Exhibits A-D.

II.   **Houghton's Motion is Improper and Itself Violates Rule 11**

   A.   **Courts in this District have admonished litigants *not* to file motions like the one presently before the Court.**

The mere fact that Houghton filed this motion while the parties are still engaged in *paper fact discovery*—and have not even started electronic discovery or depositions—is a red flag that Houghton's motion is improper.  "Rule 11 is not the appropriate vehicle for addressing claims that have not yet been adjudicated on the merits."  *Oswell v. Morgan Stanley Dean Witter & Co., Inc.*, 507 F. Supp. 2d 484, 492 (D.N.J. 2007).  This is because absent "the benefit, and the procedural safeguards, of summary judgment motion practice addressing [such] claims under applicable law, the Court cannot say that the disputed claims are so unreasonable that sanction should follow."  *Id.*  To explain its extraordinary choice to pursue mid-discovery Rule 11 sanctions in lieu of summary judgment, Houghton merely offers the insufficient explanation that "summary judgment may be years away."

Beyond its timing, the arguments offered in support of Houghton's motion make clear it is doing exactly what courts in this District have admonished parties and their counsel *not* to do. "Rule 11 is not a means of getting around the standards on a motion to dismiss" nor "a vehicle

for resolving disputed questions of fact and law." *Sloatman v. Triad Media Solutions, Inc.*, No.

17-11383, 2018 WL 4204444, * 1 (D.N.J. Sept. 4, 2018).  "Where such disputes exist, they are

appropriately resolved after discovery." *Id.* (citation omitted); *see also* Fed. R. Civ. P. 11

Advisory Committee Note (1993 Amendments) ("Rule 11 motions should not be made or

threatened . . . as a discovery device or to test the legal sufficiency or efficacy of allegations in

the pleadings; other motions are available for those purposes."); 5A Charles Alan Wright &

Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1336 (2d ed. Supp. 2003) ("Rule 11

should not be used to raise issues of legal sufficiency that more properly can be disposed of by a

motion to dismiss, a motion for more definite statement, or a motion for summary judgment.").

Houghton's brief uses Rule 11 as a pretext to shoehorn arguments more appropriately set forth in

support of other motions—whose standards Houghton cannot meet.

For example, much of Houghton's brief is a misguided attempt to reargue the motion to

dismiss it joined in 2018 by attacking the sufficiency of—rather than the evidentiary support

for—the allegations in OxyChem's Complaint.  *See* Houghton's Br. at 6 (lead argument:

"**OxyChem has Failed to Allege in the Complaint Any Facts to Support Its CERCLA

Claims Against Houghton**"; *id.* at 7 (citing *Ashcroft v. Iqbal* in its argument seeking Rule 11

sanctions).  Similarly, Houghton argues that OxyChem's responses to contention interrogatories

warrant Rule 11 sanctions.  *See id.* at 4 ("OxyChem's responses were completely deficient and

failed to answer the interrogatories in good faith or provide any information to support the

allegations it made against Houghton.").  Setting aside the fact that Rule 11 does not apply to

discovery responses, *see* Fed. R. Civ. P. 11(d), Houghton's claim that OxyChem's responses are

deficient is belied by its choice not to seek relief under the Federal Rules specifically addressing

discovery disputes, nor any application to the Special Master specifically appointed to address

such disputes.  *See* Dkt. 646 (Order appointing Special Master to oversee discovery); Dkt. 755 at

2 ("[A]ll discovery issues must first be presented to the Special Master before seeking relief from

the Court"); L. Civ. R. 37.1 (requiring presentation of discovery dispute to Magistrate Judge by

letter or telephone conference before formal motion).  Houghton circumvented the procedures

for addressing alleged deficiencies in discovery responses because OxyChem's responses are

adequate, and because serving mid-discovery contention interrogatories to manufacture a Rule

11 issue is a tactic courts are rightfully skeptical of.[4]

    **B.**     **Houghton's motion is not well grounded in fact or law, and was brought for an improper purpose.**

    Rule 11 motions should not "be prepared to emphasize the merits of a party's position, to

exact an unjust settlement, [nor] to intimidate an adversary into withdrawing contentions that are

fairly debatable."  Fed. R. Civ. P. 11 Advisory Committee Note (1993 Amendments).  The filing

of a motion for sanctions is itself subject to the requirements of the rule and can lead to

sanctions, including attorney's fees incurred to oppose the motion.[5]  *Id.*; Fed. R. Civ. P. 11(c)(2).

"Thus, where a party's motion for Rule 11 sanctions is not well grounded in fact or law, or is

filed for an improper purpose, a court may find itself in the position of imposing Rule 11

---

[4] *See, e.g., Nestle Foods Corp. v. Aetna Cas. and Sur. Co.*, 135 F.R.D. 101, 111 (D.N.J. 1990) (Rule 33(a)(2) contention interrogatories are appropriate only "after a substantial amount of discovery has been conducted."); *Conopco, Inc. v. Warner-Lambert Co.*, No. 99-101, 2000 WL 342872, at *4-5 (D.N.J. Jan. 26, 2000) ("The party serving the [contention] interrogatories must prove how discovery is benefited by an earlier answer."); *In re: Riddell Concussion Reduction Litig.*, No. 13-7585, 2016 WL 7365508, at *2, n. 4 (D.N.J. Jan. 6, 2016) ("Of course, at this [early discovery] stage of the case plaintiffs do not have to prove their allegations [and] plaintiffs' allegations may change based upon the discovery in the case.").

[5] A party opposing a Rule 11 motion can be awarded costs and fees as a Rule 11 sanction, without filing a separate motion.  *See id.*; *Smith v. Psychiatric Solutions, Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014) ("Ordinarily, this does not require a cross-motion for sanctions, since a court is authorized to award fees to a party that successfully opposes a Rule 11 sanctions motion.  Thus, when a party files a Rule 11 motion for an improper purpose, the court may award fees to the target of the motion.").

sanctions on the moving party and/or her attorney."  Georgene M. Vairo, RULE 11 SANCTIONS: CASE LAW PERSPECTIVES AND PREVENTIVE MEASURES § 4.01[c][3][F] (2d ed. Supp. 1994).

Houghton's motion is not well grounded in fact.  Based on a mischaracterization of its own submission to EPA, Houghton and its counsel avail themselves of a rule designed for the most exceptional abuses of judicial process.  They rewrite the procedural history of discovery in this case, representing that OxyChem has disclosed no information about its costs—ignoring the breakdown of OxyChem's costs included in its Initial Disclosures, its Answers to the Standard Interrogatories, and the updated information in its Amended Answers to the Standard Interrogatories.  They accuse OxyChem of slow-playing discovery to delay summary judgment and "extort" settlements from the defendants, when the record is overwhelmingly clear that OxyChem has repeatedly sought entry of schedules under which fact discovery would be *completed* by now—only to be opposed by Houghton and the other defendants.  *See*, *e.g.*, Dkt. 531 (OxyChem letter to Court reciting Joint Discovery Plan proposals).

Nor is Houghton's motion well-grounded in law.  Houghton argues its motion based on a completely inaccurate characterization of what a plaintiff must prove to establish a defendant's CERCLA liability, submitting its erroneous recitation to the Court as settled law—but without a single citation.

The only possible conclusion is that Houghton threatened and then filed its motion for an improper purpose.  *See In re Cendant Corp.*, 96 F. Supp. 2d 403, 406 (D.N.J. 2000) (improper purpose includes "to harass or cause unnecessary delay or needless increase in the cost of litigation").  Houghton and its counsel know the significance of being targeted by a Rule 11 motion, even when that motion is meritless.  *See* Ex. 12 (*OxyChem Faces Sanctions Bid Over NJ Cleanup Suit*, LAW 360, May 8, 2020).  OxyChem explained to counsel twice why a Rule 11

motion would be improper, warned that such a motion would waste time and entitle OxyChem to costs, and suggested good faith settlement negotiations instead.  *See* Dumville Aff. Ex. G (Dec. 11, 2019 Letter from OxyChem to Houghton); Ex. 10 (May 5, 2020 Letter from OxyChem to Houghton).  Houghton should never have threatened its motion in the first place—and the fact that Houghton followed-through with this filing, viewed together with the procedural posture and the thin support offered in support, reveals it as a litigation tactic and cynical bid for leverage.

Finally, in filing this motion, Houghton and its counsel have disregarded their duty to promote judicial economy.  "While the focus of Rule 11 is on whether a claim is wholly without merit, and is not dictated by whether resources will be expended in deciding the motion, Rule 11 motions should conserve rather than misuse judicial resources."  *Moeck v. Pleasant Valley Sch. Dist.*, 96 F.3d 387, 391 n. 9 (3d Cir. 2016); *see also* Fed. R. Civ. P. 1 Advisory Committee Note (2015 Amendments) (noting purpose to "discourage over-use, misuse, and abuse of procedural tools that increase cost and result in delay").  Houghton's Rule 11 motion has misused judicial resources—it ensured its motion would bypass the Special Master that the Court appointed to efficiently manage discovery in this case, and ensured the Court would have to address this motion while resources were strained and the District Court was shut down or in the process of reopening from the COVID-19 pandemic.  *See* D.N.J. Standing Order No. 2020-06 ("[E]mergency conditions, consistent with the national emergency declared with respect to COVID-19, will materially affect the functioning of the Federal courts").  And it ensured that OxyChem and its counsel would need to take time from advancing the merits of this case to respond to the very serious accusations Houghton cavalierly filed.

While an order awarding fees and costs incurred in responding to this motion is justified, OxyChem recognizes that such an order would only compound this distraction caused by

Houghton.  *See Moeck*, 96 F.3d at 391 ("Rule 11(c)(6) requires only that a district court explain

the basis of its order when the court imposes a sanction, not when it denies sanctions").  Instead,

OxyChem respectfully submits that the Court should summarily deny Houghton's improper

motion, and admonish Houghton (and other defendants) not to engage in frivolous motion

practice.

## **CONCLUSION**

For the foregoing reasons, OxyChem respectfully requests that the Court enter an Order

denying Houghton International, Inc.'s Motion for Rule 11 Sanctions, and granting any other relief

the Court deems appropriate.

Dated:  June 17, 2020                      Respectfully submitted,

   /s/ *John J. McDermott*   
John J. McDermott, Esq.
(jmcdermott@archerlaw.com)
Charles J. Dennen, Esq.
Lauren E. Krohn, Esq.
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel. (856) 795-2121

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel. (713) 650-8805
By:    Kathy D. Patrick, Esq.
       (kpatrick@gibbsbruns.com)
       Anthony N. Kaim, Esq.
       Katherine H. Kunz, Esq.
       Jorge M. Gutierrez, Esq.
       Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel. (215) 732-3255
By:    Larry D. Silver, Esq.
        (lsilver@lssh-law.com)
        David E. Romine, Esq.

GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
Tel. (310)553-3610
By:    Peter A. Nyquist, Esq.
        (pnyquist@ggfirm.com)
        Noah Perch-Ahern, Esq.
        Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

218731524v1