ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel.    (856) 795-2121
By:    John J. McDermott, Esq.
        (jmcdermott@archerlaw.com)

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.    (713) 650-8805
By:    Kathy D. Patrick, Esq.
        (kpatrick@gibbsbruns.com)
        Anthony N. Kaim, Esq.
        Jorge M. Gutierrez, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION | ) Hon. Madeline Cox Arleo |
| | ) Hon. Joseph A. Dickson |
| | ) |
| Plaintiff, | ) Civil Action No. 2:18-cv-11273 |
| | ) |
| v. | ) **PLAINTIFF OCCIDENTAL** |
| | ) **CHEMICAL CORPORATION'S** |
| 21ST CENTURY FOX AMERICA, INC., *et al.* | ) **RESPONSE TO MOTION BY THE** |
| | ) **SMALL PARTIES GROUP FOR AN** |
| Defendants. | ) **ORDER COMPELLING PLAINTIFF** |
| | ) **TO PRODUCE DOCUMENTS IT** |
| | ) **HAS WITHHELD AS PRIVILEGED** |
| | ) **OR PROTECTED** |

## <u>TABLE OF CONTENTS</u>

I.    Introduction and Summary ........................................................................... 1

II.   Standard of Review and Relevant Legal Principles....................................... 3

III.  Relevant Facts ............................................................................................... 5

      A.    Joint Counsel Represented OxyChem, Maxus and Tierra .................. 6

      B.    Three Judgments in State and Federal Courts Confirm the Complete
            Alignment of OxyChem and Maxus and Tierra Regarding the Defense of
            Lister-Related Liabilities. ................................................................... 8

      C.    The Drinker Biddle Privilege Log Is Produced in the NJDEP Litigation............ 9

      D.    OxyChem Receives the Documents on the Drinker Biddle Log Pursuant to
            Court Orders in the Maxus Bankruptcy and Re-Reviews the Entire Drinker
            Biddle Log for this Case. ................................................................... 11

IV.   ARGUMENT ................................................................................................ 13

      A.    OxyChem's Privilege Log—Built on a 30-Year Joint-Client Privilege, and
            the Community-of-Interest Privilege—Easily Withstands SPG's Attempt
            to Brush Aside Three Decades and 30,000 Privilege Entries ........................... 13

            1.    OxyChem's Privilege Log is Supported by the Joint-Client
                  Privilege:  Thousands of Documents SPG Challenges Are
                  Authored By or For OxyChem's and Maxus's Joint, Outside
                  Counsel or their Consultants.............................................. 13

            2.    OxyChem's Privilege Log Is Also Founded on the Community of
                  Interest: For the Last 30 Years, as Required by the 1986 SPA,
                  OxyChem and Maxus Shared a Common Interest in Defending
                  Lister-Related Environmental Liabilities................................ 15

            3.    Finally, OxyChem's Privilege Log is Built on Work Product
                  Protection, Stemming from the Joint Representation and
                  Community of Interest. ...................................................... 17

            4.    SPG Cannot Erase 30 Years of Joint Client and Common Interest
                  by Plucking Examples of Adversity from the Fringes of the
                  Relationship Among Maxus, Tierra, and OxyChem. ........................... 19

      B.    OxyChem Did Not Waive Protection Over the 66 Pages SPG Challenges....... 23

1.    Production of OxyChem's Privileged Documents by Maxus or the Liquidating Trust Does Not Prove Waiver by OxyChem....................... 24

2.    Rule 502(d) Prohibits a Finding of Waiver as a Result of Productions in Either the Bankruptcy Proceedings or Production in this Case. ............................................................................................. 25

a.    Rule 502(d) Orders by the Bankruptcy Court................ 26

b.    Rule 502(d) Order in this CERCLA Action. ................. 27

C.    In Response to SPG's Remaining Attacks, which It Should Have Raised Before Filing the Motion, OxyChem Reviewed Its Privilege Log Yet Again and Is Making Supplemental Productions and Revised Privilege Entries. .............................................................................................. 29

V.    CONCLUSION………………………………………………………………...30

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.*,
   174 F.R.D. 609 (M.D. Pa. 1997)...........................................................................4, 16, 17, 20

*Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*,
   255 F. Supp. 3d 561 (M.D. Pa. 2017)................................................................................17

*In re Cendant Corp. Sec. Litig.*,
   343 F.3d 658 (3d Cir. 2003).........................................................................................17, 18

*Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles & Kaufman, LLP*,
   No. 01 CV 3844, 2006 WL 2135782 (E.D.N.Y. July 28, 2006) ...........................................17

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985) (superseded on other grounds).....................................15, 16, 20

*Equal Employment Opportunity Comm'n v. George Washington Univ.*,
   No. 17-CV-1978, 2020 WL 3489478 (D.D.C. June 26, 2020)............................................28

*Eureka Inv. Corp. N.V. v. Chicago Title Ins. Co.*,
   743 F.2d 932 (D.C. Cir. 1984) ..........................................................................................23

*Ex. 16*
   *(4/24/18 Consent Order, Maxus Bankruptcy (ECF No. 2015))*...........................................12

*F.D.I.C. v. Ogden Corp.*,
   202 F.3d 454 (1st Cir. 2000)........................................................................................4, 14

*Hickman v. Taylor*,
   329 U.S. 495 (1947).......................................................................................................18

*In re Human Tissue Prod. Liab. Litig.*,
   255 F.R.D. 151 (D.N.J. 2008)...........................................................................................4

*Louisiana Mun. Police Emp.Ret. Sys. v. Sealed Air Corp.*,
   253 F.R.D. 300 (D.N.J. 2008)..................................................................................4, 17, 18

*Martin v. Bally's Park Place Hotel & Casino*,
   983 F.2d 1252 (3d Cir. 1993)..........................................................................................18

*In re Maxus Energy Corp. et al.*,
   Case No.16-11501 (CSS) (Bankr. D. Del.)........................................................................11

*McLane Foodservices, Inc. v. Ready Pac Produce, Inc.*,
   No. 10-6076, 2012 WL 1981559 (D.N.J. June 1, 2012)...........................................16, 20, 21

*Shipyard Assoc., L.P. v. City of Hoboken*,
No. 14-1145, 2015 WL 4623470 (D.N.J. Aug. 3, 2015) ...................................................... 20

*Sinclair Wyoming Ref. Co. v. A&B Builders, Ltd.*,
No. 15-CV-91, 2017 WL 10309305 (D. Wyo. Oct. 24, 2017) ................................................. 16

*In re Teleglobe Commc'ns Corp.*,
493 F.3d 245 (3d Cir. 2007) ............................................................................................. *passim*

*Truck Ins. Exchange v. St. Paul Fire & Marine Ins. Co.*,
66 F.R.D. 129 (E.D. Pa. 1975) .......................................................................................... 23

*United Coal Companies v. Powell Const. Co.*,
839 F.2d 958 (3d Cir. 1988) ......................................................................................... 16, 18

*United States v. Caroleo*,
No. 17-CR-177 (ENV), 2019 WL 5869690 (E.D.N.Y. Nov. 11, 2019) ............................... 26

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) ....................................................................................................... 14

*Vermont Gas Sys., Inc. v. U.S. Fid. & Guar. Co.*,
151 F.R.D. 268 (D. Vt. 1993) ........................................................................................... 21

**Other Authorities**

FED. R. EVID. 501 ............................................................................................................... 3

FED. R. EVID. 502(b) .......................................................................................................... 28

FED. R. EVID. 502(d) .......................................................................................................... 25

8 J. Wigmore, *Wigmore on Evidence* § 2312 (McNaughton rev. ed. 1961) ..................................... 4

1 Kenneth S. Broun et al., *McCormick on Evidence*, § 91 ......................................................... 23

S. REP. 110-264, 2, 2008 U.S.C.C.A.N. 1305 ...................................................................... 26

## I.    Introduction and Summary[1]

The SPG's motion attempts to wipe out 30,000 privilege claims and 30 years of OxyChem and Maxus's joint-defense efforts. To make this broadside, SPG did not even need to look at OxyChem's privilege log. It does not challenge 30,000 entries category by category, let alone document by document, as the law requires. Rather SPG lobs an all-or-nothing grenade, asserting that because OxyChem and Maxus were adverse on certain issues during their thirty-year relationship, they can have no common interest on *any* issues and cannot preserve their rights, as joint clients of the same law firms, to protect the confidentiality of the work product and privileged communications of their lawyers. If SPG were right, this grenade would blow up in its face: as soon as its own members filed crossclaims against each other in this case, they would have to produce all of their privileged communications, too. SPG also distorts OxyChem's and Maxus's relationship and misunderstands common-interest law.

OxyChem's privilege log easily withstands Maxus's generic challenge. The log is founded on a three-decade joint-client relationship and community of interest between OxyChem and its indemnitors Maxus and Tierra, during which they defended, indemnified, and held OxyChem harmless as to Lister-related environmental liabilities. Through decades of regulatory action and litigation, OxyChem and Maxus coordinated their legal strategy. National law firms represented them as joint clients for decades. Until weeks before their 2016 bankruptcy, Maxus and Tierra discharged their obligations, so OxyChem did not have to lead its own defense.

In 2016, OxyChem took the reins from its indemnitors, inheriting volumes of historical information and analysis. That inheritance included a privilege log prepared by Drinker Biddle,

---

[1] While the length of OxyChem's brief complies with L. Civ. Rule 7.2, to the extent paragraph 11(c) of the Protective Order applies to responsive briefs OxyChem hereby requests leave to file an over-length brief.  The factual and legal scope of the SPG's motion necessitate additional pages, and the SPG has previously consented to OxyChem filing an over-length brief in response.

which had led the defense of the indemnified claims in the New Jersey Spill Act litigation (the "Drinker Biddle Log"). Faced with complaints by the SPG Defendants that the log was unusable, OxyChem re-reviewed the underlying documents and prepared a new log from scratch—a process that took ten months and cost hundreds of thousands of dollars. The result is a log that is specific, clear, and permits relevant challenges to the joint client and common-interest privileges asserted for each, individual document.

This defeats the SPG's challenge, because the SPG does not attack *any* specific privilege claims for *any* particular document. Indeed, while their motion rests entirely on an alleged (but not actual) adversity between OxyChem and Maxus, SPG has not even tried to show that Maxus and OxyChem *were* adverse as to a *single* document on the log. On that basis alone, the SPG's motion should be denied.

Unable to refute the clear, unchanging joint-client and community-of-interest privileges, SPG is left to cherry-pick disputes between OxyChem and Maxus. These do not change the calculus. SPG points to disputes regarding the scope of the indemnity—ignoring the admission of Maxus that, "Since 1986, Maxus (through Tierra) has regularly performed its indemnification obligations to OCC in accordance with the SPA."[2] SPG's attempt to seize on a dispute that existed *only because* Maxus acknowledged its otherwise broad obligations to defend OxyChem does not negate either their joint-client or their community-of-interest privileges—nor does it permit the SPG, a *third party*, to discover them. Adversity between OxyChem and Maxus could allow *them* to discover joint communications with their shared counsel, but it would never permit third parties off the street, like SPG, to pry into privileged materials.

---

[2] *See* Certification of John J. McDermott, Esq. ("McDermott Cert."), Ex. 1 (Javier Gonzalez First Day Decl. ¶ 47). Unless otherwise noted, all citations to "Ex." refer to exhibits to the McDermott Cert., filed herewith.

Aside from OxyChem and Maxus's joint representation and alignment, the Court need look only at three orders issued by Judge Sontchi of the United States Bankruptcy Court for the District of Delaware to dispose of this motion—not one of which SPG acknowledges. These Orders required the transfer of historical information and analysis regarding the indemnified sites to OxyChem and ordered—three times—that the transfer of that information would *not* constitute waiver of any privilege. Members of the SPG—including Givaudan, Ashland, Mallinkrodt and *every* member of the former CPG (appearing here as the SPG)—appeared in the Bankruptcy and *none* objected to the non-waiver provisions in these Orders. It is less than candid for SPG to claim a waiver arose from the transfer of information from Maxus to OxyChem in the Bankruptcy proceedings, when each of them is aware that the United States Bankruptcy court *ordered* that no waiver could or would occur. To grant SPG's motion, the Court would have to countermand all three of Judge Sontchi's orders. And it would have to do so *despite* the fact that *both* Maxus and OxyChem relied on these orders when they undertook the transfer SPG now attacks, wrongly, as a waiver.

For these reasons, and those stated in greater detail below, SPG's motion should be denied.

## II.    Standard of Review and Relevant Legal Principles

This action arises under federal law, so the scope of OxyChem's privileges are defined by federal common law. FED. R. EVID. 501.

The Third Circuit has explained that the "common interest privilege" encompasses two types of privileged communications. The first is a "joint-defense" or "joint client" privilege, which protects the confidentiality of communications among *clients represented by the same counsel. In re Teleglobe Commc'ns Corp.*, 493 F.3d 245, 363-64 (3d Cir. 2007).[3] When "a lawyer represents

---

[3] Unless otherwise noted, all emphasis is added and internal citations are omitted.

multiple clients having a common interest, communications between the lawyer and any one (or more) of the clients are *privileged as to outsiders* but not *inter sese* [between themselves]." *F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000) (*citing Eureka Inv. Corp. N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 937-938 (D.C. Cir. 1984)); 8 J. Wigmore, *Wigmore on Evidence* § 2312 at 603-09 (McNaughton rev. ed. 1961).

The second privilege, applicable "in civil and criminal litigation, and even in purely transactional contexts," is a "broader one that protects all communications shared within a proper 'community of interest.'" *Teleglobe*, 493 F.3d at 364. It allows "*attorneys representing different clients with similar legal interests to share information without having to disclose it to others*." *Id.* Here, "because the clients have separate attorneys, courts can afford to relax the degree to which clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer." *Id.*, 493 F.3d at 366. "To establish a right to the [common interest] privilege, the party asserting it must show that: (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived." *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609, 634 (M.D. Pa. 1997).

The party asserting attorney-client privilege bears the burden of establishing its applicability. *In re Human Tissue Prod. Liab. Litig.*, 255 F.R.D. 151, 164 (D.N.J. 2008). The party asserting work product protection also bears the burden to show its applicability, but "the burden of establishing waiver of work-product doctrine falls, unlike the attorney-client privilege, on the party seeking to establish waiver." *Louisiana Mun. Police Emp.Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306, 311 (D.N.J. 2008).

### III.    Relevant Facts

In the 1980s, after more than a century of contamination by hundreds of industrial operations, the Lower Passaic River and surrounding properties became the subject of formal regulatory action.  *See*, *e.g.*, Ex. 20 (1980 NJDEP report observing risks from mercury, copper, and other metals in Passaic River fish); Ex. 2 (1982 designation of Passaic River as "closed fishing area due to PCBs in fish tissue"); Ex. 3 (Executive Orders regarding contamination detected on Lister and Givaudan sites).  In 1984, the site was listed on the Superfund National Priorities List (NPL).

By the time OxyChem's affiliate purchased the stock of Diamond Shamrock Chemicals Company (DSCC) from Maxus Energy Corporation in 1986, litigation was not just anticipated— it had arrived.  The US Environmental Protection Agency (EPA) and New Jersey Department of Environmental Protection (NJDEP) had issued several directives related to investigation and remediation of the long-inactive Lister Site.  Nearby residents and property owners had already filed lawsuits.

When Maxus sold DSCC's active chemicals business, it was not only aware of these liabilities, it agreed expressly to retain the Lister Site liabilities, promising to defend both it and the buyer from the litigation and threats of litigation that would follow as the Diamond Alkali Superfund Site was investigated and remediated. *See* Ex. 25 at OCCNJ0027239. Under the 1986 Stock Purchase Agreement (SPA) Maxus assumed a duty to "defend, indemnify, and hold harmless" OxyChem from all environmental liabilities associated with former DSCC operations, including the Diamond Alkali Superfund Site. For 30 years after the SPA, Maxus performed its

indemnification obligations to OxyChem through Tierra Solutions, Inc. ("Tierra"),[4] which also owned the Lister Site. *See* Ex. 1 (Javier Gonzalez First Day Decl. ¶ 47).

### A.   Joint Counsel Represented OxyChem, Maxus and Tierra.

In 1988, aware of OxyChem's purchase of the stock of DSCC from Maxus, EPA notified OxyChem it was a party that was potentially liable under CERCLA to implement the remedial action selected by EPA's 1987 Record of Decision for the Lister Site. *See* Exs. 25-27 (correspondence among EPA, OxyChem, and Maxus regarding Maxus's defense of OxyChem).

As agreed in the SPA, Maxus immediately retained the law firm Vinson & Elkins LLP to jointly represent Maxus, OxyChem in negotiations with EPA regarding performance of the remedial action. *See* Declaration of Benjamin S. Lippard ("Lippard Decl.") ¶ 3. Included within the scope of this engagement were the defense of additional investigations by the NJDEP, the National Oceanic and Atmospheric Administration, and possible claims for natural resource damages. *Id.* at ¶ 4. Those negotiations culminated in entry of a Consent Order in 1990. Vinson & Elkins also represented jointly, with OxyChem and Maxus, the entity that eventually became known as Tierra—the owner of the Lister Plant site. *Id.* at ¶ 3.

For decades thereafter, Vinson & Elkins directly represented OxyChem, Maxus, and Tierra. *Id.* at ¶ 6. Until 2016, Vinson & Elkins was also OxyChem's counsel for all aspects of potential environmental liabilities at the Diamond Alkali Superfund Site, *id.* at ¶ 4, including negotiating at least 8 settlements between OxyChem and federal and state agencies. *See* Ex. 5 (OxyChem's Answer to Standard Interrogatory 16).

---

[4] Tierra was incorporated in March 1986 under the name "Diamond Shamrock Process Chemicals, Inc." That entity's name was changed to "Diamond Shamrock Chemical Land Holdings, Inc." in July 1986, and further changed to "Chemical Land Holdings, Inc." in 1987 and, finally, "Tierra Solutions, Inc." in 2002. *See* Ex. 4.

During that 30-year window, various scientific and technical consultants were retained either by Tierra or by Vinson & Elkins to work with and support the defense provided to all three clients—Maxus, Tierra, and OxyChem—by their joint counsel. *See* Declaration of David Rabbe ("Rabbe Decl.") ¶ 8.[5]

When the Spill Act case was filed in 2005, Maxus again retained counsel to represent the companies jointly. Vinson & Elkins and Drinker Biddle & Reath LLP appeared in the Superior Court of New Jersey on behalf of all three companies to defend against NJDEP's claims seeking response costs and other alleged damages. *See* Lippard Decl. ¶ 4; Rabbe Decl. ¶ 7; Ex. 28 (Motion to Admit Vinson & Elkins).

In 2006, NJDEP amended its complaint to allege that Maxus's foreign parent companies were trying to strand the Lister Site liabilities in Maxus and Tierra, while stripping their assets and hindering their ability to satisfy the environmental liabilities. *See* Ex. 6 (First Amended Complaint). This forced OxyChem to engage its own counsel to pursue cross-claims against Maxus, Tierra, and their parents to protect OxyChem's indemnity rights under the SPA. *See* Ex. 29 (substitution of counsel for OxyChem).

But those cross-claims had *no* effect on the community of interest among OxyChem, Maxus, and Tierra regarding the defense of the Lister-related liabilities. OxyChem's cross-claims, in fact, resulted in a judgment that confirmed Maxus's and Tierra's complete alignment with OxyChem relating to the defense of those liabilities. *See* Exs. 7, 10 (orders from Spill Act case).

---

[5] In 1995, Maxus also retained the law firm Andrews & Kurth LLP to assist with Vinson & Elkins' representation of Maxus, Tierra, and OxyChem related to the Lister Site liabilities. Later, in the Spill Act case, Andrews & Kurth appeared on behalf of Maxus and Tierra to pursue contribution claims against third-party PRPs, and compel those parties to pay their fair share for the contamination of the Lower Passaic River and surrounding waterways. *See* Rabbe Decl. ¶ 7.

Accordingly, even after OxyChem obtained independent counsel in the Spill Act case, the firms retained by Maxus continued to represent OxyChem and its interests jointly, with Maxus and Tierra. In the Spill Act case, Drinker Biddle negotiated a settlement releasing Maxus, Tierra, *and* OxyChem from NJDEP's response cost claims. That settlement was entered in 2013—well *after* the latest document on the Drinker Biddle Log. *See* Ex. 9 (Court Approved Settlement Agreement). And Vinson & Elkins continued to represent OxyChem in its interactions with EPA, NJDEP, and other PRPs though Maxus's bankruptcy in June 2016. *See* Rabbe Decl. ¶ 7; Lippard Decl. ¶ 6.

### B.    Three Judgments in State and Federal Courts Confirm the Complete Alignment of OxyChem and Maxus and Tierra Regarding the Defense of Lister-Related Liabilities.

Although OxyChem and Maxus and Tierra have been adverse on the precise *scope* of Maxus's indemnity obligations under the SPA, the community of interest between OxyChem, Maxus, and Tierra regarding the defense of environmental liabilities continued through all relevant periods. Binding judgments in those disputes confirm the close alignment of Maxus and OxyChem as to the defense of the underlying liabilities.

In a June 27, 2006 final judgment in Cause No. 02-09156, *Occidental Chemical Corp. v. Maxus Energy Corp.*, the 14th District Court of Dallas County, Texas granted OxyChem a declaratory judgment that "Plaintiff Occidental Chemical Corporation's requests to Defendant Maxus Energy Corporation for indemnity or defense for obligations under Sections 9.03 (a)(iv) and 9.03 (a)(viii) of the [SPA] Agreement *are not limited* by Section 9.03(a)(ii) of the Agreement." 2006 WL 6040766 (June 27, 2006). In other words, under the SPA, Maxus had a broad and unlimited obligation to defend OxyChem.

On February 1, 2008, the Fifth Court of Appeals affirmed this judgment in Case No. 05-06-01299-CV, *Maxus Energy Corp. v. Occidental Chemical Corp.*, reciting that, "Occidental sought affirmative relief by its request for a declaration that Maxus is obligated to indemnify

Occidental *indefinitely* for lawsuits relating to the Inactive Sites and Historical Obligations. . . .
*We affirm the trial court's judgment*." 244 S.W.3d 875, 885.

Finally, on August 24, 2011, in the Spill Act litigation, Docket No. L-009868-05, *New Jersey Dep't'. of Envt'l. Protection v. Occidental Chemical Corporation*, the Superior Court of New Jersey granted OxyChem's motion for partial summary judgment against Maxus, ruling:

> Occidental Chemical Corporation's Motion for Partial Summary Judgment Against Defendant Maxus Energy Corporation is GRANTED. Defendant Maxus Energy Corporation is required to indemnify Occidental Chemical Corporation for *any costs, losses and liabilities* that may be incurred by Occidental Chemical Corporation in the above-captioned action *as a result of Occidental Chemical Corporation's acquisition of Diamond Shamrock Chemicals Company.*

Ex. 7 (emphasis added). In 2016, that court again confirmed that Maxus's indemnity obligations extended to *all* liabilities related to the Lister Site and the Diamond Alkali Superfund Site. *See* Ex. 10 (April 15, 2016 order granting OxyChem's Motion for Partial Summary Judgment Against Maxus).

Accordingly, OxyChem, Maxus, and Tierra were *always* fully aligned regarding the defense of the environmental liabilities arising from the Lister Plant site.

### C.    The Drinker Biddle Privilege Log Is Produced in the NJDEP Litigation.

On May 5, 2011, the Spill Act court established a nine-track trial plan that segregated the claims on which Maxus, Tierra, and OxyChem's interests were completely aligned from those where they were adverse. The aligned interests—NJDEP's claims regarding the extent of the Lister Site liabilities and an allocation among the third-party PRPs—were assigned to "Track VIII" and "Track IX." The adverse interests—the scope of Maxus's contractual liability to OxyChem and statutory liability to NJDEP—were assigned to "Track III."  *See* Ex. 11 (May 5, 2011 CMO XVII).

Days before the start of a fast-tracked, 90-day discovery period on Track III, Maxus served a 153,000-document privilege log (the "Drinker Biddle Log").

On November 3, 2011, with the clock ticking, NJDEP and OxyChem requested that the Special Master order Maxus and Tierra to produce certain documents on the Drinker Biddle Log—emergency relief necessitated by the impending discovery deadline on Track III. OxyChem's joinder in NJDEP's motion was both limited and clear: OxyChem was emphatic that before any documents were produced *to* NJDEP *or* other third parties, OxyChem would first have an opportunity to screen any Maxus and Tierra documents for its own privileged information. *See* Ex. 12 (Nov. 4, 2011 letter).

A December 5, 2011 Consent Order established a procedure for resolving the dispute as to Maxus's privileged documents, under which the parties identified documents relevant to Track III, the scope of the indemnity. *See* Ex. 13 (Dec. 5, 2011 Order). Without waiver of any privileges, those Track III documents were to be "provisionally produced" ***to NJDEP and OxyChem only— not to the SPG or other parties***. *Id.* Documents relevant to Tracks VIII and IX (environmental damages and allocation) were not produced.

With OxyChem and NJDEP's input, and based on their review of the Drinker Biddle Log, Maxus provisionally produced, to *only* NJDEP and OxyChem, ***9,770 documents*** related to the scope of Maxus's indemnity obligations. After reviewing them, OxyChem challenged *Maxus's* privilege claim as to ***38 documents*** that were on the Drinker Biddle Log, and presented these documents for a privilege determination by the Special Master. *See* Exs. 22-24 (letters from OxyChem to Special Master regarding privilege challenges). Pursuant to the procedure established by the Special Master, OxyChem and NJDEP were required to then destroy copies of the 9,770 documents that Maxus had provisionally produced, while Maxus of course retained its copies and originals of those documents. *See* Ex. 13.

All of the 38 documents in OxyChem's possession for which OxyChem *challenged* Maxus's privilege claim as *invalid* have been now been produced to the SPG.[6] Since these documents were Maxus's documents, and were not privileged to begin with, that production did not waive any privilege that belonged to OxyChem.

**D.    OxyChem Receives the Documents on the Drinker Biddle Log Pursuant to Court Orders in the Maxus Bankruptcy and Re-Reviews the Entire Drinker Biddle Log for this Case.**

In June 2016, Maxus and Tierra filed for bankruptcy—and stopped defending OxyChem's environmental liabilities. Recognizing OxyChem's need for the documents and information in Maxus's and Tierra's possession from decades of defending those liabilities, Judge Sontchi approved a Site Transition Agreement. This transferred to OxyChem, among other things, "All data and information related to the environmental conditions of any of the Sites in possession of the Debtors; [and] Any other factual information related to the Sites which is relevant to the environmental conditions, source(s) of contamination, scientific studies, and/or remediation work at the Site." *See* Ex. 14 (Site Transition Agreement (ECF No. 1208)), *In re Maxus Energy Corp. et al.*, Case No.16-11501 (CSS) (Bankr. D. Del.) ("Maxus Bankruptcy")) at § 2.1.  The Site Transition Agreement also provided that law firms, including Vinson & Elkins and Drinker Biddle, and a variety of consultants, would provide services directly for OxyChem to defend the environmental liabilities previously defended jointly with Maxus and Tierra.  *See id.* § 2.3; Ex. D. Judge Sontchi further ordered that "[t]he transfer of Transition Information … shall not constitute a waiver of any applicable evidentiary privilege or the work produce doctrine by Debtors, Company, or OCC."  *Id.* § 3.1.5.

---

[6] Some of these 38 documents were not produced here, because they were subject to privilege claims by YPF and Repsol under the 4/24/18 Consent Order, discussed below.

In July 2017, Judge Sontchi entered a second order that recognized, "the Debtors possess large volumes of Documents that may constitute . . . privileged attorney-client communications, joint interest communications, and litigation work product information for which OCC asserts that OCC either owns the privilege alone or jointly with Debtors." *See* Ex. 15 (7/18/17 Consent Order, Maxus Bankruptcy (ECF No. 1704)), Recital B. The Consent Order required the Maxus Liquidating Trust to provide all documents Debtors had transferred to the Liquidating Trust to OxyChem, so it could review them for its privilege. *See id* ¶ 2. Judge Sontchi again ordered that transfers from the Maxus Liquidating Trust to OxyChem or its affiliates *did not waive* any applicable privilege or protection under Rule 502(d):

> Pursuant to Federal Rule of Evidence 502(d), the transfer of (a) Documents or information concerning such Documents or (b) such other information relating to Occidental Privileged Information by the Debtors to the Liquidating Trust, under the Plan, and to Glenn Springs Holding, Inc. and OCC, under the Transition Agreement, shall not constitute a waiver of any applicable evidentiary privilege or immunity of the Parties.

*Id.* ¶ 1.

Finally, Judge Sontchi entered another Consent Order establishing a protocol so that YPF and Repsol, the Debtors' former parents, could screen certain Maxus Liquidating Trust documents for their privileges as well. *See* Ex. 16 (4/24/18 Consent Order, Maxus Bankruptcy (ECF No. 2015)). Judge Sontchi again ordered that the transfers contemplated by these Consent Orders would not constitute waivers under Rule 502(d). *Id.* ¶ 1.

Pursuant to the Site Transition Agreement and Consent Orders, OxyChem received from Maxus and Tierra the 152,974 documents that were listed on the Drinker Biddle Log, in several volumes produced between May 15 and September 13, 2018. OxyChem promptly initiated a complete re-review of these documents, retaining dozens of contract attorneys who worked for more than 10 months on the project, to assess which of these documents were privileged and to

create new—and complete—privilege descriptions. As a result of that review, OxyChem determined that the vast majority of the documents on the log that Maxus and Tierra had asserted as privileged were not, in fact, privileged, but about 20% of them were. Accordingly, as a result of that review:

- 103,770 documents, 67%, were found **not** to be **privileged**;

- 66,598 documents, 43%, were also found not to be privileged and had **already been produced** by Maxus in the Spill Act case;

- 18,884 documents, approximately 12%, were confirmed to be **non-responsive** to the issues and discovery requests in this CERCLA case.

- 30,307 documents, less than 20%, were **privileged**.

OxyChem then produced the non-privileged and previously produced documents to SPG and the other defendants in this case. SPG now challenges OxyChem's privilege claims on the remaining 30,307 documents.

## IV.    ARGUMENT

### A.    OxyChem's Privilege Log—Built on a 30-Year Joint-Client Privilege, and the Community-of-Interest Privilege—Easily Withstands SPG's Attempt to Brush Aside Three Decades and 30,000 Privilege Entries

Three privileges are at issue in this motion: the joint-client privilege, the community-of-interest privilege and the work-product doctrine. We address each below. As demonstrated, *all* privileges apply here, so SPG's motion must be denied.

> *1.    OxyChem's Privilege Log is Supported by the Joint-Client Privilege: Thousands of Documents SPG Challenges Are Authored By or For OxyChem's and Maxus's Joint, Outside Counsel or their Consultants.*

The "joint-defense privilege" protects the confidentiality of communications among parties represented by the same counsel. *Teleglobe*, 493 F.3d at 363-64.[7] Ignoring *Teleglobe*, SPG seeks

---

[7] *Teleglobe* is controlling, but SPG's motion cites it only once, Mot. at 7, and never applies it.

disclosure of thousands of documents that OxyChem's and Maxus's ***joint, outside counsel*** authored or received—***while*** counsel represented ***both*** clients—along with thousands more documents prepared by consultants retained by OxyChem and Maxus's joint counsel. SPG's motion fails because it does not challenge—much less refute—the application of the joint client privilege.

Vinson & Elkins, Drinker Biddle, and Andrews Kurth appear on the face of the log, as do a host of consultants retained for the joint defense.

- SPG seeks to discover 5,269 documents prepared by or for Vinson & Elkins. *See* Ex. H-1.

- SPG seeks to discover 321 documents prepared by or for Drinker Biddle between 2005 and 2007. *See id.*

- SPG seeks to discover 3,872 documents prepared by or for Andrews & Kurth. *See id.*

- SPG seeks to discover 13,063 documents prepared by or for at least 56 consultants that were retained by Vinson & Elkins or Tierra to support the legal defense being jointly provided to Maxus, Tierra, and OxyChem. *See id.*; Rabbe Decl. ¶ 8.[8]

No law allows SPG, which is outside the joint representation, to discover such joint-client documents. *See Teleglobe*, 493 F.2d at 363-64; *Ogden*, 202 F.3d at 461. OxyChem and Maxus/Tierra were *joint clients* of Vinson & Elkins and Andrews Kurth throughout the relevant period. *See* Lippard Decl. ¶¶ 3-6. They were also joint clients of Drinker Biddle from 2005 through 2007. *See* Rabbe Decl. ¶ 7. In connection with these joint representations, Vinson & Elkins, Drinker Biddle, and Tierra also retained at least 56 consultants to assist in the joint representation. *See* Rabbe Decl. ¶ 8; Lippard Decl. ¶ 5.

---

[8] The attorney-client privilege also protects communications, among Maxus/Tierra employees and consultants, to facilitate the lawyer's rendition of legal advice. *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981).

Accordingly, the joint-client privilege and work product doctrine, discussed further below, apply to shield from discovery the thousands of documents on which Vinson & Elkins and Drinker Biddle appear, as well documents on which their consultants appeared. SPG's challenge does not negate the privilege as to *even one* of these documents. Accordingly, as to this category of documents, SPG's motion must be denied.

> 2.    *OxyChem's Privilege Log Is Also Founded on the Community of Interest: For the Last 30 Years, as Required by the 1986 SPA, OxyChem and Maxus Shared a Common Interest in Defending Lister-Related Environmental Liabilities.*

In addition to the joint-client privilege, the community-of-interest privilege protects the balance of the 30,000 documents SPG seeks to discover. *See Teleglobe*, 493 F.3d at 364-66. At all times, OxyChem and Maxus shared a common interest in defending the environmental liabilities related to the Lister site. OxyChem and Maxus (1) were joint defendants aligned in ongoing litigation; (2) had an indemnitor-indemnitee relationship that aligned their interests; and (3) were parties to a significant business transaction that aligned their interests.  *See* Lippard Decl. ¶¶ 3-4; Rabbe Decl. ¶¶ 5-6.

The "community of interest" privilege protects communications among these parties and their counsel because this privilege is a "broader one that protects all communications shared within a proper 'community of interest,'" such as between co-defendants. *Teleglobe*, 493 F.3d at 364. OxyChem and Maxus were co-defendants in ongoing litigation and regulatory actions. Communications between co-defendants to "set up a common defense strategy"—like OxyChem and Maxus's common defense strategy against NJDEP's Spill Act claims—are privileged. *Eisenberg v. Gagnon*, 766 F.2d 770, 787-88 (3d Cir. 1985) (superseded on other grounds).

SPG's motion seizes on disagreements at the margins about the scope of Maxus's indemnity obligations, ignoring the plain law that perfect alignment on all interests is not required

15

to sustain the community of interest privilege: what is required is proof that parties have a "similar legal interest" in executing a litigation strategy or defending factual or legal positions in litigation. *Teleglobe*, 493 F.3d at 364. OxyChem and Maxus's shared interest in showing that Lister was not the sole source of contamination in the Passaic, and that other PRPs had contributed to pollute the river, too, are "similar interests" that meet the test for this privilege to apply. *See McLane Foodservices, Inc. v. Ready Pac Produce, Inc.*, No. 10-6076, 2012 WL 1981559, at *5-*7 (D.N.J. June 1, 2012) ("[D]efendants' interests are not perfectly aligned, [but] they have a common interest in establishing and arguing that lettuce did not cause the outbreak."); *Andritz Sprout-Bauer*, 174 F.R.D. at 634 ("The interests of the parties need not be identical, and may even be adverse in some respects. It is only when the clients' interests are completely adverse that the privilege will be denied." (citation omitted)).

OxyChem and Maxus were also aligned by their indemnitor-indemnitee relationship, which parallels the insurer-insured relationship. Courts routinely enforce the common-interest doctrine between an insured and its insurer, even where the insurer is not itself a party to the case. *See, e.g.*, *Eisenberg*, 766 F.2d at 787-88 (insurer and insured had common interest); *United Coal Companies v. Powell Const. Co*., 839 F.2d 958, 965 (3d Cir. 1988) (reversing trial court determination that communications with and work product created by nonparty insurer were not privileged and noting "it is the attorney client status that determines the existence of the privilege, and not party status"); *Sinclair Wyoming Ref. Co. v. A&B Builders, Ltd.*, No. 15-CV-91, 2017 WL 10309305, at *6 (D. Wyo. Oct. 24, 2017) ("[T]he common interest doctrine allows the insurer, when the insurer's interest aligns with the insured, to have access to the privileged communications."); *Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles & Kaufman, LLP*, No. 01 CV 3844, 2006 WL 2135782, at *15 (E.D.N.Y. July 28, 2006) ("This [common-interest] rule

allows an insurer aligned in interest with the insured to have access to privileged communications between the insured and its counsel, without breach of the attorney-client privilege.").

Finally, OxyChem and Maxus were aligned as a result of the SPA, under which OxyChem's affiliate acquired DSCC while Maxus agreed to retain environmental liability and indemnify, defend, and hold OxyChem harmless against any environmental claims. Courts routinely hold that parties to a business transaction, like OxyChem and Maxus in the SPA, are aligned as a result of the business transaction.[9] This showing s defeats SPG's broad-strokes assertion that there is no community of interest whatsoever.

3.     *Finally, OxyChem's Privilege Log is Built on Work Product Protection, Stemming from the Joint Representation and Community of Interest.*

The work product doctrine also shields from discovery the opinions and mental impressions of OxyChem and Maxus's counsel and the work of consultants they retained to assist them in defending actual and anticipated litigation.

The work product doctrine protects from discovery "documents and tangible things … prepared in anticipation of litigation or for trial or for another party or by or for that party's representative (including the other party's attorney, *consultant*, surety, *indemnitor*, insurer, or agent)." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003) (quoting FED. R. CIV. P. 26(b)(3)); s*ee also Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). The doctrine protects

---

[9] *See Louisiana Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 310 (D.N.J. 2008) (enforcing potential merger parties' common interest regarding potential asbestos claims even though the parties "were on opposite sides of a deal"); *Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*, 255 F. Supp. 3d 561, 570-72 (M.D. Pa. 2017) (holding that two parties to purchase agreement formed a community of interest where they both wanted to defend the validity of their contract); *Andritz Sprout-Bauer, Inc.*, 174 F.R.D. at 634-36 (documents shared between plaintiff and its predecessor to obtain legal advice in anticipation of prosecuting defendant were protected under the common interest privilege).

documents prepared in reasonable anticipation of litigation and for the primary purpose of litigation. *See Sealed Air Corp.*, 253 F.R.D. at 306-07.

Work of consultants retained to assist counsel in the defense of actual or anticipated litigation is work product and protected from discovery under the plain language of Rule 26(b)(3). "As the Supreme Court explained, 'Attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the work product doctrine protect materials prepared by agents of the attorneys as well as those prepared by the attorney himself." *In re Cendant Corp.*, 343 F.3d at 662-63 (quoting *United States v. Nobles*, 422 U.S. 225, 238-39 (1975)).[10] Work product protection also applies where one party's consultant's work product is shared with persons with whom that party has a community of interest or that person's attorneys. *See Sealed Air Corp.* at 310-11 (applying work-product protection to materials created by and shared between parties on different sides of a deal who had a community of legal interests). "Waiver of work-product protection occurs only when a disclosure enables an adversary to gain access to the information." *Id.* at 311. "[T]he burden of establishing waiver of work-product falls … on the party seeking to establish waiver." *Id.*

The SPG neither acknowledges nor comes close to meeting its burden on waiver of work product protection. SPG has not argued or shown waiver of work product protection as to *any* of the specific entries on the privilege log. And SPG does not even try to dispute that OxyChem had a reasonable anticipation of litigation throughout the thirty-year period covered by the privilege log, nor could it credibly do so. The Diamond Alkali Superfund Site was placed on the national

---

[10] *See also Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260-62 (3d Cir. 1993) (technical report prepared by a consulting firm was protected from discovery because it was prepared in anticipation of litigation); *Powell Constr. Co.*, 839 F.2d at 966 (work product doctrine extended to encompass materials prepared in anticipation of litigation by a party's insurer).

priorities list in 1984. EPA took regulatory action with respect to the Site starting in the 1980s and through the following decades. *See* Rabbe Decl. ¶ 6. The New Jersey Department of Environmental Protection filed suit against OxyChem, Maxus and Tierra in 2005. As the declarations establish, OxyChem and Maxus were subject to regulatory action, civil litigation, and the risk of potential claims for environmental damages, natural resource damages, and response costs throughout this period. From at least the mid-1980s, Maxus/Tierra and OxyChem reasonably anticipated litigation. And, though it bears the burden to negate the work product privilege, SPG makes *no effort* to suggest otherwise and it offers *no evidence* to dispute this is true.

A host of consultants worked with outside counsel for OxyChem and Maxus/Tierra while they reasonably anticipated litigation. *See* Rabbe Decl. ¶ 8; Lippard Decl. ¶ 5. The consulting experts on the privilege log were retained to assist counsel in defending OxyChem, Maxus, and Tierra on the Lister-related liabilities. *See* Rabbe Decl. ¶ 8. OxyChem and Maxus's joint-representation with Vinson & Elkins and Drinker Biddle, along with their common interest in defending the Lister-related liabilities, confirms that broad work-product protection shields from discovery documents prepared by counsel and their consultants and agents in anticipation of litigation.

    4.     *SPG Cannot Erase 30 Years of Joint Client and Common Interest by Plucking Examples of Adversity from the Fringes of the Relationship Among Maxus, Tierra, and OxyChem.*

Cherry-picked examples of adversity in the NJDEP Litigation do not negate OxyChem, Tierra, and Maxus's decades-long joint defense and common interest in defending OxyChem's environmental liabilities. *See* Mot. at 8-9. SPG is thus wrong when it insists that perfect alignment on all issues is required to sustain the community of interest privilege: *McLane* makes clear that "adversarial co-defendants" may "have a common interest or purpose as to significant litigation related issue or strategy." *McLane* at *6. The common-interest privilege requires only

19

substantial—not *perfect*—alignment. *Shipyard Assoc., L.P. v. City of Hoboken*, No. 14-1145, 2015 WL 4623470, at *8 (D.N.J. Aug. 3, 2015) (citing *Teleglobe*, 493 F.3d at 366). Because OxyChem's and Maxus's overall goals—to defend Lister-related liability—were constant and never changed, adversity around the fringes of their relationship is irrelevant. *See Eisenberg*, 766 F.2d at 787-88 (correspondence between insurer and insured remained privileged, despite coverage disagreements, because "[c]ommunications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client *with some adverse interests*" (emphasis added)); *McLane*, 2012 WL 1981559, at **5-7 ("[D]efendants' interests are not perfectly aligned, [but] they have a common interest in establishing and arguing that lettuce did not cause the outbreak."); *Andritz Sprout-Bauer*, 174 F.R.D. at 634 ("The interests of the parties need not be identical, and may even be adverse in some respects. It is only when the clients' interests are completely adverse that the privilege will be denied." (citation omitted)).

In *McLane*, a case about an e-coli outbreak, the court upheld the common interest among co-defendants, even though their interests were indisputably "not identical"—in fact, the *McLane* defendants were "pursuing claims *against* each other in at least three lawsuits." *McLane*, 2012 WL 1981559, at *5 (emphasis added). Nevertheless, the court held that documents setting out the defendants' "traceback analysis" were protected work product as to their common adversary. *Id.* The court noted that although the "defendants' interests are not perfectly aligned, they have a common interest in establishing and arguing that lettuce did not cause the outbreak." *Id.* at *6. Like the *McLane* defendants, OxyChem and Maxus had a common interest in defending Lister-related liabilities, although they may have been adverse on certain issues or claims. *See id.* The court rejected exactly the argument SPG is making here, that common-interest protection dissolves if the parties are adverse on any issue: "the Court does not agree . . . that adversarial co-defendants

cannot have a common interest or purpose as to a significant litigation related issue or strategy." *Id.*

One other point is important. If the SPG were *right*, then as soon as any SPG members (or any other defendants) cross-claimed against each other, they would have no ground on which to protect their *own* claimed common interest privilege. At the moment, the SPG parties are aligned in asserting (wrongly) that "it's all OxyChem's fault." If (as SPG claims) the assertion of cross-claims is enough to negate the community of interest privilege, if the SPG members filed cross-claims against each other, then the SPG could not validly claim a privilege over *any* of its own common interest communications or the work of its consultants.

In the face of OxyChem and Maxus's 30-year relationship, with Maxus on the front lines of OxyChem's defense, SPG dismisses binding Third Circuit authority—*Teleglobe*—in favor of a 1993 District of Vermont case that could not be more inapposite.  *See* Mot. at 10; *Vermont Gas Sys., Inc. v. U.S. Fid. & Guar. Co*., 151 F.R.D. 268 (D. Vt. 1993). There, the insurer disputed coverage from the outset of the case and refused to participate in the defense. The court's analysis began and ended with this fact: "the parties have never shared the same counsel or litigation strategy." *Id.* at 277. This case bears no resemblance to *Vermont Gas*. Unlike the insurer in that case, here "Since 1986, Maxus (through Tierra) has regularly performed its indemnification obligations to OCC in accordance with the SPA." *See* Ex. 1 (Javier Gonzalez First Day Decl. ¶ 47). Maxus always recognized its broad indemnification obligations, it retained counsel and consultants to jointly represent Maxus and OxyChem in defending those liabilities, and it not only participated in defending them—it was on the *front lines* of—OxyChem's defense, allowing OxyChem to rely on that defense until Maxus collapsed into bankruptcy in 2016.

21

The bedrock alliance of OxyChem, Tierra, and Maxus does not go out the window because of disputes between Maxus and OxyChem over the *scope* of Maxus's indisputably broad indemnity (the thrust of which was never questioned by either party), or the fact that OxyChem demanded that *Maxus pay for* separate counsel for OxyChem (a fact that *demonstrates* both alignment on the indemnity *and* the common interest). *See* Mot. at 8-9. The SPA's indemnity was always acknowledged and in place, as evidenced by OxyChem's and Maxus's *joint representation* by Vinson & Elkins beginning in 1988. And on the issue of defending against Lister-related liabilities, OxyChem and Maxus have always been aligned.

Unable to negate either the joint client or community of interest privileges, SPG makes much of OxyChem's joinder in the challenge to Maxus/Tierra's assertions of privilege during the Spill Act litigation. Mot. at 9. But OxyChem's joinder was consistent with its privilege claims for at least three reasons.

- First, documents prepared by or for joint counsel to OxyChem, Maxus, and Tierra were not privileged *as to OxyChem*, even though they remained privileged as to third parties. Thus, OxyChem's attempt—as a *joint client*—to discover documents over which Maxus asserted privilege would not waive *either* OxyChem's privilege or Maxus's privilege as to a third party like the SPG. *See* Ex. 13 (Dec. 5, 2011 Consent Order).

- Second, OxyChem sought to *protect* its own privilege (including its joint client and work product privileges) before any of these documents were produced were produced to third parties. *See* Ex. 17 (Agreed Order Regarding Documents Withheld from Privilege).

- Third, SPG misleadingly suggests that OxyChem sought to compel the *entire* 153,000-document Drinker Biddle Log to all parties in the litigation. *See* Mot. at 9. This is false. The privilege challenge was made in Track III. It concerned issues pertaining to OxyChem's indemnity and addressed only approximately 10,000 documents (a fraction of the log). That universe of documents was produced, *provisionally*, to OxyChem and NJDEP only, so that those parties could assess Maxus's *own* privilege claims—*not* OxyChem's privilege claims. *See* Ex. 13 (Dec. 5, 2011 Order). OxyChem ultimately asserted that 38 of those documents were not privileged. OxyChem never argued that the entire Drinker Biddle Log, or even the 10,000-document subset, was not privileged.

SPG also overstates the effect of any adversity between OxyChem and Maxus, whose communications were protected by both joint-client and community-of-interest privileges. As a

matter of law, adversity between OxyChem and Maxus would let only *those parties* discover the relevant materials. "[T]he joint-client privilege [. . .] protects communications from compelled disclosure to parties *outside* the joint representation." *Id.* at 366; *see also id.* at 379-80.[11] For the same reason, communications "made in the course of the attorney's joint representation of a common interest of the two parties," are privileged as to third parties (like the SPG), although they are *not* privileged *as between the parties with the common interest. Eureka*, 743 F.2d at 937-38.[12] Neither a dispute among Maxus and OxyChem, nor a failure of their attorneys to withdraw from representing them in response to a conflict, can or does waive OxyChem and Maxus's privilege as to third parties like the SPG. *See id.*; *In re Teleglobe*, 493 F.3d at 381 ("The guiding principle of *Eureka* is that when an attorney errs by continuing to represent two clients despite their conflicts, the clients-who reasonably expect their communications to be secret-are not penalized by losing their privilege"). Thus, as a party outside OxyChem and Maxus's common interest and joint representation, SPG cannot discover OxyChem and Maxus's common-interest materials—even if it proved (and it has not proved) their interests were adverse to one another.

**B.    OxyChem Did Not Waive Protection Over the 66 Pages SPG Challenges.**

Apart from SPG's generic challenge to OxyChem's entire privilege log, SPG specifically challenges 66 pages of legal memoranda on the basis that they have been produced in prior

---

[11] *See also* 1 Kenneth S. Broun et al., *McCormick on Evidence*, § 91 at 335-36 ("When two or more persons, each having an interest in some problem, or situation, jointly consult an attorney, their confidential communications with the attorney, though known to each other, *will of course be privileged in a controversy of either or both of the clients with the outside world, that is, with parties claiming adversely to both or either of those within the original charmed circle*." (emphasis added)).

[12] *Compare Truck Ins. Exchange v. St. Paul Fire & Marine Ins. Co.*, 66 F.R.D. 129, 132 (E.D. Pa. 1975) ("The cases … are uniform in holding, however, that when a lawyer represents two clients in a matter of common interest, the privilege cannot be claimed by one client as to communications made by him to the attorney *when offered in an action between the clients*." (emphasis added)).

litigation. That the SPG insists on discovering what are, on their face, lawyers' memos demonstrates their motion is groundless. The Court should reject SPG's challenge: (1) production in the Spill Act case by *Maxus* of documents OxyChem contends are privileged did not waive OxyChem's privileges as a matter of law, (2) any production of allegedly privileged materials in the Bankruptcy Proceedings did not waive any privilege, because *all* productions in that Court were made under the auspices of a Rule 502(d) protective order, (3) any production in *these* proceedings—whether by the Liquidating Trust or OxyChem—likewise did not constitute a waiver because of *this* Court's 502(d) order and, (4), while proof of diligence to protect the privilege is not required to invoke the protections of Rule 502(d), there is no question that OxyChem acted at all times *with* diligence to protect its privileges. We address each of these points, below.

       1.    *Production of OxyChem's Privileged Documents by Maxus or the Liquidating Trust Does Not Prove Waiver by OxyChem.*

SPG argues that OxyChem's privilege over the 66-page memoranda is extinguished by *other parties'* production in prior litigation in the Spill Act case. Mtn. at 2. This ignores blackletter law that only OxyChem can waive its own privilege and must knowingly agree to do so. *See Teleglobe*, 493 F.3d at 379. SPG offers *no* evidence that OxyChem assented to any alleged prior disclosures. And, as SPG concedes, Maxus had previously clawed *back* the 66-page memorandum pursuant to the protective order entered in the Spill Act litigation, Mtn. at 11-12, so there is no evidence that even *Maxus* intended to waive the privilege over these 66 pages.

OxyChem and Maxus maintained "bilateral control" of common-interest materials, so both were required to assent before any waiver occurred. To waive privilege over common-interest materials, *all* parties must agree to any disclosure:

> [E]ach co-client may waive the privilege with respect to that co-client's own communications with the lawyer, *so long as the communication relates only to the communicating and waiving client*. One co-client does *not* have authority to waive the privilege *with respect to another co-client's communications to their common*

24

> *lawyer*. If a document or other recording embodies communications from two or more co-clients, *all those clients must join in a waiver*, unless a nonwaiving co-client's communication can be redacted from the document.

*Teleglobe*, 493 F.3d at 379 (emphasis added). OxyChem did not consent to waive the privilege over these materials, so SPG's argument about the claimed production of those materials in the Spill Act case fails to meet its burden to show waiver.

More important, the record in the Spill Act case refutes any claim that OxyChem failed to act with diligence in *that* proceeding to protect its privileges. *See supra* at III.C. OxyChem was entitled to rely—and it did rely—on its joint counsel with Maxus to protect its privileges and OxyChem itself took steps to ensure that none of its privileged materials was produced, including in Track III.

> 2. *Rule 502(d) Prohibits a Finding of Waiver as a Result of Productions in Either the Bankruptcy Proceedings or Production in this Case.*

Production of the memoranda in the Maxus bankruptcy or in this case could not constitute a waiver, because the production of documents in those actions was shielded from any finding of waiver under Federal Rule of Evidence 502(d). Below is the text of the Rule:

> **Controlling Effect of a Court Order.** A federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court — in which event the disclosure is also not a waiver in any other federal or state proceeding.

When 502(d) orders are issued, they have a "controlling effect" and prohibit any finding of waiver *either* in the litigation pending before the court or "in any other federal or state proceeding." *Id.* Congress enacted the non-waiver rule to reduce delay, cost, and uncertainty related to waiver and inadvertence disputes. *See* S. REP. 110-264, 2, 2008 U.S.C.C.A.N. 1305, 1306. ("In addition to the amount of resources litigants must dedicate to preserving privileged material, the fear of waiver also leads to extravagant claims of privilege, further undermining the purpose of the discovery process. Consequently, the costs of privilege review are often wholly disproportionate to the

overall cost of the case."). This non-waiver rule does not require a showing of inadvertence. "Even if the disclosure is not 'inadvertent' under Rule 502(b) … a court may nevertheless 'order that privilege or protection is not waived by disclosure connected with the litigation pending before the court.'" *United States v. Caroleo*, No. 17-CR-177 (ENV), 2019 WL 5869690, at *1 (E.D.N.Y. Nov. 11, 2019).

As demonstrated below, there are *five* federal court Orders—four in the Bankruptcy Court and one here—that provide rule 502(d) or other non-waiver protection. SPG doesn't acknowledge these orders in its motion. But they bar SPG—as a matter of law—from claiming *any* waiver as a result of a production of these 66 pages in either the Bankruptcy proceedings or this CERCLA case. Under the Protective Orders in the Bankruptcy proceeding, in this case and under the Federal Rules, OxyChem is therefore entitled to claw back the 66-page memoranda.

a.    Rule 502(d) Orders by the Bankruptcy Court

In the Maxus Bankruptcy proceedings, Judge Sontchi issued a broad 502(d) Protective Order pertaining to productions of documents by Maxus and Tierra:

> Inadvertent Production Of Privileged Discovery Material: The production of privileged or work-product protected documents, electronically stored information or information, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding. **This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).**

*See* Ex. 18 (Amended Confidentiality Agreement and Stipulated Protective Order, Maxus Bankruptcy (ECF No. 1003)) ¶ 30 (emphasis added).

Members of the SPG who received production of privileged materials in the Bankruptcy Court are *barred* by these Orders from claiming any waiver arising from that production either in the Bankruptcy court "or in any other federal …proceeding," including this CERCLA case. Three other orders issued by Judge Sontchi, all of which are described above in section III.D., likewise

prohibit any finding of waiver arising from production of documents in the Bankruptcy proceedings. Accordingly, *no* finding of waiver can be based on any production of these 66 pages in the Bankruptcy proceedings.

b.    Rule 502(d) Order in this CERCLA Action

In this CERCLA action, the SPG negotiated and agreed to a Protective Order that has an explicit Rule 502(d) non-waiver provision, providing that ***any*** production—"***inadvertent or otherwise***"—is not a waiver.

> Disclosure of Privileged Information. The production of documents or ESI protected by the attorney-client privilege, work product doctrine, or other privilege against disclosure, ***whether inadvertent or otherwise, is not a waiver of the privilege*** or protection from discovery in this case or in any other federal or state proceeding. ***This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).***

Dkt. 543 (Protective Order) at 14 (emphasis added). That ends the issue. Having agreed that production in this case, "whether inadvertent or otherwise, is not a waiver of the privilege," SPG is again barred as a matter of law from arguing waiver based on the production of these 66 pages— whether by OxyChem or by the Liquidating Trust, in response to the SPG's subpoena. The Court's analysis on this issue should begin and end with the *agreed* Protective Order.

SPG ignores this, urging the Court to perform a Rule 502(*b*) inadvertence analysis and marshaling Rule 502(*b*) cases that do not apply. Mtn. at 12-14. This disregards that Rule 502(d) is a "Controlling Order" under the Federal Rules. *See Equal Employment Opportunity Comm'n v. George Washington Univ*., No. 17-CV-1978 (CKK/GMH), 2020 WL 3489478, at *8 (D.D.C. June 26, 2020) ("Rule 502(d) can be read to protect a party from subject-matter waiver without regard to whether a court finds that the disclosure was inadvertent pursuant to Rule 502(b)."). Where a court has issued a Rule 502(d) Order, the "gross negligence" standard the SPG advocates under Rule 502(*b*) does not apply. And no showing of inadvertence can or should be required here,

because the Protective Order to which SPG agreed provides protection to production "whether inadvertent or not…."

But even if Rule 502(b)'s inadvertence standard applied (and it does not), OxyChem has acted diligently to protect its privilege. There is no waiver if (1) the disclosure is inadvertent; (2) the holder of the privilege took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error. FED. R. EVID. 502(b). There is no fair argument, here, that OxyChem failed to act with diligence—and certainly not as to *66 pages* within a database of 7 million pages. Further, in the Spill Act and bankruptcy litigations, OxyChem reasonably relied on its indemnitors' privilege review and the clawback procedures set out in the applicable protective orders. Nothing in the law requires OxyChem (as a company) to double-check and re-review its indemnitors' privilege determinations, especially when they were made by sophisticated outside counsel *who also represented OxyChem itself*.

In this CERCLA action, the record demonstrates OxyChem acted with diligence to protect these 66 pages, even if a showing of inadvertence was required. OxyChem acted promptly to claw back the 66-page memorandum upon learning of that document's inadvertent production. And, as noted above, SPG concedes that Maxus had previously clawed *back* the 66-page memorandum pursuant to the protective order entered in the Spill Act litigation.

More generally, OxyChem protected its privilege in both the Spill Act Litigation and the Maxus Bankruptcy proceedings repeatedly:

- When joining the NJDEP's privilege challenge in the Spill Act case, OxyChem sought to review Maxus's production for its own privilege before Maxus disclosed any documents. *See supra* at III.C.

- In the Maxus bankruptcy, OxyChem secured three consent orders that allowed it to protect its privilege and retain documents related to its environmental defense. *See supra* at III.D.

- Finally, the Maxus Liquidating Trust produced documents in this case pursuant to a protective order with a Rule 502(d) non-waiver provision, so any such production could not constitute a waiver for the same reasons described above. *See* Protective Order (ECF No. 543) at ¶ 13.

**C.    In Response to SPG's Remaining Attacks, which It Should Have Raised Before Filing the Motion, OxyChem Reviewed Its Privilege Log Yet Again and Is Making Supplemental Productions and Revised Privilege Entries.**

Although SPG never conferred with OxyChem about them, SPG's motion tacks on miscellaneous challenges that could have been resolved without the Court's intervention. *See* Ex. 19 (letter from OxyChem to SPG agreeing to re-review entries related to communications with regulators, pre-1977 documents, and undated documents). In response, OxyChem has re-reviewed the log entries identified by the SPG and the underlying documents, and has served logs with 2,892 revised entries. It has also removed (and will produce) an additional 163 documents. *See* Ex. 21 (letter producing revised privilege logs). OxyChem briefly addresses the SPG's exhibits below:

- **<u>139 Documents on Exhibit H-3 (communications with regulators)</u>:** After its review, OxyChem determined that 32 of these documents are not privileged and has revised 107 entries. Documents remaining on the log have been revised to clarify that they were either (1) an internal draft, circulated for legal counsel's review and often containing counsel's redlines or handwritten comments and revisions; or (2) a privileged settlement communication with a regulator.

- **<u>730 Documents on Exhibit H-4 (undated or pre-1977)</u>:** After its review, OxyChem determined that 46 of these documents are not privileged and has revised 505 entries to identify a more specific author, recipient, or date by placing the content of the document in context with other similar documents that did contain more specific identifying information. Five pre-1977 documents remain, which are privileged as to DSCC.

## V.    CONCLUSION

For the foregoing reasons, OxyChem respectfully requests that the Court enter an Order denying the Small Parties Group's Motion for an Order Compelling Plaintiff to Produce Documents It Has Withheld as Privileged or Protected, and granting any other relief the Court deems appropriate.

Dated: August 28, 2020                    Respectfully submitted,

                                          _ /s/ *John J. McDermott*          _
                                          John J. McDermott, Esq.
                                          (jmcdermott@archerlaw.com)
                                          ARCHER & GREINER, P.C.
                                          One Centennial Square
                                          Haddonfield, NJ 08033
                                          Tel. (856) 795-2121

                                          GIBBS & BRUNS, LLP
                                          1100 Louisiana Street, Suite 5300
                                          Houston, TX 77002
                                          Tel. (713) 650-8805
                                          By:    Kathy D. Patrick, Esq.
                                                 (kpatrick@gibbsbruns.com)
                                                 Anthony N. Kaim, Esq.
                                                 Jorge M. Gutierrez, Esq.


                                          *Attorneys for Plaintiff Occidental Chemical*
                                          *Corporation*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION | ) Hon. Madeline Cox Arleo |
| | ) Hon. Joseph A. Dickson |
| | ) |
| Plaintiff, | ) Civil Action No. 2:18-cv-11273 |
| | ) |
| v. | ) |
| | ) **CERTIFICATE OF SERVICE** |
| 21ST CENTURY FOX AMERICA, INC., *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

I hereby certify that on August 28, 2020, a copy of the Plaintiff Occidental Chemical Corporation's Response to the Motion by the Small Parties Group for an Order Compelling Plaintiff to Produce Documents It Has Withheld as Privileged or Protected was served on counsel via CM/ECF.

Dated: August 28, 2020

By: ___/s/ *John J. McDermott*___
John J. McDermott, Esq.