# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*,[1] | ) | |
| | ) | Case No. 16-11501 (___) |
| Debtors. | ) | |
| | ) | Joint Administration Pending |

## DECLARATION OF JAVIER GONZALEZ IN SUPPORT OF
## CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, Javier Gonzalez, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the Vice President, General Counsel and Corporate Secretary of Maxus Energy Corporation ("Maxus"), a corporation organized under the laws of the State of Delaware, and its Debtor-affiliates and subsidiaries (collectively, the "Debtors").

2.      On June 17, 2016 (the "Petition Date") and contemporaneously with the filing of this declaration (the "First Day Declaration"), the Debtors filed voluntary petitions commencing cases (collectively, the "Chapter 11 Cases") in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to preserve and maximize the value of their chapter 11 estates.  The Debtors will continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

01:18819733.1

3.      I submit this First Day Declaration in support of the Debtors' chapter 11 petitions and the First Day Pleadings (defined below) as described herein.[2]  Except as otherwise indicated, all statements in this First Day Declaration are based upon: my personal knowledge; information supplied or verified by current and former directors, officers and employees or current consultants familiar with the Debtors' business operations; my review of the Debtors' books and records as well as other relevant documents; information prepared or supplied by the Debtors' management team, consultants and legal and financial professional advisors; or my opinion based upon my experience and my familiarity with, expertise with, and knowledge of, the Debtors' books and records, operations, financial condition, and history.  I have relied upon these persons accurately recording, preparing, collecting, or verifying any such documentation and other information.

4.      Part I of this First Day Declaration provides a basic overview of the Chapter 11 Cases.  Part II describes the Debtors' business, including the Debtors' current assets and liabilities.  Part III describes the evolution of the Debtors' business going back to the mid-1990s.  Part IV describes in detail the developments that led to the filing of the Chapter 11 Cases.  Part V sets forth the relevant facts in support of the First Day Pleadings.

## I.      OVERVIEW OF THE CHAPTER 11 CASES

5.      In 1986, Maxus sold its chemicals business to Occidental Chemical Corporation ("OCC") in order to focus its business on the petroleum industry, becoming an active exploration and production ("E&P") company with both domestic and foreign assets.  In 1995, YPF S.A. ("YPF") obtained control of Maxus through a leveraged buyout of Maxus' common stock.  In the years following YPF's acquisition, a global multi-faceted restructuring of Maxus' operations

---

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the applicable First Day Pleadings.

shifted Maxus' foreign asset holdings to YPF so Maxus could concentrate its operations in the U.S. while also significantly reducing Maxus' leverage.  As a consequence, Maxus became a smaller domestic E&P company.

6.     In recent years, the Debtors have attempted unsuccessfully to grow and diversify their business.  For example, the Debtors made significant capital investments in exploratory oil wells in the Gulf of Mexico; however, the plummeting price of oil and the increase in the cost of complying with environmental regulations for activities in the Gulf of Mexico significantly impaired the Debtors' returns on investment.  In addition, within the past three years, the Debtors attempted to transform Tierra Solutions, Inc. ("Tierra") into an independent environmental remediation services company with clients other than OCC, which had some limited success, but ultimately the Debtors were not able to develop it into a viable venture.

7.     As a result, the Debtors' business today is comprised of three principal components:  (i) management of various oil and gas-related interests held by Maxus and its wholly-owned subsidiaries, (ii) environmental remediation management services by Tierra, which also holds title to certain real estate properties (principally, former chemical manufacturing plant sites), and (iii) management of legacy employee benefit obligations to retired former employees.  Tierra provides environmental remediation management services almost exclusively for Maxus so that Maxus can satisfy both its own remediation obligations as well as its longstanding contractual indemnification obligation to OCC.

8.     Although the Debtors' non-remediation business has been able to operate on a cash-flow neutral basis, in the years leading up to the Petition Date, the OCC indemnity-related environmental remediation obligation has become one of the Debtors' most significant liabilities. The Debtors have performed dutifully their environmental remediation obligations at an

aggregate cost of more than $755 million, the vast majority of which is on account of Maxus'

contractual environmental indemnification obligations to OCC. Changes in environmental laws,

shifts in U.S. Environmental Protection Agency ("EPA") enforcement priorities, advances in

scientific knowledge about hazardous substances, and new information regarding environmental

contamination at a number of legacy Superfund sites over the last thirty years has increased

exponentially the burden on Maxus to perform its contractual indemnification obligations to

levels that neither Maxus nor OCC could have contemplated in 1986. As a result, the ongoing

remediation obligations have placed an enormous strain on the Debtors' finances, and required

significant cash infusions, in the form of capital contributions and loans, from the Debtors'

ultimate parent company, YPF. In fact, the Debtors' external auditor noted in its Independent

Accountants Auditors' Report (dated March 3, 2016) with respect to the consolidated financial

statements of Debtors' immediate parent company, that in light of the Debtors' dependence on

YPF for financial support, together with the Debtors' exposure to significant environmental

contingencies, the Debtors' ability to continue as a going concern is in doubt.

9.       Other than the Debtors' ongoing remediation obligations, litigation liability is the

most significant liability for the Debtors. Over the past ten years, certain of the Debtors, as well

as OCC, have been defendants in litigation before the New Jersey state courts in which the N.J.

Department of Environmental Protection ("NJDEP") sought compensation from OCC and the

other defendants for environmental contamination of the Passaic River that dates back for over a

century (the "Passaic River Litigation"). NJDEP settled with the defendants, including certain of

the Debtors, but cross-claims among the defendants (including, but not limited to, OCC, YPF

and Maxus) remain, and one theory of damages being pursued by OCC is that YPF and Maxus

are alter egos on account of their historical dealings. Through these claims, OCC seeks to extend to YPF a contractual indemnity obligation that Maxus has been held to owe to OCC.

10.     In light of these claims and developments in the Passaic River Litigation, approximately one year ago, two special independent directors were appointed to Maxus' board of directors in order to review and assess the historical transactions, interrelationships and course of dealing between Maxus and YPF, and identify potential claims arising in relation to such transactions and relationships. As described in greater detail in the *Declaration of Bradley I. Dietz in Further Support of Debtors' Chapter 11 Petitions* (the "Dietz Declaration") submitted contemporaneously herewith, in the weeks leading up to the Petition Date, Maxus and YPF negotiated a settlement to resolve any and all claims that the Debtors may have against YPF and its affiliates arising from or related in any way to the Debtors or their business or assets. Pursuant to the terms of the Settlement and Release dated June 17, 2016 (the "Settlement Agreement") with YPF and certain of its affiliates, YPF will fund the Debtors' estate with $130 million upon the Effective Date (as defined in the Settlement Agreement) and the dismissal of the Passaic River Litigation as to YPF and its affiliates. Moreover, subject to certain milestones, but without requiring the Settlement Agreement to first be approved by the Court, YPF will provide the estates with approximately $63.1 million of additional liquidity through a debtor-in-possession financing facility (the "DIP Facility"). The DIP Facility will provide adequate funding for the Chapter 11 Cases for twelve months, thereby allowing the Debtors to continue with their ongoing remediation obligations and ultimately consummate a value-maximizing reorganization that will benefit their creditors.

11.     Accordingly, the Debtors' objectives in the Chapter 11 Cases are to put an end to the Debtors' longstanding indemnification obligations to OCC as well as the related

environmental litigation that has burdened the Debtors for the past decade.  The Debtors seek to do so by implementing the Settlement Agreement through these Chapter 11 Cases in order to maximize recoveries for the Debtors' creditors.  The Debtors anticipate that a confirmed plan would distribute the Settlement Agreement consideration and the value of the Debtors' assets to the Debtors' creditors in satisfaction of the Debtors' liabilities.  With the Debtors freed from the burden of litigation and indemnification claims, the Chapter 11 Cases will provide the Debtors with the opportunity to assess whether the Debtors' existing environmental remediation operations and/or oil and gas operations can be restructured as a sustainable, stand-alone enterprise.

## II.	THE DEBTORS' BUSINESS

### A.	Corporate Structure[3]

12.	The Debtors' current business operations consist generally of managing a non-operating, working interest in an oil and gas field in the deep waters of the Gulf of Mexico (known as Neptune), collecting onshore oil and gas royalties from thousands of producing wells in Texas, Oklahoma and other states, providing environmental remediation management services, providing employee benefits to retired employees, and addressing certain other administrative matters as described below.  These operations are broken down on a Debtor by Debtor basis as follows:

Maxus is a Delaware corporation, which is a wholly-owned subsidiary of non-Debtor YPF Holdings, Inc. ("YPFH").  Maxus' current business consists of collecting onshore oil and gas royalties from over 3,000 wells located in six states in the U.S., overseeing the administration of benefits for Maxus and Debtor Gateway Coal Company

---

[3] A corporate organization chart identifying the Debtors and their non-debtor affiliates is attached hereto as **Exhibit 1**.

retirees, addressing environmental issues, providing general and administrative services for its subsidiaries and Tierra, and managing U.S.-based and international litigation on behalf of itself and OCC.

**Tierra Solutions, Inc.** is a Delaware corporation that is directly owned by CLH Holdings, Inc. ("CLH," an inactive, non-Debtor entity, which, in turn, is owned by YPFH). Tierra's business is to manage environmental remediation obligations owed by Maxus, either as principal or when acting on behalf of third parties, principally OCC.

**Maxus International Energy Company** ("Maxus International") is a Delaware corporation, and a wholly-owned subsidiary of Maxus, whose business is inactive. Maxus International is also a named defendant in the Passaic River Litigation.

**Maxus (U.S.) Exploration Company** ("MUSE") is a Delaware corporation, and a wholly-owned subsidiary of Maxus, which is involved in oil and gas exploration efforts in the deep waters of the Gulf of Mexico primarily through its ownership of a 15% non-operating working interest in an offshore oil drilling field known as Neptune.

**Gateway Coal Company** is a Delaware corporation, and a wholly-owned subsidiary of Maxus, whose business is limited to the administration of retiree benefits for its 142 former employees and their dependents.

## B.    The Debtors' Assets

13.    As described in greater detail below, the Debtors' assets are comprised primarily of (a) MUSE's 15% working interest in the Neptune field in the deep waters of the Gulf of Mexico, (b) Maxus' overriding royalty interests in thousands of wells located in six states throughout the U.S., (c) real property interests owned by Tierra, and (d) potential proceeds from reimbursement claims made against the Debtors' insurance policies. In addition, as of the Petition Date, the Debtors have approximately $6.4 million in cash on hand, $3.8 million in stock

investments, and $20 million of cash collateral that supports a letter of credit issued by Citibank and payable to the NJDEP, which constitutes financial assurance for the Hudson County chrome remediation and investigation work currently being done in New Jersey.

### (1)   *Neptune*

14.     MUSE owns a 15% non-operating working interest in the Neptune oil field, which is operated by non-affiliate BHPB Billiton Petroleum (GOM) Inc. (the "Operator").  The working interest requires MUSE to pay certain expenses and fund its share of capital expenditures that are billed by the Operator.  In exchange, the Debtors receive revenues generated from third-party contracts to purchase the oil, gas and liquids that are produced at Neptune.  The drilling field contains seven subsea producing oil and gas wells that produce (as of December 31, 2015) an average of 8,862 barrels of oil per day.

### (2)   *Overriding Royalty Interests*

15.     In recent years, through a sustained management effort, Maxus has been able to identify additional producing wells and obtain overriding royalty interests.  Maxus presently holds overriding royalty interests in over 3,000 oil and gas wells located in six states within the United States (Louisiana, New Mexico, Oklahoma, Texas, West Virginia, and Wyoming), which entitles Maxus to receive periodic payments from the wells' operators as revenues are generated.

16.     In 2015, Maxus earned approximately $3 million on account of these interests.

### (3)   *Real Property Interests*

17.     Tierra owns certain real property that is the subject of ongoing environmental remediation activities, including (a) 80-120 Lister Avenue in Newark, New Jersey, (b) property in Kearny, New Jersey, and (c) 1,300 acres in Painesville, Ohio.  In 2011, Tierra entered into a development agreement and long-term ground lease with a "brownfields" real estate developer for the Painesville property with a plan to develop it into a mixed-use commercial, residential

and recreational area; however, at this time, it is uncertain whether future productive use of the Painesville site will be realized.

<p style="text-align:center">(4)   <em><strong>Insurance Policies</strong></em></p>

18.     In August 2012, Maxus engaged Aon Risk Insurance Services, Inc. ("ARS") to identify whether the Debtors could assert coverage claims against their insurers for litigation costs and damages the Debtors both have incurred previously and are expected to incur.  In exchange for such services, Maxus agreed to pay ARS a percentage of the funds recovered from the insurers.  At this time, Maxus has either notified or tendered claims to its insurers seeking reimbursement for those amounts that Maxus paid to settle outstanding litigation claims or that Maxus is being asked by OCC to pay pursuant to the existing indemnification obligation.  Maxus' reimbursement claims submitted to its insurers exceed $200 million and were asserted against policies with aggregate coverage of approximately $500 million; however, the estimated recovery to Maxus is uncertain.

**C.     The Debtors' Liabilities[4]**

19.     As of the Petition Date, Maxus has no outstanding secured or unsecured funded debt, and does not have a credit facility with any lender.

20.     The Debtors' liabilities fall primarily into the following general categories:
(a) historical environmental liabilities; (b) other legal liabilities; and (c) employee benefits plans.  OCC is the Debtors' largest unsecured creditor.

<p style="text-align:center">(1)   <em><strong>Historical Environmental Liabilities</strong></em></p>

21.     The vast majority of the Debtors' current environmental liabilities relate primarily to historical obligations of Diamond Shamrock Chemicals Company ("DSCC") and remediation

---

[4] Nothing herein affects the Debtors' rights, and the Debtors expressly reserve such rights, to object to, dispute, setoff, and otherwise challenge all claimed liabilities against the estates.

01:18819733.1

undertaken to fulfill DSCC-related legacy obligations to governmental authorities.   OCC acquired DSCC and its active, ongoing "Chemicals Business" from DSC (defined below) pursuant to a Stock Purchase Agreement by and among Diamond Shamrock Corporation ("DSC," which subsequently changed its name to Maxus), Occidental Petroleum Corporation, Occidental Chemical Holding Corporation, and Oxy-Diamond Alkali Corporation, dated September 4, 1986 (the "SPA").[5] Under the SPA, DSC sold all of the outstanding stock of DSCC to Oxy-Diamond Alkali Corporation, which then merged into OCC on November 24, 1987, and DSCC merged into OCC on November 30, 1987.

22.     As part of the SPA, Maxus agreed to indemnify OCC from and against certain liabilities relating to DSCC's  business or activities prior to the September 4, 1986 closing date (the "Closing Date"), including certain environmental liabilities relating to chemical plants and waste disposal sites used by DSCC prior to the Closing Date.[6]  As of December 31, 2015, the Debtors' probable and reasonably estimable cost of work to be done at these sites exceeds $275 million.  These environmental liabilities relate to specific locations throughout the U.S.: (a) the Diamond Alkali Superfund Site in Newark, New Jersey, which is comprised of the Lister Site[7] and two contaminated sites along the Passaic River and Newark Bay; (b) Hudson & Essex Counties, New Jersey; (c) Painesville, Ohio; (d) Greens Bayou, Texas; and (e) Other Sites.  In

---

[5] The "Chemicals Business" is defined in section 2.02(b) of the SPA as "the DSCC Companies taken as a whole and the Business Units taken as a whole, and the business being conducted by them in the aggregate as of the date of this Agreement[September 4, 1986] . . . ."

[6] Section 9.03(a)(iii) and (iv) and the associated schedules of the SPA required Maxus to "indemnify, defend, and hold harmless" OCC, from and against, among other things, "any and all claims, demands, or suits . . . relating to, resulting from, or arising out of" certain Superfund Sites and Inactive Sites, including the Lister Site.  Section 9.03(a)(viii) of the SPA also required Maxus to indemnify OCC for Historical Obligations, which generally includes "those obligations, liabilities, guarantees and contingent liabilities of the DSCC Companies, or any of them, which arose prior to or in connection with the Reorganization and which relate to any business, asset or property other than those of the Chemicals Business." (collectively, the "OCC Indemnification Obligations").

[7] In 1986, DSCC transferred ownership of the entire Lister Site to another affiliated company, Diamond Shamrock Chemical Land Holdings, Inc. (n/k/a Tierra), and Tierra continues to own the entire Lister Site today.

many cases, the remediation obligations arise out of either an administrative order on consent (an "AOC"), an Administrative Consent Order (an "ACO"), or a Consent Judgment ("CJ"). In certain cases, Maxus and/or Tierra may be a party to an AOC, ACO or CJ.

23.     In addition to participating on behalf of OCC in the aforementioned remediation activities, pursuant to its indemnification obligation, Maxus is also defending OCC (as successor to DSCC) in proceedings regarding sites in Louisville, Kentucky (Black Leaf), Galveston County, Texas (Malone Services), Hagerstown, Maryland (Central Chemical Co.), Yosemite Creek, California, and other third party sites where DSCC has been named a potentially responsible party by the EPA under CERCLA for certain sites where hazardous substances from DSCC's plant operations were allegedly disposed or have come to be located. In addition, there is one other proceeding regarding a site in Milwaukee, Wisconsin where Maxus is defending its own interests, as a successor to Pickland Mather & Co. and Milwaukee Solvay Coke Co.

### (2)     *Other Legal Liabilities and Proceedings*

24.     In addition to its environmental obligations, Maxus has liabilities associated with its working interest in the Neptune oil field, and also faces potential liability in connection with litigation involving personal injury claims associated with Agent Orange, more recent environmental contamination claims brought against it in Louisiana arising from legacy petroleum exploration and production activities, and toxic tort claims arising in Illinois, Missouri and Texas in which the plaintiffs allege harm (lung cancer and mesothelioma) caused by exposure to asbestos while working as oilfield service workers for an independent contractor.

### (3)     *Employee Benefit Plans*

25.     As described in greater detail in the Wages Motion (defined herein), the Debtors sponsor an Excess Benefits Plan, and provide certain health care and life insurance benefits for over 500 eligible retired employees and other post-employment benefits for eligible individuals

01:18819733.1

ny-1233876

whose employment was terminated by the Debtors prior to their normal retirement.  In addition, the Debtors also have a Supplemental Death Benefit program for certain former executives and a Long-Term Disability program for disabled former employees and their dependents.  As of May 31, 2016, the net present value of the Debtors' obligations for these benefit plans and programs is approximately $20.2 million.

## III. EVOLUTION OF THE DEBTORS' BUSINESS

### A. YPF's Acquisition of Maxus

26.     In the early 1990s, Maxus experienced a liquidity crisis resulting from, among other things, depressed oil and gas prices, Maxus' high cost of debt, and its limited access to the capital markets.  On or about February 1994, the board of directors of Maxus (the "Maxus Board") engaged Credit Suisse First Boston as its financial advisor to review long-term strategic alternatives in order to fund a five-year projected funding gap of approximately $600 million.  At that time, Maxus could not access the capital markets on favorable terms, so various capital raising strategies were explored, including asset sales (that the Maxus Board believed would hinder future growth) and raising capital at the subsidiary level.

27.     On February 28, 1995, at the direction of the Maxus Board, Maxus entered into an Agreement of Merger (the "Merger Agreement") with YPF and YPF's wholly owned subsidiary, YPF Acquisition Corp. ("YPFA").  Pursuant to the Merger Agreement, YPFA merged into Maxus, leaving Maxus as YPF's wholly-owned subsidiary.  Immediately prior to the merger, Maxus had approximately $975.6 million (face value) in senior debt obligations.  As of April 1, 1995, following the execution of the Merger Agreement, Maxus' senior debt obligations increased to approximately $1,410.5 million (face value).

### B.    YPF's Global Restructuring of Maxus

28.    Beginning in 1995, the management of Maxus and YPF explored the best way to maximize the synergies that existed between YPF and Maxus.  By mid-1996, a multi-faceted restructuring of Maxus was implemented through the following transactions:   (a) a tax restructuring that transferred Maxus' international assets to YPF-owned foreign corporations in order to maximize tax synergies for the YPF enterprise; (b) an environmental restructuring that placed Maxus' environmental liabilities under specialized management (i.e., Tierra) and presented a more streamlined balance sheet to external investors; and (c) a debt restructuring that replaced expensive debt that Maxus incurred in connection with the merger with lower-priced debt owing to YPF and its affiliates.

29. The environmental reorganization spun off CLH, an indirect wholly owned subsidiary of Maxus, to YPFH (a newly formed U.S. affiliate of YPF) that would also hold all of Maxus' equity.  CLH and Maxus entered into an agreement (the "Assumption Agreement") whereby CLH assumed, among other things, the OCC Indemnification Obligations.  CLH's commitment to Maxus under the Assumption Agreement was supported by a capital contribution agreement, whereby

**YPF-Maxus Corporate Structure After Creation of YPFI, YPFH and CLHH**



YPF agreed to make contributions to CLH up to an amount equal to $111.5 million.  In addition, YPF agreed to cover general and administrative costs and expenses incurred, including legal expenses, up to 110% of CLH's budget, as prepared annually.

30. By the time the tax restructuring concluded, Maxus' outstanding senior debt obligations (as of December 31, 1998) were only a fraction of what they were immediately after the merger.[8]  However, Maxus' assets were also significantly diminished from what existed before the merger and were limited to domestic E&P working and overriding royalty interests in oil exploration wells.

31. In the years that followed, Maxus' asset portfolio of E&P interests further diminished and Maxus' capital investments went primarily towards developing its working

---

[8] At the time, Maxus had approximately $304.1 million (face value) in senior debt obligations.  Maxus also had approximately $87.5 million (liquidation value) outstanding pursuant to its $2.50 Preferred Stock as of December 31, 1998.

interest in the Neptune oil field (discussed in greater detail in Part IV.A herein).  By late 2005, Maxus' property interests included approximately eighty leased blocks lying offshore in the deepwater region of the Gulf of Mexico (the "Gulf Assets").

### C.    The Passaic River Litigation

#### (1)    *2005: Litigation Commences*

32.    The Passaic River Litigation started on December 13, 2005, when the State of New Jersey (the "State") filed its complaint in the Superior Court of New Jersey, Law Division – Essex County, against OCC, Tierra, Maxus, Repsol, S.A. ("Repsol"),[9] YPF, YPFH and CLH Holdings, Inc. ("CLHH") seeking to hold them liable for damages resulting from alleged toxic discharges from the Lister Site.  Thereafter, the State amended its complaint four more times, adding additional claims and defendants, including Debtor Maxus International and non-debtor YPF International ("YPFI").

33.    On October 6, 2008, the court granted OCC's motion to amend its answer to assert cross-claims for the fraudulent transfer of Maxus' assets as well as for breach of the SPA, tortious interference with the SPA, unjust enrichment, contractual indemnification, common law indemnification, contribution under the New Jersey Spill Compensation and Control Act (the "Spill Act"), statutory contribution, and a declaratory judgment that Maxus, and not OCC, is the successor to the Lister Site.  All of these claims, except for tortious interference with the SPA and unjust enrichment, were asserted against Maxus.

34.    On October 18, 2010, OCC filed its First Amended Cross-Claims adding YPFI as a cross-claim defendant and asserting claims against the YPF Defendants[10] for alter ego liability.

---

[9] Repsol was YPF's controlling shareholder from 1999-2012.
[10] The "YPF Defendants" include YPF, YPFH, YPFI and CLHH.

35.     On July 19, 2011, the court held that OCC is liable to the State under the Spill Act for any "cleanup and removal costs" later shown to be associated with Lister Site discharges, and that OCC is DSCC's successor and liable for its operations at the Lister Plant.

36.     On August 24, 2011, an order was entered against Maxus affirming its contractual indemnification obligations.  The *Order Granting Defendant & Cross-Claimant Occidental Chemical Corporation's Motion for Partial Summary Judgment Against Defendant Maxus Energy Corporation* provides, in pertinent part, that "Maxus Energy Corporation is required to indemnify Occidental Chemical Corporation for any costs, losses and liabilities that may be incurred by Occidental Chemical Corporation in the above-captioned action as a result of Occidental Chemical Corporation's acquisition of Diamond Shamrock Chemicals Company."

37.     On May 21, 2012, the court held that Maxus was the alter ego of Tierra, and that both entities were strictly, jointly, and severally liable under the Spill Act for any "cleanup and removal costs" later shown to be associated with Lister Site discharges, based solely on Tierra having acquired title to the Lister Site in 1986.

38.     On September 26, 2012, OCC filed its Second Amended Cross-Claims Complaint, adding claims for civil conspiracy/aiding and abetting against all Cross-Claim Defendants[11], and breach of fiduciary duty and aiding and abetting breach of fiduciary duty against the YPF Defendants and Repsol (the "Second Amended Cross-Claims").

(2)     *2013/2014: Settlements*

39.     On December 12, 2013, the court approved a settlement between the State and the non-OCC defendants (the "RYM Settlement").  Specifically, all claims that the State had asserted against Repsol, YPF, YPFI, YPFH, CLHH, Maxus, Tierra, and Maxus International

---

[11] The "Cross-Claim Defendants" means, collectively, Maxus, Maxus International, Tierra, Repsol, YPF, YPFH, YPFI and CLHH.

were dismissed in exchange for a $130 million payment to the State, subject to certain reservations.  Repsol funded $65 million and Maxus/Tierra/YPF funded the remaining $65 million.  The State released certain claims against OCC as part of that settlement.

40.     On December 16, 2014, the court then approved a settlement between the State and OCC (the "OCC Consent Judgment") in which OCC agreed to pay $190 million to the State in exchange for the release of certain of the State's remaining claims against OCC.  This resolved the State's claims against OCC for all costs already incurred by the State, economic damages, punitive damages, penalties, Natural Resource Damages assessment costs, and Natural Resource Damages (subject to certain claims for future costs above a certain amount).

### (3)     *Remaining Causes of Action*

41.     Thus, after OCC settled with the State, the only claims remaining in the Passaic River Litigation were OCC's Second Amended Cross-Claims against the Cross-Claim Defendants, as well as Repsol's counter-claims against OCC.  In November 2014, the YPF Defendants filed two motions to dismiss the Second Amended Cross-Claims.  In late January 2015, the court granted in part and denied in part the YPF Defendants' motions to dismiss.  In responding to OCC's Second Amended Cross-Claims, Repsol asserted counter-claims against OCC in February 2015 seeking to recover from OCC the $65 million that Repsol paid to the State pursuant to the RYM Settlement.  OCC has submitted an indemnity claim to Maxus for any amount for which OCC is held liable to Repsol as well as the $190 million that OCC paid to the State pursuant to the OCC Consent Judgment.

42.     After additional discovery, the court permitted a second round of dispositive motion practice, which resulted in a further narrowing of the contested causes of action against the Cross-Claim Defendants.  As a result of rulings from the Special Master in mid-January 2016 (which were subsequently adopted by the trial court judge), the matters presently scheduled to go

to trial on or about June 21, 2016 include (a) Repsol's claim for contribution from OCC under the Spill Act for the $65 million settlement, and (b) OCC's claims against (i) Maxus, as to whether Maxus has an obligation to indemnify, defend and hold OCC harmless for $190 million paid by OCC under the OCC Consent Judgment, and (ii) Maxus/YPF Defendants, as to whether (A) Maxus (and YPF Defendants, as alter egos) failed to indemnify, defend and hold OCC harmless pursuant to SPA indemnification obligations, and (B) OCC is entitled to contractual indemnification from these defendants.

## IV. EVENTS LEADING TO THE CHAPTER 11 CASES

43.     In recent years, Debtor MUSE made significant capital investments in numerous exploratory oil wells to create additional revenue sources, but production at those wells has been disappointing.  There were also efforts to develop Tierra into an international environmental remediation services company; however, that too was not successful.  Despite the Debtors' best efforts, they have not been able to get out from under the enormous financial burden that is the OCC contractual indemnification obligation, which has enveloped the Debtors in litigation for the last eleven years.

44.     Within the last year, the Maxus Board decided that a change of course was needed.  As discussed in greater detail herein and in the Dietz Declaration, two independent directors were appointed to conduct an investigation of claims Maxus might be able to pursue against its ultimate parent, YPF, and if possible, pursue a settlement of those claims that would inure to the benefit of Maxus' creditors.  A settlement has been agreed to, and it will be implemented through the Chapter 11 Cases.

### A.     Underperformance of the Gulf Assets

45.     On May 22, 2003, Maxus acquired a 15% working interest in the Neptune oil field from non-debtor BHP Billiton Petroleum (Deepwater) Inc.  Commercial production was

expected to commence in late 2007, but setbacks occurred in 2006 and continued through 2007 and 2008.  Initial production was achieved on July 6, 2008, and by the end of that year, six wells had started production.  Unfortunately, by that time, international commodity prices declined as the 2008 global financial collapse took shape, and in the years that followed, actual production did not meet estimates.  When combined with low commodity prices, Maxus' cash realization on its interest in the Neptune field fell well short of projected expectations.

46.     Notwithstanding the challenging market conditions, in the years that followed, MUSE continued its oil exploration efforts in the Gulf of Mexico by making substantial capital commitments of $350 million towards numerous projects.  Certain exploratory wells, including those at Coronado and Tiger/Bronto proved to be "dry holes" that did not produce oil.  On the other hand, the Neptune field actively produced oil, but required substantial capital commitments.  In recent years, the Debtors have spent $285 million on production-related costs at Neptune, yet the asset continues to underperform against the Debtors' expectations.

## B.     Ongoing Indemnification Obligations Owing to OCC

47.     Since 1986, Maxus (through Tierra) has regularly performed its indemnification obligations to OCC in accordance with the SPA.  Those efforts have led to the successful remediation of a number of contaminated industrial sites throughout the country.  Tierra's successful remediation activities have included treating groundwater, removing and treating polluted sediment, dismantling industrial structure, pioneering the use of new remediation technologies, and purifying contaminated soil.  Moreover, in certain instances, Tierra has continued to oversee the maintenance of such properties to ensure that remedies are properly implemented.

48.     However, these services have come at a significant price to Maxus.  Over the past thirty years, Maxus (through its affiliate, Tierra) has provided approximately $755 million worth

of remediation services both to OCC (on account of the aforementioned contractual indemnification obligation) as well as other parties, which includes remedial investigation, feasibility studies, and remediation work at Superfund sites across the country.  Tierra bills Maxus for its remediation services, and Maxus pays Tierra.  Maxus is not able to recover those funds from any third-party source.

49.     Even though Neptune, combined with Maxus' other E&P holdings, provides Maxus with adequate income to cover its overhead, it is not enough to address the substantial ongoing indemnification obligation to OCC.  As a result, over the past few years, the Debtors have requested and obtained significant cash infusions from YPF to meet their contractual obligations to OCC.

### C.     Inability to Develop an Independent Tierra

50.     From 2013-2015, Tierra tried to develop an international environmental consulting service and actively worked to develop new business opportunities throughout both the United States and South America.  Efforts were undertaken by Tierra to construct a business plan and find potential business partners to assist with the venture's entry into international markets.  Despite some initial successes, the business venture never reached critical mass and sustainability because of the numerous challenges to break into a highly competitive marketplace for these types of services, including certification and licensing requirements as well as significant upfront capital needs.  Independent of that effort, Tierra also devoted substantial resources towards developing an environmentally friendly technology for the cleanup of contaminated sediment, but this effort is presently dormant due to a lack of funding.

### D.     2015/2016 Investigation By Maxus' Independent Directors

51.     In July 2015, the Maxus Board formed a Special Independent Committee, comprised of Bradley Dietz and Theodore Nikolis, to "design and implement a process and

procedure for the review and assessment of (A) all material transactions entered into between the Corporation and any affiliate involving aggregate consideration of $10 million or more in any instance that occurred after April 8, 1995, and prior to the date of creation of the Special Independent Committee, (B) the historic course of dealing and interrelationships between the Corporation and its affiliates over the same time period, and (C) potential claims and defenses arising in relation to these transactions and interrelationships (collectively, the "Special Independent Committee Investigative Responsibilities")."  The Special Independent Committee also was empowered to negotiate a settlement, release, discharge or any other agreement relating to any potential claims and defenses identified in connection with the execution of the Special Independent Committee Investigative Responsibilities.

52.    As set forth in detail in the Dietz Declaration, the Special Independent Committee, together with its advisors, analyzed the historical relationship between the Debtors and YPF and examined whether Maxus was damaged by its ultimate parent's actions.  The assessment served as the foundation for the Special Independent Committee's negotiation with YPF, which resulted in the Settlement that the Debtors seek to effectuate through a confirmed plan in the Chapter 11 Cases.

## V.    FACTS IN SUPPORT OF FIRST DAY PLEADINGS

53.    To enable the Debtors to operate effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors request certain relief in various motions and applications for orders filed with the Court contemporaneously herewith (collectively, the "First Day Pleadings").  As described herein, the First Day Pleadings seek, among other things, to stabilize and maintain the Debtors' remaining operations by (a) ensuring the continuation of the Debtors' cash management system, (b) allowing the Debtors to obtain post-petition financing on a partially secured, superpriority basis, (c) maintaining employee

morale and confidence, and (d) ensuring performance of certain remediation obligations, and thereby, promoting a seamless transition into chapter 11.

54.     I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.  In my role as the Debtors' general counsel, I have formed opinions as to: (a) the urgency and necessity for obtaining the relief sought by the Debtors in the First Day Pleadings; (b) the need for the Debtors to continue to effectively maintain their current activities and, as seamlessly as possible, commence the Chapter 11 Cases; (c) the detrimental effects upon the Debtors and their estates if the Debtors do not obtain the relief requested in the First Day Pleadings; and (d) the immediate and irreparable harm that the Debtors, their estates, and their stakeholders would be exposed to in the event that the Court does not approve such relief.  My opinions are based on my review of various materials and information and discussions with the Debtors' management team and the Debtors' professional advisors.

55.     The relief sought in the First Day Pleadings will minimize the adverse impact of the Chapter 11 Cases on, and preserve and maximize the value of, the Debtors' estates.  The Debtors, in consultation with their professional advisors, carefully designed the relief requested so that the Debtors will not suffer any immediate and irreparable harm as a result of the commencement of the Chapter 11 Cases.  Accordingly, for the reasons stated herein and in the First Day Pleadings, I believe that the relief requested in each of the First Day Pleadings is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be approved.  Set forth below are facts in support of the First Day Pleadings, summarized for the convenience of the Court.

01:18819733.1

ny-1233876

**A.** **Debtors' Motion for Interim and Final Orders (A) Approving Post-Petition Financing; (B) Granting Liens and Providing Superpriority Administrative Expense Claims; (C) Modifying the Automatic Stay; (D) Scheduling Interim and Final Hearings; and (E) Granting Related Relief (the "DIP Motion")**

56.     The Debtors are in need of postpetition financing for, among other things, working capital and other general purposes.   As of the Petition Date, the Debtors have approximately $6.4 million of cash on hand.  By the DIP Motion, the Debtors seek authority to obtain $63.1 million of post-petition financing in the form of the DIP Facility, which is bifurcated into two tranches:   (1) Tranche A, consisting of a senior secured, superpriority $31,900,000 facility (the "Tranche A Facility"), and (2) Tranche B, consisting of a subordinated unsecured $31,200,000 facility (the "Tranche B Facility").   The Debtors seek to grant a superpriority administrative expense claim and liens on substantially all of their assets to the Lender (subject and subordinate to payment of the Carve-Out) to secure the Tranche A Facility. The Tranche B Facility, however, is unsecured and subordinate in payment to all unsecured claims, and the Lender will not receive payment of the Tranche B Facility until all allowed general unsecured claims (other than the claims of the Lender and its affiliates) have been fully satisfied.

57.     I believe that without access to the DIP Facility, the Debtors will not have sufficient cash to, among other things, meet its obligations to its employees, consultants, independent contractors, and vendors, comply with environmental and regulatory obligations, and satisfy other working capital and operational needs during the pendency of these Chapter 11 Cases.  Without the funds made available through the DIP Facility, the Debtors will be unable to meet their obligations and risk losing the opportunity to maximize the value of their estates for all stakeholders.   Accordingly, I believe that, in light of the Debtors' need for immediate

liquidity, entry into the DIP Facility is in the best interests of the Debtors' estates and stakeholders.

**B.     *Debtors' Motion for Entry of an Order (I) Authorizing, but Not Directing, the Debtors to (A) Maintain Their Accounts and Cash Management System and Honor Certain Prepetition Obligations Related Thereto, (B) Continue Using Existing Checks, Business Forms and Records, and (C) Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Priority Status to Postpetition Intercompany Claims among the Debtors, (II) Waiving the Section 345(b) Deposit and Investment Requirements, as Necessary, and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>")[12]**

58.     In the ordinary course of their business, the Debtors maintain a cash management system to fund their operations and manage their cash flow (the "<u>Cash Management System</u>"). Under this system, the Debtors are able to efficiently collect funds generated by their operations and distribute them, as necessary, to pay their obligations.

59.     The Debtors maintain a total of twenty (20) accounts (collectively, the "<u>Accounts</u>").  Seven (7) of the accounts are bank accounts utilized in connection with the Debtors' cash management functions, two (2) accounts are investment accounts (together, the "<u>Investment Accounts</u>"), two (2) accounts hold security deposits for letters of credit, eight (8) accounts hold funds in trust to satisfy certain ongoing environmental remediation obligations, and one (1) account holds funds associated with a rabbi trust.

60.     The Debtors seek authority to maintain their existing Accounts and Cash Management System, and manage their cash and investments, in accordance with their prepetition practices, which the Debtors submit is in the best interests of the Debtors' estates, their creditors, and other interested parties.  Through the Cash Management System, the Debtors are able to collect and disburse funds, as well as monitor and control the movement of cash.  Requiring the Debtors to establish new accounts at this juncture would create an

---

[12]     The Debtors are not seeking interim relief with respect to the Cash Management Motion.

01:18819733.1

ny-1233876

unnecessary administrative burden, delay the payment of workforce-related obligations and other expenses, and eliminate cost savings. The cost and delay associated with opening new accounts and establishing modified cash management practices and policies would disrupt the Debtors' transition into chapter 11 and the interim maintenance of their business. Conversely, maintenance of the Cash Management System avoids the inconvenience, cost, confusion, and delay associated with transferring cash management operations to new accounts. The Debtors will maintain strict records of all receipts and disbursements from the Accounts during the pendency of these Chapter 11 Cases, thereby ensuring that the Debtors properly distinguish between prepetition and post-petition transactions.

61.     The Debtors also seek authority to continue using existing Business Forms. The Debtors submit that authorization to use the Business Forms will minimize disruption to the Debtors' business affairs and save the unnecessary expense, nuisance, and delay of ordering entirely new forms as required under the U.S. Trustee Guidelines.

62.     At any given time, there may be Intercompany Claims owing by one Debtor to another, and Intercompany Transactions are made between and among Debtors in the ordinary course as part of the Cash Management System. The Debtors seek authority to continue conducting Intercompany Transactions and grant administrative priority status to post-petition Intercompany Claims among the Debtors. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and their estates' detriment.

63.     The Debtors also seek a waiver of the deposit and investment requirements set forth in section 345(b) of the Bankruptcy Code with respect to the Investment Accounts. The

Debtors submit that a waiver of these requirements will facilitate an orderly transition into chapter 11.

**C.** ***Debtors' Motion for Entry of an Order Authorizing, but Not Directing, Debtors to (I) Pay and Honor Prepetition Wages, Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations and (II) Maintain and Continue Certain Compensation and Benefit Programs Post-Petition* (the "Wages Motion")[13]**

64.      As of the Petition Date, the Debtors employed 30 individuals, consisting of 29 full time employees and 1 part time employee, and 4 independent contractors (the "Current Workforce").  Each member of the Current Workforce is essential to the administration of these Chapter 11 Cases and the ability of the Debtors to successfully reorganize and emerge from these cases.  As discussed below, the Current Workforce is being compensated in the ordinary course and consistent with the Debtors' historical practice.

65.      The Debtors believe that, as of the Petition Date, the majority of all prepetition amounts owed on account of Current Workforce Obligations and Former Workforce Obligations have been satisfied, including severance and other benefit amounts that accrued and became payable upon retirement or termination of employment.  However, certain amounts may remain outstanding on account of certain Current Workforce Obligations and Former Workforce Obligations due to a number of factors, including (a) discrepancies that exist between amounts paid prepetition and the amounts that should have been paid, (b) the fact that certain accrued obligations may not yet have become due and payable as of the Petition Date, and (c) the possibility that certain prepetition amounts may have accrued but remain outstanding because they are pending approval or they have not yet been submitted.

66.      Based on my knowledge and conversations with the Debtors' professional advisors, it is my understanding that the members of the Current Workforce and Former

---

[13]    The Debtors are not seeking interim relief with respect to the Wages Motion.

Workforce heavily rely on the continued payment of outstanding wages and benefits. If the Debtors' Current Workforce ceases to provide services to the Debtors, it would derail the Debtors' efforts to successfully reorganize. A significant deterioration in their morale at this critical time undoubtedly would have a devastating impact on the Debtors and the value of their assets and business. Thus, the Debtors' payment of these obligations would enable the Debtors to devote their resources to ensuring successful chapter 11 cases and minimizing the personal hardship of these individuals following their retirement or termination from the Debtors' employ as full-time employees.

      **D.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Adequate Assurance of Payment, and (IV) Granting Related Relief***

    67.     In connection with operating their businesses and managing their properties, the Debtors obtain various landline, internet, cable, WiFi, electrical and similar utility products and services (the "Utility Services") from various utility companies (the "Utility Companies"). Approximately six (6) different Utility Companies provide these services through various accounts. On average, the Debtors spent an aggregate of approximately $10,000 each month on utility costs.

    68.     The Utility Services provided by the Utility Companies are crucial to the Debtors' continued operations and, thus, these chapter 11 cases. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely (and potentially irreparably) disrupted. It is therefore essential that the Utility Services continue uninterrupted.

E.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

1.      In the ordinary course of business, the Debtors incur certain tax liabilities, including real property, personal property, excise, royalty, and business taxes (collectively, the "Taxes") necessary to operate their business, incur associated regulatory and other fees (collectively, the "Fees"), and remit such taxes and fees to applicable taxing and other regulatory authorities (collectively, the "Authorities"). The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Authorities, in each case as required by applicable laws and regulations. The Debtors believe that they are current in the payment of assessed and undisputed Taxes and Fees that were due as of the Petition Date. Certain Taxes and Fees attributable to the prepetition period, however, have accrued and will not come due until after the Petition Date.

69.     The Debtors' failure to pay the Taxes and Fees could negatively impact the Debtors' estate because, absent payment of Taxes and Fees, the Debtors may incur substantial liabilities to the Authorities. Further, certain Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will be administratively burdensome to the estate, including revoking the Debtors' licenses and/or permits and other privileges. Any unexpected or inopportune interruption of the Debtors' activities during the course of these chapter 11 cases could greatly diminish the value of the estates and frustrate the Debtors' chapter 11 efforts.

70.     Based on my knowledge and conversations with the Debtors' professional advisors, it is my understanding that certain Taxes may be "trust fund" taxes that are not considered property of the Debtors' estates. Further, based on my knowledge and conversations with the Debtors' professional advisors, it is my understanding that certain of the Taxes and Fees

are entitled to priority status under the Bankruptcy Code and, as a result, must be paid in full before any general unsecured obligations may be satisfied. Accordingly, the Debtors' payment of Taxes and Fees is an exercise of sound business judgment.

**F.** ***Debtors' Motion for Entry of Order Directing Joint Administration of Chapter 11 Cases***

71. Given the integrated nature of the Debtors' operations, I believe that the joint administration of these cases will provide significant administrative convenience without prejudicing the substantive rights of any party in interest. The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code.

72. Joint administration of these chapter 11 cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources and the resources of all parties in interest. Accordingly, I believe that joint administration of the Debtors' cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**G.** ***Debtors' Application for an Order Approving Retention and Employment of Prime Clerk LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date*** **(the "<u>Prime Clerk Retention Application</u>")**

73. The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code authorizing the retention and appointment of Prime Clerk LLC as claims and noticing agent in these Chapter 11 Cases. I believe that the relief requested in the Prime Clerk Retention Application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.

## <u>CONCLUSION</u>

74.    Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the Debtors request that the relief sought in the proposed orders appended to the First Day Pleadings be granted.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I swear under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2016

MAXUS ENERGY CORPORATION

*/s/ Javier Gonzalez*

Javier Gonzalez
Vice President, General Counsel and
Corporate Secretary

## Exhibit 1



# EXHIBIT 2

23

**EMERGENCY ADOPTIONS**   APPENDIX II   **ENVIRONMENTAL PROTECTION**

# EMERGENCY ADOPTIONS

## ENVIRONMENTAL PROTECTION

### (a)

### OFFICE OF CANCER AND TOXIC SUBSTANCES RESEARCH

**Fisheries Closures and Advisories for Striped Bass, American Eel, Bluefish, White Perch and White Catfish Taken from the Northeast Region of the State**

**Adopted Emergency New Rule and Concurrent Proposal: N.J.A.C. 7:25-18A**

Emergency New Rule Adopted: December 15, 1982 by Robert E. Hughey, Commissioner. Department of Environmental Protection.

Emergency New Rule Filed: December 15, 1982 as R.1982 d.477.

Authority: Marine Fisheries Management and Commercial Fisheries Act, N.J.S.A. 23:2B-1 et seq.

Emergency New Rule Effective Date: December 15, 1982.

Emergency New Rule Expiration Date: February 14, 1983.

DEP Docket No 060-82-12.

Interested persons may submit in writing, data, views or arguments relevant to the proposal on or before February 3, 1983. These submissions, and any inquiries about submissions and responses, should be addressed to:

> Thomas Burke, Director
> Office of Cancer and Toxic
>   Substances Research
> CN 402
> 190 West State Street
> Trenton, NJ 08625

This new rule was adopted on an emergency basis and became effective upon acceptance for filing by the Office of Admininstrative Law (see N.J.S.A. 52:14B-4(c) as implemented by N.J.A.C. 1:30-4.4). Concurrently, the provisions of this emergency new rule are being proposed for readoption in compliance with the normal rulemaking requirements of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. The readopted rule becomes effective upon acceptance for filing by the Office of Administrative Law (see N.J.A.C. 1:30-4.4(d)).

The concurrent proposal is known as PRN 1983-20.

The agency emergency adoption and concurrent proposal follows:

**Summary**

The toxicity of polychlorinated biphenols ("PCB's") has been known for many years. PCB's are a suspected human carcinogen. Birth defects and a wide range of acute and chronic health affects have been attributed to PCB's which bioaccumulate in humans. Virtually, everyone has some level of PCB's in their body. Recent

surveys by the Federal Drug Administration ("FDA") indicate that fish are the most significant source of dietary exposure.

Since 1976, the Office of Cancer and Toxic Substances Research and the Division of Fish, Game and Wildlife within the New Jersey Department of Environmental Protection have been conducting a comprehensive survey of possible PCB's contamination of finfish and shellfish throughout the State. The three main objectives of the Department's PCB Project have been to determine: 1) the degree of PCB contamination of aquatic animals caught in the State; 2) how the PCB levels of aquatic animals vary due to geographic factors and 3) the suitability of aquatic animals for human consumption. Only "edible fillets" of all fish caught were analyzed. The Department determined edible fillet testing to be the most appropriate health risk indicator for New Jersey's consumers. The fish were analyzed for "Aroclor 1254", the most persistent and toxic mixture of PCB's, and, recently, for "Aroclor 1248". All analyses were carried out by the New Jersey Department of Health laboratories. Sampling locations were selected to incorporate areas of known or suspected PCB contamination, areas important to commercial or recreational fisheries and areas of major drainage basins. Indicator aquatic organisms included species of commercial and recreational importance and other ecological indicators.

The results of these efforts have been presented in a Departmental report entitled "Polychlorinated Biphenyls (Aroclor 1254) in Fish Tissues Throughout the State of New Jersey: A Comprehensive Survey". The study finds that a substantial proportion of the finfish and shellfish analyzed had detectable levels of PCB's in their edible flesh (75 percent and 50 percent respectively). A smaller percentage, 2.4 percent of the finfish, had levels exceeding the existing FDA action level of 5.0 ug/g (parts per million) The FDA has proposed lowering the action level to 2.0 ug/g (ppm). A total of 11.1 percent of the finfish exceeded the proposed level. None of the shellfish had contaminant concentrations greater than the proposed 2 ug/g action level.

The data also shows that those fish which are highly contaminated represent only a few species, with the freshwater groups being much lower in PCB's compared to the saltwater and migratory fish. The study results show that six species of fish have concentrations at or exceeding the five parts per million level. The White Catfish, a freshwater species, is much lower in PCB on the average, than are the Striped Bass, White Perch, American Eel, and Atlantic Sturgeon, all diadromous or migratory fishes, and the Bluefish, a marine fish.

The geographical analysis indicates that some drainages and/or geographic subregions tend to have more highly contaminated fish than others and that the heavily urbanized northeastern corner of the State, within the Hudson-Newark-Raritan Bay Complex, is especially impacted. The term "Northeast Region" has been defined for the purposes of this emergency rule as that region encompassing the New Jersey portion of Sandy Hook and Raritan Bays; the tidal portion of the Raritan River upstream to the Route 1 Bridge in New Brunswick; the Arthur Kill and Newark Bay; the Passaic River up to Dundee Dam; the Hackensack River up to Oradell Dam. the Kill Van Kull and Upper New York Bay; and the Hudson River up to the New Jersey-New York Border, approximately four miles above Alpine, New Jersey. The Hudson River appears to be the most severely contaminated drainage within State waters and although the mean PCB level for its fish has declined since the mid 1970's the combined levels of several PCB compounds for many Hudson River fish are still above the existing action level of 5 ug/g (ppm)

The Department realizes the importance of commercial and recreational fisheries to the economy and enjoyment of the citizens of the State. Furthermore, the Department understands the broad

## ENVIRONMENTAL PROTECTION

## EMERGENCY ADOPTION$

range public health threat associated with the contamination of fisheries. Human health remains extremely sensitive to aquatic releases of toxic chemicals.

Therefore, the Department finds that an imminent peril of serious public health problems exists due to PCB contamination in certain species of finfish in particular areas of the State's waters, necessitating the following emergency action by the Department.

Prohibition of the sale of Striped Bass (Morone saxatilis) taken from the Hudson River, Upper New York Bay, Newark Bay, Lower Passaic River, Lower Hackensack River, Arthur Kill and Kill Van Kull. Also, an advisory to "limit consumption" of Striped Bass taken from the Northeast Region and the offshore State waters in the northern coastal area of the State. ("Limited consumption" for the purposes of this emergency rule means that in order to reduce exposure to and accumulation of PCB's, persons of high risk, such as pregnant women, nursing mothers, women of child-bearing age and young children, should not eat any fish taken from the regions designated above and all other citizens should consume not more than one meal per week of such fish.)

Prohibition of the sale of American Eels (Anguilla rostrata) taken from the Hudson River, Upper New York Bay, Newark Bay, Lower Passaic and Hackensack River, the Arthur Kill and Kill Van Kull. Also an advisory to limit consumption of American Eels taken from the entire State, especially the Northeast Region.

An advisory to limit consumption of Bluefish (Pomatomus saltatrix) taken from the Northeast Region, including the offshore State waters in the northern coastal area of the State. The advisory has primary relevance to Bluefish exceeding 24 inches in length or six pounds in weight.

An advisory to limit consumption of White Perch (Morone american) taken from the Northeast Region.

An advisory to limit consumption of White Catfish (Ictalurus catus) taken from the Northeast Region.

The Department shall utilize all reasonable and effective methods to publicize and educate the citizens of the State concerning the contents of this emergency rule. The Department shall utilize press conferences, press releases, Departmental mailing lists, public notice in State newspapers, and posting of signs in appropriate locations. Copies of the adopted emergency rule shall be made available to the public upon request.

### Social Impact

A major positive social impact will result from the adopted emergency rule. Imminent public health problems due to PCB contamination of Striped Bass, American Eel, Bluefish, White Perch and White Catfish taken from the Northeast Regions of the State by citizens of the State shall be eliminated due to citizen compliance with the closures and advisories established in the adopted emergency rule. The bioaccumulation of PCB's in the fish consuming public of the State shall be substantially decreased, thus reducing the risk of cancer and other serious health problems.

### Economic Impact

An adverse economic impact of the adopted emergency rule will be caused by the prohibition of the sale of Striped Bass and American Eel in the Northeast Region of the State and by the reduction of consumption advised for Striped Bass, American Eel, Bluefish, White Perch and White Catfish taken from the Northeast Region of the State. This negative economic impact (upon commercial and recreational fishing) will, however, be offset by the overall public health benefit of reducing the consumption of PCB contaminated fish taken from the Northeast Region of the State.

### Environmental Impact

The adopted emergency rule shall have the positive environmental impact of reducing the consumption by humans of PCB contaminated fish. A serious environmental health problem shall be substantially reduced.

Full text of the emergency adoption and concurrent propos follows:

SUBCHAPTER 18A.   FISHERIES CLOSURES AND ADVISORIES FOR STRIPED BASS, AMERICAN EEL, BLUEFISH, WHIT PERCH AND WHITE CATFISH TAKEN FORM THE NORTHEAST REGION OF THE STATE

#### 7:25-18A.1   Authority

This subchapter has been promulgated pursuant to the Marin Fisheries Management and Commercial Fisheries Act, N.J.S.A 23:2B-1 et seq.

#### 7:25-18A.2   Scope and construction

(a) The following shall constitute the rules governing the issuance by the Department, of fisheries closures and advisories concernin; PCB contaminated fish taken from the waters of the Northeas Region of the State.

(b) These rules shall be liberally construed to permit the Department to effectuate the purpose of these rules.

#### 7:25-18A.3   Definitions

"Advisory" means a Departmental warning to limit consumptior of designated fish species taken from designated regions of the State's waters.

"Closure" or "closed" means prohibition of sales of designated fish species taken from designated regions of the State's waters.

"Commissioner" means the Commissioner of the Department o Environmental Protection.

"Department" means the Department of Environmenta Protection.

"Limited consumption" or "limit consumption" means that ir order to reduce exposure to and bioaccumulation of PCB's person: of high risk, including but not limited to pregnant women, nursin; mothers, women of child-bearing age, and young children, shoul not eat any designated fish species taken from designated region: of the State's waters and all other persons should not consume mon than one meal per week of any designated fish taken fron designated regions of the State's waters.

"Northeast Region" means the region encompassing the New Jersey portion of Sandy Hook and Raritan Bay; the tidal portion: of the Raritan River upstream to the Route 1 Bridge in New Brunswick; the Arthur Kill and Newark Bay; the Passaic Rive upstream to the Dundee Dam; the Hackensack River up to Oradel Dam; the Kill Van Kull and Upper New York Bay; and the Hudsor River upstream to the New Jersey-New York State border approximately four miles above Alpine, New Jersey.

"PCB's" means polychlorinated biphenyls.

#### 7:25-18A.4   Closure of fisheries

(a) The Commissioner finds, based upon scientific investigation that to protect the public health of the citizens of the State the following designated regions of the State's waters shall be closec and the sale prohibited of the following designated fish species:

1. Prohibition of the sale of Striped Bass (Morone saxatilis) taker from the Hudson River, Upper New York Bay, Newark Bay, Lower Passaic River, Lower Hackensack River, Arthur Kill and Kill Var Kull; and

2. Prohibition of the sale of American Eels (Anguilla rostrata) taken from the Hudson River, Upper New York Bay, Newark Bay, Lower Passaic River, Lower Hackensack River, Arthur Kill anc Kill Van Kull.

#### 7:25-18A.5   Public advisories concerning fisheries

(a) The Commissioner finds, based upon scientific investigation, that to protect the citizens of the State, the following advisorie: concerning the taking of designated fish species from designatec regions of the State's waters shall be set forth below:

25

**EMERGENCY ADOPTIONS**

1. Advisory for the limited consumption of Striped Bass (Morone saxatilis) taken from the Northeast Region, including offshore State waters in the northern coastal area;

2. Advisory for the limited consumption of American Eel (Anguilla rostrata) taken from the entire State, especially the Northeast Region;

3. Advisory for the limited consumption of Bluefish (Pomatomus saltatrix) taken from the Northeast Region, including offshore State waters in the northern coastal area;

4. Advisory for the limited consumption of White Perch (Morone american) from the Northeast Region; and

5. Advisory for the limited consumption of White Catfish (Ictalurus catus) from the Northeast Region.

(b) The Department further advises that even said designated fish species to be consumed not more than one meal per week should be carefully prepared as set forth below:

1. Remove fat areas from designated fish species, for example, fish belly flaps or abdomens and dark meat portions; and

2. Bake or broil fish on an elevated rack, which allows PCB contaminated fat areas to drip free and away from the fish.

**7:25-18A.6    Public notice of fisheries closures and advisories**

(a) The Department shall utilize all reasonable and effective methods to publicize and educate the citizens of the State concerning all fishery closures and advisories pursuant to this subchapter, including but not limited to the following:

1. Schedule appropriate press conference;

2. Prepare and distribute appropriate press releases;

3. Post informational notices and signs in appropriate locations;

4. Advertise public notices in State newspapers for a reasonable period of time;

5. Distribute public informational notices according to appropriate Departmental mailing lists; and

6. Compliance with notification requirements of the Administrative Procedures Act, N.J.S.A. 52:14B-1 et seq., and the regulations promulgated thereto.

**7:25-18A.7    Violations**

Any person who violates any provision of this subchapter shall be liable to the full range of penalties set forth in Section 14 of the Marine Fisheries Management and Commercial Fisheries Act, N.J.S.A. 23:2B-14.

───────────

26

**ADOPTIONS**                                    **ENVIRONMENTAL PROTECTION**

APPENDIX II

# RULE ADOPTIONS

# ENVIRONMENTAL PROTECTION

(c)

## OFFICE OF CANCER AND TOXIC SUBSTANCES RESEARCH

**Fisheries Closures and Advisories for Striped Bass, American Eel, Bluefish, White Perch and White Catfish, Taken from the Northeast Region of the State**

### Readopted New Rule: N.J.A.C. 7:25-18A

Proposed: January 3, 1983 at 15 N.J.R. 39(a).
Adopted: March 17, 1983 by Robert E. Hughey,
  Commissioner, Department of Environmental
  Protection.
Filed: March 17, 1983 as R.1983 d.102, with **substantive changes** not requiring additional public notice and comment (see N.J.A.C. 1:30-3.5).

Authority: Marine Fisheries Management and Commercial
  Fisheries Act, N.J.S.A. 23:2B-1 et seq.

Effective Date: March 17, 1983.
Expiration Date pursuant to Executive Order No. 66 (1978):
  March 16, 1988.
DEP Docket No. 060-82-12.

**Summary** of Public Comments and Agency Responses:
  **No comments received.**

  **Full text** of the changes between proposal and adoption follows (additions to proposal shown in boldface with asterisks **\*thus\***; deletions from proposal shown in brackets with asterisks \*[thus]\*).

7:25-18A.1–18A.5    (No change from proposal.)

7:25-18A.6    Public notice of fisheries closures and advisories
  (a) The Department shall utilize all reasonable and effective methods to publicize and educate the citizens of the State concerning all fishery closures and advisories pursuant to this subchapter, including but not limited to the following:
  1. Schedule appropriate press conference**\*s\***;
  2. Prepare and distribute appropriate press releases **\*on May 15 and August 15 of each year, and as otherwise deemed necessary\***;
  3. (No change from proposal.)
  4. Advertise public notices in State newspapers \*[for a reasonable period of time]\* **\*on May 15 and August 15 of each year, and as otherwise deemed necessary\***;
  5.-6. (No change from proposal.)



New York

# CLOSED FISHING AREA
## DUE TO PCBs IN FISH TISSUE

## CLOSED AREA

**Sale of STRIPED BASS and AMERICAN EEL taken from these waterways is prohibited.**

New Jersey

Staten Island

**Closed area includes the following waterways and tributaries:**

Hudson River
Upper New York Bay
Newark Bay
Tidal Passaic River
Tidal Hackensack River
Arthur Kill
Kill Van Kull

27

APPENDIX II



# FISHING ADVISORY AREA
## DUE TO PCBs IN FISH TISSUE

## ADVISORY AREA

Advisory in effect to
limit consumption of
STRIPED BASS, BLUEFISH,
WHITE PERCH, WHITE CATFISH,
and AMERICAN EEL.

Advisory area includes the
following waterways and
tributaries:

**Hudson River**
**Upper New York Bay**
**Newark Bay**
**Tidal Passaic River**
**Tidal Hackensack River**
**Arthur Kill**
**Kill Van Kull**
**Tidal Raritan River**
**Raritan Bay**
**Sandy Hook Bay**
**Lower New York Bay**

STRIPED BASS and BLUEFISH advisory
includes Offshore Waters for
Northern Coastal Area.

AMERICAN EEL advisory includes

28

29

**TABLES**

Table 1

### Mean PCB[a] Results in ug/g (ppm) for Selected Finfish Caught within the Northeast Region[b] of New Jersey

| ·es | Size | 1975-1980 Aroclor 1254 (ppm) | 1981 Aroclor 1254 | Aroclor 1248 | Combined PCB | 1982 Aroclor 1254 | Aroclor 1248 | Combined PCB |
|-----|------|------------------------------|-------------------|--------------|--------------|-------------------|--------------|--------------|
| ed Bass | 45.72 cm (18 inches) | 3.58 (17)** | 2.03 (3) | 3.33 (1) | 3.14 (3) | 3.56 (19) | 3.93 (19) | 6.07 (19) |
| | 45.72 cm | 2.52 (34) | 1.80 (16) | 2.13 (9) | 3.00 (16) | 1.93 (11) | 1.12 (11) | 3.46 (11) |
| | Combined Sizes | 2.87 (51) | 1.84 (19) | 2.26 (10) | 3.02 (19) | 2.21 (26) | 2.39 (26) | 3.47 (26) |
| can Eel | | 2.29 (14) | 2.28 (13) | 1.18 (1) | 2.32 (13) | 2.06 (7) | 2.00 (7) | 4.86 (7) |
| Perch | | 2.10 (23) | 1.39 (12) | 1.23 (4) | 1.79 (12) | 3.01 (3) | 2.09 (3) | 6.80 (3) |
| Catfish | | 5.83 (2) | 2.00 (3) | 1.98 (1) | 2.66 (3) | 1.21 (10) | 3.30 (10) | |

Mean is Arithmetic Mean giving equal weight to both single and composite analyses
·ber of analyses
·escribed by Belton et. al. (4) and in this article

**Table 2**

PCB Results* in ug/g (ppm) for Selected Finfish Caught within the Hudson-Raritan Estuary

Sampling Locations

| Species | Sample Year | Hudson River | | | Passaic River | | | Raritan Bay | | | Raritan River | | | Arthur Kill | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | X** | Range | N | X | Range | N | X | Range | N | X | Range | N | X | Range | N |
| Striped Bass | 1981 | 1.56 | (0.16-5.03) | 40 | 6.04 | (1.24-14.85) | 5 | 3.93 | (0.63-7.23) | 2 | | | | | | |
| | 1982 | 3.18 | (0.76-11.5) | 90 | | | | | | | | | | | | |
| American Eel | 1981 | 3.50 | (0.9-7.86) | 20 | | | | 1.06 | (0.9-1.21) | 6 | 0.92 | (0.72-1.04) | 12 | | | |
| | 1982 | 4.80 | (2.68-7.58) | 11 | 7.18 | (7.18) | 5 | | | | | | | 4.09 | (4.09) | 5 |
| White Perch | 1981 | 1.31 | (0.9-1.58) | 10 | 3.72 | (0.51-10.03) | 15 | | | | 0.62 | (0.25-1.29) | 17 | | | |
| | 1982 | 6.34 | (4.97-8.07) | 7 | | | | | | | | | | | | |
| White Catfish | 1981 | 1.89 | (1.25-2.52) | 6 | 4.21 | (4.21) | 6 | | | | | | | | | |
| | 1982 | 3.12 | (1.86-5.69) | 38 | | | | | | | | | | | | |

1981 results are for Aroclor 1254 with some limited Aroclor 1248 analyses included, mostly for the Passaic River fish.
All 1982 fish were analyzed for both Aroclors and are reported as totaled PCBs.
*FDA Mean is the Arithmetic Mean giving equal weight to both single and composite samples, N is the number of organisms caught and analyzed.

**Table 3**

**PCB and Pesticide Levels* for Bluefish Caught within the Northeast Region and Control Waters of N.J.+**

| | **PCB Results** | | | | Pesticide Results |
|---|---|---|---|---|---|
| | 1975-1981*** | | 1982 | | 1982 |
| Size | Aroclor 1254 (ppm) | Aroclor 1254 | Aroclor 1248 | Combined PCBs | Total Chlordane (ppb) |
| 60 cm | 1.59 (44)** | 0.71 (14) | 2.33 (14) | 3.03 (14) | 207.93 (14) |
| 40-60 cm | 1.20 (21) | 0.34 (13) | 0.20 (13) | 0.54 (13) | 47.05 (13) |
| 40 cm | 1.04 (62) | 0.45 (8) | 0.25 (8) | 0.70 (8) | 25.00 (8) |
| Combined | 1.25 (127) | 0.50 (35) | 0.93 (35) | 1.43 (35) | 93.93 (29) |

*Results are expressed as the FDA mean or Arithmetic mean given equal weight to both single and composite analyses.
 PCB results are in ug/g (ppm) while pesticide levels are in ug/kg (ppb).
**Number of analyses.
***Only a small number of Bluefish samples were caught in 1981 so they were pooled with the 1975-1980 data set.
+The Northeast Region is that as defined by Belton et. al. (82). Coastal waters include sites from Sandy Hook south
 to Barnegat Inlet, from the surf line to thirty miles offshore.

Table 4

PCB and Chlordane Levels for Bluefish by Location

Sampling Location's

| ical | Sample Year | Hudson River | | | | Raritan/Sandy Hook Bay& | | | | Coastal+ | | | |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| | | A* | X | Range | N | A | X | Range | N | A | X | Range | N |
| * | 1981 | 2 | 1.78 | (1.57-1.99) | 3 | 4 | 1.29 | (0.49-2.31) | 12 | - | - | - | - |
| (ppm) | 1982 | 3 | 1.55 | (1.38-1.70) | 11 | 4 | 0.46 | (0.32-0.69) | 20 | 28 | 1.73 | (0.1-8.28) | 123 |
| rdane*** | 1981 | 2 | 205.9 | (127.4-284.5) | 3 | 4 | 110.1 | (2.5-232.1) | 12 | - | - | - | - |
| ı (ppb) | 1982 | 3 | 36.93 | (30.4-50.0) | 11 | 4 | 27.75 | (18.21-39.03) | 20 | 28 | 125.7 | (11.21-357.6) | 123 |

mber of analyses performed

)A Mean is the Arithmetic Mean giving equal weight to both single and composite samples.

mber of organisms analyzed.

)81 Results are for Aroclor 1254 with some limited Aroclor 1248 analyses included. All 1982 fish were analyzed for both Aroclors and are reported as total PCBs.

ılordane is reported as the sums of the alpha and gamma chlordane isomers.

)astal waters include sites from Sandy Hook south to Barnegat Inlet, from the surf line to thirty miles offshore.

### Table 5

### Percentage of Fish Caught within the Northeast Region of New Jersey During the 1982 Sampling Season as Specified by Certain Regulatory Ranges+ for PCBs*

#### Percentages

| Species (N)** | Minimal Levels (0.1-2.0 ppm) PCBs | Advisory Range (2.0-5.0 ppm) PCBs | Closure Range (5.0 ppm) PCBs |
|---|---|---|---|
| Bluefish (154) | 68% (26)*** | 26% (9) | 6% (2) |
| Striped Bass (90) | 38% (9) | 45% (12) | 19% (5) |
| American Eel (21) | 0% | 71% (5) | 29% (2) |
| White Catfish (38) | 10% (1) | 80% (8) | 10% (1) |
| White Perch (7) | 0% | 33% (1) | 67% (3) |

   *PCBs results are for Aroclor 1254 and 1248 summed (ug/g or ppm)
  **Number of organisms caught
***Number of analyses formed
  +Existing FDA Tolerance is 5.0 ug/g
  Proposed FDA Tolerance is 2.0 ug/g

35

Table 6

COMMERCIAL FISHERY STATISTIC FOR NEW JERSEY (1976)

| Species | Recreational Total No. Caught 1979* | Commercial Landing (lbs.) 1976 | Commercial Dollar Value($) 1976 |
|---|---|---|---|
| 1. Summer Flounder | 5,142,000 | 5,647,000 | $2,341,000 |
| 2. Bluefish | 4,948,000 | 1,280,000 | 145,000 |
| 3. Winter Flounder | 1,434,000 | 147,000 | 26,000 |
| 4. Weakfish | 1,372,000 | 5,709,000 | 555,000 |
| 5. Atlantic Mackerel | 969,000 | 1,852,000 | 151,000 |
| 6. Striped Bass | 30,000 | 137,000 | 102,000 |

*Statistics Compiled by U.S. Department of Commerce
 Current Fisheries Statistics

36

Table 7

## A. MARINE RECREATIONAL FISHERIES IN N.J. * (1979)

|  | Total Fish Caught |
|---|---|
| 1. Summer Flounder | 5,142,000 |
| 2. Bluefish | 4,948,000 |
| 3. Winter Flounder | 1,634,000 |
| 4. Weakfish | 1,372,000 |
| 5. Atlantic Mackerel | 969,000 |
| 6. Striped Bass | 30,000 |

## B. Percentage of Fishermen Affirming Species Groups Sought in Mid-Atlantic Region◊

|  | Percentage |
|---|---|
| 1. Bluefish | 25.59 |
| 2. Summer Flounder | 15.61 |
| 3. Weakfish | 10.50 |
| 4. Striped Bass | 10.49 |
| 5. Winter Flounder | 7.85 |
| 6. White Perch | 3.39 |
| 7. None | 32.62 |

*Marine Recreational Fishery Statistics Survey, Atlantic and Gulf Coast, 1979.
 U.S. Dept. of Commerce, Current Fishery Statistics Number 8063.  December, 1980.

+=972,000 Participants in the Marine Recreational Fishery in N.J. for 1979.

# EXHIBIT 3

J15

MAXUS0844402

EXECUTIVE ORDER NO. 40C

WHEREAS, Executive Order No. 40 was signed on June 2, 1983 to declare an emergency for the possible dioxin contamination of a site located at 80 Lister Avenue in the City of Newark; and

WHEREAS, that emergency was extended by Executive Order No. 40A, signed on June 14, 1983 to cover the possible dioxin contamination of another site, located at 30 Whitman Avenue, in the Township of Edison; and

WHEREAS, that emergency was further extended by Executive Order No. 40B, signed on June 17, 1983 to cover the possible dioxin contamination of another site, located at 125 Delawanna Avenue, in the City of Clifton, County of Passaic; and

WHEREAS, the preliminary investigation, sampling, and analysis of soil samples at certain property located in Building No. 8 at 100 West Main Street in the Borough of Bound Brook, County of Somerset, and more particularly known as the former Blue Spruce International, Inc facility, has indicated detectable levels of dioxin present at certain areas on that property; and

WHEREAS, further investigations, samplings, and analyses are necessary in order to determine definite information as to the nature and extent of any danger which may be posed by the possible dioxin contamination at the above described premises and in the immediate vicinity thereof in order to determine what actions if any will be required to safeguard the public health and welfare; and

WHEREAS, this situation warrants on extension of the declaration of emergency as set forth in Executive Order

WHEREAS, the scope of the efforts necessary to so protect the public health and welfare is beyond the capacity of regular municipal operating services, or any State agency acting singly.

NOW THEREFORE, I, Thomas H. Kean, Governor of the State of New Jersey, by virtue of the authority vested in me by the constitution and laws of the State of New Jersey, do hereby amend Executive Order No. 40 and follows:

1. Continue in full force and effect Executive Order No. 40, and all terms and provisions thereof.

2. Executive Order No. 40 is amended to include the former Blue Spruce International premises located in Building No. 8 at 100 West Main Street in the Borough of Bound Brook, as described above.

3. This Order shall take effect immediately. It shall remain in effect until terminated or amended by action of the Governor.

GIVEN, under my hand and seal this 27 day of June, in the year of Our Lord, one thousand nine hundred and eighty-three, and of the United States, the two hundred and seventh.

THOMAS H. KEAN, Governor

Attest: Michael J. Catania

BBA000120-A

MAXUS0844403

STATE OF NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL PROTECTION
ROBERT E. HUGHEY, COMMISSIONER
CN 402
TRENTON, N.J. 08625
(609) 292-2885

ADMINISTRATIVE ORDER NO. EO

WHEREAS, Governor Thomas H. Kean has issued Executive Order No.    declaring
that a state of emergency exists arising from the potential dioxin contami-
nation of the premises at 125 Delawanna Avenue, in the City of Clifton,
New Jersey; and

WHEREAS, by said Executive Order the Governor has authorized and directed
me to take such emergency measures as I may determine to be necessary in
order to fully and adequately protect the health, safety and welfare of the
citizens of this State from any actual or potential threat or danger which
may exist as a result thereof; and

WHEREAS, preliminary test results have indicated detectable levels of dioxin
present at portions of the site of the Givaudan Corporation at 125 Delawanna
Avenue, in the City of Clifton, New Jersey and:

WHEREAS, it is necessary to take additional measures to protect the public
health, safety and welfare while further information is obtained;

NOW, THEREFORE, pursuant to the powers vested in me by Executive Order
No.    , I hereby Order and Direct that the Givaudan Corporation immediately
implement the following measures, at its expense, under the supervision
and direction of this Department and the U. S. Environmental Protection
Agency:

(1) All areas where preliminary test results have indicated
the presence of dioxin at or in excess of one (1) part
per billion shall be closed and secured, with physical
access thereto restricted. All such areas should be
covered by a permeable ground cover installed by a
contractor approved by representatives of the Department
and the U. S. Environmental Protection Agency in such
manner and location as may be directed by those
representatives.

(2) All hexachlorophene production shall be suspended until
further notice by the Department. Those areas of the
facility which are associated with the hexachlorophene
production process, as determined by the Department,
shall be closed and secured with physical access thereto
restricted. No hexachlorophene shall be moved into or
from these areas or any other area of the 125 Delawanna
site.

*100% Recycled*

MAXUS0844404

-2-

(3) Commencing June 18, 1983, on-site sampling of interior and exterior areas of the 125 Delawanna Avenue facility shall be conducted by a contractor approved by representatives of the Department and the U. S. Environmental Protection Agency, in such manner and location as may be directed by those representatives.

(4) No hazardous or chemical waste shall be removed from the 125 Delawanna Avenue site until further notice by the Department. No materials or substances containing Trichlorophenol shall be moved onto, about or from the 125 Delawanna Avenue site until further notice by the Department.

(5) No demolition, excavation, movement or disturbance of soil, or placing, movement or removal of construction materials or equipment shall occur and 125 Delawanna Avenue site until further notice by the Department.

(6) All medical and personnel records, reports and other information shall be provided as requested by the Commissioner of the N. J. Department of Health.

(7) Appropriate health screening and evaluation programs, including but not limited to employee medical ex- aminations, shall be implemented as directed by the Commissioner of the N. J. Department of Health.

(8) Any other precautionary or remedial action shall be implemented as may be directed by this Department, the N. J. Department of Health, or the U. S. Environ- mental Protection Agency.

MAXUS0844405

This Order shall take effect immediately.

WITNESS: _Michael E. Catania_

_____
ROBERT E. HUGHEY
Commissioner


_6/17/83_
_____
DATED

MAXUS0844406

# EXHIBIT 4

BOOK 349 PAGE 142

# FILED

MAR 21 1986

*[signature]* 10A M
SECRETARY OF STATE

CERTIFICATE OF INCORPORATION

OF

DIAMOND SHAMROCK PROCESS CHEMICALS INC.

The undersigned, for the purpose of incorporating and organizing a corporation under the General Corporation Law of the State of Delaware (the "GCL"), does hereby certify as follows:

1.    The name of the corporation is Diamond Shamrock Process Chemicals Inc. (the "Corporation").

2.    The address of the Corporation's registered office in the State of Delaware is the Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

3.    The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the GCL.

4.    The total number of shares of capital stock which the Corporation shall have authority to issue is 1,000 shares of Common Stock, $1.00 par value.

5.    The name and mailing address of the incorporator is Grace Alcala', 351 Phelps Court, P. O. Box 152300, Irving, Texas 75015-2300.

6.    The names and mailing addresses of the persons who are to serve as Directors of the Corporation until the first annual meeting of stockholders or until their successors are duly elected and qualified are as follows:

MAXUS3373102

BOOK 349 PAGE 143

| Name | Mailing Address |
|------|-----------------|
| J. W. McConnell | 351 Phelps Court<br>P. O. Box 152300<br>Irving, Texas  75015-2300 |
| M. J. Dumeny | 351 Phelps Court<br>P. O. Box 152300<br>Irving, Texas  75015-2300 |

7.   The Board of Directors of the Corporation shall have power to adopt, alter, amend or repeal the By-Laws of the Corporation.

8.   The Corporation reserves the right at any time and from time to time to alter, amend, change, or repeal any provision contained in this Certificate of Incorporation, and other provisions authorized by the laws of the GCL at the time in force may be added or inserted, in the manner now or hereafter prescribed by law; and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the rights hereby reserved.

The undersigned, being the incorporator hereinabove named, does hereby execute this Certificate of Incorporation this 20th day of March, 1986.

Grace Alcala'

RECEIVED FOR RECORD

MAR 2 5 1986

LEO J. DUGAN, Jr., Recorder

030ga³

— 2 —

CONFIDENTIAL                                                                    MAXUS3373103

PAGE    1



## State of Delaware

11318

BOOK 339 PAGE 503

## Office of Secretary of State

I, MICHAEL HARKINS, SECRETARY OF STATE OF THE STATE OF

DELAWARE DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF AMENDMENT BEFORE PAYMENT FOR STOCK OF

DIAMOND SHAMROCK PROCESS CHEMICALS, INC. FILED IN THIS OFFICE ON

THE ELEVENTH DAY OF JULY, A.D. 1986, AT 10 O'CLOCK A.M.

: : : : : : : : : :



Michael Harkins, Secretary of State

AUTHENTICATION:    10883560

DATE:    07/14/1986

736192063

TIERRA000012

731192023

FILED

~~JUN~~ 11 1986  10AM

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

DIAMOND SHAMROCK PROCESS CHEMICALS INC.    BOOK 339 PAGE 504

DIAMOND SHAMROCK PROCESS CHEMICALS INC., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware,

DOES HEREBY CERTIFY THAT:

1. The name of the corporation is DIAMOND SHAMROCK PROCESS CHEMICALS INC. (the "Corporation").

2. An original Certificate of Incorporation was filed in the office of the Secretary of State of Delaware on March 21, 1986 and recorded in the office of the Recorder of Deeds of New Castle County of March 21, 1986.

3. The Certificate of Incorporation of the Corporation is hereby amended by deleting in its entirety the present section one of the Certificate of Incorporation of the Corporation and replacing it with the following:

   FIRST:  The name of the corporation (hereinafter called the Corporation) is Diamond Shamrock Chemical Land Holdings Inc.

4. The Corporation has not received any payment for any capital stock, and the foregoing amendment has been duly adopted by the unanimous actions of the Board of Directors of the Corporation in accordance with section 241 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said DIAMOND SHAMROCK PROCESS CHEMICALS INC. has caused this certificate to be signed by J. W. McConnell, its Vice President, and attested to by MARCEL J. DUMENY, its Secretary, this _26th_ day of June, 1986.

By _____
   Vice President

ATTEST:

By _____
   Secretary

RECEIVED FOR RECORD

JUL 16 1986

LEO J. DUGAN, Jr., Recorder

0112:CI

TIERRA000013

16

PLEASE RETURN TO
THE CORPORATION TRUST COMPANY

RECEIVED FOR RECORD

JUL 1 6 1986

LEO J. DUGAN, Jr., Recorder

INDEXED

TIERRA000014


# State of DELAWARE

## Office of SECRETARY OF STATE

*I,* Michael Harkins, *Secretary of State of the State of Delaware, do hereby certify* that the "DIAMOND SHAMROCK CHEMICAL LAND HOLDINGS INC.", filed

a Certificate of Amendment, changing its corporate title to "CHEMICAL LAND HOLDINGS, INC.", on the fourth day of December, A.D. 1987, at 10 o'clock A.M.

*In Testimony Whereof, I have hereunto set my hand and official seal at Dover this* _____eighteenth_____ *day of* _____January_____ *in the year of our Lord one thousand nine hundred and* _____eighty-eight._____



Michael Harkins, Secretary of State

FORM 122

MAXUS0443848



# State
## of
# DELAWARE

### Office of SECRETARY OF STATE

*I,* Michael Harkins, *Secretary of State of the State of Delaware, do hereby certify* that the "DIAMOND SHAMROCK CHEMICAL LAND HOLDINGS INC.", filed a Certificate of Amendment, changing its corporate title to "CHEMICAL LAND HOLDINGS, INC.", on the fourth day of December, A.D. 1987, at 10 o'clock A.M.

And I do hereby further certify that the aforesaid Corporation is duly incorporated under the laws of the State of Delaware and is in good standing and has a legal corporate existence so far as the records of this office show and is duly authorized to transact business.

In Testimony Whereof, *I have hereunto set my hand and official seal at Dover this* ___eighteenth___ *day of* ___January___ *in the year of our Lord one thousand nine hundred and* ___eighty-eight.___



_____
Michael Harkins, Secretary of State

FORM 122

MAXUS0443849

# THE CORPORATION TRUST COMPANY

*Associated with C T Corporation System*

CORPORATION TRUST CENTER
1209 ORANGE STREET
WILMINGTON, DEL. 19801
(302) 658-7581

JAN 2 9 1988

MAILING ADDRESS:
P.O. BOX 631
WILMINGTON, DEL. 19899

RE:   CHEMICAL LAND HOLDINGS, INC.
      FORMERLY: DIAMOND SHAMROCK CHEMICAL LAND HOLDINGS, INC.

LAW DEPARTMENT
MAXUS ENERGY CORPORATION
ATTENTION: RHONDA BRAUCHT, LEGAL ASSISTANT
717 NORTH HARWOOD
DALLAS, TEXAS  75201

Attached for the permanent records of this corporation, is the certified recorded copy of your document, which has just been released by the Recorder of Deeds.

THE CORPORATION TRUST COMPANY

George J. Coyle
Assistant Vice-President

Enclosure

MAXUS0443850



PAGE    1

# State of Delaware

## Office of Secretary of State

---

I, MICHAEL HARKINS, SECRETARY OF STATE OF THE STATE OF
DELAWARE DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF AMENDMENT OF DIAMOND SHAMROCK PROCESS
CHEMICALS, INC. FILED IN THIS OFFICE ON THE FOURTH DAY OF
DECEMBER, A.D. 1987, AT 10 O'CLOCK A.M.

: : : : : : : : : :



Michael Harkins, Secretary of State

AUTHENTICATION:    !1493591

DATE:    12/08/1987

737338032

MAXUS0443851

BOOK 639 PAGE 354

### State of Delaware



39905

## Office of Secretary of State

---

I, MICHAEL HARKINS, SECRETARY OF STATE OF THE STATE OF DELAWARE,

DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE

CERTIFICATE OF AMENDMENT OF DIAMOND SHAMROCK CHEMICAL LAND HOLDINGS

INC. FILED IN THIS OFFICE ON THE FOURTH DAY OF DECEMBER, A.D. 1987,

AT 10 O'CLOCK A.M.



737339032

Michael Harkins, Secretary of State

AUTHENTICATION:   1493592

DATE:   12/08/1987

MAXUS0443852

**FILED**

DEC 4 1987    10 AM

*[signature]*

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

DIAMOND SHAMROCK CHEMICAL LAND HOLDINGS INC., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware,

DOES HEREBY CERTIFY:

FIRST:   That the Board of Directors of said corporation, by unanimous written consent of its members, filed with the minutes of the board, adopted a resolution proposing and declaring advisable the following amendment to the Certificate of Incorporation of said corporation:

> RESOLVED, that the Board of Directors hereby declares it advisable that the Corporation change its name, and in furtherance thereof that Article 1 of the Certificate of Incorporation be amended in its entirety to read as follows:
>
> 1.  The name of the corporation is Chemical Land Holdings, Inc. (the "Corporation").

SECOND:   That in lieu of a meeting and vote of the sole stockholder, the stockholder has given written consent to said amendment in accordance with the provisions of Section 228 of the General Corporation Law of the State of Delaware.

THIRD:   That the aforesaid amendment was duly adopted in accordance with the applicable provisions of Sections 242 and 228 of the General Corporation Law of the State of Delaware.

MAXUS0443853

BOOK 639 PAGE 556

IN WITNESS WHEREOF, said DIAMOND SHAMROCK CHEMICAL LAND HOLDINGS INC. has caused this certificate to be signed by D. C. Mielke, its Vice President, and attested by D. H. Van Horn, its Assistant Secretary, this 21st day of October, 1987.

DIAMOND SHAMROCK CHEMICAL LAND HOLDINGS INC.

By _D. C. Mielke_____
    D. C. Mielke, Vice President

ATTEST:

By _D. H. Van Horn_____
    D. H. Van Horn
    Assistant Secretary

7321/SUBMTGSI

RECEIVED FOR RECORD

DEC 1 5 1987

William M. Honey, Recorder

MAXUS0443854

PLEASE RETURN TO
THE CORPORATION TRUST COMPANY

$27.^{00}$

INDEXED

MAXUS0443855



# Delaware

PAGE 1

### *The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF AMENDMENT OF "CHEMICAL LAND HOLDINGS,
INC.", CHANGING ITS NAME FROM "CHEMICAL LAND HOLDINGS, INC." TO
"TIERRA SOLUTIONS, INC.", FILED IN THIS OFFICE ON THE
TWENTY-FIFTH DAY OF FEBRUARY, A.D. 2002, AT 9 O'CLOCK A.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE
NEW CASTLE COUNTY RECORDER OF DEEDS.



Harriet Smith Windsor, Secretary of State

2086415  8100

020125241

AUTHENTICATION: 1631735

DATE: 02-25-02

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 02/25/2002
020125241 - 2086415

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

CHEMICAL LAND HOLDINGS, INC., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"),

DOES HEREBY CERTIFY:

FIRST.    That the Board of Directors of the Corporation, by unanimous written consent of its members, filed with the minutes of the board, adopted a resolution proposing and declaring advisable the following amendment to the Certificate of Incorporation of the Corporation:

RESOLVED, that the Board of Directors hereby declares it advisable that the Corporation change its name, and in furtherance thereof that Article 1 of the Certificate of Incorporation of the Corporation, as heretofore amended, be further amended in its entirety to read as follows:

1.    The name of the corporation is Tierra Solutions, Inc. (the "Corporation").

SECOND:    That in lieu of a meeting and vote of the sole stockholder, the stockholder has given written consent to said amendment in accordance with the provisions of Section 228 of the General Corporation Law of the State of Delaware.

DEP\DA0008960

NJDEP00052044

THIRD:    That the aforesaid amendment was duly adopted in accordance with the applicable provisions of Sections 242 and 228 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by David A. Wadsworth, its Vice President, this 21st day of February 2002.

CHEMICAL LAND HOLDINGS, INC.

By: _____
David A. Wadsworth,
Vice President

r·\legal\smithdoc\name change\chemical-land-holdings doc – page 3

DEP\DA0008961

NJDEP00052045

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### NEWARK VICINAGE

| | | |
|---|---|---|
| OCCIDENTAL CHEMICAL CORPORATION | ) | Hon. Madeline Cox Arleo |
| | ) | Hon. Joseph A. Dickson |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:18-cv-11273-MCA-JAD |
| | ) | |
| v. | ) | **OCCIDENTAL CHEMICAL** |
| | ) | **CORPORATION'S AMENDED** |
| 21ST CENTURY FOX AMERICA, INC., *et al.* | ) | **RESPONSES TO THE STANDARD** |
| | ) | **SET OF INTERROGATORIES** |
| Defendants. | ) | |
| | ) | |

ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel.    (856) 795-2121
By:    John J. McDermott, Esq.
        (jmcdermott@archerlaw.com)
        William J. Stack, Esq.
        Charles J. Dennen, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.    (713) 650-8805
By:    Kathy D. Patrick, Esq.
        (kpatrick@gibbsbruns.com)
        Anthony N. Kaim, Esq.
        Katherine H. Kunz, Esq.
        Jorge M. Gutierrez, Esq.
        Marshal J. Hoda, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
1818 Market Street, Suite 2610
Philadelphia, PA 19103
Tel.    (215) 732-3255
By:    Larry D. Silver, Esq.
        (lsilver@lssh-law.com)
        David E. Romine, Esq.
        Erin M. Carter, Esq.

GREENBERG CLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, CA 90067
Tel.    (310) 553-3610
By:    Peter A. Nyquist, Esq.
        (pnyquist@ggfirm.com)
        Noah Perch-Ahern, Esq.
        Sherry E. Jackman, Esq.

*Attorneys for Plaintiff Occidental Chemical Corporation*

16.     Identify and describe all litigations, arbitrations, mediations, or settlements in which You have been involved relating to any Property at Issue or Operations identified in response to Interrogatories Nos. 1 or 2 that pertained in any way to the COCs, Identify the outcome of those proceedings, and Identify where Documents related to those proceedings are stored.

**RESPONSE**:

As described in OxyChem's Preliminary Statement, OxyChem itself did not conduct the Operations identified in response to Interrogatory No. 2. After a reasonably diligent search, OxyChem identified the following information responsive to this Interrogatory.

## Litigations[4]

*New Jersey Dep't of Envtl. Prot. v. Occidental Chemical Corporation, et al.*

In 2005, the New Jersey Department of Environmental Protection and the Administrator of the New Jersey Spill Compensation Fund (collectively, "the NJDEP") filed a complaint in the Superior Court of New Jersey, Law Division, Essex County, Docket No. L9868-05, under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11a to -23.11z (the "Spill Act"), the Water Pollution Control Act, N.J.S.A. 58:0A-1 to -37, 23, and New Jersey common law, seeking damages related to alleged discharges to the Passaic River from the chemical plant formerly located at the Lister Site. The NJDEP's Complaint named as defendants OxyChem, Maxus, Tierra, Repsol, S.A. ("Repsol"), YPF, S.A. ("YPF"), and related entities. On February 4, 2009, Maxus and Tierra asserted cross-claims against 308 parties ("Third-Party Defendants") alleging the Third-Party Defendants contributed to the contamination of the Passaic River, its tributaries, and Newark Bay, and certain Third-Party Defendants asserted claims against Fourth-Party Defendants. In 2012, discovery involving the Third- and Fourth-Party Defendants was stayed while those parties negotiated and ultimately settled with the NJDEP.

In addition, OxyChem asserted cross claims seeking to enforce its indemnity against Maxus, Tierra, YPF and Repsol. Cross claims involving Repsol are currently on appeal in New Jersey. OxyChem's cross claim against YPF was stayed and removed to the U.S. Bankruptcy Court in Delaware (see *In re Maxus Energy Corp.*, below).

*Diamond Shamrock Chemicals Co. v. Aetna Cas. And Sur. Co.*

DSCC was covered by a series of primary and excess insurance policies during its ownership of the Lister Avenue plant. After investigation and remediation at the Lister Site began in the early 1980s, DSCC made a claim for coverage of environmental-remediation and personal-

---

[4] OxyChem was not a party to most of the litigations in response to Interrogatory No. 16. Accordingly, OxyChem's knowledge of certain litigations—including which entities were named as parties--is limited to information contained in the Spill Act Production, provided to OxyChem in the Maxus Bankruptcy, and/or publicly available sources.

injury liabilities. In addition, after DSCC agreed to a settlement in the Agent Orange Litigation, DSCC made a claim for coverage of its settlement costs.

DSCC's insurers denied coverage for these claims. DSCC then filed suit against its insurance providers in New Jersey state court.[5] The Superior Court of New Jersey Appellate Division eventually held that the insurers were not obligated to provide coverage for environmental or personal-injury liabilities. Day Pitney, LLP and Cahill Gordon & Reindel, LLP represented DSCC in this litigation and may be in possession of related documents.

*Agent Orange U.S. Class Action*

In 1978, a veteran of the Vietnam War filed suit against seven chemical companies, including DSCC, in the Supreme Court of New York County. The case was eventually consolidated with hundreds of similar suits and certified as a class action. Diamond Shamrock agreed to a global settlement. Cadwalader, Wickersham & Taft, LLP represented DSCC in these proceedings and may be in possession of related documents.

*Agent Orange (France)*

In 2014, an individual French plaintiff of Vietnamese origin sued twenty-six current or former chemical manufacturers, including OxyChem, in the civil court of Evry in France. The litigation is in the pre-hearing briefing phase and remains ongoing. There has been no decision. Documents related to these proceedings are in OxyChem's possession.

*Ironbound Health Rights Advisory Com v. Diamond Shamrock Chem. Co.*

In 1983, the Ironbound Health Rights Advisory Commission ("IHRAC') filed suit against a number of defendants including DSCC and NJDEP under the New Jersey Environmental Rights Act and Spill Compensation and Control Act. IHRAC sought preliminary and permanent relief requiring defendants to clean up and remove all dioxin in the area surrounding 80 Lister Avenue. The Ironbound litigation was settled between IHRAC and Maxus pursuant to a private settlement agreement. McCarter & English, LLP represented DSCC in this litigation and may be in possession of related documents.

*Vuocolo v. Diamond Shamrock Chem. Co.* (1985)

In 1985, the estate of Lucy Vuocolo sued DSCC, alleging that dioxin released from the Lister Site increased her risk of contracting cancer. The New Jersey Superior Court dismissed Vuocolo's claim on summary judgment and the New Jersey Appellate Division affirmed. McCarter & English, LLP represented DSCC in this litigation and may be in possession of related documents.

---

[5] In the 1986 Stock Purchase Agreement in which OxyChem acquired the stock of DSCC from Maxus Energy Corporation ("Maxus"), Maxus retained both DSCC's applicable claims under the Aetna policies and the rights to all damages, judgments, and recoveries from the Aetna litigation.

*Marques v. Diamond Shamrock Corporation*, Docket No. L-071277-83

In November 1983, Michael and Vivan Marques filed a lawsuit against Diamond Shamrock Corporation alleging personal injuries arising from exposure to dioxin. The Superior Court of New Jersey dismissed the case with prejudice for failure to prosecute. McCarter & English, LLP represented Diamond Shamrock Corporation in this litigation and may be in possession of related documents.

*Gray v. Diamond Alkali Co.*, Docket No. L-023213-85

In March 1985, Naamon Gray filed a lawsuit against Diamond Shamrock Corporation and DSCC, among other defendants, alleging that he had suffered personal injuries as a result of exposure to dioxin while employed by Benjamin Moore. In 1985, Diamond Shamrock Corporation was dismissed from the lawsuit. In 1986, the Superior Court of New Jersey dismissed the remaining defendants. McCarter & English, LLP represented Diamond Shamrock Corporation and DSCC in this litigation and may be in possession of related documents.

*Morrissey v. Diamond Shamrock Corp.*, Docket No. L-030772-84

In May 1984, Charles Morrissey filed a lawsuit against Diamond Shamrock Corporation, among other defendants, alleging personal injury arising from exposure to dioxin while employed at the Lister Site. On information and belief, the Superior Court of New Jersey dismissed that case as barred by the New Jersey Workers Compensation Act. McCarter & English, LLP represented Diamond Shamrock in this litigation and may be in possession of related documents.

*Lamoreaux, et al. v. Diamond Shamrock Corporation*, Docket No. L-036231-83

On June 13, 1983, former employees, businesses and residents located in the area of 80 Lister Avenue filed a lawsuit against Diamond Shamrock Corporation, among other defendants. Marisol, Inc. filed cross-claims against DSCC seeking damages for alleged injury to the 80 Lister Avenue property, then owned by Marisol. In December 1985, Marisol and DSCC entered into a Settlement Agreement and Release whereby Marisol sold the 80 Lister Avenue property to DSCC. In 1988, the New Jersey Superior Court dismissed all remaining claims in the suit. McCarter & English, LLP represented Diamond Shamrock and DSCC in this litigation and may be in possession of related documents.

*Brady Iron and Metal, Inc. v. State of New Jersey, et al.*, Docket No. L-005961-84

In 1984, Brady Iron & Metal filed a lawsuit against Diamond Shamrock Corporation and several other defendants alleged property damage due to dioxin contamination. All parties agreed to a settlement in 1985. On information and belief, McCarter & English, LLP represented Diamond Shamrock in this litigation and may be in possession of related documents.

*Brennan v. Diamond Shamrock Corp., et al.*, Docket No. L-045269-85

In 1985, area residents and former employees at the 80 Lister Avenue plant filed suit against Diamond Shamrock Corporation and other defendants. On information and belief, the Superior Court of New Jersey dismissed this suit in 1989 for failure to provide answers to

interrogatories.  McCarter & English, LLP represented Diamond Shamrock in this litigation and may be in possession of related documents.

*Intercity Steel Supply Corp. v. Diamond Shamrock Chemicals Co.*, Docket No. L-89551-86

In 1986, Intercity Steel filed suit against DSCC alleging that it had sustained damages due to dioxin contamination.  In 1987, the Superior Court of New Jersey dismissed this suit for Plaintiff's failure to answer interrogatories.  McCarter & English, LLP represented DSCC in this litigation and may be in possession of related documents.

*Occidental Chemical Corp. v. Maxus Energy Corp.* (68th Judicial District Court, Dallas, TX, Case No. 95-11776-C)

In 1995, OxyChem sued Maxus Energy Corporation seeking a declaration that Maxus was required to reimburse OxyChem for environmental costs resulting from the 1986 Stock Purchase Agreement.  The trial court entered summary judgment in OxyChem's favor, holding that Maxus was required to reimburse OxyChem for environmental costs under the Agreement.  *Maxus Energy Corp. v. Occidental Chem. Corp.*, No. 05-96-01101-CV, 1998 WL 269994, at *2 (Tex. App.—Dallas 1998, pet. denied).  The Court of Appeals of Texas at Dallas "affirmed the trial court's judgment in all respects."  *Id.* at *13.

*Occidental Chemical Corp. v. Maxus Energy Corp.* (14th Judicial District Court, Dallas, TX, Case No. 02-09156)

In 2005, OxyChem sued Maxus Energy Corporation seeking a declaration that there was no time limit on Maxus's obligation to indemnify, defend and hold harmless OxyChem for environmental costs under the 1986 Stock Purchase Agreement.  A jury ruled in OxyChem's favor. *See* Maxus Energy Corp. v. Occidental Chem. Corp., 244 S.W.3d 875, 878 (Tex. App.—Dallas 2008, pet. denied).  The Court of Appeals of Texas at Dallas affirmed.  *Id.* at 885.

*In re Maxus Energy Corp.* (District of Delaware, Case No. 16-11501/Adv. Pro. No. 16-51025/Adv. Pro. No. 18-50489)

After Maxus declared bankruptcy, an adversary proceeding was initiated against Maxus Energy Corporation, Tierra Solutions, Inc., YPF, Inc., and Repsol, S.A. (the "Defendants").  The proceeding asserted that the Defendants had systematically colluded to deplete Maxus's assets and bankrupt the company in order to escape Maxus's legacy environmental liabilities—primarily those liabilities associated with historical operations at the Lister Site.  The Defendants are, therefore, liable for Maxus's environmental liabilities under various legal doctrines, including the alter-ego doctrine, unjust enrichment, fraudulent transfer, and conspiracy.

The Delaware court ruled that the Maxus Liquidating Trust was the proper party to pursue these claims.  The Liquidating Trust is pursuing those claims and litigation is ongoing.  In March 2019, the Delaware court refused the Defendants request to abstain from proceeding with the Liquidating Trust's Adversary Proceeding.  *See In re Maxus Energy Corp.*, 597 B.R. 235, 239 (Bankr. D. Del. 2019).  White & Case, LLP represents the Liquidating Trust and is in possession of related documents.

## Mediations

*River Mile 10.9 Mediation*

OxyChem, Maxus, and Tierra participated in a confidential mediation process among members of the Cooperating Parties Group to allocate costs of performing certain activities with respect to the removal action at RM 10.9 in Lyndhurst, New Jersey. Maxus and Tierra directed the effort on OxyChem's behalf in their capacity as its indemnitors. Maxus, Tierra, and OxyChem did not reach an agreement with the other parties. Vinson & Elkins represented Maxus, Tierra, and OxyChem in this mediation and may be in possession of related documents.

*New Jersey Dep't of Envtl. Prot. v. Occidental Chemical Corporation, et al.*

OxyChem participated in (directly and through its indemnitors, Maxus and Tierra) in a confidential mediation process between and among the NJDEP and various defendants in 2012 before Eric Green of Resolutions, LLC. In 2014, OxyChem participated in a confidential mediation process with the NJDEP before Hon. Marina Corodemus (Ret.).

## Settlements

Since the execution of the Stock Purchase Agreement in 1986, OxyChem has entered into a number of agreements as described below. At all times before its indemnitors' bankruptcy, OxyChem acted as a reasonably prudent indemnitee while its indemnitors, Maxus and Tierra, directed these efforts.

- On March 13, 1984, NJDEP entered into an Administrative Consent Order ("ACO I") with DSCC and Marisol. Under ACO I, DSCC was required to conduct: (1) investigations to determine the extent of contamination at 80 Lister, and (2) feasibility studies of possible remedial actions.

- On December 21, 1984, NJDEP entered into a second Administrative Consent Order ("ACO II") with DSCC. Under ACO II, the scope of work set out in ACO I was expanded to involve 120 Lister and other sites in Newark, New Jersey. In addition, DSCC was to further investigate the contamination at the Lister Site, as well as conduct immediate response actions (*e.g.*, the decontamination and removal of contaminated equipment from 120 Lister).

- In December 1984, DSCC agreed to settle an informal claim for damages related to dioxin contamination by Consolidated Rail Corporation.

- In 1986, DSCC agreed to settle an informal claim for damages related to dioxin contamination by Sherwin Williams Company.

- In 1986, DSCC agreed to settle an informal claim for damages related to dioxin contamination by Earthline Company.

31

- In 1987, Occidental Electrochemicals Corporation ("OEC") entered into a supplemental ACO with NJDEP. Under this supplemental ACO, OEC agreed to pay funds to NJDEP for research being conducted regarding, in part, the health and ecological effects of dioxins, as outlined within ACO I and ACO II.

- On November 19, 1990, OxyChem, EPA, and NJDEP entered into a Consent Decree that required OxyChem and Tierra Solutions to undertake cleanup activities at the Lister Site. Construction of the interim remedy was completed in 2001.

- On April 20, 1994, OxyChem and EPA entered into an Administrative Order on Consent ("AOC"), whereby Tierra, on behalf of OxyChem, agreed to conduct a Remedial Investigation and Feasibility Study for a six-mile stretch of the Passaic River.

- On April 4, 2001, NJDEP and OxyChem executed a Memorandum of Agreement ("MOA"), whereby OxyChem agreed to reimburse NJDEP for past oversight costs associated with NJDEP's review of documents that OxyChem submitted to EPA in conjunction with past AOCs. On December 14, 2005, NJDEP terminated this MOA because the Passaic six-mile project has become a "High Priority" site and a "priority for publicly funded remediation."

- On February 17, 2004, OxyChem and EPA entered into an AOC, whereby Tierra was instructed to perform an RI/FS for Newark Bay, including portions of the Hackensack River, Arthur Kill and Kill Van Kull. On March 18, 2010, OxyChem and EPA amended the statement of work set out in this AOC.

- On April 6, 2004, EPA entered into an Agreement with 31 PRPs, including OxyChem, which required the "Settling Parties to make a cash payment to resolve their alleged civil liability for the RI/FS…" Specifically, the payments were for funding the RI/FS for the Lower Passaic River Study Area ("LPRSA") (i.e. the lower 17 miles of the Passaic River) and the ecosystem restoration study pursuant to the Water Resources Development Act ("WRDA Study"). This Agreement became effective on June 22, 2004.

  o Subsequently, on July 26, 2005, this Agreement was amended ("Amendment No. 1") to include 12 additional PRPs to share in the estimate costs of the RI/FS portion for the LPRSA. The settling parties also agreed to contribute an additional $750,000 for the RI/FS if such funds were needed to complete the study. Amendment No. 1 became effective on November 9, 2005.

  o In addition, on May 31, 2007, this Agreement was amended a second time ("Amendment No. 2") to add 29 additional settling parties.

- On May 8, 2007, EPA entered into an AOC with 73 PRPs, including OxyChem and 42 other PRPs who signed the previous Agreements with EPA. Under this agreement, the settling parties took over the RI/FS for the LPRSA, with EPA oversight.

- On June 23, 2008, OxyChem, Tierra, and EPA entered into an Administrative Settlement Agreement and Order on Consent for Removal Action (Region 2, CERCLA Docket No.

02-2008-2020) ("Tierra Removal ASAOC") to excavate and dispose of sediments at RM 3.0 to RM 3.8.

- On December 11, 2008, OxyChem entered into two agreements with the United States Department of the Interior (acting through the United States Fish and Wildlife Service) ("FWS"), and the United States Department of Commerce (acting through the National Oceanic and Atmospheric Administration) ("NOAA"): (1) an Interim Cooperative Assessment Funding Agreement under which Maxus and Tierra, on behalf of OxyChem, agreed to reimburse the FWS and NOAA for a portion of their past costs related to a natural resource damage assessment (NRDA) of the Diamond Alkali Superfund Site, and to provide funding for a portion of future costs incurred by the FWS and NOAA in pursuing a cooperative NRDA of the LPRSA; and (2) an Interim Cooperative Assessment Agreement under which Maxus and Tierra, on behalf of OxyChem, agreed to an interim framework for a cooperative NRDA of the LPRSA.

- On October 4, 2011, OxyChem, Tierra, and EPA entered into an Administrative Settlement Agreement and Order on Consent for Combined Sewer Overflow/Storm Water Outfall Investigation (Region 2, CERCLA Docket No. 02-2011-2016) ("CSO ASAOC") to determine the nature and extent of contamination emanating from the combined sewer overflows and the storm water outfalls to the Passaic River.

- On December 12, 2014, following the settlement of NJDEP's claims against Maxus, YPF, and Repsol, OxyChem entered into a settlement agreement with NJDEP. The terms of that settlement agreement are set out in the Consent Judgment entered in New Jersey Dep't of Enviro. Prot. v. Occidental Chemical Corporation, Docket No. ESX-L-9869-05. The terms of that settlement agreement included an NRD Payment of $50 million required to be applied by the State of New Jersey to restoration projects for natural resources in the Lower Passaic River and surrounding waterways.

- On September 30, 2016, OxyChem entered into the Administrative Settlement Agreement and Order on Consent for Remedial Design for Operable Unit Two of the Diamond Alkali Superfund Site (Region 2, CERCLA Docket No. 02-2016-2021) ("2016 ASAOC"). Under the 2016 ASAOC, OxyChem agreed to design (and fund the costs of designing) the remedy for OU2 of the Lower Passaic River.

17.     Identify the dates and describe the nature and results of any soil, groundwater, surface water, stormwater, sediment, wastewater, or other site media sampling that relates to COCs on any Property at Issue identified in response to Interrogatory No. 1 or in the Passaic River.

**RESPONSE**:

OxyChem refers Defendants to the records identified below for information regarding the nature and results of the sampling related to the Lister Site and the Passaic River. These documents

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 18, 2019, a copy of Plaintiff Occidental

Chemical Corporation's Amended Responses to the Standard Set of Interrogatories was served on

counsel of record via electronic mail.


Dated: September 18, 2019                                By:    _/s/ John J. McDermott_
                                                                John M. McDermott, Esq.

# EXHIBIT 6

STUART RABNER
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
PO Box 093
Trenton, NJ 08625-0093
Attorney for Plaintiffs

By: John F. Dickinson, Jr.
Deputy Attorney General
(609) 984-4654

CONNELLY•BAKER•MASTON•WOTRING•JACKSON LLP
700 Louisiana Street
Suite 1800
Houston, Texas 77002-2778

By: Michael Connelly
(713) 980-1700

30 2006
ESSEX

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND,<br>Plaintiffs,<br><br>v.<br><br>OCCIDENTAL CHEMICAL CORPORATION, TIERRA SOLUTIONS, INC., MAXUS ENERGY CORPORATION, REPSOL YPF, S.A., YPF, S.A., YPF HOLDINGS, INC., and CLH HOLDINGS,<br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - ESSEX COUNTY DOCKET NO. ESX-L-9868-05<br><br>CIVIL ACTION<br><br>FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY |

Plaintiffs, New Jersey Department of Environmental Protection ("DEP") and Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively, "Plaintiffs"), by way of this Complaint against the above-named defendants, Occidental

Chemical Corporation ("OCC"), Tierra Solutions, Inc. ("Tierra"), Maxus Energy Corporation ("Maxus"), Repsol YPF, S.A. ("Repsol"), YPF, S.A. ("YPF"), YPF Holdings, Inc. ("YPFH"), and CLH Holdings, Inc. ("CLHH") (collectively, "Defendants"), say:

### STATEMENT OF THE CASE

1.      For roughly twenty years, OCC and its predecessors-in-interest deliberately polluted the Passaic River with 2,3,7,8-Tetrachlorodibenzo-p-dioxin ("TCDD"), a particularly potent form of dioxin, DDT and various other pesticides and chemicals. For an essentially equivalent period of time, OCC, Tierra, Maxus, Repsol, YPF, YPFH, and CLHH have orchestrated and implemented a strategy to delay and impede the clean-up and restoration of the Passaic River. As a direct result of OCC's intentional releases and discharges into the Passaic River, and Defendants' feat of delaying any real solution for another 20-plus years, TCDD has migrated throughout the lower 17 miles of the Passaic River, Newark Bay, the lower reaches of the Hackensack River, the Arthur Kill, the Kill Van Kull, and into adjacent waters and sediments (collectively, the "Newark Bay Complex"). The sediments in the Newark Bay Complex are saturated with TCDD, yet not one teaspoon of TCDD-impacted sediment has been removed as part of a clean-up or restoration effort.

2.      Similarly, Repsol, YPF, YPFH, CLHH, Maxus and Tierra have orchestrated and implemented a strategy to strand environmental liabilities associated with the Newark Bay Complex in Tierra, which has no independent ability to satisfy such obligations.

3.      The consequences of Defendants' actions are far-reaching and significant. The Newark Bay Complex has become one of the world's worst sites for TCDD contamination. TCDD concentrations recorded in blue crabs in the Newark Bay Complex may be the highest ever discovered in aquatic animals. Because of this contamination, DEP has issued a complete

- 2 -

ban on all fish and shellfish consumption from the Newark Bay Complex, though studies performed by Defendants themselves show that consumption continues. It is clear that the TCDD concentrations throughout the Newark Bay Complex present a real threat to human health and to the environment.

4.     Similarly, Defendants have caused myriad and substantial economic injuries to the State and the Newark Bay Complex. Defendants' TCDD has impacted commerce, industry, navigation, dredging, and disposal for decades. Likewise, the ecosystem and natural resources of the Newark Bay Complex have been significantly injured.

5.     Accordingly, Plaintiffs now bring this action to recover past and future damages caused by Defendants' intentional and egregious conduct. This civil action is brought pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11a to -23.11z (the "Spill Act"), the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -37.23 (the "WPCA"), and New Jersey common law. In this action, Plaintiffs seek reimbursement of any and all cleanup and removal costs the State of New Jersey has incurred, and all such costs that the State of New Jersey will incur, alone and working in conjunction with federal agencies, as a result of Defendants' discharge of TCDD into the Newark Bay Complex. Plaintiffs also seek compensatory damages, punitive damages, declaratory relief, and equitable relief as set forth herein.

6.     Plaintiffs are not seeking, and this Complaint should not be characterized as asserting a claim for natural resources damages, including the loss of use of the State's natural resources. The State reserves the right to bring such claim for natural resources damages for the Passaic River and/or other parts of the Newark Bay Complex in the future. Additionally, Plaintiffs are not seeking to enforce or recover any costs covered by the 1990 Consent Decree regarding the Lister Site, nor are they seeking to enforce the December 14, 2005 Directive

- 3 -

regarding the funding of a source control dredge plan or the September 19, 2003 Directive regarding assessment of natural resources damages.

<div align="center">THE PARTIES</div>

7.     Plaintiff DEP is a principal department within the Executive Branch of the State government vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety.  See N.J.S.A. 13:1D-9; see also Executive Order 40.  Plaintiff DEP's principal office is located at 401 East State Street, Trenton, Mercer County, New Jersey.

8.     In addition, the State of New Jersey is the trustee of all natural resources within its jurisdiction for the benefit of its citizens and is vested with the authority to protect this public trust.  See N.J.S.A. 58:10-23.11a.

9.     Plaintiff Administrator is the chief executive officer of the New Jersey Spill Compensation Fund (the "Spill Fund").  See N.J.S.A. 58:10-23.11j.  As chief executive officer of the Spill Fund, Plaintiff Administrator is authorized to approve and pay cleanup and removal costs Plaintiff DEP incurs, see N.J.S.A. 58:10-23.11f.c. and d., and to certify the amount of any claim to be paid from the Spill Fund, see N.J.S.A. 58:10-23.11j.d.  Plaintiff Administrator's principal office is located at New Jersey Department of Environmental Protection, Environmental Claims Administration, 401 East State Street, P.O. Box 028, Trenton, New Jersey 08625-0028.

10.     Defendant Occidental Chemical Company ("OCC") is a corporation organized under the laws of the State of New York, with a principal place of business located at 5005 LBJ Freeway, Dallas, Texas 75380.  OCC has been served and has appeared in this matter.

<div align="center">- 4 -</div>

11.     Maxus Energy Corporation (f/k/a Diamond Shamrock Corporation, f/k/a New Diamond Corporation) ("Maxus") is a corporation organized under the laws of the State of Delaware with a principal place of business located at 1330 Lake Robbins Drive, Suite 400, The Woodlands, Texas 77380. Maxus has been served and has appeared in this matter.

12.     Tierra Solutions, Inc. (f/k/a Diamond Shamrock Chemical Land Holdings, f/k/a Chemical Land Holdings, Inc.) ("Tierra") is a corporation organized under the laws of the State of Delaware with a principal place of business located at 2 Tower Center Boulevard, Floor 10, East Brunswick, New Jersey 08816. Tierra has been served and has appeared in this matter.

13.     Repsol YPF, S.A. ("Repsol") is, upon information and belief, a Spanish business entity with a principal place of business located at Paseo de la Castellana, 278-280, 28046 Madrid Spain. Repsol has been served in this matter.

14.     YPF, S.A. ("YPF") is, upon information and belief, an Argentinean business entity with a principal place of business located at Avenida Presidente Roque Saenz Pena, 777, C.P. 1364 Buenos Aires Argentina. YPF has been served and has appeared in this matter.

15.     YPF Holdings, Inc. ("YPFH") is, upon information and belief, a Delaware corporation with a principal place of business located at 1330 Lake Robbins Drive, The Woodlands, Texas 77380. YPFH has been served and has appeared in this matter.

16.     CLH Holdings ("CLHH") is, upon information and belief, a Delaware corporation with a principal place of business located at 1330 Lake Robbins Drive, Suite 400, The Woodlands, Texas 77380. CLHH has been served and has appeared in this matter.

<u>OWNERSHIP HISTORY OF LISTER SITE</u>

17.     In 1940, Kolker Chemical Works, Inc. ("Kolker") acquired an approximate 3.4 acre tract of land located at 80 Lister Avenue, in the Ironbound section of Newark, Essex

County, New Jersey, for the production of DDT and phenoxy herbicides. 80 Lister Avenue, together with the adjacent property at 120 Lister Avenue, is referred to herein as the "Lister Site." The Lister Site is located on the banks of the Passaic River.

18.     In March 1951, Kolker was acquired by Diamond Alkali Company. Diamond Alkali Company owned and operated that portion of the Lister Site located at 80 Lister Avenue from 1951 until 1967. In 1967, Diamond Alkali Company merged with Shamrock Oil & Gas Company, and the company's name was changed to Diamond Shamrock Corporation ("DSC-1"). DSC-1 continued to operate that portion of the Lister Site located at 80 Lister Avenue until August 1969 and sold it in March 1971.

19.     In 1983, New Diamond Corporation was incorporated to be the holding company and parent of DSC-1. After the creation of New Diamond Corporation, DSC-1 changed its name to Diamond Chemicals Company on or about September 1, 1983. A few days later, New Diamond changed its name to Diamond Shamrock Corporation ("DSC-2"). On or about October 26, 1983, Diamond Chemicals Company changed its name to Diamond Shamrock Chemicals Company.

20.     On September 4, 1986, DSC-2 sold all of the stock of Diamond Shamrock Chemicals Company to an affiliate of Occidental Chemical Company, Oxy-Diamond Alkali Corporation. Diamond Shamrock Chemicals Company then merged with Oxy-Diamond Alkali Corporation and was renamed Occidental Electrochemicals Corporation on or about September 29, 1986. Occidental Electrochemicals Company was then merged into its parent, Occidental Chemical Corporation, effective on or about November 30, 1987.

21.     Through both the November 30, 1987 merger agreement and the operation of law, Occidental Chemical Corporation assumed and succeeded to the Diamond Alkali/DSC-1

- 6 -

liabilities now at issue in this case.[1]  OCC knowingly accepted the benefits and liabilities of this transaction and is responsible for the prior acts of DSC-1.  OCC is a "discharger" and a person "in any way responsible" under the Spill Act.

22.     On April 30, 1987, shortly after its sale of the chemicals division to OCC, DSC-2 changed its name to Maxus Energy Corporation.  As part of the September 4, 1986 transaction whereby Maxus sold Diamond Shamrock Chemicals Company to OCC, Maxus agreed to manage the environmental liabilities at DSC-1's historical sites and to indemnify OCC from certain liabilities associated therewith.  On information and belief, at various times Maxus had the authority to control and, in fact, controlled the environmental response at the Lister Site and in the Newark Bay Complex.  During the time of Maxus' control, discharges of TCDD continued to occur from the Lister Site into the Newark Bay Complex.  Maxus is now an indirect subsidiary of Spanish oil giant Repsol, through YPFH and YPF.  Maxus is a "discharger" and a person "in any way responsible" under the Spill Act.

23.     After TCDD contamination was discovered at the Lister Site, DSC-1 acquired ownership of 120 Lister Avenue in 1984 and reacquired 80 Lister Avenue in 1986.  DSC-1 then transferred title to both 80 and 120 Lister Avenue to Tierra, which continues to own the entire Lister Site today.  During the time of Tierra's ownership and control, discharges of TCDD continued to occur from the Lister Site into the Newark Bay Complex.  Tierra is a "discharger" and a person "in any way responsible" under the Spill Act.

---

[1]     As used herein, "OCC" includes Kolker Chemical Works, Inc., Diamond Alkali Company, Diamond Alkali Organic Chemicals Division, Inc., DSC-1, Diamond Chemicals Company, Diamond Shamrock Chemicals Company and Occidental Electrochemicals Company, in addition to their successor Occidental Chemical Corporation.

## ALTER-EGO/COMMON ECONOMIC UNIT

24.     Through a series of related transactions, Repsol, YPF, YPFH, CLHH, Maxus, and Tierra (the "Repsol Group") have worked to strand the environmental liabilities associated with the Newark Bay Complex in Maxus and Tierra, while systematically stripping Maxus's and Tierra's assets and ability to satisfy these obligations.  The members of the Repsol Group are acting jointly, as a common economic unit, and as alter egos of each other.

25.     For many years following its September 4, 1986 sale of the Diamond Shamrock Chemicals Company to OCC, Maxus managed the environmental liabilities flowing from the Lister Site, while Tierra actually owned the Lister Site.  Maxus' role changed, however, following its 1995 acquisition by YPF, the former Argentinean state-owned oil and gas conglomerate.

26.     After YPF's privatization in 1993, YPF embarked on a strategy to become a global force in the oil and gas industry.  One of YPF's primary acquisitions was Maxus, which was acquired in 1995 for almost $2 billion in cash and assumed debt.  As part of its effort to integrate and globalize the combined operations of the two companies, YPF undertook a series of transactions to (a) increase its profits from the various oil and gas investments and operations owned by Maxus prior to Maxus's acquisition, and (b) isolate the environmental liabilities associated with the Newark Bay Complex and various other sites in New Jersey and elsewhere.

27.     In order to move Maxus's environmental liabilities and certain income-producing assets away from Maxus, YPF created a series of intermediate holding companies in the Netherlands, Cayman Islands, Texas, and elsewhere.  As part of this plan, YPF directed the creation of two intermediate parent companies for Maxus and Tierra, specifically, YPFH and

- 8 -

YPF International Ltd. Additionally, CLHH was created to be the intermediate holding company between Tierra and YPFH.

28.     In 1996, immediately following the creation of the various intermediate holding companies, YPF had Tierra – Maxus's sister company – assume all of Maxus' obligations to OCC flowing from the Lister Site as well as other environmental liabilities in New Jersey and elsewhere through an "Assumption Agreement." At the time, Tierra's chief "asset" was the Lister Site itself.

29.     The plan also required that YPF, YPFH, CLHH, Maxus, and YPF International, Ltd. fund certain environmental liabilities, including those environmental liabilities associated with the Diamond-era production at the Lister Site, through a "Contribution Agreement." Funding under the Contribution Agreement occurred via direct, cascading capital contributions from YPF to its wholly-owned subsidiary YPF International Ltd., from YPF International Ltd. to its wholly-owned subsidiary YPFH, from YPFH to its wholly-owned subsidiary CLHH, and from CLHH to its wholly-owned subsidiary Tierra.

30.     Under the terms of the Contribution Agreement, the funding obligations of YPF and its wholly-owned subsidiaries are capped at approximately $111 million for all obligations assumed pursuant to the Assumption Agreement. The Contribution Agreement also provides that once the cap is met, YPF, YPFH, CLHH, Maxus, and YPF International Ltd. have no further obligation to fund Tierra. On information and belief, that cap has been exceeded, thereby extinguishing the contractual obligations of YPF, YPFH, CLHH, Maxus, and YPF International Ltd. to fund Tierra.

31.     Over the course of several years beginning in 1996, YPF also moved essentially all of Maxus' foreign income-producing assets to offshore entities owned by YPF, including

- 9 -

Maxus Indonesia, while its key domestic operations were sold to third parties. On information and belief, some of Maxus' assets were transferred or sold for less than fair market value.

32.    By 2001, Maxus did not have income-producing assets sufficient to fund its own operations and liabilities and was forced to rely upon its cash reserves. By no later than 2005, Maxus had depleted all of its cash reserves and was forced to look to its parent companies, YPF and YPFH, for funding. In fact, in 2002 and again in 2003, YPF submitted financial guarantees in the amount of $20 million to DEP for chromium-contaminated sites in New Jersey because Maxus and its direct parent, YPFH, lacked the financial ability to do so. As a result of YPF's 1996 plan, shareholder equity and retained deficit of YPF's American Unit – YPFH, CLHH, Maxus and Tierra – was approximately <u>negative</u> $150 million and <u>negative</u> $650 million, respectively, by March of 2006, a mere ten years later. Currently, neither Maxus nor Tierra are able to independently meet their financial obligations as they become due.

33.    Accordingly, starting in 2005, YPF made other funding arrangements via inter-company credit facilities to permit YPFH and its subsidiaries, CLHH, Maxus and Tierra, to continue as going concerns.[2] In August 2005, YPF extended the first credit facility to YPFH in an amount of $35 million. By May 2006, a mere nine months later, YPF had amended the credit facility with YPFH no less than three times, raising the amount "loaned" to $190 million. Upon information and belief, YPFH distributed the funds for the benefit of Maxus and Tierra. These credit facilities are unsecured, and neither Maxus nor Tierra have any apparent ability to repay the "loans." Moreover, without the credit facilities, YPF's auditor, Deloitte & Touche, refused

---

[2]    YPFH is the top-tiered American subsidiary of YPF. YPFH is merely a holding company, owning the stock of Maxus and CLHH. CLHH is another empty holding company, which only owns the stock of Tierra. For almost a decade, since the inception of the Assumption Agreement and Contribution Agreements, YPF and its American subsidiaries have operated as a common economic unit and as one enterprise.

- 10 -

to give YPFH and its subsidiaries, including CLHH, Maxus and Tierra, a clean financial bill of health in YPFH's consolidated financial report.

34.    YPFH and CLHH do not have any operations or employees. Similarly, YPFH, CLHH and Tierra do not have any independent income. Rather, they continue to exist solely at the whim and control of YPF.

35.    The officers and directors of YPF International Ltd., YPFH, CLHH, Tierra, and Maxus significantly overlap, and in some instances have been identical for years. Moreover, the vast majority of officers and directors of YPFH, CLHH, and Tierra came from Maxus, YPF, and/or Repsol.

36.    In 1999, Repsol acquired in excess of 95% of YPF's stock, thereby becoming the majority owner. Thereafter, in 2003, Repsol implemented its own plan of reorganization whereby it divided its worldwide operations, including YPF and its wholly-owned subsidiaries, into three divisions: Upstream, Downstream, and the Americas. YPF and its wholly-owned subsidiaries operate in the Americas Division.

37.    Repsol and its divisions do not adhere to corporate formalities regarding separateness. While the funding of YPF's American Unit continues to flow through YPF, Repsol directs and controls the environmental practices and operations of Maxus and Tierra. On information and belief, Repsol directs and controls the policies, procedures, funding and actions of YPF, YPFH, CLHH, Maxus, and Tierra.

38.    The Repsol Group is acting jointly, as a common economic unit, and its members are alter-egos of the other. As such, each member of the Repsol Group is liable as and for the other members of the group.

- 11 -

## HAZARDOUS SUBSTANCES PRODUCED AT THE LISTER SITE

39.    OCC owned the Lister Site from 1940 through 1971.   From the mid-1940s through 1969, OCC manufactured agricultural chemicals at a portion of the Lister Site, including dichlorodiphenyltrichloroethane ("DDT") and phenoxy herbicides.   DDT production began before the end of World War II and continued through the late-1950s when OCC's DDT operations were consolidated at its Greens Bayou Plant in Houston, Texas.  The Greens Bayou Plant was also extensively contaminated with hazardous substances intentionally discharged by OCC.

40.    Production of phenoxy herbicides commenced in 1948 and continued through the summer of 1969.    Two chemicals manufactured at the Lister Site were 2,4-dichlorophenoxyacetic acid ("2,4-D") and 2,4,5-trichlorophenoxyacetic acid ("2,4,5-T").  TCDD (or 2,3,7,8-tetrachlorodibenzo-p-dioxin) is a particularly toxic form of dioxin that was formed as a by-product of the 2,4,5-T process.

41.    Like many other constituents used, produced, and discarded at the Lister Site, DDT, 2,4-D, 2,4,5-T and TCDD all constitute "hazardous substances," as defined in N.J.S.A. 58:10-23.11b.

## OCC'S OPERATIONS AND PRACTICES AT THE LISTER SITE

42.    As has been previously held by the courts of New Jersey, OCC's operations at the Lister Site offer a glimpse of an exceedingly rare type of corporate citizen:  one that both undertook a "deliberate course of pollution [constituting] intentional conduct" and one that had the "subjective knowledge of harm" posed by the TCDD in its discharges and emissions. Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co., 258 N.J. Super. 167, 215-16 (App. Div. 1992).

43.     As laid out by the New Jersey Appellate Division, OCC's production practices at the Lister Site were notorious:

a.      Almost from the day production of the phenoxy herbicides commenced in 1948, the workers at the Lister Site experienced chloracne (a disfiguring disease typically involving open and closed comedones, pustules, cysts and blisters on the face, armpits, and groin);

b.      By 1955, OCC was aware that its processes were causing the chloracne and was advised to reduce its air contamination and to insist upon personnel and plant cleanliness. These suggestions were either ignored or poorly implemented;

c.      In the Autumn of 1959, OCC was advised that a German chemical manufacturer had discovered that TCDD was the causative agent of chloracne and that decreasing OCC's reaction temperature in the 2,4,5-T manufacturing process would substantially reduce the production of TCDD. OCC was offered a two-step process by which TCDD could be eliminated – or at least appreciably reduced – in the 2,4,5-T manufacturing process. OCC instead decided to run the process at a higher temperature than recommended because reducing the autoclave temperature also would reduce production volumes and, therefore, OCC's profits;

d.      In 1960, a reaction in the autoclave – whose temperature was "out of control" – caused an explosion that destroyed the larger of the two process buildings on the Lister Site. Following the explosion, OCC rebuilt the destroyed manufacturing process building. OCC had the opportunity to employ improved processes and techniques to lower the TCDD production, but again chose not to do so to avoid incurring capital costs and ensure increased profitability;

- 13 -

e.    Throughout its years of operation, vapors produced by the 2,4,5-T process were vented into the atmosphere on a daily basis. OCC's emissions from the scrubber unit would literally "pit" the paint on the cars in the parking lot – appearing as if acid had been thrown on them. Only in 1967 did OCC construct a carbon tower designed to remove TCDD in its process and finished product at or below a level of one part per million. Even after the carbon tower was installed, there was no decrease in the chloracne among the workers: monitoring reports from 1968 and 1969 showed dioxin levels in OCC's process and finished product at up to 9.6 parts per million and employees recall finished product with up to 80 parts per million.

See Diamond Shamrock Chems. Co., 258 N.J. Super. at 181-87, 212-13.

44.    OCC's production processes were not reflective of the industry norm at the time. In fact, records indicate that OCC's products consistently contained more TCDD than their competitors' products.

45.    Similarly, OCC's waste management and environmental practices were not reflective of industry standards at the time. In fact, New Jersey's courts have determined that OCC's waste management and environmental practices underscore the intentional nature of its behavior:

a.    A number of former plant workers testified that OCC's waste management policy essentially amounted to "dumping everything" into the Passaic River;

b.    From the mid-1940s through 1955, all waste products from chemical processes were either directly discharged or ultimately released into the Passaic River;

- 14 -

c.      In 1956, discharges from the Lister Site plant were directed to an industrial sewer line, but the evidence demonstrates that not all of the effluent from the plant was actually directed into the line;

d.      In fact, so much DDT waste water was directed into the Passaic River that a mid-river "mountain" of DDT was created. Employees were directed to wade surreptitiously into the Passaic River at low tide and "chop up" the deposits so that they would not be seen by passing boats;

e.      In the old – but undamaged – building where OCC manufactured 2,4-D and 2,4,5-T, OCC's "heedless indifference to the environmental damage which resulted from its manufacturing operations" continued after the 1960 explosion. The floors of the old building would accumulate so much 2,4-D and 2,4,5-T that twice-monthly they would be washed down with sulfuric acid, with the waste water flowing into trenches that ran outside the building and into the Passaic River. Routine blockages in the trenches and waste water pits also would cause effluent to back up and migrate into the Passaic River. The concrete floor would be replaced every few years because it was turned to "dust" through the acid-washing process;

f.      The "sloppy practices" tolerated by OCC management were also evident from the various leaks in the autoclave room and the pipes that ran between the two manufacturing buildings. Likewise, the pipelines along the 2,4,5-T process units constantly became clogged. Employees were then directed to break and steam clean the clogged lines. The material washed from the pipelines was discharged onto the ground or directly into the Passaic River;

- 15 -

g.     The 10,000 gallon storage tanks on the Lister Site routinely were cleaned of amine, butyl-T, 2,4-D, and 2,4,5-T by shoveling out the residue at the bottoms of the tanks once or twice a month. In this process, both liquid and solid waste fell onto the ground where the waste would be washed away into the Passaic River.

See Diamond Shamrock Chems. Co., 258 N.J. Super. at 181-87.

46.     As a result of OCC's practices at the Lister Site, TCDD has been found in the soil at and around the Lister Site, in the groundwater under and around the Lister Site, and in the Newark Bay Complex. Defendants failed to timely notify Plaintiff DEP of the discharges of TCDD and other hazardous substances at and from the Lister Site as required by N.J.S.A. 58:10-23.11e.

47.     Based upon the foregoing, the New Jersey courts already have found that the subjective knowledge of OCC was proven, as a matter of fact: OCC knew "the nature of the chemicals it was handling," knew that "they were being continuously discharged into the environment," and knew that "they were doing at least some harm." Diamond Shamrock Chems. Co., 258 N.J. Super. at 210-15 (OCC's "deliberate course of pollution constituted intentional conduct with the corresponding intentional injury inextricably intertwined").

48.     OCC clearly "discharged" TCDD and other hazardous substances within the meaning of N.J.S.A. 58:10-23.11b. Defendants have also conducted operations on the Lister Site that involved the generation, storage, and handling of "hazardous substances," as defined in N.J.S.A. 58:10-23.11b.

49.     By the judgment of the trial court and the affirming decision of the New Jersey Appellate Division in Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co., 258 N.J. Super.

167, 215-16 (App. Div. 1992), Defendants are collaterally estopped from relitigating the nature and extent of the intentional discharges into the Passaic River and Newark Bay Complex.

### THE REGULATORY HISTORY

50.    The Lister Site.    In 1982, the United States Environmental Protection Agency ("EPA") initiated a National Dioxin Strategy, targeting facilities that produced 2,4,5-T and its herbicide derivatives for soil sampling and testing for dioxins.

51.    After DEP learned of the TCDD contamination at the Lister Site, then-New Jersey Governor Thomas H. Kean issued Executive Order 40, authorizing DEP to engage in emergency measures "necessary to fully and adequately protect the health, safety and welfare of New Jersey citizens." Pursuant to Executive Order 40, DEP issued an administrative order on June 13, 1983, requiring OCC to implement certain stabilization measures at the Lister Site to prevent further TCDD migration off-site.  Two subsequent administrative consent orders were entered between DEP and OCC in 1984 to address the Lister Site itself.

52.    In 1987, EPA selected an interim remedy for the Lister Site.  Under a 1990 Consent Decree with EPA and DEP, OCC and Tierra submitted designs for the interim remedy on the Lister Site.  The construction of the interim remedy was just recently completed in 2001. The interim remedy is to be periodically reevaluated.

53.    The Newark Bay Complex.    Under an Administrative Order on Consent (AOC) executed with EPA on April 20, 1994, Tierra agreed to study a six-mile stretch of the Passaic River and to determine: (1) the spatial distribution and concentrations of TCDD and other contaminants in the Passaic River; (2) the primary human and ecological receptors of the contaminated sediments; and (3) the transport of contaminated sediment within the six-mile stretch.

- 17 -

54.     However, after approximately ten years, this study has not yet been completed. By entering into the 1994 AOC, Tierra and the other Defendants agreed to undertake a proper investigation of the extent and impacts of the TCDD contamination emanating from the Lister Site into the lower six miles of the Passaic River. Defendants instead devoted their resources to various efforts to shift blame away from their activities on the Lister Site and onto other parties and chemicals.

55.     Defendants concentrated their resources on manipulating the focus of the investigation away from TCDD and to mislead the regulators. When Defendants initially conducted sampling and reported data to the Government, they did not even include or mention TCDD – the driving force behind the entire study. Likewise, in maps submitted to the regulators as part of the investigation, the Lister Site was inexplicably left off the map and not even identified.

56.     Defendants also have attempted to bias the results of the investigation and testing that they controlled. For example, EPA instructed Defendants not to undertake certain studies because EPA was concerned that the results would be misleading and incorrect and would understate the risk to human health and the environment caused by OCC's TCDD. Defendants nonetheless conducted the studies.

57.     Defendants' efforts appear geared to justify a predetermined conclusion that there is no increased risk to human health or the environment posed by the TCDD and, therefore, that the TCDD may remain in the Newark Bay Complex.

58.     Certain key aspects of the investigation of the lower six miles of the Passaic River were removed from Defendants' control by EPA letter dated January 30, 2001. However, effective June 22, 2004, EPA entered into a new AOC with OCC and about 30 other parties to

- 18 -

fund $10 million of a $19 million study of the 17-mile stretch of the Passaic River from the Dundee Dam to Newark Bay. Pursuant to a separate agreement, the United States Army Corps of Engineers ("USACE") and New Jersey Department of Transportation ("NJDOT") are to contribute $9 million of the cost of this study, though the USACE's funding has recently come into doubt.

59.     Following the filing of a notice of Citizen's Suit for the TCDD impacts in Newark Bay, OCC entered into a separate AOC with EPA on February 13, 2004 to begin another study of the impacts of the Lister Site, this time focusing on Newark Bay and adjacent waters. By entering into the AOC, Defendants deprived courts of jurisdiction to hear the Citizen's Suit. This AOC provides that EPA will maintain oversight control of the Newark Bay investigation.

60.     On September 19, 2003, Plaintiff DEP issued a Spill Act directive to OCC, Maxus, Tierra, and others pursuant to N.J.S.A. 58:10-23.11f.a. directing these entities to assess any natural resource that has been, or may be, injured as a result of the discharges of TCDD from the Lister Site.

61.     Plaintiff DEP and NJDOT have investigated and are investigating the nature and extent of the contamination in the Newark Bay Complex, dredging options, and disposal techniques.

62.     Sampling results from investigations reveal the presence of TCDD at extremely high concentrations.

### CONTAMINATION OF THE NEWARK BAY COMPLEX

63.     The Newark Bay Complex now constitutes one of the worst TCDD contaminated sites in the world. TCDD is a persistent substance that remains in the environment long after discharge. Further, it bioaccumulates and/or biomagnifies in the food chain and the

- 19 -

environment. The levels of TCDD in the Newark Bay Complex, and in its fish and shellfish, present an endangerment to human health, the environment, and the well-being of the people of the State of New Jersey.

64.    TCDD in the Newark Bay Complex is clearly traceable to the Lister Site. There is a clear TCDD signal in the Passaic River, Newark Bay and beyond, which is unmistakably tied to the Lister Site and the actions of Defendants.

65.    Portions of the Passaic River near the Lister Site constitute an ongoing source of TCDD contamination throughout the remainder of the Newark Bay Complex. High levels of TCDD are intermittently released from the Passaic River in storm and other high water events that scour the river bottom. Unacceptable levels of TCDD are persistently discharged from the surface sediments in the Passaic River to the remainder of the Newark Bay Complex.

<u>FIRST COUNT</u>

Spill Act

66.    Plaintiffs repeat each allegation of paragraphs 1 through 65 above as though fully set forth in its entirety herein.

67.    Each Defendant is a "person" within the meaning of <u>N.J.S.A.</u> 58:10-23.11b.

68.    The State of New Jersey has incurred, and will continue to incur, costs as a result of the discharge of TCDD into the Newark Bay Complex. These costs include, but are not limited to, the costs of investigation, cleanup and removal, reasonable costs of preparing and successfully litigating this action, and any other costs incurred pursuant to the Spill Act, <u>N.J.S.A.</u> 58:10-23.11a to -23.11z.

69.    The State of New Jersey has incurred, and will continue to incur, damages as a result of the discharge of TCDD into the Newark Bay Complex. These damages include, but are

- 20 -

not limited to, damages to and loss of value of real or personal property and the lost income associated therewith.

70.     Plaintiff Administrator has certified, and may certify for payment, valid claims made against the Spill Fund concerning the discharges of TCDD to the Newark Bay Complex, and further has approved, and may approve, other appropriations from the Spill Fund to address the discharges of TCDD to the Newark Bay Complex.

71.     The costs and damages the State of New Jersey has incurred, and will incur, for the Newark Bay Complex are "cleanup and removal costs," within the meaning of N.J.S.A. 58:10-23.11b, including: all costs associated with (1) the removal or attempted removal of hazardous substances, or (2) taking reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including but not limited to, public and private property, shorelines, beaches, surface waters, water columns and bottom sediments, soils and other affected property, including wildlife and other natural resources. The cleanup and removal costs include those program costs directly related to the cleanup and removal of the discharge and, with respect to the recovery of past costs, any indirect costs incurred by the State of New Jersey. N.J.S.A. 58:10-23.11b.

72.     Defendants are "dischargers" and persons "in any way responsible" for hazardous substances (TCDD) discharged to the Newark Bay Complex, and are strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs, including, but not limited to, the costs of investigation, cleanup and removal, the costs of all reasonable measures taken to mitigate damage to the public health, safety or welfare as a result of the discharges, the reasonable costs of preparing and successfully litigating this action, any other costs incurred pursuant to the Spill Act, and expenditures made by the State of New Jersey.

- 21 -

73.    Defendants' discharges of TCDD into the Newark Bay Complex were the result of Defendants' gross negligence and/or willful misconduct, within the knowledge and privity of the owner, operator, or person in charge.  Therefore, the $50,000,000.00 maximum limitation codified at N.J.S.A. 58:10-23.11g.b. is inapplicable to any action against Defendants.  Further, Defendants are jointly and severally liable for the full amount of damages.

74.    Pursuant to the Spill Act, Plaintiffs may bring an action in the Superior Court for injunctive relief, for unreimbursed costs of investigation, cleanup or removal costs, reasonable direct and indirect costs of preparing and successfully litigating the action, damages to and loss of value of real or personal property and lost income associated therewith, for any unreimbursed costs or damages paid from the Spill Fund, and for any other unreimbursed costs or damages the State of New Jersey incurs under the Spill Act, N.J.S.A. 58:10-23.11u.b.(1), (2), (3) and (5).

<div align="center">PRAYER FOR RELIEF</div>

**WHEREFORE,** Plaintiffs pray that this Court:

a.    Order Defendants to pay or reimburse Plaintiffs for all unreimbursed costs that the State of New Jersey has incurred, separately or in conjunction with federal agencies, as a result of the discharges of TCDD, including, but not limited to, all cleanup and removal costs, other costs of investigation, cleanup and removal, the costs of all reasonable measures taken to mitigate damage to the public health, safety or welfare as a result of the discharges, any unreimbursed costs or damages paid from the Spill Fund, and any other costs incurred pursuant to the Spill Act, N.J.S.A. 58:10-23.11a to -23.11z, with applicable interest;

b.    Enter declaratory judgment against Defendants for all unreimbursed costs that the State of New Jersey may incur in the future, separately or in conjunction with

federal agencies, as a result of the discharges of TCDD, including, but not limited to, all cleanup and removal costs, other costs of investigation, cleanup and removal, the costs of all reasonable measures taken to mitigate damage to the public health, safety or welfare as a result of the discharges, any unreimbursed costs or damages paid from the Spill Fund, reasonable costs of preparing and successfully litigating this action, and any other costs incurred pursuant to the Spill Act, N.J.S.A. 58:10-23.11a to -23.11z;

c.    Order Defendants to pay and reimburse Plaintiffs for all damages that the State of New Jersey has incurred, and may incur in the future, including, but not limited to, damages to and loss of use of real or personal property and the lost income associated therewith, with applicable interest;

d.    Assess civil penalties as provided by N.J.S.A. 58:10-23.11u and its predecessors against Defendants for Defendants' failure to timely notify Plaintiff DEP of the discharges of TCDD and other hazardous substances as required by N.J.S.A. 58:10-23.11e;

e.    Award Plaintiffs their reasonable direct and indirect costs and fees for preparing and successfully litigating this action; and

f.    Award Plaintiffs such other monetary relief as this Court deems appropriate, except that nothing herein is intended to seek, and should not be interpreted to seek, that Defendants undertake any cleanup, removal, or remedial action within the Newark Bay Complex or on the Lister Site in response to this Complaint. Plaintiffs are not seeking, and this Complaint should not be characterized as asserting a claim for natural resources damages. The State reserves the right to

- 23 -

bring such claim for natural resources damages for the Passaic River and/or other parts of the Newark Bay Complex in the future. Additionally, Plaintiffs are not seeking to enforce or recover any costs covered by the 1990 Consent Decree regarding the Lister Site, nor are they seeking to enforce the December 14, 2005 Directive regarding the funding of a source control dredge plan or the September 19, 2003 Directive regarding assessment of natural resources damages.

<div align="center">SECOND COUNT</div>

<div align="center">Water Pollution Control Act</div>

75.    Plaintiff DEP repeats each allegation of paragraphs 1 through 74 above as though fully set forth in its entirety herein.

76.    Each Defendant is a "person" within the meaning of N.J.S.A. 58:10A-3.

77.    Defendants discharged pollutants (TCDD) into the Newark Bay Complex within the meaning of N.J.S.A. 58:10A-3 & 58:10A-6.

78.    The Commissioner of Environmental Protection or her authorized representative has determined that Defendants violated provisions of the Water Pollution Control Act, N.J.S.A. 58:10A-1 to 37.23 and its predecessors.

79.    The State of New Jersey has incurred, and will continue to incur, costs as a result of the discharge of TCDD into the Newark Bay Complex. These costs include, but are not limited to, the cost of any investigation, inspection, or monitoring survey which led to the establishment of the violation, the cost incurred in removing, correcting or terminating the adverse effects upon water quality resulting from the unauthorized discharge of TCDD, and the reasonable direct and indirect costs of preparing and litigating this action.

80. The State of New Jersey has incurred, and will continue to incur, damages as a result of the discharge of TCDD into the Newark Bay Complex.

81. Pursuant to N.J.S.A. 58:10A-10c., Plaintiff DEP may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10A-10c.(1); for the costs of any investigation, inspection, or monitoring survey which led to the establishment of the violation, N.J.S.A. 58:10A-10c.(2); for the reasonable costs of preparing and litigating this case, N.J.S.A. 58:10A-10c.(2); for any reasonable cost incurred by the State of New Jersey in removing, correcting or terminating the adverse effects upon water quality, N.J.S.A. 58:10A-10c.(3); for actual damages caused by the unauthorized discharge, N.J.S.A. 58:10C.(4); and, for the actual amount of any economic benefits accruing to the violator from a violation, N.J.S.A. 58:10A-10c.(5).

<div align="center">PRAYER FOR RELIEF</div>

**WHEREFORE,** Plaintiff DEP prays that this Court:

a. Order Defendants to pay or reimburse Plaintiff DEP for all unreimbursed costs that the State of New Jersey has incurred, separately or in conjunction with federal agencies, as a result of Defendants' discharges of TCDD, including, but not limited to, the cost of any investigation, inspection, or monitoring survey which led to the establishment of the violation and the cost incurred in removing, correcting, or terminating the adverse effects upon water quality resulting from the unauthorized discharge of TCDD, with applicable interest;

b. Enter declaratory judgment against Defendants for all unreimbursed costs that the State of New Jersey may incur, separately or in conjunction with federal agencies, as a result of Defendants' discharges of TCDD, including, but not limited to, the cost of any investigation, inspection, or monitoring survey which led to the

establishment of the violation, and the cost incurred in removing, correcting, or terminating the adverse effects upon water quality resulting from the unauthorized discharge of TCDD;

c. Order Defendants to pay Plaintiff DEP in an amount equal to the actual amount of economic benefit that accrued, and continues to accrue, to Defendants as a result of the violations of the Water Pollution Control Act, with applicable interest. Such economic benefits include, but are not limited to, the amount of any savings realized from avoided capital or non-capital costs resulting from the violations, the return earned or that may be earned on the amount of avoided costs, and any benefits accruing to Defendants as a result of a competitive market advantage enjoyed by reason of the violations, and any other benefits resulting from the violations.

d. Award Plaintiff DEP the reasonable direct and indirect costs and fees for preparing and litigating this action; and

e. Award Plaintiff DEP such other monetary relief as this Court deems appropriate, except that nothing herein is intended to seek, and should not be interpreted to seek, that Defendants undertake any cleanup, removal, or remedial action within the Newark Bay Complex or on the Lister Site in response to this Complaint. Plaintiffs are not seeking, and this Complaint should not be characterized as asserting a claim for natural resources damages. The State reserves the right to bring such claim for natural resources damages for the Passaic River and/or other parts of the Newark Bay Complex in the future. Additionally, Plaintiffs are not seeking to enforce or recover any costs covered by the 1990 Consent Decree

regarding the Lister Site, nor are they seeking to enforce the December 14, 2005

Directive regarding the funding of a source control dredge plan or the September

19, 2003 Directive regarding assessment of natural resources damages.

### THIRD COUNT

### Public Nuisance

82.    Plaintiffs repeat each allegation of paragraphs 1 through 81 above as though fully

set forth in its entirety herein.

83.    The use, enjoyment, and existence of the Newark Bay Complex and surrounding

areas are rights common to the general public.

84.    Defendants released and discharged hazardous substances (TCDD) into the

Newark Bay Complex and surrounding areas and had an affirmative obligation to remedy the

results of such discharges.

85.    The TCDD contamination of the Newark Bay Complex and surrounding areas

resulting from Defendants' releases and discharges of TCDD constitutes a physical invasion of

public and private property and an unreasonable and substantial interference, both actual and

potential, with the exercise of the public's common right to the use and enjoyment of the Newark

Bay Complex and surrounding areas.

86.    Defendants' releases and discharges, and failure to remedy the releases and

discharges, of TCDD have caused and continue to cause a significant interference with the public

health, public safety, public peace, public good and the public convenience.

87.    Defendants' releases and discharges, and failure to remedy the releases and

discharges, of TCDD were in violation of New Jersey law at the time of the releases, discharges

and inaction.

- 27 -

88.    As long as the Newark Bay Complex and surrounding areas remain contaminated with Defendants' TCDD, the public nuisance continues.

89.    Until the Newark Bay Complex and surrounding areas are remediated, Defendants are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common rights.

90.    Defendants' conduct was willful, wanton, and without regard to the rights of Plaintiffs and the State and the citizens of New Jersey.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff DEP prays that this Court:

a.    Order Defendants to pay and/or reimburse Plaintiff DEP for all costs the State of New Jersey has incurred, separately or in conjunction with federal agencies, as a result of the public nuisance caused by Defendants' releases and discharges of TCDD and their failure to remedy the releases and discharges, with applicable interest;

b.    Enter declaratory judgment against Defendants for all costs that the State of New Jersey may incur, separately or in conjunction with federal agencies, as a result of the public nuisance caused by Defendants' releases and discharges of TCDD and their failure to remedy the releases and discharges;

c.    Order Defendants to pay and/or reimburse Plaintiff DEP for all damages that the State of New Jersey has incurred, and may incur in the future, as a result of the public nuisance caused by Defendants' releases and discharges of TCDD and their failure to remedy the releases and discharges, with applicable interest.

- 28 -

d.   Order Defendants to make restitution for their unjust enrichment and pay Plaintiff

DEP in an amount equal to the actual amount of economic benefits that accrued

and continue to accrue to Defendants as a result of Defendants' manufacturing

and environmental practices, releases and discharges of hazardous substances to

the Newark Bay Complex, and the nuisance created thereby, with applicable

interest. Such economic benefits include, but are not limited to, the amount of

any savings realized from avoided capital or non-capital costs resulting from

Defendants' actions, the return earned or that may be earned on the amount of

avoided costs, any benefits accruing to Defendants as a result of a competitive

market advantage enjoyed by reason of Defendants' actions, and any other

benefits resulting from Defendants' actions;

e.   Order Defendants to pay Plaintiff DEP punitive damages in an amount to be

determined by the trier of fact; and

f.   Award Plaintiff DEP such other monetary relief as this Court deems appropriate,

except that nothing herein is intended to seek, and should not be interpreted to

seek, that Defendants undertake any cleanup, removal, or remedial action within

the Newark Bay Complex or on the Lister Site in response to this Complaint.

Plaintiffs are not seeking, and this Complaint should not be characterized as

asserting a claim for natural resources damages. The State reserves the right to

bring such claim for natural resources damages for the Passaic River and/or other

parts of the Newark Bay Complex in the future. Additionally, Plaintiffs are not

seeking to enforce or recover any costs covered by the 1990 Consent Decree

regarding the Lister Site, nor are they seeking to enforce the December 14, 2005

Directive regarding the funding of a source control dredge plan or the September 19, 2003 Directive regarding assessment of natural resources damages.

## FOURTH COUNT

### Trespass

91.     Plaintiffs repeat each allegation of paragraphs 1 through 90 above as though fully set forth in its entirety herein.

92.     Defendants are liable for trespass, and continued trespass, because Defendants released, discharged, and failed to remedy the releases and discharges of TCDD into the Newark Bay Complex and surrounding areas.

93.     As long as the Newark Bay Complex and surrounding areas remain contaminated with Defendants' TCDD, Defendants' trespass continues.

94.     Defendants' conduct was willful, wanton, and without regard to the rights of Plaintiffs and the State and the citizens of New Jersey.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff DEP prays that this Court:

a.      Order Defendants to pay and/or reimburse Plaintiff DEP for all costs the State of New Jersey has incurred as a result of the trespass to the Newark Bay Complex and surrounding areas, with applicable interest;

b.      Enter declaratory judgment against Defendants for all costs that the State of New Jersey may incur as a result of the trespass to the Newark Bay Complex and surrounding areas;

- 30 -

c.    Order Defendants to pay Plaintiff DEP for all damages the State of New Jersey

has incurred, and may incur in the future, as a result of the trespass to the Newark

Bay Complex and surrounding areas, with applicable interest;

d.    Order Defendants to make restitution for their unjust enrichment and pay Plaintiff

DEP in an amount equal to the actual amount of economic benefits that accrued

and continue to accrue to Defendants as a result of Defendants' manufacturing

and environmental practices, releases and discharges of hazardous substances to

the Newark Bay Complex and surrounding areas, and the trespass created thereby,

with applicable interest. Such economic benefits include, but are not limited to,

the amount of any savings realized from avoided capital or non-capital costs

resulting from Defendants' actions, the return earned or that may be earned on the

amount of avoided costs, any benefits accruing to Defendants as a result of a

competitive market advantage enjoyed by reason of Defendants' actions, and any

other benefits resulting from Defendants' actions;

e.    Order Defendants to pay Plaintiff DEP punitive damages in an amount to be

determined by the trier of fact; and

f.    Award Plaintiff DEP such other monetary relief as this Court deems appropriate,

except that nothing herein is intended to seek, and should not be interpreted to

seek, that Defendants undertake any cleanup, removal, or remedial action within

the Newark Bay Complex in response to this Complaint. Plaintiffs are not

seeking, and this Complaint should not be characterized as asserting a claim for

natural resources damages. The State reserves the right to bring such claim for

natural resources damages for the Passaic River and/or other parts of the Newark

- 31 -

Bay Complex in the future. Additionally, Plaintiffs are not seeking to enforce or recover any costs covered by the 1990 Consent Decree regarding the Lister Site, nor are they seeking to enforce the December 14, 2005 Directive regarding the funding of a source control dredge plan or the September 19, 2003 Directive regarding assessment of natural resources damages.

## FIFTH COUNT

### Strict Liability

95.     Plaintiffs repeat each allegation of paragraphs 1 through 94 above as though fully set forth in its entirety herein.

96.     Toxic wastes are inherently abnormally dangerous and their release, disposal, and/or discharge is an abnormally dangerous activity.

97.     Defendants are strictly liable for their abnormally dangerous activity because Defendants released, disposed of, and discharged toxic wastes (TCDD) from and at the Lister Site and into the Newark Bay Complex and surrounding areas.

98.     Defendants' conduct was willful, wanton, and without regard to the rights of Plaintiffs and the State.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff DEP prays that this Court:

a.      Order Defendants to pay and/or reimburse Plaintiff DEP for all costs that the State of New Jersey has incurred as a result of the release, disposal and/or discharge of toxic wastes (TCDD) to the Newark Bay Complex and surrounding areas, with applicable interest;

- 32 -

b.    Enter declaratory judgment against Defendants for all costs that the State of New

Jersey may incur in the future as a result of the release, disposal, and/or discharge

of toxic wastes to the Newark Bay Complex and surrounding areas;

c.    Order Defendants to pay Plaintiff DEP for all damages that the State of New

Jersey has incurred, and may incur in the future, as a result of the release,

disposal, and/or discharge of toxic wastes to the Newark Bay Complex and

surrounding areas, with applicable interest;

d.    Order Defendants to make restitution for their unjust enrichment and pay Plaintiff

DEP in an amount equal to the actual amount of economic benefits that accrued

and continue to accrue to Defendants as a result of Defendants' manufacturing

and environmental practices, disposal, releases, and/or discharges of toxic wastes

to the Newark Bay Complex and surrounding areas, with applicable interest.

Such economic benefits include, but are not limited to, the amount of any savings

realized from avoided capital or non-capital costs resulting from Defendants'

actions, the return earned or that may be earned on the amount of avoided costs,

any benefits accruing to Defendants as a result of a competitive market advantage

enjoyed by reason of Defendants' actions, and any other benefits resulting from

Defendants' actions;

e.    Order Defendants to pay Plaintiff DEP punitive damages in an amount to be

determined by the trier of fact; and

f.    Award Plaintiff DEP such other monetary relief as this Court deems appropriate,

except that nothing herein is intended to seek, and should not be interpreted to

seek, that Defendants undertake any cleanup, removal, or remedial action within

the Newark Bay Complex or on the Lister Site in response to this Complaint.

Plaintiffs are not seeking, and this Complaint should not be characterized as

asserting a claim for natural resources damages. The State reserves the right to

bring such claim for natural resources damages for the Passaic River and/or other

parts of the Newark Bay Complex in the future. Additionally, Plaintiffs are not

seeking to enforce or recover any costs covered by the 1990 Consent Decree

regarding the Lister Site, nor are they seeking to enforce the December 14, 2005

Directive regarding the funding of a source control dredge plan or the September

19, 2003 Directive regarding assessment of natural resources damages.

STUART RABNER
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _George F. Sullow / fer_
John F. Dickinson, Jr.
Deputy Attorney General

Dated: November 2 9, 2006

Of Counsel:

CONNELLY•BAKER•MASTON•WOTRING•JACKSON LLP
700 Louisiana Street
Suite 1850
Houston, Texas 77002-2778

GORDON & GORDON
505 Morris Avenue
Springfield, NJ 07081

LAMBERT & NELSON, PLC
701 Magazine Street

- 34 -

New Orleans, Louisiana 70130-3629

REICH & BINSTOCK
4265 San Felipe
Suite 1000
Houston, Texas 77027

## DEMAND FOR TRIAL BY JURY

Plaintiff DEP hereby demands a trial by jury on all issues involving the causes of action

in the Third Count (Public Nuisance), Fourth Count (Trespass), and Fifth Count (Strict Liability).

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, the Court is advised that John F. Dickinson, Jr., Deputy Attorney

General, is hereby designated as trial counsel for Plaintiffs in this action.

– 35 –

# EXHIBIT 7

ARCHER & GREINER
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968
(856) 795-2121

BY: ROBERT T. LEHMAN, ESQUIRE

GABLE & GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
(918) 595-4990

BY: OLIVER S. HOWARD, ESQUIRE
      DAVID L. BRYANT, ESQUIRE

Attorneys for Defendant Occidental Chemical Corporation

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - ESSEX COUNTY <br><br> DOCKET NO.: L-009868-05 <br><br> Civil Action |
| Plaintiffs, | |
| vs. <br><br> OCCIDENTAL CHEMICAL CORPORATION, TIERRA SOLUTIONS, INC., MAXUS ENERGY CORPORATION, MAXUS INTERNATIONAL ENERGY COMPANY, REPSOL YPF, S.A., YPF, S.A., YPF HOLDINGS, INC., YPF INTERNATIONAL S.A. (f/k/a) YPF INTERNATIONAL LTD. AND CLH HOLDINGS | **ORDER GRANTING DEFENDANT & CROSS-CLAIMANT OCCIDENTAL CHEMICAL CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT MAXUS ENERGY CORPORATION** |
| Defendants. | |

FILED

AUG 2 4 2011

Sebastian P. Lombardi, J.S.C.

**THIS MATTER** having come before the Court on the Motion of Defendant and Cross-Claimant Occidental Chemical Corporation, by and through its attorneys Archer & Greiner, P.C. and Gable & Gotwals, for partial summary judgment against Defendant Maxus Energy Corporation; and the Court having considered the parties' submissions and arguments; and it appearing that no genuine issue of material fact exists and that Occidental Chemical Corporation is entitled to judgment as a matter of law; and for good cause having been shown;

**IT IS** on this 24th day of _August_ , 2011 **ORDERED** that:

1.    Defendant Occidental Chemical Corporation's Motion for Partial Summary Judgment Against Defendant Maxus Energy Corporation is **GRANTED**; and

2.    Defendant Maxus Energy Corporation is required to indemnify Occidental Chemical Corporation for any costs, losses and liabilities that may be incurred by Occidental Chemical Corporation in the above-captioned action as a result of Occidental Chemical Corporation's acquisition of Diamond Shamrock Chemicals Company.

A copy of this Order is to be served on all counsel of record within seven (7) days of receipt.

_____
**SEBASTIAN P. LOMBARDI, JSC**    J.S.C.

___✓___ Opposed
_____ Unopposed

ORDER entered for the reasons
stated in an oral decision
on _8/29/11_

6682403v2

# EXHIBIT 8



**Diamond Shamrock**

James F. Kelley
Vice President and
General Counsel

April 4, 1986

Dr. Ray Irani
President
Occidental Petroleum Corp.
10889 Wilshire Blvd.
Los Angeles, California  90024

Dear Ray:

When we were in California we discussed several issues
relating to the environmental and legal liabilities of
Diamond Shamrock Chemicals and how they might be handled in
a transaction with Oxy.  Subsequently we have had
discussions with other potential purchasers which have
raised many of these same issues.

Recognizing that the disposition of these issues will have a
significant effect on the overall value of the transaction
to a purchaser, we have thought it appropriate to clarify
and expand Diamond Shamrock's position with respect to these
issues.  I enclose for your information a copy of the terms
and conditions relating to these issues, which we are also
providing to other purchasers, and would ask that you
include these in your continuing consideration of this
possible transaction.

Needless to say I'd be happy to clarify any of these points
or answer any related questions you or your staff may have.

Sincerely yours,

James F. Kelley

DEPOSITION
EXHIBIT
BRICKER

:dw

enc.

cc:  W. H. Bricker
     P. A. Hesse
     C. E. Stewart

RECEIVED
APR  8 1986
RAY R. IRANI

Diamond Shamrock Corporation
World Headquarters, 717 North Harwood Street, Dallas, Texas 75201  Phone  214 922-2715

OCC 002965
CONFIDENTIAL

JOINT
EXHIBIT
5

Confidential

OCCNJ0027238

4/4/86

## SALE OF DIAMOND SHAMROCK CHEMICALS

In considering the acquisition of Diamond Shamrock Chemicals
Company (DSCC), the following terms and conditions relating
to liabilities will apply:

1.   The closing of the sale of the DSCC shares will pass to
the purchaser all liabilities of DSCC, whether fixed,
accrued, contingent, unknown or otherwise, including pending
litigation, potential environmental claims and cleanup
costs, except those arising from operations of DSCC which
have previously been sold or discontinued or products no
longer manufactured or sold, as more fully described below.

2.   Liabilities for cleanup costs mandated by any
environmental protection law or regulation are excluded to
the extent they arise out of or relate to (a) any site now
owned by Diamond Shamrock or DSCC at which manufacturing
operations have been permanently abandoned and (b) any site
not now owned by Diamond Shamrock or DSCC which has been or
may within three years from the date of closing be
designated a Superfund site as a result of activities of
DSCC while owned by Diamond Shamrock, in each case only to
the extent Diamond Shamrock or DSCC may be legally
responsible for cleanup costs at such site.

3.   Also excluded are damages, judgments and costs,
including attorneys fees, which arise out of the following
litigation against Diamond Shamrock or DSCC (whether now
pending or filed in the future):

   (a)   All litigation arising out of or relating to the
   manufacture and sale by Diamond Shamrock of Agent
   Orange and similar herbicides to the U. S. Government
   for use in Vietnam.

   (b)   All litigation arising out of DSCC's
   manufacturing operations at 80 Lister Avenue, Newark,
   New Jersey, and other sites where manufacturing
   operations have been permanently abandoned, including
   claims for property damage and personal injury arising
   from the cleanup of such sites.

   (c)   Litigation relating to products or operations of
   DSCC which had been permanently discontinued or sold to
   third parties on or before April 1, 1986, including but
   not limited to agricultural chemicals, functional
   polymers, PVC/VCM and polyester resins.

OCC 002966
CONFIDENTIAL

4.   Excluded from the transaction are all damages, judgments
and recoveries which Diamond Shamrock or DSCC may secure as
a result of any litigation, whether now pending or
subsequently filed, brought by them against Aetna Insurance
Company or any of their other insurers to recover for any
liability retained by them pursuant to paragraphs 1, 2 and 3
above.

5.   Immediately upon the execution by the purchaser and
Diamond Shamrock of a letter of intent with respect to the
transaction, the purchaser will be afforded full access to
DSCC's plants, records and personnel for the purpose of
carrying out a "due diligence" examination of the health,
safety, environmental and legal liabilities of DSCC.
Diamond Shamrock will provide the purchaser with estimates
of the amount of such liabilities.  The purchaser will use
its best efforts to complete this examination within 30 days
of the execution of such letter of intent.  Not later than
such 30th day the purchaser will provide Diamond Shamrock a
written list of issues arising from such examination which
the purchaser proposes to negotiate in the definitive
purchase agreement.  Diamond Shamrock in its sole discretion
will have the right to terminate negotiations with the
purchaser if it considers such issues unduly burdensome.

6.   All liabilities and expenditures resulting from
compliance with environmental protection laws or regulations
with respect to the business of DSCC which become payable at
any time during the three-year period immediately following
closing of the transaction, except for liabilities retained
by Diamond Shamrock pursuant to paragraph 2 above, will be
shared by Diamond Shamrock and the purchaser (after
application of available insurance proceeds) in accordance
with the following formula:

| Date Liability Becomes Payable | % Paid by Purchaser | % Paid by Diamond Shamrock |
|---|---|---|
| Up to 1 year after closing | 25 | 75 |
| During 2nd year after closing | 50 | 50 |
| During 3rd year after closing | 75 | 25 |
| After 3 years from the date of closing | 100 | 0 |

OCC 002967
CONFIDENTIAL

All liabilities described in this paragraph 6 will be deemed a liability for the purpose of such formula on the date they become payable, regardless of when they arose or came into existence and regardless of whether they were due to the acts of DSCC or a third party, and will be shared by Diamond Shamrock and the purchaser according to the foregoing formula.

7.  In order to monitor expenditures which may be liabilities under the above formula, at the closing the purchaser and Diamond Shamrock will establish an environmental review committee consisting of not less than two qualified environmental personnel from each company. Such committee shall meet at least quarterly to review all DSCC's environmental compliance programs, cleanup programs and expenditures and liabilities which may be subject to the foregoing formula. For this purpose Diamond Shamrock representatives will have access to all documents, facilities and personnel of DSCC as they may request.  All liabilities and expenditures approved by such committee shall automatically be included in such formula.  In the event of disagreement among the members of such committee as to the necessity of making such payments, the purchaser will have the right to include in such formula up to $1,000,000 of disputed liabilities in each of the three years immediately following the closing.

OCC 002968
CONFIDENTIAL

Confidential                                                    OCCNJ0027241

# EXHIBIT 9

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW
JERSEY
Richard J. Hughes Justice Complex
25 Market Street, PO Box 093
Trenton, New Jersey 08625-0093
Attorney for Plaintiffs

By: John F. Dickinson, Jr.
Deputy Attorney General
(609) 984-4863

JACKSON GILMOUR & DOBBS, PC
3900 Essex Lane, Suite 700
Houston, Texas 77027

By: William J. Jackson, Special Counsel
(713) 355-5000

GORDON & GORDON
505 Morris Avenue
Springfield, New Jersey 07081

By: Michael Gordon, Special Counsel
(973) 467-2400

---

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
THE COMMISSIONER OF THE NEW
JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION and
THE ADMINISTRATOR OF THE NEW
JERSEY SPILL COMPENSATION
FUND,
    Plaintiffs,

v.

OCCIDENTAL CHEMICAL
CORPORATION, TIERRA
SOLUTIONS, INC., MAXUS ENERGY
CORPORATION, MAXUS
INTERNATIONAL ENERGY
COMPANY, REPSOL YPF, S.A., YPF,
S.A., YPF HOLDINGS, INC., YPF
INTERNATIONAL S.A. (f/k/a YPF
INTERNATIONAL LTD.) and CLH
HOLDINGS,
    Defendants

MAXUS ENERGY CORPORATION and
TIERRA SOLUTIONS,
INC.,

Third-Party Plaintiffs,

v.

3M COMPANY, et al.,

Third-Party Defendants

---

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - ESSEX COUNTY
DOCKET NO. ESX-L9868-05 (PASR)

Civil Action

COURT APPROVED SETTLEMENT
AGREEMENT



FILED

DEC 1 2

Sebastian P. Lombardi, J.S.C.

## TABLE OF CONTENTS

                                                                                      Page
I.      BACKGROUND..........................................................................................................................1

II.     JURISDICTION.........................................................................................................................6

III.    PARTIES BOUND .....................................................................................................................7

IV.     DEFINITIONS............................................................................................................................7

V.      PARTIES' OBJECTIVES........................................................................................................22

VI.     SETTLING DEFENDANTS' COMMITMENTS....................................................................22

VII.    PLAINTIFFS' COVENANT NOT TO SUE THE SETTLING DEFENDANTS AND
        RESERVATION OF RIGHTS.................................................................................................24

VIII.   PLAINTIFFS' COVENANT NOT TO SUE OCC AND RESERVATION OF RIGHTS...........30

IX.     PLAINTIFFS' ADDITIONAL COVENANTS AND RESERVATIONS .................................35

X.      CAP ON SETTLING DEFENDANTS' FUTURE LIABILITY .................................................37

XI.     PLAINTIFFS' COVENANTS AND RESERVATIONS OF RIGHTS WITH RESPECT TO
        FUTURE CLEANUP AND REMOVAL COSTS .....................................................................44

XII.    SETTLING DEFENDANTS' COVENANTS .........................................................................48

XIII.   SETTLING DEFENDANTS' RESERVATIONS.....................................................................52

XIV.    FINDINGS & NON-ADMISSIONS OF LIABILITY ..............................................................54

XV.     EFFECT OF SETTLEMENT AND CONTRIBUTION PROTECTION.....................................54

XVI.    NOTICES..................................................................................................................................61

XVII.   EFFECTIVE DATE .................................................................................................................62

XVIII.  RETENTION OF JURISDICTION .........................................................................................62

XIX.    RETENTION OF RECORDS ..................................................................................................63

XX.     MODIFICATION......................................................................................................................63

XXI.    APPROVAL OF THIS SETTLEMENT AGREEMENT AND FURTHER ASSURANCES ......64

XXII.   SIGNATORIES........................................................................................................................65

-i-

This matter was opened to the Court by John J. Hoffman, Acting Attorney General of New Jersey, John F. Dickinson, Jr., Deputy Attorney General, and Special Counsel William J. Jackson and Michael Gordon appearing, attorneys for plaintiffs, and this Settlement Agreement is among the New Jersey Department of Environmental Protection ("DEP"), the Commissioner of the New Jersey Department of Environmental Protection ("Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively, "Plaintiffs"), and Defendants Tierra Solutions, Inc. ("Tierra"), Maxus Energy Corporation ("Maxus"), Maxus International Energy Company ("MIEC"), Repsol, S.A. (formerly known as Repsol YPF, S.A.) ("Repsol"), YPF, S.A. ("YPF"), YPF Holdings, Inc. ("YPFH"), YPF International S.A. ("YPFI") and CLH Holdings, Inc. ("CLHH"). The Parties have amicably resolved their dispute before trial and request approval of this Settlement Agreement[1] as provided below:

## I. BACKGROUND

1. Plaintiffs initiated the Passaic River Litigation by filing a complaint on or about December 13, 2005 against Occidental Chemical Corporation ("OCC"), Tierra, Maxus, Repsol, YPF, YPFH and CLHH pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 through 23.24 (the "Spill Act"), the Water Pollution Control Act, N.J.S.A. 58:10A-1 through 35 ("WPCA"), and New Jersey common law, which complaint has been subsequently amended on several occasions to add, inter alia, claims against YPFI and MIEC (collectively, the "Complaint").

2. Plaintiffs, in their Complaint, seek, among other things, past and future costs and damages, together with penalties, associated with Discharges of 2,3,7,8 – TCDD ("dioxin") and

---

[1] Capitalized terms are defined in Paragraph 19 below.

other Hazardous Substances at and from the Lister Property into the Newark Bay Complex as alleged in the Complaint. Plaintiffs allege, and Settling Defendants deny, that dioxin and other Hazardous Substances were Discharged from the Lister Property and have migrated throughout the Newark Bay Complex.

3.     The Settling Defendants subsequently filed responsive pleadings in which they denied liability, and asserted various defenses to the allegations contained in the Complaint. Repsol, YPF, MIEC, YPFH, CLHH and YPFI all contest personal jurisdiction. Specifically, on January 8, 2007, Repsol and YPF filed Motions to Dismiss on the grounds that the Court lacked personal jurisdiction over them (the "Motions to Dismiss"). On September 5, 2008, the Court denied the Motions to Dismiss, reserving adjudication of the jurisdictional issue until the close of merits discovery because "the jurisdictional issues and the meritorious facts are so intertwined." On October 24, 2008, Repsol and YPF filed an answer to the Second Amended Complaint, contesting liability and personal jurisdiction. On October 18, 2010, Repsol and YPF again sought leave to file a Motion to Dismiss the Third Amended Complaint on the grounds that the Court lacked personal jurisdiction. Prior to the Court responding to this request, the Plaintiffs filed the Fourth Amended Complaint on September 28, 2012.

4.     OCC sought leave to file cross-claims on June 29, 2007. The Court instructed OCC to file proposed cross-claims, which OCC did on May 15, 2008. On October 6, 2008, OCC filed its final Cross-Claims. On February 9, 2009, YPF, YPFH, CLHH, and Repsol filed their answers to the Cross-Claims, contesting liability and personal jurisdiction. On February 9, 2009, Maxus and Tierra also filed their answer to the Cross-Claims, contesting liability. On September 26, 2012, OCC filed its Second Amended Cross-Claims, which added claims against YPFI.

-2-

5.     On December 14, 2012, Repsol sought leave to file Motions to Dismiss the Fourth
Amended Complaint and Second Amended Cross-Claims on various grounds, including lack of
personal jurisdiction, failure to state claims upon which relief could be granted, and on the
grounds that many of OCC's Cross-Claims are barred by the applicable statutes of limitation.
On December 14, 2012, YPF, YPFH, YPFI and CLHH sought leave to file Motions to Dismiss
on substantially similar grounds, however, they did not reassert personal jurisdictional
arguments, instead choosing to preserve their jurisdictional arguments until the close of
discovery. On December 19, 2012, Maxus, MIEC, and Tierra also sought leave to file Motions
to Dismiss on various grounds, but also chose to preserve their lack of jurisdiction arguments
until the close of discovery. On January 29, 2013, the Special Master granted the parties leave to
file renewed motions to dismiss on various issues.

6.     Defendants Maxus and Tierra ("Third-Party Plaintiffs") filed Third-Party
Complaints on February 4 and 5, 2009, alleging that Third-Party Defendants are liable for the
costs and damages incurred and to be incurred in investigating and remediating contamination
and for any judgment obtained by Plaintiffs related to Discharges of Hazardous Substances into
the Newark Bay Complex under the Spill Act and other New Jersey statutes, including (without
limitation) the Joint Tortfeasor Contribution Act, N.J.S.A. 2A:53A-1 et seq., and/or N.J.S.A.
59:9-3. Maxus and Tierra asserted additional third-party claims against certain public Third-
Party Defendants under the New Jersey Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq.,
Passaic Valley Sewerage Commissioners Statutes, N.J.S.A. 58:14-7 and 58:14-8, and for
nuisance and breach of the public trust.

7.     By Orders dated December 15, 2010 and April 24, 2012, the Court permitted
Plaintiffs to reserve (i) the claims Plaintiffs may have against current Third-Party Defendants and

-3-

claims Plaintiffs may have against any future third-party or fourth-party defendants that could be brought during the pendency of, and after the conclusion of the Passaic River Litigation, and (ii) natural resource damages claims, other than to recover the cost of a natural resource damages assessment, that Plaintiffs may have against current Defendants that could be brought during the pendency of, and after the conclusion of, the Passaic River Litigation.

8.      By entering into this Settlement Agreement, the Settling Defendants do not admit any fact, fault or liability, including (without limitation) any liability arising from the claims, transactions or occurrences Plaintiffs have alleged or could have alleged in their Complaint or otherwise in the Passaic River Litigation.

9.      Plaintiffs allege, and the Settling Defendants deny, that the State of New Jersey has incurred, and will continue to incur, costs and damages as a result of the Discharge of Hazardous Substances at and from the Lister Property and/or into the Newark Bay Complex.

10.      Plaintiff Administrator alleges that he has certified or may certify for payment claims made against the Spill Compensation Fund ("Spill Fund") concerning any Discharge of Hazardous Substances at or from the Lister Property and/or into the Newark Bay Complex, and, further, has approved or may approve other appropriations for the Newark Bay Complex.

11.      Plaintiffs allege, and the Settling Defendants deny, that Plaintiffs have incurred, and will continue to incur, costs and damages, including (without limitation) Economic Damages and Natural Resource Damage Assessment Costs as a result of the Discharge of Hazardous Substances at and from the Lister Property and/or into the Newark Bay Complex.

12.      Plaintiffs allege, and the Settling Defendants deny, that certain costs and damages they have allegedly incurred, and will allegedly incur, for the Lister Property and Newark Bay Complex are Cleanup and Removal Costs pursuant to N.J.S.A. 58:10-23.11b.

-4-

13.     Plaintiffs allege, and the Settling Defendants deny, that certain costs and damages that Plaintiff DEP has incurred, and will incur, for Discharges at and from the Lister Property and into the Newark Bay Complex are also recoverable within the meaning of N.J.S.A. 58:10A-10c.(2)-(4) and the WPCA.

14.     Unless expressly provided to the contrary herein, the Parties intend that this Settlement Agreement and the motions filed in its support will result in the dismissal of all Claims between the Parties and in the reorganization of proceedings relating to remaining claims asserted in the Passaic River Litigation. The Parties to this Settlement Agreement agree and consent to the publishing of this Settlement Agreement, Order Dismissing Certain Claims, attached hereto as Exhibit A ("Dismissal Order"), and Case Management Order, attached hereto as Exhibit B ("Case Management Order"), for notice and public comment as provided herein, and agree to support entry of those Orders and approval of this Settlement Agreement.

15.     The Parties represent and agree, and the Court so finds, that the Parties have negotiated this Settlement Agreement at arm's-length and in good faith. The Parties also agree that the implementation of this Settlement Agreement will allow the Parties to avoid prolonged and complicated litigation; that the implementation of this Settlement Agreement will save and preserve Plaintiffs' limited resources by avoiding the expenditure of limited resources to allege and prosecute Claims against the Settling Defendants; and that this Settlement Agreement warrants approval consistent with the purposes of the Spill Act.

**THEREFORE,** with the consent of the Parties to this Settlement Agreement, it is hereby **ORDERED** that this Settlement Agreement is approved as follows:

## II. **JURISDICTION**

16. This Court has subject matter jurisdiction over this action pursuant to the Spill Act, the WPCA, and the common law. The Settling Defendants agree not to contest personal jurisdiction over them for the limited purposes of entering this Settlement Agreement and Dismissal Order and of enforcing the Settlement Agreement in future proceedings in this action. However, neither this Settlement Agreement (including the Exhibits hereto), any motions that may be filed in support of this Settlement Agreement, nor entry of any order shall create any personal jurisdiction in this Court over the Settling Defendants for any other purpose, including (but not limited to) prosecution by the Plaintiffs of any Claims they may have reserved pursuant to this Settlement Agreement or otherwise.

17. For the sole and limited purposes of entering this Settlement Agreement and Dismissal Order and of enforcement of this Settlement Agreement in future proceedings in this action, Settling Defendants agree not to contest the continuing jurisdiction of this Court, or venue in this County. The Settling Defendants shall have the right to challenge this Court's jurisdiction over them for any other purpose. This limited agreement not to contest this Court's jurisdiction to approve and enforce this Settlement Agreement and Dismissal Order shall not give rise to personal jurisdiction over the Settling Defendants for any purposes that do not arise directly from the approval or enforcement of the Settlement Agreement and Dismissal Order. Only the Parties, as defined in Paragraph 19.42, are intended to benefit from this limited waiver of objections and defenses to jurisdiction. The Settling Defendants reserve all objections and defenses to personal jurisdiction which they may have with respect to cross-claims brought against them by OCC and/or any other person or entity in the Passaic River Litigation or otherwise, and do not intend to and do not waive personal jurisdiction defenses with respect to other actions brought against

them in the courts or agencies of the State of New Jersey, any other State, or of the United States by any person, party or entity. Because the Settling Defendants are resolving the Claims brought or which could have been brought related to the Discharges of Hazardous Substances into the Newark Bay Complex against them by the Plaintiffs prior to appeal, any prior decision that this Court has personal jurisdiction over them shall have no res judicata or collateral estoppel effect in any other proceeding. For the avoidance of doubt, this Settlement Agreement shall not preclude the Settling Defendants from pursuing their motions to dismiss the claims brought against them by OCC or any other person or entity in this proceeding on any ground, including lack of personal jurisdiction.

## III. PARTIES BOUND

18.     This Settlement Agreement applies to and is binding upon Plaintiffs and Settling Defendants and, pursuant to Sections VIII and XV herein, applies to OCC, the Third-Party Defendants, and, to the extent provided by law and equity, any non-parties and non-settling parties.

## IV. DEFINITIONS

19.     Unless otherwise expressly provided herein, terms used in this Settlement Agreement that are defined in the Spill Act, the WPCA, or in the regulations promulgated under these acts, shall have their statutory or regulatory meaning. Whenever the terms listed below are used in this Settlement Agreement, the following definitions shall apply, solely for the purpose of this Settlement Agreement, the Dismissal Order and the Case Management Order and for no other purpose:

19.1.  "Affiliate" shall mean (a) a company or other legal entity that directly or indirectly controls a Settling Defendant or OCC (as applicable); (b) a company or other

-7-

legal entity which is directly or indirectly controlled by a Settling Defendant or OCC (as applicable); or (c) a company or other legal entity which is directly or indirectly controlled by a company or other legal entity which directly or indirectly controls a Settling Defendant or OCC (as applicable). For purposes of this definition of Affiliate, control means the ownership directly or indirectly of more than fifty (50) percent of the voting rights in a company or other legal entity.

19.2.   "Cap" shall mean the hard cap of Four Hundred Million Dollars ($400,000,000) on the Capped Claims under Paragraph 37.

19.3.   "Capped Claims" shall mean all of the Claims Plaintiffs asserted or could assert against OCC as identified in Paragraph 36.

19.4.   "Category I Capped Claims" shall have the meaning given to that term in Paragraph 36.

19.5.   "Category II Capped Claims" shall have the meaning given to that term in Paragraph 36.

19.6.   "CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §1906 et seq.

19.7.   "Claim(s)" shall mean any claim (including directives) for damages, costs (including direct and indirect), injunctive or other relief, whether known or unknown, contingent or accrued.

19.8.   "Cleanup and Removal Costs" shall have the meaning ascribed to it in the Spill Act, N.J.S.A. 58:10-23.11b, and, to the extent not within the meaning ascribed under the Spill Act, shall also include direct and indirect costs recoverable under the WPCA, and shall include all costs of "response" (also known herein as "Response

-8-

Costs") as defined under 42 U.S.C. § 9601(25) (including, without limitation, by assignment). For purposes of this Settlement Agreement only, Cleanup and Removal Costs include, without limitation, the costs of evaluating and developing navigation in the Newark Bay Complex but only to the extent such costs are incurred as part of the Diamond Alkali Superfund Process and for which recovery is sought under the Spill Act, CERCLA or common law, but not otherwise. By including such navigation costs as "Cleanup and Removal Costs" Settling Defendants do not waive any defense or argument as to the recoverability of such costs or agree that such costs are recoverable under the Spill Act or CERCLA.

19.9. "CLHH" shall mean Defendant CLH Holdings, Inc.

19.10. "Complaint" shall mean the complaint dated November 22, 2005 and filed by Plaintiffs on or about December 13, 2005, as subsequently amended, against Defendants.

19.11. "Cross-Claims" shall mean the cross-claims filed in the Passaic River Litigation by OCC against Settling Defendants.

19.12. "Defendants" shall mean OCC and the Settling Defendants collectively.

19.13. "Diamond Alkali Superfund Process" shall mean all investigations and/or response actions pursuant to CERCLA (including (without limitation) removal actions and remedial actions) undertaken in respect to the Diamond Alkali Superfund Site (added to the National Priorities List on September 21, 1984, reference number NJD980528996, and including all operable units thereof or added thereto), undertaken by Plaintiffs and/or by federal agencies, separately or in conjunction with each other, or undertaken by other entities (including Defendants or Third-Party Defendants) and overseen or directed by

-9-

Plaintiffs and/or federal agencies pursuant to administrative orders, decrees, directives, statutory or regulatory obligations, or similar authority, that address or respond to any alleged Discharge of Hazardous Substances that are located or come to be located within the Diamond Alkali Superfund Site (regardless of the location of the source of such Discharge whether inside or outside the Newark Bay Complex), and all federal or CERCLA enforcement activities and litigation directly related thereto. For purposes of this definition, "remedial actions" include monitored natural attenuation and no further action when such actions (or no action) have been selected as part of any remedy in the Diamond Alkali Superfund Process. "Diamond Alkali Superfund Process" shall not include any Other Action or other CERCLA investigations and/or remedial actions at any Superfund site other than the Diamond Alkali Superfund Site.

19.14. "Diamond Alkali Superfund Site" shall mean the geographic area consisting of all operable units or areas identified for investigation and/or response actions, including (without limitation) removal and remedial actions by the United States Environmental Protection Agency ("U.S. EPA") and any other federal agencies or departments with authority to implement CERCLA, the Plaintiffs, and/or any other agencies and departments of the State of New Jersey, separately or in conjunction with each other, or with other entities acting under the direction of any of the foregoing, pursuant to administrative orders, decrees, directives, statutory or regulatory obligations, or other similar authority, as part of the Diamond Alkali Superfund Process, and as those areas may be expanded from time to time, including (without limitation) the Lower Passaic River Study Area, the Lister Avenue Removal Area (Phase I and II), the Newark Bay Study Area and the Lister Property.

-10-

19.15. "Discharge(s)" and "Discharged" shall have the meanings ascribed to "discharge" in N.J.S.A. 58:10-23.11b and 58:10A-3, except that, for purposes of this Settlement Agreement, "Discharge(s)" and "Discharged" shall also include the emission of Hazardous Substances into the atmosphere to the extent such emission contributes to contamination of water, sediments or other media in the Newark Bay Complex. For avoidance of doubt, "Discharge(s)" and "Discharged" shall include such Discharge(s), whether known or unknown, directly or indirectly, without limitation.

19.16. "DSC-1" or "DSCC" shall mean the corporation that was named Diamond Alkali Company (which is the stipulated successor to, and allegedly assumed the liabilities of, Diamond Alkali Organic Chemicals Division, Inc., Kolker Realty Company and Kolker Chemical Works, Inc.), was subsequently renamed Diamond Shamrock Corporation after a 1967 merger with Shamrock Oil & Gas Company, and was later renamed Diamond Chemicals Company and then Diamond Shamrock Chemicals Company prior to its acquisition by and merger into OCC.

19.17. "Economic Damages" shall mean any and all damages, loss of value of real or personal property, costs, expenditures, lost income of any kind, and lost tax revenue, including (without limitation) loss of revenue associated with lost industrial, manufacturing, commercial, residential or mixed use development, navigation and port facilities, increased costs of and expenditures for health or medical treatment, and other expenditures, including costs for impacts to navigation and commerce in or related to the Newark Bay Complex, recoverable under the Spill Act, the WPCA, any other statute or regulations relating to the protection of human health, the environment or natural resources, and/or common law (including, without limitation, by assignment), with

-11-

applicable interest. For avoidance of doubt, Economic Damages shall include (without limitation) any and all forms of damages or rights of compensation or restitution available at law or equity for compensatory relief other than those remediation costs included within Cleanup and Removal Costs and, but shall not include Natural Resource Damages, disgorgement, punitive or exemplary damages.

19.18. "Escrow Account" and "Escrow Trigger" shall have the meaning given to those terms, respectively, in Paragraph 22.

19.19. "FFS Area" shall mean the geographic area subject to and/or addressed by the Focused Feasibility Study, including the Passaic River from river mile ("RM") 0.0 to RM 8.3 and any expansion thereof by any subsequent amendment, revision or final version of the Focused Feasibility Study issued by U.S. EPA or the functional equivalent issued by U.S. EPA to the extent it addresses the same general or approximate geographic areas (not to be unduly expanded thereby).

19.20. "Focused Feasibility Study" or "FFS" shall mean the Draft Source Control Early Action Focused Feasibility Study for the Lower Passaic River Restoration Project issued in June 2007 by Malcolm Pirnie, Inc. for the U.S. EPA, U.S. Army Corps of Engineers, and the New Jersey Department of Transportation.

19.21. "Future Cleanup and Removal Costs" shall mean Cleanup and Removal Costs incurred on or after the Effective Date of the Settlement.

19.22. "Hazardous Substances" shall have the meaning ascribed to them in N.J.S.A. 58:10-23.11b, and shall also be deemed, for purposes of this Settlement Agreement only and without prejudice to the interpretation of the meaning of Hazardous Substances under the Spill Act, to include "Pollutants," as that term is defined in N.J.S.A.

-12-

58:10A-3, including Pollutants contained within (i) sewage, including sewer systems and those systems' main outfalls and Combined Sewer Outfalls ("CSOs") and (ii) stormwater.

19.23. "Interest" shall mean interest payable under the terms of the Escrow Agreement.

19.24. "Investigation Costs" shall have the meaning given to that term in Paragraph 38.

19.25. "Lister Avenue Removal Area (Phase I and II)" shall mean that area selected for a non-time critical removal under the Administrative Settlement Agreement and Order on Consent, Docket No. 02-2008-2020, among U.S. EPA, OCC and Tierra.

19.26. "Lister Property" shall mean the former DSC-1 facility and site located at and including the real property of 80 Lister Avenue, together with the real property at 120 Lister Avenue (acquired by DSCC on or about April 19, 1984), Newark, Essex County, New Jersey, these properties being known and designated as Block 2438, Lot(s) 57, 58 and 59, on the Tax Map of the City of Newark. For the avoidance of doubt, the Lister Property is outside of the FFS Area, except that the portion of the bank below mean high tide of the Passaic River that runs along the Lister Property is not to be included in the definition of the Lister Property, but is considered part of the FFS Area.

19.27. "Lower Passaic River Study Area" shall mean the lower 17 miles of the Passaic River and its tributaries, from the confluence with Newark Bay to the Dundee Dam, as identified in the May 8, 2007 Administrative Order on Consent concerning the Lower Passaic River Study Area, and as may be expanded by U.S. EPA from time to time. For the avoidance of doubt, the Lower Passaic River Study Area includes the FFS Area.

-13-

19.28. "Matters Addressed" shall have the meaning provided for that term in Paragraph 63.

19.29. "Maxus" shall mean Defendant Maxus Energy Corporation.

19.30. "MIEC" shall mean Defendant Maxus International Energy Company.

19.31. "Natural Resource Damages" (also known herein as loss of natural resources or restoration of natural resources), for purposes of this Settlement Agreement only, shall mean all Claims arising from Discharges at or to the Newark Bay Complex, known or unknown, that occurred prior to the Effective Date of this Settlement Agreement and that are recoverable by any New Jersey state natural resource trustee as damages for injuries to natural resources under the Spill Act; the WPCA; the Oil Pollution Act, 33 U.S.C.A. §§ 2701 through 2761; the Clean Water Act, 33 U.S.C.A. §§ 1251 through 1387; CERCLA, or any other state or federal common law, statute, or regulation, for compensation for the restoration and/or replacement of, the lost value of, injury to, or destruction of natural resources and natural resource services, including (but not limited to) Claims for penalties, attorneys' fees, consultants' fees or experts' fees incurred in connection therewith, but do not include Natural Resource Damages Assessment Costs. For the avoidance of doubt, the costs of compliance with statutory or regulatory requirements concerning the on-going operations of active facilities are not considered to be Natural Resource Damages.

19.32. "Natural Resource Damages Assessment Costs" shall mean the costs of assessing injury to natural resources and natural resource services and the restoration thereof, including (without limitation) oversight costs, attorneys' fees, consultants' fees and experts' fees incurred as part of such assessment.

-14-

19.33. "Newark Bay Complex" shall mean (i) the Lister Property; (ii) the lower 17 miles of the Passaic River (including but not limited to the FFS Area), (iii) Newark Bay, (iv) the Arthur Kill, (v) the Kill Van Kull, (vi) to the extent investigated by or at the direction of U.S. EPA or the DEP for remediation as part of the Diamond Alkali Superfund Process, now or in the future, the lower reaches of the Hackensack River and as may be further extended by U.S. EPA or the DEP in the Diamond Alkali Superfund Process, and (vii) to the extent investigated by or at the direction of U.S. EPA for remediation as part of the Diamond Alkali Superfund Process, now or in the future, any adjacent waters, sediments and other media of (i) through (vi).

19.34. "Newark Bay Study Area" shall mean Newark Bay and portions of the Hackensack River, Arthur Kill, and the Kill Van Kull, as identified in the February 13, 2004 Administrative Order on Consent between the U.S. EPA and OCC, and as may be expanded by U.S. EPA.

19.35. "OCC" shall mean Occidental Chemical Corporation and its predecessors (including (without limitation) DSC-1/DSCC). For purposes of the covenant not to sue in Paragraphs 28 and 29, and for contribution protection in Paragraphs 62 and 63, OCC shall also include any and all persons entitled to the benefit of the covenant not to sue in Paragraph 28. OCC is not a Settling Defendant or an Affiliate of a Settling Defendant under this Settlement Agreement.

19.36. "OCC/DSCC Deliberate Conduct" shall mean OCC's (specifically including its predecessors DSC-1/DSCC's) intentional or fraudulent conduct in connection with the Lister Property at any time before September 4, 1986, including the operations on the Lister Property between 1940 and 1969. OCC/DSCC Deliberate

-15-

Conduct includes conduct that may result in damages awarded against OCC based upon the intentional or fraudulent conduct of DSC-1/DSCC, including the damages that relate to, result from, or arise out of DSC-1/DSCC's intentional pollution activities of the nature discussed in Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co., 134 N.J. 481 (1993) and appellate and trial court proceeding, i.e., Claims for Economic Damages, punitive damages, disgorgement damages, and Natural Resource Damages relating to the Hazardous Substances and contamination associated therewith.    As used herein, "intentional" refers to the intent to perform an act or refrain from performing an act knowing that Hazardous Substances would be Discharged or released into the environment, regardless of whether OCC intended or knew the consequences or effects thereof. For avoidance of doubt, OCC/DSCC Deliberate Conduct shall not include any conduct, action or inaction of any Settling Defendant or their Affiliates, and "intentional" or "fraudulent" conduct as used herein does not include conduct that is merely negligent (including grossly negligent), or conduct that is non-intentional or non-fraudulent or conduct to the extent that it would only result in strict liability based upon non-intentional or non-fraudulent action or inaction, including the mere ownership of land or of a facility.

19.37. "OCC Distinct Conduct" shall mean (i) conduct of OCC, its Affiliates, joint venturers and associated entities, and of Chemicaland Corporation (not to be confused with Chemical Land Holdings, Inc.), but not DSC-1/DSCC or its Affiliates, at any time before September 4, 1986; and/or (ii) conduct of OCC, Occidental Electrochemical Corporation and/or DSC-1/DSCC at any time after September 4, 1986. Notwithstanding the forgoing, OCC Distinct Conduct shall not include the conduct,

-16-

action or inaction of any of the Settling Defendants or their Affiliates on the Effective
Date of this Settlement Agreement.

19.38. "OCC Resolved Claims" shall have the meaning given to that term in
Paragraph 28.

19.39. "Other Action" or "Other Actions" shall mean past, present or future
judicial, civil and administrative Claims (including directives) relating to the Discharge
of a Hazardous Substance at, onto or from a site other than the Lister Property whether
such Claims are among Plaintiffs and any Settling Defendant(s) or OCC or are among
Settling Defendants or any of them, and any other person to the extent that the losses,
liabilities, costs, penalties or damages sought in such alleged Claims are either (i) caused
by a Discharge of Hazardous Substances from a source not located in the Newark Bay
Complex and which Hazardous Substances do not come to be located in the Newark Bay
Complex, or (ii) not caused in whole or in part by a Discharge of Hazardous Substances
from the Lister Property.

19.40. "Passaic River Litigation" shall mean the action, originally initiated by
Plaintiffs through the Complaint, as later amended, and proceeding in the Superior Court
of New Jersey, Law Division - Essex County, Docket No. ESX-L9868-05 (PASR),
against Defendants pursuant to the Spill Act, the WPCA, and common law and otherwise,
including all cross-claims and counter-claims related thereto, the claims which the Third-
Party Plaintiffs have asserted against the Third-Party Defendants in the Third-Party
Complaints, and such State law claims as Third-Party Plaintiffs could have asserted
against all Third-Party Defendants (rather than only some) but for an existing agreement
among Third-Party Plaintiffs and certain Third-Party Defendants referenced in paragraph

-17-

15 of Third-Party Complaint B, paragraph 14 of Third-Party Complaint C, and paragraph 7 of Third-Party Complaint D.

19.41. "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral.

19.42. "Party" or "Parties" shall mean Plaintiff DEP, Plaintiff Commissioner, Plaintiff Administrator, and the Settling Defendants.

19.43. "Past Cleanup and Removal Costs" shall mean Cleanup and Removal Costs incurred before the Effective Date of the Settlement Agreement.

19.44. "Plaintiff(s)" shall mean DEP, Commissioner, Administrator, and any predecessor or successor department, agency or official thereof acting on their own behalf and on behalf of the State of New Jersey, its departments and agencies.

19.45. "Repsol" shall mean Defendant Repsol, S.A. (formerly known as Repsol YPF, S.A.).

19.46. "Reserved Claims" shall mean those claims of Plaintiffs reserved by orders dated December 15, 2010 and April 24, 2012, as described in Paragraph 48 herein.

19.47. "Section" shall mean a portion of this Settlement Agreement identified by a Roman numeral.

19.48. "Settlement Agreement" shall mean this Settlement Agreement, including all exhibits hereto.

19.49. "Settlement Funds" shall mean the total moneys paid or to be paid to Plaintiffs by Settling Defendants under Section VI of this Settlement Agreement.

19.50. "Settling Defendants" shall mean collectively Tierra, Maxus, MIEC, Repsol, YPF, YPFI, YPFH and CLHH, and "Settling Defendant" shall mean any of the

-18-

Settling Defendants individually.  For purposes of the covenant not to sue in Paragraphs 25 and 26, and for contribution protection in Paragraphs 62 and 63, Settling Defendants shall also include any and all persons entitled to the benefit of the covenant not to sue in Paragraph 25.  OCC is not a Settling Defendant or an Affiliate of a Settling Defendant under this Settlement Agreement.

19.51. "Settling Defendant Resolved Claims" shall have the meaning given to that term in Paragraph 25.

19.52. "Settling Third-Party Defendant" shall mean those entities that entered into and abide by the obligations under the final, approved, and entered Third-Party Consent Judgment.

19.53. "SPA" shall mean the Stock Purchase Agreement, dated September 4, 1986, by which Maxus sold the stock of its wholly-owned subsidiary, DSCC, to Oxy-Diamond Alkali Corporation.

19.54. "Sub-caps" shall mean Sub-cap A, Sub-cap B and Sub-cap C.

19.55. "Sub-cap A" shall mean the hard cap of Twenty Million Dollars ($20,000,000) that applies to Investigation Costs pursuant to Paragraph 38.

19.56. "Sub-cap B" shall mean the hard cap of Two Hundred and Fifty Million Dollars ($250,000,000) that applies, pursuant to Paragraph 39, to limit the Plaintiffs' potential recovery from OCC for Category II Capped Claims to the extent OCC collects such damages from Repsol but not YPF(I).

19.57. "Sub-cap C" shall mean the hard cap of Two Hundred and Fifty Million Dollars ($250,000,000) that applies, pursuant to Paragraph 40, to limit the Plaintiffs'

-19-

potential recovery against OCC for Category II Capped Claims to the extent that OCC collects such damages from YPF(I) but not Repsol.

19.58. "Third-Party Consent Judgment" shall mean the consent judgment among Plaintiffs and certain Third-Party Defendants in the Passaic River Litigation presented to the Court or to be presented to the Court to resolve certain liabilities of and certain claims against the Settling Third-Party Defendants.

19.59. "Third-Party Defendants" shall mean those entities named as third-party defendants by Maxus and Tierra in the Third-Party Complaints filed in this action on February 4 and 5, 2009 and as may be later amended.

19.60. "Third-Party Sites" shall mean the sites, operations and/or facilities (whether public or private) identified in the Third-Party Complaints, including sewer systems and those systems' main outfalls and CSOs, as well as those sites and/or facilities, whether known or unknown, owned, previously owned, operated, or previously operated by a Settling Third-Party Defendant or at which a Settling Third-Party Defendant may otherwise be a potentially responsible party (i.e., any person who has discharged a hazardous substance or is any way responsible for any hazardous substance pursuant to N.J.S.A. 58:10-23.11g), from where a Third-Party Defendant Discharged, caused to be Discharged or is alleged to have Discharged any Hazardous Substance into, or which Hazardous Substance reached, migrated or was transported by any means into, the Newark Bay Complex.

19.61. "Tierra" shall mean Defendant Tierra Solutions, Inc.

19.62. "Upland Order" shall mean the judicial and administrative orders for investigation and remediation of the Lister Property (i.e. the 1990 Consent Decree in the

-20-

matter of the United States of America, the State of New Jersey v. Occidental Chemical Corporation Chemical Land Holdings, Inc., Civil Action No. 89-5065, in the United States District Court for the District of New Jersey, the March 13, 1984 Administrative Consent Order among the New Jersey Department of Environmental Protection and Diamond Shamrock Chemicals Company and Marisol, Inc. (ACO I) and the December 21, 1984 Administrative Consent Order between the New Jersey Department of Environmental Protection and Diamond Shamrock Chemicals Company (ACO II)).

19.63. "YPF" shall mean Defendant YPF, S.A.

19.64. "YPF(I)" shall mean, for the limited purpose of facilitating this Settlement Agreement, YPF and/or YPFI, collectively, or individually if only one of YPF or YPFI are found liable to OCC. For avoidance of doubt, and notwithstanding any other provision herein, (a) if YPF and YPFI are both found liable for claims under a particular Cap or Sub-cap, application of the Cap or Sub-caps herein shall apply to them as if they were one entity, and each Cap and Sub-cap shall apply to limit the total award against both YPF and YPFI combined, if any; and (b) nothing in this Settlement Agreement shall obligate YPF to guarantee or otherwise be responsible for any liability of YPFI, and nothing in this Settlement Agreement shall obligate YPFI to guarantee or otherwise be responsible for any liability of YPF.

19.65. "YPFH" shall mean Defendant YPF Holdings, Inc.

19.66. "YPFI" shall mean Defendant YPF International S.A. (formerly known as and as successor, at law or in equity, to YPF International Ltd.).

-21-

## V. **PARTIES' OBJECTIVES**

20.    Given the uncertainties of litigation, the Parties' objectives in entering into this
Settlement Agreement, Dismissal Order and Case Management Order include, inter alia, (a)
advancing the Plaintiffs' protection of public health and safety and the environment, consistent
with the purposes that the Spill Act is intended to serve; (b) resolving disputed liabilities as to
Plaintiffs' alleged right to recover a portion of funds expended and secure additional funds for
the investigation and remediation of Hazardous Substances or restoration of natural resources
within the Newark Bay Complex related, in whole or in part, to Discharges from the Lister
Property; (c) avoiding the expenditure of an inordinate amount of resources that would be
incurred in the prosecution and defense of the Claims in the Passaic River Litigation resolved
hereby; (d) resolving the Claims of the Plaintiffs in the Passaic River Litigation as to the Settling
Defendants; (e) resolving any Claims of the Settling Defendants in the Passaic River Litigation
as to the Plaintiffs; (f) securing contribution protection as to Matters Addressed in this Settlement
Agreement; (g) limiting discovery and further litigation; (h) dismissing of all Claims between
Plaintiffs and Settling Defendants pursuant to the terms of this Settlement Agreement, Dismissal
Order and Case Management Order and as provided by New Jersey law; and (i) reorganizing the
resolution of the matters remaining in the Passaic River Litigation in accordance with the Case
Management Order.

## VI. **SETTLING DEFENDANTS' COMMITMENTS**

21.    Within sixty (60) days of an order approving this Settlement Agreement, Repsol
and YPF (and/or Maxus) shall each pay or cause to be paid into the Escrow Account (as
provided by Paragraph 22) for the benefit of Plaintiffs Sixty-Five Million Dollars ($65,000,000)

for a combined payment of One Hundred and Thirty Million Dollars ($130,000,000) (the "Settlement Funds").

22.    The Escrow Account is to be established under the Escrow Agreement, which shall be attached as Exhibit C to this Settlement Agreement. Except as provided below, after approval of the Settlement Agreement by the Court in accordance with Paragraph 69, and the order approving the Settlement Agreement becoming final and non-appealable (the "Escrow Trigger"), the escrow agent shall disburse the Settlement Funds, plus Interest, if any, as provided in the Escrow Agreement, by check or checks made payable to the "Treasurer, State of New Jersey." The payment or payments shall be mailed or otherwise delivered to the Section Chief, Environmental Enforcement Section, Department of Law and Public Safety, Division of Law, Richard J. Hughes Justice Complex, 25 Market Street, P.O. Box 093, Trenton, New Jersey 08625-0093.

23.    In the event this Settlement Agreement and/or the Dismissal Order and/or Case Management Order are not approved, or the approval thereof is overturned, remanded or modified on appeal such that the Settlement Agreement is void as provided by Paragraph 69 or if the Settlement Agreement is void for non-payment under Paragraph 24, the funds placed into the Escrow Account by Settling Defendants shall be returned immediately and in full to Repsol and YPF, respectively, in the same amount as each of them paid in or caused to be paid in, plus Interest prorated, if any, as provided by the Escrow Agreement.

24.    Settling Defendants' obligations to pay the amounts owed to the Plaintiffs under Paragraph 21 are several only. Failure of any Settling Defendant to pay the Settlement Funds as provided in Paragraph 21 shall void this Settlement Agreement, in which case all Settlement Funds shall be returned immediately and in full to Repsol and YPF, respectively, plus Interest, if

-23-

any, as provided by the Escrow Agreement. The Settlement Funds shall first be applied to Plaintiffs' Claims for Past Cleanup and Removal Costs, to the extent recoverable under CERCLA, and then applied as a credit against any Natural Resource Damages owed or that may be owed in the future by Settling Defendants (but not OCC) that could have been sought by Plaintiffs against Settling Defendants in the Passaic River Litigation related to Discharges of Hazardous Substances from or at the Lister Property. Notwithstanding any allocation credit given to the Settling Defendants, this Paragraph does not control any internal allocation or use that Plaintiffs or the State of New Jersey may make with respect to the Settlement Funds received.

## VII.  PLAINTIFFS' COVENANT NOT TO SUE THE SETTLING DEFENDANTS AND RESERVATION OF RIGHTS

25.    In exchange for the consideration provided by the Settling Defendants, including (without limitation) the payments the Settling Defendants are making pursuant to Paragraph 21 above, and except as otherwise provided in Paragraphs 26, 44, 45, 46, and 49 below, Plaintiffs, on their own behalf and on behalf of the State of New Jersey and its departments and agencies, covenant not to sue for, and not to take or procure judicial or administrative action (including, without limitation, the issuance of a directive) with respect to, any and all of the Settling Defendant Resolved Claims listed below against any Settling Defendant including (without limitation) under New Jersey and federal statutory and common law. For purposes of the covenant not to sue described in Paragraphs 25 and 26, and for contribution protection under Paragraphs 62 and 63, the "Settling Defendants" are intended to and shall be interpreted to include the respective past and present officers, directors, employees, and predecessors of Settling Defendants. In addition, for purposes of the covenant not to sue described in Paragraphs 25 and 26, and for contribution protection in Paragraphs 62 and 63, the "Settling Defendants" are

-24-

intended to and shall be interpreted to include each of their past and present direct and indirect parents, Affiliates, members (in the case of a limited liability corporation), partners (in the case of partnerships), joint venturers (in cases of joint ventures), successors, and subsidiaries (both present and former) (i) to the extent that the alleged liability of any such parent, Affiliate, member, partner, joint venturer, successor, or subsidiary is based upon its status and in its capacity as an entity related to Settling Defendants or to the extent based on transactions with any Settling Defendants, and not to the extent that the alleged or potential liability of such entity arises independently of its status and capacity as a related entity of any Settling Defendant or (ii) to the extent that the alleged liability of any such parent, Affiliate, member, partner, joint venturer, successor, or subsidiaries arises from or relates to facts establishing the basis of Plaintiffs' fraudulent transfer or conveyance or alter ego allegations in the Fourth Amended Complaint, as well as the officers, directors and employees of any of them, or any other persons or entities that are, or are adjudicated to be in the future, indemnitors of OCC under the SPA; provided, however, that "Settling Defendants" shall not include OCC or its predecessors DSCC/DSC-1 or any Third-Party Defendant. Subject to Paragraph 26, this covenant not to sue shall apply to any and all of the following Claims (hereinafter "Settling Defendant Resolved Claims"):

<ol type="a">
<li>All Claims for Discharges to the Newark Bay Complex which Plaintiffs brought or could have brought against Settling Defendants in the Passaic River Litigation;</li>
<li>All Claims brought or which could have been brought against Settling Defendants for Past Cleanup and Removal Costs paid or incurred by Plaintiffs, Settling Defendants, OCC, Third-Party Defendants, or any other person or entity in</li>
</ol>

-25-

connection with Discharges of Hazardous Substances to the Newark Bay Complex;

c. All Claims against Settling Defendants for Future Cleanup and Removal Costs paid or incurred by Plaintiffs, or assigned to Plaintiffs by other persons, now or in the future, in connection with response actions (including (without limitation) investigations and removal and remedial actions) or cleanup and removal actions in the Newark Bay Complex;

d. All Claims against Settling Defendants for Economic Damages, suffered by Plaintiffs or assigned to Plaintiffs by other persons, now or in the future, associated with Discharges of Hazardous Substances to the Newark Bay Complex caused in whole or in part by Settling Defendants or any of them or by OCC;

e. All Claims against Settling Defendants for disgorgement damages (whether Plaintiffs' Claims or assigned to Plaintiffs by other persons), now or in the future, associated with Discharges of Hazardous Substances to the Newark Bay Complex related, in whole or in part, to the conduct of Settling Defendants or any of them or of OCC;

f. All Claims against Settling Defendants for punitive or exemplary damages (whether Plaintiffs' Claims or assigned to Plaintiffs by other persons), now or in the future, associated with Discharges of Hazardous Substances to the Newark Bay Complex resulting, in whole or in part, from actions or failures to act by Settling Defendants or any of them or by OCC;

g. All Claims against Settling Defendants for Natural Resource Damages (including Natural Resource Damage Assessment Costs), now or in the future, associated

-26-

with Discharges of Hazardous Substances into the Newark Bay Complex for
which Settling Defendants or any of them or OCC are or may be allegedly liable
pursuant to any legal theory;

h.  All Claims against Settling Defendants for attorneys' fees and litigation costs
incurred by Plaintiffs, now or in the future, in the Passaic River Litigation;

i.  All Claims against Settling Defendants, now or in the future, based upon
allegations that Repsol, YPF, YPFI, YPFH, CLHH and/or MIEC are alter egos of
Maxus and/or Tierra or that any of the Settling Defendants fraudulently conveyed
or transferred assets or resources of or belonging to Maxus or Tierra or are
otherwise vicariously liable for the debts or obligations of Maxus or Tierra, with
respect to any geographic area in New Jersey outside the Diamond Alkali
Superfund Site at which OCC is liable as successor to DSC-1/DSCC, in whole or
in part;

j.  All Claims, now or in the future, against Settling Defendants for penalties
pursuant to the Spill Act, WPCA, and/or any other statutory or common law
associated with Discharges of Hazardous Substances into the Newark Bay
Complex for which Settling Defendants or any of them or OCC may be alleged to
be liable or in any way responsible with respect to the Newark Bay Complex; and

k.  All Claims for injunctive or equitable relief, now or in the future, against the
Settling Defendants in connection with Discharges of Hazardous Substances to
the Newark Bay Complex taking place prior to the Effective Date of this
Settlement Agreement.

26.    Notwithstanding anything to the contrary herein, including Plaintiffs' covenant
not to sue Settling Defendants in Paragraph 25, Plaintiffs reserve, and this Settlement Agreement
is without prejudice to and shall have no effect and limitation on, all rights against the Settling
Defendants concerning the following:

> a.  Failure of a Settling Defendant to satisfy its obligation to contribute to the
>     Settlement Funds under Paragraph 21 of this Settlement Agreement;
>
> b.  Future Cleanup and Removal Costs (including recoverable attorneys' fees)
>     actually paid or incurred (not including unpaid future obligations) by the State of
>     New Jersey, including any of its departments and agencies, in connection with the
>     Lister Property pursuant to the Diamond Alkali Superfund Process against all
>     Settling Defendants, but, with respect to Settling Defendants other than Maxus
>     and Tierra, if and only if the Plaintiffs have satisfied the conditions specified in
>     Paragraph 46 below;
>
> c.  Future Cleanup and Removal Costs actually paid or incurred (not including
>     unpaid future obligations) by the State of New Jersey, including any of its
>     departments and agencies, in excess of $70,800,000 in connection with the
>     Newark Bay Complex outside of the FFS Area (but not with respect to the Lister
>     Property itself), if and only if Plaintiffs have satisfied the conditions of Paragraph
>     46 below. For purposes of this Subparagraph 26(c) only, Cleanup and Removal
>     Costs actually paid or incurred by the State of New Jersey shall still be considered
>     paid or incurred even if such costs are recovered from or reimbursed by any
>     person not a Settling Defendant; provided, however, that there shall never be any
>     double recovery by the State of New Jersey;

-28-

d.  Cleanup and Removal Costs or damages not caused, in whole or in part, by Discharges of Hazardous Substances from the Lister Property, for which remedial action is not taken as part of the Diamond Alkali Superfund Process and as to which the Settling Defendant being sued is a Discharger, a person in any way responsible or a responsible party;

e.  Claims under 25(i) if, and only if, Plaintiffs have satisfied the applicable conditions of Paragraph 46 below;

f.  Liability for any Discharge of any Hazardous Substance (but not including the migration of any Hazardous Substance from a Discharge that occurred prior to approval of this Settlement Agreement but enters the Newark Bay Complex thereafter) occurring after the Effective Date of this Settlement Agreement;

g.  Liability for future air emissions;

h.  Criminal liability; and

i.  Obligations of Tierra or Maxus under current administrative orders, consent decrees, or judgments to which Tierra or Maxus is a party, including, but not limited to, the Upland Orders, as long as Plaintiffs shall also enforce these obligations against OCC to the extent OCC is obligated under these administrative orders, consent decrees or judgments; Plaintiffs may only pursue Claims with respect to those obligations against Settling Defendants other than Tierra or Maxus, if, and only if, Plaintiffs have satisfied the conditions in Paragraph 46 below, unless OCC is not responsible for the obligation(s) under the administrative order, consent decree or judgment.

27.     Notwithstanding any of the above reservations by Plaintiffs, Settling Defendants
reserve all defenses they may have to these Claims or actions, including but not limited to all
defenses based on lack of personal jurisdiction.

## VIII. PLAINTIFFS' COVENANT NOT TO SUE OCC AND RESERVATION OF RIGHTS

28.     In exchange for the consideration provided by the Settling Defendants, including
(without limitation) the payments the Settling Defendants are making pursuant to Paragraph 21
above, and except as otherwise provided in Paragraphs 29, 43, 44, 45, 46 and 49 below,
Plaintiffs, on their own behalf and on behalf of the State of New Jersey and its departments and
agencies, covenant not to sue for, and not to take or procure judicial or administrative action
(including, without limitation, the issuance of a directive) with respect to, any of the OCC
Resolved Claims listed below against OCC including (without limitation) under New Jersey and
federal statutory and common law.  For purposes of the covenant not to sue described in
Paragraphs 28 and 29, and contribution protection in Paragraphs 62 and 63, OCC shall include
its respective officers, directors, employees, and predecessors.  For purposes of the covenant not
to sue described in Paragraphs 28 and 29 and contribution protection in Paragraphs 62 and 63,
OCC shall also include those direct and indirect parents, Affiliates, members (in the case of a
limited liability corporation), partners (in the case of partnerships), joint venturers (in cases of
joint ventures), successors, and subsidiaries (both present and former), (i) to the extent that the
alleged liability of any such parent, Affiliate, member, partner, joint venturer, successor, or
subsidiary is based upon its status and in its capacity as an entity related to OCC and not to the
extent that the alleged or potential liability of such entity arises independently of its status and
capacity as a related entity of OCC, or (ii) any other persons or entities that are, or are
adjudicated to be in the future, indemnitees of OCC under the SPA, but only to the extent such

-30-

liability is based solely on the person's or entity's status as an indemnitee of OCC under the SPA. Subject to Paragraph 29, this covenant not to sue shall apply to any and all of the following Claims (hereinafter "OCC Resolved Claims"):

    a. All Claims against OCC for Past Cleanup and Removal Costs paid or incurred by Plaintiffs, Settling Defendants, OCC, Third-Party Defendants, or any other person in connection with Discharges of Hazardous Substances to the Newark Bay Complex brought or which otherwise could have been brought by Plaintiffs in the Passaic River Litigation;

    b. All Claims against OCC for Economic Damages (whether by Plaintiffs' Claims or those assigned to Plaintiffs by other persons), now or in the future, associated with Discharges of Hazardous Substances to the Newark Bay Complex caused, in whole or in part, by OCC, but not by OCC/DSCC Deliberate Conduct or OCC Distinct Conduct;

    c. All Claims against OCC for disgorgement damages (whether by Plaintiffs' Claims or those assigned to Plaintiffs by other persons), now or in the future, associated with Discharges of Hazardous Substances to the Newark Bay Complex related, in whole or in part, to the conduct of OCC, but not by OCC/DSCC Deliberate Conduct or OCC Distinct Conduct;

    d. All Claims against OCC for punitive or exemplary damages (whether by Plaintiffs' Claims or those assigned to Plaintiffs by other persons), now or in the future, associated with Discharges of Hazardous Substances to the Newark Bay Complex resulting, in whole or in part, from actions or failures to act by OCC, but not by OCC/DSCC Deliberate Conduct or OCC Distinct Conduct;

-31-

e. All Claims against OCC for Natural Resource Damages (including Natural
Resource Damage Assessment Costs), now or in the future, associated with
Discharges of Hazardous Substances into the Newark Bay Complex for which
OCC is or may be allegedly liable, but not by OCC/DSCC Deliberate Conduct or
OCC Distinct Conduct; and

f. All Claims against OCC for attorneys' fees and litigation costs incurred by
Plaintiffs in the Passaic River Litigation prior to the Effective Date of this
Settlement Agreement.

29. Notwithstanding anything to the contrary herein, including Plaintiffs' covenant
not to sue OCC in Paragraph 28, Plaintiffs reserve, and this Settlement Agreement is without
prejudice to and shall have no effect and limitation on, all rights and Claims against OCC
concerning the following:

a. Future Cleanup and Removal Costs (including recoverable attorneys' fees)
actually paid or incurred (not including unpaid future obligations and excluding
any internal government expenditures for employee salaries, benefits, and
overhead not subject to reimbursement by U.S. EPA) by the State of New Jersey,
including any of its departments and agencies, in connection with the FFS Area
pursuant to the Diamond Alkali Superfund Process;

b. Future Cleanup and Removal Costs (including recoverable attorneys' fees)
actually paid or incurred (not including unpaid future obligations) by the State of
New Jersey, including any of its departments and agencies, in connection with the
Lister Property pursuant to the Diamond Alkali Superfund Process;

-32-

c. Future Cleanup and Removal Costs (including recoverable attorneys' fees) actually paid or incurred (not including unpaid future obligations) by the State of New Jersey, including any of its departments and agencies, up to $35,400,000 and in excess of $70,800,000 in connection with areas of the Newark Bay Complex outside of the FFS Area (but not with respect to the Lister Property itself), if and only if the conditions in Paragraph 45 below are satisfied;

d. Cleanup and Removal Costs or damages not caused, in whole or in part, by Discharges of Hazardous Substances from the Lister Property and for which response or remedial action is not taken as part of the Diamond Alkali Superfund Process;

e. Liability for any Discharge of any Hazardous Substance (but not including the migration of any Hazardous Substance from a Discharge that occurred prior to the Effective Date of this Settlement Agreement but enters or moves within the Newark Bay Complex thereafter) occurring after the Effective Date of this Settlement Agreement;

f. Liability for any future air emissions;

g. Criminal liability;

h. Claims for the following categories of damages to the extent that OCC's liability is predicated upon OCC/DSCC Deliberate Conduct or OCC Distinct Conduct:

   i.   Economic Damages,

   ii.  Disgorgement damages,

   iii. Punitive and exemplary damages, or

   iv.  Natural Resource Damages;

-33-

    i.   Claims for attorneys' fees and litigation costs incurred by Plaintiffs in the Passaic River Litigation on or after the Effective Date or on or after July 1, 2013 for Claims under Sub-paragraphs 29(h) and 29(j);

    j.   Cleanup and Removal Costs actually paid or incurred between July 1, 2013 and the Effective Date of this Agreement (not including unpaid future obligations and excluding any internal government expenditures for employee salaries, benefits, and overhead not subject to reimbursement by U.S. EPA) by the State of New Jersey, including any of its departments and agencies, in connection with the FFS Area pursuant to the Diamond Alkali Superfund Process; and

    k.   OCC's liability or obligations, if any, under current administrative orders, consent decrees, or judgments, including, but not limited to, the Upland Orders.

For purposes of Subparagraph 29(c), Cleanup and Removal Costs actually paid or incurred by the State of New Jersey shall still be considered paid or incurred even if such costs are recovered from or reimbursed by OCC or any person not a Settling Defendant; provided, however, that there shall never be any double recovery by the State of New Jersey.  For the avoidance of doubt, the State of New Jersey will not seek to collect from OCC Future Cleanup and Removal Costs associated with areas of the Newark Bay Complex outside the FFS Area (but not with regard to the Lister Property) between \$35,400,001 and \$70,799,999, but may seek to collect Future Cleanup and Removal Costs above or below such amounts; provided, however, as set forth in Paragraph 50, the monetary restrictions in Subparagraph 29(c) shall be void and not applicable if the Third-Party Consent Judgment is not approved by the Court (or not upheld on appeal if an appeal is filed).  The monetary restrictions in Subparagraph 29(c) shall also not apply to any Future Cleanup and Removal Costs for which OCC is not jointly liable with a Settling Third-

Party Defendant for such Future Cleanup and Removal Costs. Nothing herein requires Plaintiffs to pursue OCC and/or any person not a Settling Defendant in separate suits or proceedings or to segregate their liability, but Plaintiffs agree to collect any such Future Cleanup and Removal Costs consistent with the terms of this Paragraph.

## IX. PLAINTIFFS' ADDITIONAL COVENANTS AND RESERVATIONS

30.     Subject to Plaintiffs' covenants in Sections VII through IX, Plaintiffs retain all authority, and reserve all rights, to undertake any further remediation authorized by law concerning the Newark Bay Complex. The covenants contained in Sections VII through IX do not pertain to any matters other than those expressly stated.

31.     Plaintiffs acknowledge and agree that U.S. EPA is, and Plaintiffs will not seek to become, the designated lead agency with respect to all response actions selected, to be selected and/or conducted as part of the Diamond Alkali Superfund Process. Plaintiffs agree to defer to U.S. EPA's final decisions on the selection of a remedy or remedies within the Diamond Alkali Superfund Site as determined by the formal Diamond Alkali Superfund Process, and Plaintiffs shall not use State authorities to select or require separate and/or additional response action(s) for the Diamond Alkali Superfund Site from those selected by U.S. EPA in implementing the Diamond Alkali Superfund Process. Nothing in this Paragraph shall limit Plaintiffs' authority or action related to response actions that do not address Hazardous Substances Discharged or released from the Lister Property or that address Hazardous Substances Discharged or released from a Third-Party Site other than the Lister Property. Furthermore, nothing in this Paragraph shall obligate Plaintiffs or the State of New Jersey to provide or to not provide, or agree to or not agree to permanent use of, State of New Jersey lands or take title to land, or not take title to land, for the implementation of any remedy or response action for the Diamond Alkali Superfund Site.

-35-

32.     Plaintiffs agree not to oppose any application made by any Settling Defendant or OCC to U.S. EPA for a waste classification determination that sediments in the FFS Area do not contain listed hazardous wastes and/or are not "Hazardous Wastes from Non-Specific Sources" pursuant to 40 C.F.R. § 261.3. To the extent reasonable and within ordinary agency discretion, Plaintiffs will use good faith efforts to resolve their differences and to coordinate with the Settling Defendants and OCC on future regulatory issues associated with the Diamond Alkali Superfund Process.

33.     Plaintiffs covenant not to support OCC, directly or indirectly, in connection with the prosecution of OCC's Cross-Claims (or any Claims based on the same operable facts) against Settling Defendants, except as required by law.  Plaintiffs reserve their right to seek testimony and documents from Maxus in connection with the Plaintiffs' prosecution of the Claims reserved against OCC in Paragraph 29, and Maxus agrees, except as prohibited by law or the SPA, to cooperate in responding to those requests to the extent reasonably possible.

34.     Entry or approval of, or performance under, this Settlement Agreement and/or the payment of the Settlement Funds under the terms hereunder do not constitute grounds for personal jurisdiction over any of the Settling Defendants in New Jersey or any of the United States, except solely to the limited extent necessary to enforce the terms of this Settlement Agreement and any future obligations of Settling Defendants under this Settlement Agreement, for which Settling Defendants expressly agree that service will not be required and that each will appear and not contest the jurisdiction of the courts of the State of New Jersey over them for those limited purposes.

35.     Plaintiffs and Settling Defendants agree to join and support each other in defending this Settlement Agreement, the Dismissal Order and the Case Management Order in

-36-

any appeal thereof, and in seeking to dismiss any Claim that is barred or otherwise precluded by this Settlement Agreement brought against that Settling Defendant after approval of this Settlement Agreement and the entry of the Dismissal Order and the Case Management Order.

## X. CAP ON SETTLING DEFENDANTS' FUTURE LIABILITY

36.     For the purposes of this Settlement Agreement, "Capped Claims" shall mean the Claims reserved against OCC under Subparagraphs 29(a) and 29(j) ("Category I Capped Claims") and Subparagraph 29(h) and 29 (i) ("Category II Capped Claims").

37.     If the requirements in paragraph 41 are met, Plaintiffs agree to reduce their recovery of any judgment or settlement against OCC for costs and damages recovered for Capped Claims in the Passaic River Litigation or any future action subject to the Cap, so that Plaintiffs will not recover more than the Cap (Four Hundred Million ($400,000,000) Dollars) or the amounts of the Sub-caps, as applicable.  For the avoidance of doubt, and irrespective of which Cap or Sub-cap, if any, may be triggered, the Settling Defendants' combined total exposure for Capped-Claims shall not exceed $400 million (plus the upfront payments provided for in Paragraph 21).

38.     Further, if the requirements in Paragraph 41 are met, Plaintiffs agree to reduce their recovery of any future judgment or settlement against OCC for Investigation Costs incurred in the FFS Area, so that Plaintiffs will not recover more than the amount of Sub-cap A (Twenty Million ($20,000,000) Dollars) for such costs.  For purposes of this Settlement Agreement, Investigation Costs shall mean all costs under Category I Capped Claims in (i) the investigation of the environmental condition of the FFS Area or the selection of a remedy for the FFS Area (but not the implementation of a remedy or evaluating and/or developing navigation in the FFS Area), and (ii) a removal action for the FFS Area not taken or directed by U.S. EPA.  For

avoidance of doubt, Investigation Costs shall include the costs of site investigation and evaluation, sampling and analysis of environmental media, gathering of geological, hydrological and other scientific data, risk assessment, remedial investigation, and feasibility studies.

39.    If the requirements in Paragraph 41 are met, Plaintiffs also agree to reduce their collection of any future judgment or settlement against OCC for Category II Capped Claims so that Plaintiffs will not recover more than the amount of Sub-cap B (Two Hundred Fifty Million ($250,000,000) Dollars) against OCC with respect to Category II Capped Claims for which Repsol is held liable to OCC, and will not recover more than the amount of the Cap (Four Hundred Million ($400,000,000) Dollars from Repsol and YPF(I) in total.

40.    If the requirements in Paragraph 41 are met, Plaintiffs also agree to reduce their collection of any future judgment or settlement against OCC for Category II Capped Claims so that Plaintiffs will not recover more than the amount of Sub-cap C (Two Hundred Fifty Million ($250,000,000) Dollars) against OCC with respect to Category II Capped Claims for which YPF(I) is held liable to OCC, and will not recover more than the amount of the Cap (Four Hundred Million ($400,000,000) Dollars from Repsol and YPF(I) in total.

41.    The Cap and Sub-caps referenced in Paragraphs 36, 37, 38, 39 and 40 apply if, and only if:

> i.    OCC is successful in obtaining a final, non-appealable, judgment against Repsol and/or YPF(I) holding Repsol and/or YPF(I) liable to OCC (under theories asserted or that could be asserted in the Cross-Claims) for some or all of the costs or damages recovered by Plaintiffs under the Capped Claims; and

-38-

ii. Repsol and/or YPF(I) satisfy and pay such OCC judgment(s) up to the amount of the applicable Caps or Sub-caps. In the event that some of Repsol, YPF or YPFI pay their individual share, but some do not, only the Settling Defendants that pay their share will have the benefit of the Cap and any applicable Sub-cap.

42. The Cap and Sub-caps do not apply to the Settlement Funds, and the Cap and Sub-caps do not apply to, and are not reduced or affected in any way by, any monies paid to Plaintiffs by any other person or entities, including the Settling Third-Party Defendants ("Other Recoveries"). Pre-Judgment and Post-Judgment interest on any Capped Claim shall be subject to the Cap or applicable Sub-cap.

43. The Cap and Sub-caps are intended to cap and limit Settling Defendants' ultimate maximum exposure for the costs and damages recovered under the applicable Capped Claims, but only to the extent that Repsol and/or YPF(I) are held liable to and pay OCC for the particular Capped Claims and amounts upon which Plaintiffs recover. The Cap and Sub-caps shall apply to the aggregate of any amounts recovered by Plaintiffs through Capped Claims (exclusive of the Settlement Funds), but only to the extent that Repsol and/or YPF(I) are held liable to and pay OCC for the particular Capped Claims and amounts upon which Plaintiffs recover.

43.1 If the Plaintiffs recover from OCC an amount greater than the Cap or an applicable Sub-cap for the Capped Claims, the amounts above the Cap or applicable Sub-cap shall be held in escrow by Plaintiffs pending a determination and satisfaction of OCC's Claims against Repsol and YPF(I). Plaintiffs agree that any interest that accrues on the funds held in escrow shall be payable to Plaintiffs and may be withdrawn by Plaintiffs at any time, and Settling Defendants disavow any rights thereto. If OCC is

-39-

ultimately successful in obtaining and collecting upon a final, non-appealable judgment
against Repsol and/or YPF(I) holding Repsol and/or YPF(I) responsible to OCC for
damages subject to the Cap or an applicable Sub-cap, the Plaintiffs will then reduce their
recovery of any judgment or settlement in conformity herewith and return excess funds, if
any, to OCC. If Repsol and YPF(I) are successful in defeating all of OCC's Claims for
costs and damages subject to the Cap or applicable Sub-caps in final and non-appealable
form or if OCC does not pursue Repsol and YPF(I) for Claims for costs and damages
subject to the Cap or applicable Sub-caps within the applicable limitations period, the
funds held in escrow shall be distributed to Plaintiffs. Repsol and YPF(I) shall diligently
defend any action by OCC for costs and/or damages subject to the Cap or Sub-caps and
shall not unreasonably delay or postpone any such action for the purpose of frustrating
the Plaintiffs' recovery of money held in escrow under this Settlement Agreement.

43.2    If both Repsol and YPF(I) are successful in defeating OCC's Claims
against them in a final and non-appealable form for a Capped Claim, the Cap or Sub-caps
shall not be applicable or limit any recovery by Plaintiffs from OCC and any money held
in escrow shall be released to Plaintiffs. Likewise, if Repsol, YPF and/or YPFI do not
satisfy a final and non-appealable judgment in favor of OCC for a Capped Claim within
four (4) years of issuance, the Cap or Sub-caps shall not be applicable for the amount of
the unsatisfied judgment by the non-paying Settling Defendant or limit any recovery by
Plaintiffs from OCC for such amount (and any money held in escrow shall be released to
Plaintiffs). In the event OCC's judgment is several as to Repsol, YPF and/or YPFI, the
Cap or applicable Sub-cap shall not apply to that portion of the judgment awarded against
the particular Settling Defendant that failed to satisfy a final and non-appealable

-40-

judgment, provided that no Settling Defendant shall be required to pay more than the applicable Cap or Sub-cap.

43.3    If both Repsol and YPF(I) are successful in defeating some or all of OCC's Claims against them for Category I Capped Claims only, then the Cap or Sub-cap is inapplicable to that category of costs and damages and there is no cap on the amount of funds Plaintiffs may recover from OCC for a Category I Capped Claim. Likewise, if both Repsol and YPF(I) are successful in defeating some or all of OCC's Claims against them for Category II Capped Claims only, then the Cap or any Sub-cap is inapplicable to that category or sub-category of damages in which both Repsol and YPF(I) prevailed.

43.4    To the extent that either Repsol alone or YPF(I) alone are held liable to OCC, in a final and non-appealable order, for any amount of a Capped Claim, then the particular entity found liable (or entities, in the event that both YPF and YPFI are found liable) shall pay the relevant capped amount to OCC. To the extent that both Repsol and YPF(I) are held, in a final and non-appealable order, jointly and severally liable to OCC for any amount of the Capped Claims, they hereby agree to each pay to OCC 50% of that amount, subject to any applicable Caps. To the extent that Repsol and YPF(I) are both held liable to OCC, in a final and non-appealable order, for Capped Claims in a proportionate ratio other than on a joint and several basis, they shall each pay to OCC the portion of the amount under the Cap that is consistent with that ratio of liability. To the extent that Repsol or YPF(I) are held liable to OCC, in a final and non-appealable order, for a Capped Claim in an amount that is less than the Cap or applicable Sub-cap, this Settlement Agreement shall not require any entity to pay more to OCC than the amount for which it has been liable. Nothing herein shall be construed to result in any Settling

-41-

Defendant being responsible for more than the amount of the Capped Claims, if any, for which that particular entity is found liable to OCC. Notwithstanding Paragraph 19.64, except as to payments made pursuant to Paragraph 21 herein, Repsol and YPF(I) hereby reserve any and all contribution and other rights and claims each may have against the other with respect to any liabilities that Repsol and/or YPF(I) are determined, in a final and non-appealable order, to have in the Passaic River Litigation (including without limitation the Capped Claims) and otherwise between Repsol, YPF and YPFI related to this or any other matter.

43.5    Examples of the application of the Cap and Sub-caps are set forth on Schedule 1, which examples are incorporated herein by reference. These examples are intended to provide an interpretive guide in applying the Cap and Sub-caps to future events.

43.6    In any proceedings against OCC with respect to Category I Capped Claims, Plaintiffs may rely upon the existing judgment against OCC in the Passaic River Litigation, the facts underpinning such judgment (including facts associated with DSC-1/DSCC) and/or upon OCC Distinct Conduct or OCC/DSCC Deliberate Conduct. But in any portion of a proceeding with respect to Category II Capped Claims, Plaintiffs may not rely on the existing judgment for OCC's liability to establish OCC/DSCC Deliberate Conduct or OCC Distinct Conduct; provided, however, Plaintiffs may use the existing judgment for purposes of establishing OCC's liability as the corporate successor to DSC-1/DSCC in any Claim against OCC.

43.7    Plaintiffs covenant that they will clearly indicate the different standards for OCC/DSCC Deliberate Conduct applicable to Category II Capped Claims and

damages recoverable thereunder in all relevant submissions to the Court or requested submissions to a jury (including, but not limited to, summary judgment motions, proposed findings of facts and conclusions of law, proposed jury instructions and proposed verdict forms). Plaintiffs are not restricted in the evidence or types of evidence they may seek to introduce in any Category II Capped Claim.

43.8    This Settlement Agreement shall not limit the causes of action Plaintiffs may assert (including the causes of action currently in the Complaint) in any Capped Claim or require Plaintiffs or a finder of fact to segregate or allocate damages resulting from OCC/DSCC Deliberate Conduct or OCC Distinct Conduct from any other damages in the event of joint and several liability. Further, nothing in this Settlement Agreement shall limit Plaintiffs' ability to establish any element of a cause of action or damages subject to a Capped Claim or prevent Plaintiffs from meeting any obligation to satisfy a required higher standard of liability for damages under a Capped Claim, including Punitive Damages. For example, Plaintiffs allege and intend to put on evidence that OCC and its predecessors DSC-1/DSCC intentionally Discharged dioxins and other Hazardous Substances directly into the Passaic River for years (and that the plant on the Lister Property was in fact designed to do so) in prosecuting the Plaintiffs' causes of action against OCC. In order to recover Category I Capped Claims under the Spill Act, Plaintiffs may only need to prove that OCC is a Discharger. As provided herein, in order to recover on a Category II Capped Claim, Plaintiffs must obtain a finding that Discharges were the result of OCC/DSCC Deliberate Conduct (though Plaintiffs do not have to demonstrate that OCC knew or understood the consequences or effects of its acts or omissions, nothing herein prevents Plaintiffs from putting on evidence of such

-43-

knowledge or intent) or OCC Distinct Conduct. In addition, to recover Punitive Damages under a Category II Capped Claim, Plaintiffs must also meet any higher standard of liability or proof required for recovery of Punitive Damages under New Jersey law.

43.9    With respect to Claims reserved against OCC under Paragraph 29 above, nothing herein prevents Plaintiffs from pursuing declaratory relief against OCC for costs and damages for the Capped Claims or limit Plaintiffs ability to pursue OCC for Claims that are not Capped Claims.

## XI. PLAINTIFFS' COVENANTS AND RESERVATIONS OF RIGHTS WITH RESPECT TO FUTURE CLEANUP AND REMOVAL COSTS

44.    Nothing in this Settlement Agreement shall mitigate or limit (i) OCC's or Tierra's obligations to perform response actions or provide access as respectively applicable under the Upland Orders, (ii) Plaintiffs' or the State of New Jersey's right or ability, if any, to enforce the Upland Orders against OCC or Tierra, or (iii) Plaintiffs' or the State of New Jersey's right, if any, to seek to require OCC to perform future response actions or cleanup and removal actions at the Lister Property.

45.    For any and all Claims reserved by Plaintiffs against OCC for Future Cleanup and Removal Costs at parts of the Diamond Alkali Superfund Site outside of the FFS Area, as reserved in Subparagraph 29(c) (but not at the Lister Property itself), Plaintiffs covenant that the following conditions must be met before or as part of asserting such Claims or taking administrative action against OCC:

> i.    The additional response action or Cleanup and Removal Costs sought are undertaken or incurred, or to be undertaken, as part of the Diamond Alkali Superfund Process;

-44-

     ii.     Plaintiffs are able to demonstrate, to the extent required by law, a causal nexus between Discharges which occurred prior to the Effective Date at or from the Lister Property and the response action or Cleanup and Removal Costs incurred or required to be incurred by the Plaintiffs;

     iii.     In any action or proceeding other than the Passaic River Litigation, Plaintiffs will also reasonably pursue liability as to non-governmental entities that Plaintiffs reasonably determine are responsible for known Discharge(s) that are or may be substantial contributing factors to such Cleanup and Removal Costs, subject to Plaintiffs' reasonable and non-arbitrary discretion to enforce or pursue state or federal law, or policies, and any covenant not to sue provided by Plaintiffs; and

     iv.     Plaintiffs do not join, and Plaintiffs hereby covenant not to join, any Settling Defendant or otherwise bring any Claims against any Settling Defendant in such action or Trial Track.

46.     For any and all Claims reserved by Plaintiffs against Settling Defendants in Subparagraphs 26(c) and 26(e), and those claims reserved against Settling Defendants other than Maxus and Tierra under Subparagraphs 26(b) and 26(i), the following conditions must be met before Plaintiffs may assert such Claims or take administrative action against Settling Defendants:

     i.     OCC is first adjudicated liable to Plaintiffs with respect to such Claims; and

-45-

ii.     Plaintiffs are able to demonstrate that OCC is insolvent or otherwise without sufficient resources to fully satisfy Plaintiffs' judgment against OCC for these Claims or costs, and Plaintiffs have exhausted all reasonable avenues of relief available to them against OCC, including but not limited to pursuing Claims in bankruptcy court. To the extent OCC is able to satisfy the judgment in part, Plaintiffs shall collect the portion of the judgment that OCC is able to satisfy from OCC before pursuing Claims against the Settling Defendants.

iii.    With respect to Claims under Subparagraph 26(c) only and to the extent applicable, Plaintiffs have satisfied the conditions of Subparagraph 45(iii); and

iv.     If, in any action brought by Plaintiffs against OCC and/or any other non-governmental entity, OCC and/or any other non-governmental entity files a third-party complaint against any Settling Defendant, Plaintiffs shall cooperate with that Settling Defendant in seeking to have OCC's and/or the non-governmental entity's case against that Settling Defendant tried in a separate proceeding or subsequent trial track, and Plaintiffs shall not participate or assist in OCC's and/or the non-governmental entity's prosecution of such Claims against that Settling Defendant.

For any and all Claims reserved by Plaintiffs against Settling Defendants in Subparagraph 26(e) in connection with areas outside the Newark Bay Complex for which OCC is not adjudicated

-46-

liable, Plaintiffs may pursue the claims reserved under Subparagraph 26(e) without meeting the conditions in Subparagraphs i-iv of this Paragraph 46.

47.    Except as provided by Paragraph 67, in any such action under Section XI, Settling Defendants shall retain all defenses they may have, including, but not limited to, the defense of a lack of personal jurisdiction and the Court's prior decision on personal jurisdiction shall have no res judicata or collateral estoppel effect; provided, however, that any limitations period, if any, applicable to Plaintiffs' Claims against the Settling Defendants reserved under Subparagraphs 26(b), 26(c) or 26(e) shall be tolled from the time Plaintiffs' first bring a Claim against OCC until two (2) years after OCC defaults on (i) a payment obligation under a final non-appealable judgment in favor of Plaintiffs or (ii) a settlement agreement or consent decree with Plaintiffs. In the event OCC is in bankruptcy proceedings or other insolvency proceedings, this limitations period shall be further tolled until one (1) year after the conclusion of such proceedings.

48.    The approval of this Settlement Agreement shall have no effect and shall not disturb the Plaintiffs' Claims reserved under the December 15, 2010 and April 24, 2012 orders reserving such Claims against persons other than the Settling Defendants. With respect to Claims of the Plaintiffs against the Settling Defendants, this Settlement Agreement shall supersede those orders.

49.    Except as provided in Subparagraphs 25(i), 26(e), and 26(i), the Parties agree that this Settlement Agreement shall not release, be applied as a credit against, a defense to, contribution protection for, or a compromise of any Claims, costs, damages or penalties that are the subject of an Other Action. Further, except as provided by Sub-paragraphs 25(i), 26(e), and 26(i), Plaintiffs reserve, and this Settlement Agreement is without prejudice to, the right to institute proceedings against any or all of the Settling Defendants in any Other Action. Settling

-47-

Defendants reserve all defenses they may have to such Other Actions, including, but not limited to, defenses based on the lack of personal jurisdiction.

## XII. SETTLING DEFENDANTS' COVENANTS

50.    Subject to the conditions in Section XXI, the Settling Defendants agree to support and covenant not to oppose entry of an order approving this Settlement Agreement by this Court, or to challenge any provision of this Settlement Agreement, unless Plaintiffs notify the Settling Defendants, in writing, that they no longer support entry of this Settlement Agreement. This Settlement Agreement shall be presented to the Court for its approval prior to or simultaneously with the Third-Party Consent Judgment. Settling Defendants further represent that they will not oppose and covenant not to oppose, either before the Court or on appeal, the entry of the Third-Party Consent Judgment by this Court, and will not challenge any provision of the Third-Party Consent Judgment or the dismissal of the Settling Third-Party Defendants from the Passaic River Litigation. In the event that Plaintiffs withdraw from this Settlement Agreement or that this Settlement Agreement is not approved by the Court, or is overturned, disapproved or materially modified on appeal, Settling Defendants' covenant not to oppose the entry of the Third-Party Consent Judgment or any of its provisions is null and void. Further, Plaintiffs agree that, if this Settlement Agreement is not approved by the Court or is overturned, disapproved or modified on appeal (except for ministerial changes only), Plaintiffs shall (i) reopen the public comment period concerning the Third-Party Consent Judgment for Sixty (60) days to allow the Settling Defendants to submit public comments on the Third-Party Consent Judgment; and (ii) withdraw the Third-Party Consent Judgment from the Court's consideration until the Settling Defendants have had an opportunity to submit public comments on the Third-Party Consent Judgment to the Plaintiffs and to submit briefs and arguments to the Court concerning the proposed approval of

-48-

the Third-Party Consent Judgment. In the event the Third-Party Consent Judgment is not entered by the Court or is overturned on appeal, the monetary restrictions on Plaintiffs' reservation under Subparagraph 29(c) (Future Cleanup and Removal Costs in excess of $35,400,000 and less than $70,800,000) shall not apply. For the avoidance of doubt, it is the Parties' mutual intent that the Court consider this Settlement Agreement and the Third-Party Consent Judgment simultaneously, but that the Court must decide whether to approve or disapprove this Settlement Agreement prior to deciding whether to approve or disapprove the Third-Party Consent Judgment. Nevertheless, Settling Defendants reserve the right to challenge in federal court any allegation or claim that the Third-Party Defendant Consent Judgment provides the Settling Third-Party Defendants with contribution protection as to any federal claim, and neither this Settlement Agreement nor the fact that the Settling Defendants did not challenge the Third-Party Consent Judgment shall waive or impede such rights.

51.     The Settling Defendants further covenant, subject to Paragraph 54 below, not to sue or assert any claim or cause of action (whether under federal or state law) for monetary relief against any Plaintiff or the State of New Jersey, including any department, authority or agency thereof, for the Settlement Funds or any other money recovered by Plaintiffs from OCC or the Settling Defendants for costs and damages subject to the Cap, including any direct or indirect claim for reimbursement from the Spill Fund, except that if the requirements of Paragraph 41 are met, Settling Defendants may seek to enforce Plaintiffs' obligations to return amounts in excess of the Cap or an applicable Sub-cap to OCC, pursuant to Section X. Maxus and Tierra covenant to dismiss all counterclaims asserted against Plaintiffs in the Passaic River Litigation.

52.     The Settling Defendants further covenant, subject to Paragraph 54 below, not to sue or assert any Claim or cause of action for monetary relief against the New Jersey Department

-49-

of Agriculture, the New Jersey Department of Transportation and the New Jersey Transit Corporation for any Past Cleanup and Removal Costs incurred in the Newark Bay Complex or Future Cleanup and Removal Costs with respect to the Diamond Alkali Superfund Process to the extent of the contribution protection provided by the Third-Party Consent Judgment, and the Settling Defendants covenant not to challenge the application of such contribution protection under the Spill Act as to the New Jersey Department of Agriculture, the New Jersey Department of Transportation and the New Jersey Transit Corporation.

53.    The Settling Defendants further covenant not to sue or assert any Claim or cause of action against any Settling Third-Party Defendant for monetary relief under the Spill Act for Cleanup and Removal Costs incurred with respect to the Diamond Alkali Superfund Process, but only to the extent that such Settling Third-Party Defendant has contribution protection with respect to such Claim or cause of action under the Third-Party Consent Judgment and the Third-Party Consent Judgment has been entered by this Court and becomes a final, non-appealable order.  Except in Other Actions, unless a Claim arises solely under a State law requiring a filing in a state court, Settling Defendants agree to assert any Claims against the Settling Third-Party Defendants that arise in whole or in part as a result of Discharges of Hazardous Substances into the Newark Bay Complex in federal court.  Notwithstanding any provision in this Paragraph, and except as provided by Paragraphs 51 and 52, if any Claims against a Settling Third-Party Defendant asserted in federal court are barred under the Eleventh Amendment of the United States Constitution nothing herein shall preclude or prevent Settling Defendants from bringing such Claims under State statute or common law in state court.  Notwithstanding the foregoing and the contribution protection afforded Settling Defendants from Spill Act claims asserted by a Settling Third-Party Defendant or any other person pursuant to Paragraphs 62 and 63, nothing

-50-

herein is intended to preclude any Settling Defendant from seeking to assert a claim, if any, against any Settling Third-Party Defendant for monetary relief under the Spill Act in the nature of offset for such Cleanup and Removal Costs incurred with respect to the Diamond Alkali Superfund Process in an amount, if any, that any Settling Third-Party Defendant seeks to recover from a Settling Defendant under the Spill Act for costs related to the Diamond Alkali Superfund Site.

54.     Any covenant not to sue or to assert any Claim or cause of action by a Settling Defendant against the State of New Jersey, or an agency, authority or department thereof, made with the Settling Defendants herein does not apply in the event, and to the extent, that Plaintiffs sue or take administrative action jointly or severally against Settling Defendants pursuant to Plaintiffs' reserved rights under Subparagraphs 26(c) or against Settling Defendants other than Maxus and Tierra under Subparagraphs 26(b). In the event, and only in the event that any of the Settling Defendants bring a claim against Plaintiffs or the State of New Jersey and/or its departments and agencies as provided in this Paragraph, those departments and agencies are not barred by this Settlement Agreement from asserting a cross-claim for contribution under federal or New Jersey law against the Settling Defendant bringing that claim.

55.     Settling Defendants agree not to enter and shall not enter into any settlement (or agreed judgment, contract or award) with OCC that would limit or cap Plaintiffs' rights or Claims against OCC, including the Capped Claims, in such a way as to trigger the Cap or Sub-caps, except upon written approval from Plaintiffs, or assign any rights or Claims to OCC that could be asserted against Plaintiffs. Plaintiffs agree not to enter and shall not enter into any settlement (or agreed judgment, administrative agreement or award) with OCC that would limit Settling Defendants' Claims against OCC related to the Newark Bay Complex/Diamond Alkali

-51-

Superfund Site Process (other than statutory contribution protection attendant to OCC's direct payment of future remediation costs) or Settling Defendants' defenses to OCC's Claims related to the Newark Bay Complex/Diamond Alkali Superfund Site Process against them. Notwithstanding the foregoing, nothing herein restricts or prevents the Plaintiffs from settling their Capped Claims for an amount of damages or for a guaranty of their future costs, or for a combination thereof, in an aggregate amount not to exceed the Cap and/or applicable Sub-caps so long as the amount of such settlement is not contingent on OCC's success in prosecuting Claims against Repsol and/or YPF(I). Notwithstanding the foregoing, no settlement between Plaintiffs and OCC shall provide OCC with contribution protection against Claims brought by any of the Settling Defendants to recover amounts they paid or caused to be paid to Plaintiffs under this Settlement Agreement.

56.    Nothing in this Settlement Agreement shall be deemed to constitute preauthorization of a claim against the Spill Fund within the meaning of N.J.S.A. 58:10-23.11k. or N.J.A.C. 7:1J.

## XIII.  SETTLING DEFENDANTS' RESERVATIONS

57.    Except as specifically addressed herein, Settling Defendants reserve all rights, Claims and defenses against any person not a Party to this Settlement Agreement.

58.    This Settlement Agreement, and any Dismissal Order entered pursuant to this Settlement Agreement, is not a judicially-approved settlement of liability as to any Claims in any Other Action, and the rights, Claims and defenses, including (without limitation) Claims for contribution and other third-party cross-claims of the Settling Defendants, in any Other Action, are expressly reserved. This Settlement Agreement, and any Dismissal Order entered pursuant to

-52-

this Settlement Agreement, shall not bar the assertion of any contribution and/or other Claims by any Settling Defendants against any other person or entity in any Other Action.

59.     Subject to Paragraphs 51 and 52 (Covenants Not to Sue), the Parties intend and agree that this Settlement Agreement, and the Dismissal Order entered pursuant to this Settlement Agreement, will not bar the assertion of any Claim or cause of action under a federal statute or federal common law ("United States Claims") for contribution or cost recovery and/or other United States Claims by any Settling Defendant against any other person.    Settling Defendants do not waive any Claims and rights under CERCLA or other federal law against OCC, any Settling Third-Party Defendant or against any other person or entity, and explicitly reserve any and all such United States Claims, including but not limited to Claims for cost recovery and contribution for Response Costs that may also constitute Cleanup and Removal Costs under the Spill Act and Natural Resource Damages under CERCLA.    Subject to Paragraphs 49 (Other Actions), and 51, 52 and 53 (Covenants Not to Sue), Settling Defendants reserve all rights, Claims and defenses, including (without limitation) contribution, under any federal or New Jersey statute or common law they have or may have against any person or entity, including (without limitation) OCC or any Settling Third-Party Defendant, for: (i) Discharges of Hazardous Substances into the Newark Bay Complex; (ii) costs, damages or judgments for any Claims asserted by Plaintiffs pursuant to Section VI; and (iii) any costs or damages unrelated to the contamination at or from the Lister Property and into the Newark Bay Complex or that otherwise are not being sought in the Passaic River Litigation.

60.     Settling Defendants reserve any rights to assert Claims for the Settlement Funds against OCC, including (but not limited to) rights and Claims under the Spill Act or CERCLA. Nothing in this Settlement Agreement shall require Maxus or Tierra to breach any defense or

-53-

indemnity obligations they may have to OCC under the SPA. To the extent a conflict arises between the terms of this Settlement Agreement and the defense and indemnity provisions of the SPA, Maxus and Tierra shall take all reasonable efforts to prevent the breach of either agreement.

### XIV. FINDINGS & NON-ADMISSIONS OF LIABILITY

61.    Nothing contained in this Settlement Agreement shall be considered an admission of any issue of fact or law or jurisdiction by the Settling Defendants as to any matter, or a finding by the Court or by Plaintiffs of any wrongdoing or liability on the Settling Defendants' part for any matters, including matters Plaintiffs and OCC have alleged in the Passaic River Litigation.

### XV. EFFECT OF SETTLEMENT AND CONTRIBUTION PROTECTION

62.    Nothing in this Settlement Agreement shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Settlement Agreement, except that under Paragraphs 28, 29 and 63, OCC shall be entitled to the protection under the Plaintiffs' covenant not to sue and to contribution protection. Further, nothing in this Settlement Agreement, including (without limitation) Plaintiffs' covenant not to sue under federal law, waives or limits, and shall not be deemed to waive or limit Eleventh Amendment immunity under the United States Constitution, if any, of the State of New Jersey or Plaintiffs, or consent to jurisdiction in federal court.

63.    Upon approval by this Court, this Settlement Agreement will constitute a judicially approved settlement of liability to the State of New Jersey within the meaning of N.J.S.A. 58:10-23.11f.a.(2)(b) and, within the meaning of 42 U.S.C. § 9613(f)(2), and under common law for the Matters Addressed identified below, for the purpose of providing protection

-54-

to the Settling Defendants from contribution actions brought by OCC or by any other person or entity:

        a.     The Parties agree, and the Court by approving this Settlement Agreement so intends, that except as provided in Paragraph 49 (Other Actions), the Settling Defendants are entitled, upon satisfying their payment obligations under Paragraph 21 of this Settlement Agreement, to protection from any and all contribution Claims for all such Matters Addressed, and OCC is likewise entitled to protection from any and all contribution Claims by persons other than the Settling Defendants to the extent that OCC is entitled to indemnification for such Claims from any of the Settling Defendants under the SPA, relating to all of the Matters Addressed listed below:

            i.     Past Cleanup and Removal Costs of Plaintiffs and any other person (including the Third-Party Defendants) under applicable State law associated with Discharges of Hazardous Substances (including Hazardous Substances contained in sewage and stormwater) to the Newark Bay Complex;

           ii.     Future Cleanup and Removal Costs of Plaintiffs and any other person (including the Third-Party Defendants) under applicable State law associated with Discharges of Hazardous Substances (including Hazardous Substances contained in sewage and stormwater) to the Newark Bay Complex;

-55-

iii.    Past Cleanup and Removal Costs of Plaintiffs, the State of New Jersey, its agencies and departments, under CERCLA or other federal law;

iv.    Natural Resource Damages Assessment Costs related to the Newark Bay Complex;

v.    Natural Resource Damages associated with the Newark Bay Complex under applicable state and federal law, with respect to Settling Defendants only;

vi.    All Economic Damages incurred by Plaintiffs, the State of New Jersey, its agencies and departments, or assigned thereto, now or in the future, with respect to the Newark Bay Complex;

vii.    All disgorgement damages awarded to Plaintiffs against OCC, now or in the future, with respect to the Newark Bay Complex;

viii.    All punitive or exemplary damages awarded to Plaintiffs against OCC, now or in the future, with respect to the Newark Bay Complex; and

ix.    The Settlement Funds paid herein by each Settling Defendant, provided, however, that contractual indemnity Claims for Settlement Funds are not barred.

b.    The Parties agree, and the Court by approving this Settlement Agreement so intends, that Matters Addressed shall not include and this Settlement Agreement should not be construed to limit or provide protection from contribution for:

-56-

i.      Against Settling Defendants only, Claims for Cleanup and Removal Costs or other damages or claims for which Plaintiffs have reserved their rights under Paragraphs 26, 44, 46, and 49 of this Settlement Agreement, in the event that, and only to the extent that, Plaintiffs assert rights against the Settling Defendants within the scope of those reservations;

ii.     With respect to OCC only, Claims for Cleanup and Removal Costs or other damages or claims for which Plaintiffs have reserved their rights under Paragraphs 29, 44, 45, 48, and 49 of this Settlement Agreement, in the event that, and only to the extent that, Plaintiffs assert rights against OCC within the scope of those reservations;

iii.    Past Cleanup and Removal Costs incurred by OCC, Settling Defendants, Third-Party Defendants or any other person (excluding the State of New Jersey and any agencies and departments thereof) sought under CERCLA or other federal law;

iv.     Future Cleanup and Removal Costs incurred by OCC, Settling Defendants, Third-Party Defendants or any other person (excluding the State of New Jersey and any agencies and departments thereof) sought under CERCLA or other federal law;

v.      Future Cleanup and Removal Costs of Plaintiffs or any other person for future Discharges of Hazardous Substances after the Effective Date of this Settlement Agreement under State or federal law;

-57-

vi.    Relief sought in any Other Action; and

vii.    Claims reserved by Settling Defendants in Paragraphs 58 and 59.

c.    This Settlement Agreement and the Dismissal Order shall not be a release of or a compromise of any Claims, costs, damages or penalties under CERCLA or other federal law by any Settling Defendant; nor shall it be a release of or a compromise of any Claims, costs, damages or penalties under CERCLA or other federal law by any person or entity not a party to this Settlement Agreement, nor of any Claims, costs, damages or penalties in any Other Action.  Any Settling Defendant and any person or entity not a Party to this Settlement Agreement (including Third-Party Defendants) may assert Claims under CERCLA or other federal law against any person or entity, including any Settling Defendant, and such Claims are not intended to be barred by CERCLA § 113(f)(2), except as specifically provided in Subparagraph (a) herein or with respect to the State of New Jersey as provided in Paragraphs 51 and 52.

d.    Nothing in this Settlement Agreement shall be interpreted as a waiver by Maxus and Tierra (or any other Settling Defendants) of their right to pursue Claims for contribution and/or indemnity against OCC in any subsequent litigation or as counterclaims to OCC's cross-claims in the Passaic River Litigation.  Furthermore, nothing in this Settlement Agreement shall be interpreted as a waiver or abrogation of Plaintiffs' obligation to protect the public health, safety and environment or fulfill its legal mandates.

-58-

e.    Plaintiffs agree to cooperate with the Settling Defendants in establishing whether Cleanup and Removal Costs sought in the Passaic River Litigation were consistent and/or not inconsistent with the National Contingency Plan ("NCP"). To the extent that any portion of the Settlement Funds are not entitled to credit as response and/or remediation costs paid under CERCLA, the Parties agree that such Settlement Funds shall be considered payment for Natural Resource Damages owed by Settling Defendants, but shall not otherwise limit or reduce any Claim or recovery by Plaintiffs or any federal trustee in any Natural Resources Damages action against OCC. Settling Defendants reserve their right to seek testimony and documents from Plaintiffs regarding the NCP consistency, and Plaintiffs agree to cooperate in responding to those requests to the extent reasonably possible, except as prohibited by law. Failure of the Settling Defendants to obtain a credit for purposes of contribution protection with respect to payment of the Settlement Funds shall not limit or otherwise affect any other provision of this Settlement Agreement.

64.    In order for the Settling Defendants to obtain protection under N.J.S.A. 58:10-23.11f.a.(2)(b) from contribution Claims concerning the Matters Addressed in this Settlement Agreement, Plaintiffs published notice of this Settlement Agreement in the New Jersey Register and on Plaintiff DEP's website on July 1, 2013, in accordance with N.J.S.A. 58:10-23.11e.2. Such notice included the following information:

a.    the caption of this case;

     b. the name and location of the Newark Bay Complex;

     c. the names of the Settling Defendants; and

     d. a summary of the terms of this Settlement Agreement.

65. Plaintiffs, in accordance with N.J.S.A. 58:10-23.11e2, arranged for written notice of the Settlement Agreement to all other potentially responsible parties of whom Plaintiffs had notice as of the date Plaintiffs published notice of the proposed settlement in this matter in the New Jersey Register in accordance with Paragraph 64.

66. Plaintiffs will submit this Settlement Agreement to the Court for approval pursuant to Section XXI unless, as a result of the notice of this Settlement Agreement pursuant to Paragraphs 64 and 65, Plaintiffs receive new information that discloses facts or considerations that indicate to them, in their sole discretion, that the Settlement Agreement is inappropriate, improper or inadequate, but Plaintiffs agree not to withdraw from this Settlement Agreement for the purpose of entering into a settlement with OCC unless the Settling Defendants are also parties to the same settlement with OCC.

67. In any subsequent administrative or judicial proceeding for claims reserved by Plaintiffs (under Paragraphs 26, 29, 44, 45, 46, and 49) or Settling Defendants, no Party shall assert or maintain any contention against any other Party that the Claims reserved in this Settlement Agreement were or should have been brought in this case, including under the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or the entire controversy doctrine.

68. All Sections, Paragraphs and provisions of this Settlement Agreement are integral to the Settlement Agreement, and any Court Order that does not approve this Settlement Agreement in its entirety or attempts to modify this Settlement Agreement, except as to

-60-

ministerial changes, shall cause this Settlement Agreement to be void and of no effect, unless otherwise agreed in writing by the Parties.

69.     This Settlement Agreement shall be void and of no force or effect until the Court shall approve it by means of a Dismissal Order entered in the form attached to this Settlement Agreement as Exhibit A and enter a Case Management Order in the form attached to this Settlement Agreement as Exhibit B, unless the Parties agree to all changes made in both Exhibits.

## XVI. <u>NOTICES</u>

70.     Except as otherwise provided in this Settlement Agreement, whenever written notice or other documents are required to be submitted by one Party to another, they shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing.

As to Plaintiffs DEP, Commissioner & Administrator:

<div align="center">

Section Chief
Environmental Enforcement Section
Department of Law & Public Safety
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 093
Trenton, New Jersey 08625-0093
(609) 984-4863

</div>

As to Settling Defendants:

Contact for each Settling Defendant is listed with that Party on its respective signature page.

## XVII. EFFECTIVE DATE

71.     The "Effective Date" of this Settlement Agreement shall be the date upon which this Settlement Agreement has been approved by order of the Court and the conditions set forth in Section XXI have been met.

## XVIII. RETENTION OF JURISDICTION

72.     This Court retains jurisdiction over the subject matter of this Settlement Agreement and the Parties for the duration of the performance of the terms and provisions of this Settlement Agreement and Dismissal Order for the purpose of enabling the Plaintiffs and any of Settling Defendants to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification pursuant to Paragraphs 17 and 74 of this Settlement Agreement, or to effectuate or enforce compliance with its terms, or to resolve disputes.  Each of the Settling Defendants agrees not to contest the Court's personal jurisdiction over it solely for the limited purposes of this Paragraph 72 and Paragraph 17.  The Settling Defendants limited agreement not to contest personal jurisdiction shall not extend to any other purpose except the approval and the entry of the Settlement Agreement and Dismissal Order.  Only Parties as defined in Paragraph 19.42 are intended to benefit from this limited agreement not to contest personal jurisdiction.  The Settling Defendants reserve all objections and defenses to personal jurisdiction with respect to Cross-Claims brought against them by OCC and Third Parties in the Passaic River Litigation, and do not waive personal jurisdiction defenses with respect to other actions brought against them in the courts of New Jersey by any person. Because the Settling Defendants are resolving the Claims brought or which could have been brought against them by the Plaintiffs prior to appeal, any prior decision that this Court has personal jurisdiction over them shall have no res judicata or collateral estoppel effect in any

-62-

other proceeding. For the avoidance of doubt, this Settlement Agreement shall not preclude the Settling Defendants from pursuing their motions to dismiss the claims brought against them by OCC in this proceeding on any ground, including lack of personal jurisdiction.

## XIX. RETENTION OF RECORDS

73.    Until completion of the Diamond Alkali Superfund Process, each Plaintiff and Settling Defendant shall preserve and retain all records, reports, or information (hereinafter referred to as "records") now in its possession or control, or which come into its possession or control, that relate in any manner to cleanup and removal or response actions taken at the Diamond Alkali Superfund Site or to the liability of OCC or any Settling Defendant for Cleanup or Removal Costs, Natural Resource Damages, response actions or response costs at or in connection with the Diamond Alkali Superfund Site, regardless of any retention policy to the contrary. In no event shall this Section XIX require preservation of records beyond ten (10) years from the Effective Date of the Settlement Agreement unless Plaintiffs provide written notice to a Settling Defendant (or vice versa) upon good cause requiring preservation of records for an additional fixed term not to exceed five (5) years, or as further extended upon good cause and in writing for additional five (5) year periods. To the extent a Settling Defendant is a party to a current or future Administrative Order on Consent ("AOC"), Consent Decree, or Court Order which requires such party to maintain documents and information beyond the requirements of this Settlement Agreement, such AOC, Consent Decree or Court Order shall control as to that Settling Defendant.

## XX. MODIFICATION

74.    This Settlement Agreement and any notices or other documents specified in this Settlement Agreement may be modified only by agreement of the Parties. All such

-63-

modifications shall be made in writing and shall not require Court approval. Nothing in this Settlement Agreement shall be deemed to alter the Court's power to enforce, supervise or approve modifications made pursuant to this Paragraph.

## XXI. APPROVAL OF THIS SETTLEMENT AGREEMENT AND FURTHER ASSURANCES

75.    Upon conclusion of the public comment process, Plaintiffs shall promptly submit to the Court this Settlement Agreement for approval, and the Dismissal Order and Case Management Order for entry.

76.    This Settlement Agreement is void if any Settling Defendant fails to pay its share of Settlement Funds in accordance with Paragraph 21.

77.    The Parties agree that this Settlement Agreement shall be void and of no effect if the Court fails to (i) dismiss all of Plaintiffs' Claims against all Settling Defendants and Maxus's counterclaims against Plaintiffs consistent with this Settlement Agreement; (ii) approve and enter the Dismissal Order in the form attached as Exhibit A or in materially the same form as attached; (iii) approve and enter the Case Management Order in the form attached as Exhibit B or in materially the same form as attached; and (iv) approve and enter as a Court Order the terms of this Settlement Agreement. This Settlement Agreement shall be void and of no effect if any appellate court reverses, remands, vacates or modifies the Settlement Agreement, or Dismissal Order, or Case Management Order so that (i) all Claims brought by Plaintiffs against all Settling Defendants are not dismissed, or (ii) the terms of the Settlement Agreement or the Case Management Order are materially changed. In such event, the terms of this Settlement Agreement may not be used as evidence in any litigation, administrative proceeding or other proceeding.

78.    This Settlement Agreement shall not be effective as to any Settling Defendant that has not paid in full its court costs, including Special Master fees, outstanding and due at the time of approval of this Settlement Agreement until such fees and costs are paid.

79.    Each of the parties to this Settlement Agreement shall use its best efforts to fulfill and cause to be fulfilled the terms and conditions of this Settlement Agreement and to effectuate the dismissal of all Claims by Plaintiffs against Settling Defendants as set forth herein.

## XXII. SIGNATORIES

80.    Each undersigned representative of a Party to this Settlement Agreement certifies that he or she is authorized to enter into the terms and conditions of this Settlement Agreement, and to execute and legally bind such party to this Settlement Agreement.

81.    This Settlement Agreement may be signed and dated in any number of counterparts, each of which shall be an original, and such counterparts shall together be one and the same Settlement Agreement.

82.    Each Settling Defendant shall identify on the attached signature pages the name, address and telephone number of an agent in the United States who is counsel of record with respect to all matters arising under or relating to this Settlement Agreement.

SO APPROVED this _12_ day of _December_, 20_13_.

_[signature]_

, J.S.C.

ORDER entered for the reasons stated in an order concurrent on _12/12/13_

-65-

JOHN J. HOFFMAN, ACTING ATTORNEY
GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By:

John J. Dickinson, Jr.
Deputy Attorney General

Dated: 12/12/13

Settling Defendant Repsol, S.A.

BY: _MIGUEL KLINGENBERG_

_DEPUTY SECRETARY GENERAL_

DATE: _31 MAY, 2013_

Counsel of Record for Repsol, S.A.

NAME: _____
      Diane Sullivan

ADDRESS: _Weil, Gotshal and Manges_

_301 Carnegie Center_

_Princeton, N.J.  08540-6589_

PHONE NO.: _609 - 986 - 1120_

-67-

**Settling Defendant YPF, S.A.**

**Counsel of Record for YPF, S.A.**

AS ATTORNEY-IN-FACT

NAME: _____

BY: _Talbert I. Nania_

ADDRESS: _____

TALBERT I. NANIA

DATE: _June 6th, 2013_

_____

_____

PHONE NO.: _____

**Settling Defendant YPF Holdings, Inc.**

**Counsel of Record for YPF Holdings, Inc.**

NAME: _____

_____

BY: _____

ADDRESS: _____

_____

DATE: _____

_____

_____

PHONE NO.: _____

**Settling Defendant YPF International S.A.**

**Counsel of Record for YPF International S.A.**

_____

NAME: _____

BY: _____

ADDRESS: _____

_____

DATE: _____

_____

_____

PHONE NO.: _____

**Settling Defendant YPF, S.A.**

**Counsel of Record for YPF, S.A.**

_____

NAME:_____

BY: _____

ADDRESS:_____

_____

_____

DATE:_____

_____

PHONE NO.:_____

**Settling Defendant YPF Holdings, Inc.**

**Counsel of Record for YPF Holdings, Inc.**

_____

NAME:   Thomas J. Hall, Esq._____

BY:    Guillermo Valfin

ADDRESS:   Chadbourne & Parke LLP

President & CEO, Maxus Energy

30 Rockefeller Plaza

DATE:  June 4, 2013

New York, NY  10112

PHONE NO.: (212) 408-5487

**Settling Defendant YPF International S.A.**

**Counsel of Record for YPF International S.A.**

_____

NAME:_____

BY: _____

ADDRESS:_____

_____

DATE:_____

_____

PHONE NO.:_____

-68-

**Settling Defendant YPF, S.A.**

BY: _____

DATE: _____

**Counsel of Record for YPF, S.A.**

NAME: _____

ADDRESS: _____

_____

_____

PHONE NO.: _____

**Settling Defendant YPF Holdings, Inc.**

BY: _____

DATE: _____

**Counsel of Record for YPF Holdings, Inc.**

NAME: _____

ADDRESS: _____

_____

_____

PHONE NO.: _____

**Settling Defendant YPF International S.A.**

BY: Sol. Cesar Xandivar
    Castro

DATE: 06/06/2019

**Counsel of Record for YPF International S.A.**

NAME: _____

ADDRESS: _____

_____

_____

PHONE NO.: _____

-69-

<u>**Settling Defendant CLH Holdings**</u>

BY: _____Guillermo Jalfin_____

President & CEO, Maxus Energy

DATE: ___June 4, 2013_____

<u>**Counsel of Record for CLH Holdings**</u>

NAME: ___Thomas J. Hall, Esq._____

ADDRESS: _Chadbourne & Parke, LLP__

_____30 Rockefeller Plaza_____

_____New York, NY  10112_____

PHONE NO.: _(212) 408-5487_____

<u>**Settling Defendant Maxus Energy Corporation**</u>

BY: _____

DATE: _____

<u>**Counsel of Record for Maxus Energy Corporation**</u>

NAME: _____

ADDRESS: _____

_____

PHONE NO.: _____

<u>**Settling Defendant Maxus International Energy Company**</u>

BY: _____

DATE: _____

<u>**Counsel of Record for Maxus International Energy Company**</u>

NAME: _____

ADDRESS: _____

_____

PHONE NO.: _____

**Settling Defendant CLH Holdings**

BY: _____

DATE: _____

**Counsel of Record for CLH Holdings**

NAME: _____

ADDRESS: _____

_____

_____

PHONE NO.: _____

**Settling Defendant Maxus Energy Corporation**

BY: Guillermo Jalfin

President & CEO, Maxus Energy Corporation

DATE: June 4, 2013

**Counsel of Record for Maxus Energy Corporation**

NAME: William L. Warren, Esq.

ADDRESS: Drinker Biddle & Reath, LLP

105 College Road East

Princeton, NJ  08542

PHONE NO.: (609) 716-6500

**Settling Defendant Maxus International Energy Company**

BY: Guillermo Jalfin

President & CEO, Maxus Energy Corporation

DATE: June 4, 2013

**Counsel of Record for Maxus International Energy Company**

NAME: William L. Warren, Esq.

ADDRESS: Drinker Biddle & Reath, LLP

105 College Road East

Princeton, NJ  08542

PHONE NO.: (609) 716-6500

<u>**Settling Defendant Tierra Solutions, Inc.**</u>

BY:    David Rabbe

President & CEO, Tierra Solutions, Inc.

DATE:    June 4, 2013

<u>**Counsel of Record for Tierra Solutions, Inc.**</u>

NAME:  William L. Warren, Esq.

ADDRESS:  Drinker Biddle & Reath, LLP

105 College Road East

Princeton, NJ  08542

PHONE NO.:  (609) 716-6500

# EXHIBIT 10

| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - ESSEX COUNTY |
|---|---|
| Plaintiffs, | DOCKET NO.: ESX - L9868-05 (PASR) Civil Action |
| v. | |
| OCCIDENTAL CHEMICAL CORPORATION, TIERRA SOLUTIONS, INC., MAXUS ENERGY CORPORATION, MAXUS INTERNATIONAL ENERGY COMPANY, REPSOL, S.A., YPF, S.A., YPF HOLDINGS, INC., YPF INTERNATIONAL S.A. (f/k/a YPF INTERNATIONAL LTD.) AND CLH HOLDINGS, INC., | ORDER GRANTING OCCIDENTAL CHEMICAL CORPORATION'S PARTIAL MOTION FOR SUMMARY JUDGMENT AGAINST MAXUS ENERGY CORPORATION |
| Defendants. | |

FILED
APR - 5 2016
Hon. Garry J. Furnari, J.S.C.

**THIS MATTER**, having come before the Court on April 4, 2016 and good cause having been shown;

**IT IS** on this 5th day of April, 2016 **ORDERED AS FOLLOWS:**

1. Occidental Chemical Corporation's Motion for Partial Summary Judgment against Maxus Energy Corporation is GRANTED.

2. Occidental Chemical Corporation is entitled to indemnification for its own pre-closing conduct at the Lister Site.

3. The reasons for this decision and the factual findings to support same are set forth at length and detail in the attached Recommendation Opinion of Special Master, Marina Corodemus, J.S.C., retired, dated January 14, 2016. This Court adopts the written Recommendation Opinion in its entirety and incorporates same as the Opinion of this Court.

81086632. 41

HON. GARRY FURNARI, J.S.C.

| | |
|---|---|
| New Jersey Department of Environmental Protection, The Commissioner of the New Jersey Department of Environmental Protection and the Administrator of the New Jersey Spill Compensation Fund, | Superior Court of New Jersey<br>Law Division, Essex County<br><br>Docket No. ESX-L-9868-05 (PASR)<br><br>Civil Action |

New Jersey Department of Environmental Protection, The Commissioner of the New Jersey Department of Environmental Protection and the Administrator of the New Jersey Spill Compensation Fund,

Plaintiffs,

vs.

Occidental Chemical Corporation, Tierra Solutions, Inc., Maxus Energy Corporation, Maxus International Energy Corporation, Repsol YPF, S.A., YPF S.A., YPF Holdings, Inc., YPF International, S.A. (f/k/a YPF International, Ltd.) and CLH Holdings, Inc.,

Defendants.

Superior Court of New Jersey
Law Division, Essex County

Docket No. ESX-L-9868-05 (PASR)

Civil Action

**Special Master Recommendation on Occidental Chemical Corporation's Motion for Partial Summary Judgment Against Maxus Energy Corporation**

Before Hon. Marina Corodemus, J.S.C., retired, Special Master

Archer & Greiner, P.C., Munger, Tolles & Olson, LLP, and Gable Gotwals, for movant, Occidental Chemical Corporation (William Stack, Phil Cha, Lindsay A. Brown, Oliver S. Howard, Scott R. Rowland, Amelia A. Fogelman, Jerome C. Roth, attorneys).

Drinker, Biddle & Reath, LLP for respondent, Maxus Energy Corporation, Maxus International Energy Corporation, and Tierra Solutions, Inc. (William L. Warren, Thomas E. Starnes, attorneys)

**Corodemus, J.S.C. (retired), Special Master.**

This recommendation examines whether Occidental Chemical Corporation (OCC) is entitled to partial summary judgment on its indemnification cross claims against Maxus Energy Corporation (Maxus). OCC's motion involves interpretation of an inactive-sites indemnity provision in a stock-purchase agreement executed by the parties. The narrow issue is whether OCC is entitled to indemnification for all environmental losses arising from the Lister site,

including those arising from OCC's own pre-closing conduct, or whether the indemnification provision precludes OCC from recovering the latter, namely, those losses arising from that conduct. In preparing this recommendation, the Special Master reviewed the parties' briefs and the extensive exhibits supporting the factual assertions made in these briefs. In addition, the Special Master heard oral argument on the motion on December 10, 2015 with a court reporter present. For the reasons that follow, the Special Master recommends that the Court grant OCC's motion.

**Facts**[1]

**Background**

The Passaic River litigation is a ten-year-old environmental clean-up case that began when the State of New Jersey (through various departments) sued OCC, Maxus, and several other defendants, including, Repsol., S.A. and the YPF defendants.[2] In its complaint, the State alleged that these defendants were responsible for contamination in the Passaic River that originated from the Lister Avenue chemical-manufacturing plant in Newark. The State sued under a variety of theories, including alleged violation of the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, *et seq.*

**History of the Lister Site and its owners**

The facts that give rise to this litigation go back to at least 1951, when Diamond Alkali Company (Maxus's predecessor) purchased Kolker Chemical Works, Inc., a company that owned the Lister site. Diamond operated the site for over ten years, manufacturing pesticides and

---

[1] As required, this opinion reviews the facts in the light most favorable to Maxus.

[2] For ease of reference, the "YPF defendants" consist of YPF, S.A, YPF Holdings, Inc., YPF International, S.A., and CLH Holdings.

herbicides. Then, in 1967, Diamond merged with Shamrock Oil and Gas Company to form Diamond Shamrock Corporation. The parties often refer to the company as "old Diamond Shamrock," and this recommendation adopts that name.

Old Diamond Shamrock continued to operate a chemical-manufacturing facility on the site until 1969, when it stopped operations and closed its plant. A little less than two years later it sold the Lister site to a company known as Chemicaland Corporation. When Chemicaland owned the Lister site, the company entered into an agreement with an OCC-related entity to manufacture 2,4-D acid. This took place in about 1974. At some point in 1975, Chemicaland started manufacturing herbicides for OCC too. Evidence suggests that for about a year and a half, OCC effectively controlled Chemicaland's operations, thus providing the basis for OCC's possible liability in this case.

Through a series of transactions, Old Diamond Shamrock reorganized in 1983 and 1984. To do so, it first created a new parent company for itself called Diamond Shamrock Corporation (which later became Maxus). Then, at some later point, Old Diamond Shamrock changed its name to Diamond Shamrock Chemicals Corporation (DSCC). DSCC then repurchased the Lister site in 1986. Thus, as of 1986, DSCC owned the Lister site.

**The stock purchase agreement**

In 1986, Diamond Shamrock Corporation sold its stock in DSCC to OCC.[3] As part of the deal, OCC received various DSCC-owned properties across the country, including the Lister site, which the stock purchase agreement (SPA) refers to as one of DSCC's "Inactive Sites." At that point, the Lister site was already included on the EPA's list of dioxin-contaminated properties,

---

[3] Technically it sold the stock to an OCC-related entity. There is no dispute, however, that OCC has succeeded to that entity's rights and responsibilities.

and Maxus had agreed to administrative consent orders involving the property. Documents from 1984 and 1985 also show that Maxus was aware of OCC's connection to the site during the Chemicaland era.

Section 9.03 of the SPA sets out, among other things, the parties' indemnification obligations, with subsection (a) detailing the seller's obligations to OCC:

> (a)   Seller shall indemnify, defend and hold harmless [OCC] from and against any and all claims, demands or suits ..., losses, liabilities, damages, obligations, payments, costs and expenses, paid or incurred, whether or not relating to, resulting from or arising out of any Third Party Claim ... and whether for property damage, natural resource damage, bodily injury ... governmental fines or penalties ... pollution, threat to the environment, environmental remediation, or otherwise (individually and collectively "Indemnifiable Losses") relating to, resulting from or arising out of any of the following:
>
> ...
>
>> (iv) the "Inactive Sites" (which for purposes of this Agreement, shall mean those former chemical plants and commercial waste disposal sites listed on Schedule 9.03 (a) (iv) and all other properties which were previously, but which, as of the Closing Date, are not, owned, leased, operated or used in connection with the business or operations of any Diamond Company, including, without limitation, any DSCC Company, or any predecessor-in-interest thereof), including, without limitation, any matter relating to any of the Inactive Sites for which (A) any Diamond Company (including, without limitation, any DSCC Company) on or prior to the Closing Date agreed to indemnify, defend or hold harmless any Entity, or (B) any Diamond Company may otherwise be held liable;

In addition to setting out the indemnity obligations for inactive sites like the Lister site, the SPA also includes the seller's obligations for Superfund Sites, which the agreement defines to include those sites on the "National Priorities List" listed on a schedule attached to the SPA. While interpretation of this provision is not at issue in this motion, the language in the provision is relevant to interpreting the inactive-sites provision (as explained in the Analysis section to this recommendation). For Superfund Sites, the seller must indemnify for

> (iii) any (A) Superfund Site and (B) any Litigation commenced after the Closing pursuant to the provisions of CERCLA or RCRA with respect to any release, storage or disposal of Polluting Substances at any commercial waste disposal facility ("Federal Superfund Litigation") to the extent, but only to the extent, that such Federal Superfund Litigation relates to, results from or arises out of the actions or omissions of any Diamond Company (including, without limitation, any DSCC Company) or any predecessor-in-interest thereof prior to the Closing, but excluding matters expressly covered by Article X hereof … (emphasis added).

Two other provisions are also relevant when interpreting the inactive-sites provision. The first deals with active sites. For active sites (where OCC would be operating the site post-sale) the parties agreed to a cost-sharing approach to handling responsibility for environmental liabilities. The approach for active sites is set out in Article X of the SPA, which requires each party to contribute 50% of the environmental costs for ten years following the agreement's closing or until Maxus reached a $75 million cap. OCC also agreed to indemnify Maxus in certain instances. Section 9(b) of the agreement contains a general provision requiring OCC to indemnify Maxus for "any obligations or liabilities of Buyer or any subsidiary of Buyer (other than any DSCC Company) prior to the Closing Date."

**The allegations against OCC**

Diamond Shamrock Corporation changed its name to Maxus in 1987. As noted previously, the State filed its original complaint in 2005, and in doing so, sued OCC as successor to DSCC. OCC asked Maxus to defend under the SPA on OCC's behalf, and Maxus retained counsel to do just that. When the State amended its complaint to bring alter-ego claims against Maxus's corporate parents and grandparents, OCC recognized a conflict of interest and asked for separate counsel. Maxus declined. OCC then retained its own attorneys and filed cross claims against Maxus and the other defendants. In answering these cross claims, Maxus denied any indemnity obligation to OCC.

The State first alleged that OCC had independent liability—based on OCC's own conduct during the Chemicaland era—in August 2010 when it amended its complaint for the third time. Maxus's cross claims included these allegations, namely, that OCC's control of Chemicaland subjected it to direct liability based on its own conduct.

In 2011, OCC moved for partial summary judgment, claiming it was owed indemnity for losses resulting from its acquisition of DSCC. The Court agreed and granted OCC's motion. Notably, the motion did not resolve the issue OCC now raises: Does the indemnity agreement require Maxus to indemnify OCC for its own pre-closing conduct? In other words, must Maxus indemnify OCC for losses arising from OCC's own conduct during the Chemicaland era?[4]

**The State's settlements**

Maxus, Repsol, and the YPF defendants settled with the State in 2013. The parties refer to this as the "RYM Settlement." The RYM Settlement resolved the claims against Maxus, Repsol, and the YPF defendants, and it also resolved some of the claims against OCC. The settlement left intact the State's claims against OCC for "OCC Distinct Conduct," which includes OCC's conduct during the Chemicaland era. OCC resolved these claims in a separate settlement with the State entered in 2014. In return for $190 million, OCC received a covenant not to sue that released all claims based on OCC's own conduct. When OCC asked Maxus for indemnity, including the entire amount of the settlement, Maxus declined. In doing so, Maxus indicated that it would not indemnify OCC for claims other than those arising from its status as successor to DSCC.

---

[4] While not discussed in detail in the parties' briefs, there are also allegations that Hooker Chemical, an OCC-related entity, supplied chemicals to Diamond Alkali and Old Diamond Shamrock for use at the Lister site during the 1950s and 1960s. This is another basis for OCC's potential liability based on its own pre-closing conduct.

**OCC's allegedly inconsistent conduct**

Maxus claims OCC has often acted inconsistently with the notion that it should be indemnified for its own pre-closing conduct (that is, the conduct that allegedly occurred during the Chemcaland era). To make its point, Maxus first points to statements OCC's attorneys made when they moved for partial summary judgment in 2011. In its briefs, OCC only alleged that the indemnity provision required Maxus to indemnify for liabilities based upon DSCC's ownership and operation of the site. OCC never alleged that the indemnity provision required Maxus to indemnify OCC for OCC's own conduct.

In response to the 2011 motion, Maxus pointed to the Chemicaland-era allegations, saying that granting the motion would subject it (Maxus) to liability for these losses even though the SPA did not expressly provide for them. To counter this argument, OCC disavowed the notion that it was seeking indemnity for Chemicaland-era conduct, often saying that it was not seeking indemnification for its own conduct through its motion (and once stating during oral argument that it was not "suing" for indemnification based upon claims arising from Chemicaland). Similarly, when Maxus argued that issues of fact precluded summary judgment "because the finder of fact will still have to make an 'equitable apportionment between OCC's direct liability, for which it is singularly responsible, from the successor exposure for which it seeks indemnity,'" OCC did not respond by disputing this, but instead, by acknowledging that the issue would remain but did not prelude the relief sought.

Maxus also points to out-of-state litigation where OCC allegedly took an inconsistent position about its indemnity obligations. In what Maxus refers to as the *Dallas-II* litigation, OCC made statements during opening arguments and during witness testimony suggesting that each party would bear responsibility under the indemnification agreement for its own conduct. In

fact, OCC's attorney referred to the indemnification provision as an "our watch / your watch" provision.

According to Maxus, OCC also took inconsistent positions about the meaning of the indemnification provision when it came time to give jury instructions. Maxus urged the court to charge the jury that the provision was required to be "clear and unequivocal" and that it should be construed against the indemnitee. OCC disagreed, arguing that these standards only apply under Delaware law when an indemnitee seeks indemnity for its own conduct. The trial court agreed with OCC, as did an appellate court when Maxus appealed an adverse jury verdict. *See Maxus Energy Corp. v. Occidental Chem. Corp.,* 244 S.W.3d 875 (Tex. Ct. App. 2008).

The issue in *Dallas-II* was how the indemnity provision's time limit applied to Maxus's indemnity obligation. *Id.* at 878. OCC also points to a key factual assertion it made in the litigation: that it never owned or operated the properties at issue. Maxus never challenged this. In fact, Maxus indicated in an appellate brief that the indemnity claims arose from Diamond Shamrock activities.

**Analysis**

In its motion, the OCC asks the Court to interpret the indemnity provision in a manner that would require Maxus to indemnify for conduct allegedly attributable to OCC during the Chemcaland era. The essence of OCC's argument is straightforward: The parties drafted a site-specific agreement that required the seller to indemnify the buyer for all environmental liabilities. If the seller had wanted to exclude certain liabilities, it could have.

Maxus offers a three-pronged response. First, it contends that the agreement should not be interpreted to require indemnification for OCC's own conduct, because the agreement does not specifically provide for this (as required by Delaware law). Second, Maxus says judicial

estoppel bars OCC's argument. And finally, Maxus argues that, at a minimum, the SPA is ambiguous and can be read multiple ways, thus providing a basis to look to extrinsic evidence about its meaning—and precluding summary judgment.

## A.    Interpretation of the indemnity provision

The parties agree that Delaware's substantive law is controlling. As is the case in New Jersey, Delaware courts try to effectuate the parties' intent when construing a contract. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). To discern intent, a court looks first to the language of the agreement. *Id.* If the language is clear and unequivocal, the court is bound to enforce the provision based upon its plain meaning. *Id.*

Delaware courts only look to extrinsic evidence to discern the meaning of a contract when the language is ambiguous. *Lorillard Tobacco Co.*, 785 A.2d at 738; *O'Brien*, 785 A.2d at 287. Courts do not use extrinsic evidence, however, to decide whether a contract is ambiguous. *Id.* at 289. The test is whether the agreement is reasonably susceptible to different meanings. *Lorillard Tobacco Co.*, 785 A.2d at 739.

Special rules apply when interpreting indemnity agreements. Agreements that indemnify a party for that party's own negligence are strictly construed against the indemnitee. *Powell v. Interstate Vendaway, Inc.*, 300 A.2d 241, 243 (Del. Super. 1972); *Fina, Inc. v. ARCO*, 200 F.3d 266, 270 (5th Cir. 2000). As noted by the Fifth Circuit, "[t]he purpose of this rule is to ensure that the indemnitor is fully cognizant of the extraordinary risk that it is assuming." *Id.*

At least in typical cases, an indemnity agreement will not be construed to indemnify a party for its own negligence unless the intent to do so is specifically expressed: "'the intent to indemnify must be clear and unequivocal' on the face'" of the provision. *Id.* (citing

*Cumberbatch v. Bd. of Trustees of Del. Tech & Comm. College,* 382 A.2d 1383, 1386 (Del. Super. 1978). While Delaware law does not require any specific words, "broad, catchall language" is insufficient to meet this test. *Id.*

Delaware state-court opinions stating these principles involve what OCC refers to as "conduct-related" indemnity provisions. In other words, they typically apply when an indemnitor indemnifies the indemnitee for the indemnitor's conduct. *See, e.g., Cumberbatch,* 382 A.2d at 1385-86. By contrast, the provision at issue here is not based on conduct. Nothing in the inactive-sites provision limits the seller to indemnifying OCC for the seller's conduct.

Rather, the indemnification is site-related. Under Section 9.03(a)(4), Maxus is required to indemnify OCC for, among other things, environmental losses "relating to, resulting from or arising out of" the inactive sites. The provision does not make negligent conduct or any other type of conduct by the seller a prerequisite to indemnification. By its plain language, the provision allocates all environmental liabilities to the seller, regardless of whether the seller's conduct caused the loss.

The parties knew how to allocate responsibility based on fault when they intended this. For example, the Superfund provision in Section 9.03(a)(iii) stands in contrast to the inactive-sites provision. The Superfund provision requires indemnity for certain Federal Superfund Litigation, "but only to the extent, that such Federal Superfund Litigation relates to, results from or arises out of the actions or omissions of any Diamond Company ...." The inactive-sites provision contains no similar conduct-related language. In the same way, rather than use fault, Article X of the SPA uses a cost-sharing approach for losses arising at active sites. These provisions evince a well-thought-out approach to site-related indemnity (as opposed to conduct-related indemnity) that is evident when one considers the whole agreement rather than individual

- 10 -

sections. *Intel Corp. v. Am. Guarantee & Liab. Ins. Co.*, 51 A.3d 442, 446 (Del. 2012) ("Courts must consider the contract as whole, rather than analyzing specific provisions in isolation.").

Notably, no Delaware state-court decision directly addresses whether the "clear and equivocal" requirement applies to cases like the one here—where the indemnification provision is site-related rather than conduct-related and is based on strict environmental obligations rather than fault. While not dispositive, Judge Wefing's decision in *Celanese Limited v. Essex County Improvement Authority*, 404 N.J. Super. 514 (App. Div. 2009), predicts the dilemma. After setting out the traditional rule requiring an agreement to unequivocally state an intention to indemnify for one's own conduct, the opinion goes on to state: "We question the applicability of that concept to the present matter, in which we are dealing with an indemnity agreement with respect to obligations imposed by environmental laws, an area in which fault in not material." *Id.* at 529; *cf., Fina, Inc. v. ARCO*, 200 F. 3d 266, (5th Cir. 2000) ("No Delaware case has addressed the applicability of the clear and unequivocal test to claims based on strict liability").

While the court in *Celanese* did not reach this issue—it had not been addressed below— the opinion points to federal cases interpreting the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), where the courts have held that parties "'wish[ing] to redistribute the [environmental] risks distributed by Congress ... must do so clearly and unequivocally.'" *Id.* at 530 (quoting *Mobay Corp. v. Allied–Signal, Inc.*, 761 F. Supp. 345, 355 (D.N.J.1991) (further citation and quotation omitted)). To do so under CERCLA, the agreement "must at least mention that one party is assuming environmental-type liabilities." *Id.* at 530 (quoting *Mobay Corp.*, 761 F. Supp. at 358).

Here, the language is straightforward and unambiguous. It provides for indemnity for "any and all" environmental losses "relating to, resulting from or arising out of" the inactive

sites, including the Lister site, without any limitation. This language clearly and unequivocally transfers all pre-closing environmental-liability risks to the seller. In other words, the seller assumed responsibility for the environmental claims arising from these sites, regardless of fault. To hold otherwise would ignore the plain language of the parties' agreement.[5]

## B.    Whether OCC is judicially estopped from arguing that the inactive-sites provision indemnifies for OCC's own conduct

The Special Master's recommendation regarding interpretation of the indemnity provision moots Maxus's argument regarding extrinsic evidence. There is no need to consider parol evidence, as the provision is unambiguous. The next question, then, is whether judicial estoppel bars OCC's argument.

"The purpose of the judicial estoppel doctrine is to protect 'the integrity of the judicial process.'" *Kimball Int'l, Inc. v. Northfield Metal Prods.*, 334 N.J. Super. 596, 606 (App. Div. 2000), *certif. denied*, 167 N.J. 88 (2001) (quoting *Cummings v. Bahr*, 295 N.J. Super. 374, 387 (App. Div. 1996)). The doctrine prevents litigants from "playing fast and loose" with, or otherwise manipulating, the judicial process. *State v. Jenkins*, 178 N.J. 347, 359 (2004).

"A threat to the integrity of the judicial system sufficient to invoke the judicial estoppel doctrine only arises when a party advocates a position contrary to a position it successfully asserted in the same or a prior proceeding." *Kimball*, 334 N.J. Super. at 606. An essential element of judicial estoppel is the unequivocal assertion of law or fact by a party in a judicial proceeding. *Levin v. Robinson, Wayne & LaSala* , 246 N.J. Super. 167, 187 (Law Div. 1990),

---

[5] Maxus relies on *Fina* to reach a contrary conclusion. But in *Fina* the provision at issue did not refer to environmental liability. *See* 200 F.3d 266. In addition, while Maxus points to a cross indemnity provision to support its argument, that provision is a general one, not one specifically relating to inactive sites. When interpreting a contract, a more specific provision prevails over a more general one. *Brinckerhoff v. Texas E. Products Pipeline Co., LLC*, 986 A.2d 370, 387 (Del. Ch. 2010).

overruled on other grounds, *Kimball Intern., Inc.,* 334 N.J. Super. 596. As a remedy, judicial estoppel is invoked to prevent a miscarriage of justice. *DeMarco v. Stoddard*, 434 N.J. Super. 352, 366 (App. Div. 2013).

Here, the question is whether OCC's positions in this litigation (in 2011 when the Court granted its partial summary-judgment motion) and in the *Dallas-II* litigation constituted "unequivocal assertion[s]" that justify invoking judicial estoppel because they create a miscarriage of justice. In other words, did OCC create an injustice by unequivocally asserting that the inactive-sites provision applied only to claims arising from the seller's conduct and by expressly negating the notion that it applied to OCC's own conduct? The answer is *no*.

To reach a contrary conclusion, Maxus relies upon snippets of language in both proceedings but ignores the big picture. In 2011 OCC only raised a limited issue: Did the indemnification provision apply to claims involving the seller's conduct? The Court found that it did. Granted, it would have been more efficient for OCC to have raised the issue it now raises then. But any representations it made were in the context of its limited motion.

Similarly, OCC did not take an inconsistent position in the *Dallas-II* litigation. That litigation did not seek to interpret the specific SPA provision at issue here, but rather, dealt with time limitations on certain indemnification claims. Neither the trial court nor the appellate court were asked to decide whether the inactive-sites provision indemnified OCC for its own conduct. Moreover, to the extent Maxus might have represented certain facts and taken certain positions, these facts and positons were tangential. They did not go to the heart of the issue the courts resolved, and they cannot form the basis for judicial estoppel, as they could not have resulted in any type of miscarriage of justice.

In short, judicial estoppel does not thwart OCC's partial summary-judgment motion.

## Conclusion

For the reasons stated above, the Special Master recommends that the Court grant OCC's partial summary-judgment motion against Maxus and hold that OCC is entitled to indemnification for its own pre-closing conduct on the Lister site.

Respectfully submitted,

**Hon. Marina Corodemus (Ret.)**
Special Master

January 14, 2016

- 14 -