**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| CHAMBERS OF<br>MADELINE COX ARLEO<br>UNITED STATES DISTRICT JUDGE | MARTIN LUTHER KING COURTHOUSE<br>50 WALNUT ST. ROOM 4066<br>NEWARK, NJ 07101<br>973-297-4903 |
|---|---|

September 11, 2020

<u>VIA ECF</u>

**<u>LETTER ORDER</u>**

Re: <u>Occidental Chemical Corporation v. 21st Century Fox America, et al.,
Civil Action No. 18-11273</u>

Dear Litigants:

Before the Court is Defendant Small Parties Group's[1] ("Defendants" or "SPG") Motion for Summary Judgment as to Plaintiff Occidental Chemical Corporation's ("OxyChem" or "Plaintiff") successor liability. ECF No. 950. Plaintiff opposes the Motion. ECF No. 967. For the reasons that follow, the Motion is **GRANTED in part** and **DENIED in part**.

**I.   BACKGROUND[2]**

OxyChem filed this action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., for cost recovery and contribution from Defendants and numerous other entities based on response costs that it expended and will expend to address "releases and threatened releases of hazardous substances in the Lower Passaic River and elsewhere within the Diamond Alkali Superfund Site [the 'Superfund Site']." Compl. at 4, ECF No. 1.

Beginning in the 1940s, Kolker Chemical Works, Inc. ("Kolker") manufactured herbicides at 80 and 120 Lister Avenue, Newark, New Jersey (the "Lister Plant"), which is part of the Superfund Site. Def. SOMF ¶¶ 1, 19. In 1947, the Kolker Realty Company ("Kolker Realty") acquired ownership of the real property underlying the Lister Plant, and in 1950, Kolker Realty merged into Kolker. <u>Id.</u> ¶¶ 2-3.

In 1951, Diamond Alkali Company ("Diamond Alkali") acquired Kolker's stock, and in 1953, Kolker was renamed Diamond Alkali Organic Chemicals Division, Inc. <u>Id.</u> ¶¶ 4-5. The

---

[1] As previously noted by the Court, the SPG includes sixty-six defendants to this action. See ECF No. 647 (the "July 31 Order") at 1 n.1.

[2] The facts are drawn from Defendants' Statement of Material Facts ("Def. SOMF"), ECF No. 951, Plaintiff's Counterstatement of Material Facts ("Pl. SOMF"), ECF No. 967.1, and Defendants' Response to Plaintiff's Counterstatement of Material Facts ("Def. Resp. to Pl. SOMF"), ECF No. 1069.1. Any disputes are noted by the Court.

next year, the Organic Chemicals Division was merged into Diamond Alkali, and Diamond Alkali "expressly assumed its assets and liabilities." Id. ¶ 6. Diamond Alkali continued to manufacture herbicides and pesticides at the Lister Plant from 1951 to 1967. Id. ¶ 7.

In 1967, the Shamrock Oil and Gas Company merged into Diamond Alkali, and the surviving corporation's name was changed to Diamond Shamrock Corporation ("DSC I" or "Old Diamond"). Id. ¶ 8. DSC I continued to operate the Lister Plant until 1969, when it was shut down. Id. ¶ 9.[3]

In July 1983, DSC I formed a new subsidiary named New Diamond Corporation ("New Diamond"). Id. ¶ 10; Pl. SOMF ¶ 4.[4] Following a series of mergers, New Diamond and DSC I were renamed Diamond Shamrock Corporation ("DSC II") and then Diamond Shamrock Chemicals Company ("DSCC"). Def. SOMF ¶¶ 11-13.

OxyChem asserts that in October 1983, DSCC "created three new wholly-owned subsidiaries known as Diamond Shamrock Exploration Company ('DS E&P'), Diamond Shamrock Refining and Marketing Company ('DS R&M'), and Diamond Shamrock Coal Company ('DS Coal')," which would "carry on businesses theretofore conducted . . . as divisions of Old Diamond." Pl. SOMF ¶ 14 (citing Pl. Ex. 9 at MAXUS61027-28 (the "Diamond Shamrock Corporate Reorganization 1983-84 Document"), ECF No. 967.3). Defendants do not appear to dispute this corporate reorganization, but they argue that it is irrelevant to the instant dispute "[b]ecause [the Lister Plant] had been sold by DSC I in 1971 . . . [so it] was not among the businesses and assets assigned to any of the three new subsidiaries." Def. Resp. to Pl. SOMF ¶¶ 14-15.

The parties agree that on November 28, 1983, DSCC created "a fourth new wholly-owned subsidiary known as Diamond Shamrock Corporate Company ('DS Corporate')" which later changed its name to Maxus Corporate Company ("Maxus Corporate"). Pl. SOMF ¶¶ 16-17; Def. Resp. to Pl. SOMF ¶¶ 16-17. DSCC's President, Vice Presidents, Treasurer, Secretary, Assistant Treasurers, Unit Vice Presidents, and General Managers were authorized "to convey, assign, lease or otherwise transfer and deliver to [DS Corporate] all properties, right and other assets owned or leased by DSCC . . . used principally or in connection with . . . [DSCC's] refining and marketing, exploration and production, coal or industrial and process chemicals businesses" and to "assign and transfer to [DS Corporate] all rights, obligations and liabilities of [DSCC]" related to the property transferred. Pl. SOMF ¶ 18; Def. Resp. to Pl. SOMF ¶ 18; Pl. Ex. 18 (the "December 15, 1983 DSCC Board Consent"), ECF No. 967.5.

Effective January 1, 1984, DSCC entered into an Assignment and Assumption Agreement with DS Corporate. Pl. SOMF ¶ 19; Pl. Ex. 19 (the "Assignment and Assumption Agreement"), ECF No. 967.5. The Assignment and Assumption Agreement excluded "all assets that are necessary for the operation of or used principally in connection with . . . the industrial and proprietary chemicals businesses of [DSCC]" as well as "capital stock and notes payable to [DSCC]" of DS E&P, DS R&M, and DS Coal (collectively, the "Principal Subsidiaries").

---

[3] DSC I sold the Lister Plant to a third party in 1971. Def. SOMF ¶ 9.

[4] OxyChem notes that Old Diamond "had been put on notice" of United States Environmental Protection Agency ("EPA") and New Jersey Department of Environmental Protection ("NJDEP") enforcement actions related to the Lister Plant prior to July 1983. Pl. SOMF ¶ 3.

Assignment and Assumption Agreement at MAXUS022692. The assignment and assumption of liabilities and obligations also excluded "any liability or obligation of any nature whatsoever relating to or arising from the Chemicals Businesses or . . . the Principal Subsidiaries." Id. at MAXUS022695. Effective on or about January 26, 1984, DSCC transferred to DSC II all its assets and liabilities except "its industrial and proprietary chemicals businesses." See Pl. Ex. 23 at MAXUS022732, ECF No. 967.6; see also Pl. SOMF ¶¶ 28-29; Def. Resp. to Pl. SOMF ¶¶ 28-29.

In September 1986, DSC II sold its remaining DSCC stock to Oxy-Diamond Alkali Corporation, an affiliate of OxyChem. Def. SOMF ¶ 14; Pl. SOMF ¶ 32; see also Pl. Ex. 26 (the "Stock Purchase Agreement" or "SPA"), ECF No. 967.6. In April 1987, DSC II merged into "its subsidiary Diamond Shamrock Merger Company and changed its name to Maxus Energy Corporation ('Maxus')." Def. SOMF ¶ 16.[5]

In November 1987, Oxy-Diamond Alkali and Occidental Electrochemicals Corporation merged into OxyChem. Id. ¶¶ 17-18.

Beginning in 2005 and continuing through entry of a Consent Judgment in December 2014, the NJDEP pursued a lawsuit against OxyChem and others in state court for violations of the New Jersey Spill Compensation and Control Act, N.J.S.A. § 58:10-23.11a et seq. (the "Spill Act"), the New Jersey Water Pollution Control Act, N.J.S.A. § 58:10A-1 et seq. (the "Water Pollution Control Act"), and New Jersey common law based on contamination of the Passaic River caused by discharges from the Lister Plant. See Def. SOMF ¶¶ 21-38; Pl. SOMF ¶¶ 40-67; see also Pl. Ex. 33 (the "Third-party Consent Judgment"), ECF No. 967.7. While the parties dispute the effect of the Third-party Consent Judgment, OxyChem "acknowledges that based on its 1986 purchase of the stock of DSCC from Diamond Shamrock Corporation and the 1987 merger of DSCC into OxyChem, a court in New Jersey found that OxyChem is a legal successor to DSCC, and to certain environmental liabilities resulting from . . . historical operations of the Lister Plant from the late 1940s through the 1960s." Def. SOMF ¶ 40. Additionally, on June 17, 2016, Maxus filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware. Pl. SOMF ¶ 36. In the bankruptcy proceedings, the EPA filed a proof of claim asserting that Maxus was "jointly and severally liable, along with other parties" for cleanup and other costs related to the Lister Plant's contamination of the Superfund Site. Id. ¶ 37.

On June 30, 2018, OxyChem filed the instant Complaint, which asserts three causes of action under CERCLA flowing from several agreements with the EPA and other federal government entities: (1) cost recovery under Section 107(a); (2) contribution under Sections 113(f)(1) and 113(f)(3)(B); and (3) a declaration of Defendants' liability under Section 113(g)(2). See Compl. ¶¶ 271-87. On July 31, 2019, the Court partially granted Defendants' Motion to Dismiss, allowing one Section 107(a) claim and three Section 113(f)(3)(B) claims to go forward. See July 31 Order.

On March 9, 2020, following limited discovery, Defendants filed the instant Motion for summary judgment on the issue of whether OxyChem is "liable as the successor-in-interest to the Kolker and Diamond entities." Def. Br. at 7, ECF No. 950. OxyChem opposed the Motion. ECF No. 967.

---

[5] Maxus Corporate merged into Maxus effective December 31, 1998. Pl. SOMF ¶ 17.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

## III. ANALYSIS

Defendants argue that OxyChem is DSCC's successor, such that it is liable for the Lister Plant discharges as a matter of law. See Def. Br. at 8-13. OxyChem concedes that it is a "legal successor" to DSCC, Pl. Br. at 1, ECF No. 967, but argues that genuine issues of material fact preclude equitable allocation of response costs under CERCLA Section 113(f), 42 U.S.C. § 9613, Pl. Br. at 17-24. The Court agrees with Defendants that OxyChem is a legal successor to DSCC and concludes that equitable allocation of costs is inappropriate at this time.[6]

"CERCLA is a sweeping federal remedial statute, enacted . . . to ensure that everyone who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." United States v. General Battery Corp., 423 F.3d 294, 297-98 (3d Cir. 2005) (internal quotation marks and citations omitted) (emphasis in original). Against this backdrop, the Third Circuit has explained that "CERCLA successor liability is a matter of uniform federal law, as derived from 'the general doctrine of successor liability in operation in most states.'" Id. at 298 (quoting Smith Land & Improvement Corp v. Celotex Corp., 851 F.2d 86, 92 (3d Cir. 1988)). As such, a successor corporation will not be held liable under CERCLA for the acts of its predecessor unless one of four exceptions are present: "(1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company." Id. at 305 (citing Polius v. Clark Equip. Co., 802 F.2d 75, 78 (3d Cir. 1986)).

Here, OxyChem does not contest that it is a "legal successor" to DSCC. See Pl. Br. at 1. This fact is amply supported by the record, which indicates that DSC II sold its DSCC stock to Oxy-Diamond Alkali in September 1986, see Stock Purchase Agreement, and that Oxy-Diamond Alkali subsequently merged into OxyChem in 1987, see Def. SOMF ¶¶ 17-18; Pl. SOMF ¶¶ 32-35 (noting, for example, that OxyChem "acquired DSCC's active, ongoing 'Chemicals Business'") (emphasis omitted). As such, the Court concludes as a matter of law that OxyChem may be held liable for CERCLA response costs flowing from DSCC's operation of the Lister Plant. See, e.g., Baker v. Nat'l St. Bank, 161 N.J. 220, 227-28 (1999) ("When . . . a merger or consolidation

---

[6] Defendants note in their reply briefing that they are not asking the Court to conduct an equitable allocation in the instant Motion. See Def. Reply Br. at 4 ("[Defendants'] motion does not ask the Court to prejudge the [CERCLA] equitable allocation."), ECF No. 1069.

becomes effective . . . [t]he surviving or new corporation shall be liable for all the obligations and liabilities of each of the corporations so merged . . . . Proof of a merger is sufficient to establish liability.") (internal quotation marks and citations omitted); Gould, Inc. v. A & M Battery & Tire Serv., 987 F. Supp. 353, 372 (M.D. Pa. 1997) (finding, in CERCLA contribution action, that plaintiff had to "bear the responsibility of its predecessor's actions"), vacated on other grounds 232 F.3d 162 (3d Cir. 2000).

OxyChem, however, argues that it should not be held liable for all liabilities flowing from the Lister Plant's operation because Maxus is also a successor to DSCC pursuant to a series of stock swaps and the Assignment and Assumption Agreement, which took place prior to OxyChem's acquisition of DSCC in 1986. See Pl. Br. at 6-12. Defendants counter that DSCC could not transfer its CERCLA liabilities because parties are barred "from divesting CERCLA liability by purporting to transfer it to a third party," Def. Br. at 11 (citing 42 U.S.C. § 9607(e)(1)), and "[t]hat OxyChem and Maxus may have a common share of liability for the Lister Plant does not change the fact that OxyChem is fully liable for that share," Def. Reply Br. at 4 (emphasis added). Because the parties agree that equitable allocation is inappropriate at this time, and because OxyChem has not cross-moved for summary judgment as to Maxus's successor liability, the Court concludes that it need not determine whether OxyChem is "fully" liable, see Def. Reply Br. at 3, for the Lister Plant's discharges.[7]

"Under CERCLA, a party who has paid for environmental remediation may seek to hold other potentially responsible parties ('PRPs') liable through the cost recovery mechanisms of [Section] 107(a) or the contribution mechanisms of [Section] 113(f)." Trinity Indus., Inc. v. Greenlease Holding Co., 903 F.3d 333, 348 (3d Cir. 2018). "While [Section] 107(a) authorizes complete cost recovery under a joint and several liability theory, [Section] 113(f) permits a party to seek contribution from other PRPs following a CERCLA suit brought by a governmental authority." Id. Here, the Court has allowed one of Plaintiff's Section 107(a) claims and three of Plaintiff's Section 113(f) claims to go forward against Defendants, see July 31 Order at 12, and Defendants "do[] not disagree" that "there can be multiple successors to the same liability," Def. Reply Br. at 5. Accordingly, OxyChem may raise the issue of Maxus's successor liability in a subsequent motion and, once relevant liability determinations have been made, the Court will then "apportion[] the liable parties' shares in an equitable manner." Beazer East, Inc. v. Mead Corp.,

---

[7] It bears noting, however, that the current record does not explain whether DSCC's legacy chemicals business operated at the Lister Plant was fully merged into DS Corporate and then Maxus, or whether that business passed to OxyChem. Compare Assignment and Assumption Agreement at MAXUS022692, MAXUS022695 (excluding "all assets that are necessary for the operation of or used principally in connection with . . . the industrial and proprietary chemicals businesses of [DSCC]" and "capital stock" of the Principal Subsidiaries); Pl. Ex. 23 at MAXUS022732 (DSCC transferring to DSC II all its assets and liabilities except "its industrial and proprietary chemicals businesses"); with Def. SOMF ¶ 14 (explaining that DSC II sold its remaining DSCC stock to Oxy-Diamond Alkali in 1986); Pl. SOMF ¶ 32 (same); and Stock Purchase Agreement. Given these facts, the Court cannot conclude whether Maxus is also liable as a successor to DSCC.

Additionally, the Court disagrees with Defendants that DSCC and Maxus could not indemnify OxyChem for CERCLA liability. In CERCLA actions, "agreements to indemnify or hold harmless are enforceable between the parties but not against the government." Smith Land, 851 F.2d at 89; see also Beazer East, Inc. v. Mead Corp., 34 F.3d 206, 211-19 (3d Cir. 1994) (analyzing whether assumption and indemnification agreement reached liability for CERCLA contribution); Caldwell Trucking PRP v. Rexon Tech. Corp., 421 F.3d 234, 241-45 (3d Cir. 2005) (same).

5

412 F.3d 429, 438 (3d Cir. 2005) (citing 42 U.S.C §§ 9607(a), 9613(f)(1) and New Jersey Turnpike Auth. v. PPG Indus., Inc., 197 F.3d 96, 104 & n.7 (3d Cir. 1999)).[8]

Because the Court concludes that successor liability has attached to OxyChem, it need not address the parties' arguments regarding issue preclusion.  See Def. Br. at 13-21; Pl. Br. at 25-29.

## IV.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 950, is **GRANTED** to the extent it seeks a finding that Plaintiff is liable as a successor to DSCC and is otherwise **DENIED**.

                                                         **SO ORDERED.**

                                                         */s Madeline Cox Arleo*_____
                                                         **MADELINE COX ARLEO**
                                                         **UNITED STATES DISTRICT JUDGE**

---

[8] Relevant to this action, the panel in Beazer East noted that the liability phase was uncontested, with three parties "each liable as current or former owners and operators the Woodward Coke Plant," and that the "equitable apportionment phase was divided into two proceedings: a proceeding . . . to determine the parties' equitable shares of response costs on a percentage basis . . . and a separate proceeding . . . to determine which of [plaintiff's] actual costs qualif[ied] as recoverable response costs" under CERCLA.  412 F.3d at 438.  At the equitable allocation phase, the Court is afforded "tremendous discretion" in apportioning costs.  Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Protection, 725 F.3d 369, 387 (3d Cir. 2013).