## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION, | ) Hon. Madeline Cox Arleo <br> ) Hon. Magistrate Joseph A. Dickson <br> ) <br> ) Civil Action No. 2:18-CV-11273 <br> ) (MCA-JAD) <br> ) |
| Plaintiff, | |
| v. | ) **REPLY BRIEF IN SUPPORT OF** <br> ) **MOTION BY THE SMALL** <br> ) **PARTIES GROUP FOR AN ORDER** <br> ) **COMPELLING PLAINTIFF TO** |
| 21ST CENTURY FOX AMERICA, INC., *et al.*, | ) **PRODUCE DOCUMENTS IT HAS** <br> ) **WITHHELD AS PRIVILEGED OR** <br> ) **PROTECTED** <br> ) |
| Defendants. | ) <br> ) Oral Argument Requested <br> ) <br> ) |

16063510.1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................2

    I.    OXYCHEM HAS NOT ESTABLISHED THAT THE
DOCUMENTS ON THE MAXUS LOG ARE SUBJECT
TO THE JOINT-CLIENT OR COMMUNITY-OF-INTEREST PRIVILEGE .............2

        A.    OxyChem Failed To Claim Joint-Client or
Community-Of-Interest Privilege Over Documents In The Maxus Log And
Has, Therefore, Waived Those Privileges To The Extent They Ever Existed ..2

        B.    OxyChem Misconstrues The Legal Standards For
Establishing The Joint-Client And Community-Of-Interest Privileges .............4

        C.    OxyChem's Asserted Privilege Over Documents On
The Maxus Log Ignores the Substantial Adversity Between
OxyChem and Maxus Regarding The Defense of Lister-Related Liabilities ....5

        D.    OxyChem Has Not Established A Joint-Client
Privilege Over Documents On The Maxus Log ...............................................9

        E.    OxyChem Has Not Established A
Community-of-Interest Privilege Over Documents On The Maxus Log ........11

    II.    ANY PRIVILEGE OVER THE 66-PAGE GROUP OF
DOCUMENTS PREVIOUSLY PRODUCED HAS BEEN WAIVED.......................12

    III.    AFTER MONTHS OF DISPUTE, OXYCHEM
CONCEDES ITS PRIVILEGE LOG DEFICIENCIES AND
WRONGFUL WITHHOLDINGS ONLY AFTER THE SPG FILES ITS
MOTION....................................................................................................................14

CONCLUSION...................................................................................................................15

16063510.1

# **TABLE OF AUTHORITIES**

CASES

*Arconic Inc. v. Novelis Inc.*,
　Civ. No. 17-1434, 2019 WL 911417 (W.D. Pa. Feb. 26, 2019) ............................................... 14

*Hoffmann-La Roche, Inc. v. Roxane Laboratories, Inc.*,
　Civ. No. 09-6355 (WJM), 2011 2446600 (D.N.J. June 16, 2011) ........................................ 9, 11

*Immunex Corp. v. Sandoz Inc.*,
　Civ. No. 16-1118 (CCC), 2017 WL 2466507 (D.N.J. June 7, 2017). ..................................... 11

*In re Grand Jury Proceedings*, 604 F.2d 798 (3d Cir. 1979) ........................................................ 8

*Margulis v. Hertz Corp.*, Civ. No. 14-1209, 2017 WL 772336 (D.N.J. Feb. 28, 2017) ................. 2

*Schaeffer v. Tracey*,
　Civ. No. 2:15-CV-08836-MCA-SCM, 2017 WL 465913 (D.N.J. Feb. 2, 2017) ....................... 2

*Sippel Dev. Co. v. Western Sur. Co.*,
　Civ. No. 05-46, 2007 WL 1115207 (W.D. Pa. Apr. 13, 2007) ................................................ 15

COMMENTARIES

The Sedona Conference Commentary on Production of Privileged ESI (2016)) ......................... 14

RULES

Federal Rules of Evidence 502(b) - Rule 502(d) ........................................................................... 13

Rule 4:10-2(e)(2) of the Rules Governing the Courts of the State of New Jersey. ...................... 13

**INTRODUCTION**

OxyChem's 30-page Opposition (ECF No. 1102) ("Opposition") focuses almost entirely on its effort to withhold approximately 30,000 documents that Maxus previously refused to share with OxyChem—and OxyChem moved to compel the production of—when the two parties were adversaries in the Spill Act litigation.[1] Although unclear from the generic descriptions on OxyChem's privilege log in this case, the Maxus documents presumably explain Maxus's role at the site, its view of OxyChem's contributions, and OxyChem's liability for contamination from the Lister Plant. In its Opposition, OxyChem devotes little attention to the waiver of privilege for documents that were produced, but never clawed back, in the Spill Act litigation. And OxyChem concedes, after eight months of notice, numerous meet-and-confers, and the SPG's Motion to Compel, that many documents on its privilege logs never should have been withheld. This resulted in OxyChem producing yet another set of amended privilege logs on the day it filed its Opposition.

In a desperate attempt to prevent the production of Maxus's documents, OxyChem resorts to a kitchen-sink approach. It offers numerous potential privilege theories, including ones not even asserted on its privilege logs, and never fully explains how these theories apply to the facts of this case. OxyChem's muddling of the legal standards for the potential privileges serves to obfuscate fundamental facts it cannot escape. While Maxus and OxyChem may have been in "complete alignment" when it came to downplaying the human health risks of 2,3,7,8-TCDD, delaying cleanup efforts, and spreading blame for contamination in the Lower Passaic River, the record shows that they have long been adversaries on issues associated with OxyChem's operation of the

---

[1] The SPG's Motion to Compel (ECF No. 1091-1) ("SPG Br.") identified four categories of documents that the SPG asserted OxyChem has wrongfully withheld: (1) 30,000 documents that Maxus previously withheld from OxyChem when the parties were adversaries in the Spill Act litigation; (2) a group of documents that has been repeatedly produced in this and other litigation to hundreds of parties over the past decade; (3) communications with government entities; and (4) entries that are undated or give dates that are inconsistent with anticipated litigation.

Lister Facility and its primary liability for the Site. Indeed, OxyChem continues in this litigation to refer to Maxus as the "true and substantive successor" to the Lister Plant-related liabilities, trying to shift OxyChem's well-established liability to its defunct former indemnitor, Maxus. The Court should not permit OxyChem to hide Maxus's documents with unstated privileges and vague descriptions at the same time that it attempts to shift its judicially established responsibility for Lister Plant contamination to Maxus.

As explained below, the Court should grant the SPG's Motion to Compel and not allow OxyChem to continue to withhold documents that should have been produced long ago.

## ARGUMENT

**I. OXYCHEM HAS NOT ESTABLISHED THAT THE DOCUMENTS ON THE MAXUS LOG ARE SUBJECT TO THE JOINT-CLIENT OR COMMUNITY-OF-INTEREST PRIVILEGE**

**A. OxyChem Failed To Claim Joint-Client Or Community-Of-Interest Privilege Over Documents In The Maxus Log And Has, Therefore, Waived Those Privileges To The Extent They Ever Existed**

As a threshold matter, by failing to assert either the joint-client or community-of-interest privilege over any Maxus Log[2] documents in its privilege logs, OxyChem has waived those privileges. Failure to submit an adequate privilege log constitutes a failure to meet the burden to establish privilege and work-product claims and may constitute waiver of the asserted privilege or protection. *See Schaeffer v. Tracey*, Civil Action No. 2:15-CV-08836-MCA-SCM, 2017 WL 465913, at *4 (D.N.J. Feb. 2, 2017) (ruling that Prosecutor's Office waived the privilege asserted by submitting an inadequate privilege log); *Margulis v. Hertz Corp.*, Civil Action No. 14-1209, 2017 WL 772336, at *4 (D.N.J. Feb. 28, 2017) (stating that "it would be reasonable" in light of

---

[2] As it did in its opening brief, the SPG uses "Maxus Log" to refer to the privilege log Maxus served on OxyChem in 2011 in the Spill Act litigation. OxyChem refers to the same log as the "Drinker Biddle Log" in its Opposition. (Opp'n at 1-2.)

defendant's submission of an inadequate privilege log "to deny all claims of privilege by finding that the party asserting the privilege has not met its burden of establishing all of the elements").

OxyChem asserts that its privilege log "permits relevant challenges to the joint client and common-interest privileges asserted for each, individual document" (Opp'n at 2), but OxyChem's log nowhere asserts the joint-client or common-interest privileges over documents on the Maxus Log.[3]  OxyChem made vague allusions to such privileges during conferences with the SPG and the Special Master but never specified exactly which privilege it was relying on.

The record from the Spill Act litigation demonstrates OxyChem well knows the need to expressly assert these privileges.  In that case, in 2010, OxyChem claimed "common-interest/joint defense" over a number of communications between OxyChem and Maxus attorneys.  *See* excerpts attached as Exhibit 1.  Unlike here, those entries (a) expressly claimed the privilege, (b) identified communications between separate attorneys for the two parties, and (c) specifically described the subject matter over which a common interest was shared.[4]  *See, e.g.,* Ex. 1 at Log Nos. 1359, 1393 (asserting "common interest/joint defense" over communications between Maxus and OxyChem attorneys regarding "NRD Directive re Lower Passaic River" and "Newark Bay and Passive River Sediment Study," respectively).

OxyChem well understands the minimum requirements for asserting these privileges and should have to live with the consequences of its strategic decision not to even attempt to meet those standards in this case.  After four attempts, OxyChem still has not identified the privileges claimed or provided sufficient information to assess the claims.  In doing so, OxyChem also has

---

[3] Consistent with Third Circuit precedent, the SPG uses "common-interest privilege" and "community-of-interest privilege" interchangeably throughout this brief.  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (referring to "the community-of-interest (or common-interest) privilege").

[4] OxyChem did not claim the joint-client privilege over any documents in the 2010 Spill Act log.

disregarded the requirements of the Joint Protocol to support privilege claims on a document-by-document basis. (ECF No. 544 ¶ 4(c).) Accordingly, to the extent any joint-client or community-of-interest privilege ever applied to the Maxus documents, such privileges have been waived.

### B. OxyChem Misconstrues The Legal Standards For Establishing The Joint-Client And Community-Of-Interest Privileges

Throughout the parties' privilege dispute, OxyChem has refused to state with specificity what theory or theories it is relying on to claim privilege over documents in the Maxus Log. Its Opposition continues this practice by muddling the contours of three distinct privileges: the joint-client privilege, the community-of-interest privilege, and the joint-defense privilege.

OxyChem asserts that the "joint-client" and "community of interest" privileges are two categories of "common interest" privileges. *See* Opp'n at 3. In fact, the "common-interest privilege" is another term for the "community-of-interest" privilege, not an umbrella category for the community-of-interest and joint-client privileges. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359, 363 n.18 (3d Cir. 2007). The joint-client privilege is distinct from the common-interest privilege—the former involves multiple parties sharing common counsel on matters of shared interest while the latter involves communications between attorneys for separately represented parties in furtherance of a common interest between the parties. *Id.* at 363-64. By muddling two distinct legal theories, OxyChem tries to downplay its failure to state with specificity how either is applicable.

OxyChem also misreads *Teleglobe* as characterizing the community-of-interest privilege as "broader" than the joint-client privilege. *See* Opp'n at 4. In fact, what the Third Circuit said was that the community-of-interest privilege is broader than the *joint-defense* privilege—a third category of privilege that laid the groundwork for the community-of-interest privilege but applied only in the criminal context. *Teleglobe*, 493 F.3d at 364. OxyChem thus overstates the breadth of

4

the community-of-interest privilege and, as discussed below, fails to establish that its elements apply to the documents at issue.

### C. OxyChem's Asserted Privilege Over Documents On The Maxus Log Ignores The Substantial Adversity Between OxyChem And Maxus Regarding The Defense Of Lister-Related Liabilities

In its Opposition, OxyChem significantly oversimplifies the nature of its relationship with Maxus over the years. As discussed below, while OxyChem and Maxus were completely aligned on delaying cleanup activities and downplaying the human health risks of 2,3,7,8-TCDD, one of the most toxic substances known to man, the parties were not fully aligned about the Lister Plant. Rather, OxyChem and Maxus repeatedly sparred over the years about who was liable and should pay for Lister Plant-related liabilities. Indeed, Maxus not only resisted indemnifying OxyChem for those liabilities, it also claimed OxyChem was subject to direct liability for its own operation of the Lister Plant in the 1970s and its connections to the Plant even before those operations. OxyChem deflects from the real, substantive disputes between itself and Maxus relating to Lister Plant liability by attempting to shift the burden to the SPG to establish adversity over every document on its log. (Opp'n at 2). But OxyChem bears the burden to establish the privilege claimed for each document at issue. *See Teleglobe*, 493 F.3d at 364 n.22. By ignoring decades of adversity over Lister-related liability, OxyChem falls well short of meeting that burden.

The adversity between Maxus and OxyChem was apparent from the outset of NJDEP's and EPA's investigations of contamination at the Plant and subsequent enforcement activities. At that time, OxyChem immediately distanced itself from site operations and identified Maxus as the real party in interest. *See* Opp'n at Ex. 26. In the early 1990s, when EPA inquired through Maxus about historical site operations, OxyChem's Associate General Counsel, Alan Mack, claimed (wrongly) that OxyChem could not have any relevant information because it "did not operate the

Newark plant at the time when manufacturing activities ceased, or at any other time."[5]  For its part, during this time, Maxus repeatedly made clear to EPA that its activities at the Site were "on behalf of OxyChem" as an indemnitor and not because of its own liability, informing EPA that Maxus was not "a proper or necessary party" to proposed settlement agreements.  *See, e.g.*, Opp'n at Ex. 27.  Far from being an ancillary aspect of the parties' relationship, this friction over who would be liable for the massive amounts of contamination discharged from the Lister Plant characterized the relationship for the next 30 years and continues today even after Maxus declared bankruptcy.

The interests of Maxus and OxyChem diverge on liability issues relating to OxyChem's own operations of the Lister Plant in the 1970s and its connections to pollution-creating activities at the plant even before then, allegations that both Maxus and NJDEP made against OxyChem in the Spill Act litigation.  *See* Ex. 10 to Opp'n at 6 (explaining that Maxus filed cross claims against OxyChem in the Spill Act alleging that OxyChem's "control of Chemicaland subject it to direct liability based on its own conduct").  Maxus even designated The Intelligence Group's President Dennis Farley—a consultant who appears on hundreds of entries now at issue—as its Rule 30(b)(6) witness *against* OxyChem on his investigation into OxyChem's direct involvement with the Lister Facility.  *See* Farley Dep. Tr., excerpts attached hereto as Exhibit 3, at 20:5-21:3, 53:22-54:10, 83:22-84:84:6, 173:7-174:19, 202:7-204:22.  Mr. Farley's testimony crystallizes the dispute between the parties over OxyChem's direct operations at the Lister Plant in the 1970s:

> Well, the Chemicaland plant in late 1976 and early 1977 was operating for the sole benefit of Occidental's 2,4-D requirements. . . . At the time Occidental was in an operational role at the plant. . . . And during that period, I believe it's February 1977, the site was closed, shut down. . . . No cleanup was conducted based on the information that has been seen to date.

---

[5] Alan Mack Mar. 26, 2015 Dep. Tr., excerpts attached as Exhibit 2, at 457:12-458:21 (admitting that OxyChem's claim that it did not operate the Lister plant "appears incorrect").

*Id*. at 173:7-174:8. There is no way to tell from OxyChem's privilege logs whether it is wrongly withholding the results of Mr. Farley's investigation into OxyChem's liability for its own conduct at Lister. What is clear, though, is that OxyChem is withholding dozens of documents relating to Mr. Farley's work even after the Spill Act litigation was filed. *E.g.*, SPG Br. Ex. H-1 at 19 of 1436 (MaxPriv001246 claiming work-product protection over 2008 document from Dennis Farley described as "Memo prepared in anticipation of litigation and reflecting litigation strategy re: consultant investigation").[6]

Furthermore, OxyChem's own papers in opposition identify extensive litigation between OxyChem and Maxus over Lister Plant-related liabilities. OxyChem's interrogatory responses (Opp'n at Ex. 5) identify at least three legal proceedings in which OxyChem and Maxus were adversaries with respect to environmental costs under the 1986 Stock Purchase Agreement. Strangely, OxyChem asserts that these proceedings confirm the "complete alignment" of OxyChem and Maxus interests with respect to the Lister Plant, *see* Opp'n at 8-9, but they actually show that the parties have consistently attempted to foist Lister liabilities on one another. The judgments in those proceedings did not put a rest to this adversity; they reinforced it.

Similarly, OxyChem's previous statements in this litigation further undercut its self-serving attempt to now join itself to Maxus for all purposes. OxyChem cannot have it both ways. Before filing its Opposition, OxyChem repeatedly highlighted that Maxus was its adversary in the Spill Act case. During a January 28, 2019 status conference with Magistrate Judge Dickson, OxyChem balked at producing documents it received from Maxus and Tierra in the Spill Act

---

[6] The descriptions in these entries are so generic as to preclude the ability to decipher the actual subject matter of the withheld documents. After four amendments, OxyChem's failure to provide sufficient detail in these descriptions is, alone, sufficient grounds for requiring them to be produced on the grounds of waiver. *See supra*, § I.A.

7

litigation because Maxus and Tierra were "OxyChem's adversaries in the Spill Act litigation." (Jan. 28, 2019 Conf. Tr., excerpts attached as Exhibit 4 9:5-12.) OxyChem refers to Maxus and Tierra as its adversaries at least five times during the ensuing six transcript pages. *Id.* at 9:5-15:3.

Most recently, OxyChem has taken the position in this case that Maxus—not OxyChem—is the "true and substantive successor" to the Lister Plant-related liabilities. (OxyChem's Response to the Small Parties Group's Mot. for Partial Summ. J. on Occidental Chemical Corp.'s Successor Liability (ECF No. 967) at 1.) Although meritless, this position exemplifies OxyChem's and Maxus's longstanding dispute over the Lister Plant-related liabilities, and their repeated turning on each other in litigation and before third parties.

Given the longstanding, extensive adversity between OxyChem and Maxus, any purported claims of joint-client or community-of-interest privilege must be carefully scrutinized. *See In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979) (stating that both the attorney-client privilege and work-product doctrine "must be strictly confined within the narrowest possible limits consistent with the logic of [their] principle[s]." (internal quotation marks omitted)). In order for OxyChem to meet its burden to establish either of these privileges, it needed to be precise about the scope of the joint representation or the common interest furthered by the communication. *See Teleglobe*, 493 F.3d at 364 n.22 (stating that parties asserting community-of-interest privilege must "explain themselves" with "precision"). But OxyChem's privilege logs make no mention of either privilege, and its Opposition fails to rectify the deficiency. The record shows the very opposite of OxyChem's position—a longstanding, adverse relationship with Maxus, which continues to this day with Maxus's former corporate parents. As a result, OxyChem has failed to meet its burden for withholding any of the documents on the Maxus Log under either theory.

### D. OxyChem Has Not Established A Joint-Client Privilege Over Documents On The Maxus Log

OxyChem asserts that the SPG's motion "does not challenge—much less refute—the application of the joint client privilege." (Opp'n at 14.) But as discussed above, the simple reason for that is that OxyChem's privilege log *does not assert* the joint-client privilege over a single document on the Maxus Log. While OxyChem has submitted evidence (belatedly) that it shared counsel with Maxus, it has not established a joint-client privilege over any specific documents on the Maxus Log because (a) it has failed to define a specific scope and timing for the joint representation and (b) it has not demonstrated how documents OxyChem withholds from the Maxus Log fit into that scope or timeframe.

Simply claiming the existence of a joint representation is not sufficient to establish the privilege, because the privilege is only as broad as the scope of the joint representation. *See Teleglobe*, 493 F.3d at 362-63. "The existence of a joint-client relationship requires more than the mere representation of multiple clients with related interests, including examination of 'the understanding of the parties and the lawyer in light of the circumstances.'" *Hoffmann-La Roche, Inc. v. Roxane Labs., Inc.*, Civil Action No. 09-6355 (WJM), 2011 WL 2446600, at *3 n.5 (D.N.J. June 16, 2011) (quoting *Teleglobe*, 493 F.3d at 362). OxyChem makes little effort to elucidate the understanding of the parties or to define the scope of its joint representation with Maxus, much less to demonstrate the withheld documents fall within that scope and timeframe.[7]

---

[7] OxyChem cannot overcome these shortcomings with the generic and conclusory declarations of David Rabbe (ECF No. 1102-5) and Benjamin Lippard (ECF No. 1102-6). Neither declaration says anything about whether or how the privilege applies to specific documents on the Maxus Log. And Mr. Lippard, an attorney with Vinson & Elkins, was not retained by Maxus until 2003—in other words, 15 years after the events of which he claims to have personal knowledge. (ECF No. 1102-6, ¶¶ 2-3). Mr. Lippard's declaration is silent on whether he has ever even seen any of the documents on the Maxus Log.

9

Lacking any such explanation, the parties' past conduct is the best evidence of their relationship.  Significantly, OxyChem's effort to compel production of the Maxus Log documents in the Spill Act case is incompatible with its claim of joint-client privilege over those documents now.  If, as OxyChem contends, it shares a joint-client privilege over at least 22,525 documents on the Maxus Log, *see* Opp'n at 14, OxyChem either would have had those documents in the first place or had a right to obtain them from common counsel.  *See Teleglobe*, 493 F.3d at 366 (explaining that communications made in the course of a joint representation are available to all represented parties and subject to "the lawyer's fiduciary obligation of candor to both parties").  However, the record proves that there was no joint-client privilege over these documents.

OxyChem's petitioning the Spill Act court to compel production of those documents was not the action of a joint client seeking documents from its attorney; nor is Maxus's withholding the documents from OxyChem consistent with an understanding that they were subject to a joint-client relationship.  Contrary to OxyChem's suggestion that it requested only "*certain documents* on the [Maxus Log]," Opp'n at 10 (emphasis added), OxyChem requested that the Special Master order Maxus to immediately "produce *all* of their purportedly privileged materials."  (Exhibit B to SPG Br. at 3 (emphasis added); *see also id.* at 9 ("we respectfully submit that the most appropriate sanction would be to order the immediate production of the documents included on the List")*.*)  OxyChem's request was unequivocal, made no suggestion that OxyChem might share a joint privilege over the documents, and did not seek to impose any limitation on the production.  *Id.*

It was not until later that OxyChem qualified its request, saying that it wanted an opportunity to review the documents before they were produced more broadly.  *See* Ex. 12 to Opp'n.  Yet even then, OxyChem made no mention of a joint representation.  Rather, it highlighted the separate representation of the parties, stating that Maxus had communicated "with counsel for

OCC regarding" indemnification-related matters. *Id.* It further expressed uncertainty as to whether it had a privilege claim over such materials, claiming only that it was "possible, if not likely," that it held a privilege over some documents on the Maxus Log. *Id.* If OxyChem believed it was always "completely aligned" with Maxus, it would have said so in the Spill Act litigation.

OxyChem simply has not established a joint-client privilege over any documents on the Maxus Log. If it had such a privilege, why did it not obtain those documents from its own joint counsel? Why did it not cite the joint-client privilege in moving to compel the production of the documents or in seeking a first look at the documents before their broader production to NJDEP—a regulatory entity clearly at odds with both Maxus and OxyChem? Why has it still not produced any agreement setting forth the scope of the joint representation? How can OxyChem assert alignment when the parties had separate counsel and were adverse for decades?

At best, OxyChem has asserted that the same counsel may have represented multiple clients with related interests, but that is not sufficient to establish the joint-client privilege. *Hoffmann-La Roche*, 2011 WL 2446600, at *3 n.5. Because it has not explained the intention of the parties, defined the scope or timeframe of the joint-client relationship, or tied the relationship to any specific documents at issue, OxyChem has failed to meet its burden to establish the privilege.

### E. OxyChem Has Not Established A Community-of-Interest Privilege Over Documents On The Maxus Log

The community-of-interest privilege is not a privilege *per se* but an exception to the rule of waiver. *Teleglobe*, 493 F.3d at 364. It exists only where there is a communication "designed to further the shared interest." *Immunex Corp. v. Sandoz Inc.*, Civil Action No. 16-1118 (CCC), 2017 WL 2466507, at *3–4 (D.N.J. June 7, 2017). And such communication must be between *separate* attorneys for the parties. *Teleglobe*, 493 F.3d at 364 n.22. OxyChem fails to establish both elements of this limited privilege.

The community-of-interest privilege cannot protect any of the documents on the Maxus Log because OxyChem has not even attempted to establish that they were sent from Maxus to OxyChem to further a shared interest. To the contrary, OxyChem confirms it received the documents on the Maxus Log pursuant to court orders in bankruptcy. (Opp'n at 11-12.) Yet, its community-of-interest argument focuses solely on its shared interest with Maxus *before* the bankruptcy. *See id.* at 15-17. It makes no effort to rebut the point made in the SPG's Brief that after the bankruptcy Plan of Liquidation "Maxus had become immune to liability and any interest it ever had in minimizing collective liability among itself and OxyChem had passed." (SPG Br. at 9.) Rather than advancing a common legal interest between OxyChem and Maxus, the language of the Site Transition Agreement suggests that the exchange of information was intended to further the public interest in environmental cleanup, including "future management of environmental responsibilities," "transition[ing] the environmental remediation at the Sites" and providing "any required notification to regulators concerning the transfer." (Ex. 14 to Opp'n at 1.)

Nor does OxyChem attempt to show that the Maxus Log documents were exchanged between separate attorneys for OxyChem and Maxus as is required to establish the community-of-interest privilege. Rather, it points out that the Site Transition Agreement allowed it to use the same attorneys Maxus had used to defend environmental liabilities. OxyChem's failure to establish an exchange of materials in furtherance of a common interest between *separate* attorneys precludes a finding of community-of-interest privilege over the Maxus Log documents.

## II. ANY PRIVILEGE OVER THE 66-PAGE GROUP OF DOCUMENTS PREVIOUSLY PRODUCED HAS BEEN WAIVED

With respect to the second category of documents in the SPG's brief—the 66-page memo that has been repeatedly produced in various proceedings—any privilege over those documents was waived before a Rule 502(d) order was in place. OxyChem concedes that Maxus produced

12

the documents in the Spill Act case but claims that under its joint-client relationship, Maxus's production could not operate to waive OxyChem's privilege. (Opp'n at 24-25.) Even assuming OxyChem had established that the documents were subject to a joint-client privilege, which it has not, this argument ignores that in 2017—after the claimed joint-client relationship had ceased—the bankruptcy judge expressly declined to order clawback of documents produced in the Spill Act case. *See* SPG Br. at 11-12. Rather, the bankruptcy judge provided a roadmap for OxyChem to return to the New Jersey state Spill Act court if it wished to claw back the documents from the hundreds of parties that received the documents in that case. But OxyChem never did so. *Id.* OxyChem's failure, after ten years, to go to New Jersey state court to seek clawback and assert its claims of privilege over documents produced by Maxus to hundreds of adverse parties in the Spill Act litigation constitutes clear waiver. *See* Fed. R. Evid. 502(b). Rule 502(d) orders entered in subsequent proceedings do not protect against waiver in prior proceedings. Fed. R. Evid. 502(d) Explanatory Note ("If a disclosure has been made in a state proceeding (and is not the subject of a state-court order on waiver), then subdivision (d) is inapplicable").[8] The prior disclosure of these documents in the Spill Act litigation and ensuing failure to claw them back waived any privilege.

Numerous subsequent productions of these same documents—in the Maxus bankruptcy, by the Maxus Liquidating Trust in this matter, and by OxyChem in this matter—confirm any privilege has been waived notwithstanding the existence of Rule 502(d) orders. OxyChem suggests that Rule 502(d) orders give producing parties absolute protection from waiver,

---

[8] The disclosure in the Spill Act litigation was subject to a provision limiting waiver for inadvertent productions pursuant to Rule 4:10-2(e)(2) of the Rules Governing the Courts of the State of New Jersey. Because Rule 4:10-2(e)(2) is the New Jersey analogue to Fed. R. Evid. 26(b)(5)(B), its anti-waiver protection was subject to the disclosing party clawing back those inadvertently produced documents in the Spill Act court, which neither Maxus nor OxyChem did. *See* Fed. R. Evid. 502(b)(3).

13

irrespective of the care taken to protect their privileged material. This dubious position is unsupported by legal citation and unworkable in practice. Before passage of Rule 502(d), many courts enforced anti-waiver provisions but imposed some duties to take reasonable care or avoid gross negligence in handling privileged material. *See* SPG Br. at 13-14. Rule 502(d) merely codified the enforceability of those provisions and extended the enforceability to subsequent proceedings; it did not disturb the manner in which courts enforce them. OxyChem offers no authority to the contrary. Moreover, the "Sedona Commentary cautioned that 'a Rule 502(d) order should not be used as a cost-shifting tool allowing the producing party to make a "data dump" and requiring the requesting party to identify privileged documents.'" *Arconic Inc. v. Novelis Inc.*, Civil Action No. 17-1434, 2019 WL 911417, at *3 (W.D. Pa. Feb. 26, 2019) (citing The Sedona Conference Commentary on Production of Privileged ESI, 17 Sedona Conf. J. 95, 104 (2016)).

But OxyChem's approach does just that. Because most states' ethical rules for attorneys require the identification and sequestration or destruction of another party's privileged material, OxyChem's approach effectively shifts the burden to the receiving party to identify the producing party's privileged material. The Court should not tolerate such abuse of Rule 502(d). Here, the repeated productions to hundreds of parties and the failure to claw back the documents in the Spill Act litigation after more than ten years fail under any standard.

### III. AFTER MONTHS OF DISPUTE, OXYCHEM CONCEDES ITS PRIVILEGE LOG DEFICIENCIES AND WRONGFUL WITHHOLDINGS ONLY AFTER THE SPG FILES ITS MOTION

OxyChem concedes the third and fourth categories of challenges in the SPG's brief—pertaining to communications with regulators and documents either not dated or dated before any reasonable anticipation of litigation regarding the Lister Plant. (Opp'n at 29.) OxyChem admits it improperly withheld 163 documents and had nearly 3,000 deficient log entries. *See id.* By doing so, and then failing to correct those issues for more than eight months after the SPG raised them,

14

OxyChem has waived its claims of privilege or protection over the still withheld documents. *See supra*, § I.A (explaining that failure to submit an adequate privilege log may constitute waiver).

To address these issues, OxyChem submitted its *fourth* version of its First Privilege Log and *second* version of its Fourth Privilege Log. OxyChem nevertheless states, wrongly, that these challenges could have been resolved without the Court's intervention. *Id.* These categories fall within the challenges to OxyChem's logs that the SPG has been making since January and were explicitly addressed in meet and confers in June. While the SPG might not have identified every single document that fell into these categories before filing its motion, OxyChem was on notice of the flaws in its logs since January and should have corrected these plainly deficient entries.

Moreover, OxyChem states that it is withholding "a privileged settlement communication with a regulator." It cites no authority to support this withholding. Although Fed. R. Evid. 408 renders settlement communications inadmissible for certain purposes, that provision does not shield such communications from discovery. *Sippel Dev. Co. v. Western Sur. Co.*, Civil Action No. 05-46, 2007 WL 1115207, at *2 (W.D. Pa. Apr. 13, 2007) (collecting cases). Simply put, all documents exchanged with federal or state regulators should be produced.

## CONCLUSION

The SPG respectfully requests that the Court grant the relief requested in the SPG's Motion to Compel. OxyChem's Opposition fails to establish that the documents at issue were protected by either the joint-client privilege or the community-of-interest privilege—and, in any event, it has waived its right to rely on such privileges by failing to assert them earlier. Moreover, Rule 502(d) orders in the bankruptcy matter and this case do not undo the waiver that occurred when Maxus disclosed documents in the Spill Act case and failed to return to the New Jersey court to claw them back. Nor should the Court countenance careless reliance on 502(d) orders. Finally, OxyChem has conceded that the balance of documents were improperly withheld or improperly logged.

Date: September 18, 2020									Respectfully submitted,

/s/ Jeffrey D. Talbert
**PRETI, FLAHERTY, BELIVEAU
 & PACHIOS, LLP**
One City Center, PO Box 9546
Portland, ME 04112
Telephone: 207.791.3239
Jeffrey D. Talbert, Esq. (admitted *pro hac vice*)
Benjamin S. Piper, Esq. (admitted *pro hac vice*)
James W. Beers, Jr., Esq. (admitted *pro hac vice*)

**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: 816.474.6550
David R. Erickson, Esq. (admitted *pro hac vice*)
Joseph H. Blum, Esq. (NJ Bar No. 010211984)

*Common Counsel for the Small Parties Group*

16

## **CERTIFICATE OF SERVICE**

   I, Jeffrey D. Talbert, hereby certify that on September 18, 2020, I caused a copy of the foregoing document to be served via electronic filing on all counsel of record.


Dated: September 18, 2020   */s/ Jeffrey D. Talbert*
                **PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
                One City Center, PO Box 9546
                Portland, ME 04112
                Telephone: 207.791.3239