# Ballard Spahr
### LLP

– – – – – – – – – – – – – – – – – – – –

210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1163
TEL 856.761.3400
FAX 856.761.1020
www.ballardspahr.com

David A. Haworth
Tel: 856.873.5525
haworthd@ballardspahr.com

January 27, 2020

*Via E-mail*

John J. McDermott, Esq.
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, NJ 08033

Kathy D. Patrick, Esq.
Gibbs & Bruns LLP
1100 Louisiana
Houston, TX 770022

Re:     Occidental Chemical Corp. v. 21st Century Fox Am., Inc., et al.
        Civil Action no: 2:18-cv-11273-MCA-JAD

        Arkema Inc.'s Response to January 9, 2020 correspondence and follow up to Special
        Master conference of January 15, 2020

Dear Mr. McDermott and Ms. Patrick:

We represent Arkema Inc. in the above-captioned matter.  I write in response to your
correspondence of January 9, 2020 regarding ESI, and also in follow up to Special Master
Scrivo's request that the SPG Parties advise you of their positions regarding the common
search terms and OCC's proposed January 9, 2020 ESI questionnaire.  For your
convenience, I have attached hereto as Exhibits 1-3 the January 9, 2020 letter re ESI, the
Search Terms, and the ESI questionnaire.

## ESI Scope and site background

Your January 9, 2020 letter limits the scope of OCC's e-discovery to three issues:
"historical operations at the property, releases of hazardous substances from the property,
and remedial actions at or concerning the property."

Please recall that the Wallace & Tiernan facility was located at 25 and 67 Main Street in
Belleville, New Jersey ("the Facility"). Wallace & Tiernan Inc. operated the Facility from
approximately 1921 until it was merged into Pennwalt Corporation (now known as Arkema

John J. McDermott, Esq.
Kathy D. Patrick, Esq.
January 27, 2020
Page 2

Inc.) in 1969, and the Wallace & Tiernan Division of Pennwalt Corporation operated the Facility from 1969 until the sale by Pennwalt Corporation of the Wallace & Tiernan Division in or about May of 1989. Arkema remediated the Facility from the time of the 1989 sale through 2002, when the New Jersey Department of Environmental Protection issued a No Further Action letter ("NFA").  During Arkema's 1921-1989 period of ownership/ operation, no responsive ESI would have been created that was not already produced as part of prior paper productions.  Any potentially responsive ESI that was created post 1989 sale relating to the remediation activities has either (1) already been produced as part of the paper production; (2) is not relevant and proportional to the discovery needs of the parties, or (3) is privileged and need not be logged per the agreements of the parties.  We have supplied over 50,000 pages of discovery concerning historical operations, remedial activities and sampling information, most recently in December 2019, including reports and appendices, lab data, correspondence to/from NJDEP, and the 2019 Bi-annual certification for Groundwater, and the 2019 Annual Monitoring Report.

### Arkema's Position Regarding the Common Search Terms

As noted above, while we are certainly willing to meet and confer regarding e-discovery, there seems to be little point.  There is no additional responsive ESI available other than privileged communications that the Joint Production Protocol says does not have to be logged.  Therefore, at this time the common search terms list (see Exhibit 2) that OCC has now indicated are acceptable to OCC, subject to tailoring during individual meet and confer sessions, seem to be of little relevance or importance with respect to Arkema, and Arkema has no comment at this point.  But, Arkema reserves the right to address the sufficiency and propriety of the terms further should a meet and confer be requested.

If you believe a further meet and confer on this issue is warranted, please let me know.

### OCC's Proposed ESI Questionnaire of 1/9/2020

At your request, Special Master Scrivo asked SPG members to attempt to provide general comments to OCC regarding the proposed ESI questionnaire (Exhibit 3).  Arkema joins in the general SPG group response from Jeff Talbert dated 1/27/20.  Additionally, Arkema further objects that the questionnaire and topics therein are not appropriate or relevant to Arkema so Arkema will not be completing it.

We trust this addresses OCC's concerns in full.  If it does not, then we can certainly arrange a meet and confer session at a mutually convenience time and place.

John J. McDermott, Esq.
Kathy D. Patrick, Esq.
January 27, 2020
Page 3


Thank you.

Very truly yours,

*David A. Haworth*

David A. Haworth
DAH/mds


cc:     David Erickson, Esq.
        Lee Henig-Elona, Esq.
        Diana Buongiorno, Esq.
        Jeffrey Talbert, Esq.
        David Altman, Esq.
        Steven Richman, Esq.
        Joseph Brendel, Esq.
        Wendy Klein, Esq.
        Randy Pearce, Esq.

# EXHIBIT 1





Kathy D. Patrick
Partner
kpatrick@gibbsbruns.com
713.751.5253

January 9, 2020

***Via Email***
Jeffrey D. Talbert, Esq.
Preti Flaherty Beliveau & Pachios LLP
One City Center
P.O. Box 9546
Portland, ME 04112
jtalbert@preti.com

Re:     *Occidental Chemical Corp. v. 21st Century Fox Am., Inc., et al.*
        Civil Action No. 2:18-cv-11273-MCA-JAD

Dear Jeff:

        We write to further address the issues discussed during the parties' meet and confer on December 20, 2019.  Those issues were also the subjects of your December 19, 2019 letter regarding ESI and your January 3, 2020 letters regarding OxyChem's production of sampling database files.  We propose that the parties meet and confer regarding the enclosed ESI Collection Questionnaire (discussed below) on January 10.  Please let us know your availability on that date.

## I.      **OxyChem's ESI Methodology**

        In our September 26, 2019 letter ("OxyChem's ESI Letter") to Defendants, we detailed OxyChem's efforts to collect its relevant ESI and prepare that ESI for production.  Your December 19 letter requested clarification of certain aspects of OxyChem's methodology, and during the December 20 meet-and-confer teleconference we responded informally to those inquiries.  A written response to each inquiry follows:

SPG inquiry 1: *The September 26, 2019 letter states, "In connection with the bankruptcy of its indemnitors Maxus and Tierra, OxyChem took possession of certain electronically-stored information related to its indemnitors' various environmental remediation projects." Please confirm: 1) that the "Tierra Transition ESI" includes all ESI obtained from Maxus and Tierra as a result of the Transition Services Agreement, and 2) that all ESI within this category was reviewed by counsel for responsiveness and privilege without the use of search terms.*

Jeffrey D. Talbert, Esq.
January 9, 2019
Page 2

We confirm that the Tierra Transition ESI includes all ESI obtained from Maxus and Tierra as a result of the Transition Services Agreement, and that all ESI within this category was reviewed by counsel for responsiveness and privilege without the use of search terms.

SPG inquiry 2: *The second category of ESI described in the September 26, 2019 letter is "Electronic Media Found in Hard-Copy Files." According to the September 26, 2019 letter, this category consists of "hundreds of electronic media" that were co-located with hard-copy materials that OxyChem obtained in connection with the Maxus/Tierra Bankruptcy. As to this second category, please confirm that all ESI was or will be reviewed for responsiveness and privilege by counsel without the use of search terms.*

OxyChem's Initial Disclosures identified four sets of hard-copy materials received by OxyChem in connection with the Maxus/Tierra bankruptcy. Those sets are listed below, with a description of whether portable media containing ESI were found to be co-located with each set and how OxyChem reviewed that ESI for responsiveness and privilege.

(1)  Documents in Tierra's New Jersey offices: Portable media containing ESI were co-located with these documents. That ESI was harvested by OxyChem's vendor and has been (or will be) reviewed for responsiveness and privilege by counsel, without the use of search terms.

(2)  Documents stored at Iron Mountain: As you know, during the Defendants' review of the Tierra Iron Mountain documents, both counsel for OxyChem and counsel for the SPG identified portable media contained in these boxes. All portable media in boxes selected for scanning by Defendants will either be reviewed by OxyChem for responsiveness and privilege by counsel without the use of search terms or has already been provided to Defendants and produced back to OxyChem in the SPG's production on October 28, 2019.

(3)  Documents stored at the site located at 80-120 Lister Avenue: A small set of portable media containing ESI was co-located with these documents. That ESI was harvested by OxyChem's vendor and has been (or will be) reviewed for responsiveness and privilege by counsel, without the use of search terms.

(4)  Hard-copy documents from consultant(s) that provided data-validation services to Tierra: OxyChem has not reviewed these hard-copy documents and does not know whether any portable media containing ESI are stored in these boxes. An index of these hard-copy documents was provided to the Defendants on October 18, 2019.

Jeffrey D. Talbert, Esq.
January 9, 2019
Page 3

SPG inquiry 3: *The September 26, 2019 letter generally describes the types of subjects of OxyChem ESI but does not provide any detail as to how relevant employees and affiliates were identified or how the searches were conducted to identify responsive documents. In addition, it appears that some or all of the "custodians" listed in Exhibit A to the September 26, 2019 letter may not have had actual possession of ESI but instead were interviewed regarding "locations . . . where potentially responsive ESI may be stored." Without additional detail on the relationship of the individuals listed in Exhibit A to the subject matter of this suit, it is impossible to determine whether Exhibit A, in fact, constitutes a "proportional list of custodians."*

To identify responsive documents, counsel for OxyChem conducted a due diligence investigation to identify individuals who create, receive, and manage ESI that is reasonably likely to be relevant to the claims and defenses in the case. That investigation identified the 26 custodians listed on Exhibit A to the OxyChem ESI Letter. Each custodian was interviewed by counsel to determine the locations where potentially relevant ESI is stored, including sources managed by each individual custodian (e.g., email messages or files, hard drives, personal network storage, personal devices and external media), and sources of relevant ESI managed at the organizational level.

SPG inquiry 4: *Furthermore, while we acknowledge that Exhibit B to the September 26, 2019 letter provides sixteen pages of search terms, these terms were only applied to "locations where ESI related to the Site was not intentionally filed, but nevertheless may contain responsive ESI (e.g., "Sent" email folders)." This appears to be at odds with the process contemplated by the Joint Protocol in which custodians' ESI is searched for potentially responsive documents using an established set of search terms. In addition, the search terms identified in Exhibit B are insufficient to reasonably capture potentially responsive ESI. We propose that OxyChem's ESI search terms be expanded in accordance with Exhibit 1 to this letter.*

As we explained during the December 20 meet-and-confer teleconference, counsel for OxyChem applied one of two review methodologies to each source of potentially responsive ESI identified by custodians during the due diligence process described above. For locations or sources of potentially relevant ESI identified by a custodian as specifically designated for storing documents related to the Diamond Alkali Superfund Site or other subjects related to this lawsuit, *all* ESI from that source or location was harvested and counsel conducted a linear review of that ESI for responsiveness and privilege. This included folders created by certain custodians in response to the Legal Hold issued by OxyChem, in which those custodians saved all emails related to issues relevant to this lawsuit to a designated inbox folder. All ESI from such inbox folders were collected and reviewed without using search terms.

Where custodians identified certain locations or sources as potentially containing relevant ESI, but *not* specifically designated or used for the storage of documents related to issues relevant to this lawsuit, those locations were searched as well. For example, certain custodians reported that they do not manage their "Sent" mailbox folders by saving emails to separate folders based on subject matter. For those locations or sources, OxyChem's vendor collected *all*

Jeffrey D. Talbert, Esq.
January 9, 2019
Page 4

ESI within each location or source (e.g. an entire and undifferentiated "Sent Mail" folder), applied the search terms listed on Exhibit B to OxyChem's ESI Letter, and the documents containing any search term were reviewed by counsel for responsiveness and privilege.

The Joint ESI Protocol does not, as your December 20 letter contends, require that "custodians' ESI is searched for potentially responsive documents using an established set of search terms." Rather, the Joint ESI Protocol provides that "The parties will meet and confer regarding appropriate methodologies to identify the ESI documents to be reviewed for production." *See* Dkt. 544 at ¶ 3(k). The meet-and-confer contemplated by the Joint ESI Protocol began with OxyChem's ESI Letter. While an "established set of search terms" is one method of isolating information that is likely responsive, it is not the only reasonable method of doing so, and nothing in the Joint ESI Protocol restricts a party to using only a search term method. In fact the Protocol specifically reserves the right of any party to employ "additional reasonable measures consistent with principles of proportionality to preserve, search for, retrieve and produce ESI, documents or tangible things in response to discovery requests made by any other party." *See* Dkt. 544 at ¶ 6(c). This is consistent with the principle that "it is . . . the producing party who is the best position to determine the method by which they will collect documents." *Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 427 (D.N.J. 2009) (citing *The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*). The methods OxyChem employed, which were standardized through an interview and search process used for every custodian, were reasonable and complied with OxyChem's obligations both at law and under the Joint ESI Protocol.

Finally, we address below your assertions regarding the adequacy of the search terms listed on Exhibit B to OxyChem's ESI Letter and on Exhibit 1 to your December 20 letter.

SPG inquiry 5: *The September 26, 2019 letter states, "ESI documents containing one or more search terms and any related inclusive threads were subject to a linear review for responsiveness and privilege." Please confirm that a "linear review" means that all hits using these broad search terms have been or will be reviewed further by counsel for responsiveness to Defendants' document requests and privilege, and that only documents responsive to Defendants' document requests and not subject to a claim of privilege will be produced. If OxyChem intends to produce all non-privileged documents that are captured by the broad search terms in Exhibit B without regard to Defendants' document requests, Defendants propose that OxyChem's existing search terms be narrowed in accordance with Exhibit 1 to this letter.*

In OxyChem's ESI Letter, the term "linear review" is used as defined by The Sedona Conference.[1] We confirm that all hits using the search terms listed on Exhibit B to OxyChem's ESI Letter have been or will be reviewed further by counsel for responsiveness to Defendants' document requests and for privilege, and only documents responsive to Defendants' document

---

[1] "Performed by humans. Linear review workflow begins at the beginning of a collection and addresses information in order until a full review of all information is complete." *The Sedona Conference Glossary: E-Discovery & Digital Information Management* (Fourth Edition) (2014) at p. 336.

Jeffrey D. Talbert, Esq.
January 9, 2019
Page 5

requests (or documents that OxyChem otherwise may use to support of its claims or defenses) will be produced. OxyChem does not intend to produce all non-privileged documents that are captured by its Exhibit B search terms.

## II.   ESI Collection Questionnaire

As demonstrated by OxyChem's ESI Letter and your questions in response, identifying areas of dispute and agreement regarding the parties' ESI methodology will require exchanging information about each party's collection and review process. As we proposed during the December 20 meet-and-confer teleconference, an efficient way to facilitate this exchange is for each party to complete a short questionnaire eliciting, in a uniform format, the types of information provided in OxyChem's ESI Letter and in the paragraphs above. We are enclosing with this letter a proposed questionnaire.

## III.   SPG's ESI Proposal & Search Terms

Your December 19 letter proposes limitations on the scope of ESI to be collected by the Defendants, and also proposes search terms to be used in that collection.

As a preliminary matter, OxyChem agrees that the scope of ESI discovery sought by all parties is governed by the Joint Protocol, and that, as previously agreed, for the purposes of initial discovery, "Defendant's Property" is limited to facilities or properties at issue in the Complaint. Moreover, in the interest of moving discovery along, OxyChem has agreed to limit the scope of initial ESI discovery to three issues core to OxyChem's lawsuit and the Defendants' counterclaims; namely, historical operations at the property, releases of hazardous substances from the property, and remedial actions at or concerning the property. OxyChem cannot agree to the additional ESI limitations proposed in your December 19 letter.

First, limiting ESI only to years during which a Defendant owned or operated a property would exclude any relevant ESI that a Defendant inherited from a predecessor owner of the property but maintains in its files. By definition, a successor-in-interest has liability for the entity that it has legally succeeded. The successor, therefore, is the existing party from which to seek discovery. Even if a former owner of a Defendants' Property is not a predecessor-in-interest, the documents received from that former owner are still highly relevant to evaluating the historical operations at or discharges from a site, investigation and remediation activities, etc. and are thus relevant to the parties' claims and defenses and proportional to the needs of this case, which is the standard for discovery under the Federal Rules.

Furthermore, limiting ESI only to the eight COCs identified in the ROD, or only to manufacturing operations that used or generated any of the eight COCs identified in the ROD, is unduly restrictive. In assessing cleanup responsibility and liability, EPA itself has recognized (for example, in the earlier *de minimis* settlements) that those eight chemicals alone are not the only causes contributing to the cleanup. And, even as to those eight chemicals, we have discussed repeatedly the fact that Defendants' proposed limitation would exclude from their production evidence concerning pre-cursor materials that yield one or more COCs as a result of a

Jeffrey D. Talbert, Esq.
January 9, 2019
Page 6

manufacturing process or waste, and would likewise exclude evidence of chemical degradation products and markers that point to the presence of COCs. As we have discussed this previously and believe you understand the point, at this juncture Defendants need simply to state a position: will they or will they not stand on their insistence that only the eight COCs be the subject of discovery?  If so, we need to submit this issue to the Special Master for decision, as the bounds of relevance (which all skilled counsel understand) would clearly exclude, for example, evidence of the asbestos contamination certain of your colleagues have cited—which plays no role in any issue in this lawsuit. Stated differently, the use and release of other Hazardous Substances by Defendants will lead to the discovery of admissible evidence related to the eight COCs. For instance, a COC released from a Defendant's property may be co-located in the river with another Hazardous Substance released from the same property.  Or the use of substances other than the eight COCs at a Defendants' Property could lead to discoverable information about the use or discharge of COCs—for example, as alleged in OxyChem's Complaint, SPG Defendant Innospec "utilized or discharged several hazardous substances including maleic anhydride, dichlorobenzene, and trichlorobenzene, which are Class III organic compounds that EPA has associated with the formation of dioxins."  While there may be exceptions—again, OxyChem is not seeking production of documents related to friable asbestos at a Defendants' Property—those exceptions cannot drive the rule.  Accordingly, OxyChem is entitled to discovery related to Defendants' use of and releases of all CERCLA-defined Hazardous Substances.

Similarly, SPG Defendants may not limit their ESI as to remedial investigations and actions at Defendants' Properties only to those "performed by the Defendant under CERCLA, ISRA, ECRA, or the Spill Act relating to releases of any of the eight COCs identified in the ROD."  As stated above, OxyChem is entitled to discovery related to Defendants' releases of *all* CERCLA-defined Hazardous Substances, not merely those related to the eight COCs. Moreover, OxyChem has the right to inquire into relevant remedial investigations and actions that were *not* performed under CERCLA, ISRA, ECRA, or the Spill Act if, in fact, those remedial investigations and actions are relevant to the facts of this dispute.

Nor is there any reason to "[e]xclude releases to contained or indoor spaces."  As Defendants are surely aware, releases to "contained" or "indoor spaces" can have environmental impact beyond those areas, and simply because a release is "indoors" does not mean that the involved chemicals did not reach the Passaic River, or that they could lead to evidence about or support the proof of releases to the Passaic River.  OxyChem is entitled to production of relevant ESI on *all* releases, and to draw its own conclusions about whether and how any such releases affected contamination in the Passaic River.

Finally, OxyChem does not consent to SPG Defendants' blanket exclusion of environmental compliance audits and similar investigations undertaken by or at the direction of counsel.  While certain environmental compliance audit- or investigation-related documents may be subject to a privilege, unless such documents fall into an exception already included in the Joint Protocol they will have to be identified and listed on a privilege log.  Moreover, *results* of any such audit or investigation at the very least would not be privileged and should be produced. Under Defendants' theory, Defendants could shield all evidence about the current state of their

Jeffrey D. Talbert, Esq.
January 9, 2019
Page 7

Properties by having counsel initiate investigation or sampling.  The results of environmental audits and/or investigations on the Properties at issue are highly relevant evidence to which Defendants have unique access and that would be highly burdensome for OxyChem to obtain by other means.  It would be extremely prejudicial for Defendants to hide this evidence.

With regard to the search terms themselves, OxyChem will agree to search its ESI for the terms listed on Exhibit 1 to your December 19 letter and to review the documents containing any of those terms for responsiveness and privilege, with one exception: the search term "release" is unreasonably broad and OxyChem will not use that search term.  But OxyChem believes Defendants should also run those Exhibit 1 search terms on their own ESI (in addition to the terms listed on your Exhibit B).

**IV.**     **OxyChem's Production of Sampling Database Files**

During the December 20 meet-and-confer teleconference, we also discussed the SPG Defendants' request that OxyChem reproduce its sampling data in a different format from the format used in OxyChem's November 4, 2019 production.  That request was reiterated in your January 3, 2020 letter.  Below, we address the SPG Defendants' apparent confusion about what OxyChem has produced and how it was produced.

A.  OxyChem's Production of Sampling Data

In compliance with the Special Master's October 3, 2019 Order, OxyChem produced electronic files containing all Sampling Data received from its indemnitors as production volume OCC-CER-S002, and all Sampling Data collected by OxyChem after entry of the Environmental Site Transition Agreement in the Maxus/Tierra Bankruptcy as production volume OCC-CER-SD001.[2]

As we explained during the parties' December 20, 2019 teleconference, the sampling data collected by OxyChem (OCC-CER-SD001) were produced in the same format in which the data was submitted to EPA.[3]  That format, called Electronic Data Deliverable (EDD), is specifically required by EPA Region 2 to facilitate a standardized exchange of data between Earthsoft's EQuIS database program—the same database program used by EPA, OxyChem's consultant, and the SPG Defendants' consultant.  In addition, certain data were also produced to Defendants in Microsoft Access format.

---

[2] OCC-CER-SD001 included sampling data collected through the date of the Special Master's Order. Sampling data collected after entry of the Special Master's October 3, 2019 order were subsequently produced by OxyChem on November 25, 2019 (as production volume OCC-CER-SD002) and on December 31, 2019 (as production volume OCC-CER-SD003).  These volumes were produced in the same format as OCC-CER-SD001.

[3] The electronic files received from Tierra (OCC-CER-S002) were produced to Defendants in the same format as OxyChem received them.  It is our understanding that the SPG Defendants (who also received the data produced as OCC-CER-S002 in the Maxus/Tierra Bankruptcy) are not requesting reproduction of that data.

Jeffrey D. Talbert, Esq.
January 9, 2019
Page 8

As your January 3 letter points out, the files included in OCC-CER-SD001 had bates numbers for filenames.  The Joint Protocol specifically requires this naming convention for files produced in native format.  *See* Dkt. 544 at ¶ 3(c) ("The file name for documents produced in native form will consist of a Bates number and, if applicable, a confidentiality designation.").  But your statements that "no index or key to the bates numbers was included with the production" and "there is no way to review or analyze the thousands of sampling data files without blindly opening each file to locate relevant sampling data" are incorrect.[4]  Also as required by the ESI Protocol, OxyChem included with its November 4, 2019 production the required metadata for each file—including the original filename and folder path.  *See id.* at Appendix B.

We hereby provide that information *again* in the enclosed Microsoft Excel file that cross-references each file in OCC-CER-SD001 with its full file path and original filename.  Like the metadata previously provided to Defendants, which Defendants could already use and access, that information can be used to easily navigate OxyChem's production: the files related to OxyChem's sampling at OU2 can be found within the root folder "DASS-OU2PassaicRiver," and the files related to OxyChem's sampling at OU1 can be found within the root folder "DASS-OU1Lister."  OxyChem provided to its litigation experts the exact production sent to Defendants, and those experts were able to navigate the production and import the data without issue.

B.   The SPG's Request that OxyChem Reproduce the Data in a Different Format

As explained above, OxyChem has already produced its data in a format that environmental consultants commonly utilize—the standard EDD format required by EPA specifically for the purpose of importing data into its EQuIS database.  Nevertheless, you have requested that OxyChem reproduce its data in a different format.  Consistent with the ESI Protocol's requirement to meet and confer regarding production of databases, OxyChem has conferred with the consultant that manages its EQuIS database to identify what options are available for such a reproduction.

As an initial matter, your January 3 letter seems to envision production of a single "Master Database" file that can be produced to the SPG Defendants.  It is our understanding that, due to the massive size of the EQuIS database maintained by OxyChem's consultant, such an export would be technically impossible.  But there are two options to reduce the number of files involved in the transfer of the OCC-CER-SD001 data.

The first option is to export *only the validated data* from OCC-CER-SD001 into one or more Microsoft Access files.  Because of size limitations for Microsoft Access files, multiple files may still be required to transfer the validated data.  In light of the SPG Defendants' months-long perseveration about the importance of unvalidated laboratory data, it is also unclear whether this option would satisfy the purported needs of the SPG Defendants.  OxyChem's consultant

---

[4] Your statement that there are "thousands of sampling data files" is also misleading.  While 2,407 native files are included in the production, nearly all of those files are laboratory reports and data validation reports in PDF format.  Only 164 are "sampling data files" to be imported into your consultant's database.

Jeffrey D. Talbert, Esq.
January 9, 2019
Page 9

would need several days to perform this export, and the estimated cost to the SPG Defendants would be $2,500.

The second option is to export the validated data and all laboratory QC data into a rearranged version of the EDD files already produced within OCC-CER-SD001. While this may reduce the number of files in the production, given the volume of sampling data it is unclear how many files would be needed to transfer the data. For example, certain EDD files within OCC-CER-SD001 are already at maximum file size and would have to be re-produced as duplicates, while other files are below maximum size and may be combined. Moreover, these files would need to be checked for accuracy and completeness after the export. OxyChem's consultant would need several weeks to perform this export, and the estimated cost to the SPG Defendants would be $15,000.

Because OxyChem's sampling data has already been produced in a format designed to be compatible with the EQuIS database program used by the SPG Defendants' consultant, and is in the format mandated by EPA, if the SPG Defendants want something different than the way the materials are maintained in the ordinary course of business, they will need to pay any costs associated with reproducing that data in the format the SPG prefers.

C. The SPG Defendants' Production of its Consultant's Sampling Database

In your January 3 letter, you emphasize that the production of sampling data is essential to the parties' adequate and timely review of the sampling data and is necessary to ensure that the parties timely resolve sampling data issues. You also state that the SPG Defendants will incur administrative costs in producing their sampling data in a useable format to OxyChem. To date, OxyChem has not received the SPG Defendants' sampling database in *any* format, despite the fact that it has been requested for many months. Please confirm by January 10 that the SPG Defendants intend to produce this database within a reasonably short timeframe, so the parties can promptly resolve any such issues.

Very truly yours,

Kathy D. Patrick

/s/ *John J. McDermott*

John J. McDermott

cc:   All counsel of record
217768614v2

# EXHIBIT 2

# Exhibit 2

[Property address or Facility Name or Facility ID# or ISRA Case #] AND

[2,3,7,8* or TCDD or dioxin* or furan or PCB* or Aroclor or "polychlorinated biphenyl" or mercury or Hg or DDT or dichlorodiphenyltrichloroethane or copper or Cu or dieldrin or pesticide or PAH or "poly aromatic" or polyaromatic or polycyclic or lead or Pb]

AND:

analy* w/5 "soil"
analy* w/5 "ground*"
analy* w/5 "sediment"
analy* w/3 "data"
application w/5 "permit"
"AST"
Basin
bypass
"CERCLA" or "Comprehensive Environmental Response, Compensation, and Liability Act"
"cleanup plan" or "clean-up plan"
"corrective action"
"corrective measures study"
 "dep.nj.gov"
dispos*
"discharge"
drain w/10 ("release" or spill or leak or disch* or emit*)
drum w/10 ("release" or spill or leak or disch* or emit*)
dump*
"ECRA" or "Environmental Cleanup Responsibility Act. "
effluent w/5 disch*
emergency w/5 "response" emission
"Environmental Protection" w/3 Agency
"Environmental Protection" w/3 Department
EPA
"epa.gov"
Explosion
"feasibility study"
fire
investigat* w/2 rem*
"ISRA" or "Industrial Site Recovery Act"
lagoon
landfill*
leak
manifest w/5 dispos*
manufactur*
"NJDEP"

NOV or "notice of violation"
"NPDES"
operat*
"operating permit"
outfall
Passaic w/3 River
permit w/5 waste*
permit w/5 disch*
"pipe*" w/5 ("release" or spill or leak or disch* or emit*)
piping w/5 ("release" or spill or leak or disch* or emit*)
pit
plumbing w/5 ("release" or spill or leak or disch* or emit*)
plume
"preliminary assessment"
pollution
pretreat* w/10 "waste*"
PVSC  or "Passaic Valley Sewerage Commission"
RCRA or "Resource Conservation and Recovery Act"
"record of decision" or "ROD"
"Region 2" w/5 "EPA
"Region 2" w/5 "Environmental"
"release"
remedia*
remov*
 "response action"
risk w/ 5 assess*
Saddle w/3 River
sampl* w/5 "soil"
sampl* w/5 ground*
sampl* w/5 sediment
Second w/3 River
sediment
sewer w/5 disch*
"site assessment"
"site inspection"
"spill"
"Spill Act"
stor* w/5 "waste"
stor* w/5 "product"
"storage tank"
Superfund
Third w/3 River
toxicity
treat* w/5 waste*
UST
waste

# EXHIBIT 3

PROPOSED

DOCUMENT PRODUCTION QUESTIONNAIRE

**PARTY NAME:**

**DATE QUESTIONNAIRE COMPLETED: _____**

**QUESTIONNAIRE COMPLETED BY: _____**

| DOCUMENT RETENTION POLICY | Answer - Note the Drop Down Choices | Comments |
|---|---|---|
| Do you have a document retention or records management policy? | | |
| What year was the document retention policy implemented? | | |
| Have you produced the policy/procedure in place since implementation? | | |
| If yes, identify Bates number. | | |

| DOCUMENT CUSTODIANS AND PRESERVATION | | |
|---|---|---|
| Has a litigation hold notice has been issued for relevant documents? | | |
| In the "Designees" tab below, identify the corporate designee(s) for ESI records. | See Designees Tab. | |
| In the "Designees" tab below, identify the corporate designee(s) for paper/hard copy records. | See Designees Tab. | |
| How did you identify custodians? | | |
| In the "Custodians" tab below, identify all custodians (including any outside vendors which store or archive on your behalf) of relevant documents (ESI and/or Hard Copy/Paper) and indicate with an X if you searched for responsive documents within each category.  If you did not search within a category you may explain why. | See Custodians Tab. | |

| ARCHIVING OF PAPER DOCUMENTS AND ESI | | |
|---|---|---|
| Identify locations where Paper/Hard Copy Documents that may contain relevant documents are kept. | | |
| For offsite storage documents, how did you review? | | |

| NETWORK SERVERS AND EMAIL SYSTEMS | | |
|---|---|---|
| Do you have potentially responsive EMAIL data? | | |
| If yes, specify the system(s) in which relevant documents may be located: | | |
| Was a date filter used to cull this data? | | |
| If yes, specify date range: | | |
| How was or will this data be searched: | | |
| How will this data be reviewed? | | |

| Do you have any INSTANT MESSAGING data? | | |
|---|---|---|
| If yes, specify the system(s) in which relevant documents may be located: | | |
| Was a date filter used to cull this data? | | |
| If yes, specify date range: | | |
| How was or will this data be searched: | | |
| How will this data be reviewed? | | |
| | | |
| Do you have any NETWORK BASED SYSTEMS for ESI that contain relevant documents (for example, network share drives, or file and print servers)? | | |

PROPOSED

DOCUMENT PRODUCTION QUESTIONNAIRE

| | | |
|---|---|---|
| **If yes, specify the system(s) in which relevant documents may be located:** | | |
| **Was a date filter used to cull this data?** | | |
| **If yes, specify date range:** | | |
| **How was or will this data be searched:** | | |
| **How will this data be reviewed?** | | |

| | | |
|---|---|---|
| **Do you have any DATABASES that may contain relevant documents?** | | |
| **If yes, specify the database(s) in which relevant documents may be located:** | | |
| **Was a date filter used to cull this data?** | | |
| **If yes, specify date range:** | | |
| **How was or will this data be searched:** | | |
| **How will this data be reviewed?** | | |

| | | |
|---|---|---|
| **HARD DRIVES AND OTHER STORAGE MEDIA** | | |
| **Do you have policies that prohibit employees from saving files, email or other data to their personal desktop and/or laptop hard drives?** | | |
| **Were individual custodians asked about data that may be located on USB, Flash Drives, Floppy Disks, CD, DVD, etc.?** | | |
| **Do you have any data on external devices such as USB, Flash Drives, Floppy Disks, CD, DVD, etc.? This includes electronic media found in paper boxes, desk drawers, etc.** | | |
| **If yes, specify the device(s) in which relevant documents may be located:** | | |
| **Was a date filter used to cull this data?** | | |
| **If yes, specify date range:** | | |
| **How was or will this data be searched:** | | |
| **How will this data be reviewed?** | | |

| | | |
|---|---|---|
| **NON COMPANY COMPUTERS (BYOD)** | | |
| **Do any custodians have any relevant documents located on PERSONAL COMPUTERS OR DEVICES?** | | |
| **If yes, specify the device(s) in which relevant documents may be located:** | | |
| **Was a date filter used to cull this data?** | | |
| **If yes, specify date range:** | | |
| **How was or will this data be searched:** | | |
| **How will this data be reviewed?** | | |

|  | ESI Designee(s) | Hard Copy Designee(s) |
|---|---|---|
| **Name (Last, First)** | | |
| **Title** | | |
| **Contact Info** | | |

| **Name (Last, First)** | | |
|---|---|---|
| **Title** | | |
| **Contact Info** | | |

| **Name (Last, First)** | | |
|---|---|---|
| **Title** | | |
| **Contact Info** | | |

| **Name (Last, First)** | | |
|---|---|---|
| **Title** | | |
| **Contact Info** | | |

| Name | Title and Organization | Subject Matter / Role |
|------|------------------------|----------------------|
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |
|      |                        |                       |

| | Paper | | | | | | | | |
| Office | Near Office/Assistant | Centralized File Rooms | Off-Site Storage | Other (Workrooms) | Home Office | Outlook Mailbox | Outlook Calendar | Other Email Systems | Instant Messages |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

ESI

| Share Drive | Personal Drive | Hard Drive "C" | External Media | Mobile Devices | BYOD | Intranet | Databases | Legacy Applications | Other (Specify) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |