**PretiFlaherty**

Portland, ME
Augusta, ME
Concord, NH
Boston, MA
Washington, DC

Jeffrey D. Talbert
jtalbert@preti.com
207.791.3239

January 18, 2021

**VIA E-MAIL AND ECF**

Special Master Thomas P. Scrivo, Esq.
O'Toole Scrivo, LLC
14 Village Park Road
Cedar Grove, NJ 07009
tscrivo@oslaw.com

   RE: *Occidental Chemical Corp. v. 21st Century Fox America, Inc., et al.*
      Docket No. 2:18-cv-11273-MCA-LDW

Dear Special Master Scrivo:

  The Small Parties Group ("SPG") respectfully requests that the Special Master order Occidental Chemical Corporation, Inc. ("OCC") to produce documents in response to certain of the Second Set of Requests for Production From the Small Parties Group to Plaintiff (the "Requests", attached as **Exhibit A**). The SPG sought these documents months ago, and OCC has not only refused to produce responsive documents but has delayed even explaining the bases for its objections, despite telling the SPG in a meet-and-confer that it would do so. OCC's unjustified delay is hindering the SPG's ability to gather information needed to prepare for the upcoming deposition phase of this litigation, and the SPG—despite its best efforts to resolve this discovery dispute without involving the Special Master—now requires the assistance of the Special Master to order OCC to fulfill its obligation to participate meaningfully in the discovery process.

  **I.** **Procedural Background**

  The SPG served the Requests on OCC on September 28, 2020. OCC replied with its objections and responses on October 28, 2020 (the "Objections", attached as **Exhibit B**), and indicated that, of the 28 requests, it would not produce documents to 14; was unclear about whether any documents would be forthcoming regarding 14; would withhold so-called "settlement communications" even if otherwise responsive to 3; and would unilaterally limit the scope of its responses to 6. The SPG evaluated the Objections and sent a detailed letter to OCC on November 25, 2020 (attached as **Exhibit C**) requesting clarification and seeking a meet-and-confer to narrow or resolve the dispute. The parties conferred via teleconference on December 11, 2020, and OCC stated that it would respond to the SPG's letter with a detailed response letter of its own, which it anticipated sending by December 18, 2020. To date, the SPG has received no additional communication of any kind from OCC on these issues.

  **II.** **Argument**

  OCC has refused to produce documents in response to a variety of categories reasonably related to the parties' claims and defenses, in contravention of the broad scope of discovery. *See*

Preti Flaherty
Beliveau & Pachios LLP
Attorneys at Law

One City Center, Portland, ME 04101 | PO Box 9546, Portland, ME 04112-9546 | Tel 207.791.3000 | www.preti.com

16473714.2

Preti Flaherty

Special Master Thomas P. Scrivo, Esq.
January 18, 2021
Page 2

Fed. R. Civ. P. 26(b)(1). The SPG moves to compel production of documents that (A) request information needed to prepare for depositions; (B) relate to the equitable factors courts consider in CERCLA allocations—the very heart of this case; and (C) are necessary to flesh out discovery already produced in this case regarding OCC's (and its predecessors') prior experience with dioxin remediation at the infamous Love Canal site.

### A.  Information Needed To Prepare For Depositions

OCC has flatly refused to produce a variety of documents—including very basic background information—that the SPG needs in order to prepare for depositions.

#### i.  Organizational Information (Requests 21 and 25)

OCC has refused to produce information, such as org charts, identifying employees of OCC's environmental-remediation subsidiaries and affiliates Glenn Springs Holdings ("GSH"), Miller Springs, and Conestoga Rovers & Associates ("CRA"). *See* Objection 21. This basic information is necessary for the SPG to develop the facts at issue, as well as to identify potential deposition witnesses and sources of other discoverable information. At the meet-and-confer, OCC stated that certain org charts may have been produced in prior litigation and indicated that it would identify specific documents for the SPG. But OCC has not done so, and its refusal has hindered the SPG's ability to prepare for the deposition phase of discovery.

The SPG also requested a narrow set of documents "sufficient to show" the corporate structure of OCC, its predecessors, and its environmental-remediation affiliates. OCC has refused to produce documents sufficient to show the corporate structure of any of these entities, save two. *See* Objection 25. Without the requested documents, the SPG will be unable to fully unravel the labyrinthine relationships between and among the various parents, subsidiaries, and affiliates that have all been involved in various degrees at various times since the 1986 merger. Again, this understanding is necessary to identify deponents and prepare for depositions.

#### ii.  Background Information About Site Transition (Request 14)

The SPG must understand the complex factual and procedural background in this decades-long dispute, but OCC is refusing to produce documents in OCC's possession regarding the transfer of material from the Maxus Liquidating Trust to OCC relating to the Maxus bankruptcy proceeding (to which the SPG was not a party). *See* Objection 14. The SPG needs these materials to understand what materials OCC received during that proceeding, and to assess whether there are gaps in the discovery it has received from OCC and the Maxus Liquidating Trust. Without these materials, the SPG is left with an incomplete understanding of the timeframe, key actors, and other basic information regarding transition of the Site from Maxus to OCC.

#### iii.  Fact And Expert Witness Materials (Request 28)

To prepare adequately for depositions, to develop potential impeachment material, and to explore the bases for OCC's experts' opinions, among other reasons, the SPG sought production

P<small>RETI</small> F<small>LAHERTY</small>

Special Master Thomas P. Scrivo, Esq.
January 18, 2021
Page 3

of deposition or trial testimony of individuals identified in OCC's Rule 26 disclosures and/or interrogatory answers. OCC refused to produce any responsive materials that, in its view, do not "relate to the Diamond Alkali Superfund Site." Objection 28. But this sort of material is relevant and is routinely requested in litigation. For example, a witness's prior testimony may be offered into evidence if that witness is unavailable at trial, *see* Fed. R. Evid. 804(b)(1), and the SPG is "entitled to explore [OCC's] experts' prior testimony" to "uncover[] inconsistencies between the opinions they intend to express in this case and the opinions expressed in other cases." *Brown v. Overhead Door Corp.*, 2008 WL 1924885, at *1-2 (N.D. Ill. Apr. 29, 2008) (ordering plaintiff to produce prior expert testimony). Furthermore, OCC's scope limitation is improper: as just two examples, prior testimony about the risk of dioxin generally, or the costs associated with remedying dioxin sites, are relevant to the claims and defenses here, and the SPG should be allowed discovery in this area.

### B. Information Relevant To Equitable Allocation Factors

In a CERCLA Section 113 contribution action, a court will "consider and apply such equitable factors as it deems appropriate to achieve a just and fair allocation." *United States v. Compaction Sys. Corp.*, 88 F. Supp. 2d 339, 350 (D.N.J. 1999) (quoting *United States v. Kramer*, 953 F. Supp. 592, 594 (D.N.J. 1997)). But OCC is refusing to produce documents responsive to several requests that would enable the SPG to develop evidence and argument regarding these equitable considerations.

#### i. Cooperation (Requests 17 and 18)

OCC's "degree of cooperation" with authorities is an equitable factor to be considered in this contribution action. *See, e.g.*, *Compaction Sys.*, 88 F. Supp. 2d at 355. As the Superior Court noted in the Spill Act litigation, OCC "has not cooperated with the State as well as it could have or should have" and its earlier cooperation "would have been a significant help to the State and the cause of protecting public health and the environment." Op. and Order on Mot. for Summ. J., *New Jersey Dep't of Envtl. Protection et al. v. Occidental Chem. Corp. et al.*, No. ESX-L-9868-05, at 22, 25-26 (N.J. Super. Ct. Law Div. Oct. 19, 2017) (attached as **Exhibit D**).

But OCC has refused to produce any non-privileged documents responsive to the SPG's requests for information concerning two critical moments relevant to this litigation: OCC's decision to withdraw from the Cooperating Parties Group ("CPG") (Request 17) and its decision not to participate in the EPA-ordered Batson allocation (Request 18).[1] The SPG understands that these Requests may implicate privilege, but OCC cannot simply dodge these topics altogether. Any responsive, non-privileged materials are directly relevant to developing an understanding of OCC's degree of cooperation with the federal and state governments and should be produced; any

---

[1] To streamline effort involved in dividing responsibility and cost for work needed to remediate the Passaic River, the EPA requested that Potentially Responsible Parties ("PRPs") band together cooperatively, including for possible settlement purposes. The CPG formed as a result. The EPA also requested that PRPs participate in an allocation led by an individual chosen by the EPA to aid in apportioning responsibility for contamination. The members of the CPG and SPG participated in the Batson allocation, while OCC did not.

responsive, privileged materials should be logged. Furthermore, these Requests may shed light on any number of other significant issues, such as OCC's understanding of its own liability for the Site, the nature and extent of OCC's oversight and direct involvement in Maxus's and Tierra's remedial strategy and decisions, and OCC's direct costs related to the Site.

### ii. Degree Of Care (Request 5)

The SPG also requested that OCC produce documents regarding waste disposal and handling practices during the 1970s, when the Chemicaland Corp. made 2,4-D at the Lister facility—which Occidental Chemical Company had directly operated immediately before it was shut down in 1977, *see* Paul W. Herring Letter to J. Alan Mack (With Enclosures) dated July 5, 1990 (attached as **Exhibit E**) at 2, 6; p. 5, *infra*. OCC, however, refused to produce any responsive documents beyond those it subjectively believes "relate to the Diamond Alkali Superfund Site." Objection 5. Again, the requested material pertains, among other things, to the equitable factors courts consider in these cases—specifically the "degree of care" exercised "with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste." *Compaction Sys.*, 88 F. Supp. 2d at 355. Documents demonstrating company-wide practices for the handling and disposal of waste—whether or not these practices were actually followed at the Lister plant—are directly relevant to this analysis and should be produced.

### iii. Financial Condition (Request 24)

OCC has refused to produce documents concerning the financial condition of OCC, GSH, Miller Springs, and/or CRA. Objection 24. As the SPG explained at the meet-and-confer, the SPG seeks the sort of standard financial documents readily available to any company, like balance sheets, cash flow statements, and income statements, *see* Request 24, in order to understand the viability of OCC and its affiliated environmental-remediation companies. Indeed, the "financial resources of the liable parties" are an allocation factor "commonly taken into account" and courts consider a "party's ability to pay its share of the cost" *United States v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998), *aff'd*, 231 F.3d 1 (1st Cir. 2001). Thus, to the extent OCC intends to make any equitable arguments based on its financial condition, or its (in)ability to pay for the cleanup of the Passaic River, even though its contamination contributions dwarf those of all other sources combined, then the SPG must be able to probe the veracity of such arguments. The information the SPG seeks is relevant and proportionate to the needs of the case and should be produced.

In short, these equitable factors are an integral part of this case, and the SPG should be allowed discovery into these issues.

### C. Love Canal (Request 22)

OCC is also refusing to produce documents regarding its experience with Love Canal—perhaps the Nation's most notorious environmental disaster, which served as a catalyst for the creation of CERCLA itself. As the SPG made clear in the meet-and-confer, it is not engaging in a fishing expedition for every document ever created that mentions Love Canal. Rather, it is

PRETI FLAHERTY

Special Master Thomas P. Scrivo, Esq.
January 18, 2021
Page 5

seeking additional information because discovery to date demonstrates that there is a direct link between OCC's and its predecessors' experience with Love Canal (a dioxin Superfund site) and the dioxin Superfund site at issue in this dispute.[2]

In the 1970s, Hooker/Occidental Chemical Company considered purchasing the Lister plant from Chemicaland and sent employees to inspect the plant in 1976. As Eric Ashton reported to Hooker in a November 22, 1976 memo, "[a]s a small firm, Chemicaland offers a degree of anonymity, with respect to OSHA and EPA regulations, that a large chemical corporation, such as Hooker, is not allowed" and the Lister plant was not in "acceptable operating shape." Inter-Office Memorandum from W.E. Ashton to T.H. Chmielewski dated Nov. 22, 1976, at 1 (attached as **Exhibit F**). A separate memo from Bernie Carreno, who also participated in the inspection, elaborated that "[e]quipment and structures to protect the environment . . . are essentially nonexistent" and that state regulatory scrutiny "appears to be lacking," but that situation could "easily be reversed overnight . . . especially . . . if the Hooker name, which has been the subject of intense government and media scrutiny, were to become associated with the plant." Memorandum from B.J. Carreno to W.E. Ashton dated Nov. 19, 1976, at 1 (attached as **Exhibit G**). Mr. Carreno reiterated that "the possible implications of the Hooker name becoming associated with this facility should not be overlooked. Hooker's current environmental/safety image is such that usually intense regulatory agency activity would be anticipated." *Id.* at 5. Spill Act deposition testimony confirmed that "Hooker's involvement at Love Canal" was a likely reason for these reputational concerns. *See* Dep. Tr. of Robert McIntyre (Apr. 7, 2015) at 96:17-97:1 (excerpts attached as **Exhibit H**). Hooker/Occidental did not ultimately acquire the Lister plant. *See* Exhibit E at 2, 6.

OCC's extensive experience with dioxin at Love Canal, from formation to contamination, to remediation—to say nothing of that experience's relationship to a decision not to purchase the Lister site and its decision nevertheless to go forward with the risky Diamond Shamrock Chemical Corporation stock purchase in 1986—is relevant to a host of issues in this litigation, including OCC's understanding of: environmental liability exposure at dioxin sites; how dioxin is created in the manufacture of TCP; how dioxin may be transported into a water system; how dioxin sites may be remediated; and the costs associated with remediating dioxin sites.

### III. Conclusion

For the above reasons, the SPG respectfully requests that the Special Master order OCC to produce documents responsive to the identified Requests. These documents are relevant to the issues in this case and are necessary for the SPG to adequately prepare for further discovery phases.

---

[2] This topic is also relevant to the degree-of-care factor discussed above: Love Canal indisputably informed OCC's and its predecessors' understanding of dioxin's characteristics, because Love Canal was also, like the Site here, contaminated with dioxin from the manufacture of TCP at a Hooker facility. *See, e.g.*, Dep. Tr. of Frank Parigi (Aug. 13, 2015) at 824:20-826:9 (excerpts attached as **Exhibit I**). The EPA removed Love Canal from the Superfund National Priorities List in September 2004 after a decades-long remediation effort. *See* EPA Press Release dated Sept. 30, 2004, *available at* https://bit.ly/35pJfqF.

Preti Flaherty

Special Master Thomas P. Scrivo, Esq.
January 18, 2021
Page 6

Respectfully Submitted,

*[signature]*

Jeffrey D. Talbert
*Common Counsel for the Small Parties Group*

Attachments – Exhibits A-I