Kirstin Bohn, Esq.
CHASAN LAMPARELLO MALLON & CAPPUZZO, PC
300 Lighting Way, Suite 200
Secaucus, New Jersey  07094
Attorneys for Third-Party Defendant Passaic Valley Sewerage Commissioners

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>21ST CENTURY FOX AMERICA, INC., et al.,<br><br>Defendants.<br><br>21ST CENTURY FOX AMERICA, INC., et al.,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>PASSAIC VALLEY SEWERAGE COMMISSIONERS,<br>BOROUGH OF EAST NEWARK,<br>BOROUGH OF ELMWOOD PARK,<br>BOROUGH OF FAIR LAWN,<br>BOROUGH OF FRANKLIN LAKES,<br>BOROUGH OF GLEN RIDGE,<br>BOROUGH OF GLEN ROCK,<br>BOROUGH OF HALEDON,<br>BOROUGH OF HASBROUCK HEIGHTS,<br>BOROUGH OF HAWTHORNE,<br>BOROUGH OF LODI,<br>BOROUGH OF NORTH ARLINGTON,<br>BOROUGH OF NORTH CALDWELL,<br>BOROUGH OF NORTH HALEDON,<br>BOROUGH OF PROSPECT PARK,<br>BOROUGH OF RUTHERFORD,<br>BOROUGH OF TOTOWA,<br>BOROUGH OF WALLINGTON, | Hon. Madeline Cox Arleo<br>Hon. Magistrate Judge Leda D. Wettre<br><br>Civil Action No. 2:18-CV-11273 (MCA-LDW)<br><br><br>**THIRD-PARTY DEFENDANT PASSAIC VALLEY SEWERAGE COMMISSIONERS' FIRST AMENDED ANSWER TO THIRD-PARTY COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AGAINST THIRD-PARTY PLAINTIFFS, AND CROSSCLAIMS AGAINST THIRD-PARTY DEFENDANTS** |

BOROUGH OF WOODLAND PARK, F/K/A
BOROUGH OF WEST PATERSON,
BOROUGH OF WOOD-RIDGE,
CITY OF CLIFTON,
CITY OF EAST ORANGE,
CITY OF GARFIELD,
CITY OF NEWARK,
CITY OF ORANGE TOWNSHIP,
CITY OF PASSAIC,
CITY OF PATERSON,
TOWNSHIP OF BELLEVILLE,
TOWN OF HARRISON,
TOWN OF KEARNY,
TOWN OF NUTLEY,
TOWNSHIP OF BLOOMFIELD,
TOWNSHIP OF CEDAR GROVE,
TOWNSHIP OF LITTLE FALLS,
TOWNSHIP OF LYNDHURST,
TOWNSHIP OF MONTCLAIR,
TOWNSHIP OF SADDLE BROOK,
TOWNSHIP OF SOUTH HACKENSACK,
TOWNSHIP OF SOUTH ORANGE VILLAGE,
TOWNSHIP OF WEST ORANGE,
VILLAGE OF RIDGEWOOD,

Third-Party Defendants.

## ANSWER TO THIRD-PARTY COMPLAINT

Third-Party Defendant Passaic Valley Sewerage Commissioners ("PVSC") answers the

Third-Party Complaint by 21st Century Fox America, Inc., et al., as follows:

## INTRODUCTION

1.     Occidental Chemical Corporation ("OxyChem") brought contribution claims

under CERCLA Sections 107 and 113 against 120 parties for remediation of the Diamond Alkali

Superfund Site, despite the fact that substantially all of the 2,3,7,8-Tetrachlorodibenzo-*p*-dioxin

("2,3,7,8-TCDD"), which is driving the remediation and is one of the most toxic "man-made"

substances, was discharged directly to the Lower Passaic River ("LPR") from the Diamond

Alkali chemical manufacturing facility at 80 and 120 Lister Avenue in Newark, New Jersey (the "Diamond Alkali Plant" or "Facility"), for which OxyChem is liable.

ANSWER: PVSC admits the allegations in this paragraph.

2.      In 1984, the U.S. Environmental Protection Agency ("EPA") identified the lower 17 miles of the Passaic River and Newark Bay as the Diamond Alkali Superfund Site (the "Diamond Alkali Site").

ANSWER:  PVSC admits the allegations in this paragraph.

3.      In addition to 2,3,7,8-TCDD, EPA identified seven other Contaminants of Concern ("COCs") for the Diamond Alkali Site.[1] Discharges from the Diamond Alkali Plant are responsible for nearly all of the 2,3,7,8-TCDD, dichlorodiphenyltrichloroethane ("DDT"), and Dieldrin in the LPR. As a result of discharges from the Diamond Alkali Plant, the LPR has some of the highest concentrations and greatest mass of 2,3,7,8-TCDD in the world.

ANSWER: PVSC admits the allegations in this paragraph.

4.      The Diamond Alkali Site was designated as a Superfund site as a result of discharges from the Diamond Alkali Plant, for which OxyChem is liable.

ANSWER: PVSC admits the allegations in this paragraph.

5.      Notwithstanding OxyChem's overwhelming responsibility for the human health and ecological risks present in the LPR, OxyChem refuses to accept full responsibility for its actions in rendering the LPR one of the most dioxin-contaminated rivers in the world and instead prematurely elected to sue more than 100 parties whose contributions, if any, pale in comparison to its own.

---

[1] In its 2016 Record of Decision for the lower eight miles of the LPR, EPA identified eight COCs: polychlorinated dioxins and furans, polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons (PAHs), DDT, Dieldrin, Mercury, Copper, and Lead. U.S. EPA, Record of Decision for the Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey 14-16 (Mar. 3, 2016). All COCs are Hazardous Substances under 42 U.S.C. § 9601(14).

ANSWER: PVSC admits the allegations in this paragraph.

6.      OxyChem's refusal to accept full responsibility for its contributions necessitates this Third-Party Complaint. To the extent that any Third-Party Plaintiff is found liable for any contributions of COCs to the LPR, the PVSC and Municipalities are also liable and must pay their fair share.

ANSWER: PVSC denies the allegations in his paragraph.

7.      Any contributions of COCs to the LPR allegedly attributable to the Third-Party Plaintiffs were insignificant and were largely the result of diversions to the LPR by PVSC or the municipalities of wastewater flows that had been lawfully discharged to PVSC or municipal sewer systems by Third-Party Plaintiffs as well as by thousands of other entities. Some Third-Party Plaintiffs' discharges to the PVSC and municipalities' sewer systems were not diverted to the LPR given those Third-Party Plaintiffs' locations in the system.

ANSWER: PVSC admits the allegations in the last sentence of this paragraph.  PVSC denies the remaining allegations of this paragraph.

8.      Wastewater sent to the PVSC via municipally owned sewer systems was generally treated and then discharged to New York Harbor, not the LPR.

ANSWER: PVSC admits the allegations in this paragraph.

9.      Wastewater discharged to PVSC or municipal sewer systems was only discharged to the LPR through bypasses or combined sewer overflows ("CSOs") operated by PVSC or the Municipalities.

ANSWER: PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

10.      Because the PVSC has served thousands of customers since it began operations, among other reasons, the Third-Party Plaintiffs whose wastewaters discharged to the LPR

through bypasses or CSOs constitute less than one percent of the potential contributors of COCs

to the PVSC system.

> ANSWER: PVSC admits only that it "has served thousands of customers since it began operations."  PVSC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

11.    The PVSC and Municipalities owning and operating CSOs, not their customers,

had control over bypasses and CSOs. Bypasses and CSOs were the only potential pathways that

contaminants sent to the PVSC could have reached the LPR.

> ANSWER:  PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

12.    Pursuant to Sections 107 and 113 of CERCLA, Third-Party Plaintiffs allege on

information and belief as follows:

> ANSWER: PVSC admits that the Third-Party Plaintiffs make allegations under Sections 107 and 113 of CERCLA,  but denies that they are entitled to relief.

## BACKGROUND

### A.    <u>Historical Background</u>

13.    EPA declared the Diamond Alkali Site a Superfund site in 1984 due to discharges

of dioxin and other hazardous substances from OxyChem's Diamond Alkali Plant.

> ANSWER: The EPA designation speaks for itself.  Any allegation contrary or inconsistent with that designation is denied as such.

14.    2,3,7,8-TCDD, the form of dioxin OxyChem discharged into the environment

from the Diamond Alkali Plant, is one of the most toxic known chemicals. The Diamond Alkali

Site contains one of the largest environmental accumulations of 2,3,7,8-TCDD in the world.

> ANSWER: PVSC admits the allegations in this paragraph.

15.    For more than twenty years, from approximately 1947 to at least approximately

1969, and at other times thereafter, OxyChem disposed of and released 2,3,7,8-TCDD, DDT, and

various other pesticides, chemicals, and COCs into the LPR and the surrounding area. Despite clear responsibility for these releases, OxyChem has never fully remediated the areas that it contaminated with 2,3,7,8-TCDD and other hazardous substances, resulting in continuing and ongoing releases to the LPR and the surrounding area.

ANSWER:  PVSC admits the allegations in this paragraph.

16. This Court found that OxyChem is the legal successor to the entities that owned and operated the Lister Plant during the relevant time period and may be held liable for the CERCLA response costs flowing therefrom. (Letter Order (ECF No. 1105 at 4).)

ANSWER: PVSC admits the allegations in this paragraph.

17. In 1983, the New Jersey Department of Environmental Protection ("NJDEP") conducted a dioxin investigation and sampling activities at the Diamond Alkali Plant and along the LPR. On or around June 2, 1983, in response to high levels and pervasive presence of dioxin, New Jersey Governor Thomas H. Kean issued an executive order declaring a state of emergency due to the threat that dioxin posed to public health.

ANSWER: PVSC admits the allegations in this paragraph.

18. In 1984, in a document titled "Dioxin Strategy Newark, New Jersey," NJDEP laid out steps New Jersey would take to minimize public exposure to unacceptable levels of 2,3,7,8-TCDD. In that document, NJDEP concluded that "80 Lister Avenue is . . . the state believes, the source site for all of the dioxin contamination found today in Newark."

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

19. In September 1984, Diamond Shamrock Chemicals Company, predecessor-in-interest to OxyChem, sued Aetna Casualty & Surety Company and 125 other insurers in New Jersey Superior Court seeking a declaratory judgment that the insurers were required to pay for

OxyChem's past and future remediation of the Diamond Alkali Plant and for third-party bodily injury and property damage claims resulting from dioxin (the "*Aetna* litigation").

      ANSWER: The complaint identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

      20.     After a twenty-day bench trial in the *Aetna* litigation in 1988, Judge Stanton found the insurers were not liable under the policies at issue and concluded that OxyChem "intentionally and continuously discharged highly toxic chemical effluent into the Passaic River," "was conscious that its discharges into the river were illegal," "deliberately concealed [discharges]," "employed an alarm system to warn employees to stop the discharges when . . . inspectors were on the premises," and "even by the standards of the 1951-1969 period, [OxyChem's] conduct . . . was unacceptably wrong and irresponsible."

      ANSWER: The court finding identified in this paragraph speaks for itself and any allegation contrary or inconsistent with those findings is denied as such.

      21.     In the decades since New Jersey declared a state of emergency and EPA designated the LPR as a Superfund site, OxyChem and its indemnitors have delayed the cleanup in the LPR and sought to offload their responsibility onto others.

      ANSWER: PVSC admits the allegations in this paragraph.

      22.     In 2005, the State of New Jersey sued OxyChem and its indemnitors and affiliates under *inter alia* the New Jersey Spill Compensation and Control Act to recover costs and damages and to ensure OxyChem was assigned responsibility for remediation in the LPR.[2]  The State alleged OxyChem had "orchestrated and implemented a strategy to delay and impede the clean-up and restoration of the Passaic River," and "[a]s a direct result of O[xyChem]'s intentional releases and discharges into the Passaic River, and Defendants' feat of delaying any real solution for

---

[2] *Complaint* (Nov. 22, 2005), *NJDEP et al. v. Occidental Chemical Corp., et al.*, Docket No. ESX-L9868-05 (PASR) (Sup. Ct. N.J.).

another 20-plus years, TCDD has migrated throughout the lower 17 miles of the Passaic River . . .

[such that] sediments in the Newark Bay Complex are saturated with TCDD, yet not one teaspoon

of TCDD-impacted sediment has been removed as part of a clean-up or restoration effort."

ANSWER: The complaint identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

23.     In 2004, OxyChem, as the party responsible for the Diamond Alkali Plant, and

other parties, including certain Third-Party Plaintiffs or their predecessors-in-interest or

indemnitors, entered into a settlement agreement with EPA ("2004 RI/FS Agreement") under

which the parties agreed to fund certain costs to perform the Remedial Investigation and Feasibility

Study ("RI/FS") of the 17-mile tidal portion of the Passaic River from the Dundee Dam to the

Newark Bay, also known as the Lower Passaic River Study Area ("LPRSA").

ANSWER:  The agreement identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

24.     The 2004 RI/FS Agreement was amended in 2005 and 2007 to include additional

settling parties and funding commitments. A list of Third-Party Plaintiffs that are signatories to the

2004 RI/FS Agreement either in their own names (alone or together with corporate affiliates) or the

name of a predecessor-in-interest or indemnitor, including its amendments, is attached as Exhibit 2.

ANSWER: The agreement identified in this paragraph speaks for itself and any allegation in this paragraph or the referenced exhibit that is contrary or inconsistent with that document is denied as such.

25.     In 2007, OxyChem, as the party responsible for the Diamond Alkali Plant, and

other parties, including many Third-Party Plaintiffs, entered into a settlement agreement with EPA

("2007 RI/FS Agreement") under which the parties agreed to perform the RI/FS of the LPRSA. In

or around 2012, OxyChem ceased complying with that agreement and has since refused to pay its

share of costs incurred by settlement parties for work performed under the 2007 RI/FS Agreement.

ANSWER: The agreement identified in the first sentence of this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such. Upon information and belief, PVSC admits the allegations in the last sentence of this paragraph.

26.     In 2017, the 2007 RI/FS Agreement was amended to include additional settling parties. A list of Third-Party Plaintiffs that are signatories to the 2007 RI/FS Agreement either in their own names (alone or together with corporate affiliates) or the name of a predecessor-in-interest or indemnitor, including its 2017 amendment, is attached as Exhibit 3.

ANSWER: The agreement identified in this paragraph speaks for itself and any allegation in this paragraph or the referenced exhibit contrary or inconsistent with that document is denied as such.

27.     In June 2012, after RI/FS sampling indicated that an approximately five-acre mud flat and point bar near River Mile ("RM") 10.9 was contaminated with high levels of 2,3,7,8-TCDD, the Third-Party Plaintiffs listed in Exhibit 4—either in their own names (alone or together with corporate affiliates) or the name of a predecessor-in-interest, or indemnitor—and other parties, entered into a settlement agreement with EPA ("2012 RM 10.9 Agreement") to remove approximately two feet of sediment (approximately 16,000 cubic yards) from the RM 10.9 Removal Area and cap this area.

ANSWER:  The agreement identified in this paragraph speaks for itself and any allegation in this paragraph or the referenced exhibit contrary or inconsistent with that document is denied as such.

28.     In 2016, EPA issued a Record of Decision ("ROD") selecting a remedy for the lower 8.3 miles of the Passaic River to address the risks to human health and the environment posed by eight contaminants of concern (the "8 COCs").

ANSWER: The ROD identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

29.     The 8 COCs are dioxins/furans, polychlorinated biphenyls (PCBs), polychlorinated aromatic hydrocarbons (PAHs), DDT, Dieldrin, Copper, Mercury, Lead.

9

ANSWER: The ROD identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

30.     Of the 8 COCs, 2,3,7,8-TCDD poses the most significant risk to human health and the environment and provides the sole or primary justification for EPA's selected remedy.

ANSWER: PVSC admits the allegations in this paragraph.

31.     In the 2016 ROD, EPA concluded that no level of remediation could reduce the level of risk to a degree consistent with the traditional remediation goals EPA has set for all CERCLA sites in the National Contingency Plan ("NCP"): "EPA has concluded that a 10-6 cancer risk [aspired to by the NCP] for the fish and crab consumption exposure pathway cannot be attained through remediation," and "it is unlikely that the ecological [preliminary remediation goals] could be met under any of the alternatives, even with natural recovery processes." Because the adjusted "acceptable risk range"—which includes risk in excess of the NCP goals for other sites—would not be achieved by the selected remedy, EPA required continued use of fishing prohibitions in the LPR: "in the 26-year period after construction, risks and hazards exceed the acceptable risk range . . . so [the selected remedy] would incorporate institutional controls such as fish and crab consumption prohibitions and advisories enhanced by additional outreach to ensure protectiveness."

ANSWER: The ROD identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

32.     Separate from and in addition to the costs incurred pursuant to the 2004 RI/FS Agreement, the 2007 RI/FS Agreement, and the 2012 RM 10.9 Agreement, each Third-Party Plaintiff has incurred additional recoverable costs closely tied to the cleanup of the Lower Passaic River. These costs include but are not limited to legal fees, administrative costs, PRP search costs, costs of investigation, planning, and technical support, and other indirect costs incurred for work that has significantly benefitted the entire cleanup effort.

ANSWER: PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

## B.     **Procedural Background**

33.     On June 30, 2018, OxyChem filed its complaint against 120 parties, seeking cost recovery, contribution, and a declaratory judgment against the original Defendants, under CERCLA Sections 107(a) and 113(f), 42 U.S.C. §§ 9607(a), 9613(f), for response costs that OxyChem allegedly has and may incur to remediate hazardous substances at the Diamond Alkali Superfund Site.

ANSWER: PVSC admits the allegations of this paragraph.

34.     On July 31, 2019, U.S. District Judge Honorable Madeline Cox Arleo dismissed OxyChem's CERCLA Section 107(a) claims, 42 U.S.C. § 9607(a), that related to the 2008, 2011, and 2016 Administrative Settlements, and dismissed OxyChem's CERCLA Section 113(f)(1) claims, 42 U.S.C. § 9613(f)(1), that related to the 2012 Unilateral Administrative Order ("UAO").[3]

ANSWER: PVSC admits the allegations in this paragraph.

35.     OxyChem's surviving claims are a CERCLA Section 107(a), 42 U.S.C. § 9607(a), claim relating to the 2012 UAO and CERCLA Section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), claims relating to the 2008, 2011, and 2016 Administrative Settlements.

ANSWER: PVSC admits the allegations in this paragraph.

---

[3] Administrative Settlement Agreement and Order on Consent for Removal Action between the U.S. EPA, OxyChem, and Tierra (June 23, 2008) (the "2008 Settlement"); Administrative Settlement Agreement and Order on Consent for Combined Sewer Overflow/Storm Water Outfall Investigation between the U.S. EPA and OxyChem (Oct. 4, 2011) (the "2011 Settlement"); Unilateral Administrative Order for Removal Response Activities from the Passaic River at River Mile 10.9 between U.S. EPA and OxyChem (June 2012) (the "2012 UAO"); Administrative Settlement Agreement and Order on Consent for Remedial Design for Operable Unit Two of the Diamond Alkali Superfund Site between U.S. EPA and OxyChem (June 2016) (the "2016 Settlement").

36.     On or around August 14, 2019, many Third-Party Plaintiffs filed counterclaims against OxyChem for contribution, cost recovery, declaratory judgement and/or breach of contract for costs incurred and to be incurred at the LPRSA portion of the Diamond Alkali Superfund Site, including pursuant to the 2004 RI/FS Agreement, the 2007 RI/FS Agreement, and the 2012 RM 10.9 Agreement.

ANSWER: PVSC admits the allegations in this paragraph.

## JURISDICTION AND VENUE

37.     The Third-Party Claims set forth herein arise out of and are ancillary to the claims set forth in the Complaint.

ANSWER: PVSC admits the allegations in this paragraph.

38.     If jurisdiction is proper with respect to the Complaint, it is proper with respect to the Third-Party Claims.

ANSWER: PVSC admits the allegations in this paragraph as a general principle but denies that this Court necessarily has jurisdiction over it in this matter.

39.     If venue is proper with respect to the Complaint, it is proper with respect to the Third-Party Claims.

ANSWER: PVSC admits the allegations in this paragraph.

40.     Each Third-Party Defendant named herein is a "person" within the meaning of 42 U.S.C. § 9601(21).

ANSWER: PVSC admits the allegations of this paragraph.

41.     As alleged elsewhere herein, each Third-Party Defendant has conducted activities in the State of New Jersey and has had sufficient contacts with the State of New Jersey to be subject to the jurisdiction of this Court.

ANSWER: PVSC admits the allegations of this paragraph.

## THE PARTIES

42.     Third-Party Defendant the PVSC is a public body politic and corporate authorized by statute with its principal place of business at 600 Wilson Avenue, Newark, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

43.     Third-Party Defendant Borough of East Newark is a public body and municipality of the State of New Jersey with its principal place of business at 34 Sherman Avenue, East Newark, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

44.     Third-Party Defendant Borough of East Rutherford is a public body and municipality of the State of New Jersey with its principal place of business at 1 Everett Place, East Rutherford, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

45.     Third-Party Defendant Borough of Elmwood Park is a public body and municipality of the State of New Jersey with its principal place of business at 182 Market Street #2, Elmwood Park, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

46.     Third Party Defendant Borough of Fair Lawn is a public body and municipality of the State of New Jersey with its principal place of business at 8-01 Fair Lawn Avenue, Fair Lawn, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

47.     Third-Party Defendant Borough of Franklin Lakes is a public body and municipality of the State of New Jersey with its principal place of business at Franklin Lakes Municipal Building, DeKorte Drive, Franklin Lakes, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

13

48.     Third-Party Defendant Borough of Glen Ridge is a public body and municipality of the State of New Jersey with its principal place of business at 825 Bloomfield Avenue, Glen Ridge, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

49.     Third-Party Defendant Borough of Glen Rock is a public body and municipality of the State of New Jersey with its principal place of business at 1 Harding Plaza, Municipal Building, Glen Rock, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

50.     Third-Party Defendant Borough of Haledon is a public body and municipality of the State of New Jersey with its principal place of business at 510 Belmont Avenue, Haledon, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

51.     Third-Party Defendant Borough of Hasbrouck Heights is a public body and municipality of the State of New Jersey with its principal place of business at 320 Boulevard, Hasbrouck Heights, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

52.     Third-Party Defendant Borough of Hawthorne is a public body and municipality of the State of New Jersey with its principal place of business at 445 Lafayette Avenue, Hawthorne, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

53.     Third-Party Defendant Borough of Lodi is a public body and municipality of the State of New Jersey with its principal place of business at 1 Memorial Drive, Lodi, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

54.     Third-Party Defendant Borough of North Arlington is a public body and municipality of the State of New Jersey with its principal place of business at 214 Ridge Road, North, North Arlington, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

55.     Third-Party Defendant Borough of North Caldwell is a public body and municipality of the State of New Jersey with its principal place of business at 141 Gould Avenue, North Caldwell, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

56.     Third-Party Defendant Borough of North Haledon is a public body and municipality of the State of New Jersey with its principal place of business at 103 Overlook Avenue, North Haledon, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

57.     Third-Party Defendant Borough of Prospect Park is a public body and municipality of the State of New Jersey with its principal place of business at 106 Brown Avenue, Prospect Park, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

58.     Third-Party Defendant Borough of Rutherford is a public body and municipality of the State of New Jersey with its principal place of business at 176 Park Avenue, Rutherford, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

59.     Third-Party Defendant Borough of Totowa is a public body and municipality of the State of New Jersey with its principal place of business at 527 Totowa Road, Totowa, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

60.     Third-Party Defendant Borough of Wallington is a public body and municipality of the State of New Jersey with its principal place of business at 24 Union Boulevard, Wallington, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

61.     Third-Party Defendant Borough of Woodland Park is a public body and municipality of the State of New Jersey with its principal place of business at 5 Brophy Lane, Woodland Park, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

62.     Third-Party Defendant Borough of Wood-Ridge is a public body and municipality of the State of New Jersey with its principal place of business at 85 Humboldt Street, Wood-Ridge, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

63.     Third-Party Defendant City of Clifton is a public body and municipality of the State of New Jersey with its principal place of business at 900 Clifton Avenue, Clifton, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

64.     Third-Party Defendant City of East Orange is a public body and municipality of the State of New Jersey with its principal place of business at 44 City Hall Plaza, East Orange, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

65.     Third-Party Defendant City of Garfield is a public body and municipality of the State of New Jersey with its principal place of business at 111 Outwater Lane, Garfield, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

66.     Third-Party Defendant City of Newark is a public body and municipality of the State of New Jersey with its principal place of business at City Hall - Room B331F, 920 Broad Street, Newark, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

67.     Third-Party Defendant City of Orange Township is a public body and municipality of the State of New Jersey with its principal place of business at 29 North Day Street, Orange, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

68.     Third-Party Defendant City of Passaic is a public body and municipality of the State of New Jersey with its principal place of business at 330 Passaic Street, Passaic, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

69.     Third-Party Defendant City of Paterson is a public body and municipality of the State of New Jersey with its principal place of business at 155 Market Street, Paterson, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

70.     Third-Party Defendant Township of Belleville is a public body and municipality of the State of New Jersey with its principal place of business at 152 Washington Avenue, Belleville, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

71.     Third-Party Defendant Town of Harrison is a public body and municipality of the State of New Jersey with its principal place of business at 318 Harrison Avenue, Harrison, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

72.     Third-Party Defendant Town of Kearny is a public body and municipality of the State of New Jersey with its principal place of business at 402 Kearny Avenue, Kearny, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

73.     Third-Party Defendant Town of Nutley is a public body and municipality of the State of New Jersey with its principal place of business at 1 Kennedy Drive, Nutley, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

74.     Third-Party Defendant Township of Bloomfield is a public body and municipality of the State of New Jersey with its principal place of business at 1 Municipal Plaza, Bloomfield, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

75.     Third-Party Defendant Township of Cedar Grove is a public body and municipality of the State of New Jersey with its principal place of business at 525 Pompton Avenue, Cedar Grove, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

76.     Third-Party Defendant Township of Little Falls is a public body and municipality of the State of New Jersey with its principal place of business at 225 Main Street, Little Falls, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

77.     Third-Party Defendant Township of Lyndhurst is a public body and municipality of the State of New Jersey with its principal place of business at 367 Valley Brook Avenue, Lyndhurst, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

78.     Third-Party Defendant Township of Montclair is a public body and municipality of the State of New Jersey with its principal place of business at 205 Claremont Avenue, Montclair, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

79.     Third-Party Defendant Township of Saddle Brook is a public body and municipality of the State of New Jersey with its principal place of business at 93 Market Street, Saddle Brook, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

80.     Third-Party Defendant Township of South Hackensack is a public body and municipality of the State of New Jersey with its principal place of business at 227 Phillips Avenue, South Hackensack, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

81.     Third-Party Defendant Township of South Orange Village is a public body and municipality of the State of New Jersey with its principal place of business at 76 South Orange Avenue, South Orange, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

82.     Third-Party Defendant Township of West Orange is a public body and municipality of the State of New Jersey with its principal place of business at Town Hall, 66 Main Street, South Orange, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

83.     Third-Party Defendant Village of Ridgewood is a public body and municipality of the State of New Jersey with its principal place of business at Village Hall, 131 North Maple Avenue, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

## FACTUAL ALLEGATIONS

84.     The New Jersey Legislature created the PVSC in 1902 with the stated purpose of relieving and preventing pollution in the Passaic River and its tributaries from Great Falls in Paterson to Newark Bay.

ANSWER:  PVSC admits the allegations in this paragraph only to the extent that it was created in its current form in the method stated.

85.     In August 1924, the PVSC began operating the Main Interceptor Sewer (also known as "the Trunk Line"), which since that time has collected and continues to collect untreated sewage and industrial wastes from tributary municipal sewer systems that had previously discharged to the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph.

86.     The Trunk Line is 22 miles long, begins at Prospect Street in Paterson, New Jersey and generally follows the alignment of the Passaic River, along the west bank of the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph.

87.     The PVSC designed, constructed, installed, owns, and operates the Trunk Line.

ANSWER: PVSC admits the allegations in this paragraph.

88.     The Trunk Line terminates in the City of Newark at the PVSC's Sewage Treatment Plant Wastewater Reclamation Facility ("WWRF") at about 600 Wilson Avenue, Newark, New Jersey, which began operations circa 1931.

ANSWER: PVSC admits the allegations in this paragraph.

89.     PVSC designed, constructed, installed, owns, and operates the WWRF.

ANSWER: PVSC admits the allegations in this paragraph.

90.     Before the Trunk Line became operational, most municipalities within PVSC's jurisdiction had developed individual sewer systems that discharged directly to the LPR through discharge lines ending in outfalls on or near the banks of the LPR.

ANSWER: PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

91.     After the construction of the Trunk Line, those municipalities who previously discharged directly to the LPR connected directly to the PVSC system. The PVSC's WWRF currently receives flow from 48 municipalities through three primary lines that the PVSC designed, constructed, and installed: the Trunk Line, the South Side Interceptor, and the Hudson County Force Main.

ANSWER: PVSC admits the allegations in this paragraph.

92.     The PVSC designed, constructed, installed, owns, operates, and has control over the 59 active regulating chambers, and additional historic chambers not now in use, located within and along the Trunk Line and tributary PVSC sewers through which untreated sewage, industrial wastewater, and stormwater have been and are from time to time directed away from the PVSC WWRF to CSO outfalls and bypasses and discharged into the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph.

93.     The Trunk Line and tributary PVSC and municipal sewers also have approximately 50 active CSO outfalls or bypasses, and additional historic outfalls or bypasses not now in use, through which untreated sewage, industrial wastewater, and stormwater have been and still periodically are discharged into the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph only as to the Trunk Line and tributary sewers. PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph as to municipal sewers.

94.     For decades, PVSC staff manually opened and closed its bypasses through chains linked to regulator valves or flaps, or through gates operated by hoists. This allowed the PVSC to choose to bypass the treatment system and discharge untreated sewage, industrial wastewater, and stormwater directly to the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph's first sentence.  PVSC denies the allegations in this paragraph's second sentence.

95.     In the mid-1980s, the PVSC designed, constructed, and continues to operate remote controls to allow PVSC to control its bypass gates from a central control facility.

ANSWER: PVSC admits the allegations in this paragraph.

96.     The major bypasses discharged untreated sewage, industrial wastewater, and stormwater from multiple municipalities, including third party defendant Municipalities.

ANSWER: PVSC denies the allegations in this paragraph.

97.     When the Yantacaw Bypass was opened, all wastes upstream of the Third River were sent untreated to the Passaic River, including waste from the municipalities of Paterson, Haledon, Prospect Park, Hawthorne, Fair Lawn, Elmwood Park, Garfield, Clifton, Lodi, Passaic, Wallington, and East Rutherford.

ANSWER: PVSC denies the allegations in this paragraph.

98.     When the Union Outlet (Second River Bypass) was opened, the entire flow of untreated sewage, industrial wastewater, and stormwater from Montclair, Orange, Glen Ridge, Bloomfield, and East Orange was discharged directly to the Passaic River.

ANSWER: PVSC denies the allegations in this paragraph.

99.     A 1976 report by Killam Associates for the PVSC, *Report Upon Overflow Analysis to Passaic Valley Sewerage Commissioners: Passaic River Overflows* ("1976 Killam

Report"), measured flows to the Passaic River from bypasses and 73 CSOs, that were owned and operated by the PVSC at the time.

ANSWER: The report identified in this paragraph speaks for itself and any allegation in this paragraph contrary or inconsistent with that document is denied as such.

100.   According to the 1976 Killam Report, approximately 7,600 million gallons of combined stormwater and untreated sewage were discharged into the Passaic River during the study period (1974-1975).

ANSWER: The report identified in this paragraph speaks for itself and any allegation in this paragraph contrary or inconsistent with that document is denied as such.

101.   According to his January 6, 1994 Affidavit ("Lubetkin Affidavit"), Seymour A. Lubetkin was the Chief Engineer for the PVSC from 1954 to 1978 and the author of numerous PVSC Annual Reports.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

102.   According to the Lubetkin Affidavit, PVSC has admitted that the untreated waste from every municipality connected to sewer lines served by the PVSC was diverted to the Passaic River on a periodic basis through CSOs and bypasses.

ANSWER:  The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

103.   Combined stormwater and untreated sewage have been discharged to the Passaic River through some of the PVSC bypasses and/or CSOs for the entire time period of PVSC's operations.

ANSWER: PVSC denies the allegations in this paragraph.

104.   According to a 1980 Heavy Metals Report by Killam Associates, which published the results of sampling for heavy metals at nine manhole locations along the length of the PVSC

system, heavy metals, including the COCs lead, copper, and mercury, were present in wastewater throughout the PVSC service area.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

105.   According to sampling conducted by EPA during rain events in 1981, published in its 1983 CSO Toxic Pollutant Study, CSO discharges to the Passaic River in Newark contained copper, lead, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

106.   According to samples collected by NJDEP during rain events between 2001 and 2004, the results of which were published in the New Jersey Toxics Reduction Workplan for NY-NJ Harbor, CSO and stormwater discharges to the Passaic River contained all of the 8 COCs.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

107.   In 2007 and 2008 as part of EPA's Remedial Investigation for the lower 8.3 miles of the LPR, Malcom Pirnie, Inc. sampled five CSOs during rain events between RM 3.9 and RM 7.8, which represent the largest drainage areas that discharge directly to the LPR. All 8 COCs were detected in all samples.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

108.   Sludge from the PVSC's WWRF was sampled as part of EPA's National Sewage Sludge Survey of 1989. That sampling showed sludge from the PVSC's WWRF contained 2,3,7,8-TCDD and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

109.    The influent flow from the PVSC's sewers to the WWRF was sampled for a 1978 EPA study seeking to characterize the fate of pollutants in wastewater treatment plants. That sampling showed the WWRF's influent contained copper, lead, mercury, and PAHs.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such

110.    The influent flow from the PVSC's sewers to the WWRF was sampled in 1984-1986, for organic priority pollutants. Publication of the results in 1986 showed the WWRF's influent contained a number of PAHs.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such

111.    The influent flow from the PVSC's sewers to the WWRF was sampled in 1994 and 1995 for PCBs as part of a study of 26 wastewater treatment plants discharging to the New York/New Jersey Harbor Estuary. That sampling detected PCBs in the flow entering the WWRF.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

112.    The PVSC's annual Pretreatment Program Annual Reports submitted to NJDEP for 2008, 2009, 2010, 2011, 2012, 2013, 2014, and 2015 all show that influent to the WWRF contained copper, lead, and mercury.

ANSWER: PVSC admits the allegations of this paragraph.

113.    The PVSC received a New Jersey Pollution Discharge Elimination System Permit modification in or about November 2007 that required monitoring for PCBs. That monitoring shows that PCBs are discharged from the PVSC sewer system and its tributary sewers into the Passaic River.

ANSWER: PVSC admits the allegations of the first sentence of this paragraph.  PVSC denies the allegations of the second sentence of this paragraph.

114.    Since the 1920's, the untreated sewage, industrial wastewater, and stormwater that the PVSC has discharged to the Passaic River through some bypasses and/or CSOs has contained and continues to contain Hazardous Substances including all of the 8 COCs.

ANSWER: PVSC denies the allegations in this paragraph.

115.    The City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison are served by the PVSC and also own and operate combined sewer systems that receive and carry untreated sewage, industrial wastewater, and stormwater.

ANSWER: PVSC admits the allegations in this paragraph.

116.    The City of Paterson has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from twenty-three CSOs into the Passaic River.

ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

117.    The City of Newark has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from fourteen CSOs into the Passaic River: Herbert Place #1, Herbert Place #2, Delavan Avenue, Verona Avenue, Oriental Avenue, Clay Street #1, Clay Street #2, Fourth Avenue, Rector Street, Jackson Street, City Dock, Freeman Street, Polk Street, and Roanoke Avenue.

ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

118.    The Town of Kearny has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from five CSOs into the Passaic River and Frank's Creek, which discharges to the Passaic River: Johnston Avenue, Stewart Avenue, Nairn Avenue, Saybrook Place, and Ivy Street.

ANSWER:  The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

119.    The Borough of East Newark has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from the Central Avenue CSO into the Passaic River.

ANSWER:  The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

120.    The Town of Harrison has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from seven CSOs into the Passaic River and Frank's Creek, which discharges to the Passaic River: Worthington Avenue, Bergen Street, Middlesex Street, Dey Street, Harrison Avenue, Cleveland Avenue, Hamilton Avenue.

ANSWER:  The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

121.    In the PVSC system, tributary flows from combined sewer systems pass through regulating chambers, where excessive peak flows may be bypassed to the Passaic River in order to avoid surcharging the system capacity.

ANSWER: PVSC denies the allegations in this paragraph.

122.    The untreated sewage, industrial wastewater, and stormwater discharged to the Passaic River through each of the CSOs owned and operated by the City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison, contain or contained Hazardous Substances including all of the 8 COCs.

ANSWER:  The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

123.    The following municipalities are served by the PVSC and have sewer systems that convey stormwater flow and untreated sewage in separate networks: Township of Belleville, Township of Bloomfield, Township of Cedar Grove, City of Clifton, City of East Orange, Borough of East Rutherford, Borough of Elmwood Park, Borough of Fair Lawn, Borough of Franklin Lakes, City of Garfield, Borough of Glen Ridge, Borough of Glen Rock, City of Hackensack, Borough of Haledon, Borough of Hasbrouck Heights, Borough of Hawthorne, Township of Little Falls, Borough of Lodi, Township of Lyndhurst, Township of Montclair, Borough of North Arlington, Borough of North Caldwell, Borough of North Haledon, Township of Nutley, City of Orange Township, City of Passaic, Borough of Prospect Park, Village of Ridgewood, Borough of Rutherford, Township of Saddle Brook, Township of South Hackensack, Township of South Orange Borough of Totowa, Borough of Wallington, Township of West Orange, Borough of Woodland Park, and Borough of Wood-Ridge.

ANSWER: PVSC admits the allegations in this paragraph.

124.    According to the 1980 Heavy Metals Report, the wastewater of ten companies connected to the sewer systems owned and operated by the Township of Belleville contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

125.    According to the 1980 Heavy Metals Report, the wastewater of four companies connected to the sewer systems owned and operated by the Township of Bloomfield contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

126.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Borough of East Newark contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

127.     According to the 1980 Heavy Metals Report, the wastewater of seventeen companies connected to the sewer systems owned and operated by the City of Clifton contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

128.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the City of East Orange contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

129.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Borough of East Rutherford contained heavy metals, including lead and copper.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

130.     According to the 1980 Heavy Metals Report, the wastewater of three companies connected to the sewer systems owned and operated by the Borough of Elmwood Park contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

131.     According to the 1980 Heavy Metals Report, the wastewater of eight companies connected to the sewer systems owned and operated by the Borough of Fair Lawn contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

132.     According to the 1980 Heavy Metals Report, the wastewater of seven companies connected to the sewer systems owned and operated by the City of Garfield contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

133.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Borough of Glen Rock contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

134.     According to the 1980 Heavy Metals Report, the wastewater of five companies connected to the sewer systems owned and operated by the Borough of Haledon contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

135.     According to the 1980 Heavy Metals Report, the wastewater of six companies connected to the sewer systems owned and operated by the Town of Harrison contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

136.    According to the 1980 Heavy Metals Report, the wastewater of nine companies connected to the sewer systems owned and operated by the Borough of Hawthorne contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

137.    According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Town of Kearny contained heavy metals, including lead and copper.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

138.    According to the 1980 Heavy Metals Report, the wastewater of six companies connected to the sewer systems owned and operated by the Borough of Lodi contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

139.    According to the 1980 Heavy Metals Report, the wastewater of three companies connected to the sewer systems owned and operated by the Township of Lyndhurst contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

140.    According to the 1980 Heavy Metals Report, the wastewater of 101 companies connected to the sewer systems owned and operated by the City of Newark contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

141.    According to the 1980 Heavy Metals Report, the wastewater of four companies connected to the sewer systems owned and operated by the Township of Nutley contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

142.    According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the City of Orange Township contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

143.    According to the 1980 Heavy Metals Report, the wastewater of nine companies connected to the sewer systems owned and operated by the City of Passaic contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

144.    According to the 1980 Heavy Metals Report, the wastewater of fifty-six companies connected to the sewer systems owned and operated by the City of Paterson contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

145.    According to the 1980 Heavy Metals Report, the wastewater of five companies connected to the sewer systems owned and operated by the Township of Saddle Brook contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

146.    According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Borough of Wallington contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

147.    Companies that use PCBs are, or have been, located within the following municipalities: Township of Belleville, Township of Bloomfield, Township of Cedar Grove, City of Clifton, City of East Orange, Borough of East Rutherford, Borough of Elmwood Park, Borough of Fair Lawn, City of Garfield, Borough of Glen Rock, Borough of Haledon, Town of Harrison, Borough of Hawthorne, Town of Kearny, Township of Little Falls, Borough of Lodi, Township of Lyndhurst, Township of Montclair, City of Newark, Borough of North Arlington, Township of Nutley, City of Orange Township, City of Passaic, City of Paterson, Township of Saddle Brook, Borough of Totowa, Borough of Wallington, Township of West Orange, and Borough of Wood-Ridge.

ANSWER: The allegations against this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

148.    Wastewater containing PCBs has been discharged to the sewer systems owned and operated by the Township of Belleville, Township of Bloomfield, Township of Cedar Grove, City of Clifton, City of East Orange, Borough of East Rutherford, Borough of Elmwood Park, Borough of Fair Lawn, City of Garfield, Borough of Glen Rock, Borough of Haledon, Town of Harrison, Borough of Hawthorne, Town of Kearny, Township of Little Falls, Borough of Lodi, Township of Lyndhurst, Township of Montclair, City of Newark, Borough of North Arlington, Township of Nutley, City of Orange Township, City of Passaic, City of Paterson, Township of

Saddle Brook, Borough of Totowa, Borough of Wallington, Township of West Orange, and Borough of Wood-Ridge.

> ANSWER: The allegations against this paragraph are not against PVSC and therefore no response is required. To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

## COUNT I

### (Contribution Under CERCLA Section 113)
### (Against All Third-Party Defendants)

149.    Third-Party Plaintiffs reallege and incorporate by reference paragraphs 1 through 148 above.

> ANSWER: PVSC incorporates herein its responses to paragraphs 1-148.

150.    Each Third-Party Plaintiff is a "person" as that term is defined in 42 U.S.C. § 9601(21).

> ANSWER: PVSC admits the allegations of this paragraph.

151.    Each Third-Party Defendant is a "person" as that term is defined in 42 U.S.C. § 9601(21).

> ANSWER: PVSC admits the allegations of this paragraph.

152.    The PVSC system, consisting of the Trunk Line, other intercepting sewers, regulators, CSOs, WWRF, bypasses and other appurtenances is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

> ANSWER: PVSC admits the allegations in this paragraph except denies that it has more than one CSO.

153.    The PVSC is the owner and operator of a facility from which there has been a "release" of Hazardous Substances as those terms are defined in 42 U.S.C. § 9601(14) and § 9601(22).

> ANSWER: PVSC denies the allegations in this paragraph.

154.    The PVSC is therefore liable under 42 U.S.C. § 9607(a)(1) and/or § 9607(a)(2) for the costs of response resulting from the release of Hazardous Substances from its facility.

ANSWER: PVSC denies the allegations in this paragraph.

155.    The PVSC designed, constructed, and operated the sewage collection and treatment system in a manner that resulted in the "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14) and § 9601(22).

ANSWER: PVSC denies the allegations in this paragraph.

156.    The PVSC is therefore liable under 42 U.S.C. § 9607(a)(3) for the costs of response resulting from the release of Hazardous Substances.

ANSWER: PVSC denies the allegations in this paragraph.

157.    The PVSC accepted Hazardous Substances for transport to the WWRF from which there has been a "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14).

ANSWER: PVSC denies the allegations in this paragraph.

158.    The PVSC is therefore liable under 42 U.S.C. § 9607(a)(4) for the costs of response resulting from the release of Hazardous Substances from the WWRF.

ANSWER: PVSC denies the allegations in this paragraph.

159.    Third-Party Defendants City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison each now own and/or operate, or in the past have owned and/or operated combined sewer systems that included CSOs that discharged to the Passaic River.

ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC admits the allegations in this paragraph.

160.     Each combined sewer system now or formerly owned and/or operated by the City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, or Town of Harrison is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

>ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required. To the extent a response is required, PVSC admits the allegations in this paragraph.

161.     The facilities now or formerly owned and/or operated by the City of Paterson, City of Newark, Town of Kearny, Borough of Newark, or Town of Harrison were designed, constructed, and operated in a manner that resulted in the "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14) and § 9601(22).

>ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required, and they also constitute a legal conclusion to which Plaintiffs are left to their proofs. To the extent a response is required, PVSC admits the allegations in this paragraph, upon information and belief.

162.     The City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison are each therefore liable under 42 U.S.C. § 9607(a)(1) and/or § 9607(a)(2) for the costs of response resulting from the release of Hazardous Substances, including all of the 8 COCs, from their respective facilities.

>ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required, and they also constitute a legal conclusion to which Plaintiffs are left to their proofs. To the extent a response is required, PVSC denies that these municipalities are liable to Third Party Plaintiffs.

163.     The Township of Belleville, Township of Bloomfield, Township of Cedar Grove, City of Clifton, Borough of East Newark, City of East Orange, Borough of East Rutherford, Borough of Elmwood Park, Borough of Fair Lawn, Borough of Franklin Lakes, City of Garfield, Borough of Glen Ridge, Borough of Glen Rock, Borough of Haledon, Town of Harrison, Borough of Hasbrouck Heights, Borough of Hawthorne, Town of Kearny, Township of Little Falls, Borough of Lodi, Township of Lyndhurst, Township of Montclair, City of Newark,

Borough of North Arlington, Borough of North Caldwell, Borough of North Haledon, Township of Nutley, City of Orange Township, City of Passaic, City of Paterson, Borough of Prospect Park, Village of Ridgewood, Borough of Rutherford, Township of Saddle Brook, Township of South Hackensack, Township of South Orange Borough of Totowa, Borough of Wallington, Township of West Orange, Borough of Woodland Park, and Borough of Wood-Ridge are owners and operators of sewers that transport and arrange for the disposal of Hazardous Substances including the 8 COCs from municipal and industrial dischargers to the PVSC system and to the Passaic River and are therefore each liable under 42 U.S.C. § 9607(a)(3) for the costs of response resulting from the release of Hazardous Substances from the PVSC system.

ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required, and they also constitute a legal conclusion to which Plaintiffs are left to their proofs. To the extent a response is required, PVSC denies that either PVSC or these municipalities are liable to Third Party Plaintiffs but otherwise admits the allegations in this paragraph.

164.   Each Third-Party Plaintiff has incurred costs and will continue to incur costs as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at and from the PVSC facility. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

ANSWER: PVSC denies the allegations in this paragraph.

165.   Each Third-Party Plaintiff has incurred costs and will continue to incur costs as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at and from the combined sewer systems now or formerly owned and/or operated by the City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

ANSWER: PVSC denies the allegations in this paragraph.

166.     Each Third-Party Plaintiff has paid more than its equitable share of response costs and is entitled to contribution from each Third-Party Defendant pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of the response costs incurred, or to be incurred, as a consequence of the release(s) or threatened release(s) of hazardous substances into the environment at the Diamond Alkali Site, including prejudgment interest.

ANSWER: PVSC denies the allegations in this paragraph.

## COUNT II

### (Declaratory Judgment - CERCLA)
### (Against All Third-Party Defendants)

167.     Third-Party Plaintiffs reallege and incorporate by reference paragraphs 1 through 166 above.

ANSWER: PVSC incorporates herein its responses to paragraphs 1-166.

168.     An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between Third-Party Plaintiffs and Third-Party Defendants concerning their respective rights and responsibilities for the response costs incurred and to be incurred with respect to the Diamond Alkali Site.

ANSWER:  PVSC admits the allegations of this paragraph.

169.     Each Third-Party Plaintiff has incurred and will continue to incur response costs as a direct consequence of the release(s) or threatened release(s) of Hazardous Substances disposed by the Municipalities into the environment at and from the PVSC system and from CSOs now or previously owned and operated by the City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

ANSWER:  PVSC denies the allegations of this paragraph.

170.    Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), Third-Party Plaintiffs are entitled to a declaratory judgment, which will be binding in any subsequent action or actions to recover further response costs, that each Third-Party Defendant is a liable party under 42 U.S.C. § 9607(a)(1) and/or (a)(2) and/or (a)(3) for releases of Hazardous Substances at the Diamond Alkali Site.

ANSWER: PVSC denies the allegations in this paragraph.

## COUNT III

### (Contribution Under CERCLA Section 113)
### (Against All Third-Party Defendants)

171.    Third-Party Plaintiffs reallege and incorporate by reference paragraphs 1 through 170, above.

ANSWER: PVSC incorporates herein its responses to paragraphs 1-170.

172.    OxyChem has asserted a claim against Third-Party Plaintiffs pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a) relating to the 2012 UAO.

ANSWER: PVSC admits the allegations in this paragraph.

173.    Third-Party Plaintiffs deny all liability for OxyChem's claim relating to the 2012 UAO.

ANSWER:  PVSC admits the allegations of this paragraph.

174.    However, if any Third-Party Plaintiff is found liable for OxyChem's claim relating to the 2012 UAO, such Third-Party Plaintiff is entitled to contribution from each Third-Party Defendant pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of that Third-Party Plaintiff's liability for OxyChem's claim relating to the 2012 UAO.

ANSWER: PVSC denies the allegations in this paragraph.

## COUNT IV

**(Contribution Under CERCLA Section 113)**
**(Against All Third-Party Defendants)**

175.    Third-Party Plaintiffs reallege and incorporate by reference paragraphs 1 through 174, above.

ANSWER: PVSC incorporates herein its responses to paragraphs 1-174.

176.    OxyChem has asserted contribution claims against Third-Party Plaintiffs pursuant to CERCLA section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B) relating to the 2008, 2011, and 2016 Settlements.

ANSWER: PVSC admits the allegations in this paragraph.

177.    OxyChem has represented during the course of this litigation that Third-Party Plaintiffs can be held liable in contribution for more than their equitable shares of any liability relating to the 2008, 2011, and 2016 Settlements and that Defendants, including Third-Party Plaintiffs, bear the risk of not impleading third parties.

ANSWER: The allegations of this paragraph go to the beliefs or motivations of Third-Party Plaintiffs, and no response from PVSC is required.

178.    Third-Party Plaintiffs deny all liability for OxyChem's claims relating to the 2008, 2011, and 2016 Settlements.

ANSWER:  PVSC admits the allegations of this paragraph.

179.    Furthermore, Third-Party Plaintiffs disagree that a contribution defendant can be held liable for more than its equitable share of any liability relating to the 2008, 2011, and 2016 Settlements.

ANSWER:  The allegations of this paragraph go to the beliefs or motivations of Third-Party Plaintiffs, and no response from PVSC is required.

180.    Nevertheless, if the Court credits OxyChem's position and if any Third-Party Plaintiff is found liable for more than its equitable share of any liability relating to the 2008, 2011, and 2016 Settlements, then such Third-Party Plaintiff is entitled to contribution from each Third-Party Defendant pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of that Third-Party Plaintiff's liability for OxyChem's claim relating to the 2008, 2011, and 2016 Settlements.

ANSWER: PVSC denies the allegations in this paragraph.

## AFFIRMATIVE DEFENSES

1.    Third-Party Plaintiffs' claims fail to state a claim on which relief can be granted.

2.    This Court lacks subject matter jurisdiction over Third-Party Plaintiffs' claims because of, amongst other reasons, PVSC's sovereign immunity from this suit.

3.    The Third-Party Complaint should be dismissed for failure to join indispensable parties.

4.    Third-Party Plaintiffs' claim for cost recovery pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a) is barred to the extent they have a contribution claim pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1), (f)(3)(B)—the remedies are mutually exclusive.

5.    Some or all of the response costs allegedly incurred by Third-Party Plaintiffs are not necessary costs of response; none of the chemicals Third-Party Plaintiffs allege were associated with PVSC have caused, or will cause, the incurrence of response costs; and/or some of the costs purportedly incurred and/or to be incurred in the future by Third-Party Plaintiffs are not, and will not be, "response costs."

6.     To the extent PVSC is found to be a person liable under CERCLA:  PVSC is not liable for any costs that result from the cleanup of materials or compounds that are not "hazardous substances" as defined in CERCLA; and/or Third-Party Plaintiffs are barred from recovery of some or all of their alleged response costs because PVSC has already paid more than its fair share of any response costs.

7.     PVSC is not a person liable at the Diamond Alkali Superfund Site under 42 U.S.C. § 9607(a) because, *inter alia*, PVSC did not at the time of disposal of any hazardous substance own or operate the Diamond Alkali Superfund Site or any facility at the Diamond Alkali Superfund Site, for purposes of 42 U.S.C. § 9607(a)(2), and did not "select" the Diamond Alkali Superfund Site, for purposes of 42 U.S.C. § 9607(a)(4).

8.     The hazardous substances that Third-Party Plaintiffs allege PVSC discharged are not "contained" at the Diamond Alkali Superfund Site for purposes of 42 U.S.C. § 9607(a)(3).

9.     Third-Party Plaintiffs have failed to allege (and cannot establish) intent to dispose under governing law.

10.     At the time of the activities complained of, and thereafter, PVSC was not on notice, and could not have been reasonably aware, that any of the substances allegedly disposed were hazardous or were the subject of disposal, or arrangements for same, within the meaning of any applicable law.

11.     Plaintiffs' claims are barred by the pesticide application exemption of 42 U.S.C. § 9607(i).

12.     Third-Party Plaintiffs' claims are barred by the *de micromis* exemption of 42 U.S.C. § 9607(o).

13.     Third-Party Plaintiffs' claims are barred by the federally permitted release exemption of 42 U.S.C. § 9601(10).

14.     Some or all of the response actions for which Third-Party Plaintiffs allegedly will incur or have incurred response costs were arbitrary and capricious, or otherwise not in accordance with the law, and further were in violation of 42 U.S.C. § 9613(j)(2).

15.     Some or all of Third-Party Plaintiffs' claims are barred by the doctrines of unclean hands, unjust enrichment, estoppel, and/or recoupment.

16.     Some or all of Third-Party Plaintiffs' claims are barred by setoff.

17.     Some or all of Third-Party Plaintiffs' claims are barred by waiver.

18.     Some or all of Third-Party Plaintiffs' claims are barred by the doctrines of claim and/or issue preclusion.

19.     Any alleged liability of PVSC is divisible from the harm for which the other parties or non-parties are liable, and the costs and damages, if any, caused by such harm should be apportioned among the persons who allegedly caused the harm.

20.     The alleged incidents and damages of which Third-Party Plaintiffs complain were caused solely by the separate, independent, negligent or intentional acts or omissions of third parties over which PVSC exerted no influence and control, and accordingly the claims asserted against PVSC are barred by the provisions of 42 U.S.C. § 9607(b)(3).

21.     Any liability or responsibility with which PVSC might be charged is negated by the superseding or intervening criminal or tortious acts of third parties over whom PVSC had no control.

22.     One or more of Third-Party Plaintiffs' causes of action is barred in whole or in part by the applicable statute of limitations or laches.

23. PVSC has no liability for acts or omissions occurring before the enactment of CERCLA or any other legal requirement upon which Third-Party Plaintiffs rely.

24. At all times the activities undertaken by PVSC were lawful and/or permitted by law.

25. Third-Party Plaintiffs failed to mitigate, reduce, or otherwise avoid their alleged damages.

26. Third-Party Plaintiffs' claims are precluded because they failed to meet the procedural prerequisites necessary in order to bring suit under some or all of the statutes or other legal requirements upon which they rely.

27. Third-Party Plaintiffs may not recover administrative costs, attorneys' fees, and other litigation costs in excess of those provided for in 28 U.S.C. § 1920, because there is no basis, statutory or otherwise, for such an award.

28. The conduct of PVSC was consistent with the promotion of the public health, safety and welfare, and no feasible or prudent alternative existed to its conduct.

29. Third-Party Plaintiffs lack legal capacity or standing to maintain some or all of this action.

30. PVSC reserves the right to amend these affirmative defenses or assert additional affirmative and other defenses as may be established by the evidence in this case.

WHEREFORE, PVSC prays as follows:

1. that Third-Party Plaintiffs take nothing by way of their Third-Party Complaint;

2. that PVSC be awarded costs of suit;

3. that PVSC be awarded reasonable attorneys' fees; and

4. for such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

For its Counterclaims against the Third-Party Plaintiffs, Third-Party Defendant PVSC alleges as follows:

## NATURE OF ACTION

1.      Plaintiff   Occidental   Chemical   Corporation   ("OxyChem")   and   the Defendants/Third-Party Plaintiffs have brought contribution claims against each other under CERCLA for remediation of the Diamond Alkali Superfund Site (the "Site").  They have also both brought contribution claims against Third-Party Defendants, including PVSC.  PVSC hereby seeks contribution from Third-Party Plaintiffs for any liability imposed against it.  PVSC also seeks to recover all response costs it has incurred associated with the Site and all future response costs it will incur associated with the Site.

## JURISDICTION AND VENUE

2.      The Counterclaims set forth herein arise out of the same transactions and occurrences that are set forth in Third-Party Plaintiffs' Third-Party Complaint against Third-Party Defendants.

3.      If jurisdiction is proper with respect to the Third-Party Complaint, it is proper with respect to PVSC for the purposes of these Counterclaims.

4.      If venue is proper with respect to the Third-Party Complaint, it is proper with respect to PVSC for the purposes of these Counterclaims.

## GENERAL ALLEGATIONS

5.      OxyChem brought contribution claims under CERCLA against the Third-Party Plaintiffs for remediation of the Site.

6.      Third-Party Plaintiffs brought contribution claims under CERCLA against OxyChem for remediation of the Site.

7.      Third-Party Plaintiffs brought contribution claims under CERCLA against Third-Party Defendants, including PVSC, seeking to recover the share of liability, if any, related to the Site that this Court deems appropriate to assign to Third-Party Defendants.

8.      OxyChem brought contribution claims under CERCLA against Third-Party Defendants, including PVSC, seeking to recover the share of liability, if any, related to the Site that this Court deems appropriate to assign to Third-Party Defendants.

9.      PVSC has incurred response costs associated with the Site, including but not limited to, its current efforts to condemn property next to its Newark facility in order to locate a sediment processing facility needed for the remediation of the Site.

10.     PVSC will incur future response costs associated with the Site, including but not limited to, dedicating its property to a sediment processing facility needed to remediate the Site.

## COUNT I
### (Contribution Under CERCLA Section 113)

11.     PVSC realleges and incorporates by reference paragraphs 1 through 10 above.

12.     Third-Party Plaintiffs all qualify as a "person" as that term is defined in 42 U.S.C. § 9601(21).

13.     PVSC is a "person" as that term is defined in 42 U.S.C. § 9601(21).

14.     The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

15.     Contaminants released by Third-Party Plaintiffs are "Hazardous Substances" under 42 U.S.C. § 9601(14).

16.     The presence of those Hazardous Substances in the Site constitute a release or threatened release of Hazardous Substances as defined in 42 U.S.C. § 9601(22).

17.     Third-Party Plaintiffs owned or operated portions of the Site at or during the time of the acts or omissions which resulted in the release of Hazardous Substances.

18.     Third-Party Plaintiffs arranged for disposal of Hazardous Substances that ended up in the Site.

19.     Third-Party Plaintiffs all qualify as persons liable pursuant to 42 U.S.C. § 9607(a)(2) and (a)(3).

20.     PVSC has incurred costs and will continue to incur costs as a direct consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment by Third-Party Plaintiffs.  These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

21.     PVSC has paid and will continue to pay more than its equitable share of response costs and is entitled to contribution from Third-Party Plaintiffs pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of the response costs incurred, or to be incurred, as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at the Site, including prejudgment interest.

WHEREFORE, PVSC demands that the Court:

(1)     Declare that Third-Party Plaintiffs are liable under 42 U.S.C. § 9613(f) for their share, determined by the Court using such equitable factors as it determines are appropriate, of response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Award PVSC an amount determined by the Court, using such equitable factors as it determines are appropriate, to satisfy the obligation of Third-Party Plaintiffs for all necessary

response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(3)     Award PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(4)     Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

<u>**COUNT II**</u>
**(Cost Recovery Under CERCLA Section 107)**

22.     PVSC realleges and incorporates by reference paragraphs 1 through 21 above.

23.     Third-Party Plaintiffs are jointly and severally liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a) because they are responsible parties as defined by CERCLA Section 107(a), 42 U.S.C. § 9607(a).

24.     Each release or threatened release of hazardous substances as described above has caused and will continue to cause PVSC to incur necessary response costs consistent with the National Oil and Hazardous Substances Contingency Plan, 40 C.F.R. § 300 et seq (the "NCP").

25.     Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), PVSC is entitled to cost recovery from Third-Party Plaintiffs for necessary response costs incurred and to be incurred by PVSC consistent with the NCP.

WHEREFORE, PVSC demands that the Court:

(1)     Declare that Third-Party Plaintiffs are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Award PVSC an amount determined by the Court to satisfy the obligation of Third-Party Plaintiffs for all necessary response costs incurred and to be incurred by PVSC;

(3)     Award PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(4)     Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

**<u>COUNT III</u>**
**(Declaratory Judgment - CERCLA)**

26.     PVSC realleges and incorporates by reference paragraphs 1 through 25 above.

27.     An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between PVSC and Third-Party Plaintiffs concerning their respective rights and responsibilities for the response costs incurred and to be incurred by PVSC.

28.     The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

29.     Contaminants released by Third-Party Plaintiffs are "Hazardous Substances" under 42 U.S.C. § 9601(14).

30.     The presence of those Hazardous Substances in the Site constitute a release or threatened release of Hazardous Substances as defined in 42 U.S.C. § 9601(22).

31.     Third-Party Plaintiffs owned or operated portions of the Site at or during the time of the acts or omissions which resulted in the release of Hazardous Substances.

32.     Third-Party Plaintiffs arranged for disposal of Hazardous Substances that ended up in the Site.

33.     Third-Party Plaintiffs all qualify as persons liable pursuant to 42 U.S.C. § 9607(a)(2) and (a)(3).

34.     PVSC has incurred costs and will continue to incur costs as a direct consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment by Third-

Party Plaintiffs. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

35.     Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), PVSC is entitled to a declaratory judgment, which will be binding in any subsequent action or actions to recover further response costs, that Third-Party Plaintiffs are liable parties under 42 U.S.C. § 9607(a)(2) and (a)(3) for releases from and to the Site and that Third-Party Plaintiffs are liable for any and all response costs that may be incurred in the future.

WHEREFORE, PVSC demands that the Court:

(1)     Enter judgment under 42 U.S.C. § 9613 against Third-Party Plaintiffs, finding that they are liable to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site, or, in the alternative, for a 100 percent allocation by the Court (using such equitable factors as the Court determines are appropriate) to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Enter judgment under 42 U.S.C. § 9607 against Third-Party Plaintiffs, finding that they are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site, or, in the alternative, for a 100 percent allocation by the Court (using such equitable factors as the Court determines are appropriate) to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(3)     Enter a declaratory judgment that Third-Party Plaintiffs are liable parties under 42 U.S.C. § 9607(a)(2) and (a)(3) for releases from and to the Site and that Third-Party Plaintiffs are liable for any and all response costs that may be incurred in the future**;**

(4)     Enter a declaratory judgment that Third-Party Plaintiffs are liable for additional current and future work obligations;

(5)     Enter an order awarding PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(6)     Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## CROSSCLAIMS

For its Crossclaims against all other Third-Party Defendants (the "Municipal Third-Party Defendants"), Third-Party Defendant PVSC alleges as follows:

## NATURE OF ACTION

1.     Plaintiff Occidental Chemical Corporation ("OxyChem") and the Defendants/Third-Party Plaintiffs have brought contribution claims against each other under CERCLA for remediation of the Diamond Alkali Superfund Site (the "Site"). They have also both brought contribution claims against Third-Party Defendants, including PVSC. PVSC hereby seeks contribution from Municipal Third-Party Defendants for any liability imposed against it. PVSC also seeks to recover all response costs it has incurred associated with the Site and all future response costs it will incur associated with the Site.

## JURISDICTION AND VENUE

2.      The Crossclaims set forth herein arise out of the same transactions and occurrences that are set forth in the Defendants/Third-Party Plaintiffs' claims against Oxychem and counterclaims against PVSC.

3.      If jurisdiction is proper with respect to the Third-Party Complaint, it is proper with respect to Municipal Third-Party Defendants for the purposes of these Crossclaims.

4.      If venue is proper with respect to the Third-Party Complaint, it is proper with respect to Municipal Third-Party Defendants for the purposes of these Crossclaims.

### GENERAL ALLEGATIONS

5.      OxyChem brought contribution claims under CERCLA against the Third-Party Plaintiffs for remediation of the Site.

6.      Third-Party Plaintiffs brought contribution claims under CERCLA against OxyChem for remediation of the Site.

7.      Third-Party Plaintiffs brought contribution claims under CERCLA against Third-Party Defendants, including PVSC, seeking to recover the share of liability, if any, related to the Site that this Court deems appropriate to assign to Third-Party Defendants.

8.      OxyChem brought contribution claims under CERCLA against Third-Party Defendants, including PVSC, seeking to recover the share of liability, if any, related to the Site that this Court deems appropriate to assign to Third-Party Defendants.

9.      PVSC has incurred response costs associated with the Site, including but not limited to, its current efforts to condemn property next to its Newark facility in order to locate a sediment processing facility needed for the remediation of the Site.

10.      PVSC will incur future response costs associated with the Site, including but not limited to, dedicating its property to a sediment processing facility needed to remediate the Site.

## COUNT I
### (Contribution Under CERCLA Section 113)

11.     PVSC realleges and incorporates by reference paragraphs 1 through 10 above.

12.     Municipal Third-Party Defendants all qualify as a "person" as that term is defined in 42 U.S.C. § 9601(21).

13.     PVSC is a "person" as that term is defined in 42 U.S.C. § 9601(21).

14.     Some or all of the Municipal Third-Party Defendants now own and/or operate, or in the past have owned and/or operated combined sewer systems that included CSOs that discharge(d) to the Passaic River, and/or sewers that transport(ed) and arrange(d) for the disposal of Hazardous Substances from municipal and industrial dischargers to the PVSC system and to the Passaic River.

15.     Each of these CSOs or sewers is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

16.     The facilities were designed, constructed, and operated in a manner that resulted in the "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14) and § 9601(22).

17.     The Municipal Third-Party Defendants  are each therefore liable under 42 U.S.C. § 9607(a)(1) and/or § 9607(a)(2)  and/or § 9607(a)(3) for PVSC's costs of response resulting from the release of Hazardous Substances.

18.     PVSC has incurred costs and will continue to incur costs as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at and from the facilities now or formerly owned and/or operated by the Municipal Third-Party Defendants. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

19.     PVSC has paid and will continue to pay more than its equitable share of response costs and is entitled to contribution from Municipal Third-Party Defendants pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of the response costs incurred, or to be incurred, as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at the Site, including prejudgment interest.

WHEREFORE, PVSC demands that the Court:

(1)     Declare that Municipal Third-Party Defendants are liable under 42 U.S.C. § 9613(f) for their share, determined by the Court using such equitable factors as it determines are appropriate, of response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Award PVSC an amount determined by the Court, using such equitable factors as it determines are appropriate, to satisfy the obligation of Municipal Third-Party Defendants for all necessary response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(3)     Award PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(4) Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## COUNT II
### (Cost Recovery Under CERCLA Section 113)

20.     PVSC realleges and incorporates by reference paragraphs 1 through 19 above.

21.     Municipal Third-Party Defendants are jointly and severally liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a) because they are responsible parties as defined by CERCLA Section 107(a), 42 U.S.C. § 9607(a).

22.    Each release or threatened release of hazardous substances as described above has caused and will continue to cause PVSC to incur necessary response costs consistent with the National Oil and Hazardous Substances Contingency Plan, 40 C.F.R. § 300 et seq (the "NCP").

23.    Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), PVSC is entitled to cost recovery from Municipal Third-Party Defendants for necessary response costs incurred and to be incurred by PVSC consistent with the NCP.

WHEREFORE, PVSC demands that the Court:

(1)    Declare that Municipal Third-Party Defendants are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)    Award PVSC an amount determined by the Court to satisfy the obligation of Municipal Third-Party Defendants for all necessary response costs incurred and to be incurred by PVSC;

(3)    Award PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(4)    Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## COUNT III
### (Declaratory Judgment – CERCLA)

24.    PVSC realleges and incorporates by reference paragraphs 1 through 23 above.

25.    An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between PVSC and Municipal Third-Party Defendants concerning their respective rights and responsibilities for the response costs incurred and to be incurred by PVSC.

26.     Some or all of the Municipal Third-Party Defendants now own and/or operate, or in the past have owned and/or operated, combined sewer systems that included CSOs that discharge(d) to the Passaic River, and/or sewers that transport(ed) and arrange(d) for the disposal of Hazardous Substances from municipal and industrial dischargers to the PVSC system and to the Passaic River.

27.     Each of these CSOs and/or sewers is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

28.     The facilities were designed, constructed, and operated in a manner that resulted in the "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14) and § 9601(22).

29.     The Municipal Third-Party Defendants are each therefore liable under 42 U.S.C. § 9607(a)(1) and/or § 9607(a)(2) and/or § 9607(a)(3) for PSVC's costs of response resulting from the release of Hazardous Substances.

30.     PVSC has incurred costs and will continue to incur costs as a direct consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment by Municipal Third-Party Defendants. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

31.     Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), PVSC is entitled to a declaratory judgment, which will be binding in any subsequent action or actions to recover further response costs, that Municipal Third-Party Defendants are liable parties under 42 U.S.C. § 9607(a)(2) and (a)(3) for releases from and to the Site and that Municipal Third-Party Defendants are liable for any and all response costs that may be incurred in the future.

WHEREFORE, PVSC demands that the Court:

(1)      Enter judgment under 42 U.S.C. § 9613 against Municipal Third-Party Defendants, finding that they are liable to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site, or, in the alternative, for a 100 percent allocation by the Court (using such equitable factors as the Court determines are appropriate) to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)      Enter judgment under 42 U.S.C. § 9607 against Municipal Third-Party Defendants, finding that they are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site, or, in the alternative, for a 100 percent allocation by the Court (using such equitable factors as the Court determines are appropriate) to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(3)      Enter a declaratory judgment that Municipal Third-Party Defendants are liable parties under 42 U.S.C. § 9607(a)(2) and (a)(3) for releases from and to the Site and that Municipal Third-Party Defendants are liable for any and all response costs that may be incurred by PVSC in the future;

(4)      Enter a declaratory judgment that Municipal Third-Party Defendants are liable for additional current and future work obligations;

(5)      Enter an order awarding PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(6)    Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify that, to the best of my knowledge, the subject matter of this proceeding is not the subject of any other pending court action, or of any pending arbitration or administrative proceeding. I am aware that if the foregoing is willfully false, I am subject to punishment.

_____
Kirstin Bohn, Esq.
CHASAN LAMPARELLO MALLON & CAPPUZZO, PC
300 Lighting Way, Suite 200
Secaucus, NJ 07094
Tel: (201) 348-6000
Fax: (201) 348-6633
kbohn@chasanlaw.com

*Counsel for Third Party Defendant*
*Passaic Valley Sewerage Commissioners*

Dated: September _____, 2021

## CERTIFICATION OF SERVICE

I hereby certify that on September _____, 2021, a true and correct copy of Third Party Defendant Passaic Valley Sewerage Commissioners' First Amended Answer to the Third Party Complaint of Third Party Plaintiffs was served upon all counsel of record via the Electronic Court Filing system, where it is available for viewing.

_____
Kirstin Bohn, Esq.

CHASAN LAMPARELLO MALLON & CAPPUZZO, PC
300 Lighting Way, Suite 200
Secaucus, NJ 07094
Tel: (201) 348-6000
Fax: (201) 348-6633
kbohn@chasanlaw.com

*Counsel for Third Party Defendant*
*Passaic Valley Sewerage Commissioners*

Dated: September _____, 2021

Kirstin Bohn, Esq.
CHASAN LAMPARELLO MALLON & CAPPUZZO, PC
300 Lighting Way, Suite 200
Secaucus, New Jersey  07094
Attorneys for Third-Party Defendant Passaic Valley Sewerage Commissioners

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION,<br><br>Plaintiff,<br>v.<br><br>21ST CENTURY FOX AMERICA, INC., et al.,<br><br>Defendants.<br><br>21ST CENTURY FOX AMERICA, INC., et al.,<br><br>Third-Party Plaintiffs,<br>v.<br><br>PASSAIC VALLEY SEWERAGE COMMISSIONERS,<br>BOROUGH OF EAST NEWARK,<br>BOROUGH OF ELMWOOD PARK,<br>BOROUGH OF FAIR LAWN, | Hon. Madeline Cox Arleo<br>Hon. Magistrate Judge Leda D. Wettre<br><br>Civil Action No. 2:18-CV-11273 (MCA-LDW)<br><br>**THIRD-PARTY DEFENDANT PASSAIC VALLEY SEWERAGE COMMISSIONERS' FIRST AMENDED ANSWER TO THIRD-PARTY COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AGAINST THIRD-PARTY PLAINTIFFS, AND CROSSCLAIMS AGAINST THIRD-PARTY DEFENDANTS** |

BOROUGH OF FRANKLIN LAKES,
BOROUGH OF GLEN RIDGE,
BOROUGH OF GLEN ROCK,
BOROUGH OF HALEDON,
BOROUGH OF HASBROUCK HEIGHTS,
BOROUGH OF HAWTHORNE,
BOROUGH OF LODI,
BOROUGH OF NORTH ARLINGTON,
BOROUGH OF NORTH CALDWELL,
BOROUGH OF NORTH HALEDON,
BOROUGH OF PROSPECT PARK,
BOROUGH OF RUTHERFORD,
BOROUGH OF TOTOWA,
BOROUGH OF WALLINGTON,
BOROUGH OF WOODLAND PARK, F/K/A
BOROUGH OF WEST PATERSON,
BOROUGH OF WOOD-RIDGE,
CITY OF CLIFTON,
CITY OF EAST ORANGE,
CITY OF GARFIELD,
CITY OF NEWARK,
CITY OF ORANGE TOWNSHIP,
CITY OF PASSAIC,
CITY OF PATERSON,
TOWNSHIP OF BELLEVILLE,
TOWN OF HARRISON,
TOWN OF KEARNY,
TOWN OF NUTLEY,
TOWNSHIP OF BLOOMFIELD,
TOWNSHIP OF CEDAR GROVE,
TOWNSHIP OF LITTLE FALLS,
TOWNSHIP OF LYNDHURST,
TOWNSHIP OF MONTCLAIR,
TOWNSHIP OF SADDLE BROOK,
TOWNSHIP OF SOUTH HACKENSACK,
TOWNSHIP OF SOUTH ORANGE VILLAGE,
TOWNSHIP OF WEST ORANGE,
VILLAGE OF RIDGEWOOD,

Third-Party Defendants.

## ANSWER TO THIRD-PARTY COMPLAINT

Third-Party Defendant Passaic Valley Sewerage Commissioners ("PVSC") answers the

Third-Party Complaint by 21st Century Fox America, Inc., et al., as follows:

60

**INTRODUCTION**

181.    Occidental Chemical Corporation ("OxyChem") brought contribution claims under CERCLA Sections 107 and 113 against 120 parties for remediation of the Diamond Alkali Superfund Site, despite the fact that substantially all of the 2,3,7,8-Tetrachlorodibenzo-*p*-dioxin ("2,3,7,8-TCDD"), which is driving the remediation and is one of the most toxic "man-made" substances, was discharged directly to the Lower Passaic River ("LPR") from the Diamond Alkali chemical manufacturing facility at 80 and 120 Lister Avenue in Newark, New Jersey (the "Diamond Alkali Plant" or "Facility"), for which OxyChem is liable.

ANSWER: PVSC admits the allegations in this paragraph.

182.    In 1984, the U.S. Environmental Protection Agency ("EPA") identified the lower 17 miles of the Passaic River and Newark Bay as the Diamond Alkali Superfund Site (the "Diamond Alkali Site").

ANSWER:  PVSC admits the allegations in this paragraph.

183.    In addition to 2,3,7,8-TCDD, EPA identified seven other Contaminants of Concern ("COCs") for the Diamond Alkali Site.[4] Discharges from the Diamond Alkali Plant are responsible for nearly all of the 2,3,7,8-TCDD, dichlorodiphenyltrichloroethane ("DDT"), and Dieldrin in the LPR. As a result of discharges from the Diamond Alkali Plant, the LPR has some of the highest concentrations and greatest mass of 2,3,7,8-TCDD in the world.

ANSWER: PVSC admits the allegations in this paragraph.

184.    The Diamond Alkali Site was designated as a Superfund site as a result of discharges from the Diamond Alkali Plant, for which OxyChem is liable.

---

[4] In its 2016 Record of Decision for the lower eight miles of the LPR, EPA identified eight COCs: polychlorinated dioxins and furans, polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons (PAHs), DDT, Dieldrin, Mercury, Copper, and Lead. U.S. EPA, Record of Decision for the Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey 14-16 (Mar. 3, 2016). All COCs are Hazardous Substances under 42 U.S.C. § 9601(14).

ANSWER: PVSC admits the allegations in this paragraph.

185.    Notwithstanding OxyChem's overwhelming responsibility for the human health and ecological risks present in the LPR, OxyChem refuses to accept full responsibility for its actions in rendering the LPR one of the most dioxin-contaminated rivers in the world and instead prematurely elected to sue more than 100 parties whose contributions, if any, pale in comparison to its own.

ANSWER: PVSC admits the allegations in this paragraph.

186.    OxyChem's refusal to accept full responsibility for its contributions necessitates this Third-Party Complaint. To the extent that any Third-Party Plaintiff is found liable for any contributions of COCs to the LPR, the PVSC and Municipalities are also liable and must pay their fair share.

ANSWER: PVSC denies the allegations in his paragraph.

187.    Any contributions of COCs to the LPR allegedly attributable to the Third-Party Plaintiffs were insignificant and were largely the result of diversions to the LPR by PVSC or the municipalities of wastewater flows that had been lawfully discharged to PVSC or municipal sewer systems by Third-Party Plaintiffs as well as by thousands of other entities. Some Third-Party Plaintiffs' discharges to the PVSC and municipalities' sewer systems were not diverted to the LPR given those Third-Party Plaintiffs' locations in the system.

ANSWER: PVSC admits the allegations in the last sentence of this paragraph.  PVSC denies the remaining allegations of this paragraph.

188.    Wastewater sent to the PVSC via municipally owned sewer systems was generally treated and then discharged to New York Harbor, not the LPR.

ANSWER: PVSC admits the allegations in this paragraph.

189.    Wastewater discharged to PVSC or municipal sewer systems was only discharged to the LPR through bypasses or combined sewer overflows ("CSOs") operated by PVSC or the Municipalities.

ANSWER: PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

190.    Because the PVSC has served thousands of customers since it began operations, among other reasons, the Third-Party Plaintiffs whose wastewaters discharged to the LPR through bypasses or CSOs constitute less than one percent of the potential contributors of COCs to the PVSC system.

ANSWER: PVSC admits only that it "has served thousands of customers since it began operations."  PVSC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

191.    The PVSC and Municipalities owning and operating CSOs, not their customers, had control over bypasses and CSOs. Bypasses and CSOs were the only potential pathways that contaminants sent to the PVSC could have reached the LPR.

ANSWER:  PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

192.    Pursuant to Sections 107 and 113 of CERCLA, Third-Party Plaintiffs allege on information and belief as follows:

ANSWER: PVSC admits that the Third-Party Plaintiffs make allegations under Sections 107 and 113 of CERCLA,  but denies that they are entitled to relief.

## BACKGROUND

### A.    <u>Historical Background</u>

193.    EPA declared the Diamond Alkali Site a Superfund site in 1984 due to discharges of dioxin and other hazardous substances from OxyChem's Diamond Alkali Plant.

ANSWER: The EPA designation speaks for itself.   Any allegation contrary or inconsistent with that designation is denied as such.

194.    2,3,7,8-TCDD, the form of dioxin OxyChem discharged into the environment from the Diamond Alkali Plant, is one of the most toxic known chemicals. The Diamond Alkali Site contains one of the largest environmental accumulations of 2,3,7,8-TCDD in the world.

ANSWER: PVSC admits the allegations in this paragraph.

195.    For more than twenty years, from approximately 1947 to at least approximately 1969, and at other times thereafter, OxyChem disposed of and released 2,3,7,8-TCDD, DDT, and various other pesticides, chemicals, and COCs into the LPR and the surrounding area. Despite clear responsibility for these releases, OxyChem has never fully remediated the areas that it contaminated with 2,3,7,8-TCDD and other hazardous substances, resulting in continuing and ongoing releases to the LPR and the surrounding area.

ANSWER:  PVSC admits the allegations in this paragraph.

196.    This Court found that OxyChem is the legal successor to the entities that owned and operated the Lister Plant during the relevant time period and may be held liable for the CERCLA response costs flowing therefrom. (Letter Order (ECF No. 1105 at 4).)

ANSWER: PVSC admits the allegations in this paragraph.

197.    In 1983, the New Jersey Department of Environmental Protection ("NJDEP") conducted a dioxin investigation and sampling activities at the Diamond Alkali Plant and along the LPR. On or around June 2, 1983, in response to high levels and pervasive presence of dioxin, New Jersey Governor Thomas H. Kean issued an executive order declaring a state of emergency due to the threat that dioxin posed to public health.

ANSWER: PVSC admits the allegations in this paragraph.

198.    In 1984, in a document titled "Dioxin Strategy Newark, New Jersey," NJDEP laid out steps New Jersey would take to minimize public exposure to unacceptable levels of 2,3,7,8-TCDD. In that document, NJDEP concluded that "80 Lister Avenue is . . . the state believes, the source site for all of the dioxin contamination found today in Newark."

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

199.    In September 1984, Diamond Shamrock Chemicals Company, predecessor-in-interest to OxyChem, sued Aetna Casualty & Surety Company and 125 other insurers in New Jersey Superior Court seeking a declaratory judgment that the insurers were required to pay for OxyChem's past and future remediation of the Diamond Alkali Plant and for third-party bodily injury and property damage claims resulting from dioxin (the "*Aetna* litigation").

ANSWER: The complaint identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

200.    After a twenty-day bench trial in the *Aetna* litigation in 1988, Judge Stanton found the insurers were not liable under the policies at issue and concluded that OxyChem "intentionally and continuously discharged highly toxic chemical effluent into the Passaic River," "was conscious that its discharges into the river were illegal," "deliberately concealed [discharges]," "employed an alarm system to warn employees to stop the discharges when . . . inspectors were on the premises," and "even by the standards of the 1951-1969 period, [OxyChem's] conduct . . . was unacceptably wrong and irresponsible."

ANSWER: The court finding identified in this paragraph speaks for itself and any allegation contrary or inconsistent with those findings is denied as such.

201.    In the decades since New Jersey declared a state of emergency and EPA designated the LPR as a Superfund site, OxyChem and its indemnitors have delayed the cleanup in the LPR and sought to offload their responsibility onto others.

ANSWER: PVSC admits the allegations in this paragraph.

202.    In 2005, the State of New Jersey sued OxyChem and its indemnitors and affiliates under *inter alia* the New Jersey Spill Compensation and Control Act to recover costs and damages and to ensure OxyChem was assigned responsibility for remediation in the LPR.[5]   The State alleged OxyChem had "orchestrated and implemented a strategy to delay and impede the clean-up and restoration of the Passaic River," and "[a]s a direct result of O[xyChem]'s intentional releases and discharges into the Passaic River, and Defendants' feat of delaying any real solution for another 20-plus years, TCDD has migrated throughout the lower 17 miles of the Passaic River . . . [such that] sediments in the Newark Bay Complex are saturated with TCDD, yet not one teaspoon of TCDD-impacted sediment has been removed as part of a clean-up or restoration effort."

ANSWER: The complaint identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

203.    In 2004, OxyChem, as the party responsible for the Diamond Alkali Plant, and other parties, including certain Third-Party Plaintiffs or their predecessors-in-interest or indemnitors, entered into a settlement agreement with EPA ("2004 RI/FS Agreement") under which the parties agreed to fund certain costs to perform the Remedial Investigation and Feasibility Study ("RI/FS") of the 17-mile tidal portion of the Passaic River from the Dundee Dam to the Newark Bay, also known as the Lower Passaic River Study Area ("LPRSA").

ANSWER:  The agreement identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

204.    The 2004 RI/FS Agreement was amended in 2005 and 2007 to include additional settling parties and funding commitments. A list of Third-Party Plaintiffs that are signatories to the

---

[5] *Complaint* (Nov. 22, 2005), *NJDEP et al. v. Occidental Chemical Corp., et al.*, Docket No. ESX-L9868-05 (PASR) (Sup. Ct. N.J.).

2004 RI/FS Agreement either in their own names (alone or together with corporate affiliates) or the name of a predecessor-in-interest or indemnitor, including its amendments, is attached as Exhibit 2.

ANSWER: The agreement identified in this paragraph speaks for itself and any allegation in this paragraph or the referenced exhibit that is contrary or inconsistent with that document is denied as such.

205.    In 2007, OxyChem, as the party responsible for the Diamond Alkali Plant, and other parties, including many Third-Party Plaintiffs, entered into a settlement agreement with EPA ("2007 RI/FS Agreement") under which the parties agreed to perform the RI/FS of the LPRSA. In or around 2012, OxyChem ceased complying with that agreement and has since refused to pay its share of costs incurred by settlement parties for work performed under the 2007 RI/FS Agreement.

ANSWER: The agreement identified in the first sentence of this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such. Upon information and belief, PVSC admits the allegations in the last sentence of this paragraph.

206.    In 2017, the 2007 RI/FS Agreement was amended to include additional settling parties. A list of Third-Party Plaintiffs that are signatories to the 2007 RI/FS Agreement either in their own names (alone or together with corporate affiliates) or the name of a predecessor-in-interest or indemnitor, including its 2017 amendment, is attached as Exhibit 3.

ANSWER: The agreement identified in this paragraph speaks for itself and any allegation in this paragraph or the referenced exhibit contrary or inconsistent with that document is denied as such.

207.    In June 2012, after RI/FS sampling indicated that an approximately five-acre mud flat and point bar near River Mile ("RM") 10.9 was contaminated with high levels of 2,3,7,8-TCDD, the Third-Party Plaintiffs listed in Exhibit 4—either in their own names (alone or together with corporate affiliates) or the name of a predecessor-in-interest, or indemnitor—and other parties, entered into a settlement agreement with EPA ("2012 RM 10.9 Agreement") to remove

approximately two feet of sediment (approximately 16,000 cubic yards) from the RM 10.9

Removal Area and cap this area.

> ANSWER:  The agreement identified in this paragraph speaks for itself and any
> allegation in this paragraph or the referenced exhibit contrary or inconsistent with that
> document is denied as such.

208.    In 2016, EPA issued a Record of Decision ("ROD") selecting a remedy for the

lower 8.3 miles of the Passaic River to address the risks to human health and the environment

posed by eight contaminants of concern (the "8 COCs").

> ANSWER: The ROD identified in this paragraph speaks for itself and any allegation
> contrary or inconsistent with that document is denied as such.

209.    The 8 COCs are dioxins/furans, polychlorinated biphenyls (PCBs), polychlorinated

aromatic hydrocarbons (PAHs), DDT, Dieldrin, Copper, Mercury, Lead.

> ANSWER: The ROD identified in this paragraph speaks for itself and any allegation
> contrary or inconsistent with that document is denied as such.

210.    Of the 8 COCs, 2,3,7,8-TCDD poses the most significant risk to human health and

the environment and provides the sole or primary justification for EPA's selected remedy.

> ANSWER: PVSC admits the allegations in this paragraph.

211.    In the 2016 ROD, EPA concluded that no level of remediation could reduce the

level of risk to a degree consistent with the traditional remediation goals EPA has set for all

CERCLA sites in the National Contingency Plan ("NCP"): "EPA has concluded that a 10-6 cancer

risk [aspired to by the NCP] for the fish and crab consumption exposure pathway cannot be

attained through remediation," and "it is unlikely that the ecological [preliminary remediation

goals] could be met under any of the alternatives, even with natural recovery processes." Because

the adjusted "acceptable risk range"—which includes risk in excess of the NCP goals for other

sites—would not be achieved by the selected remedy, EPA required continued use of fishing

prohibitions in the LPR: "in the 26-year period after construction, risks and hazards exceed the

acceptable risk range . . . so [the selected remedy] would incorporate institutional controls such as fish and crab consumption prohibitions and advisories enhanced by additional outreach to ensure protectiveness."

ANSWER: The ROD identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

212.    Separate from and in addition to the costs incurred pursuant to the 2004 RI/FS Agreement, the 2007 RI/FS Agreement, and the 2012 RM 10.9 Agreement, each Third-Party Plaintiff has incurred additional recoverable costs closely tied to the cleanup of the Lower Passaic River. These costs include but are not limited to legal fees, administrative costs, PRP search costs, costs of investigation, planning, and technical support, and other indirect costs incurred for work that has significantly benefitted the entire cleanup effort.

ANSWER: PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

## B.    Procedural Background

213.    On June 30, 2018, OxyChem filed its complaint against 120 parties, seeking cost recovery, contribution, and a declaratory judgment against the original Defendants, under CERCLA Sections 107(a) and 113(f), 42 U.S.C. §§ 9607(a), 9613(f), for response costs that OxyChem allegedly has and may incur to remediate hazardous substances at the Diamond Alkali Superfund Site.

ANSWER: PVSC admits the allegations of this paragraph.

214.    On July 31, 2019, U.S. District Judge Honorable Madeline Cox Arleo dismissed OxyChem's CERCLA Section 107(a) claims, 42 U.S.C. § 9607(a), that related to the 2008, 2011,

and 2016 Administrative Settlements, and dismissed OxyChem's CERCLA Section 113(f)(1) claims, 42 U.S.C. § 9613(f)(1), that related to the 2012 Unilateral Administrative Order ("UAO").[6]

ANSWER: PVSC admits the allegations in this paragraph.

215.    OxyChem's surviving claims are a CERCLA Section 107(a), 42 U.S.C. § 9607(a), claim relating to the 2012 UAO and CERCLA Section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), claims relating to the 2008, 2011, and 2016 Administrative Settlements.

ANSWER: PVSC admits the allegations in this paragraph.

216.    On or around August 14, 2019, many Third-Party Plaintiffs filed counterclaims against OxyChem for contribution, cost recovery, declaratory judgement and/or breach of contract for costs incurred and to be incurred at the LPRSA portion of the Diamond Alkali Superfund Site, including pursuant to the 2004 RI/FS Agreement, the 2007 RI/FS Agreement, and the 2012 RM 10.9 Agreement.

ANSWER: PVSC admits the allegations in this paragraph.

## JURISDICTION AND VENUE

217.    The Third-Party Claims set forth herein arise out of and are ancillary to the claims set forth in the Complaint.

ANSWER: PVSC admits the allegations in this paragraph.

218.    If jurisdiction is proper with respect to the Complaint, it is proper with respect to the Third-Party Claims.

---

[6] Administrative Settlement Agreement and Order on Consent for Removal Action between the U.S. EPA, OxyChem, and Tierra (June 23, 2008) (the "2008 Settlement"); Administrative Settlement Agreement and Order on Consent for Combined Sewer Overflow/Storm Water Outfall Investigation between the U.S. EPA and OxyChem (Oct. 4, 2011) (the "2011 Settlement"); Unilateral Administrative Order for Removal Response Activities from the Passaic River at River Mile 10.9 between U.S. EPA and OxyChem (June 2012) (the "2012 UAO"); Administrative Settlement Agreement and Order on Consent for Remedial Design for Operable Unit Two of the Diamond Alkali Superfund Site between U.S. EPA and OxyChem (June 2016) (the "2016 Settlement").

ANSWER: PVSC admits the allegations in this paragraph as a general principle but denies that this Court necessarily has jurisdiction over it in this matter.

219.    If venue is proper with respect to the Complaint, it is proper with respect to the Third-Party Claims.

ANSWER: PVSC admits the allegations in this paragraph.

220.    Each Third-Party Defendant named herein is a "person" within the meaning of 42 U.S.C. § 9601(21).

ANSWER: PVSC admits the allegations of this paragraph.

221.    As alleged elsewhere herein, each Third-Party Defendant has conducted activities in the State of New Jersey and has had sufficient contacts with the State of New Jersey to be subject to the jurisdiction of this Court.

ANSWER: PVSC admits the allegations of this paragraph.

## THE PARTIES

222.    Third-Party Defendant the PVSC is a public body politic and corporate authorized by statute with its principal place of business at 600 Wilson Avenue, Newark, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

223.    Third-Party Defendant Borough of East Newark is a public body and municipality of the State of New Jersey with its principal place of business at 34 Sherman Avenue, East Newark, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

224.    Third-Party Defendant Borough of East Rutherford is a public body and municipality of the State of New Jersey with its principal place of business at 1 Everett Place, East Rutherford, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

225.     Third-Party Defendant Borough of Elmwood Park is a public body and municipality of the State of New Jersey with its principal place of business at 182 Market Street #2, Elmwood Park, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

226.     Third Party Defendant Borough of Fair Lawn is a public body and municipality of the State of New Jersey with its principal place of business at 8-01 Fair Lawn Avenue, Fair Lawn, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

227.     Third-Party Defendant Borough of Franklin Lakes is a public body and municipality of the State of New Jersey with its principal place of business at Franklin Lakes Municipal Building, DeKorte Drive, Franklin Lakes, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

228.     Third-Party Defendant Borough of Glen Ridge is a public body and municipality of the State of New Jersey with its principal place of business at 825 Bloomfield Avenue, Glen Ridge, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

229.     Third-Party Defendant Borough of Glen Rock is a public body and municipality of the State of New Jersey with its principal place of business at 1 Harding Plaza, Municipal Building, Glen Rock, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

230.     Third-Party Defendant Borough of Haledon is a public body and municipality of the State of New Jersey with its principal place of business at 510 Belmont Avenue, Haledon, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

231.    Third-Party Defendant Borough of Hasbrouck Heights is a public body and municipality of the State of New Jersey with its principal place of business at 320 Boulevard, Hasbrouck Heights, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

232.    Third-Party Defendant Borough of Hawthorne is a public body and municipality of the State of New Jersey with its principal place of business at 445 Lafayette Avenue, Hawthorne, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

233.    Third-Party Defendant Borough of Lodi is a public body and municipality of the State of New Jersey with its principal place of business at 1 Memorial Drive, Lodi, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

234.    Third-Party Defendant Borough of North Arlington is a public body and municipality of the State of New Jersey with its principal place of business at 214 Ridge Road, North, North Arlington, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

235.    Third-Party Defendant Borough of North Caldwell is a public body and municipality of the State of New Jersey with its principal place of business at 141 Gould Avenue, North Caldwell, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

236.    Third-Party Defendant Borough of North Haledon is a public body and municipality of the State of New Jersey with its principal place of business at 103 Overlook Avenue, North Haledon, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

237.     Third-Party Defendant Borough of Prospect Park is a public body and municipality of the State of New Jersey with its principal place of business at 106 Brown Avenue, Prospect Park, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

238.     Third-Party Defendant Borough of Rutherford is a public body and municipality of the State of New Jersey with its principal place of business at 176 Park Avenue, Rutherford, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

239.     Third-Party Defendant Borough of Totowa is a public body and municipality of the State of New Jersey with its principal place of business at 527 Totowa Road, Totowa, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

240.     Third-Party Defendant Borough of Wallington is a public body and municipality of the State of New Jersey with its principal place of business at 24 Union Boulevard, Wallington, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

241.     Third-Party Defendant Borough of Woodland Park is a public body and municipality of the State of New Jersey with its principal place of business at 5 Brophy Lane, Woodland Park, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

242.     Third-Party Defendant Borough of Wood-Ridge is a public body and municipality of the State of New Jersey with its principal place of business at 85 Humboldt Street, Wood-Ridge, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

243.     Third-Party Defendant City of Clifton is a public body and municipality of the State of New Jersey with its principal place of business at 900 Clifton Avenue, Clifton, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

244.     Third-Party Defendant City of East Orange is a public body and municipality of the State of New Jersey with its principal place of business at 44 City Hall Plaza, East Orange, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

245.     Third-Party Defendant City of Garfield is a public body and municipality of the State of New Jersey with its principal place of business at 111 Outwater Lane, Garfield, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

246.     Third-Party Defendant City of Newark is a public body and municipality of the State of New Jersey with its principal place of business at City Hall - Room B331F, 920 Broad Street, Newark, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

247.     Third-Party Defendant City of Orange Township is a public body and municipality of the State of New Jersey with its principal place of business at 29 North Day Street, Orange, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

248.     Third-Party Defendant City of Passaic is a public body and municipality of the State of New Jersey with its principal place of business at 330 Passaic Street, Passaic, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

249.     Third-Party Defendant City of Paterson is a public body and municipality of the State of New Jersey with its principal place of business at 155 Market Street, Paterson, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

250.     Third-Party Defendant Township of Belleville is a public body and municipality of the State of New Jersey with its principal place of business at 152 Washington Avenue, Belleville, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

251.     Third-Party Defendant Town of Harrison is a public body and municipality of the State of New Jersey with its principal place of business at 318 Harrison Avenue, Harrison, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

252.     Third-Party Defendant Town of Kearny is a public body and municipality of the State of New Jersey with its principal place of business at 402 Kearny Avenue, Kearny, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

253.     Third-Party Defendant Town of Nutley is a public body and municipality of the State of New Jersey with its principal place of business at 1 Kennedy Drive, Nutley, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

254.     Third-Party Defendant Township of Bloomfield is a public body and municipality of the State of New Jersey with its principal place of business at 1 Municipal Plaza, Bloomfield, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

255.    Third-Party Defendant Township of Cedar Grove is a public body and municipality of the State of New Jersey with its principal place of business at 525 Pompton Avenue, Cedar Grove, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

256.    Third-Party Defendant Township of Little Falls is a public body and municipality of the State of New Jersey with its principal place of business at 225 Main Street, Little Falls, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

257.    Third-Party Defendant Township of Lyndhurst is a public body and municipality of the State of New Jersey with its principal place of business at 367 Valley Brook Avenue, Lyndhurst, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

258.    Third-Party Defendant Township of Montclair is a public body and municipality of the State of New Jersey with its principal place of business at 205 Claremont Avenue, Montclair, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

259.    Third-Party Defendant Township of Saddle Brook is a public body and municipality of the State of New Jersey with its principal place of business at 93 Market Street, Saddle Brook, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

260.    Third-Party Defendant Township of South Hackensack is a public body and municipality of the State of New Jersey with its principal place of business at 227 Phillips Avenue, South Hackensack, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

77

261.     Third-Party Defendant Township of South Orange Village is a public body and municipality of the State of New Jersey with its principal place of business at 76 South Orange Avenue, South Orange, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

262.     Third-Party Defendant Township of West Orange is a public body and municipality of the State of New Jersey with its principal place of business at Town Hall, 66 Main Street, South Orange, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

263.     Third-Party Defendant Village of Ridgewood is a public body and municipality of the State of New Jersey with its principal place of business at Village Hall, 131 North Maple Avenue, New Jersey.

ANSWER: PVSC admits the allegations of this paragraph.

## FACTUAL ALLEGATIONS

264.     The New Jersey Legislature created the PVSC in 1902 with the stated purpose of relieving and preventing pollution in the Passaic River and its tributaries from Great Falls in Paterson to Newark Bay.

ANSWER:  PVSC admits the allegations in this paragraph only to the extent that it was created in its current form in the method stated.

265.     In August 1924, the PVSC began operating the Main Interceptor Sewer (also known as "the Trunk Line"), which since that time has collected and continues to collect untreated sewage and industrial wastes from tributary municipal sewer systems that had previously discharged to the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph.

266.     The Trunk Line is 22 miles long, begins at Prospect Street in Paterson, New Jersey and generally follows the alignment of the Passaic River, along the west bank of the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph.

267.     The PVSC designed, constructed, installed, owns, and operates the Trunk Line.

ANSWER: PVSC admits the allegations in this paragraph.

268.     The Trunk Line terminates in the City of Newark at the PVSC's Sewage Treatment Plant Wastewater Reclamation Facility ("WWRF") at about 600 Wilson Avenue, Newark, New Jersey, which began operations circa 1931.

ANSWER: PVSC admits the allegations in this paragraph.

269.     PVSC designed, constructed, installed, owns, and operates the WWRF.

ANSWER: PVSC admits the allegations in this paragraph.

270.     Before the Trunk Line became operational, most municipalities within PVSC's jurisdiction had developed individual sewer systems that discharged directly to the LPR through discharge lines ending in outfalls on or near the banks of the LPR.

ANSWER: PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

271.     After the construction of the Trunk Line, those municipalities who previously discharged directly to the LPR connected directly to the PVSC system. The PVSC's WWRF currently receives flow from 48 municipalities through three primary lines that the PVSC designed, constructed, and installed: the Trunk Line, the South Side Interceptor, and the Hudson County Force Main.

ANSWER: PVSC admits the allegations in this paragraph.

272.     The PVSC designed, constructed, installed, owns, operates, and has control over the 59 active regulating chambers, and additional historic chambers not now in use, located

within and along the Trunk Line and tributary PVSC sewers through which untreated sewage, industrial wastewater, and stormwater have been and are from time to time directed away from the PVSC WWRF to CSO outfalls and bypasses and discharged into the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph.

273.    The Trunk Line and tributary PVSC and municipal sewers also have approximately 50 active CSO outfalls or bypasses, and additional historic outfalls or bypasses not now in use, through which untreated sewage, industrial wastewater, and stormwater have been and still periodically are discharged into the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph only as to the Trunk Line and tributary sewers.  PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph as to municipal sewers.

274.    For decades, PVSC staff manually opened and closed its bypasses through chains linked to regulator valves or flaps, or through gates operated by hoists. This allowed the PVSC to choose to bypass the treatment system and discharge untreated sewage, industrial wastewater, and stormwater directly to the Passaic River.

ANSWER: PVSC admits the allegations in this paragraph's first sentence.  PVSC denies the allegations in this paragraph's second sentence.

275.    In the mid-1980s, the PVSC designed, constructed, and continues to operate remote controls to allow PVSC to control its bypass gates from a central control facility.

ANSWER: PVSC admits the allegations in this paragraph.

276.    The major bypasses discharged untreated sewage, industrial wastewater, and stormwater from multiple municipalities, including third party defendant Municipalities.

ANSWER: PVSC denies the allegations in this paragraph.

277.    When the Yantacaw Bypass was opened, all wastes upstream of the Third River were sent untreated to the Passaic River, including waste from the municipalities of Paterson,

80

Haledon, Prospect Park, Hawthorne, Fair Lawn, Elmwood Park, Garfield, Clifton, Lodi, Passaic, Wallington, and East Rutherford.

ANSWER: PVSC denies the allegations in this paragraph.

278.   When the Union Outlet (Second River Bypass) was opened, the entire flow of untreated sewage, industrial wastewater, and stormwater from Montclair, Orange, Glen Ridge, Bloomfield, and East Orange was discharged directly to the Passaic River.

ANSWER: PVSC denies the allegations in this paragraph.

279.   A 1976 report by Killam Associates for the PVSC, *Report Upon Overflow Analysis to Passaic Valley Sewerage Commissioners: Passaic River Overflows* ("1976 Killam Report"), measured flows to the Passaic River from bypasses and 73 CSOs, that were owned and operated by the PVSC at the time.

ANSWER: The report identified in this paragraph speaks for itself and any allegation in this paragraph contrary or inconsistent with that document is denied as such.

280.   According to the 1976 Killam Report, approximately 7,600 million gallons of combined stormwater and untreated sewage were discharged into the Passaic River during the study period (1974-1975).

ANSWER: The report identified in this paragraph speaks for itself and any allegation in this paragraph contrary or inconsistent with that document is denied as such.

281.   According to his January 6, 1994 Affidavit ("Lubetkin Affidavit"), Seymour A. Lubetkin was the Chief Engineer for the PVSC from 1954 to 1978 and the author of numerous PVSC Annual Reports.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

282.    According to the Lubetkin Affidavit, PVSC has admitted that the untreated waste from every municipality connected to sewer lines served by the PVSC was diverted to the Passaic River on a periodic basis through CSOs and bypasses.

ANSWER:  The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

283.    Combined stormwater and untreated sewage have been discharged to the Passaic River through some of the PVSC bypasses and/or CSOs for the entire time period of PVSC's operations.

ANSWER: PVSC denies the allegations in this paragraph.

284.    According to a 1980 Heavy Metals Report by Killam Associates, which published the results of sampling for heavy metals at nine manhole locations along the length of the PVSC system, heavy metals, including the COCs lead, copper, and mercury, were present in wastewater throughout the PVSC service area.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

285.    According to sampling conducted by EPA during rain events in 1981, published in its 1983 CSO Toxic Pollutant Study, CSO discharges to the Passaic River in Newark contained copper, lead, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

286.    According to samples collected by NJDEP during rain events between 2001 and 2004, the results of which were published in the New Jersey Toxics Reduction Workplan for NY-NJ Harbor, CSO and stormwater discharges to the Passaic River contained all of the 8 COCs.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

287.    In 2007 and 2008 as part of EPA's Remedial Investigation for the lower 8.3 miles of the LPR, Malcom Pirnie, Inc. sampled five CSOs during rain events between RM 3.9 and RM 7.8, which represent the largest drainage areas that discharge directly to the LPR. All 8 COCs were detected in all samples.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

288.    Sludge from the PVSC's WWRF was sampled as part of EPA's National Sewage Sludge Survey of 1989. That sampling showed sludge from the PVSC's WWRF contained 2,3,7,8-TCDD and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

289.    The influent flow from the PVSC's sewers to the WWRF was sampled for a 1978 EPA study seeking to characterize the fate of pollutants in wastewater treatment plants. That sampling showed the WWRF's influent contained copper, lead, mercury, and PAHs.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such

290.    The influent flow from the PVSC's sewers to the WWRF was sampled in 1984-1986, for organic priority pollutants. Publication of the results in 1986 showed the WWRF's influent contained a number of PAHs.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such

291.    The influent flow from the PVSC's sewers to the WWRF was sampled in 1994 and 1995 for PCBs as part of a study of 26 wastewater treatment plants discharging to the New York/New Jersey Harbor Estuary. That sampling detected PCBs in the flow entering the WWRF.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

292.    The PVSC's annual Pretreatment Program Annual Reports submitted to NJDEP for 2008, 2009, 2010, 2011, 2012, 2013, 2014, and 2015 all show that influent to the WWRF contained copper, lead, and mercury.

ANSWER: PVSC admits the allegations of this paragraph.

293.    The PVSC received a New Jersey Pollution Discharge Elimination System Permit modification in or about November 2007 that required monitoring for PCBs. That monitoring shows that PCBs are discharged from the PVSC sewer system and its tributary sewers into the Passaic River.

ANSWER: PVSC admits the allegations of the first sentence of this paragraph.  PVSC denies the allegations of the second sentence of this paragraph.

294.    Since the 1920's, the untreated sewage, industrial wastewater, and stormwater that the PVSC has discharged to the Passaic River through some bypasses and/or CSOs has contained and continues to contain Hazardous Substances including all of the 8 COCs.

ANSWER: PVSC denies the allegations in this paragraph.

295.    The City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison are served by the PVSC and also own and operate combined sewer systems that receive and carry untreated sewage, industrial wastewater, and stormwater.

ANSWER: PVSC admits the allegations in this paragraph.

296.    The City of Paterson has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from twenty-three CSOs into the Passaic River.

ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

297.    The City of Newark has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from fourteen CSOs into the Passaic River: Herbert Place

#1, Herbert Place #2, Delavan Avenue, Verona Avenue, Oriental Avenue, Clay Street #1, Clay Street #2, Fourth Avenue, Rector Street, Jackson Street, City Dock, Freeman Street, Polk Street, and Roanoke Avenue.

> ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required. To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

298.    The Town of Kearny has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from five CSOs into the Passaic River and Frank's Creek, which discharges to the Passaic River: Johnston Avenue, Stewart Avenue, Nairn Avenue, Saybrook Place, and Ivy Street.

> ANSWER:  The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

299.    The Borough of East Newark has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from the Central Avenue CSO into the Passaic River.

> ANSWER:  The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

300.    The Town of Harrison has discharged and continues to discharge untreated sewage, industrial wastewater, and stormwater from seven CSOs into the Passaic River and Frank's Creek, which discharges to the Passaic River: Worthington Avenue, Bergen Street, Middlesex Street, Dey Street, Harrison Avenue, Cleveland Avenue, Hamilton Avenue.

> ANSWER:  The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

301.   In the PVSC system, tributary flows from combined sewer systems pass through regulating chambers, where excessive peak flows may be bypassed to the Passaic River in order to avoid surcharging the system capacity.

ANSWER: PVSC denies the allegations in this paragraph.

302.   The untreated sewage, industrial wastewater, and stormwater discharged to the Passaic River through each of the CSOs owned and operated by the City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison, contain or contained Hazardous Substances including all of the 8 COCs.

ANSWER:  The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

303.   The following municipalities are served by the PVSC and have sewer systems that convey stormwater flow and untreated sewage in separate networks: Township of Belleville, Township of Bloomfield, Township of Cedar Grove, City of Clifton, City of East Orange, Borough of East Rutherford, Borough of Elmwood Park, Borough of Fair Lawn, Borough of Franklin Lakes, City of Garfield, Borough of Glen Ridge, Borough of Glen Rock, City of Hackensack, Borough of Haledon, Borough of Hasbrouck Heights, Borough of Hawthorne, Township of Little Falls, Borough of Lodi, Township of Lyndhurst, Township of Montclair, Borough of North Arlington, Borough of North Caldwell, Borough of North Haledon, Township of Nutley, City of Orange Township, City of Passaic, Borough of Prospect Park, Village of Ridgewood, Borough of Rutherford, Township of Saddle Brook, Township of South Hackensack, Township of South Orange Borough of Totowa, Borough of Wallington, Township of West Orange, Borough of Woodland Park, and Borough of Wood-Ridge.

ANSWER: PVSC admits the allegations in this paragraph.

304.     According to the 1980 Heavy Metals Report, the wastewater of ten companies connected to the sewer systems owned and operated by the Township of Belleville contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

305.     According to the 1980 Heavy Metals Report, the wastewater of four companies connected to the sewer systems owned and operated by the Township of Bloomfield contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

306.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Borough of East Newark contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

307.     According to the 1980 Heavy Metals Report, the wastewater of seventeen companies connected to the sewer systems owned and operated by the City of Clifton contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

308.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the City of East Orange contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

309.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Borough of East Rutherford contained heavy metals, including lead and copper.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

310.     According to the 1980 Heavy Metals Report, the wastewater of three companies connected to the sewer systems owned and operated by the Borough of Elmwood Park contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

311.     According to the 1980 Heavy Metals Report, the wastewater of eight companies connected to the sewer systems owned and operated by the Borough of Fair Lawn contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

312.     According to the 1980 Heavy Metals Report, the wastewater of seven companies connected to the sewer systems owned and operated by the City of Garfield contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

313.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Borough of Glen Rock contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

314.    According to the 1980 Heavy Metals Report, the wastewater of five companies connected to the sewer systems owned and operated by the Borough of Haledon contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

315.    According to the 1980 Heavy Metals Report, the wastewater of six companies connected to the sewer systems owned and operated by the Town of Harrison contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

316.    According to the 1980 Heavy Metals Report, the wastewater of nine companies connected to the sewer systems owned and operated by the Borough of Hawthorne contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

317.    According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Town of Kearny contained heavy metals, including lead and copper.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

318.    According to the 1980 Heavy Metals Report, the wastewater of six companies connected to the sewer systems owned and operated by the Borough of Lodi contained heavy metals, including lead, copper, and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

319.    According to the 1980 Heavy Metals Report, the wastewater of three companies connected to the sewer systems owned and operated by the Township of Lyndhurst contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

320.    According to the 1980 Heavy Metals Report, the wastewater of 101 companies connected to the sewer systems owned and operated by the City of Newark contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

321.    According to the 1980 Heavy Metals Report, the wastewater of four companies connected to the sewer systems owned and operated by the Township of Nutley contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

322.    According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the City of Orange Township contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

323.    According to the 1980 Heavy Metals Report, the wastewater of nine companies connected to the sewer systems owned and operated by the City of Passaic contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

324.     According to the 1980 Heavy Metals Report, the wastewater of fifty-six companies connected to the sewer systems owned and operated by the City of Paterson contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

325.     According to the 1980 Heavy Metals Report, the wastewater of five companies connected to the sewer systems owned and operated by the Township of Saddle Brook contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

326.     According to the 1980 Heavy Metals Report, the wastewater of one company connected to the sewer systems owned and operated by the Borough of Wallington contained heavy metals, including lead, copper and mercury.

ANSWER: The document identified in this paragraph speaks for itself and any allegation contrary or inconsistent with that document is denied as such.

327.     Companies that use PCBs are, or have been, located within the following municipalities: Township of Belleville, Township of Bloomfield, Township of Cedar Grove, City of Clifton, City of East Orange, Borough of East Rutherford, Borough of Elmwood Park, Borough of Fair Lawn, City of Garfield, Borough of Glen Rock, Borough of Haledon, Town of Harrison, Borough of Hawthorne, Town of Kearny, Township of Little Falls, Borough of Lodi, Township of Lyndhurst, Township of Montclair, City of Newark, Borough of North Arlington, Township of Nutley, City of Orange Township, City of Passaic, City of Paterson, Township of Saddle Brook, Borough of Totowa, Borough of Wallington, Township of West Orange, and Borough of Wood-Ridge.

ANSWER: The allegations against this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

328.    Wastewater containing PCBs has been discharged to the sewer systems owned and operated by the Township of Belleville, Township of Bloomfield, Township of Cedar Grove, City of Clifton, City of East Orange, Borough of East Rutherford, Borough of Elmwood Park, Borough of Fair Lawn, City of Garfield, Borough of Glen Rock, Borough of Haledon, Town of Harrison, Borough of Hawthorne, Town of Kearny, Township of Little Falls, Borough of Lodi, Township of Lyndhurst, Township of Montclair, City of Newark, Borough of North Arlington, Township of Nutley, City of Orange Township, City of Passaic, City of Paterson, Township of Saddle Brook, Borough of Totowa, Borough of Wallington, Township of West Orange, and Borough of Wood-Ridge.

ANSWER: The allegations against this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

## COUNT I

### (Contribution Under CERCLA Section 113)
### (Against All Third-Party Defendants)

329.    Third-Party Plaintiffs reallege and incorporate by reference paragraphs 1 through 148 above.

ANSWER: PVSC incorporates herein its responses to paragraphs 1-148.

330.    Each Third-Party Plaintiff is a "person" as that term is defined in 42 U.S.C. § 9601(21).

ANSWER: PVSC admits the allegations of this paragraph.

331.    Each Third-Party Defendant is a "person" as that term is defined in 42 U.S.C. § 9601(21).

ANSWER: PVSC admits the allegations of this paragraph.

332.    The PVSC system, consisting of the Trunk Line, other intercepting sewers, regulators, CSOs, WWRF, bypasses and other appurtenances is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

ANSWER: PVSC admits the allegations in this paragraph except denies that it has more than one CSO.

333.    The PVSC is the owner and operator of a facility from which there has been a "release" of Hazardous Substances as those terms are defined in 42 U.S.C. § 9601(14) and § 9601(22).

ANSWER: PVSC denies the allegations in this paragraph.

334.    The PVSC is therefore liable under 42 U.S.C. § 9607(a)(1) and/or § 9607(a)(2) for the costs of response resulting from the release of Hazardous Substances from its facility.

ANSWER: PVSC denies the allegations in this paragraph.

335.    The PVSC designed, constructed, and operated the sewage collection and treatment system in a manner that resulted in the "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14) and § 9601(22).

ANSWER: PVSC denies the allegations in this paragraph.

336.    The PVSC is therefore liable under 42 U.S.C. § 9607(a)(3) for the costs of response resulting from the release of Hazardous Substances.

ANSWER: PVSC denies the allegations in this paragraph.

337.    The PVSC accepted Hazardous Substances for transport to the WWRF from which there has been a "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14).

ANSWER: PVSC denies the allegations in this paragraph.

338.    The PVSC is therefore liable under 42 U.S.C. § 9607(a)(4) for the costs of response resulting from the release of Hazardous Substances from the WWRF.

ANSWER: PVSC denies the allegations in this paragraph.

339.    Third-Party Defendants City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison each now own and/or operate, or in the past have owned and/or operated combined sewer systems that included CSOs that discharged to the Passaic River.

ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC admits the allegations in this paragraph.

340.    Each combined sewer system now or formerly owned and/or operated by the City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, or Town of Harrison is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required.  To the extent a response is required, PVSC admits the allegations in this paragraph.

341.    The facilities now or formerly owned and/or operated by the City of Paterson, City of Newark, Town of Kearny, Borough of Newark, or Town of Harrison were designed, constructed, and operated in a manner that resulted in the "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14) and § 9601(22).

ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required, and they also constitute a legal conclusion to which Plaintiffs are left to their proofs.  To the extent a response is required, PVSC admits the allegations in this paragraph, upon information and belief.

342.    The City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison are each therefore liable under 42 U.S.C. § 9607(a)(1) and/or § 9607(a)(2)

for the costs of response resulting from the release of Hazardous Substances, including all of the

8 COCs, from their respective facilities.

> ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required, and they also constitute a legal conclusion to which Plaintiffs are left to their proofs.   To the extent a response is required, PVSC denies that these municipalities are liable to Third Party Plaintiffs.

343.     The Township of Belleville, Township of Bloomfield, Township of Cedar Grove,

City of Clifton, Borough of East Newark, City of East Orange, Borough of East Rutherford,

Borough of Elmwood Park, Borough of Fair Lawn, Borough of Franklin Lakes, City of Garfield,

Borough of Glen Ridge, Borough of Glen Rock, Borough of Haledon, Town of Harrison,

Borough of Hasbrouck Heights, Borough of Hawthorne, Town of Kearny, Township of Little

Falls, Borough of Lodi, Township of Lyndhurst, Township of Montclair, City of Newark,

Borough of North Arlington, Borough of North Caldwell, Borough of North Haledon, Township

of Nutley, City of Orange Township, City of Passaic, City of Paterson, Borough of Prospect

Park, Village of Ridgewood, Borough of Rutherford, Township of Saddle Brook, Township of

South Hackensack, Township of South Orange Borough of Totowa, Borough of Wallington,

Township of West Orange, Borough of Woodland Park, and Borough of Wood-Ridge are owners

and operators of sewers that transport and arrange for the disposal of Hazardous Substances

including the 8 COCs from municipal and industrial dischargers to the PVSC system and to the

Passaic River and are therefore each liable under 42 U.S.C. § 9607(a)(3) for the costs of response

resulting from the release of Hazardous Substances from the PVSC system.

> ANSWER: The allegations of this paragraph are not against PVSC and therefore no response is required, and they also constitute a legal conclusion to which Plaintiffs are left to their proofs.   To the extent a response is required, PVSC denies that either PVSC or these municipalities are liable to Third Party Plaintiffs but otherwise admits the allegations in this paragraph.

344.     Each Third-Party Plaintiff has incurred costs and will continue to incur costs as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at and from the PVSC facility. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

ANSWER: PVSC denies the allegations in this paragraph.

345.     Each Third-Party Plaintiff has incurred costs and will continue to incur costs as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at and from the combined sewer systems now or formerly owned and/or operated by the City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

ANSWER: PVSC denies the allegations in this paragraph.

346.     Each Third-Party Plaintiff has paid more than its equitable share of response costs and is entitled to contribution from each Third-Party Defendant pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of the response costs incurred, or to be incurred, as a consequence of the release(s) or threatened release(s) of hazardous substances into the environment at the Diamond Alkali Site, including prejudgment interest.

ANSWER: PVSC denies the allegations in this paragraph.

## COUNT II

### (Declaratory Judgment - CERCLA)
### (Against All Third-Party Defendants)

347.     Third-Party Plaintiffs reallege and incorporate by reference paragraphs 1 through 166 above.

ANSWER: PVSC incorporates herein its responses to paragraphs 1-166.

348.    An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between Third-Party Plaintiffs and Third-Party Defendants concerning their respective rights and responsibilities for the response costs incurred and to be incurred with respect to the Diamond Alkali Site.

ANSWER:  PVSC admits the allegations of this paragraph.

349.    Each Third-Party Plaintiff has incurred and will continue to incur response costs as a direct consequence of the release(s) or threatened release(s) of Hazardous Substances disposed by the Municipalities into the environment at and from the PVSC system and from CSOs now or previously owned and operated by the City of Paterson, City of Newark, Town of Kearny, Borough of East Newark, and Town of Harrison. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

ANSWER:  PVSC denies the allegations of this paragraph.

350.    Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), Third-Party Plaintiffs are entitled to a declaratory judgment, which will be binding in any subsequent action or actions to recover further response costs, that each Third-Party Defendant is a liable party under 42 U.S.C. § 9607(a)(1) and/or (a)(2) and/or (a)(3) for releases of Hazardous Substances at the Diamond Alkali Site.

ANSWER: PVSC denies the allegations in this paragraph.

## COUNT III

### (Contribution Under CERCLA Section 113)
### (Against All Third-Party Defendants)

351.    Third-Party Plaintiffs reallege and incorporate by reference paragraphs 1 through 170, above.

ANSWER: PVSC incorporates herein its responses to paragraphs 1-170.

352.    OxyChem has asserted a claim against Third-Party Plaintiffs pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a) relating to the 2012 UAO.

ANSWER: PVSC admits the allegations in this paragraph.

353.    Third-Party Plaintiffs deny all liability for OxyChem's claim relating to the 2012 UAO.

ANSWER:  PVSC admits the allegations of this paragraph.

354.    However, if any Third-Party Plaintiff is found liable for OxyChem's claim relating to the 2012 UAO, such Third-Party Plaintiff is entitled to contribution from each Third-Party Defendant pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of that Third-Party Plaintiff's liability for OxyChem's claim relating to the 2012 UAO.

ANSWER: PVSC denies the allegations in this paragraph.

## COUNT IV

### (Contribution Under CERCLA Section 113)
### (Against All Third-Party Defendants)

355.    Third-Party Plaintiffs reallege and incorporate by reference paragraphs 1 through 174, above.

ANSWER: PVSC incorporates herein its responses to paragraphs 1-174.

356.    OxyChem has asserted contribution claims against Third-Party Plaintiffs pursuant to CERCLA section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B) relating to the 2008, 2011, and 2016 Settlements.

ANSWER: PVSC admits the allegations in this paragraph.

357.    OxyChem has represented during the course of this litigation that Third-Party Plaintiffs can be held liable in contribution for more than their equitable shares of any liability

relating to the 2008, 2011, and 2016 Settlements and that Defendants, including Third-Party Plaintiffs, bear the risk of not impleading third parties.

ANSWER: The allegations of this paragraph go to the beliefs or motivations of Third-Party Plaintiffs, and no response from PVSC is required.

358.   Third-Party Plaintiffs deny all liability for OxyChem's claims relating to the 2008, 2011, and 2016 Settlements.

ANSWER:  PVSC admits the allegations of this paragraph.

359.   Furthermore, Third-Party Plaintiffs disagree that a contribution defendant can be held liable for more than its equitable share of any liability relating to the 2008, 2011, and 2016 Settlements.

ANSWER:  The allegations of this paragraph go to the beliefs or motivations of Third-Party Plaintiffs, and no response from PVSC is required.

360.   Nevertheless, if the Court credits OxyChem's position and if any Third-Party Plaintiff is found liable for more than its equitable share of any liability relating to the 2008, 2011, and 2016 Settlements, then such Third-Party Plaintiff is entitled to contribution from each Third-Party Defendant pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of that Third-Party Plaintiff's liability for OxyChem's claim relating to the 2008, 2011, and 2016 Settlements.

ANSWER: PVSC denies the allegations in this paragraph.

## **AFFIRMATIVE DEFENSES**

31.   Third-Party Plaintiffs' claims fail to state a claim on which relief can be granted.

32.   This Court lacks subject matter jurisdiction over Third-Party Plaintiffs' claims because of, amongst other reasons, PVSC's sovereign immunity from this suit.

33.   The Third-Party Complaint should be dismissed for failure to join indispensable parties.

34.     Third-Party Plaintiffs' claim for cost recovery pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a) is barred to the extent they have a contribution claim pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1), (f)(3)(B)—the remedies are mutually exclusive.

35.     Some or all of the response costs allegedly incurred by Third-Party Plaintiffs are not necessary costs of response; none of the chemicals Third-Party Plaintiffs allege were associated with PVSC have caused, or will cause, the incurrence of response costs; and/or some of the costs purportedly incurred and/or to be incurred in the future by Third-Party Plaintiffs are not, and will not be, "response costs."

36.     To the extent PVSC is found to be a person liable under CERCLA:  PVSC is not liable for any costs that result from the cleanup of materials or compounds that are not "hazardous substances" as defined in CERCLA; and/or Third-Party Plaintiffs are barred from recovery of some or all of their alleged response costs because PVSC has already paid more than its fair share of any response costs.

37.     PVSC is not a person liable at the Diamond Alkali Superfund Site under 42 U.S.C. § 9607(a) because, *inter alia*, PVSC did not at the time of disposal of any hazardous substance own or operate the Diamond Alkali Superfund Site or any facility at the Diamond Alkali Superfund Site, for purposes of 42 U.S.C. § 9607(a)(2), and did not "select" the Diamond Alkali Superfund Site, for purposes of 42 U.S.C. § 9607(a)(4).

38.     The hazardous substances that Third-Party Plaintiffs allege PVSC discharged are not "contained" at the Diamond Alkali Superfund Site for purposes of 42 U.S.C. § 9607(a)(3).

39.     Third-Party Plaintiffs have failed to allege (and cannot establish) intent to dispose under governing law.

40.     At the time of the activities complained of, and thereafter, PVSC was not on notice, and could not have been reasonably aware, that any of the substances allegedly disposed were hazardous or were the subject of disposal, or arrangements for same, within the meaning of any applicable law.

41.     Plaintiffs' claims are barred by the pesticide application exemption of 42 U.S.C. § 9607(i).

42.     Third-Party Plaintiffs' claims are barred by the *de micromis* exemption of 42 U.S.C. § 9607(o).

43.     Third-Party Plaintiffs' claims are barred by the federally permitted release exemption of 42 U.S.C. § 9601(10).

44.     Some or all of the response actions for which Third-Party Plaintiffs allegedly will incur or have incurred response costs were arbitrary and capricious, or otherwise not in accordance with the law, and further were in violation of 42 U.S.C. § 9613(j)(2).

45.     Some or all of Third-Party Plaintiffs' claims are barred by the doctrines of unclean hands, unjust enrichment, estoppel, and/or recoupment.

46.     Some or all of Third-Party Plaintiffs' claims are barred by setoff.

47.     Some or all of Third-Party Plaintiffs' claims are barred by waiver.

48.     Some or all of Third-Party Plaintiffs' claims are barred by the doctrines of claim and/or issue preclusion.

49.     Any alleged liability of PVSC is divisible from the harm for which the other parties or non-parties are liable, and the costs and damages, if any, caused by such harm should be apportioned among the persons who allegedly caused the harm.

50.     The alleged incidents and damages of which Third-Party Plaintiffs complain were caused solely by the separate, independent, negligent or intentional acts or omissions of third parties over which PVSC exerted no influence and control, and accordingly the claims asserted against PVSC are barred by the provisions of 42 U.S.C. § 9607(b)(3).

51.     Any liability or responsibility with which PVSC might be charged is negated by the superseding or intervening criminal or tortious acts of third parties over whom PVSC had no control.

52.     One or more of Third-Party Plaintiffs' causes of action is barred in whole or in part by the applicable statute of limitations or laches.

53.     PVSC has no liability for acts or omissions occurring before the enactment of CERCLA or any other legal requirement upon which Third-Party Plaintiffs rely.

54.     At all times the activities undertaken by PVSC were lawful and/or permitted by law.

55.     Third-Party Plaintiffs failed to mitigate, reduce, or otherwise avoid their alleged damages.

56.     Third-Party Plaintiffs' claims are precluded because they failed to meet the procedural prerequisites necessary in order to bring suit under some or all of the statutes or other legal requirements upon which they rely.

57.     Third-Party Plaintiffs may not recover administrative costs, attorneys' fees, and other litigation costs in excess of those provided for in 28 U.S.C. § 1920, because there is no basis, statutory or otherwise, for such an award.

58.     The conduct of PVSC was consistent with the promotion of the public health, safety and welfare, and no feasible or prudent alternative existed to its conduct.

59.     Third-Party Plaintiffs lack legal capacity or standing to maintain some or all of this action.

60.     PVSC reserves the right to amend these affirmative defenses or assert additional affirmative and other defenses as may be established by the evidence in this case.

WHEREFORE, PVSC prays as follows:

1.      that Third-Party Plaintiffs take nothing by way of their Third-Party Complaint;

2.      that PVSC be awarded costs of suit;

3.      that PVSC be awarded reasonable attorneys' fees; and

4.      for such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

For its Counterclaims against the Third-Party Plaintiffs, Third-Party Defendant PVSC alleges as follows:

## NATURE OF ACTION

36.     Plaintiff Occidental Chemical Corporation ("OxyChem") and the Defendants/Third-Party Plaintiffs have brought contribution claims against each other under CERCLA for remediation of the Diamond Alkali Superfund Site (the "Site").  They have also both brought contribution claims against Third-Party Defendants, including PVSC.  PVSC hereby seeks contribution from Third-Party Plaintiffs for any liability imposed against it.  PVSC also seeks to recover all response costs it has incurred associated with the Site and all future response costs it will incur associated with the Site.

## JURISDICTION AND VENUE

37.     The Counterclaims set forth herein arise out of the same transactions and occurrences that are set forth in Third-Party Plaintiffs' Third-Party Complaint against Third-Party Defendants.

38.     If jurisdiction is proper with respect to the Third-Party Complaint, it is proper with respect to PVSC for the purposes of these Counterclaims.

39.     If venue is proper with respect to the Third-Party Complaint, it is proper with respect to PVSC for the purposes of these Counterclaims.

## GENERAL ALLEGATIONS

40.     OxyChem brought contribution claims under CERCLA against the Third-Party Plaintiffs for remediation of the Site.

41.     Third-Party Plaintiffs brought contribution claims under CERCLA against OxyChem for remediation of the Site.

42.     Third-Party Plaintiffs brought contribution claims under CERCLA against Third-Party Defendants, including PVSC, seeking to recover the share of liability, if any, related to the Site that this Court deems appropriate to assign to Third-Party Defendants.

43.     OxyChem brought contribution claims under CERCLA against Third-Party Defendants, including PVSC, seeking to recover the share of liability, if any, related to the Site that this Court deems appropriate to assign to Third-Party Defendants.

44.     PVSC has incurred response costs associated with the Site, including but not limited to, its current efforts to condemn property next to its Newark facility in order to locate a sediment processing facility needed for the remediation of the Site.

45.     PVSC will incur future response costs associated with the Site, including but not limited to, dedicating its property to a sediment processing facility needed to remediate the Site.

## COUNT I
### (Contribution Under CERCLA Section 113)

46.    PVSC realleges and incorporates by reference paragraphs 1 through 10 above.

47.    Third-Party Plaintiffs all qualify as a "person" as that term is defined in 42 U.S.C. § 9601(21).

48.    PVSC is a "person" as that term is defined in 42 U.S.C. § 9601(21).

49.    The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

50.    Contaminants released by Third-Party Plaintiffs are "Hazardous Substances" under 42 U.S.C. § 9601(14).

51.    The presence of those Hazardous Substances in the Site constitute a release or threatened release of Hazardous Substances as defined in 42 U.S.C. § 9601(22).

52.    Third-Party Plaintiffs owned or operated portions of the Site at or during the time of the acts or omissions which resulted in the release of Hazardous Substances.

53.    Third-Party Plaintiffs arranged for disposal of Hazardous Substances that ended up in the Site.

54.    Third-Party Plaintiffs all qualify as persons liable pursuant to 42 U.S.C. § 9607(a)(2) and (a)(3).

55.    PVSC has incurred costs and will continue to incur costs as a direct consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment by Third-Party Plaintiffs.   These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

56.    PVSC has paid and will continue to pay more than its equitable share of response costs and is entitled to contribution from Third-Party Plaintiffs pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of the response costs incurred, or to be incurred, as a

consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at the Site, including prejudgment interest.

WHEREFORE, PVSC demands that the Court:

(1)    Declare that Third-Party Plaintiffs are liable under 42 U.S.C. § 9613(f) for their share, determined by the Court using such equitable factors as it determines are appropriate, of response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)    Award PVSC an amount determined by the Court, using such equitable factors as it determines are appropriate, to satisfy the obligation of Third-Party Plaintiffs for all necessary response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(3)    Award PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(4)    Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

### COUNT II
### (Cost Recovery Under CERCLA Section 107)

57.    PVSC realleges and incorporates by reference paragraphs 1 through 21 above.

58.    Third-Party Plaintiffs are jointly and severally liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a) because they are responsible parties as defined by CERCLA Section 107(a), 42 U.S.C. § 9607(a).

59.    Each release or threatened release of hazardous substances as described above has caused and will continue to cause PVSC to incur necessary response costs consistent with the National Oil and Hazardous Substances Contingency Plan, 40 C.F.R. § 300 et seq (the "NCP").

60.     Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), PVSC is entitled to cost recovery from Third-Party Plaintiffs for necessary response costs incurred and to be incurred by PVSC consistent with the NCP.

WHEREFORE, PVSC demands that the Court:

(1)     Declare that Third-Party Plaintiffs are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Award PVSC an amount determined by the Court to satisfy the obligation of Third-Party Plaintiffs for all necessary response costs incurred and to be incurred by PVSC;

(3)     Award PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(4)     Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## COUNT III
### (Declaratory Judgment - CERCLA)

61.     PVSC realleges and incorporates by reference paragraphs 1 through 25 above.

62.     An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between PVSC and Third-Party Plaintiffs concerning their respective rights and responsibilities for the response costs incurred and to be incurred by PVSC.

63.     The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

64.     Contaminants released by Third-Party Plaintiffs are "Hazardous Substances" under 42 U.S.C. § 9601(14).

65.     The presence of those Hazardous Substances in the Site constitute a release or threatened release of Hazardous Substances as defined in 42 U.S.C. § 9601(22).

66.     Third-Party Plaintiffs owned or operated portions of the Site at or during the time of the acts or omissions which resulted in the release of Hazardous Substances.

67.     Third-Party Plaintiffs arranged for disposal of Hazardous Substances that ended up in the Site.

68.     Third-Party Plaintiffs all qualify as persons liable pursuant to 42 U.S.C. § 9607(a)(2) and (a)(3).

69.     PVSC has incurred costs and will continue to incur costs as a direct consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment by Third-Party Plaintiffs. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

70.     Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), PVSC is entitled to a declaratory judgment, which will be binding in any subsequent action or actions to recover further response costs, that Third-Party Plaintiffs are liable parties under 42 U.S.C. § 9607(a)(2) and (a)(3) for releases from and to the Site and that Third-Party Plaintiffs are liable for any and all response costs that may be incurred in the future.

WHEREFORE, PVSC demands that the Court:

(1)     Enter judgment under 42 U.S.C. § 9613 against Third-Party Plaintiffs, finding that they are liable to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site, or, in the alternative, for a 100 percent allocation by the Court (using such equitable factors as the Court determines are appropriate) to PVSC for response costs incurred and to be incurred by PVSC as

108

a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Enter judgment under 42 U.S.C. § 9607 against Third-Party Plaintiffs, finding that they are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site, or, in the alternative, for a 100 percent allocation by the Court (using such equitable factors as the Court determines are appropriate) to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(3)     Enter a declaratory judgment that Third-Party Plaintiffs are liable parties under 42 U.S.C. § 9607(a)(2) and (a)(3) for releases from and to the Site and that Third-Party Plaintiffs are liable for any and all response costs that may be incurred in the future;

(4)     Enter a declaratory judgment that Third-Party Plaintiffs are liable for additional current and future work obligations;

(5)     Enter an order awarding PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(6)     Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## **CROSSCLAIMS**

For its Crossclaims against all other Third-Party Defendants (the "Municipal Third-Party Defendants"), Third-Party Defendant PVSC alleges as follows:

## **NATURE OF ACTION**

32.     Plaintiff   Occidental   Chemical   Corporation   ("OxyChem")   and   the Defendants/Third-Party Plaintiffs have brought contribution claims against each other under CERCLA for remediation of the Diamond Alkali Superfund Site (the "Site"). They have also both brought contribution claims against Third-Party Defendants, including PVSC. PVSC hereby seeks contribution from Municipal Third-Party Defendants for any liability imposed against it. PVSC also seeks to recover all response costs it has incurred associated with the Site and all future response costs it will incur associated with the Site.

## JURISDICTION AND VENUE

33.     The Crossclaims set forth herein arise out of the same transactions and occurrences that are set forth in the Defendants/Third-Party Plaintiffs' claims against Oxychem and counterclaims against PVSC.

34.     If jurisdiction is proper with respect to the Third-Party Complaint, it is proper with respect to Municipal Third-Party Defendants for the purposes of these Crossclaims.

35.     If venue is proper with respect to the Third-Party Complaint, it is proper with respect to Municipal Third-Party Defendants for the purposes of these Crossclaims.

## GENERAL ALLEGATIONS

36.     OxyChem brought contribution claims under CERCLA against the Third-Party Plaintiffs for remediation of the Site.

37.     Third-Party Plaintiffs brought contribution claims under CERCLA against OxyChem for remediation of the Site.

38.     Third-Party Plaintiffs brought contribution claims under CERCLA against Third-Party Defendants, including PVSC, seeking to recover the share of liability, if any, related to the Site that this Court deems appropriate to assign to Third-Party Defendants.

39.     OxyChem brought contribution claims under CERCLA against Third-Party Defendants, including PVSC, seeking to recover the share of liability, if any, related to the Site that this Court deems appropriate to assign to Third-Party Defendants.

40.     PVSC has incurred response costs associated with the Site, including but not limited to, its current efforts to condemn property next to its Newark facility in order to locate a sediment processing facility needed for the remediation of the Site.

41.     PVSC will incur future response costs associated with the Site, including but not limited to, dedicating its property to a sediment processing facility needed to remediate the Site.

### COUNT I
### (Contribution Under CERCLA Section 113)

42.     PVSC realleges and incorporates by reference paragraphs 1 through 10 above.

43.     Municipal Third-Party Defendants all qualify as a "person" as that term is defined in 42 U.S.C. § 9601(21).

44.     PVSC is a "person" as that term is defined in 42 U.S.C. § 9601(21).

45.     Some or all of the Municipal Third-Party Defendants now own and/or operate, or in the past have owned and/or operated combined sewer systems that included CSOs that discharge(d) to the Passaic River, and/or sewers that transport(ed) and arrange(d) for the disposal of Hazardous Substances from municipal and industrial dischargers to the PVSC system and to the Passaic River.

46.     Each of these CSOs or sewers is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

47.     The facilities were designed, constructed, and operated in a manner that resulted in the "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14) and § 9601(22).

48.     The Municipal Third-Party Defendants  are each therefore liable under 42 U.S.C. § 9607(a)(1) and/or § 9607(a)(2)  and/or § 9607(a)(3) for PVSC's costs of response resulting from the release of Hazardous Substances.

49.     PVSC has incurred costs and will continue to incur costs as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at and from the facilities now or formerly owned and/or operated by the Municipal Third-Party Defendants. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

50.     PVSC has paid and will continue to pay more than its equitable share of response costs and is entitled to contribution from Municipal Third-Party Defendants pursuant to 42 U.S.C. § 9613(f) for an equitable share up to 100 percent of the response costs incurred, or to be incurred, as a consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment at the Site, including prejudgment interest.

WHEREFORE, PVSC demands that the Court:

(1)     Declare that Municipal Third-Party Defendants are liable under 42 U.S.C. § 9613(f) for their share, determined by the Court using such equitable factors as it determines are appropriate, of response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Award PVSC an amount determined by the Court, using such equitable factors as it determines are appropriate, to satisfy the obligation of Municipal Third-Party Defendants for all necessary response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

112

(3)     Award PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(4) Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## <u>COUNT II</u>
**(Cost Recovery Under CERCLA Section 113)**

51.     PVSC realleges and incorporates by reference paragraphs 1 through 19 above.

52.     Municipal Third-Party Defendants are jointly and severally liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a) because they are responsible parties as defined by CERCLA Section 107(a), 42 U.S.C. § 9607(a).

53.     Each release or threatened release of hazardous substances as described above has caused and will continue to cause PVSC to incur necessary response costs consistent with the National Oil and Hazardous Substances Contingency Plan, 40 C.F.R. § 300 et seq (the "NCP").

54.     Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), PVSC is entitled to cost recovery from Municipal Third-Party Defendants for necessary response costs incurred and to be incurred by PVSC consistent with the NCP.

WHEREFORE, PVSC demands that the Court:

(1)     Declare that Municipal Third-Party Defendants are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Award PVSC an amount determined by the Court to satisfy the obligation of Municipal Third-Party Defendants for all necessary response costs incurred and to be incurred by PVSC;

(3)     Award PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(4)     Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## COUNT III
### (Declaratory Judgment – CERCLA)

55.     PVSC realleges and incorporates by reference paragraphs 1 through 23 above.

56.     An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between PVSC and Municipal Third-Party Defendants concerning their respective rights and responsibilities for the response costs incurred and to be incurred by PVSC.

57.     Some or all of the Municipal Third-Party Defendants now own and/or operate, or in the past have owned and/or operated, combined sewer systems that included CSOs that discharge(d) to the Passaic River, and/or sewers that transport(ed) and arrange(d) for the disposal of Hazardous Substances from municipal and industrial dischargers to the PVSC system and to the Passaic River.

58.     Each of these CSOs and/or sewers is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

59.     The facilities were designed, constructed, and operated in a manner that resulted in the "release" of Hazardous Substances as defined in 42 U.S.C. § 9601(14) and § 9601(22).

60.     The Municipal Third-Party Defendants are each therefore liable under 42 U.S.C. § 9607(a)(1) and/or § 9607(a)(2) and/or  § 9607(a)(3) for PSVC's costs of response resulting from the release of Hazardous Substances.

61.     PVSC has incurred costs and will continue to incur costs as a direct consequence of the release(s) or threatened release(s) of Hazardous Substances into the environment by Municipal Third-Party Defendants. These response costs are necessary and are consistent with the National Contingency Plan, 40 C.F.R. § 300.

62.     Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), PVSC is entitled to a declaratory judgment, which will be binding in any subsequent action or actions to recover further response costs, that Municipal Third-Party Defendants are liable parties under 42 U.S.C. § 9607(a)(2) and (a)(3) for releases from and to the Site and that Municipal Third-Party Defendants are liable for any and all response costs that may be incurred in the future.

WHEREFORE, PVSC demands that the Court:

(1)     Enter judgment under 42 U.S.C. § 9613 against Municipal Third-Party Defendants, finding that they are liable to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site, or, in the alternative, for a 100 percent allocation by the Court (using such equitable factors as the Court determines are appropriate) to PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(2)     Enter judgment under 42 U.S.C. § 9607 against Municipal Third-Party Defendants, finding that they are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site, or, in the alternative, for a 100 percent allocation by the Court (using such equitable factors as the Court determines are appropriate) to

PVSC for response costs incurred and to be incurred by PVSC as a result of releases or threatened releases of hazardous substances into the environment at the Site;

(3)     Enter a declaratory judgment that Municipal Third-Party Defendants are liable parties under 42 U.S.C. § 9607(a)(2) and (a)(3) for releases from and to the Site and that Municipal Third-Party Defendants are liable for any and all response costs that may be incurred by PVSC in the future;

(4)     Enter a declaratory judgment that Municipal Third-Party Defendants are liable for additional current and future work obligations;

(5)     Enter an order awarding PVSC prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

(6)     Grant such other and further relief as the Court determines to be just, equitable, and appropriate.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify that, to the best of my knowledge, the subject matter of this proceeding is not the subject of any other pending court action, or of any pending arbitration or administrative proceeding. I am aware that if the foregoing is willfully false, I am subject to punishment.

_____
Kirstin Bohn, Esq.
CHASAN LAMPARELLO MALLON & CAPPUZZO, PC
300 Lighting Way, Suite 200
Secaucus, NJ 07094
Tel: (201) 348-6000
Fax: (201) 348-6633
kbohn@chasanlaw.com

*Counsel for Third Party Defendant*
*Passaic Valley Sewerage Commissioners*

Dated: September 1, 2021

116

## CERTIFICATION OF SERVICE

I hereby certify that on September 1, 2021, a true and correct copy of Third Party Defendant Passaic Valley Sewerage Commissioners' First Amended Answer to the Third Party Complaint of Third Party Plaintiffs was served upon all counsel of record via the Electronic Court Filing system, where it is available for viewing.

_____
Kirstin Bohn, Esq.
CHASAN LAMPARELLO MALLON & CAPPUZZO, PC
300 Lighting Way, Suite 200
Secaucus, NJ 07094
Tel: (201) 348-6000
Fax: (201) 348-6633
kbohn@chasanlaw.com

*Counsel for Third Party Defendant*
*Passaic Valley Sewerage Commissioners*

Dated: September 1, 2021