**PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
One City Center, PO Box 9546
Portland, Maine 04112
Telephone: 207.791.3236
Jeffrey D. Talbert, Esq. (NJ ID No. 333512021)

*Common Counsel for the Small Parties Group*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | | |
|---|---|---|
| OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) | Hon. Madeline Cox Arleo Hon. Magistrate Leda D. Wettre |
| Plaintiff, | ) ) ) ) | Civil Action No. 2:18-CV-11273 (MCA-LDW) |
| v. | ) ) ) ) | **BRIEF IN SUPPORT OF MOTION FOR A STAY OF PROCEEDINGS** |
| 21ST CENTURY FOX AMERICA, INC., *et al.*, | ) ) ) ) | |
| Defendants and Third Party Plaintiffs, | ) ) ) | |
| v. | ) ) | Return Date: February 7, 2022 Oral Argument Requested |
| PASSAIC VALLEY SEWERAGE COMMISSIONERS, et al., | ) ) ) ) | |
| Third-Party Defendants. | ) | |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

LEGAL STANDARD.........................................................................................................6

ARGUMENT ....................................................................................................................7

I.    STAYS ARE APPROPRIATE TO PERMIT
      NONJUDICIAL RESOLUTION OF CERCLA CASES ............................................7

II.   EACH RELEVANT FACTOR WEIGHS
      IN FAVOR OF THE REQUESTED STAY ...............................................................10

      **A.**    A Stay Would Neither Prejudice Nor Present
              A Clear Tactical Disadvantage To OxyChem. .................................................10

      **B.**    Denial Of A Stay Would Create A Clear Case
              Of Hardship And Inequity For The Moving Parties. ......................................13

      **C.**    A Stay Would Obviate A Need For Further Litigation....................................14

      **D.**    This Case Is In The Early Stages Of
              Discovery And No Trial Date Has Been Set. ..................................................15

CONCLUSION...................................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

42 U.S.C. § 9613(f)(2) ................................................................................................ 10,14

*Akishev v. Kapustin*, 23 F. Supp. 3d 440 (D.N.J. 2014) ............................................ 6,10

*Arkema Inc. v. Honeywell Int'l, Inc.*,
   No. 10-CV-2886, 2013 WL 5356844 (E.D. Pa. Sept. 25, 2013) ............................ 15

*Bechtel Corp. v. Loc. 215, Laborers' Intern. Union of N.A., AFL-CIO*,
   544 F.2d 1207 (3d Cir. 1976)................................................................................ 14

*Blue Gentian v. Tristar Prod., Inc.*,
   No. 1:13-CV-1758, 2021 WL 3561215 (D.N.J. Aug. 12, 2021) .............................. 6

*Brass Smith, LLC v. RPI Indus., Inc.*,
   2010 WL 4444717 (D.N.J. Nov. 1, 2010) .............................................................. 15

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013) .......... 9

*Confederated Tribes & Bands of Yakama Nation v. Airgas USA, LLC*,
   435 F. Supp. 3d 1103 (D. Or. 2019) ........................................................................ 7

*Goldstein v. Time Warner New York City Cable Grp.*, 3 F. Supp. 2d 423 (S.D.N.Y. 1998).......... 7

*In re Cuyahoga Equipment Corp.*, 980 F.2d 110 (2d Cir. 1992) ................................... 9

*Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857 (9th Cir. 1979)............... 7

*LMT Mercer Grp., Inc. v. Maine Ornamental, LLC*,
   2011 WL 2039064 (D.N.J. May 24, 2011) ............................................................ 11

*New Jersey Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, Docket Nos. A02036-17, A2038-
   17, slip op. at 9-11 (N.J. Super. Ct. App. Div. Dec. 27, 2021) ............................... 12

*New York v. Solvent Chemical Co.*, 984 F. Supp. 160 (W.D.N.Y. 1997)....................... 9

*Onyx Enterprises Int'l Corp. v. Volkswagen Grp. of Am., Inc.*,
   No. 320CV09976BRMZNQ, 2021 WL 1338731 (D.N.J. Apr. 9, 2021)............... 13,15

*Reichhold, Inc. v. U.S. Metals Refining Co.*, 2004 WL 3312831 (D.N.J. Oct. 27, 2004) ........... 11

*Resco Products, Inc. v. Bosai Minerals Group Co., Ltd.*,
   CIV.A. 06-235, 2010 WL 2331069 (W.D. Pa. June 4, 2010)................................. 14

*Sabert Corp. v. Waddington N. Am., Inc.*,
   No. 06-5423, 2007 WL 2705157 (D.N.J. Sept. 14, 2007) ..................................... 15

*Sea-Land Serv., Inc. v. United States*,
   874 F.2d 169 (3d Cir. 1989).................................................................................. 11

*Sheridan v. Iheartmedia, Inc.*,
   Civ. No. 15-cv-7574 (WHW)(CLW), 2016 WL 1059268 (D.N.J. Mar. 16, 2016) .............. 7,14

*United States v. Kramer*, 19 F. Supp.2d 273 (D.N.J. 1998) ....................................... 10

*United States v. Kramer*, 770 F. Supp. 954 (D.N.J. 1991) ........................................... 9

**Other Authorities**

Jerome B. Simandle, *Resolving Multi-Party Hazardous Waste Litigation*,
    2 Vill. Envtl. L.J. 111 (1991) ............................................................................. 10

Defendants in the Small Parties Group (the "SPG"), the Gordon Rees Group, the CSG Group, along with all Third-Party Defendants in this action (individually and collectively, "Moving Parties"),[1] respectfully request a six-month pause of this case to allow the final stage of the United States' parallel allocation proceedings and resulting settlement negotiations to conclude.  Such a settlement would either obviate the need for this litigation in total, or at least significantly decrease the number of parties in the case and narrow the scope of the litigation, saving judicial and private party resources.

## **INTRODUCTION**

Before Occidental Chemical Corporation ("OxyChem") brought this case, the Environmental Protection Agency ("EPA") convened and funded an administrative allocation process with a neutral allocator to determine a fair and reasonable allocation of responsibility for the costs of remedial design and remedial action for the site at issue in this case, the Diamond Alkali Superfund Site (the "Site").  The process was specifically intended to identify parties with whom the Government intended to resolve any responsibility (through payments), and others from whom the Government would look for work commitments.

The parties included in the allocation were those formally identified by EPA after decades of investigation as being potentially responsible for contamination in the Passaic River sediments—the contamination at issue in this litigation.  Most Defendants in this litigation participated in the allocation.  Despite its responsibility for extensive Site contamination as the successor to Lister Plant-related liabilities, OxyChem chose not to participate in the EPA-

---

[1] Defendant SPG members Nokia of America Corporation, Pharmacia LLC, and Public Service Electric and Gas Company have no objection to the relief sought in the Motion for a Stay of Proceedings and accompanying proposed form of Order filed this date, but do not join this brief.

sponsored allocation process.  Instead, OxyChem filed this lawsuit, by which it seeks a separate judicial allocation of responsibility for Site costs.

After tens of millions of dollars of collective expense, EPA's allocation concluded with the independent allocator's issuance of a final allocation report.  That allocation report is currently being used as a basis for the United States' settlement negotiations with scores of parties, including most of the Defendants and many Third-Party Defendants.  Settlement with the United States would confer upon settling parties "contribution protection" which provides a statutory defense against private party CERCLA claims, such as the claims asserted by OxyChem in this case. It would also likely obviate the need for this litigation altogether because the United States has agreed to entertain settlements on a similar basis with parties that did not participate in the allocation, including parties that have never been identified by the United States as potentially liable parties and so were not invited to participate in the allocation.  Even if the United States does not reach settlement with all Moving Parties, the settlements the United States enters with other parties and the underlying allocation framework would be instructive to the Court when allocating responsibility among any remaining Moving Parties.

A stay of this litigation is appropriate to permit the Moving Parties to complete settlement discussions with the United States, unencumbered by the time and costs of litigation and discovery that would later be obviated by a settlement.  It is well recognized that Congress sought to encourage potentially responsible parties ("PRPs") to settle with the government rather than engage in protracted litigation to evade responsibility for response costs.  This policy is reflected throughout CERCLA, including but not limited to its codification of contribution protection for parties who settle with the government.  A letter sent by the United States in support of this request for stay, attached hereto as Exhibit A, explains the allocation process it sponsored, the status of

settlement negotiations, and the policy preference for these types of settlement proceedings in lieu of litigation. To allow the settlement process to play out as Congress intended, to avoid duplication of an allocation already carried out by EPA, to avoid unnecessary costs to the Moving Parties, and to limit the scope and expense of the litigation and conserve judicial resources by potentially eliminating most of the Moving Parties in this case, the Court should grant a six-month stay of this case to permit completion of settlement negotiations with the United States. Per the proposed order, filed herewith, the Moving Parties propose providing *in camera* reports as to the status of settlement negotiations at such times as the Special Master directs.

## BACKGROUND

In 2017, EPA invited the parties it had identified as PRPs, including OxyChem, to participate in an allocation (the "Allocation") of responsibility for response costs for the lower eight miles of the Lower Passaic River, referred to by EPA as Operable Unit 2 ("OU2")[2] of the Diamond Alkali Superfund Site. In particular, it sought to include "all of the OU2 PRPs and . . . ensur[e] that all of the OU2 PRPs contribute their fair share towards the costs for OU2 of the Site." Ex. B (Nov. 28, 2017 Letter from EPA to OxyChem), https://semspub.epa.gov/work/02/518289.pdf. EPA stressed that it "d[id] not think that litigation is the best approach to resolving liability for OU2," considering (among other factors) "the resources [that would be] expended in litigation." EPA hired a neutral, third-party allocator, AlterEcho, who was tasked with collecting evidence on a confidential basis and providing a recommendation based on an EPA-approved methodology regarding the equitable allocation of responsibility. *See* Ex. A (Jan. 13, 2022 Letter from Laura Rowley, United States Department of Justice, to Jeffrey D. Talbert); Ex. A, at 4. The Allocation was to serve as the first phase of a two-

---

[2] As defined by EPA, OU2 includes the lower 8.3 miles of the Passaic River.

phase settlement process between EPA and the parties who participated in the Allocation, with the second phase being Allocation-based settlement discussions with EPA.  *See* Ex. A at 4.  The vast majority of the invited partieschose to participate in the Allocation, but OxyChem refused.  *See* Ex. A at 2.Ex.

OxyChem filed this lawsuit in 2018, which in large part seeks judicial allocation of the same liability and remedial costs at issue in the EPA Allocation.  *See generally* Compl., ECF No. 1.  OxyChem sued before OxyChem (or anyone else) had funded or committed to implement the remedy at the Site.  OxyChem is entitled to recover only to the extent it can show that it paid more than its "fair share" of response costs and that a Defendant or Third-Party Defendant did not (among many other elements of the claim).  This is entirely implausible before OxyChem has committed to implement *any* of the remedial action.[3]  Thus, OxyChem's action is premature and simply represents an effort to circumvent EPA's effort to allocate responsibility for remediation costs and to fund or implement cleanup.

The EPA Allocation was well underway when OxyChem filed its complaint and concluded at the end of 2020 with a report assigning relative allocation shares to both parties that participated in the Allocation and a limited number of parties that did not participate (like OxyChem).  *See* Ex. A at 2.  EPA and parties who participated in the Allocation have been engaged in the second phase

---

[3] OxyChem filed suit despite the fact that the remedial action for OU2 has not yet even begun and the costs of that action are yet to be incurred.  Through 2020, OxyChem claims to have incurred about $76,728,183 in costs at the Site. Ex. C (OxyChem's Amended Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1), dated 02/24/2021, at 9–13 & Exs. A–E).  But according to the Record of Decision ("ROD") issued by the EPA in March 2016, the cost of implementing the selected remedy for cleaning up OU2 is estimated to be $1.38 billion.  Thus, even if OxyChem has paid all of the costs that it claims, those amount to just over five percent of the total response costs for OU2.  *See* Ex. D, at 88 (OU2 ROD), https://semspub.epa.gov/work/02/396055.pdf; Am. Compl. ¶ 38, ECF No. 1247.  In selecting the OU2 remedy, EPA made clear that OxyChem's Lister Plant and its immediate surroundings were "the dominant source of 2,3,7,8-TCDD in the Lower Passaic River." Ex. D, App. V, at 68.  And EPA concluded that approximately 74% of the DDD, DDE, and DDT in the River is directly adjacent to the Lister Plant.  Ex. E, Data Evaluation Report No. 5: "Contaminant Inventory Analysis," Fig. 2-6.  By any calculation, OxyChem's "fair share" of response costs at the Site is far more than five percent, so OxyChem's claims for contribution are far from maturation even now, nearly four years into this litigation.

of EPA's settlement process—active settlement negotiations based on the Allocation—during the past year. *See* Ex. A at 2. EPA has also been conducting active settlement negotiations with several of the Third-Party Defendants in this litigation, with the aim of reaching a comprehensive resolution of their CERCLA liability for the Site by mid-2022.

While the specific details of the settlement negotiations remain confidential, a significant number of the parties in this case and the United States are working to finalize a term sheet and are in advanced stage of discussions over the specific terms of a "cash-out" settlement for response costs, or "in-kind" contributions, associated with the entire 17-mile stretch of the Lower Passaic River Study Area ("LPRSA")—OU2 and Operable Unit 4 ("OU4").[4] *See* Ex. A at 1-2. The scope of the settlement under discussion would address all of the claims OxyChem asserted in this litigation against the settling parties, which relate to response costs incurred in OU2 and OU4. The EPA has indicated that any settlement would take the form of a consent decree submitted for approval to this Court. Upon entry, settling parties would file a dispositive motion in this case on the basis of contribution protection for matters addressed in the consent decree.

To be clear, not all Moving Parties are among the first tranche of roughly 100 parties with whom EPA has initiated settlement negotiations, nor are all of the parties participating in settlement negotiations parties in this case. Numerous other parties and their facilities are currently uninvolved in settlement discussions not because they are unwilling but because they were not invited by EPA to participate in the Allocation process. EPA has, however, indicated that once the settlement trail has been blazed by this first group and the resulting consent decree entered, other Moving Parties will be given the opportunity to engage in a similar settlement process with EPA. *See* Ex. A at 2. Therefore, all parties in this case will ultimately have an opportunity to

---

[4] As defined by EPA, OU4 includes the 17-mile Lower Passaic River Study Area.

settle with EPA and extinguish the claims asserted in this litigation.  They should have the opportunity to pursue those settlements without the expensive and unproductive burden of defending this premature action while waiting for the settlement negotiations to conclude.

Because completion of EPA's settlement process will dramatically affect proceedings in this Court for all parties, the Moving Parties seek to stay further action to conserve judicial and party resources and to preserve funds presently being spent in litigation for potential use addressing response costs in the LPRSA.  A stay in this case to allow EPA settlement discussions would be entirely consistent with those granted in a litany of CERCLA contribution cases, would be consistent with CERCLA's purposes, would promote the efficient administration of justice in this case, and would not prejudice OxyChem.

## **LEGAL STANDARD**

District courts "possess inherent discretion to stay a proceeding whenever 'the interests of justice' mandate 'such action.'"  *Blue Gentian v. Tristar Prod., Inc.*, No. 1:13-CV-1758, 2021 WL 3561215, at *8 (D.N.J. Aug. 12, 2021) (citation omitted); *see also United States v. Breyer*, 41 F.3d 884, 893 (3d Cir. 1994) ("The power to stay is incidental to the power inherent in every court to dispose of cases so as to promote their fair and efficient adjudication.").  Courts generally weigh a number of factors in determining whether to grant a stay including: (1) "whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party"; (2) "whether denial of the stay would create a clear case of hardship or inequity for the moving party"; (3) "whether a stay would simplify the issues and the trial of the case"; and (4) "whether discovery is complete and/or a trial date has been set."  *Akishev v. Kapustin*, 23 F. Supp. 3d 440, 446 (D.N.J. 2014) (citations omitted).

## ARGUMENT

**I.    STAYS ARE APPROPRIATE TO PERMIT
       NONJUDICIAL RESOLUTION OF CERCLA CASES**

Stays are appropriate in CERCLA actions, where parallel proceedings or settlement discussions would have a substantial impact on the cases before the court.  In the Third Circuit, "a district court may stay a case 'to abide the outcome of another which *may substantially affect it* or be dispositive of the issues.'"  *Sheridan v. Iheartmedia*, Inc., No. 15CV7574WHWCLW, 2016 WL 1059268, at *4 (D.N.J. Mar. 16, 2016) (citation omitted).  A "court's discretionary power to stay a case pending decisions in other proceedings 'does not require that the issues in such proceedings are necessarily controlling of the action before the court.'"  *Id.* (quoting *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979)).  "This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character . . . ." *Goldstein v. Time Warner New York City Cable Grp.*, 3 F. Supp. 2d 423, 438 (S.D.N.Y. 1998) (citation omitted).

Applying this same standard, courts in other jurisdictions have stayed CERCLA actions pending parallel administrative proceedings or settlement discussions.  In *Confederated Tribes & Bands of Yakama Nation v. Airgas USA, LLC*, 435 F. Supp. 3d 1103 (D. Or. 2019), for example, the district court considered whether to grant a motion to stay a Section 107 CERCLA cost recovery action brought by the Confederated Tribes and Bands of the Yakama Nation relating to releases of hazardous substances in and around Portland Harbor.  The court noted that in a related CERCLA contribution action (*Arkema, Inc. v. A&C Foundry Products*) "the potentially responsible parties . . . [were] participat[ing] in a comprehensive non-judicial allocation process to facilitate settlements among the potentially responsible parties and EPA on response costs for

the Portland Harbor Superfund Site." *Id.* at 1113 (internal quotation marks omitted). As a result, it stayed proceedings in *Arkema* while negotiations proceeded. *Id.*

The court held that the same reasons that compelled it to order a stay in *Arkema* applied to the new claim in *Yakama Nation*: "Plaintiff's claims . . . present some of the same complex legal and factual issues that are presented by the ongoing non-judicial allocation process." *Id.* at 1128. It noted that the "action, *Arkema*, and the allocation process all 'stem from the same Superfund Site,' and 'relate to the alleged liability of PRPs at the Site,'" and that litigation would "compel[ Defendants] to bring third-party claims against other potentially liable parties that are not currently defendants here, and those third-party defendants in turn would likely bring their own claims against other potentially liable parties, 'resulting in cascading litigation among possibly hundreds of parties.'" *Id.* (citation omitted). The court also feared that the confidential allocation process with EPA might reach "inconsistent outcomes on the same issues." *Id.* It therefore held that "these factors weigh strongly in favor of staying this action," and stayed the action pending completion of the *Arkema* negotiations. *Id.*

The *Yakama Nation* analysis applies neatly here. As in that case, there is a parallel ongoing non-judicial allocation process with EPA regarding the same Superfund site at issue in the litigation. The *Yakama Nation* court's apprehension that litigation would force the filing of third-party complaints and cascading litigation has already begun in this case. OxyChem's assertion of CERCLA Section 107 claims, and its repeated statements that it will seek to hold Defendants liable for non-party and orphan shares, has left Defendants with no choice but to implead numerous municipal parties, which may seek to reapportion responsibility themselves. Indeed, the municipal parties have already asserted counterclaims for contribution against OxyChem and the Defendants. And there remains a significant risk that this Court might allocate liability differently than the

8

Allocation process, which would lead to inconsistencies that could not be resolved in light of the protections that settlement with EPA might bring. In addition to the risk of inconsistency, undertaking a second allocation at this juncture would be extremely inefficient. Because an allocation of the liabilities at issue in this case has already occurred, judicial efficiency counsels that that process should be allowed to play out before a separate allocation occurs. If appropriate, the initial allocation can be used to guide the Court in any subsequent allocation. Moreover, where in *Yakama Nation* the parties had already had a stay of nearly a decade in pursuit of settlement, here the Moving Parties seek much shorter-term relief.

This suit would not even be the first CERCLA case in which OxyChem has been involved that was stayed to facilitate settlement. In *New York v. Solvent Chemical Co.*, 984 F. Supp. 160 (W.D.N.Y. 1997), the court "granted a stay of discovery, at the request of Solvent and the State, to permit unimpeded settlement negotiations. . . " *Id.* at 163. The parties—including OxyChem— were able to use the time to conclude consent decrees with the State of New York, which were approved by the court shortly after the expiration of the stay. *Id.* at 169.

These courts' approaches dovetail with CERCLA's statutory objectives and legislative scheme, which encourage settlement with the government in order to fund and implement cleanups without protracted litigation. Litigation diverts from that goal by depleting funds that might otherwise be available for environmental cleanup. *See, e.g.*, *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 971 (9th Cir. 2013) ("[O]ne of the core purposes of CERCLA is to foster settlement through its system of incentives and without unnecessarily further complicating already complicated litigation." (citation omitted)); *In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 119 (2d Cir. 1992) ("Congress sought through CERCLA to . . . encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation."). A stay permitting

the parties to complete settlement negotiations directly promotes CERCLA's purposes. *See United States v. Kramer*, 770 F. Supp. 954, 961 (D.N.J. 1991) ("[B]y saving the litigation costs associated with formal discovery, all of the defendants ought to have more money available to pay as part of a negotiated settlement.") (citing Jerome B. Simandle, *Resolving Multi-Party Hazardous Waste Litigation*, 2 Vill. Envtl. L.J. 111, 113–14 (1991)).

## II.   EACH RELEVANT FACTOR WEIGHS IN FAVOR OF THE REQUESTED STAY

### A.   A Stay Would Neither Prejudice Nor Present A Clear Tactical Disadvantage To OxyChem.

There is no undue prejudice or clear tactical disadvantage to OxyChem from a stay. "'[M]ere delay does not, without more, necessitate a finding of undue prejudice and clear tactical disadvantage." *Akishev*, 23 F. Supp. 3d at 447.

This is a contribution case to allocate costs, not a case for injunctive relief to prevent imminent environmental harm. The contamination of the river occurred decades ago, yet the main remediation measures in the river—those estimated to cost billions of dollars—have yet to begin. At this point, OxyChem's CERCLA claims are premature because they seek a judicial allocation of costs well before the actual costs to remediate the Site have been incurred or even committed.

Any settlement that occurs would be primarily for OxyChem's account. By statute, settlement "reduces the potential liability of the [nonsettling parties] by the amount of settlement." 42 U.S.C. § 9613(f)(2). The Court will scrutinize any settlement to assure that it is fair and reasonable. *See, e.g., United States v. Kramer*, 19 F. Supp.2d 273, 280-81 (D.N.J. 1998). OxyChem may wish to recover more than the United States receive in settlement, but OxyChem is hardly disadvantaged should any Moving Parties and the United States reach a settlement which a Court ultimately concludes is fair and reasonable.

Under CERCLA, OxyChem can only recover costs from others if it can demonstrate that it paid response costs that exceeded its "fair share" of costs for the site. *Sea-Land Serv., Inc. v. United States*, 874 F.2d 169, 171 (3d Cir. 1989) (recognizing that it is a "general rule that a cause of action for contribution does not arise until the party seeking contribution has paid, or had a judgment rendered against him or her for, more than his or her fair share of common liability"); *Reichhold, Inc. v. U.S. Metals Refining Co.*, 2004 WL 3312831, at *5 (D.N.J. Oct. 27, 2004) ("Since [CERCLA plaintiff] will not pay more than its fair share of liability, it will not be entitled to contribution from [contribution-claim] Defendants."). However, even though OxyChem's Lister Avenue facility is the primary source of the contaminants driving the remedy, OxyChem's costs incurred to date are only a fraction of the total costs estimated to design and implement the OU2 remedy. OxyChem is hundreds of millions of dollars short of the mark that represents its "fair share," and that will not change in the next six months. A stay will neither affect the design process nor the ongoing calculation of costs in this matter; instead, it would permit more accurate determinations of what costs (if any) must be contributed. If settlement discussions are unsuccessful, OxyChem may still pursue contribution claims at the appropriate time against any non-settling parties. *See LMT Mercer Grp., Inc. v. Maine Ornamental, LLC*, 2011 WL 2039064, at *12 (D.N.J. May 24, 2011) (granting stay when, among other things, "Plaintiff's legal and equitable remedies in this civil action will be available when the stay is lifted; a stay does not foreclose Plaintiff from any remedy").

Lingering uncertainty as to whether OxyChem will be indemnified by Repsol, S.A. ("Repsol") for the amounts it seeks to recover in this litigation further underscores that its claims are premature and that it will not be prejudiced by a stay. At the same time that it is pursueing Site-related costs from the Moving Parties, OxyChem is pursuing contractual indemnification from

third parties for its Lister Plant-related liabilities. In related New Jersey state court litigation, OxyChem alleges that Repsol was an alter ego of its bankrupt subsidiary Maxus Energy Corporation and, therefore, is required to indemnify OxyChem for Lister Plant-related liabilities under a 1986 Stock Purchase Agreement. *See New Jersey Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, Docket Nos. A02036-17, A2038-17, slip op. at 9-11 (N.J. Super. Ct. App. Div. Dec. 27, 2021).  The Appellate Division of the New Jersey Superior Court recently remanded that issue to the trial court.  *Id.* at 9-11, 57. In this litigation, OxyChem seeks recovery of costs incurred for the same liabilities.  In other words, OxyChem is seeking double recovery, which it is not entitled to under CERCLA.  Because OxyChem may be indemnified by Repsol for the costs it has incurred, it may not recover those funds from the Moving Parties.  Thus, OxyChem is pursuing this matter prematurely before anyone knows whether it will actually be on the hook for funding the Lister share.  A short stay to complete the settlement process would have the added benefit of providing an opportunity for the indemnification issues in the New Jersey state court action to be resolved.

In its January 13, 2022, letter submitted herewith, the United States noted the "strong policy preference for settlements with responsible parties under CERCLA to avoid spending resources on litigation rather than on cleanup," and explained that its Allocation was designed in furtherance of this policy preference. Ex. A at 1-2.  Settlement would end the litigation with respect to a significant number of parties, and these parties likely represent just the first group of parties with whom EPA will pursue settlement discussions.  But even if fewer than all parties in this case ultimately settled, the settlement would significantly impact and simplify this case by diminishing litigation costs for the remaining parties through the reduction of parties, claims, discovery, and complexity.

Finally, there is no reason to believe that there will be a material change in the evidence or a loss of ability to pursue claims vigorously, should any remain after the Court terminates this stay. Should concerns arise, the Court can order the preservation of evidence or preservation depositions for any witnesses where any party believes that witnesses will not be available for questioning in six months.  Because any harm arising from a stay would be minimal, this factor weighs strongly in favor of a stay.

**B.**  **Denial Of A Stay Would Create A Clear Case Of Hardship And Inequity For The Moving Parties.**

Conversely, denial of a stay would jeopardize the contemplated settlement and thus presents clear, measurable, and direct harm to the Moving Parties, to EPA, and to the communities impacted by the contamination of the Lower Passaic.  Every day that this litigation continues costs the parties time, attention, and resources that might otherwise be marshalled to bring about an immediate resolution and fund the cleanup.  This high cost of litigating claims that might well be obviated by a settlement is a serious hardship on the Moving Parties.  *See Onyx Enterprises Int'l Corp. v. Volkswagen Grp. of Am., Inc.*, No. 320CV09976BRMZNQ, 2021 WL 1338731, at *4 (D.N.J. Apr. 9, 2021) ("[W]hen the hardship of litigation expense and time is for a case that may be unnecessary after the findings of the other proceeding, those litigation expenses establish the requisite hardship.").

It would be inequitable to continue to force the settling Moving Parties to continue along parallel tracks by defending against OxyChem's suit, which it filed only after commencement of the Allocation and before it incurred anywhere close to its fair share of costs or resolved indemnification issues.  The United States and the many parties in this case have invested significant time and money on an Allocation and settlement negotiations based on that Allocation. OxyChem was invited to participate in that process but chose to walk away and prematurely sought

to begin its own allocation litigation.  The Court should not enable OxyChem to use its own litigation to force the United States or other parties to abandon or derail their independent efforts to negotiate a settlement.  It would be inequitable to allow OxyChem to drain resources from all other parties involved in order to pay for its forum shopping.

### C.   A Stay Would Obviate A Need For Further Litigation.

Stays are appropriate pending the outcome of related proceedings that may streamline or obviate the proceedings to be stayed.  *See, e.g.*, *Bechtel Corp. v. Loc. 215, Laborers' Intern. Union of N.A., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976) ("In the exercise of its sound discretion, a court may hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or be dispositive of the issues"); *Sheridan v. Iheartmedia, Inc.*, Civ. No. 15-cv-7574 (WHW)(CLW), 2016 WL 1059268 (D.N.J. Mar. 16, 2016) (staying case pending resolution of related issues in litigation in other circuits because it would simplify the issues in the case).  The purpose of this principle is to promote judicial efficiency by staying cases pending related proceedings that could eliminate the need to expend "substantial time, effort, and resources" on litigation.  *Resco Products, Inc. v. Bosai Minerals Group Co., Ltd.*, CIV.A. 06-235, 2010 WL 2331069, at *7 (W.D. Pa. June 4, 2010).

Here, the benefits of a stay are clear: a settlement will simplify the case by resolving most, if not all, of the claims involving three quarters of the defendants in this case, and further settlements may resolve the litigation in its entirety.  *See* 42 U.S.C. § 9613(f)(2) ("A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement").

Even if not fully precluded, this case would undergo seismic shifts if a settlement removed a large percentage of parties and claims.  Immediately, the scope of discovery would dramatically

14

decrease, and the focus of the claims would change.  As a result, countless discovery disputes on relevance, privilege, or proportionality would be avoided.  Fewer parties would need to take depositions and fewer parties would need to be deposed.  Judicial efficiency is therefore best served by a stay that allows the Moving Parties to focus on completing their settlement with EPA.  *See Onyx*, 2021 WL 1338731, at *4 ("[A]ny possible prejudice . . . is outweighed by the judicial efficiency that will be gained by waiting for the Massachusetts case to be determined . . . ."); *Sabert Corp. v. Waddington N. Am., Inc.*, No. 06-5423, 2007 WL 2705157, at *7 (D.N.J. Sept. 14, 2007) (finding the prejudice to the plaintiff was outweighed by potential benefits of awaiting parallel proceeding such as narrowing of discovery or clarifying the issues before the court).

### D.   This Case Is In The Early Stages Of Discovery And No Trial Date Has Been Set.

This case is at a procedural posture that also favors granting a stay.  Document discovery remains ongoing and has not yet begun for the dozens of Third-Party Defendants who were recently joined to this case.  A stay would permit those Third-Party Defendants the time to be ready for discovery, should it be necessary.  Moreover, depositions have yet to begin, the parties have yet to disclose experts, and no trial date has been set.  *See Brass Smith, LLC v. RPI Indus., Inc.*, 2010 WL 4444717 (D.N.J. Nov. 1, 2010) (granting stay and noting that "the parties have yet to take any depositions, relevant documents remain to be produced, [and] expert reports have not been served . . . ."); *cf. Arkema Inc. v. Honeywell Int'l, Inc.*, No. 10-CV-2886, 2013 WL 5356844, at *7 (E.D. Pa. Sept. 25, 2013) (finding "this factor weighs in favor of a stay" despite "a considerable amount of discovery" on one issue where "discovery concerning [additional matters] is just beginning, coupled with the fact that a scheduling order has yet to issue," and even more so where a parallel proceeding led to "uncertainty of what claims may emerge").  The Allocation and

settlement process with EPA is in far more advanced stages and should be allowed to reach completion before this litigation proceeds any further.

## **CONCLUSION**

Congress recognizes that EPA is the entity best suited to collect funds for CERCLA cleanups.  The Court should, therefore, allow the parties and the United Statesto complete these advanced-stage settlement discussions without the distraction and waste of OxyChem's lawsuit running alongside it.  OxyChem's suit has created a misplaced sense of urgency: far from a need for OxyChem to recover funds from other PRPs, the urgency lies with EPA's effort to recover funds from OxyChem and, to a far lesser extent, other PRPs.  EPA sought to pursue this priority through its settlement process, but OxyChem tried to flip that dynamic on its head by opting out and filing this suit instead.  The Court should allow settlement discussions to proceed unfettered by granting the Moving Parties' motion for a six-month stay.


[*SIGNATURES ON FOLLOWING PAGE*]

Dated: January 14, 2022                                         Respectfully submitted,

/s/ Jeffrey D. Talbert                               /s/ Lee Henig-Elona
**PRETI, FLAHERTY, BELIVEAU &**          **GORDON REES SCULLY**
**PACHIOS, LLP**                                     **MANSHUKHANI, LLP**
One City Center                                         18 Columbia Turnpike, Suite 220
Portland, ME 04101                                   Florham Park, NJ 07932
Tel: 207.791.3239                                      Tel: 973.549.2520
Jeffrey D. Talbert, Esq.                             Lee Henig-Elona, Esq.

*Liaison Counsel for the Small Parties Group*        *Liaison Counsel for the Gordon Rees Group*

/s/ Diana L. Buongiorno                         /s/ Grant P. Gilezan
**CHIESA SHAHINIAN & GIANTOMASI**        **DYKEMA GOSSETT PLLC**
**PC**                                                    400 Renaissance Center
One Boland Drive                                      Detroit, MI 48243
West Orange, NJ 07052                             Tel: 313.568.6800
Tel: 973.325.1500                                     Grant P. Gilezan, Esq.
Diana L. Buongiorno, Esq.

*Liaison Counsel for the CSG Group*                  *Liaison Counsel for Third-Party Defendants in
                                                      the PVSC Group*

/s/ Peter J. King
**KING MOENCH HIRNIAK & METHA,**
**LLP**
51 Gibraltar Drive, Suite 2F
Morris Plains, NJ 07950
Tel. 973.998.6860
Peter J King, Esq.

*Liaison Counsel for Third-Party Defendants in
the King Group*

17

## **CERTIFICATE OF SERVICE**

I, Jeffrey D. Talbert, hereby certify that on January 14, 2022, I caused a copy of the foregoing document to be served via electronic filing on all counsel of record.

Dated: January 14, 2022

*/s/ Jeffrey D. Talbert*
**PRETI, FLAHERTY, BELIVEAU**
**& PACHIOS, LLP**
One City Center, PO Box 9546
Portland, ME 04112
Telephone: 207.791.3239
Jeffrey D. Talbert, Esq. (Bar # 333512021)