# Exhibit C


**Occidental Petroleum Corporation**

Marcia E. Backus
Senior Vice President and General Counsel

5 Greenway Plaza, Suite 110, Houston, Texas 77046
Telephone 713.215.7802  Fax 713.985.8934

October 12, 2017

wilson.ericj@epa.gov

Mr. Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division
United States Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007-1866

> Re: September 18, 2017 Letter Concerning Proposed Allocation Process
> for Operable Unit 2, Diamond Alkali Superfund Site
> Essex and Hudson Counties, New Jersey

Dear Mr. Wilson:

I write on behalf of Occidental Chemical Corporation ("OCC") to express its concern regarding the EPA's proposed "Allocation Process," in which it seeks to impose on potentially responsible parties (PRPs) an informal procedure to be used to allocate the costs of implementing the remedy for Operable Unit 2 of the Diamond Alkali Superfund Site. OCC first learned of this process on September 18 when it received a letter inviting OCC and certain other PRPs to attend a meeting on October 13 with EPA's chosen allocator, David Batson. Given OCC's concerns, OCC believes it will be more productive for it to attend by phone and listen quietly, rather than air these issues in an open meeting. We will shortly send Ms. Yeh notice of our attendees and appreciate the opportunity to attend by phone while EPA evaluates these concerns.

For the reasons stated below, OCC believes the proposed allocation process is premature. EPA's process will not (and cannot) offer the "transparency and fairness" that EPA has "consistently stated are of importance to the Agency." Nonetheless, in the spirit of cooperation, OCC will participate in the October 13 meeting as EPA has requested. Cooperation, however, cannot come at the expense of OCC's legal rights to obtain contribution and cost recovery from all responsible PRPs who have contaminated the sediments of the Lower Passaic River. OCC therefore reserves all of its legal rights and its attendance at the meeting does not constitute its consent to EPA's proposed allocation process.

### The proposed allocation process is inconsistent with the Record of Decision.

EPA's Record of Decision (ROD) clearly and unequivocally identified *eight* chemicals of concern that drove its selection of the remedy for the Lower 8.3 miles of the Passaic River: dioxins, furans, PCBs, mercury, DDT, copper, dieldrin, PAHs, and lead.[1] According to the ROD, the data EPA studied shows that "elevated concentrations of [these] COCs are *ubiquitous* in surface sediments of the lower 8.3 miles, bank to bank."[2]

Ignoring this finding, and the voluminous record that makes clear that the remedy was selected as a result of all eight chemicals of concern, EPA's September 18 Letter indicates EPA intends to allocate the cost of implementing the remedy to parties responsible for only three chemicals: dioxins, furans, and PCBs. Having inexplicably abandoned its own finding concerning the drivers of this costly remedy, EPA's letter goes on to state that it is excluding scores of PRPs from the allocation process because they "are not responsible for the release of dioxins, furans, and/or polychlorinated biphenyls ("PCBs") into the Lower Passaic River." There is no factual record to support this statement. EPA's decision to exclude entities responsible for the discharges of all eight chemicals of concern cannot be reconciled with the ROD or the administrative record. EPA's unilateral decision to exclude key polluters is also inconsistent with EPA's public statements, which have (until now) consistently emphasized that EPA's agreement on "one singular engineering and design approach for the lower 8.3 miles ... doesn't mean that *the other 100 potentially responsible parties aren't on the hook for some of these costs.* We will apportion liability ...*for the whole cleanup project, not just the design.*"[3]

EPA's selected remedy was designed to address not merely the eight chemicals of concern identified in the ROD, but the other contaminants in the Lower Passaic River as well. EPA has no scientific or administrative basis on which it can now abandon the findings of the ROD—after selecting the remedy—in favor of an allocation process that will apportion costs based on only three chemicals of concern, ignoring all other contaminants and PRPs in the process.

### There is not sufficient information to arrive at an equitable allocation of the costs.

EPA also lacks adequate information from which to derive an equitable allocation of costs. Allocation of costs is a judicial, not an administrative, function under CERCLA. Many PRPs have not provided full responses to discovery concerning the raw materials used in their industrial process, the intermediates created in their operations, or any mass balance analysis to account for all hazardous substances handled, produced or discharged from their facilities. In addition, many PRPs have not produced all relevant documents, or provided testimony from key witnesses. As

---

[1] Lower 8.3 ROD at 15-16.
[2] Lower 8.3 ROD at 17 (emphasis added).
[3] J. Hurdle. "Occidental to Pay $165 Million Toward EPA's Cleanup of Passaic River Pollution." 6 October 2016. NJ Spotlight. (Quoting Judith Enck, EPA Region 2 Administrator) (emphasis added).

explained below, implementing an allocation process now would elevate myth to the stature of facts—but facts are required before an equitable allocation can be achieved.

It is a myth that there exists a complete discovery record in the New Jersey Spill Act litigation filed by the NJDEP. The NJDEP did not join any of the third party PRPs in its state court action. Although Maxus and Tierra added certain PRPs to the case, many PRPs were never made parties to the action by anyone. Obviously, parties not joined provided no discovery at all. Even those PRPs that were joined did not provide complete discovery. Certain PRPs produced some, but not all, of their documents. In addition, as a result of a stay of discovery issued by the New Jersey Special Master, virtually no depositions of other PRPs were taken—either of custodians of records (to ensure document production was complete) or of witnesses with knowledge of production and disposal practices. As this overview makes clear, the NJDEP discovery record is limited and incomplete as it pertains to the actions of many of the PRPs EPA has identified as potentially responsible for the costs of implementing the remedy.

EPA's Administrative Record likewise does not contain sufficient evidence to arrive at an *allocation* of the cost of implementing the remedy. EPA has yet to conduct extensive (or, in some cases, any) sampling of soils at the upland and riparian sites that belong to many PRPs. There is, and can be, no assurance that the available evidence affords an adequate basis from which to assess any PRP's relative share of the cost of the remedy, much less the share to be borne by only some PRPs (and not others, whom EPA has decided to exclude entirely from the process).

### The remedy is still being designed, so its costs and the factors that drive them are not yet known.

In September of 2016, OCC signed an Administrative Settlement Agreement and Order on Consent under which it agreed to design EPA's remedy for the Lower Passaic River. The AOC affords OCC approximately five years in which to finalize the design.

EPA is fully aware that OCC will need to conduct additional sampling and studies to finalize the design. This sampling is needed, among other things, to design a cap of appropriate thickness (a cost driver) and to identify which contaminated soils might need specialized pre- or post-removal treatment (another cost driver). These studies will also enable OCC and EPA to assess whether particular chemicals might require incineration upon removal, whereas removal and entombment elsewhere might be adequate for others. These are just a few of the significant unknowns and uncertainties that exist concerning how much the remedy will eventually cost and which *chemicals and contaminants* (in what proportions) are driving the costs.

Until the remedy is designed, OCC believes it is premature and inequitable for EPA to attempt to allocate the costs of the remedy to one PRP or another, or one chemical or another, because there is not an adequate factual basis on which EPA or its allocator can do so.

### Premature allocation may create a barrier to later consensual resolutions.

Careful, evidence-based allocation of the cost of implementing the remedy is essential as a matter of fairness and simple economics. EPA's remedy is the largest and most expensive sediment remediation project EPA has ever directed. EPA estimates it will cost $165 million to design the remedy and another $1.38 billion to implement it. Basic fairness requires that the equitable responsibility for these staggeringly large costs be ascertained carefully and with due process. As a matter of economics, single percentage inaccuracies in the allocation could shift millions of dollars in cost to parties who should not be required to bear them. EPA's selected remedy also has perpetual maintenance obligations. These costs must be borne by the parties responsible for them. They should not be shifted to other parties, simply because they assert their legal rights or decline to accept the mediator's informal attempt to allocate the costs of implementing the remedy before litigation has been filed and before discovery can be conducted.

EPA's attempt to force the early settlement of an allocation for the cost of implementing the remedy at this stage is not merely prejudicial to the PRPs. It also has the potential to impede EPA's ultimate goal of obtaining a consensual resolution on implementation of the remedy itself. Early settlements will reduce the pool of responsible parties available to fund the performance of the remedy. If EPA prejudices the rights of PRPs in this manner, it gives PRPs little reason to step up later and assume responsibility to pay costs that other PRPs would have had to bear, but for EPA's premature decision to settle with certain parties.

### OCC's concerns should be heard and considered.

Although EPA has acknowledged that "Occidental did not directly discharge pollution into the Passaic River,"[4] OCC has repeatedly demonstrated its commitment to work cooperatively with EPA to address and resolve the legacy issues associated with the former Diamond Alkali plant, which DSCC had ceased operating seventeen years *before* OCC acquired the stock of DSCC in 1986.

Since the surprise bankruptcy of OCC's indemnitor, Maxus Energy Corporation, the U.S. subsidiary of Argentine-controlled oil giant, YPF, S.A., OCC has worked rapidly and directly with EPA to address issues at Diamond Alkali and to stabilize many other contaminated sites around the country. Among other things:

- OCC agreed to an Administrative Order on Consent to design the remedy for the Lower Passaic River at a cost of $165 million.
- OCC worked tirelessly during the Maxus bankruptcy to ensure the safe and orderly transition of *all* of the former DSCC sites, including Diamond Alkali.

---

[4] EPA Region 2 Press Release, October 5, 2016.

Mr. Eric J. Wilson
October 12, 2017
Page 5

- As a result of OCC's efforts, and its cooperation with EPA and the Natural Resource Trustees, the Maxus Bankruptcy Plan was confirmed.
- The Plan ensures that recoveries from YPF will flow directly to EPA and the Trustees, along with other environmental creditors.
- The Plan also establishes an Environmental Response and Remediation Trust through which future costs can be funded, assuming litigation against the Debtors' former parent companies are successful.

By contrast, while OCC was diligently reaching an agreement with EPA to design the OU2 remedy and stabilize other DSCC environmental sites around the country, YPF was pleading the poverty of its U.S. subsidiary in Delaware bankruptcy court, even as it used the assets it had stripped from those subsidiaries as part of a balance sheet it used to help YPF raise nearly $2B on Wall Street from American investors.

Given this history and OCC's efforts to work cooperatively with EPA at Diamond Alkali and elsewhere, EPA's September 18 Letter came as a surprise to OCC. OCC intends to continue to work cooperatively with EPA on the design of the remedy. OCC also intends to cooperate on performing the remedy, *assuming that* a reasonable design is achieved, appropriate responsible parties are available to participate in performing the remedy (and have not been released prematurely), and satisfactory terms of a consent order to perform the remedy can be agreed.

That desire to cooperate is precisely why OCC has written this letter: OCC is extremely concerned that the process, as outlined thus far, will not (and cannot) arrive at a cost allocation which ensures that *all liable PRPs pay their fair share*. We urge EPA to consider and address these concerns before it attempts to mandate this (or any other) mechanism to allocate the costs of implementing the remedy for OU2.

Very truly yours,

*Marcia E. Backus*

Marcia E. Backus
General Counsel, Occidental Petroleum Corporation

cc: Mr. Eric Schaaf (schaaf.eric@epa.gov)
    Ms. Sarah Flanagan (flanagan.sarah@epa.gov)