# Exhibit D

# SMALL PARTIES GROUP

January 30, 2018

**VIA EMAIL**

Eric J. Wilson
Deputy Director for Enforcement
and Homeland Security
USEPA
Region 2
290 Broadway
New York, NY  10007-1866

**Re:    Allocation for Operable Unit 2 Remedial Action
           Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey**

Dear Mr. Wilson:

This letter responds to your correspondence dated January 5, 2018 regarding the above matter, submitted on behalf of the Small Parties Group.[1]  Because of the complexity of this case, as well as the size and cost of the remedy, it is important that the allocation process provide the Allocator and the Region with sufficient information to evaluate the merits properly without engaging in unnecessary layers of process that are inefficient and unproductive.  In order to be credible, though, the allocation must be a complete and comprehensive process.  The proposed process should be restructured to increase the potential it will generate a defensible allocation, and we again urge the Region to reconsider its approach.

## ASSURING A SUFFICIENT DATABASE OF DOCUMENTS

EPA's willingness to increase the number of documents to be considered by Mr. Batson is a positive step.  And we understand that the document submission and review portion of the allocation process is not intended to duplicate the full discovery process that litigation would include.  Yet we are justifiably concerned that the document database will not contain the documents needed to perform a fair, reasonable, and credible allocation.  For example, EPA and Mr. Batson have represented that the entire State Litigation file relating to the Diamond Alkali site has been provided and is already included in the document repository.  Our review of the database of documents provided by EPA to Mr. Batson shows with certainty that this is not the case as many documents are not included.  Additional examples of fundamental defects in the database include:

---

[1] The Small Parties Group consists of more than 50 members.  This letter is not being submitted on behalf of any members who are participating in the first round cash out settlement.  Most, but not all, remaining members who were invited to participate in the allocation support this letter and the statements herein.

- It fails to include documents in EPA's possession and/or about which EPA is fully aware that evidence the massive discharges of dioxins, furans and other COCs from the Diamond Alkali upland site into the river. These documents and categories of documents include:

    o Judicial opinions, both of the New Jersey Superior Court and Appellate Division, holding that Occidental Chemical Corp.'s predecessor, Diamond Alkali, intentionally and illegally discharged dioxin, furans, DDT, and other contaminants of concern from the Diamond Alkali upland site to the Passaic River;[2]

    o The documents submitted by NJDEP in the *NJDEP v. Occidental Chemical Corp.* litigation in support of its motion for summary judgment against Occidental; these documents include, in NJDEP's words, "pleadings, documentary evidence produced during discovery, and even a final judgment establishing . . . without question, that [Occidental's predecessor] intentionally discharged dioxin, DDT and other hazardous substances into the Passaic River – a practice so pervasive that [the predecessor's] employees had a name for it: 'riverize'" (Brief in Support of Plaintiffs' Motion for Partial Summary Judgment Against Occidental Chemical Corp., No. ESX-L9868-05 (May 6, 2011) at 2);

    o Attachment A to the Cooperating Parties Group's (CPG) comments on EPA's proposed plan for the lower eight miles of the Passaic River, submitted to EPA on August 20, 2014, addressing discharges from the upland site to the river; and

    o Published articles in the peer-reviewed scientific literature establishing that the Diamond Alkali upland site "is the dominant source of the 2,3,7,8-TCDD in sediments within approximately the lower 14 miles of the lower Passaic River" (James Quadrini, et al., "Fingerprinting 2,3,7,8-tetrachlorodibenzodioxin contamination within the lower Passaic River," 34 Environ. Toxicol. Chem. 1485 (2015));

- It also fails to include documents necessary to make informed determinations about many other PRPs' respective relative liability shares.

---

[2] *See Diamond Shamrock Chem. Co. v. Aetna Cas. & Surety Co.*, 258 N.J. Super. 167, 183 (App. Div. 1992) (Diamond Alkali's "waste disposal policy … essentially amounted to 'dumping everything' into the Passaic River"); *id.* at 197 (Diamond Alkali "intentionally and knowingly discharged hazardous pollutants with full awareness of their inevitable migration to and devastating impact upon the environment"); *id.* at 212-13 ("Diamond's management knew of the hazardous nature of dioxins at a relatively early stage. … Despite specific preventative recommendations, Diamond made a conscious decision to run the autoclave, in which chemicals were processed …, at a higher temperature … The only conclusion to be drawn is that Diamond's management was wholly indifferent to the consequences flowing from its decision. Profits came first.").

The process currently under discussion for supplementing the document repository leaves the relevancy of the documents to be added/produced to be determined by each individual party producing said documents. There is no agreement among the parties regarding what information is deemed relevant and must be produced. Furthermore, requiring parties to demonstrate the relevance of each document they produce at the time of production will be neither efficient nor practical. Rather, in order to ensure a consistent approach a detailed process for document production is essential, including clear criteria for selecting specific categories of documents for submission. For example, document categories may include: PRP site operations and conduct; hazardous substance discharges; pathways for hazardous substance discharges to impact the Passaic River; the lower Passaic River 8.3 mile FFS area site issues; and any factual information that participants will rely on to support submissions arguing what allocation share they or any other participant should be given, just to name a few.

Furthermore, parties should also be required to certify that a reasonable investigation of their records has been made and responsive information in their custody has been fully disclosed. A process for addressing those instances in which parties may make incomplete or deficient productions must also be developed and codified. In order to insure that a level playing field is established, all key, relevant information must be collected before the allocation process commences so that no advantage is gained by a party due to the lack of sufficient information in EPA's database or the failure of a PRP to undertake a diligent inquiry and produce relevant documents. In this regard we note particularly that some parties have to date not indicated an intention to participate in this allocation. Therefore, if these parties do not ultimately participate, no voluntary process of certifying productions of documents will apply to them, nor will they respond to any allocation questionnaire.

In order to create an appropriately comprehensive database, the document production cannot be limited by an arbitrary page limit. Even an augmented page limitation could very well be (and likely will be) disproportionate to the complexity of the allocation, the number of relevant documents existing, and the enormous costs at issue.

We believe that a complete database collection and meaningful meetings with the Allocator could be completed within the timeframe needed to expeditiously fund and implement the OU2 remedy.

## ASSURING A FULL ALLOCATION

In its January 5, 2018 letter, EPA stated that it will not consent to add more parties to the allocation at this time. EPA's refusal extends even to the Passaic Valley Sewerage Commission (PVSC) and the four municipalities already identified as potentially responsible parties. The parties are extremely concerned with proceeding with an allocation that does not include these identified PRPs, especially PVSC.

EPA justifies its refusal to include PVSC and the four municipalities by stating that they "are uniquely situated to provide in-kind services with respect to the remedy selected for Operable Unit 2 (OU2) of the Diamond Alkali Superfund Site." In eventually justifying to a District Court any settlement with these parties, EPA will bear the burden of demonstrating that "the proportion of total projected costs to be paid by the settlors" is commensurate "with the

proportion of liability attributable to them." *United States v. Montrose Chemical Corp. of Cal.*, 50 F.3d 741, 744 (9th Cir. 1995) (citing *United States v. Charles George Trucking*, 34 F.3d 1081, 1087 (1st Cir. 1994)).

Including PVSC and the municipalities in the allocation is obviously and for many reasons the fairest and most reasonable way to determine objectively "the proportion of liability attributable to them."  To be clear, that proportion is very substantial, as noted in the CPG's prior correspondence on this topic, and as would be demonstrated in the allocation.  For instance, EPA Region 2 has, in prior correspondence, repeatedly stated that the risk drivers for the River are dioxin, furans, and PCBs.  While the Diamond Alkali site is clearly the primary source of dioxins and furans to the River, as was set forth in detail in the October 24, 2017 letter to the EPA on behalf of the CPG, PVSC has been identified as a major, if not the primary, source of PCBs to the watershed, contributing an estimated total PCB mass of 91,613 lb. to the River.

Indeed, PVSC itself has recognized that it arranged for disposal and disposed of vast amounts of hazardous substances in the Passaic River, associated with hundreds of customers that EPA has excluded from the general notice letter and allocation process.  In the New Jersey State Court litigation regarding the Passaic River and Newark Bay Complex, on September 20, 2012, PVSC submitted a letter brief to the trial court in support of an order to show cause seeking a stay of third and fourth party claims in the suit to allow the parties to pursue settlement discussions.  In its papers, PVSC advised the trial court that "PVSC is prepared to name an additional 500 parties to this lawsuit by the Court's September 24, 2012 deadline."[3]  The letter brief states that "PVSC alone has identified approximately 500 *viable* Fourth Party Defendants" that needed to be sued and added that "[t]his number will almost certainly increase as additional Fourth Parties are identified through discovery."[4]  Indeed, as of 2012, PVSC had over 2,500 customers that had not been named in the lawsuit.  Prior to PVSC's submission, on August 22, 2012, Special Master Corodemus posted a list setting forth the identities of several thousand entities not currently parties in the action that have been, or potentially could be, identified in a first pleading as Fourth Parties to the litigation.  While those additional parties were not added to the litigation as the trial court issued a stay to allow the third party defendants to engage in settlement discussions with the State of New Jersey, PVSC's letter brief and the Special Master's list of potential fourth parties support the conclusion that EPA has not identified all viable parties in this matter for the allocation of OU2.

Moreover, in February of 2017, William J. Hengemihle of FTI Consulting submitted correspondence on behalf of the CPG identifying a number of supplemental industrial users who are believed to have discharged, directly or indirectly, into the Lower Passaic River.  By refusing to include these other parties, PVSC, or the four previously identified municipalities in the allocation process, EPA is excluding significant, primary sources of the Passaic River risk drivers from the allocation.  At a minimum, EPA should allow the parties that participate in the allocation process to submit evidence to the Allocator related to PVSC, the municipalities and additional sources for inclusion in the allocation to ensure that it appropriately accounts for those sources.

---

[3] PVSC September 20, 2012 letter brief submitted by Michael D. Witt, Esq., at p.7.
[4] PVSC September 20, 2012 letter brief submitted by Michael D. Witt, Esq., at p.9 [emphasis added].

Should it become necessary to oppose a proposed consent decree between EPA and these parties on the basis that the settlement embodied in the decree does not fairly reflect these parties' proportionate liability, we will be required to inform the Court of EPA's refusal to allow the allocator to evaluate their proportionate liability (in addition to making the full demonstration of their very substantial proportionate liability).  For these reasons, and the additional reasons previously identified by the CPG, we renew our request that the allocator evaluate these parties' proportionate liability.  If EPA is not amenable to adding the PVSC, municipalities, or additional industrial users to the allocation process, then the parties believe that these parties' true share should be evaluated as part of the allocation despite their lack of process participation. Their exclusion from the allocation altogether would proscribe a fair and complete allocation.

## CLARIFYING SETTLEMENT CRITERIA

Finally, the parties require additional information on the assessment and evaluation that EPA undertook in order to determine which parties met the stated criteria (*i.e.*, no association with the release or disposal of any of the COCs for OU2, as identified in the ROD, into the Lower Passaic River) for cash out settlements.  Since EPA stated that these criteria would be used for future cash out offers, this information will be essential in proceeding with an allocation process that allows for an early "off-ramp" for additional cash out settlements.  This would also enable the participating parties to propose supplemental criteria for the cash out settlements for the EPA's and the allocator's benefit.

## CONCLUSION

We are always willing to discuss the above issues and work with EPA to develop a comprehensive allocation process, one that the participants and EPA can agree on and that the participants would remain willing to fund.  To that end, we reiterate our prior request for a meeting with EPA to further discuss these issues.

This letter is intended as a good faith effort to improve this allocation's utility in settling this matter in whole or in part.  Nothing in this letter should be construed as an admission or agreement by any party as to any fact or matter.

Thank you in advance for your consideration of these important issues.


cc:     David Batson, Esq., AlterEcho
        Mary Apostolico, CSRA
        Kathryn Barton, EPA - OARM