

Kathy D. Patrick
Partner
kpatrick@gibbsbruns.com
713.751.5253

February 14, 2022

<u>Via CM/ECF</u>
Special Master Thomas P. Scrivo, Esq.
O'Toole Scrivo, LLC
14 Village Park Road
Cedar Grove, New Jersey 07009
tscrivo@oslaw.com

Re:   *Occidental Chemical Corp. v. 21st Century Fox Am., Inc., et al.*
      Civil Action No. 2:18-cv-11273-MCA-LDW

Dear Special Master Scrivo:

Late Friday, having exhausted every other strategy to avoid their obligation to give sworn testimony, Defendants lobbed in a midnight letter asserting that because "some" Defendants believe they have reached an "agreement in principle" to settle their liability *to the United States*, this entire case should "effectively end."[1]

Not so. This case seeks relief for *OxyChem's* claims for contribution and cost recovery against the Defendants for the pollution *they* caused in the Passaic River. The United States is not a party to this case. It does not own OxyChem's claims. And it has no statutory authority to settle or compromise OxyChem's claims. In any event, even if a settlement is eventually reached with an *unknown* number of Defendants, on *unknown* terms, the scope, validity, and impact of the "matters addressed" in any lodged settlement under CERCLA is the province of *this Court*, not the United States or the Defendants. *N.J. Dep't of Envtl. Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 494-95 (3d Cir. 2020).

The rest of the SPG Defendants' letter is equally threadbare. In a transparent attempt to distract attention from their own wrongdoing, they argue again for a stay of their depositions, plainly fearful that their sworn evidence will compound the mountain of proof against them. Their fears are well-founded. Below are just two of *many* possible examples we could cite, showing the abundant evidence OxyChem has already uncovered in this case—evidence that *requires* Defendants to explain themselves under oath.

---

[1] Dkt. 1982 at 1 (emphasis added). Unless otherwise noted, all emphasis is added throughout.

Archer & Greiner, P.C. · 1025 Laurel Oak Road · Voorhees, New Jersey 08043 · T 856.673.3902 · F 856.673.7023 · jmcdermott@archerlaw.com
Gibbs & Bruns LLP · 1100 Louisiana · Houston, Texas 77002 · T 713.650.8805 · F 713.750.0903 · www.gibbsbruns.com

Special Master Thomas P. Scrivo, Esq.
February 14, 2022
Page 2

**1.      The Sherwin-Williams Company ("Sherwin-Williams")**

As set out in Dkt. 1894-4, Sherwin-Williams destroyed evidence of its polluting operations and waste disposal practices *after* EPA notified it of its potential responsibility for polluting the Passaic River and *after* the company was legally obligated to retain all relevant documents. These are the facts about Sherwin-Williams:

- **January 3, 1995.** EPA sent Sherwin-Williams a CERCLA Section 104(e) request.[2] That request required Sherwin-Williams to gather, produce, and preserve evidence pertaining to its responsibility for hazardous substances in sediments of the Passaic River, including DDT. To prepare the response, EPA directed Sherwin-Williams to "consult with all current and former employees and agents of your company," and to produce all relevant documents to EPA. EPA warned Sherwin-Williams of severe consequences if the company's response was not complete when made and updated regularly with any new information. EPA wrote:

    > "Be advised that *you are under a continuing obligation to supplement your response* if information not known or available to you as of the date of your submission of your response should later become known or available. *If at any time in the future you obtain or become aware of additional information and/or find that any portion of the submitted information is false, misleading or misrepresents the truth, you must promptly notify EPA. If any part of your response is found to be untrue, you may be subject to criminal prosecution.*"

- **March 2, 1995.** Sherwin-Williams, after consulting its *current* employees and no *former* employees, sent EPA a letter asserting, "No information has been obtained that would indicate the [Sherwin-Williams] Lister Avenue facility ever received, utilized, manufactured, discharged, released or disposed of … DDT."[3] This "don't ask, don't tell" response was not, as explained below, remotely accurate when made. In the same response, Sherwin-Williams admitted it *had* documents regarding its handling of hazardous substances, "including manifest inventory forms and billing records," all of which were stored at the Lister Avenue facility and all of which would be made available upon request.

- **October 4, 1995.** EPA sent a letter to the Chairman of the Board of Sherwin-Williams notifying the company of its potential liability under CERCLA Section 107 for polluting the Passaic River.[4] By this point, Sherwin-Williams had not only *promised* to make the documents showing its handling of hazardous substances available to EPA, it had a legal duty to *preserve* them for inspection.[5]

---

[2] **Ex. A** (1/3/1995 104(e) request from EPA to J. Breen, Chairman, Sherwin-Williams).
[3] **Ex. B** (3/2/1995 letter from D. McConnell, Sherwin-Williams to EPA).
[4] **Ex. C** (10/4/1995 letter from EPA to J. Breen, Chairman, Sherwin-Williams).
[5] *See, e.g., Mosaid Techs., Inc. v. Samsung Elec. Co., Ltd.*, 348 F.Supp.2d 332, 336 (D.N.J. 2004) (litigant has "duty to preserve what it knows, or reasonably should know, will likely be requested in a reasonably foreseeable litigation.")

Special Master Thomas P. Scrivo, Esq.
February 14, 2022
Page 3

- **January 11, 1999**. A Sherwin-Williams consultant interviewed three former and four current employees about the company's pesticides operations—operations Sherwin-Williams had *denied existed* in its March 1995 104(e) response to EPA. Those interviews confirmed that "***pesticide formulation was conducted at the Newark facility***," and that "[t]hose pesticides were warehoused on site and shipped from the Newark plant."[6] Despite its obligation to do so, Sherwin-Williams never supplemented its 104(e) response to inform EPA of this fact or other evidence it knew about its own pesticide operations.

- **1999.** Also in 1999, after its consultant reported this information, Sherwin-Williams ceased business activities at its Lister Avenue facility and ***destroyed its building***. In interrogatory answers in this case, Sherwin-Williams admitted that there was ***no document retention policy in place to preserve environmentally related documents in 1999 when "the former facility was decommissioned … and the facility was demolished***."[7]

Sherwin-Williams' failure to disclose and preserve records also is not limited to pesticides or DDT. There is additional evidence that Sherwin-Williams' *century* of paint, lacquer, and other operations used or formed PCBs, lead, and copper—all contaminants EPA identified as ubiquitous in Passaic River sediments.[8]

Given this record, any attempt to claim there is *no* evidence of Sherwin-Williams' responsibility for polluting the Passaic River is misleading, at best. The facts above are damning: After it was under a legal duty to preserve documents and disclose all information known to its employees about its pesticide operations, Sherwin-Williams *denied* it handled DDT, *concealed* interviews of former employees about pesticide operations, *destroyed* its building, and *failed to preserve* critical documents, including inventory manifests and billing records. It would be surprising, therefore, to learn Sherwin-Williams was among the unnamed parties with whom EPA has allegedly "agreed to settle in principle." But even if EPA is unwilling to pursue recoveries from Sherwin-Williams for the United States, Congress gave OxyChem the right to pursue contribution from CERCLA. And OxyChem intends to do so.

**2.     Givaudan Fragrances Corporation ("Givaudan")**

EPA has assured the New Jersey Attorney General's office of its unchanged expectation that parties responsible for the presence of dioxins, furans, and/or PCBs in the Passaic River will not be permitted to settle because they are expected to implement the remedy in Operable Unit 2 of the Diamond Alkali Superfund Site.[9]  It would be surprising, therefore, if Givaudan is among the unnamed parties with whom the United States has allegedly settled. As demonstrated below,

---

[6] **Ex. D** (1/11/1998 Report from ENSR Consulting to D. Gustafson, Sherwin-Williams) at p. 4.

[7] **Ex. E** (9/30/2019 Sherwin-Williams Supplemental Responses to Standard Interrogatories) at p. 10.

[8] *See, e.g.*, **Ex. F** (Hu, et al., *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments*, Environ. Sci. Technol., 44 (2010) at 2823; **Ex. G** (5/3/1946 "technical services" document describing use of lead at Newark plant) at p. 3; **Ex. H** (2003 document acknowledging handling of DDT and copper at Newark plant) at p. 35.

[9] **Ex. I** (9/18/2017 Letter from EPA to Addressees at pg. 1, copied to John Dickinson at N.J. Attorney General's Office).

Special Master Thomas P. Scrivo, Esq.
February 14, 2022
Page 4

there is abundant evidence of Givaudan's responsibility for dioxin in the Passaic River.

In 2011, an EPA-sponsored study determined there was dioxin in the Passaic River that was not associated with the type of operations conducted at the former Diamond Alkali plant.[10] The highest concentrations of that dioxin type were near Defendant Givaudan's former facility.

Givaudan manufactured two compounds at its plant in Clifton, New Jersey: a disinfectant called G-11 and 2,4,5 Trichlorophenol (also known as TCP). When manufactured in high temperature, alkaline environments, the manufacture of both chemicals can produce dioxin. But Givaudan has asserted for years that it was "highly unlikely" its G-11 and TCP processes produced dioxin, because it claimed it used only "***acidic conditions and low temperatures*** in its process."[11] Givaudan made the same claim in this case, arguing in its interrogatory answers that "[t]he production of HCP (i.e., G-11) did not create or produce dioxin."[12]

But the evidence here paints a different picture. In 1945 Givaudan developed, and in 1948, Givaudan ***patented*** a ***high temperature, alkaline process to manufacture G-11***.[13] And while Givaudan told NJDEP that it did not even begin to manufacture G-11 at all until 1947, it produced in this case a 1941 batch process recipe for a "sodium salt method" to manufacture G-11 that requires high, not low, temperatures.[14] The same document reflects that this "sodium salt method" could produce *half a ton per day* of G-11. As late as 1979, other documents show Givaudan's acid-based process for G-11 was *also* conducted at temperatures of 130° Celsius, not at low temperature as Givaudan claimed.[15]

Givaudan also manufactured 300,000 pounds of TCP.[16] Its 1948 batch process recipe for manufacturing TCP calls for the addition of 312 *pounds* of caustic soda flakes to the kettle, after which the temperature is raised to 175° Celsius and held there for *four hours*.[17] This recipe's *high temperatures* all occur when the solution is in an *alkaline* condition. Based on the methodology used in a 2017 paper examining how much dioxin could be generated by this type of high temperature, alkaline process, Givaudan's manufacture of TCP could have generated between 11 and 25 *kilograms* of dioxin.[18]

And where did it go? In a supplemental Section 104(e) response, Givaudan claimed:

> The alleged existence of a possible surface water pathway that could have conveyed storm water flow . . . directly to the Passaic River is *not* supported by the historical

---

[10] *See* **Ex. J** (Garvey et al., "Dioxin in the Passaic River (NJ), The Case for Two Dioxin Sources" (Feb. 10, 2011)).
[11] *See* **Ex. K** (Excerpt from Supplemental 104(e) response (2016)) at 7; **Ex. L** (Section 104(e) Response (1983)) at 2.
[12] *See* **Ex**. **M** (Givaudan Response to Standard Interrogatory No. 11) at 23.
[13] *See* **Ex**. **N** (1945 "Improved Process for the Manufacture of Compound G-11") & **Ex. O** (1948 Patent).
[14] *See* **Ex. P** (1941 "G-11 Process (Sodium Salt Method)" (GIV_NBC_0664675)).
[15] *See* **Ex. Q** (1979 "G-11 N.P." Process) at "Step No. 17."
[16] *See* **Ex. L** (104(e) Resp. (1983)) at 2 ("305,000 pounds of 'pre-purified' 2,4,5-TCP" produced in 1948 and 1949).
[17] *See* **Ex. R** (1948 Process (GIVA-FED-0000342825)) at GIVA-FED-0000342847.
[18] *See* **Ex. S** (Parette et al., "Modeling the formation of 2378-tetrachlorodibenzo-p-dioxin in the historical manufacture of 2,4,5-trichlorophenol," Environmental Forensics, 18:4, 307-317 (2017)).

Special Master Thomas P. Scrivo, Esq.
February 14, 2022
Page 5

> aerial photo review, or the digital topography evidence completed on the historical photos. There is no evidence of a defined drainage swale either on or off the property to the Passaic River in any of the historical aerial photos.[19]

Givaudan focused attention on "aerial photos" to support its claim that there was "no evidence" of drainage swales that drained into the Passaic River. But there is other evidence—including Givaudan's own maps and consultant reports—showing there *were* surface swales on an area of Givaudan's property heavily contaminated with a form of dioxin called TCDD, swales that drained stormwater into an outfall on the Passaic River. Those swales are reflected on a "Givaudan Corporation" drainage map dated June 30, 1970,[20] a map produced for the first time in this CERCLA case, contradicting Givaudan's claim that there is "no evidence of a defined drainage swale either on or off the property to the Passaic River." Another report documented 12,700 gallons of stormwater per minute exiting and flowing into the Passaic River in a 25-year storm.[21]

**3.    Defendants Still Have No *Valid* Ground for any Stay.**

The evidence cited above proves one critical fact: subpoena power and sworn testimony matter. We know these facts about Givaudan *now* because OxyChem's *litigation* compelled Givaudan to produce 388,106 pages of records of its former operations. This is far more information than Givaudan gave to EPA, and it contradicts Givaudan's claims in its 2016 supplemental Section 104(e) response to EPA. We know the facts about Sherwin-Williams *now* because it was compelled, through this litigation, to produce the documents and answer sworn interrogatories in which it was compelled to admit it failed to preserve critical environmental documents. Defendants would plainly *prefer* to settle before these, and other uncomfortable truths come out about their wrongdoing. But their preference is *not* a ground on which this Court should stay the case. To the contrary, the depositions scheduled to begin in March are essential. They will reveal even more of the truth about Defendants' wrongful actions, providing evidence that the Court can evaluate in assessing each party's fair and equitable share of responsibility.

The same evidence shows why Defendants' attacks on OxyChem's alleged "true share of responsibility" (Dkt. 1982) are rhetoric that doesn't match reality. ***EPA has admitted OxyChem never polluted the Passaic River***. OxyChem's sole alleged basis of liability here is its merger with Diamond Shamrock Chemicals Company, long after the Lister Plant closed, in a transaction where the Seller retained liability for that Plant and gave OxyChem a robust indemnity agreement to "hold harmless" OxyChem against all liabilities related to the Diamond Alkali Superfund Site. The evidence also shows that when those indemnitors collapsed into bankruptcy years later, OxyChem immediately stepped up *alone* to design the remedy for OU 2 at an estimated cost of $165 million. OxyChem has performed well and cooperatively with EPA ever since, most recently by offering to *expand* its leadership to include the design and performance of the $441 million interim remedy at OU4 *so long as* the Defendants who polluted the river are not permitted to evade *their* responsibility for the pollution *they caused* and that OxyChem did not.

---

[19] *See* **Ex. K** (Excerpt from Supplemental 104(e) response (2016)) at 3.
[20] *See* **Ex. T** (Drainage Map (KLL0430050001)).
[21] *See* **Ex. U** (May 1993 "Givaudan-Roure; River Road - Water Problem Report") at GIVA-FED-0000092764.

This is how CERCLA is supposed to work. Congress enacted CERCLA, and gave parties like OxyChem contribution rights, to encourage them to do exactly what OxyChem has done here: perform and then recover from others their fair share of costs. Congress chose the Court—not EPA—to make a fair and equitable allocation of responsibility, based on the evidence, because an *evidence-based* assessment is the only way to ensure *every* party pays what they owe.

The United States is free to settle its own claims. When all the evidence is known, settlement may make sense for many reasons. But the United States is not free to insulate Defendants Sherwin-Williams, Givaudan, and others from their responsibility to OxyChem for costs *OxyChem* has incurred and will continue to incur to clean up *their* pollution, which OxyChem *did not* cause, and which has burdened the Passaic River and vulnerable communities in the Ironbound for over a century.

Settlement by some Defendants will not "end this litigation." It cannot and it should not. Depositions should proceed as scheduled. It is time Defendants tell the truth, under oath.

Respectfully submitted,

*Kathy Patrick*

Kathy D. Patrick

/s/ *John J. McDermott*

John J. McDermott

cc: All counsel of record

223461444v1