# EXHIBIT 1

# RESPONSE TO COMMENTS
## ADMINISTRATIVE SETTLEMENT, CERCLA DOCKET NO. 02-2020-2013
## DIAMOND ALKALI SUPERFUND SITE, OPERABLE UNIT 2

Section 122(i) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9622(i), requires the United States Environmental Protection Agency ("EPA") to publish in the Federal Register notice of proposed administrative settlements entered under Section 122(h) of CERCLA, 42 U.S.C. § 9622(h), and, for a 30-day period beginning on the date of publication, to provide an opportunity for persons to file written comments about the proposed settlement. Section 122(i) further requires EPA to consider any comments filed during the 30-day period and permits EPA to withdraw or withhold consent to the proposed settlement if such comments disclose facts or considerations which indicate the proposed settlement is inappropriate, improper, or inadequate.

In accordance with Section 122(i) of CERCLA, EPA published notice of a proposed administrative settlement ("Settlement Agreement"), CERCLA Docket No. 02-2020-2013, for the lower 8.3 miles of the Lower Passaic River, known as Operable Unit Two ("OU2") of the Diamond Alkali Superfund Site ("Site") located in and about Essex and Hudson Counties, New Jersey, in the Federal Register on September 22, 2020, 85 Fed. Reg. 59524 (FRL-10014-16-Region 2). The proposed Settlement Agreement is between EPA and six "Settling Parties": 1) Cooper Industries, LLC; 2) Croda, Inc.; 3) Darling Ingredients Inc.; 4) Flexon Industries Corp.; 5) Palin Enterprises; and 6) Textron, Inc. The Settling Parties, and the facilities with which they are associated for purposes of the settlement, are listed in Appendix A to the Settlement Agreement.[1]

In response to the proposed Settlement Agreement, EPA received comments on **October 22, 2020** (Jean Public), **October 22, 2020** (on behalf of the Occidental Chemical Corporation) and **October 23, 2020 (**on behalf of Darling Ingredients Inc.). EPA has considered all comments. The comments from each letter are summarized below, followed by EPA's responses.

1.      The settlement amount is not a fair settlement to the taxpayers/citizens of this area who have been subjected to cancer from the pollutants in this Site. Fairer numbers would be $260,000,000.00.  The cleanup of this site is very costly and the totally negative impact of this polluter for this many years - a half century- of pollution shows the bigger number above is fairer. The settlement is another giveaway to business on the backs of working people and taxpayers. *October 22, 2020, Jean Public.*

EPA disagrees with the comment. On March 3, 2016, EPA issued a Record of Decision ("ROD") for OU2 of the Site selecting a remedy to address human health and environmental risks posed by contaminated sediments in the lower 8.3 miles of the Lower Passaic River. Eight contaminants of concern ("COCs"), namely, dioxins/furans, PCBs, mercury, DDT, PAHs,

---

[1] Preliminarily, the proposed Settlement Agreement is the second administrative agreement of this type relating to Operable Unit 2 (OU2) of the Site. In the first, Settlement Agreement, CERCLA Docket No. 02-2017-2023 ("2018 Agreement"), which had an effective date of August 7, 2018, EPA settled with 15 parties on the same basis as the Settling Parties here – a payment of $280,600 for each party's facility addressed by that settlement.

1

dieldrin, copper and lead, are identified in the ROD for OU2. The Settling Parties listed in the Settlement Agreement are not definitively associated with the release or disposal of any of these COCs, into the Lower Passaic River, from the facilities specifically identified in the Settlement Agreement.[2]

The settlement amount is based on the OU2 ROD estimate for the cost of the remedy ($1.38 billion) plus past response costs of approximately $46 million.[3] EPA arrived at the individual, per-facility payment in the following way.

As it did in for the 2018 Agreement, EPA concluded that it would be equitable for each Settling Party to pay 0.01% for each facility for which it is receiving a release. The 0.01% figure is not based on a precise mathematical formula relating to non-COC volume and toxicity for which each may be responsible -- which cannot be determined at this time -- but in consideration of two major equitable factors discussed below, that is, allowing relatively minor parties to avoid the high transaction costs of remaining in this matter, and being better able to arrive at an OU2 settlement with a more streamlined group of PRPs. Applying the 0.01% share against the total of past and estimated future costs yields a figure of $142,600 per facility. EPA then added to that a 100% premium of $138,000 (0.01% of the estimated future costs for the remedy of $1.38 billion), yielding a total of $280,600 per facility. Because one of the Settling Parties owned two of the facilities, the total amount of the settlement here is seven times $280,600, or $1,964,200. The facilities covered by the Settlement Agreement are listed in Appendix A of the Settlement Agreement.

This is in accord with EPA's enforcement approach for OU2, as described in its March 31, 2016 letter to the potentially responsible parties ("PRPs") for OU2, that the major PRPs should implement and/or pay for the remedial action, while others might be eligible for cashout settlements. The facilities listed in the Settlement Agreement belong to the latter group. At the same time, EPA has continued its enforcement efforts with respect to numerous remaining PRPs that are associated with the release and/or disposal of COCs for OU2 of the Site, to ensure that those parties perform and/or fund the remedial action selected in the OU2 ROD.

Under case law regarding entry of judicial consent decrees, courts have held that the consideration paid in settlement should "roughly correlate with [,] some acceptable measure of comparative fault."  *In re Tutu Water Wells CERCLA Litig.,* 326 F.3d 201, 207 (3rd Cir. 2003); *United States v. Cannons Eng'g Corp.* 899 F.2d 79, 87 (1st Cir. 1990). The adequacy of the compensation vis-a-vis the public should also be considered. *Cannons Eng'g Corp.* 899 F.2d at 89-90. The likelihood of the plaintiff prevailing at trial and the adequacy of resources of the most culpable parties must also be taken into account in evaluating the substantive fairness and the reasonableness of the settlement. *Id.*

---

[2] Each Settling Party is receiving a release specific to the facility or facilities identified in Appendix A of the Settlement Agreement, and not for any other facility for which it may be liable under CERCLA for Site-related releases. Accordingly, as was true for the 2018 Agreement, Settling Parties are still potentially liable for releases from other facilities not identified in the Settlement Agreement.

[3] Although EPA's past unreimbursed response costs have increased somewhat since the 2018 Agreement, out of fairness to the Settling Parties here, EPA is using the same $46 million figure in this Settlement Agreement to arrive at the per-facility settlement amount.

The amount each Settling Party must pay under the Settlement Agreement takes these factors into account and serves the public interest by allowing the United States to recover fair consideration from them, which can be used to defray OU2 cleanup costs, thereby reducing the amount for which other PRPs will be responsible. At the same time, it protects the Settling Parties from the burden of further transaction costs with regard to their liability for the particular facilities identified, as the proposed Settlement Agreement will allow them to avoid further exposure in this matter for those facilities. In addition, by taking this step now, EPA hopes to expedite the negotiation of a remedial action consent decree for OU2 with the remaining PRPs. This could lead to a more timely and efficient remedial action. It is, therefore, in the public interest for EPA to settle with these parties now, rather than continue to pursue them.

The amount of the settlement also takes into account the risks attendant to establishing the liability of the Settling Parties if the case were litigated against them. While EPA has gathered information regarding possible releases of hazardous substance into the Lower Passaic River from the facilities owned and/or operated by the Settling Parties identified in the Settlement Agreement, the Settling Parties are not definitively associated with the release or disposal from the identified facilities into the Lower Passaic River of the COCs that are driving the remedy for OU2 and contributing to the cost of implementation.

In sum, while all OU2 PRPs received notice letters of their potential liability, the hazardous substances attributable to the Settling Parties from the identified facilities are either not the COCs that are driving the remedy, or have not increased the anticipated costs of the OU2 clean-up, or both. Thus, they are considered only minor players for contamination in OU2. In the context of a settlement, substantive fairness means that the parties should pay an amount equal to a rational estimate of the harm they have caused. Because of the attenuated liability for OU2 costs of the Settling Parties, EPA determined that a minimal contribution by the Settling Parties is appropriate. That is especially so where EPA has settled with similarly situated settlors in the 2018 Agreement on the same basis. To reject the settlement on the grounds noted in the comment would be unfair to the Settling Parties.

2.      Occidental Chemical Corporation (OxyChem) signed an Administrative Settlement Agreement and Order on Consent to perform and pay for the remedial design for OU2, and EPA affirmed its intention to "pursue additional agreements with all of the more than 100 parties legally responsible for the contamination to ensure that the cleanup work in the lower 8.3 miles will be carried out and paid for by those responsible for the pollution as required by the Superfund law." But, in the four years since, EPA has limited its actions to small, cashout settlements such as this one.  As a result, no large or significant parties have volunteered to cooperate in the remediation of OU2 and none have been compelled, by a unilateral order, to bear their fair share of the costs associated with the "elevated concentrations" of the eight chemicals of concern that EPA found to be "ubiquitous in the surface sediments of the lower 8.3 miles" of the Passaic River "bank to bank." This has allowed those whom EPA asserted "are legally responsible for the contamination" to avoid paying their share of the costs for years, while OxyChem labors alone. *October 22, 2020, Occidental Chemical Corporation, Pages 1 and 2.*

EPA has indeed committed to pursuing agreements with PRPs, including both those with the most substantial responsibility, and those with lesser responsibility. EPA's overall approach is discussed in response #1. This Settlement Agreement is a part of EPA's strategy, as are its continuing enforcement efforts with numerous remaining PRPs that are associated with the release and/or disposal of COCs for OU2 of the Site, to ensure that those parties perform and/or fund the remedial action selected in the OU2 ROD.

3.      Because costs incurred by OxyChem are not "costs incurred by the United States," EPA lacks statutory authority to grant contribution protection in any settlement that would bar OxyChem's claims. It also fails to provide due process. *October 22, 2020, Occidental Chemical Corporation, Page 2.*

The comment is not accurate or supported by CERCLA. Pursuant to the Settlement Agreement, each Settling Party is entitled to protection from contribution actions or claims *as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA* for "matters addressed" in the Settlement Agreement.

Section 113(f)(2) of CERCLA reads in pertinent part:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims of contribution regarding matters addressed in the settlement.

Section 122(h)(4) of CERCLA reads in pertinent part:

A person who has resolved its liability to the United States under this subsection   shall not be liable for claims of contribution regarding matters addressed in the  settlement.

"Matters addressed" in the Settlement Agreement specifically include all response actions taken or to be taken, and all response costs incurred or to be incurred, at or in connection with the lower 8.3 miles of the Lower Passaic River, which is OU2 of the Site, by the United States or any other person, except for the State of New Jersey.

EPA is authorized by Sections 113(f)(2) and 122(h)(4) of CERCLA to provide contribution protection to settlors, such as the Settling Parties here. Indeed, this is just the type of settlement contemplated by CERCLA. In 1986, CERCLA was amended by the Superfund Amendments and Reauthorization Act (SARA). SARA added Section 113(f) to CERCLA, providing PRPs with the right to seek contribution from other PRPs, while also providing parties that settle with EPA protection from contribution claims from other PRPs (Section 113(f)(2)). Under CERCLA Section 113(f)(1), a claim for contribution is subject to and limited by Section 113(f)(2).  *See United States v. BP Amoco Oil Plc.*, 277 F.3d 1012 (8th Cir. 2002). Even the contribution claim of a party that has already settled with the United States is subordinate to the government's right to recover response costs, under Section 113(f)(3)(C):  "the rights of any person who has resolved its liability to the United States .. shall be subordinate to the rights of the United States..." See, e.g., *Alcan Aluminum, Inc. v. AT&T Technologies, Inc.*, 25 F.3d 1174, 1184, fn. 14 (3d Cir. 1994) (holding that "§ 113(f)(3(C) subordinates a settler's contribution right to the

4

government's right to recover response costs..."). Congress, in passing SARA, intended to encourage settlements by providing PRPs with finality in exchange for their willingness to settle. (*Cannons Eng'r Corp*, 899 F.2d at 99). Given that Congress has made its intention clear, a non-settling party's dispute with the finality of a settlement is with Congress (see, *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 697 (S.D.N.Y. 1988), and *United States v. Petty Products, Inc.*, 780 F. Supp. 1488, 1495 (S.D. Ohio 1991).

Accordingly, matters addressed in a CERCLA settlement do not need to be as limited as the commenter suggests, but rather, matters addressed "can resolve a wide range of response actions or costs regardless of who undertakes the work or incurs the costs." (Defining "Matters Addressed" in CERCLA Settlements, EPA and the U.S. Department of Justice Memorandum, March 14, 1997, page 3)[4]. And cashout settlements, such as the Settlement Agreement, are appropriate so long as the settlement is fair, reasonable and consistent with the goals of CERCLA (*id.*, citing *United States v. Charter*, 83 F.3d at 520; *Cannon's Eng'g Corp.*, 899 F.2d at 85). The Settlement Agreement meets that standard, and moreover, is consistent with EPA policy. Indeed, the Third Circuit has explicitly held that the United States may enter into settlements that completely resolve the settlors' liability for an entire site, including liability for costs that are being incurred by non-settlors. *United States v. Southeastern Pennsylvania Transport Authority (SEPTA)*, 235 F.3d 817, 823 (3rd Cir. 2000).

Furthermore, the definition of "matters addressed" is narrow in that the Settling Parties are resolving their potential liability only for releases from their facility or facilities listed in the Settlement Agreement. While all OU2 PRPs received notice letters for a release of a hazardous substance to the Lower Passaic River, the evidence regarding each of the Settling Parties, including circumstantial evidence, does not definitively show that the Settling Parties are associated with a release or discharge of OU2 COCs to the lower 8.3 miles from the seven facilities covered by the Settlement Agreement. For some of the Settling Parties, the evidence of releases or threatened releases of non-COC hazardous substances is also attenuated. Given this tenuous connection to the OU2 risk, it would not be reasonable, appropriate, or fair for the parties to remain part of the case at this time. *United States v. Davis*, 261 F.3d 1, 23-25 (1st Cir. 2001) (appropriate for EPA to vary settlement demands to parties based on the difference in strength of evidence linking parties to the site). The toxic or other hazardous effects of any hazardous substances that the Settling Parties contributed to the Lower Passaic River are minimal in the context of OU2, justifying the proposed settlement payments, as described above in response #1.

The commenter also argues that resolving claims and providing contribution protection by means of an administrative settlement does not provide Constitutional due process; that is not so. Due process includes notice and an opportunity to be heard. Before an administrative settlement, such as the one here, may become final, notice of the proposed settlement must be published in the Federal Register and be subject to public comment for 30 days. EPA must then consider the comments filed during the public comment period; the proposed settlement may become final only if the comments received do not "disclose facts or considerations which indicate the proposed settlement is inappropriate, improper, or inadequate." (CERCLA Section 122(i)(3)).

---

[4] https://www.epa.gov/enforcement/guidance-defining-matters-addressed-cercla-settlements.

Non-parties to the Settlement Agreement, which includes other PRPs at the Site, were given this opportunity. Notice of the Settlement Agreement was published in the Federal Register; commenters, including the commenter here, have submitted comments, and EPA has carefully reviewed them. EPA has concluded that the facts and other considerations here support the proposed settlement as appropriate, proper, and adequate. As such, modification or withdrawal by EPA from the Settlement Agreement is not warranted. Further, the Settlement Agreement is in accord with the statutory authority provided by Congress as explained above (and as further explicated in response #4, below). Thus, due process has been provided.

4.      EPA cannot confer settlement power on itself greater than that granted by Congress by devising a Peripheral Party Settlement process that does not conform to the limitations of Sections 122(d) and (h). And CERCLA provides that judicial consent decrees be used for remedial action settlements. *October 22, 2020, Occidental Chemical Corporation, Page 2.*

Here, the commenter asserts that with the exception of *de minimis* settlements under Section 122(g) of CERCLA, any settlement agreement that purports to settle or extinguish a settling party's liability for the costs of any part of the remedial action must be entered in the United States district court as a consent decree. In the commenter's telling, the contribution protection offered by a settlement to the settling parties deprives other, non-settling parties of "property rights" without notice and an opportunity to be heard.

First, as discussed in response #3, a non-settling party's right to contribution is subject to and limited by Section 113(f)(2). The United States and EPA have broad settlement authority under Section 122 of CERCLA, 42 U.S.C. § 9622. EPA, with the approval of DOJ, is entering into the Settlement Agreement pursuant to Section 122(h)(1) of CERCLA.

    Section 122(h)(1) of CERCLA reads in pertinent part:

The head of any department or agency with authority to undertake a response action under this chapter pursuant to the national contingency plan may consider, compromise, and settle a claim under section 9607 of this title for costs incurred by the United States Government if the claim has not been referred to the Department of Justice for further action.

Pursuant to the early cashout Settlement Agreement, EPA is settling its claim, under Sections 106 and 107(a) of CERCLA, against the Settling Parties for all response actions taken or to be taken, and all response costs incurred or to be incurred, at or in connection with the lower 8.3 miles of the Lower Passaic River, which is OU2 for the Site.

Further, Section 122(f)(6)(B) of CERCLA authorizes EPA to grant a covenant not to sue without reopeners if EPA determines, after the assessment of relevant factors, that circumstances warrant it and the terms of the agreement are sufficient to provide all reasonable assurances that public health and the environment will be protected. Those factors include the volume and toxicity of the hazardous substances at issue; the strength of the evidence against a party; litigation risks; public interest considerations; and the equities involved.

In this case, the volume, and the toxicity or other hazardous effects of any hazardous substances released to the lower 8.3 miles of the Lower Passaic River by the Settling Parties, if any, is negligible in the context of OU2. As discussed in response #1, the public interest is served since a settlement that removes minor parties from OU2 altogether may expedite negotiation of settlements with the remaining OU2 PRPs, including settlement with the major parties for their performance and/or payment of the remedial action for OU2. A settlement which minimizes further transaction costs to minor PRPs is appropriate. Finally, the equities support a settlement without reopeners under Section 122(f)(6(B) of CERCLA.

CERCLA does not require EPA to use a consent decree for purposes of reaching a cashout settlement with a party just because the settlement resolves liability ("matters addressed") for future response actions and costs. Rather, CERCLA requires EPA to enter into a consent decree when it is entering into an agreement for the *performance* of the remedial action itself. While each settlement decision is necessarily site- and fact-specific, an administrative cashout settlement under Section 122(h) that resolves past and future liability for response costs, at the same time providing contribution protection, is a longstanding alternative to a cashout consent decree.

Moreover, a cashout settlement agreement, like a cashout consent decree, is entered into under the authority and with the approval of the United States Attorney General, who has the power to compromise and settle claims of the United States. In particular, as explained in EPA's 1998 guidance document on cashout settlements, agreements that cashout parties for future actions "should be issued jointly by EPA, under Section 122(h) authority, and by the AG, under her general authority to compromise claims of the United States, whenever a Section 106 covenant not to sue is included." [5]

Therefore, the commenter's claim that the cashout settlement at issue must take the form of a consent decree is incorrect. As EPA's 1998 guidance document states, a consent decree would be necessary if the cashout was part of a larger settlement with another party or parties who would be *performing* the remedial action. It is the performance of remedial action work that requires a settlement to be in the form of a consent decree. As discussed in response #3, in passing SARA, Congress intended to encourage settlements by providing not only a means for PRPs to seek contribution, but also by providing contribution protection to parties that choose to settle their liability by means of a consent decree or an administrative settlement. EPA has a long practice of cashout settlements, including *de minimis* settlements under Section 122(g) of CERCLA, settlements based on limited ability to pay or other peripheral status, de micromis settlements, and settlements such as this one.

5.      Because the funds may not be used for general purposes, EPA would abuse its discretion by failing to mandate that settlement funds from the cashout settlements be placed in a special site-specific account to be used only for response actions at this Site in order to reduce the potential liability of other PRPs. *October 22, 2020, Occidental Chemical Corporation, Page 5.*

---

[5] *Guidance on Administrative Response Cost Settlements under Section 122(h) of CERCLA and Administrative Cashout Settlements with Peripheral Parties under Section 122(h) of CERCLA and Attorney General Authority*, September 30, 1998, p.7.  https://www.epa.gov/sites/production/files/2013-11/documents/guide-adres-rpt.pdf.

7

The Settlement Agreement provides that the total amount to be paid by each Settling Party will be deposited by EPA in Diamond Alkali Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the Hazardous Substance Superfund. In so providing, EPA has clearly expressed its intention to utilize the funds at this Site. Consistent with EPA practice on the use of special accounts, however, EPA has used language that retains flexibility, not, language that "mandates" a particular application of funds received as a result of the Settlement Agreement.

Moreover, consistent with CERCLA Section 113(f)(2), 42 U.S.C. § 4613(f)(2), payments received by EPA from the early cashout Settlement Agreement will necessarily reduce the potential liability of the remaining OU2 PRPs. Thus, the commenter's concern is misplaced.

6.      Darling's comments are in support of the Settlement Agreement with EPA. *October 23, 2020, Darling Ingredients, Inc., page 1.*

In its comment letter, Settling Party Darling Ingredients, Inc. expresses its position that it is not responsible for CERCLA liability for the lower 8.3 miles of the Lower Passaic River, based on factual and legal grounds. Nevertheless, Darling affirms that the Settlement Agreement is an appropriate vehicle for cashing itself out, as a party that should not be the primary focus of Superfund enforcement activities for the Lower Passaic River.

This view – that the Settlement Agreement is an appropriate vehicle for cashing out a party such as Darling – is consistent with EPA policy, as described above. It is, therefore, appropriate for Darling to receive a cashout settlement for those two facilities for OU2 of the Site.

Conclusion

The comments received with respect to the Settlement Agreement do not disclose to EPA facts or considerations which indicate that the proposed settlement is inappropriate, improper, or inadequate. Further, the comments do not require modification or withdrawal by EPA from the Settlement Agreement. In accordance with Paragraph 56 of the Settlement Agreement, EPA hereby issues notice that the proposed settlement is, therefore, final and effective as of the date below.

In accordance with Paragraph 25 (Payment of Response Costs) of the Settlement Agreement, the payment by each Settling Party is due within 60 days of the Effective Date of the Settlement Agreement.

April 16, 2021

_____                             _____
Pat Evangelista, Director                                                     Date
Superfund and Emergency Management Division

8