

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

June 27, 2022

Mr. Michael S. Regan
Administrator
United States Environmental Protection Agency
1200 Pennsylvania Ave NW
Washington, DC 20460

Mr. Larry E. Douchand
Director
Office of Remediation and Technology Innovation
United States Environmental Protection Agency
1301 Constitution Ave NW
Washington, DC 20460

Ms. Lisa F. Garcia
Administrator, Region 2
United States Environmental Protection Agency
290 Broadway
New York, NY 10007

Ms. Alice Yeh
Remedial Project Manager
Diamond Alkali Superfund Site, Operable Unit 2
Superfund and Emergency Management Division
United States Environmental Protection Agency, Region 2
290 Broadway
New York, NY 10007

Ms. Diane Salkie
Remedial Project Manager
Diamond Alkali Superfund Site, Operable Unit 4
Superfund and Emergency Management Division
United States Environmental Protection Agency, Region
2290 Broadway
New York, NY 10007

      Re:    Occidental Chemical Corporation Response to EPA Region 2 Letters
                dated March 2, 2022, and May 31, 2022

Dear Administrator Regan, Director Douchand, Administrator Garcia, Ms. Yeh and Ms. Salkie:

      I write on behalf of Occidental Chemical Corporation ("OxyChem") to respond to EPA Region 2's May 31, 2022 letter (the "May Letter") and its earlier, March 2, 2022 letter (the "Notice Letter"), requesting that OxyChem and other work parties provide a good faith offer to implement the remedial actions for Operable Unit 2 ("OU2") and Operable Unit 4 ("OU4") of the Diamond Alkali Superfund Site (the "Site").



OxyChem Response to EPA Notice Letters<br>
June 27, 2022<br>
Page Two

By letter dated January 13, 2022, OxyChem provided an earlier, good faith offer to perform the entire scope of work in OU4 so long as its right to seek contribution from other responsible parties—as enacted by Congress in CERCLA—would be preserved. This condition is what the law requires. In CERCLA, Congress granted performing parties like OxyChem the right to sue other responsible parties for contribution, with the allocation of responsibility adjudicated by a federal court in proceedings that conform to the constitutional requirements of due process. EPA is an agency of limited jurisdiction and Congress did not grant EPA authority to adjudicate responsibility among responsible parties by barring contribution claims or otherwise.

### I. Good Faith Offer to Perform Remedial Design on OU4

Consistent with these principles, and its prior good faith offer, OxyChem makes the following good faith offer in response to EPA's Notice Letter. As EPA has requested, OxyChem offers to perform the remedial design of the interim remedy in OU4 on the following conditions (the "Required Conditions"):

1. The United States will take no action to impair or bar OxyChem's contribution claims against the other responsible parties for work OxyChem is undertaking to perform, including, without limitation, in any settlement the United States reaches with any other party. OxyChem's rights to cost recovery under CERCLA Section 107 and to cost reimbursement under CERCLA Section 106(b)(2) shall also be preserved.

2. The United States will provide OxyChem with a covenant not to sue under Sections 106 and 107 of CERCLA for this scope of work.

3. Any settlement recoveries received by EPA in connection with this Operable Unit will be deposited in an Operable-Unit-specific account for performing parties to use in implementing the remedies.

4. The agreement with EPA must include appropriate force majeure and other provisions to permit OxyChem to stop work without penalty if unforeseen conditions or litigation preclude continuation of the work.

5. Financial assurance requirements shall be limited to the work to be performed on an annual basis and will not be cumulative either of work already performed or work contemplated in out years.

6. Inclusion of suitable Adaptive Management provisions to permit EPA and OxyChem to make appropriate revisions as work progresses.

### II. Proposed Sequencing of Other Work at OU4 and OU2 of the Site

EPA has also asked OxyChem and other work parties to provide a good faith offer to implement the remedies in OU4 and OU2. If EPA accepts OxyChem's offer above to perform the remedial design in OU4, then OxyChem believes we can reach agreement with the other work parties to perform specific and tailored work scopes that would implement the remedies in OU4 and OU2.

OxyChem proposes a staged process of sequential agreements in which manageable scopes of work can be defined, agreed, implemented, and evaluated in sequence, with the next agreement following when the prior phase of work is planned, designed, and implemented. This sequence could be achieved through expedited negotiations of subsequent agreements, all of which must include the Required Conditions, tracking an overall schedule to which the parties would agree with EPA. OxyChem is willing to discuss leading the implementation of this further work with other work parties, so long as the Required Conditions are met.

Based on its involvement with the OU2 design and its prior work regarding the Upland Processing Facility (the "UPF"), OxyChem believes the work sequence below is essential to an effective remedy in both operable units, consistent with the National Contingency Plan:

1. **Agreement One:** Administrative Settlement Agreement and Order on Consent ("ASAOC") for the design of the OU4 interim remedy set forth in the applicable Record of Decision ("ROD"). OxyChem will negotiate the ASAOC in good faith, subject to the Required Conditions, and consistent with OxyChem's previous offer to perform this work as set out above.

    **Target Date for Execution of ASAOC:** Within EPA Fiscal Year 2022 (by September 30, 2022).

2. **Agreement Two:** Consent Decree for construction of the UPF. OxyChem has worked to obtain agreement to this consent decree since 2018. The difficulties encountered by the Passaic Valley Sewerage Commission ("PVSC") in acquiring the required property through eminent domain have caused significant delays in this decree, as has the resulting inability of the United States and PVSC to reach agreement on consent decree terms. Subject to the Required Conditions and a condition precedent requiring that the property necessary to build the UPF is and will be made available for OxyChem's use throughout the implementation period on the material terms embodied in the draft UPF consent decree, OxyChem will negotiate in good faith (as it has done for several years) to finalize this consent decree.

    **Target Date for Execution of Consent Decree:** Lodged and in force by the time the design for the UPF and other upland facilities is completed and accepted by EPA, which is currently anticipated to occur within EPA Fiscal Year 2023 (by September 30, 2023).

3. **Agreement Three:** Consent Decree for Remedial Action in OU4. OxyChem will negotiate in good faith for a consent decree to implement with the other work parties the interim remedy in OU4, subject to the Required Conditions and the completion of work under Agreements One and Two, above.

4. **Agreement Four:** Consent Decree for remainder of the Remedial Action in OU2. Once there is significant progress in implementing Agreements Two and Three, OxyChem will negotiate in good faith with the other work parties to achieve a consent decree with EPA to implement the remainder of the remedial action in OU2, subject to the Required Conditions.

OxyChem Response to EPA Notice Letters<br>
June 27, 2022<br>
Page Four

The sequence above permits EPA and the parties to discuss implementing the remedy in OU2: (i) after the remedy in OU4 has been designed and implemented, and (ii) after the UPF has been designed and constructed. This schedule makes sense for many reasons. As EPA is aware, work to implement the remedies cannot begin in earnest until the UPF is designed and built. Without that facility, there is otherwise no location at which dredged sediment from OU2 (or from OU4) can be processed. The OU4 pre-design investigation and the required design of the remedy are also essential to determine how the remedy in OU4 is best implemented. None of that work has yet been done. The remedy upriver in OU4 should also be implemented first to minimize the risk that upriver construction activities might damage or impair the remedy in OU2.

Given this, and the added fact that OU4 and OU2 encompass parts of the river up to 17 miles apart, sequencing the consent decrees for in-river work ensures clarity of scope and performance. It enables all parties to demonstrate completion of distinct milestones for the interim and final remedial goals for each operable unit. This staged approach will also expedite the design and construction of the remedies in both operable units. By creating a manageable schedule that addresses all stakeholder interests, sequencing work avoids the near certainty that resources would otherwise be wasted through inefficiencies and duplication of untargeted work.

### III. Further Discussion of Required Conditions

OxyChem is willing to discuss alternative scopes of work in OU4 and OU2 as they arise, but it cannot and will not perform all this work alone. Nor can OxyChem undertake to provide financial assurance at the outset for all estimated costs of implementing the entirety of both remedies. The Required Conditions, described in greater detail below, address both concerns. They are essential to facilitate the timely completion of the work in accordance with the National Contingency Plan and so should be acceptable to EPA.

#### A. Preservation of Contribution Claims

Hundreds of parties are responsible for pollution in the Passaic River. As described by EPA in the OU2 ROD:

> The Passaic River was one of the major centers of the American industrial revolution starting two centuries ago. By the end of the 19th century, a multitude of industrial operations…had located along the river's banks as cities such as Newark and Paterson grew. ***Industrial operations and municipalities used the river for wastewater disposal. To date, over 100 facilities have been identified as potentially responsible for discharging contaminants into the river including, but not limited to, dioxins and furans, PCBs, PAHs, DDT and other pesticides, mercury, lead, and other metals***.[1]

CERCLA's goal is to ensure that the "polluters pay," meaning that all responsible parties pay their fair and equitable shares of response costs. To ensure that they do, CERCLA affords performing parties—like OxyChem—a statutory right to pursue contribution claims against parties who have not stepped up to clean up pollution that they caused. In Section 113(f)(1) of CERCLA, Congress mandated that the United States district courts, not EPA, weigh the evidence to arrive at an equitable allocation of responsibility that binds all parties.

---

[1] *See* OU2 ROD, Section 2 pg. 3 (emphasis added).

Here, EPA has acknowledged OxyChem "did not directly discharge pollution into the Passaic River."[2] Instead, EPA alleges OxyChem's liability arises from its purchase of the stock of Diamond Shamrock Chemicals Company ("DSCC"). From the 1940s to 1969, DSCC owned and operated an agricultural chemicals plant at 80-120 Lister Avenue in Newark. During that period, the Lister Avenue plant (the "Lister Plant") manufactured DDT and, at the direction of the United States government, products for use during the Vietnam War that generated dioxin as a manufacturing byproduct. DSCC sold the plant to a third party in 1971. When an affiliate of OxyChem purchased the stock of DSCC in 1986, the Lister Plant had been closed for nine years and DSCC had not operated it for more than sixteen. In the stock purchase agreement, Diamond Shamrock Corporation (later known as Maxus Energy Corporation) agreed to defend, indemnify, and hold OxyChem harmless against all environmental liabilities associated with the former Lister Avenue Plant. Relying on this indemnity, OxyChem merged with DSCC in 1987, a transaction EPA contends made OxyChem responsible for the environmental liabilities of DSCC.

EPA has identified a total of *eight* chemicals of concern for OU2 and OU4: dioxins and furans, PCBs, DDT, dieldrin (an herbicide), poly-aromatic hydrocarbons ("PAHs"), mercury, copper, and lead.[3] The OU2 ROD makes clear that EPA mandated this remedy because the lower 8.3 miles of the Passaic River is "ubiquitously contaminated" with *all eight* COCs.[4] In OU2 alone, the ROD contemplates the permanent capping of over one hundred years of contaminated sediment and the removal from the river of approximately 24,000 pounds of mercury, 6,600 pounds of PCBs, 1,300 pounds of DDT, and 13 pounds of dioxin, subject to the remedial design.[5]

OxyChem has not disputed it bears some legal liability from its merger with DSCC. But that merger in no way makes OxyChem responsible to clean up *all* hazardous substances in the Passaic River or all dioxins found in river sediments. There is no evidence, for example, that the Lister Plant (or OxyChem) is responsible for the estimated 24,000 pounds of mercury that will be removed or remediated in the remedy for OU2, the more than 6,600 pounds of PCBs that must also be removed or remediated, or the costs to remedy contamination in the river from PAHs, dieldrin, or any of the hazardous metals. DDT was manufactured widely and was used within the Site's boundaries by, among others, the municipal entities to whom EPA also sent its Notice Letter. And finally, while the Lister Plant is alleged to be responsible for some dioxins and furans in the Site, EPA's investigation (and OxyChem's own) demonstrates there are other, significant sources that also bear responsibility for the presence of dioxins and furans in the Passaic River, including but not limited to:

- **Givaudan Fragrances Corporation**: EPA identified Givaudan as the source of the Clifton Congener, a significant contributor to dioxin in Passaic sediments that is *not* associated with the former Lister Plant.

- **Clean Earth Environmental Services**: Clean Earth is the admitted successor to S&W Waste, a company with an extensive history of environmental violations and significant dioxin contamination in the soils of its Kearny facility that is also *not* associated with the Lister Plant.

---

[2] *See* EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River. News Releases from Region 2. Jan. 19, 2017.

[3] *See* Focused Feasibility Study ("FFS") for Operable Unit 4 at pp. 1-4; 2016 Record of Decision for Operable Unit 2 (the "OU2 ROD") at 14-16.

[4] *Id.* OU2 ROD Section 5.3 (OU2 Conceptual Site Model).

[5] *Id.*

- **Ashland Chemical Corporation**: Ashland's manufacturing operations at its Drew Chemical facility involved large-scale, dioxin-forming processes on an upland site that is significantly contaminated with dioxins that, again, are *not* associated with the Lister Plant.

CERCLA requires all parties responsible for the presence of these hazardous substances in the Site to pay their fair and equitable shares of the costs to remove or remediate them. After extensive study, EPA identified over 100 facilities as potentially responsible for discharging contaminants into the Passaic River.[6] Abundant record evidence in the CERCLA case in the United States District Court in New Jersey supports a significant assignment of responsibility to parties other than OxyChem for the presence of hazardous substances in OU2 and OU4.[7] EPA also assured the public, repeatedly, that it intended "to pursue additional agreements with *all* of the more than 100 parties legally responsible for the contamination to ensure that the cleanup work in the lower 8.3 miles [and in OU4] ***will be carried out and paid for by those responsible for the pollution as required by the Superfund law***."[8]

But despite the abundant evidence available to it, EPA never pursued claims against the parties EPA identified as bearing responsibility. Instead, EPA announced its intention to *release* scores of responsible parties from their cleanup liability to the United States for undisclosed amounts, leaving the five private work parties and New Jersey's taxpayers (through the in-kind contributions of the public work parties) to carry out the work alone.

EPA refuses to provide any information concerning these proposed settlements, their terms, their amounts, or why these settlements are in any way in the public interest. EPA also rejected OxyChem's Freedom of Information Act requests pertaining to these contemplated settlements. EPA's lack of transparency is not in the public interest. EPA appears poised to abandon its public commitment that all identified polluters would be required to *carry out* and *pay for* the cost of cleaning up pollution they caused, in favor of a strategy that would let significant polluters off the hook to the United States. Releasing parties from liability exposes the United States—and its taxpayers—to significant claims for reimbursement by performing parties when the remedies in OU2 and OU4 are complete. *See* 42 U.S.C. Section 9606(b)(2).

If EPA wants to settle the *United States' claims* against those parties, it can do so with court approval. But EPA's choice not to pursue full accountability from polluters does not prevent OxyChem from acting. And OxyChem has done so. It is pursuing in court, as Congress intended, contribution claims to compel the parties who caused this pollution to pay their fair shares of the costs to clean it up. It is contrary to Congress's mandate for EPA to try to prohibit OxyChem and other performing parties from pursuing *their own contribution claims*. The pursuit of these claims costs the United States nothing. And it ensures the full scope of liability of all responsible parties will be determined by the Court, as Congress again intended.

For all these reasons, CERCLA's plain language and purpose are vindicated when OxyChem's contribution and cost recovery rights are preserved. The statute does not authorize— and the Constitution does not permit—EPA to thwart the exclusive authority Congress vested in the federal district courts to allocate liability among responsible parties. Nor do they permit EPA to provide purported "contribution protection" to responsible parties the United States has never

---

[6] *See* OU2 ROD at Section 2.

[7] Neither the public nor OxyChem knows how much of the discovery in the CERCLA case (if any) was made available by the settling parties to EPA or its allocator, AlterEcho and David Batson. For these and other reasons, OxyChem reserves its right to challenge settlements by the United States with any or all parties.

[8] EPA Press Release, October 5, 2016 (emphasis added)

Case 2:18-cv-11273-MCA-LDW   Document 2100-1   Filed 07/12/22   Page 7 of 12 PageID: 61327

sued, in a manner that seeks to bar OxyChem's contribution claims for costs that OxyChem, not the United States, has incurred or will incur. Accordingly, including in the Consent Decree the Required Condition that preserves OxyChem's contribution claims imposes no burden on EPA not already inherent in the limited authority Congress granted to EPA.

### B.  Financial Assurance Condition

EPA guidance states that consent decrees should be supported by financial assurance. Staging the work and tailoring financial assurance to the work to be performed each year, makes economic sense.

No company alone—and certainly not OxyChem—can *post* financial assurance for a multi-decade scope of work of this magnitude. And no company can secure an entire scope of work that spans decades and still retain sufficient financial resources and resilience to pay to perform the work each year, as the work is due, *while* EPA holds multiple years of financial assurance.

An agreement to limit financial assurance to the work to be performed in a given year ensures resources are available to perform that work. Requiring multi-year financial assurance for the entire project from the outset makes performance impossible. In sum, this Required Condition should be acceptable to EPA. It reflects economic reality.

### C.  PVSC Condition Precedent

The Site Selection report approved by EPA identifies property owned or to be acquired by PVSC as the preferred location where the UPF should be built to process sediment removed from the Passaic River during the remedial actions at OU2 and OU4. This is the most cost-effective option and one preferred by EPA, as it permits negotiation of an in-kind settlement with PVSC, which EPA also prefers. Thus, this condition is one that imposes no burden on EPA and acknowledges the fact that OxyChem cannot build anything on PVSC's property without its consent.

### D.  Force Majeure Condition

EPA has historically included force majeure provisions in consent decrees that implement remedial work. Given the enormous uncertainties embodied in these scopes of work, including force majeure conditions as a Required Condition imposes no burden on EPA here. Instead, it makes good sense.

No party can agree in advance to underwrite all costs of an unprecedented, decade-long construction project that is subject to inherent unknowns. The interim remedy for OU4 is not designed. The Preliminary Remediation Goals and a final remedy for OU4 are not yet determined. In addition, although the remedial design is nearly complete in OU2, it has not yet been finalized or approved by EPA. In-river implementation of any remedy—in OU2 or in OU4—also cannot begin until the required UPF is designed and built, an enormous project in itself, requiring access to government-owned property that is not yet available for that purpose. Added to these unresolved issues and unknowns are the inherent additional uncertainties of a project that contemplates miles of in-river dredging and construction, in waters of the United States and state- and privately-owned property.[9]

---

[9] Litigation by those opposed to dredging remedies is a frequent occurrence and could interpose significant delays in implementing the OU2 and OU4 remedies. Just last month, a coalition of environmental groups

### IV.　OxyChem's Offer is in Good Faith

OxyChem's offer to perform the remedial design for OU4 and its proposal of sequential agreements for other work in the Site are in good faith and consistent with OxyChem's longstanding cooperation with EPA to advance the cleanup of the Passaic River.

#### A.　OxyChem's Record of Cooperation

OxyChem's indemnitors at Maxus Energy and its affiliate, Tierra Solutions, Inc., spent approximately $300 million in response costs to perform remedies in Operable Unit 1 (the former Lister Plant site), to conduct remedial investigations in Operable Units 2 and 3 (where work by OxyChem is still ongoing), and to perform an interim removal in OU2.

When its indemnitors filed for bankruptcy protection, OxyChem immediately stepped up and agreed to perform the remedial design of the remedy EPA selected for OU2. OxyChem took this action with the understanding that it could and would—as Congress authorized under CERCLA—pursue contribution from other responsible parties to ensure they paid for their share of the costs to clean up the pollution they caused. EPA has informed OxyChem on multiple occasions that its work on the OU2 Remedial Design has been excellent.

OxyChem has performed consistently and well in remedial investigations in Operable Unit 3. And it has assisted EPA in matters related to the contemplated design and construction of the UPF.

OxyChem's January offer to perform the *entirety* of the interim Remedial Design/Remedial Action ("RD/RA") selected by EPA for OU4—at an EPA-estimated cost of $441 million— on the basic condition that OxyChem remain free to pursue contribution from the 100+ other responsible parties who should pay their fair shares is consistent with OxyChem's longstanding practice of cooperating first and seeking contribution second.

#### B.　Attempts to Achieve an Agreement with Proposed Work Parties

To further cooperate with EPA, and promptly on receiving EPA's March Notice Letter, OxyChem reached out to those public and private parties who also received the Notice Letter to seek early opportunities to meet to discuss the letter and responses to it. We have met several times with each group since then.

The private parties understand—as do the public entities—that work to implement any remedy in OU2 and OU4 cannot begin without active support from, and access to essential facilities made available by, the public entities. Accordingly, on March 21, representatives of OxyChem met in person with representatives of the PVSC and the municipalities to discuss the in-kind contributions they could provide toward implementation of the work specified in the Notice Letter. OxyChem provided to the governmental entities a list of properties and potential services they might offer to further an in-kind contribution to implement the work specified in the Notice Letter. The public entities advised OxyChem, however, that they cannot respond to these requests for assistance because they lack information about what EPA would consider a *sufficient* contribution from them for purposes of a good faith offer. OxyChem remains willing to work

---

filed suit seeking to enjoin the dredging of the Matagorda Bay shipping channel, citing the hazards associated with disturbing contaminated sediment. *See* Case No. 1:22-cv-1470, *San Antonio Bay Estuarine Waterkeeper, et al. v. Connor, et. al.*, in the U.S. District Court for the District of Columbia. No party can undertake to perform, or be penalized for failing to perform, when the project is enjoined or tied up in litigation.

toward an agreement for in-kind contribution from these public entities, if EPA will clarify what it expects those entities to provide.

Representatives of OxyChem also met remotely on a number of occasions with representatives of three of the private work parties who also received the Notice Letter: Nokia, Pharmacia, and Public Service Electricity & Gas. Work party PMC Global refused to attend any meetings and has declined OxyChem's request to provide input on a proposed offer.

Unfortunately, beyond sharing these concerns, OxyChem's attempts to negotiate an agreed response to EPA's Notice Letter with the private work parties failed. Ignoring their own significant liabilities, those parties are adamant that they too want EPA to "cash them out" in an agreement that would allow them to walk away before the enormous, decade-long work necessary to implement the remedial actions in the OU2 and OU4 RODs has even begun. They appear to intend to urge the United States to place the entire burden of performance on a *single* party, OxyChem, despite the fact that it bears *no liability* for six of the chemicals of concern, is only partially responsible for the other two, and is not *solely* liable for *any* hazardous substance in the Passaic River.

Despite the inability to reach an agreement to date, OxyChem's efforts to negotiate with the other public and private parties that received the Notice Letter demonstrate its good faith, as EPA has recognized. *See* May 25, 2022 Email from J. Fajardo to L. Silver *et al.*; *see also* May 31, 2022 Letter from E. Wilson to OxyChem *et al*. at 1 ("EPA understands the parties participated in the convening process in good faith . . . ."). This letter continues OxyChem's ongoing, good faith actions to respond to EPA's requests for assistance in implementing the remedies at OU2 and OU4.

C. **Good Faith is Reciprocal**

OxyChem intends to continue to cooperate with EPA in a manner consistent with the twin principles Congress embodied in CERCLA; namely, that all responsible parties must pay their fair shares of the costs to clean up hazardous substances for which they are responsible and that parties who perform are entitled to pursue contribution for the costs of that performance from parties who refuse to pay their fair shares. This is a good faith offer: CERCLA squarely permits OxyChem to perform while it retains and pursues remedies the law guarantees.

If EPA accepts OxyChem's offer, OxyChem will negotiate with the work parties—with EPA's good faith and reasonable support—timely agreements to achieve the scopes of work described above. Preserving OxyChem's contribution claims provides an essential *incentive* to these agreements. It allows OxyChem to perform with the assurance that it will bear only its fair and equitable share of the costs as determined by the Court, as Congress intended. And it ensures timely cooperation by other work parties. To be blunt, in the absence of OxyChem's contribution claims, other responsible parties will continue to evade their responsibilities to clean up contamination they caused.

To accede to the private work parties' pleas to be permitted to walk away from their obligations would be contrary to EPA's guidance and its promises to the public. It would also be unsound as a matter of principle. EPA assured the public that the "ubiquitous contamination" it found in the Passaic River would be remedied by *all* responsible parties who would be required to *carry out* the work to remedy pollution they caused. No party with significant responsibility (and certainly none of the work parties identified by EPA or other parties with demonstrated significant responsibility) should be relieved of all liability or have their liability capped *before* the work mandated in OU2 and OU4 is completed.

In contrast to actions that would protect polluters from the responsibility Congress imposed on them to *clean up* their own pollution, agreeing to these terms and Required Conditions with OxyChem affords EPA and communities along the Passaic River important and near-term benefits:

- OxyChem has a demonstrated history of delivering timely, efficient, and compliant performance of tasks it agrees to perform at the Site;

- OxyChem's offer to design the interim remedy in OU4 ensures that remedy will be consistent with and complement the OU2 95% Design OxyChem has already performed and submitted to EPA;

- Allowing OxyChem to coordinate the sequencing of the work in OU4 ahead of work in OU2 will minimize the risk that construction of the upriver remedy in OU4 would impair a downstream remedy in OU2; and

- OxyChem's coordinated work on both remedies will advance the timely conclusion of the remedial action in both operable units and may also shorten the implementation timetable that would otherwise be required in OU4.

EPA's agreement not to attempt to bar OxyChem's contribution claims is also in the public interest.

First, requiring responsible parties to carry out the work keeps EPA's promises to the public. *See, e.g.*, Letter from Eric J. Wilson, EPA Region 2 September 18, 2017 (EPA's view that "the private PRPs responsible for the release of dioxins, furans, and/or PCBs will *perform* the OU2 remedial action has not changed." (emphasis added)).

Second, premature settlement with other parties who bear significant responsibility for pollution in OU2 would impair the public interest. Discovery in the CERCLA case is still underway. Parties alleged to bear responsibility for polluting the Passaic River will be required to give sworn testimony pertaining to their liability in the near term. For some (and perhaps many) parties, evidence from the CERCLA case may refute the certifications OxyChem understands each party must provide to the United States in connection with any settlement, making attempts to settle with those parties a highly uncertain and legally groundless exercise for EPA.

Third, there is no basis on which EPA could or should settle with any party in OU4. Neither the private PRPs nor EPA has convened an allocation process pertaining to the interim remedy specified in OU4 ROD. To the contrary, the allocation process EPA initiated with David Batson and his firm, AlterEcho, was limited solely to OU2.

Finally, the condition that EPA must confirm it will take no action to impair or bar OxyChem's contribution claims is nothing more than what CERCLA Section 308 and the Constitution require. CERCLA's policies are vindicated when, as OxyChem seeks here, EPA preserves OxyChem's statutory right to seek contribution from other parties to recover the response costs OxyChem has borne (and those it will bear) in both operable units. In neither case does EPA have statutory authority to bar OxyChem's contribution claims for costs that OxyChem alone has borne or committed to bear at the Site.

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Eleven

In extending this offer, OxyChem emphasizes its consistent cooperation with EPA. OxyChem has worked efficiently and well to design the OU2 remedy. We desire to continue that cooperative relationship. Permitting OxyChem—at its own expense—to pursue cost recovery and contribution from other responsible parties is in the public interest. It saves the United States enormous costs, holds responsible parties accountable, and eliminates the unneeded costs of pursuing unconfirmable settlements on terms that violate CERCLA. It will also expedite implementation of the remedies. And, as CERCLA mandates, it ensures all responsible parties pay their fair shares of the costs as determined by the District Court for the District of New Jersey or other federal district court.

All of this would be another enormous step forward at the Site. We look forward to discussing this with EPA at your earliest convenience.

OxyChem reserves all rights it has at law, in equity, and under the United States Constitution.

Very truly yours,

Charles F. Weiss
Senior Vice President of
Environmental and Sustainability
Charles_Weiss@oxy.com

cc:

**EPA Headquarters:**

Mr. Lawrence Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
Starfield.Lawrence@epa.gov

Mr. Barry Breen
Acting Assistant Administrator
Office of Land and Emergency Management
Breen.Barry@epa.gov

**Region 2:**

Mr. Pat Evangelista
Director, Superfund and Emergency Management Division, EPA Region 2
Evangelista.pat@Epa.gov

Mr. Walter Mugdan
Deputy Regional Administrator, EPA Region 2
Mugdan.Walter@epa.gov

Mr. Paul Simon
Regional Counsel, EPA Region 2
simon.paul@epa.gov

Ms. Sarah Flanagan
Chief of NJ Superfund Branch, EPA Region 2
Flanagan.Sarah@epa.gov

Mr. Juan Fajardo
Assistant Regional Counsel, EPA Region 2
Fajardo.juan@Epa.gov

Ms. Frances Zizila
Assistant Regional Counsel, EPA Region 2
Zizila.Frances@epa.gov

Mr. Michael Sivak
Chief of Mega Projects, EPA Region 2
Sivak.Michael@epa.gov

**DOJ:**

Mr. Brian Donohue
U.S. Department of Justice
Brian.Donohue@usdoj.gov


Ms. Laura Rowley
U.S. Department of Justice
Laura.Rowley@usdoj.gov