**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

| | | |
|---|---|---|
| OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) | Hon. Madeline Cox Arleo Hon. Magistrate Leda D. Wettre |
| Plaintiff, | ) ) ) | Civil Action No. 2:18-CV-11273 (MCA-LDW) |
| v. | ) ) ) ) ) | **THE SMALL PARTIES GROUP'S OPPOSITION TO OCCIDENTAL CHEMICAL CORPORATION'S MOTION FOR PROTECTION** |
| 21ST CENTURY FOX AMERICA, INC., et al., | ) ) ) ) | **FROM THE SMALL PARTIES GROUP'S NOTICES OF RULE 30(b)(6) DEPOSITION OF OCCIDENTAL CHEMICAL CORPORATION** |
| Defendants and Third Party Plaintiffs, | ) ) | |
| v. | ) ) | |
| PASSAIC VALLEY SEWERAGE COMMISSIONERS, et al., | ) ) ) | |
| Third-Party Defendants. | ) ) | |

i

19885347.1

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**...................................................................................iv

**INTRODUCTION**...................................................................................................1

**BACKGROUND**.....................................................................................................3

**LEGAL STANDARD**.............................................................................................4

**ARGUMENT**..........................................................................................................6

    I.    **It is Premature to Set the Number of Hours Needed for OxyChem's Rule 30(b)(6) Deposition, but Six Hours of Questioning is Insufficient for a Deposition of this Scope and Significance**...........................6

    II.    **Defendants Are Entitled to Question OxyChem About the Factual Bases for its Claims Against Them.**..................................................9

    III.    **OxyChem Cannot Shield Relevant Information from Discovery Simply Because Such Information Also Relates to a Facilities or Operations Other Than the Lister Plant**.....................................................11

    IV.    **OxyChem Has Opened the Door to Inquiry Regarding its Financial Condition and Ability to Pay, and Even if it Hadn't, Such Information is Relevant to Any CERCLA Equitable Allocation Under the "Torres Factor" Framework.**......................................................13

    V.    **OxyChem May Not Leverage its Long and Convoluted Corporate History and Structure to Skirt Discovery.**........................................15

    VI.    **That Other Entities Might Share Knowledge of Relevant Information is Not Grounds to Shield OxyChem from Inquiry.**...............................16

        a)   Tierra/Maxus.................................................................................17

        b)   Ownership of or Occurrences at the Lister Property While It Was Owned by Other Entities...............................................18

    VII.    **Inclusion of Newark Bay in the Definition of the DASS Does Not Violate the Parties' Stipulation Concerning Newark Bay, as Reflected in OxyChem's Own Notices.**...........................................20

19885347.1

**VIII.**    **Topic 2.22 Regarding OxyChem's Involvement with the Lister Property or DASS from 1970 to Present is Temporally and Geographically Limited and Seeks Only Relevant Information** ........................21

**IX.**    **The SPG is Entitled to Discovery Regarding OxyChem's Delay of the Cleanup and Failure to Accept Responsibility.**.......................................................22

**CONCLUSION**. ..................................................................................................22

19885347.1

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adelman v. Boy Scouts of Am.*, 276 F.R.D. 681 (S.D. Fla. 2011) ................................................ 16

*Baker v. PPL Corp.*, No. 1:09-CV-428, 2011 WL 1811106 (M.D. Pa. May 12, 2011) ................. 7

*Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108 (3d Cir. 1986). ...................................................... 5

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.*, 609 A.2d 440 (N.J. Super App. Div. 1992) ................................................................................................................................................ 8

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.*, No. C-3939-84 (N.J. Super. Ct. Chancery Div. Apr. 12, 1989) ...................................................................................................... 8

*Gen. Nutrition Corp. v. Gardere Wynne Sewell, LLP*, No. 2:08-CV-831, 2009 WL 1598405 (W.D. Pa. June 5, 2009) ....................................................................................... 9, 15

*In re Riddell Concussion Reduction Litig.*, 2016 U.S. Dist. LEXIS 178342 (D.N.J. Jan. 6, 2016) ................................................................................................................... 10

*Johnson v. Geico Cas. Co.*, 269 F.R.D. 406 (D. Del. 2010) ........................................................... 5

*Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016) .......................................................................................................................... 13

*Munich Reinsurance Am., Inc. v. Am. Nat. Ins. Co.*, No. CIV.A. 09-6435 FLW, 2011 WL 1466369 (D.N.J. Apr. 18, 2011) ................................................................................................... 5

*N.J. Dep't of Envtl. Prot. v. Occidental Chem. Co.*, No. ESX-L9868-05, Consent Judgment (Super. Ct. N.J. Dec. 12, 2013) ..................................................................................................... 8

*Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101 (D.N.J. 1990) .............................. 4

*New Jersey Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, No. 98CV4781WHWCLW, 2017 WL 498710 (D.N.J. Feb. 7, 2017) ................................................................................................ 5

*Nippo Corp./Int'l Bridge Corp. v. AMEC Earth & Env't, Inc.*, No. CIVA 09-CV-0956, 2009 WL 4798150 (E.D. Pa. Dec. 11, 2009) ........................................................................................ 9

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) ............................................................ 4

*Radian Asset Assur., Inc. v. Coll. of the Christian Bros. of New Mexico*, 273 F.R.D. 689 (D.N.M. 2011) .............................................................................................................................. 9

*Sanofi-Aventis v. Sandoz, Inc.*, 272 F.R.D. 391 (D.N.J. 2011) ................................................. 4, 5

*Standard Fire Ins. Co. v. F & S Boatworks, Inc.*, No. CIV.A.07-132-JJF, 2008 WL 2647353 (D. Del. July 2, 2008) .................................................................................................................... 9

*Tele-Radio Sys., Ltd. v. De Forest Elecs, Inc.*, 92 F.R.D. 371 (D.N.J. 1981) ................................ 5

*Trinity Indus., Inc. v. Greenlease Holding Co.*, 173 F. Supp. 3d 108 (W.D. Pa. 2016), 903 F.3d 333 (3d Cir. 2018) ........................................................................................................................ 13

*United States v. Davis*, 31 F. Supp. 2d 45 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001) ......... 13

*Villlari v. Terminix Int'l, Inc.*, No. CIV.A. 85-1363, 1988 WL 35905 (E.D. Pa. Apr. 14, 1988) ............................................................................................................ 16

*Williams v. Swack*, No. 13-CV-00974-WMS-JJM, 2016 WL 3536574 (W.D.N.Y. June 29, 2016) ............................................................................................................ 16

*Yerkes v. Weiss*, CV 17-2493 (NLH/AMD), 2019 WL 12056384 (D.N.J. Sept. 30, 2019) ....... 5, 9

**Rules**

Fed. R. Civ. P. 26 .................................................................................................... 4, 5, 6, 10, 16

Fed. R. Civ. P. 30 ............................................................................................................... 4, 6

19885347.1

**INTRODUCTION**

After dozens of Defendants sat for their Rule 30(b)(6) depositions without incident or the need for motion practice, OxyChem once again seeks to apply a narrower discovery standard to itself than it applies to the Defendants in this action. In its Letter Motion for Protection from the SPG's Notice of Rule 30(b)(6) Deposition of OxyChem (ECF No. 2227) ("Letter Motion"), OxyChem raises nine issues with the SPG's notices of deposition, implicating at least 29 topics. The scope of the Letter Motion is in stark contrast to the *seven* topics OxyChem initially objected to,[1] four of which the SPG agreed to remove or modify at OxyChem's request.[2] The Letter Motion is also much broader in scope than the seven *additional* objections OxyChem raised on September 14, five-and-a-half months after the SPG sent its draft notices and two-and-a-half months after the parties met and conferred regarding OxyChem's first round of objections. At the eleventh hour, and without any prior notice, OxyChem seeks to drastically limit the scope of what is undoubtedly the most significant deposition in this case. Each of the topics noticed seeks relevant information proportional to the needs of the case.

None of the nine issues OxyChem takes with the SPG's notices establishes good cause for a protective order for the following reasons:

1. Until OxyChem designates specific witnesses to cover specific topics, it is premature to set an overall time limit for OxyChem's Rule 30(b)(6) deposition. What is clear, however, is six hours of questioning is plainly insufficient in light of the number of parties in the case and the complexity of the issues.

---

[1] *See* May 26, 2022 Ltr from OxyChem (ECF No. 2227-5) at 7 ("OxyChem will not produce a designee regarding (a) Topics 1, 2, 3, 4, 11, and 12 in the SPG's 'Notice 1' and (b) Topic 18 in the SPG's 'Notice 2'").

[2] *See* Sept. 20, 2022 Ltr from SPG (ECF No. 2227-6) at 2 ("As to the substance of OxyChem's proposed revisions to Topics 1, 3, and 4 in Notice No. 1, the SPG will incorporate any such revisions into a revised notice. The SPG agrees to remove Topic 2 in Notice No. 1 at this time.").

19885347.1

2. Each defendant should be afforded a fair opportunity to question OxyChem about the factual bases for its claims against them, as well as other party-specific issues.

3. OxyChem cannot shield relevant information from discovery simply because such information also relates to facilities or operations other than OxyChem's facility at 80-120 Lister Avenue in Newark, New Jersey (the "Lister Plant").

4. OxyChem has opened the door to inquiry regarding its financial condition and ability to pay, and even if it hadn't, such information is relevant to any CERCLA equitable allocation under the "Torres Factor" framework.

5. OxyChem may not leverage its long and convoluted corporate history and structure to skirt discovery.

6. That other entities might share knowledge of relevant information is not grounds to shield OxyChem from inquiry.

7. The notices' inclusion of Newark Bay in the definition of the Diamond Alkali Superfund Site does not violate the parties' stipulation concerning Newark Bay, as reflected in OxyChem's own notices of Rule 30(b)(6) depositions to Defendants.

8. The topic regarding OxyChem's involvement with the Lister Property or the Diamond Alkali Superfund Site from 1970 to present is temporally and geographically limited and seeks only relevant information.

9. The SPG is entitled to discovery regarding OxyChem's delay of the cleanup and failure to accept responsibility.

For all of these reasons, as explained in more detail below, OxyChem's Letter Motion should be denied.[3]

---

[3] As the Court is aware, on December 20, 2022, all Defendants sought leave to file an Unopposed Motion for a Stay of Proceedings ("Motion to Stay") in light of a settlement agreement between most Defendants and the United States addressing the settling Defendants' responsibility for costs at issue in this litigation. *See* ECF No. 2246. Moreover, all parties—including OxyChem—agreed to stay all pending or scheduled discovery and discovery disputes while the Motion to Stay is pending. *See* Dec. 21, 2022, Ltr. from SPG to Special Master, attached as Ex. 1. In the event the Court grants the Motion to Stay, OxyChem's Letter Motion would be obviated at least for the duration of the stay. Because the Motion to Stay has not yet been granted, however, the SPG files this opposition as previously scheduled.

2

## BACKGROUND

On March 18, 2022, the SPG informed OxyChem that it would provide draft Rule 30(b)(6) deposition notices for OxyChem and several of its consultants prior to a meet-and-confer regarding deposition scheduling.[4] On April 1, the SPG served two draft Rule 30(b)(6) notices of deposition of OxyChem.[5] The notices currently before the Court are narrowed versions of those draft notices.

OxyChem sent a letter to the SPG on May 26, objecting to seven of the topics in the draft notices and stating that it would produce a designee for the others.[6] On July 1, the parties met and conferred regarding the objections in OxyChem's May 26 letter. As a result of the meet-and-confer, OxyChem said it would propose revised language for four topics. For its part, the SPG said it would revisit the remaining three topics objected to, seek to narrow them per the concerns raised by OxyChem, and incorporate all changes into a revised notice once it received OxyChem's proposed revisions.

After not hearing from OxyChem on this issue for more than two months, the SPG received a letter from OxyChem on September 14 that contained several *additional* objections to the SPG's notice topics.[7] OxyChem's September 14 letter also finally included the proposed revised language for three of the four topics as to which OxyChem previously agreed to propose revisions and asked that the fourth topic be struck. On September 20, the SPG sent OxyChem a letter in which it agreed to remove or modify the four topics as requested by OxyChem and agreed to meet and confer with OxyChem regarding its additional objections.

---

[4] Mar. 18, 2022 Ltr. From SPG to OxyChem, attached as Ex. 2.
[5] Apr. 1, 2022 Email from SPG to OxyChem, attached as Ex. 3.
[6] *See* May 26, 2022 Ltr from OxyChem (ECF No. 2227-5) at 7 ("OxyChem will not produce a designee regarding (a) Topics 1, 2, 3, 4, 11, and 12 in the SPG's 'Notice 1' and (b) Topic 18 in the SPG's 'Notice 2'").
[7] Sept. 14, 2022 Ltr from OxyChem to SPG (ECF No. 2227-1).

19885347.1

On September 29, the parties met and conferred again regarding OxyChem's additional objections. At the close of that conference, the parties agreed that they had made all the progress they could; the SPG would issue final notices that modified, narrowed, or removed numerous topics per OxyChem's requests; and OxyChem could file a motion for protective order if the final notices failed to satisfactorily resolve any of the issues it raised. The SPG sent two final notices to OxyChem, which were narrowed based on the parties' meet-and-confers.[8]

More than a month later, on November 9, OxyChem sent the SPG a 43-page set of objections to the SPG's notices, including many new objections not previously made and identifying several additional issues for which it would not designate a witness. OxyChem's objections further left it unclear in many instances whether its objections meant it wouldn't designate a witness on a certain issue or not.

On December 2, OxyChem filed the Letter Motion for protective order largely addressing the new objections that it failed to raise during half a year of meet-and-confers.

## LEGAL STANDARD

Federal Rule of Civil Procedure 30(b)(6) provides that

> [i]n its notice . . . a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. . . . The persons designated must testify about information known or reasonably available to the organization.

The scope of topics on which a corporate designee can be expected to testify is defined by Rule 26(b)(1). *Sanofi-Aventis v. Sandoz, Inc.*, 272 F.R.D. 391, 393 (D.N.J. 2011). Rule 26(b)(1)

---

[8] Oct. 6, 2022, Email from SPG to OxyChem, attached as Ex. 4.

provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Courts construe Rule 26 "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990).

Once the noticing party has provided topics of examination with "reasonable particularity, the burden shifts to "the party proffering the Rule 30(b)(6) deponent to prepare the witness so he or she can answer the questions posed fully and accurately." *Yerkes v. Weiss*, CV 17-2493 (NLH/AMD), 2019 WL 12056384, at \*2 (D.N.J. Sept. 30, 2019) (quoting *New Jersey Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, No. 98CV4781WHWCLW, 2017 WL 498710, at \*2 (D.N.J. Feb. 7, 2017) (alterations omitted)). This duty "goes beyond matters personally known to the designee or to matters in which the designee was personally involved." *Am. Thermoplastics Corp.*, 2017 WL 498710, at \*2 (quotation marks omitted). The duty includes information "known or reasonably available to the organization." *Id.* (quoting *Sanofi-Aventis*, 272 F.R.D. at 393). Even if "documents are voluminous and the review of the documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed." *Id.* (quotation marks omitted). A party is required to designate more than one deponent if necessary to respond to areas of inquiry noticed. *Yerkes*, 2019 WL 12056384, at \*3.

For good cause shown, a court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c)(1). "[T]he party resisting discovery has the burden of clarifying and explaining its objections to provide support therefor." *Munich Reinsurance Am., Inc. v. Am. Nat. Ins. Co.*, No. CIV.A. 09-

6435 FLW, 2011 WL 1466369, at *10 (D.N.J. Apr. 18, 2011) (quoting *Tele-Radio Sys., Ltd. v. De Forest Elecs, Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981)). This requires the party seeking protection to show "with specificity" that the discovery resisted "will work a clearly defined and serious injury." *Id.* (quoting *Johnson v. Geico Cas. Co.*, 269 F.R.D. 406, 415 (D. Del. 2010)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). OxyChem has not met, and cannot meet, this standard here.

## ARGUMENT

### I.      It is Premature to Set the Number of Hours Needed for OxyChem's Rule 30(b)(6) Deposition, but Six Hours of Questioning is Insufficient to Cover the Necessary Scope of OxyChem's Deposition.

It is premature to put a limitation on the number of days or hours for OxyChem's Rule 30(b)(6) deposition, but given the scope and complexity of this litigation OxyChem's argument that the total deposition time should be limited to 6 hours is disingenuous and at odds with the law.

OxyChem's request for protection on this basis is premature because the parties will not know the presumptive limit for the duration of OxyChem's deposition until we know the number of individuals OxyChem will designate. The Advisory Committee Notes to the 2000 amendments to Rule 30 provide that "For purposes of the durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition." The Amended Protocol for Depositions (ECF No. 2060) ("Deposition Protocol") contains a similar provision. (ECF No. 2060 ¶ D.4.) Because the number of designees is unknown, the presumptive limit is yet to be determined. Thus, OxyChem's assertion that a five-day deposition would be five-times longer than the presumptive limit in the Deposition Protocol is unfounded.

19885347.1

Regardless of the number of designees, well more than six hours will be required to take OxyChem's Rule 30(b)(6) deposition. Notwithstanding the presumptive limits, Fed. R. Civ. P. 30(d)(1) provides that courts "*must* allow additional time consistent with Rule 26(b)(2) if needed to fairly examine the deponent . . . ." (emphasis added).

> [W]here, as here, a deposition entails examination of allegations spanning many years, and involves consideration of thousands of pages of written material, courts have held that the proper exercise of discretion under Rule 30(d)(1) is to extend the duration of a deposition beyond the 7 hour limit generally prescribed by the rule. *In re Intel Corp. Microprocessor Antitrust Litigation*, No. 05–1717, 2008 WL 53377979 (D.Del. Dec. 18, 2008) (authorizing 14 and 15 hour depositions in case where testimony spans events covering 8 years, and entails review of thousands of pages of material).

*Baker v. PPL Corp.*, No. 1:09-CV-428, 2011 WL 1811106, at *3 (M.D. Pa. May 12, 2011).

The Deposition Protocol contains a similar exception to its presumptive limits. While negotiating the Deposition Protocol, the parties contemplated that certain depositions would exceed the presumptive time limit for Rule 30(b)(6) depositions. The Deposition Protocol's presumptive limit contained the caveat that "parties will not unreasonably withhold consent to requests for additional time, through the meet and confer process . . . if necessary to fairly complete a Rule 30(b)(6) deposition of a party in the case." (ECF No. 2060 ¶ D.4.) If there is any deposition in this case that justifies time beyond the presumptive limit, it is OxyChem's the Rule 30(b)(6) deposition of OxyChem, the party who is overwhelmingly responsible for the dioxin contamination in one of the most dioxin-contaminated rivers in the world.

The breadth and volume of material to be covered to fairly examine OxyChem, as well as the significance of its deposition, easily warrants enlargement of the presumptive time limits in the rules and the Deposition Protocol. OxyChem chose to sue scores of parties. In the usual course, a defendant has the right to examine a plaintiff about the claims against it. The Advisory Committee Notes to the 1993 Amendment of Rule 30 provide that "[i]n multi-party cases, the need

7

for each party to examine the witness may warrant additional time, although duplicative questioning should be avoided and parties with similar interest should strive to designate one lawyer to question about areas of common interest." This is exactly what the SPG is doing here. Rather than have 116 parties examine OxyChem, the SPG is endeavoring to ask common questions on behalf of the SPG. The accommodations made by Defendants have made discovery less burdensome for OxyChem, but they cannot be used as grounds for precluding Defendants from relevant discovery.

In addition to the number of parties, OxyChem's Rule 30(b)(6) deposition will necessarily be complex and broad in scope. The Advisory Committee Notes to Rule 30's 2000 amendments provide that "if the examination will cover events occurring over a long period of time, that may justify allowing additional time." OxyChem has a lengthy history at the Site, including but not limited to decades of pollution through multiple successor organizations dating back at least to the 1940s; decades as the primary target of enforcement activities by federal and state regulators; public relations, lobbying, and scientific efforts carried out by OxyChem to minimize its own responsibility and cast blame on others; and the ongoing remedial design of Operable Unit 2 of the Diamond Alkali Superfund Site ("OU2"). Indeed, it cannot be seriously argued that OxyChem does not bear the overwhelming responsibility for cleaning up the Lower Passaic River.[9] As OxyChem states in its Letter Motion, "the Diamond Alkali Superfund Site [is] the heart of this litigation." (Letter Mot. at 6.) OxyChem complains about the burden of examination regarding its

---

[9] *See Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.*, No. C-3939-84 (N.J. Super. Ct. Chancery Div. Apr. 12, 1989) (unpublished) (finding that OxyChem's predecessor directly discharged dioxin to the river); *Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.*, 609 A.2d 440 (N.J. Super App. Div. 1992) (finding that OxyChem's actions were egregious, even by the standards of the 1950s and 1960s); *N.J. Dep't of Envtl. Prot. v. Occidental Chem. Co.*, No. ESX-L9868-05, Consent Judgment (Super. Ct. N.J. Dec. 12, 2013) (resulting in a settlement with the State of New Jersey in which OxyChem-related entities were required to pay 90% of costs).

8

80 years of activity at the Diamond Alkali Superfund Site ("DASS"), but the duration of relevant events is grounds for additional examination, not less.

Indeed, the significance of the Rule 30(b)(6) deposition of OxyChem cannot be overstated. It implicates more than 100 Defendants' right to fairly question OxyChem regarding its claims against them and their counterclaims against OxyChem. The need for Defendants to take discovery on these issues is the inevitable result of OxyChem's decision to sue more than 100 parties rather than participate in the EPA-administered allocation process.

## II. Defendants Are Entitled to Question OxyChem About the Factual Bases for its Claims Against Them.

OxyChem asserts, without legal support, that Defendants should not be able to question OxyChem about Defendants' own operations. Yet OxyChem ignores that its complaint contains over one hundred pages of allegations about Defendants' operations. *See* OxyChem's Am. Compl. (ECF No. 1247) at pp. 55-194. Defendants are entitled to question OxyChem about the bases for these allegations. *See Nippo Corp./Int'l Bridge Corp. v. AMEC Earth & Env't, Inc.*, No. CIVA 09-CV-0956, 2009 WL 4798150, at *4 (E.D. Pa. Dec. 11, 2009) (denying plaintiff's motion for protection from Rule 30(b)(6) deposition because, *inter alia*, "Defendant should be permitted to explore the facts and circumstances known to Plaintiff so that Defendant can ascertain and determine the nature of the allegations made against it"); *Gen. Nutrition Corp. v. Gardere Wynne Sewell, LLP*, No. 2:08-CV-831, 2009 WL 1598405, at *2 (W.D. Pa. June 5, 2009) (holding that defendant was "entitled to probe the extent of GNC's factual basis for its allegations"); *Standard Fire Ins. Co. v. F & S Boatworks, Inc.*, No. CIV.A.07-132-JJF, 2008 WL 2647353, at *1 (D. Del. July 2, 2008) (denying protection from Rule 30(b)(6) depositions noticed "to ascertain the factual basis of Plaintiff's allegations").

OxyChem's claim that this issue was resolved by the Special Master's order regarding contention interrogatories is off base for two reasons. First, the notice topics at issue only seek information concerning OxyChem's *factual* allegations; they do not seek the factual bases for OxyChem's *legal* conclusions and thus cannot be properly characterized as "contention" topics.

Second, even if the questions concerning Defendants' operations could be considered contention questions, such inquiries are appropriate at a Rule 30(b)(6) deposition. *See Yerkes*, 2019 WL 12056384, at *6 n.2 ("A party may make inquiries similar to contention interrogatories at a 30(b)(6) deposition" (collecting cases); *Radian Asset Assur., Inc. v. Coll. Of the Christian Bros. of New Mexico*, 273 F.R.D. 689, 691–92 (D.N.M. 2011) (reasoning that permitting Rule 30(b)(6) inquiries similar to contention interrogatories "will ultimately lead to fewer disputes about what subject matter is permitted in 30(b)(6) depositions and advance[] the policy underlying the rules favoring disclosure of information"). OxyChem cites no case law to the contrary. Indeed, OxyChem's position is at odds with the position it took, and case law it cited, when it sought to avoid contention interrogatories. As the Special Master noted in his decision denying the SPG's motion to compel responses to its contention interrogatories, OxyChem cited *In re Riddell Concussion Reduction Litig.*, 2016 U.S. Dist. LEXIS 178342, at *6 (D.N.J. Jan. 6, 2016), for the proposition that "*if defendants want to receive immediate answers under oath, they may question plaintiffs at depositions*."[10] OxyChem cannot have it both ways. The Special Master's prior order stands for the exact opposite proposition than what OxyChem cites it for: rather than precluding contention-like interrogatories at deposition, it cited the availability of such questioning as a reason the SPG did not need immediate responses to contention interrogatories.

---

[10] ECF No. 1249 at 6 (emphasis added).

OxyChem absurdly suggests that the Special Master's requirement that OxyChem answer contention interrogatories later in the case precludes deposition questioning pertaining to the bases for OxyChem's claims. Neither the propriety nor timing of contention-like deposition questions has been before the Special Master prior to the instant motion. Because contention-like deposition inquiry is generally permitted, because the Federal Rules do not prescribe any particular sequence for discovery, Fed. R. Civ. P. 26(d)(2)(A), and because questioning concerning the factual bases for OxyChem's allegations against them is essential to Defendants' preparation of their defense— including to identify additional discovery that might be needed—the Defendants should not be forced to wait until the close of discovery to ask these questions. Late responses to interrogatories are not an adequate substitute for deposition examination. There is no substitute for a live witness.

### III.    OxyChem Cannot Shield Relevant Information from Discovery Simply Because Such Information Also Relates to Facilities or Operations Other Than the Lister Plant.

OxyChem takes issue with topics concerning two relevant issues in this case—OxyChem's knowledge of dioxin and other COCs and its interpretation of the 1986 Stock Purchase Agreement ("SPA")—merely because those issues may incidentally touch on facilities or operations other than the Lister Plant. (Letter Mot. at 5–7.) It does so by drawing a false equivalency between six notice topics, on the one hand, and a prior document request for which OxyChem obtained protection, on the other. But there can be no comparison between the two. The prior document request sought "All Documents referring to Your involvement and knowledge of Love Canal," another infamous dioxin-contaminated site for which OxyChem is responsible.[11] In contrast, none of the notice topics is targeted at any site other than the Diamond Alkali Superfund Site. Rather, the topics at issue seek information concerning (a) OxyChem's knowledge and/or experience with

---

[11] *See* ECF No. 1380 at 2.

dioxin and other COCs, and (b) OxyChem's and Maxus Energy Corporation's ("Maxus") course of performance and enforcement of the indemnity provision in the 1986 SPA. While true that these topics are not limited the Lister Plant or DASS, these particular topics are relevant to the DASS even if they relate to other facilities or operations.

First, whether gleaned from the Lister Plant or elsewhere, OxyChem's knowledge of and experience with dioxin is relevant to the Gore and Torres factors of (a) degree of toxicity; (b) degree of care, (c) cooperation, and (d) culpability. *See Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 1233 (D.D.C. 2014) (setting forth Gore and Torres factors for equitable allocation under CERCLA). If, for example, OxyChem learned of dioxin's singular toxicity through its experience at another site, and then continued to discharge dioxin to the Passaic River, that would go to its degree of care and culpability. Moreover, such evidence of OxyChem's earlier knowledge would allow impeachment of OxyChem's efforts to downplay dioxin's toxicity in this case. It would be fundamentally unfair to preclude the SPG from probing these issues simply because OxyChem may have derived its knowledge of dioxin from another site.

Similarly, the SPG should be able to probe whether in its course of performance under the 1986 SPA OxyChem took positions regarding the 1986 SPA that are inconsistent with its positions in this case. OxyChem has taken the position in this case that Maxus was not only its indemnitor, but is the "true and substantive successor" to Lister Plant-related liabilities.[12] This position is at odds with prior admissions by OxyChem that it is solely responsible for the liabilities and Maxus was involved only as indemnitor.[13] OxyChem's shifting positions justify inquiry into OxyChem's

---

[12] ECF No. 967 at 1.
[13] *See, e.g.*, Sept. 7, 2004 email from Daniel Steel of GSH to Mike Anderson of GSH, OCC-CER-SA00013398-00013399, attached as Ex. 5. (acknowledging that OxyChem "DOES own the problem" of Lister Plant-related liabilities via the stock purchase but costs were delegated to Tierra/Maxus via indemnity).

prior interpretations of the SPA, irrespective of whether such interpretations pertained to the Lister Plant.

Finally, even if these topics could be considered comparable to the document requests previously ruled upon, the proportionality analysis is different. The SPG does not disagree that Rule 26's scope of discovery standard applies to both document and deposition discovery. But the standard includes a proportionality analysis, and the proportionality analysis here is plainly distinguishable from that previously conducted by the Special Master. Rather than requiring OxyChem to collect, review, and produce *all* documents related to another site,[14] the SPG is merely asking OxyChem to designate a witness to provide information known or reasonably available to it regarding key issues in this case. There is no risk of overbreadth or of unduly expanding the scope of discovery because any discovery concerning other sites would be securely tethered to issues in  this case concerning the DASS.

### IV.    OxyChem Has Opened the Door to Inquiry Regarding its Financial Condition and Ability to Pay, and Even if it Hadn't, Such Information is Relevant to Any CERCLA Equitable Allocation Under the "Torres Factor" Framework.

Testimony regarding OxyChem's financial condition and its ability to pay for the cleanup of the LPRSA has been put squarely at issue in recent correspondence from OxyChem and is relevant under well-established CERCLA precedent concerning equitable allocations.

As an initial matter, the playing field has changed since this issue was last addressed. In August 2021, the Special Master protected OxyChem from document requests concerning its financial condition and ability to pay, citing the lack of a claim by OxyChem that it would be unable to pay.[15] Since then, on June 27, 2022, OxyChem submitted a letter to the United States in

---

[14] *See* ECF No. 1380 at 2.
[15] *See* ECF No. 1380 at 12.

which it disclaimed its ability to pay for the cleanup, stating that it could not provide financial assurance for the Operable Unit 4 ("OU4") and OU2 remedies.[16] (ECF No. 2100-1 at 4, 7.) Meanwhile, OxyChem still refuses to stipulate that it will not raise an inability-to-pay defense. Because it has refused to disclaim that its ability to pay is an issue and has affirmatively represented to the United States that it *is* an issue, OxyChem has put its financial condition at issue, and the SPG should be able to probe this topic during OxyChem's Rule 30(b)(6) deposition.

Whether expressly pleaded or not, OxyChem's financial condition and ability to pay are now unquestionably relevant in this case and require that the Court vacate its prior order to the contrary. In addition to the so-called "Gore Factors," courts around the country also invoke the so-called "Torres Factors" when conducting equitable allocations under CERCLA. *See Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 123 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016). Deriving from *United States v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001), and named after then-Judge Torres, the Torres Factors are as follows:

1. The extent to which cleanup costs are attributable to wastes for which a party is responsible.

2. The party's level of culpability

3. The degree to which  the party benefitted from disposal of the waste

4. ***The party's ability to pay its share of the cost.***

*Lockheed*, 35 F. Supp. 2d at 123 (citing *Davis*, 31 F. Supp. 2d at 63) (emphasis added). At least one district court in the Third Circuit has invoked the Torres Factors as a basis for an equitable

---

[16] OxyChem's claimed inability to fund the remedy is dubious and unsupported. OxyChem's corporate parent is Occidental Petroleum Corporation, *see* ECF No. 2, a petroleum company with a market capitalization of nearly $60 billion, which was experienced record profits in recent years

allocation. *See Trinity Indus., Inc. v. Greenlease Holding Co.*, 173 F. Supp. 3d 108, 227 (W.D. Pa. 2016), *aff'd in part, vacated in part on other grounds, remanded*, 903 F.3d 333 (3d Cir. 2018).

In conducting the equitable allocation in this case, the District Judge may well rely on the Gore Factors, the Torres Factors, or both. Accordingly, it would be error at this stage of the case to rely on only the Gore Factors in construing the scope of discovery. The Special Master's prior order stated "If there are no claims or defenses relating to the inability to pay, then related requests are outside the scope of discovery."[17]  Per Torres, OxyChem's CERCLA contribution claims *are*, as a matter of law, claims relating to the ability or inability to pay, and OxyChem has explicitly put its inability to pay at issue.

## V. OxyChem May Not Leverage its Long and Convoluted Corporate History and Structure to Skirt Discovery.

OxyChem has a long and convoluted corporate history and remarkably complex corporate structure. It should not be able to use that to shield relevant information from discovery. To address this, the SPG included in its notice topics a number of OxyChem affiliates, subsidiaries, and predecessors the SPG believes to have been involved with the DASS. OxyChem objected, claiming that some of the entities listed were not involved with the DASS. During the meet-and-confer process, the SPG invited OxyChem to specify which identified entities did not need to be listed in the notice. Since, then, however, OxyChem refused to provide any clarity and instead attempts to limit the entities about whom the SPG can inquire.

With respect to Topic 1.07, the SPG told OxyChem it would remove the language "and any other environmental remediation-related Subsidiaries and Affiliates of OCC," if OxyChem would confirm in writing that no environmental remediation-related Subsidiaries or Affiliates other than Glenn Springs Holdings, Inc. ("GSH") and Miller Springs Remediation Management,

---

[17] ECF No. 1380 at 12.

19885347.1

Inc. ("Miller Springs") had been involved at the DASS. OxyChem declined to do so. During a prior deposition, GSH's Director of Operations, who is primarily responsible for OxyChem's work on the OU2 remedial design, could not testify which entity has paid for the costs OxyChem seeks to recover in this litigation.[18] This only speaks to the complexity of the web of entities involved with the DASS and incurring the costs OxyChem seeks to recover in this case. The SPG is entitled to get to the bottom of this complexity.

With respect to Topic 1.06, OxyChem did not object to this in its May or September letters, so it was not a subject of the parties' meet and confers. The SPG could limit this to "OCC and related entities that have had some involvement with the DASS," but OxyChem has not been helpful in identifying who those entities are and are not. There is a fundamental asymmetry of information on this issue: OxyChem has greater knowledge of its corporate history, structure, and its affiliates' and subsidiaries' involvement with the DASS than the SPG has. The SPG's concern is avoiding a situation where an underinclusive topic leaves the SPG unable to obtain relevant discovery because its topics excluded a relevant entity. The SPG has done diligent investigation to identify entities it believes to be relevant to this action. OxyChem should not be able to exclude entities without identifying the entities it claims are not relevant and why.

## VI.   That Other Entities Might Share Knowledge of Relevant Information is Not Grounds to Shield OxyChem from Inquiry.

OxyChem does not contest the relevance of topics 1.05, 2.02, 2.07 through 2.10, 2.12 through 2.14, or 2.16.[19] Instead, it objects on the grounds that it can't testify as to information in the control of unrelated entities. This is not a proper basis for objection to Rule 30(b)(6) topics.

---

[18] Enrique Castro Dep. Tr., excerpts attached as Ex. 6, at 12:17-21, 127:11-18, 190:12-191:21, 194:5-25
[19] *See* Letter Mot. at 9-11.

As an initial matter, this ignores the standards for Rule 30(b)(6) depositions. Under that standard, OxyChem's obligation extends only to what is "known or reasonably available to" it. Fed. R. Civ. P. 30(b)(6). The SPG's topics do not expand the scope of this obligation, so OxyChem cannot claim an undue burden. *See Gen. Nutrition Corp.*, 2009 WL 1598405, at *2 ("if information is not 'known or reasonably available' to [corporate deponent] as to certain questions . . . , its representative(s) can simply state that").

Moreover, that information may be available from another source is not a proper basis to object to discovery. *See Williams v. Swack*, No. 13-CV-00974-WMS-JJM, 2016 WL 3536574, at *5 (W.D.N.Y. June 29, 2016); *Adelman v. Boy Scouts of Am.*, 276 F.R.D. 681, 699 n.18 (S.D. Fla. 2011); *Villlari v. Terminix Int'l, Inc.*, No. CIV.A. 85-1363, 1988 WL 35905, at *2 (E.D. Pa. Apr. 14, 1988). It is only if the discovery sought can be obtained from some other source that is *more convenient, less burdensome, or less expensive* that protection may be warranted. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). OxyChem has made no effort to make such a showing. Indeed, Maxus and Tierra Solutions, Inc. ("Tierra") are bankrupt, and the status of other entities implicated by these requests is unknown. OxyChem is apparently the only knowledgeable entity that (a) is solvent, (b) is party to this case, and (c) has a decades-long, nearly uninterrupted involvement with the Lister Plant and DASS. It is plainly the most convenient, least burdensome, and least expensive source of the information sought in these topics. Moreover, as discussed below, there is every reason to believe OxyChem is knowledgeable of the topics at issue.

    a.  <u>Tierra/Maxus</u>

With respect to topics involving Tierra and Maxus, OxyChem has been intimately involved with Tierra and Maxus for decades, and during this litigation has repeatedly emphasized its close relationship with those entities. Pursuant to the 1986 SPA, Maxus and Tierra were OxyChem's

17

indemnitor for OxyChem's Lister Plant-related liabilities until Maxus and Tierra filed for bankruptcy in 2016. OxyChem was entitled to be informed (and the record establish that it was kept informed) about Tierra and Maxus's activities in that role. Tierra and Maxus's management of OxyChem's liabilities on OxyChem's behalf is relevant to this case, and OxyChem cannot hide from that by saying it was Tierra or Maxus, not OxyChem, managing the liabilities. OxyChem acknowledges that it "owned" the Lister Plant-related liabilities despite having Tierra and Maxus as indemnitors.[20] So OxyChem had every reason to remain apprised of Tierra and Maxus's work related to the DASS managing OxyChem's own liabilities. Indeed, OxyChem's own briefing on the SPG's motion to compel documents OxyChem withholds as privileged asserts that OxyChem worked hand-and-glove with Maxus and Tierra for decades, purportedly sharing joint counsel and joint consultants.[21]

      b.   <u>Ownership of or Occurrences at the Lister Property While It Was Owned by Other Entities</u>

OxyChem has a lengthy history with the Lister Plant, and there is reason to believe it has knowledge of or information reasonably available to it concerning the issues in topics 2.02, 2.07, 2.08, 2.09, 2.12.

Topic 2.02 relates to notices, violations, or citations related to the Lister Property. OxyChem can't deny knowledge of such occurrences from when it and its predecessors owned and operated the plant. The Lister Property has been OxyChem's liability since at least 1986, so even if it did not own the property, it had an interest in notices, violations, or citations related to the property. Prior to that, OxyChem stands in the shoes of its predecessors and must testify to the

---

[20] *See, e.g.*, Ex. 5 (GSH acknowledging that OxyChem "DOES own the problem" of Lister Plant-related liabilities via the stock purchase but costs were delegated to Tierra/Maxus via indemnity).
[21] *See* Pl. OxyChem Resp. to SPG Mot. to Compel Production of Documents Withheld as Privileged or Protected (ECF No. 1102) at 1-2.

time period during which those predecessors owned and operated their plant. To the extent any information within this topic is not "known or reasonably available to" it, OxyChem is not required to prepare a witness to testify regarding that information, but it must make diligent inquiry to determine  the availability of such information. The parties and the Court do not have to accept OxyChem's "say so" on these topics without any diligent investigation.

Topic 2.07 relates to the closure of the Lister Plant in or around 1977. As the Special Master knows from previous briefing, the documentary evidence establishes that OxyChem controlled Chemicaland's operation of the Lister Property in 1976 and 1977, including testimony that OxyChem failed to have the site cleaned up upon its closure in 1977.[22] Maxus Energy Corporation previously brought claims against OxyChem related to this conduct.[23]

Topic 2.08 seeks information regarding insurance policies related to Lister Property. OxyChem owned the Lister Property for multiple decades, on multiple occasions, and through various entities. Surely it has knowledge of insurance policies related to the Property. And the rules limit OxyChem's obligation to insurance policies known or reasonably available to it.

Topic 2.09 relates to property interests regarding the Lister Property, including interests "held by an Persons or entities on Your behalf or for Your use." OxyChem has had its own property interests in the Lister Property and acknowledges in its Letter Motion that this topic also implicates Tierra's ownership, of which it is apparently aware.

Finally, Topic 2.12 seeks information regarding the presence of contamination at and ongoing release of Hazardous Substances from the Lister Property during the 1980s and 1990s and any related inspections, reports, notices of violation, or citations. As discussed above, the Lister

---

[22] *See* ECF No. 1112 at 6.
[23] *See* ECF No. 1102-2 at 6.

19

Property has been OxyChem's liability since at least 1986. It is not credible for OxyChem to claim it has not remained apprised of the condition of the property during that time period.

**VII.    Inclusion of Newark Bay in the Definition of the DASS Does Not Violate the Parties' Stipulation Concerning Newark Bay, as Reflected in OxyChem's Own Notices.**

OxyChem's objection to 18 topics[24] on the grounds that they implicate Newark Bay/OU3 ignores the language of the parties' stipulation regarding Newark Bay (ECF No. 1233) and OxyChem's own discovery served on Defendants. The Newark Bay stipulation does not categorically bar discovery related to Newark Bay; it merely clarifies that the parties do not seek cost recovery, contribution, allocation of costs, or declarations of liability concerning costs incurred, or to be incurred addressing the Newark Bay Study Area. Indeed, the stipulation provides that Newark Bay may be implicated in the parties' claims and defenses in this case.[25]

Moreover, the topics objected to do not directly reference Newark Bay. Rather, OxyChem's issue appears to be that these topics reference the Diamond Alkali Superfund Site or "DASS," the definition of which includes OU3/Newark Bay. *But OxyChem's own Rule 30(b)(6) notices to Defendants do the exact same thing*. OxyChem adopts EPA's definition of Diamond Alkali Superfund Site in its notices: "The former Diamond Alkali facility at 80-120 Lister Avenue in Newark, New Jersey, the Lower Passaic River Study Area (LPRSA), the Newark Bay Study Area and the areal extent of contamination."[26] OxyChem goes on to incorporate this defined term

---

[24] Topics 1.01, 1.02, 1.03, 1.04, 1.05, 1.07, 1.08, 1.10, 1.11, 1.13, 1.14, 1.18, 2.10, 2.11, 2.13, 2.14, 2.15, and 2.22

[25] ECF No. 1233 at ¶ 5.b. ("This stipulation does not amend or foreclose claims that any party's alleged liability for the claims at issue in this litigation is related to properties located at or near the Newark Bay Study Area (OU3) or any defenses thereto").

[26] *See, e.g.*, Second Am Notice of Rule 30(b)(6) Deposition of Def. MI Holdings, Inc., attached as Ex. 7, at 3.

in its notice topics.[27] Indeed, OxyChem goes even further by expressly seeking information related to Newark Bay, something SPG's notices do not do.[28] OxyChem cannot have it both ways.

## VIII. Topic 2.22 Regarding OxyChem's Involvement with the Lister Property or DASS from 1970 to Present is Temporally and Geographically Limited and Seeks Only Relevant Information.

Topic 2.22 is among the numerous topics at issue in the Letter Motion that OxyChem did not previously object to during the six-month meet-and-confer process. The Topic is temporally and geographically limited. It is limited to post-1970 conduct, carving a full 30 years of OxyChem's polluting activity at the Lister Plant out of the topic. And it is geographically limited to OxyChem's involvement at the DASS, which OxyChem has repeatedly emphasized is the appropriate geographic scope for the notice topics.

Furthermore, Topic 2.22 is similar to topics posited in OxyChem's Rule 30(b)(6) notices of Defendants. Most, if not every, Rule 30(b)(6) notice OxyChem has issued to Defendants has included a topic generally covering the Defendants' ownership and/or operation of their respective sites for lengthy periods of time, often much longer than the roughly 50-year period in Topic 2.22.[29] Once again, OxyChem cannot cry foul at discovery requests that mirror its own.

---

[27] *See id.* at Topics 15-17.

[28] *See id.* at Topic 11 ("Any discharge routes from the Jersey City Facility to the Passaic River and/or Newark Bay, including but not limited to direct stormwater outfalls, process water discharge outfalls, process sewer and storm sewers").

[29] *See, e.g.*, Topic 1 in Second Am. Notice of Rule 30(b)(6) Deposition of Def. PPG Indus., Inc., attached hereto as Ex. 8 ("The ownership and/or Operations at the Riverside Industrial Park Superfund Site during the years 1902 to 1971, including without limitation all Operations that used or produced Hazardous Substances, and the Hazardous Substances that were used or produced in those Operations.").

19885347.1

IX.    **The SPG is Entitled to Discovery Regarding OxyChem's Delay of the Cleanup and Failure to Accept Responsibility.**

Topic 1.18 seeks information regarding OxyChem's activities related to the Lister Property that may have delayed cleanup or demonstrated OxyChem's failure to take responsibility. This relates to OxyChem's efforts and activities at the Site; it goes to the Gore factor of cooperation, as it will demonstrate OxyChem seeking to blame others, confuse the science, and minimize its own responsibility. But because this topic includes "expenditures" related to such activities, OxyChem misleadingly frames the topic as having to do with costs recoverable in this case. Even though not recoverable, these expenditures are relevant because they may show (a) the lengths to which OxyChem went to avoid responsibility—a literal investment in non-cooperation, and (b) expenditure funds that otherwise could have been productively spent on the cleanup. These are relevant issues in this case because they shed light on OxyChem's cooperation—or lack thereof—not because they relate to OxyChem's alleged damages.

### CONCLUSION

For all of the foregoing reasons, OxyChem has failed to meet its burden of establishing good cause for protection from any of the topics in the SPG's Rule 30(b)(6) notices, each of which seeks inquiry that is relevant and proportional to the needs of the case.

Date: January 6, 2023                 Respectfully submitted,

                                      /s/ Jeffrey D. Talbert
                                      **PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
                                      One City Center, PO Box 9546
                                      Portland, ME 04112
                                      Telephone: 207.791.3239
                                      Jeffrey D. Talbert, Esq. (NJ ID No. 333512021)
                                      James W. Beers, Jr., Esq. (admitted *pro hac vice*)
                                      Benjamin S. Piper, Esq. (admitted *pro hac vice*)

22

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey D. Talbert, hereby certify that on January 6, 2023, I caused a copy of the

foregoing document to be served via electronic filing on all counsel of record.


Dated: January 6, 2022                    /s/ *Jeffrey D. Talbert*

**PRETI, FLAHERTY, BELIVEAU
& PACHIOS, LLP**
One City Center, PO Box 9546
Portland, ME 04112
Telephone: 207.791.3239

19885347.1